# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | Case No.: 1:25-cv-128 <br><br> **REQUEST FOR EMERGENCY TEMPORARY RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(B)** |
|     Plaintiffs, | |
|     v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; | |
|     Defendants. | |

## <u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff States move for issuance of an order temporarily restraining Defendants from implementing actions in accordance with the President's March 14, 2025 Executive Order titled "Continuing the Reduction of the Federal Bureaucracy" ("the Closure Order") as they relate to the Institute of Museum and Library Services (IMLS), the Minority Business Development Agency (MBDA), and the Federal Mediation and Conciliation Service (FMCS) pending the Court's review of the merits.

The Closure Order directed these agencies to eliminate all programs and components not mandated by statute, and to reduce their statutorily mandated functions and associated staff to the minimum required by law.  Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," § 2(a) (Mar. 14, 2025).  The President further directed the Office of Management and Budget to withhold from these agencies any funds beyond the minimum necessary to fulfill their statutory functions.  *Id.* § 2(c).  The Closure Order gave the agencies just seven days to certify their "full compliance" with this directive.  *Id.* § 2(b).

IMLS, MBDA, and FMCS implemented the Closure Order by issuing decisions ("the Closure Decisions") to dismantle their operations and cease performance of their functions, many of which are mandated by statute.  The Closure Decisions are unlawful under the Administrative Procedure Act because they are arbitrary and capricious and contrary to law.  5 U.S.C. § 706.  The Closure Order and the Closure Decisions also violate Separation of Powers principles and the Executive's duties under the Take Care Clause of the Constitution.

The Closure Order and the Closure Decisions are causing Plaintiff States immediate and irreparable harm—by eliminating millions of dollars in funding and terminating programs that benefit the States—every day they remain in effect.  The balance of the equities also weighs

overwhelmingly in Plaintiffs' favor. Plaintiff States thus respectfully request this Court schedule a hearing on this matter as soon as practicable and that the Court restrain Defendants from taking steps to shutter IMLS, MBDA, and FMCS as directed by the March 14 Executive Order.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

  I.   The Administration's Efforts to Dismantle Disfavored Federal Agencies ....................... 3

  II.  The Closure Order ................................................................................. 6

  III.  The Implementation of the Closure Order at IMLS, MBDA, and FMCS ........................ 7

      A.   Institute of Museum and Library Services ................................................. 7

      B.   Minority Business Development Agency ................................................. 11

      C.   Federal Mediation and Conciliation Service ............................................ 15

ARGUMENT ................................................................................................... 17

  I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................. 19

      A.   The Closure Decisions Violate the Administrative Procedure Act. ........................ 19

         1. The Closure Decisions Are Final Agency Actions. .................................. 19

         2. The Closure Decisions Are Arbitrary and Capricious. ............................... 20

         3. The Closure Decisions Are Contrary to Law. ...................................... 23

            a.   The Closure Decisions Are Inconsistent with the Agencies' Mandatory Statutory Duties. ........................................................................ 24

            b.   The Closure Decisions Violate Each Agency's Appropriations Statute. ........ 27

      B.   The Closure Order and the Closure Decisions Violate the Separation of Powers. .. 29

      C.   The Closure Order and the Closure Decisions Violate the Take Care Clause. ........ 31

  II.  PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INTERIM RELIEF. ......................................................................... 33

      A.   Plaintiffs Will Be Irreparably Harmed by the Termination and Delay of IMLS Funding to State Libraries and Museums. ................................................. 33

      B.   Plaintiffs Will Be Irreparably Harmed by Delays in the Disbursement of MBDA Funds and Delays in the Solicitation and Award of New MBDA Grants. .............. 36

      C.   Plaintiffs Will Be Irreparably Harmed by the Inability to Use FMCS Services to Mediate and Arbitrate Labor Disputes. ................................................. 39

  III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR INTERIM RELIEF. ........................................................................................ 42

CONCLUSION ................................................................................................. 45

## INTRODUCTION

President Trump is leading a campaign to dismantle vast swaths of the federal government. Even where Congress has codified agencies into law, given them a lengthy list of statutory responsibilities, and appropriated them funds to carry out their statutory duties, President Trump has repeatedly ordered their dissolution. That effort began with the U.S. Agency for International Development and the Consumer Financial Protection Bureau. It expanded to the Department of Education and the U.S. Institute of Peace. And it is clear that more is coming soon.

On March 14, 2025, President Trump put seven more agencies in the crosshairs. That day, he issued an executive order (the "Closure Order") directing the Institute of Museum and Library Services (IMLS), the Minority Business Development Agency (MBDA), the Federal Mediation and Conciliation Service (FMCS), and four other agencies to eliminate every one of their programs and components not mandated by statute, and to reduce their statutorily mandated functions and associated staff to the minimum required by law. Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," § 2(a) (Mar. 14, 2025). The President further directed the Office of Management and Budget to withhold from these agencies any funds beyond the minimum necessary to fulfill their statutory functions. *Id.* § 2(c). And the Closure Order gave the agencies just seven days to certify their "full compliance" with this directive. *Id.* § 2(b).

For at least three agencies, "full compliance" has meant gutting their operations— statutorily mandated or not. IMLS has placed 85% of its staff on administrative leave, dramatically curtailed its administration of hundreds of grants and grant applications, and terminated statutorily mandated grant awards to several States. MBDA has cut its staff from roughly 40 to just five individuals and effectively ceased new grant solicitations. FMCS has slashed its staff from roughly

200 to 15 or fewer individuals and announced the termination of several of its core programs, including its mediation program for public sector entities.

If permitted to stand, the shredding of these statutorily mandated agencies will inflict immediate and irreparable harms on the Plaintiff States, their citizens, and the public at large. The States rely on IMLS, MBDA, and FMCS to support their public libraries and museums, assist state entities in extending contracting opportunities to disadvantaged individuals, and prevent and resolve public-sector labor disputes involving State entities. The sudden halting of the agencies' work after decades of close cooperation will immediately put at risk hundreds of millions of dollars in grant funding on which the States depend, and undermine library programs, economic opportunity, and the free flow of commerce throughout the country.

No President has authority to unilaterally dismantle federal agencies in this way. Plaintiffs are therefore likely to succeed on the merits of their claims that the Closure Order is unlawful. The sudden demolition of IMLS, MBDA, and FMCS is the epitome of arbitrary and capricious agency action: all three agencies severely curtailed their programs and operations without providing a word of reasoned explanation, considering the States' reliance interests, assessing the available alternatives, or weighing the costs and benefits of ending their critically important work. Further, by stripping these agencies well past the studs, the Administration has flouted Congress's directives. A skeleton crew of a few staffers cannot possibly fulfill the extensive statutory responsibilities Congress has assigned these agencies. And, in their severely diminished form, these agencies cannot expend or disburse anywhere close to the hundreds of millions of dollars funds that Congress appropriated them for this fiscal year. For much the same reasons, the Closure Order and its implementing directives violate the Constitution's separation of powers, which

assigns Congress the power of the purse, and the Take Care Clause, which entrusts the President with the responsibility to faithfully carry out the laws Congress enacted.

If the President believes that the federal government should cease supporting the nation's libraries and museums, expanding economic opportunity to disadvantaged individuals, and resolving labor strife, he is free to advocate that view with Congress and the public. One option that our Constitution does not afford him, however, is to unilaterally destroy the agencies that Congress established to perform those functions. The Defendants' actions implementing the Closure Order should be enjoined, and the Court should restore the agencies that Congress designed.

## BACKGROUND

### I.    The Administration's Efforts to Dismantle Disfavored Federal Agencies

The Closure Order is one of the most recent—and among the most brazen—of a lengthening series of efforts this Administration has undertaken to dissolve federal agencies established by Congress.

The first of those efforts began within hours of the President's inauguration. That day, the President ordered a pause on all funding provided by the U.S. Agency for International Development (USAID). *See* Exec. Order. No. 14,169, "Reevaluating and Realigning United States Foreign Aid." (Jan. 20, 2025). Shortly thereafter, the Administration attempted to fire or put on leave thousands of USAID workers, close the agency's headquarters, and cancel the bulk of its $40 billion in contracts and grants. Compl. ¶ 43. One court has enjoined these efforts in part, finding a likelihood of success on plaintiffs' claims that the Administration lacked a reasoned basis for categorically suspending the agency's foreign aid programs, and that the Administration violated the separation of powers by refusing to spend the funds that Congress appropriated. *Aids*

3

*Vaccine Advoc. Coal. v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 752378, at *10-11, *14-17 (D.D.C. Mar. 10, 2025).[1]

The Administration next attempted to kneecap the Consumer Financial Protection Bureau (CFPB).  On February 10, the Acting Director of the CFPB ordered all employees to stop work and engaged in "a hurried effort to dismantle and disable the agency entirely—firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force ('RIF') that would cover everyone else."  *Nat'l Treasury Emps. Union v. Vought*, --- F. Supp. 3d ---, 2025 WL 942772, at *1 (D.D.C. Mar. 28, 2025).  A district court enjoined those efforts, holding that the Administration's attempt to shut down an agency created by statute was likely unconstitutional and contrary to law.  *Id.* at *20, *40.

On February 11, the Administration made clear that its demolition campaign would extend throughout the federal government.  That day, the President issued an executive order directing every federal agency to "submit a plan to reduce the size of the Federal Government's workforce," and to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)."  Exec. Order. No. 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," § 3(a), (c) (Feb. 11, 2025).  He required these RIFs to prioritize the elimination of "[a]ll offices that perform functions not mandated by statute or other law."  *Id.* § 3(c).  The Office of Management and Budget and the Office of Personnel Management

---

[1] In a separate suit, the District Court for the District of Maryland held that the Department of Government Efficiency (DOGE) unlawfully directed the closure of USAID and issued a preliminary injunction ordering DOGE officials to reverse the closure.  *See Does 1-26 v. Musk*, No. 15-0462, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025).  The Fourth Circuit stayed the district court's injunction because it concluded DOGE was likely not a proper defendant. *Does 1-26 v. Musk*, No. 25-1273 (4th Cir. Mar. 28, 2025).  Judge Gregory wrote separately to explain that, while he agreed DOGE was likely not a proper defendant, the Administration's "actions in closing USAID" were "likely unconstitutional."  *Id.* at 16 (Gregory, J., concurring only in the result).

issued a companion memorandum emphasizing that agencies should "focus on the maximum elimination of functions that are not statutorily mandated."[2]

On February 19, the President targeted four more federal agencies for elimination. In an order entitled "Commencing the Reduction of the Federal Bureaucracy," Exec. Order. No. 14,217, § 1 (Feb. 19, 2025), he instructed four federal entities, including the U.S. Institute of Peace, to eliminate their "non-statutory components and functions," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a). Since then, the Administration has taken aggressive steps to shut down the Institute of Peace: it has fired all of the voting members of the Institute's Board, replaced its president, and enlisted the aid of law enforcement to remove the Institute's staffers from its headquarters. Compl. ¶ 46.

The President has also undertaken aggressive efforts to abolish the Department of Education. On March 11, the Department of Education announced a nearly 50% cut to its workforce. *Id.* ¶ 47. And on March 20, President Trump issued an executive order directing the Secretary to "facilitate the closure of the Department of Education and return authority over education to the States and local communities." Exec. Order No. 14,242, "Improving Education Outcomes by Empowering Parents, States, and Communities," § 2(a) (Mar. 20, 2025). The Plaintiff States have filed suit to challenge that closure and the resulting RIF. *See New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.).

---

[2] *See* Memorandum for Heads of Executive Agencies and Departments, from Russell T. Vought, Director, Office of Management and Budget, and Charles Ezell, Acting Director, Office of Personnel Management, "Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative*," at 2 (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

## II.    The Closure Order

On March 14, the President ordered the dismantling of seven more agencies.  That day, he issued the Closure Order, formally entitled "Continuing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14,238 (Mar. 14, 2025).  In terms nearly identical to the order that led to the forcible takeover of the Institute of Peace, the order directs seven congressionally created agencies, including the Institute of Museum and Library Services, the Minority Business Development Agency, and the Federal Mediation and Conciliation Service,[3] to eliminate their non-statutorily mandated functions "to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  *Id.* § 2(a).  The Closure Order provides that "[i]n reviewing budget requests submitted by" the entities, "the Director of the Office of Management and Budget . . . shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order."  *Id.* § 2(c).  And it requires the heads of these entities to submit "[w]ithin 7 days . . . a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent."  *Id.* § 2(b).

Within one day of the President's signing of the Closure Order, Congress passed, and the President signed, a continuing resolution funding the government through September 30, 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025)

---

[3] The other agencies, which are not the subject of this lawsuit, are the Community Development Financial Institutions Fund, the United States Interagency Council on Homelessness, the United States Agency for Global Media, and the Woodrow Wilson International Center for Scholars in the Smithsonian Institution.

("Continuing Appropriations Act"). That statute maintains funding for every agency subject to the Closure Order at the same level as they were funded in fiscal year 2024.

### III. The Implementation of the Closure Order at IMLS, MBDA, and FMCS

In the two weeks since it was issued, the Closure Order has already resulted in the devastation of IMLS, MBDA, and FMCS. Each of these agencies was established by Congress, has a detailed list of statutory duties, and was appropriated funds by Congress—often numbering in the hundreds of millions of dollars—as recently as March 15. Nonetheless, each of these agencies has made a final decision (the "Closure Decision") to implement the Closure Order and to eliminate the vast majority of its programs, operations, and personnel.

#### A. Institute of Museum and Library Services

1. The Institute of Museum and Library Services is the primary federal agency responsible for supporting the country's museums and libraries through grantmaking, research, and policy development.[4] Although funding for IMLS only constitutes 0.0046% of the federal budget, IMLS provides critical resources to libraries and museums across the United States.[5]

Congress established IMLS in the Museum and Library Services Act of 1996. Pub. L. 104-208, 110 Stat. 3009 (1996). It has reauthorized and extended the Institute three times since then—most recently in a law signed by President Trump in 2018. *See* Museum and Library Services Act of 2018, Pub. L. 115-410, 132 Stat. 5412 (2018) (codified at 20 U.S.C. §§ 9101 *et seq.*). The current reauthorization of the Institute extends until September 30, 2025.

By statute, IMLS is required to have both an Office of Museum Services and an Office of Library Services. 20 U.S.C. § 9102. It is required to engage in regular research and data collection

---

[4] Institute of Museum and Library Services, FY 2022–2026 Strategic Plan, at 3, https://www.imls.gov/sites/default/files/2022-02/imls-strategic-plan-2022-2026.pdf
[5] American Alliance of Museums, *AAM Statement on the Placing of IMLS Staff on Administrative Leave* (Mar. 31, 2025), https://www.aam-us.org/2025/03/31/aam-statement-on-the-placing-of-imls-staff-on-administrative-leave/.

to "extend and improve the Nation's museum, library, and information services." *Id.* § 9108. And it is charged with supporting museums and libraries across the States by disbursing and expending appropriated funds and providing other forms of assistance. *Id.* §§ 9121-9165 (libraries), 9171-9176 (museums).

IMLS's largest funding program—and the largest source of federal funding for library services—is the Grants to States Program. 20 U.S.C. § 9133(a). Under this program, IMLS awards a formula grant directly to State library administrative agencies to advance eight enumerated purposes, including expanding library services and access; improving librarian training, professional development, and recruitment; and targeting library services to diverse communities. *Id.* § 9141(a)(1)-(8). To obtain the funds, States must submit five-year plans. *Id.* § 9134(a). After a plan has been approved, IMLS pays each State the Federal share of the activities in the plan, which is 66%. *Id.* § 9133(b). All 50 States and the District of Columbia receive these grants from the IMLS.[6] Prior to the implementation of the Closure Order, the Grants to States program was administered by four program officers and one supervisor. *See* Blake Doe Decl. ¶ 17, Ex. 40.

IMLS also administers a variety of competitive grant programs for libraries and museums.[7] Its competitive grant programs for libraries include the Native American and Native Hawaiian Library Services Grants, which are awarded to eligible communities to establish, sustain, and improve library services, 20 U.S.C. § 9161; the National Leadership Grants for Libraries Program, which support projects that strengthen, develop, or enhance library services, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program grants, which support projects to recruit the next generation of librarians, including librarians from diverse and underrepresented backgrounds,

---

[6] Institute of Museum and Library Services, *Grant Programs*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs (last visited Apr. 4, 2025).
[7] *Id.*

*id.* § 9165(a)(1)-(3). Its competitive grant programs for museums include Museums for America grants, which support individual museums' abilities to serve the public through programs, exhibits, professional development, and collections management,[8] and the Native American/Native Hawaiian Museum Service grant, which support Native tribes and organizations that primarily serve and represent Native groups.[9] And IMLS administers grants and programs under the National Museum of the American Latino Act, 20 U.S.C. § 80u(f)(2), and the National Museum of African American History and Culture Act, *id.* § 80r-5(b).

IMLS also runs several other programs to support libraries and museums. IMLS's Office of Research and Evaluation conducts ongoing research and collects and disseminates data annually to the public to improve the nation's museum, library, and information services. Compl. ¶ 79. In 2014, IMLS launched Museums for All, a national access initiative under which visitors who receive Supplemental Nutrition Assistance Program benefits are eligible for deeply discounted or free admission to more than 1,400 museums throughout the United States.[10] In 2024, IMLS launched InformationLiteracy.gov, a website designed for museum and library professionals and community-based organizations to provide resources and training on a variety of information literacy subject areas.

As of March 14—the day President Trump issued the Closure Order—IMLS had a staff of approximately 77. In the 2025 continuing resolution, Congress appropriated IMLS $294.8 million for Fiscal Year 2025. *See* Full-Year Continuing Appropriations and Extensions Act,

---

[8] Institute of Museum and Library Services, *Museums for America*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/museums-for-america (last visited Apr. 4, 2025).
[9] Institute of Museum and Library Services, *Native American/Native Hawaiian Museum Services*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/native-american-native-hawaiian-museum-services (last visited Apr. 4, 2025).

[10] Museums for All, *About*, https://museums4all.org/about/ (last visited Apr. 4, 2025).

2025, Pub. L. No. 119-4, § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 div. D (2024).

2.  Shortly after issuance of the Closure Order, IMLS leadership held an agency-wide town hall in which agency leadership notified employees that they anticipated IMLS might be stripped "down to the studs."  Blake Doe Decl. ¶ 6, Ex. 40.  Agency leadership told employees to assume that they would soon be dismissed, and that a RIF plan would be implemented soon thereafter.  *Id.*

The expected closure occurred on March 31.  That day, the agency's Director of Human Resources informed staff that the entirety of IMLS would be placed on leave and that all grants would be terminated, with the potential exception of the Grants to States Program.  *Id.* ¶ 11.  (That "potential" exception quickly turned out to be not much of one.  *See infra* p. 14.)  The Director of Human Resources also advised that all but a handful of staff members should expect a RIF within 30 days or less.  *Id.*  The same day, IMLS sent an email to state librarians informing them that "IMLS received word that all staff are going to be placed on administrative leave," and that staff accordingly would "not be able to work or respond to your emails."  Compl. Ex. B (IMLS Email).

On April 1, IMLS recalled 12 staff members from administrative leave.  Blake Doe Decl. ¶ 15, Ex. 40.  This skeleton crew is not capable of processing new grant applications or servicing existing grants.  *Id.* ¶ 16.  Prior to March 31, 35 employees administered the agency's grant programs, of whom five were specifically responsible for administering the Grants to States Program.  *Id.* ¶ 17.  As of April 1, only four employees with experience administering grants are not on administrative leave, of whom only one administered the Grants to States Program.  *Id.* ¶ 20.  In addition, because none of the twelve employees works in IMLS's Office of Research and Evaluation, it appears that this office effectively no longer exists.  *Id.* ¶ 22.

On April 2, the Administration's assault on this agency's work continued. That day, Washington's State Librarian received notification from the Acting Director of IMLS, Keith Sonderling, that the State's $3,948,629 "Grants to States" award had been terminated effective April 1, because it was "inconsistent with IMLS' priorities" and because the cancellation was "mandate[d]" by the President's Executive Order. Jones Decl. ¶ ¶ 10-12, Ex. 34. The State Libraries of California and Connecticut received similar notices on April 2 informing them that California's $15.7 million and Connecticut's $2.1 million "Grants to States" awards were terminated. Lucas Decl. ¶ 17, Ex. 3; Schander Decl. ¶¶ 16, 31-33, Ex. 4. At the time of cancellation, nearly $3.4 million remained under California's award, and $984,000 under Connecticut's award, that had not yet been disbursed. Lucas Decl. ¶ 18, Ex. 3; Schander Decl. ¶ 22, Ex. 4.

On April 3, 2025, the President began dismantling the Board of the IMLS. For example, Annie Norman, the State Librarian of Delaware, received an email from the Deputy Director of Presidential Personnel terminating her Board membership, notwithstanding the fact that she had been reappointed to a new five-year term in December 2024. *See* Norman Decl. ¶ 3, Ex. 5.

### B.    Minority Business Development Agency

1. The Minority Business Development Agency is an agency within the Department of Commerce whose purpose is "to promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs."[11] Initially created in 1969 by Executive Order 11,458 (Mar. 7,

---

[11] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 16 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

1969), the MBDA was authorized by statute in 2021.[12]  *See* Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (2021) (MBD Act), *codified at* 15 U.S.C. § 9501 et seq.  By law, the Under Secretary of Commerce for Minority Business Development heads the MBDA.  15 U.S.C. § 9502(b)(1).

MBDA's principal statutory responsibility is to provide financial support to MBDA Business Centers—public-private partnerships that help minority business enterprises access capital and contracting opportunities, provide counseling and technical assistance to minority business enterprises, and otherwise facilitate the growth of such enterprises.  15 U.S.C. §§ 9522, 9523(a)(1)-(3); *see id.* § 9524(a)(1)(A).  The MBDA Office of Business Centers is administered by a Director, *id.* § 9502(d)(2), and is required to have "a regional office . . . for each of the regions of the United States," *id.* § 9502(e)(2)(A).

As of 2024, MBDA funded 41 MBDA Business Centers in 34 states and territories.[13] MBDA Business Centers are essentially business consultancies that support the growth of Minority Business Enterprises ("MBEs") by offering analytics, networking opportunities, and trainings. Many business centers are operated by state governments or their instrumentalities, including New Mexico, Connecticut, Hawaiʻi, and Maryland. *See* Compl. ¶ 82.

MBDA also funds a number of specialty centers.  As of 2024, it funded 21 MBDA Rural Business Centers, which focus on assisting minority business enterprises in rural areas; four MBDA Advanced Manufacturing Centers, which aim to help manufacturers or domestic products; four MBDA Export Centers, which are dedicated to expanding access to global markets; and a

---

[12] *See* Cong. Rsch. Serv., R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 5 (2024), https://www.congress.gov/crs-product/R46816.

[13] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 18–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

Federal Procurement Center, which is designed to increase federal procurement and acquisition opportunities for minority business enterprises.[14]

The MBD Act also authorizes the Under Secretary to establish several other programs. She "shall, whenever the Under Secretary determines such action is necessary or appropriate," (1) provide financial assistance directly or indirectly to minority business enterprises, (2) establish programs to encourage minority business enterprises to establish joint ventures and projects, and (3) engage in joint efforts with private and public sector entities to advance the growth of minority business enterprises. 15 U.S.C. §§ 9511(1)-(3), 9523(a)(1)-(3). Using this authority, MBDA has established several projects and programs to assist minority business enterprises. In 2024, these projects supported entrepreneurship education for formerly incarcerated persons, programs at minority colleges and universities, and American Indian, Alaska Native, and Native Hawaiian MBEs.[15]

In addition to providing financial assistance, MBDA is also required to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id.* § 9513(a)(1)(C). In Fiscal Year 2023, the MBDA reported that its projects and programs served more than 2,000 MBE clients, produced more than $5.4 billion in economic benefit to MBEs, and contributed to MBEs creating nearly 19,000 jobs.[16]

President Trump has repeatedly attempted to eliminate or gut MBDA. During President Trump's first term, he proposed to eliminate MBDA and requested a $6 million budget "to be used

---

[14] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 16–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.
[15] *Id.* at 20-21.
[16] *Id.* at 8, 57, 59.

to close out the agency" in fiscal year 2018.[17]   The Trump Administration's Fiscal Year 2019, 2020, and 2021 budget requests all proposed to reduce MBDA's budget to approximately $10 million. Congress declined these requests and appropriated $39 million, $40 million, $52 million, and $70 million, respectively, in each of these years.[18]

For Fiscal Year 2025, the Continuing Appropriations Act reappropriated $68,250,000 to MBDA.  *See* Continuing Appropriations Act § 1101(a)(2); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, 138 Stat. 25, 123 (2024).  As of March 14, MBDA employed approximately 49 full-time personnel.[19]

2.  Shortly after issuance of the Closure Order, MBDA placed all but five of its employees on paid administrative leave.  Alex Doe Decl. ¶ 5, Ex. 41.  The remaining employees are the Deputy Under Secretary of Commerce for Minority Business Development, the Chief Operating Officer, the Chief of the Office of Legislative, Education, and Intergovernmental Affairs, a senior advisor, and a budget analyst.  *Id*.  MBDA subsequently announced that it was initiating a RIF, which will likely result in the termination of all but three employees currently on administrative leave.  *See* Compl. Ex. C (MBDA Union Notice).

The remaining five employees working at the MBDA are not capable of carrying out the MBDA's statutorily mandated functions, administering its existing programs, or spending its appropriated funds. Alex Doe Decl. ¶ 7, Ex. 41. This skeletal staff is not sufficient to adequately monitor the existing portfolio of more than 100 grants or issue new grant awards in a timely manner.  *Id.* ¶¶ 9-10, 11.  Furthermore, all of the agency's existing grants will expire on June 30 or August 30, and the agency has not yet posted any new grants solicitations.  *Id.* ¶ 11.  The

---

[17] *See* Cong. Rsch. Serv., R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 31 (2024), https://www.congress.gov/crs-product/R46816.
[18] *Id.* at 31, 33.
[19] *Fiscal Year 2025 Congressional Justification* at 46.

remaining staff of five employees cannot feasibly award new grants before many of the existing grants terminate, or in time to expend all of the remaining funds appropriated to the agency for fiscal year 2025. *Id.* ¶ 11. And the many state grantees who have obligated funds under these grants are at serious risk of being reimbursed belatedly or not at all. *See infra* pp. 38-40.

MBDA has also taken other steps to effectively close the agency. It has allowed the contract that enables it to manage information for existing grantees to expire. Alex Doe Decl. ¶ 13, Ex. 41. It has terminated a number of agency programs and activities, including its Minority Business Center Advisory Council. *Id.* And it has placed on leave all staff responsible for its informational clearinghouse—a statutorily mandated activity to collect and share data on minority business enterprises. *Id.*

### C.    Federal Mediation and Conciliation Service

1. The Federal Mediation and Conciliation Service is the federal agency responsible for "assisting parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation."[20] 29 U.S.C. § 173(a). Congress established FMCS in the Taft-Hartley Act of 1947. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202.

By statute, FMCS is required to perform several functions related to the resolution of labor disputes. It provides labor mediation and conciliation services "to assist parties to labor disputes affecting commerce to settle such disputes." 29 U.S.C. § 173(a)-(c). It conducts grievance mediations "as a last resort in exceptional cases" to resolve grievance disputes arising out of the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). And it "encourage[s] and support[s] the establishment of joint labor management activities." 29 U.S.C. § 173(e).

---

[20]    FMCS, "Fast Facts about the Agency" (updated Jan. 2024), https://www.fmcs.gov/wp-content/uploads/2024/02/FMCS-Fast-Facts-FY23-update-Jan-2024.pdf.

FMCS also provides a variety of other services to promote the peaceful resolution of labor disputes.  It appoints arbitration panels and arbitrators; conducts skills development and conflict resolution training; and verifies signed union authorization cards when employers agree to use that method to recognize a union.  Compl. ¶ 121.  Upon information and belief, FMCS generally provides its mediation services and its educational and training services at no cost to the recipients, and it provides its arbitration panels and arbitrators to the parties at a below-market cost.[21]  *Id.*

FMCS is headquartered in the District of Columbia and has nine field offices and dozens of home offices located throughout the nation.  In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases; conducted 1,477 single or multi-day training and intervention panels; provided 10,004 arbitration panels; and appointed 4,350 arbitrators.[22]  States regularly rely on FMCS's services: many State laws require FMCS to mediate public-sector dispute; dozens of States have collective bargaining agreements that call for FMCS to mediate or arbitrate disputes; and States often select FMCS as a mediator because it is a neutral, experienced third party that provides its services at minimal or no cost.  *See infra* pp. 41-42.

Congress appropriated FMCS $53,705,000 for Fiscal Year 2025.  *See* Continuing Appropriations Act § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, 138 Stat. 460, 697 (2024).  Prior to March 14, FMCS had approximately 200 employees.  *See* Burgess Decl. ¶ 4, Ex. 42.[23]

2. FMCS has gutted its staff and severely curtailed its operations in response to the Closure Order.  On March 18, 2025, FMCS sent a memorandum to its staff announcing a list of

---

[21] Federal Mediation & Conciliation Service, *FAQs*, https://www.fmcs.gov/resources/faqs/#cbm-faqs.
[22] FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.
[23] *Id.*

"Operational Adjustments" that were "Effective Immediately." *See* Compl. Ex. D (FMCS Memo). In particular, the memorandum announced that the agency would conclude "all Public Sector work" as of April 18, 2025. *Id.* Further, the memorandum provided that no new grievance mediation cases would be accepted, and that "[a]s of March 14 all [grievance mediation] cases should be complete." *Id.* It also provided that no new in-person Education, Advocacy and Outreach meeting should be scheduled; that no new card checks would be accepted; and that as of March 14, 2025, all card checks cases should be complete. *Id.* As a result of this memorandum, FMCS has ceased all work assisting in mediating disputes in the public sector. Thornton Decl. ¶ 15, Ex. 39.

On March 26, 2026, FMCS informed its staff that nearly all employees would be placed on administrative leave, effective the following day.[24] Only approximately 10-15 employees, all located in the agency's DC headquarters, were permitted to continue working. *See* Vaile Decl. ¶ 17, Ex. 26. Because the agency has only a "skeleton crew," "[n]early all of services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided."[25] Some unions have been told that FMCS "is basically being shut down." Thornton Decl. ¶ 19, Ex. 39. The agency has initiated a RIF to terminate all but 15 of the employees remaining at the agency. *See* Burgess Decl. ¶ 7, Ex. 42.

## ARGUMENT

Section 705 of the APA provides that a "reviewing court" may issue equitable relief "to postpone the effective date of an agency action or to preserve status or rights pending conclusion

---

[24] *See* Fed. News Network, *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton-crew/
[25] *Id.*

of the review proceedings." 5 U.S.C. § 705. The court may also issue a temporary restraining order to preserve the status quo pending review. *See New York v. Trump*, --- F. Supp. 3d ---, 2025 WL 357368, at *1 (D.R.I. Jan. 31, 2025). The factors governing both forms of interim relief are the same: (1) likelihood of success on the merits, (2) potential for irreparable injury; (3) balance of the relevant equities; and (4) the effect on the public interest. *Id.*; *see Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

All of these factors weigh heavily in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits because each agency's Closure Decision is textbook arbitrary and capricious agency action; because the Closure Decisions contravene each agency's statutory obligations and flout their governing appropriations; and because the Closure Order and the Closure Decisions violate the separation of powers and the Take Care Clause. The dissolution of these agencies also inflicts immediate, irreparable harm on the Plaintiff States. IMLS has already begun terminating or delaying the payment of funds that States need to operate their libraries and museums; MBDA has proven itself incapable of timely disbursing existing grant awards or soliciting new ones; and States were actively relying on FMCS mediation services the time the Closure Decision was issued. Furthermore, the public interest in preserving federal support for libraries and museums, disadvantaged business enterprises, and peaceful resolution of labor disputes outweighs the Administration's interest in continuing its lawless campaign to shutter agencies established by Congress.

18

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  The Closure Decisions Violate the Administrative Procedure Act.

#### 1.  The Closure Decisions Are Final Agency Actions.

The Closure Decisions are "final agency actions" subject to review under the Administrative Procedure Act (APA).  5 U.S.C. § 704.  The APA's definition of "agency action" "cover[s] comprehensively every manner in which an agency may exercise its power."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *see* 5 U.S.C. § 551(13).  And an action is "final" if it (1) concludes an agency's decision-making process and (2) determines rights or obligations or imposes legal consequences.  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).

The Closure Decisions mark the conclusion of each agency's process of deciding how to comply with the Closure Order and curtail its operations.  Each of the seven agencies listed in the Closure Order was required to certify that it was in "full compliance" with the Closure Order as of March 21.  Closure Order § 2(b).  And IMLS, MBDA, and FMCS have each carried out that directive by dramatically cutting their programs and staff.  IMLS has slashed its staff by 85%, informed grant recipients that its employees would no longer be able to "work or respond to emails," left in place a skeleton crew unable to monitor existing grants or handle new grant applications, and terminated multiple existing grants.  Blake Doe Decl. ¶ 13, Ex. 40; Compl. Ex. B (IMLS Email).  MBDA has cut its staff from approximately 40 to 5, discontinued new grant solicitations, emptied the office responsible for its information clearinghouse, and "effectively closed the agency."  Alex Doe Decl. ¶ 14, Ex. 41.  And FMCS has cut its staff from approximately 200 to 15 and announced that it is halting several of its core programs, including public sector cases, grievance mediations, and education, advocacy, and outreach.  Compl. Ex. D (FMCS Memo); Burgess Decl. ¶¶ 4, 7, Ex. 42.

19

These decisions will plainly determine "rights and obligations" and have "legal consequences." *Bennett*, 520 U.S. at 178. IMLS and MBDA have halted grant solicitation and gutted offices that are necessary for the agencies to award hundreds of millions of dollars in funding to States and private entities. *See* Alex Doe Decl. ¶13, Ex. 41; Blake Doe Decl. ¶ 21, Ex. 40. FMCS has flatly stated that it will cease providing entire classes of services to States and the public. Compl. Ex. D (FMCS Memo). Each agency has also placed most of its workforce on administrative leave—immediately depriving them of access to email and locking them out of their offices—and initiated large-scale reductions in force. *See* Alex Doe Decl. ¶¶ 5, 6, 13, Ex. 41; Blake Doe Decl. ¶ 12, Ex. 40; Compl. Ex. C (MBDA Union Notice); Burgess Decl. ¶¶ 4-7, Ex. 42. By terminating large portions of what these agencies do, these decisions will have legal consequences for program beneficiaries, employees, and the public at large. They are therefore final and subject to review under the APA. *See Biden v. Texas*, 597 U.S. 785, 807 (2022) (holding that "attempt[] to terminate" programming constituted "final agency action"); *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945867, at *4-5 (S.D.N.Y. Mar. 28, 2025) (holding that the U.S. Agency for Global Media's implementation of the Closure Order constituted final agency action).

### 2. *The Closure Decisions Are Arbitrary and Capricious.*

The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015) and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When

an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020); *see Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, --- S.Ct. ---, 2025 WL 978101, at *13 (U.S. Apr. 2, 2025) (describing the "change-in-position doctrine"). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

All three agencies flunk this standard at the threshold. IMLS, MBDA, and FMCS have terminated vast swathes of their existing programs and operations—they have shut down core functions, *see* Compl. Ex. D (FMCS Memo), eliminated established components, *see* Alex Doe Decl. ¶ 13, Ex. 41, ended significant funding opportunities, *see* Blake Doe Decl. ¶ 16, Ex. 40, and reduced their staffs to caretaker crews incapable of carrying out basic agency functions. Yet the agencies have not attempted to offer *any* reasoned explanation for these consequential decisions. For example, in its memorandum informing employees that they would be placed on administrative leave, IMLS simply stated that this action was being "taken to facilitate the work and operations of the agency." *See* Compl. Ex. A (IMLS HR Letter). Similarly, in its memorandum terminating core agency programs, FMCS did nothing more than cite the Closure Order's directive to "perform only statutorily mandated functions." Compl. Ex. D (FMCS Memo). And MBDA has yet to publicly acknowledge, let alone explain, the gutting of its staff and programs. The APA requires an agency to "explain 'why it chose to do what it did,'" and these sorts of "conclusory statements"—or, in MBDA's case, no statement at all— "will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citations omitted).

21

Moreover, there was much for the agencies to consider before shuttering their offices and programs. Prior to selecting this course of action, the agencies should have assessed the degree to which program beneficiaries—libraries, museums, business centers, contractors, labor unions, States and local governments, to name just a few—relied on the services and funding these agencies provided and would be detrimentally affected by the sudden elimination of so many of the agencies' programs and personnel. *Regents*, 591 U.S. at 33. The agencies should have assessed the available alternatives to complete termination of these programs: phasing programs out gradually, for instance, or consolidating components to achieve efficiencies. *Id.* at 30. In addition, they should have weighed the purported benefits of elimination against the many apparent costs, such as the impairment of the agencies' ability to facilitate the mediation of labor disputes, support minority business enterprises, or enhance the programming provided by the nation's libraries and museums. *See Michigan*, 576 U.S. at 753 ("reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions"). The agencies considered none of these things, however. And "[t]he reviewing court . . . 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Indeed, it is not surprising that the Closure Decisions lacked any reasoned explanation. The Closure Order on its face directed the agencies to engage in arbitrary and capricious action: it instructed IMLS, MBDA, FMCS, and four other agencies that their "non-statutory components and functions . . . *shall* be eliminated" and that the agencies "*shall* reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law," for no reason other than that "the President has determined [they] are unnecessary"—that is, for no reason at all. Closure Order § 2(a) (emphases added). It then required them to certify "full

compliance" with these directives within *one week*. *Id.* § 2(b). These directives left no room for the agencies to engage in reasoned analysis, assess alternatives, consider reliance, or do anything but eliminate their discretionary programs and gut their remaining operations. The agencies understood the President's directive as just such a result-oriented command. *See* Compl. Ex. A (FMCS Memo) (stating that, pursuant to the Closure Order, "we are required to perform only statutorily mandated functions"); Lucas Decl. ¶ 19, Ex. 3 (terminating grants on the ground that the Closure Order "mandates that the IMLS eliminate all non-statutorily required activities and functions"). But—needless to say—the President does not have the power to order agencies to disregard the APA. *See In re United Mineworkers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order").

*Regents* provides a helpful point of comparison. In that case, the Supreme Court held that the Department of Homeland Security violated the APA when it terminated a single discretionary program—Deferred Action for Childhood Arrivals (DACA)—without considering alternatives to total rescission or taking into account the legitimate reliance interests of DACA recipients, States, and other entities. *Regents*, 591 U.S. at 20-33. In this case, the President has ordered *seven* agencies to eliminate *all* of their discretionary programs—and to gut their statutory programs, as well—in a matter of days. Three agencies have complied with that command without offering a word of reasoned explanation. The APA violation is inescapable, and the Closure Decisions are unlawful on that basis alone.

### 3.  The Closure Decisions are Contrary to Law.

The Closure Decisions are also inconsistent with the statutory requirements and appropriations laws that each agency is obligated to follow. *See* 5 U.S.C. § 706(1), (2)(A)

(directing courts to "compel agency action unlawfully withheld" and "set aside agency action . . . not in accordance with law").  IMLS, MBDA, and FMCS were all created by statute and vested with a lengthy list of statutory responsibilities.  The same day that the President signed the Closure Order, Congress passed—and the President subsequently signed—a law appropriating each agency tens of millions of dollars to continue operating through the end of the Fiscal Year 2025. The Closure Decisions violate these congressional enactments in two respects: first, they disable the agencies from carrying out many of their statutory responsibilities; and, second, they render the agencies unable to spend the funds Congress appropriated.

> a. The Closure Decisions are Inconsistent with the Agencies' Mandatory Statutory Duties.

It is well-settled that federal agencies are "creatures of statute," *Nat'l Fed. of Indep. Bus. v. Dep't of Labor, Occupational Safety and Health Admin.*, 595 U.S. 109, 117 (2022), and that they "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.); *see City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013))).  The Closure Decisions flout this basic principle by disabling IMLS, MBDA, and FMCS from fulfilling a long litany of statutory duties that Congress assigned them.

IMLS, for example, is responsible for administering the Grants to States Program—work that, by statute, includes evaluating 59 State and territorial plans each year, 20 U.S.C. § 9134(e)(1), "immediately notify[ing]" jurisdictions of noncompliant plans, *id.* § 9134(e)(3)(A), providing jurisdictions "technical assistance" to help bring them into compliance, *id.* § 9134(e)(3)(C), distributing funding in accordance with the plan, *id.* § 9133(a), and monitoring states to ensure

they are making appropriate expenditures (and taking appropriate corrective measures if they are not), *id.* § 9133(c). Congress also required IMLS to administer a series of competitive grant programs each year, including the Native American and Native Hawaiian Library Services Grant Program, 20 U.S.C. § 9161, the National Leadership Grants for Libraries Program, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program, *id.* § 9165(a)(1)-(3). Congress also made the agency responsible for administering grants and programs relating to the National Museum of the American Latino, *id.* § 80u(f)(2), and the National Museum of African American History and Culture, *id.* § 80r-5(b). And, among still other responsibilities, Congress instructed IMLS to engage in regular research and data collection to "extend and improve the Nation's museum, library, and information services." *Id.* § 9108.

IMLS ordinarily carries out these responsibilities with a staff of 77, approximately 35 of whom are assigned to administer its grants programs. Blake Doe Decl. ¶¶ 17, Ex. 40. It is not possible for the agency to fulfill all of this work with a barebones crew of twelve. *Id.* ¶ 21. At any given time, there are hundreds of grants at some point in the award lifecycle. *Id.* ¶ 18. Twelve individuals, most of whom are not experienced with grants administration, cannot fulfill the agency's statutory obligation to review applications, assist applicants, issue awards, monitor the use of funding, and take corrective action as to all of those grants. *Id.* ¶ 21. And IMLS has made clear that they will not: it has told employees that it will terminate existing grants and stop awarding new ones, *id.* ¶ 11; it has told state agencies that its employees will no longer communicate with them, Compl. Ex. B (IMLS Email); and it has already terminated mandatory statutory grants to three States, *see* Jones Decl. ¶¶ 10-12, Ex. 34; Lucas Decl. ¶ 17, Ex. 3; Schander Decl. ¶¶ 16, 31-33, Ex. 4. Furthermore, because the agency has emptied its Office of Research

and Evaluation, it will be impossible for the agency to engage in the regular research and data collection the statute requires. *See* 20 U.S.C. § 9108.

MBDA's position is similar. Congress has instructed that the agency "shall" provide financial awards and technical assistance to MBDA business centers, 15 U.S.C. § 9523(a)(3), and laid out criteria the agency must use in awarding funds, *id.* § 9524. It required MBDA to establish a "regional office for each of the regions of the United States," *id.* § 9502(e)(2)(A), and listed the "Duties" of each of those offices, which include outreach, cooperation, and information-gathering, *id.* § 9502(e)(2)(B). Further, Congress required MBDA to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id.* § 9513(1)(C).

MBDA cannot perform these duties with a staff of five individuals. Alex Doe Decl. ¶¶ 7, 9 -11, Ex. 41. This tiny staff—approximately 7% of the workforce for which the agency is budgeted—is incapable of monitoring existing grants for compliance or awarding new grants in a timely manner. *Id.* ¶¶ 4, 10-12. In addition, MBDA has simply stopped performing several of its statutory duties: it has ceased putting out new grant solicitations, performing statutorily mandated data-collection, or engaging in required communications with MBDA centers. *Id.* ¶ 13; Lundy Decl. ¶ 17, Ex. 12. And its five employees, by operation of simple arithmetic, cannot staff a "regional office for each of the regions of the country." 15 U.S.C. § 9502(e)(2)(A).

FMCS has likewise abandoned its statutory responsibilities. Congress "directed" FMCS to "make its conciliation and mediation services available in the settlement of . . . grievance disputes" arising out of the application or interpretation of an existing collective-bargaining agreement. 29 U.S.C. § 173(d). And Congress made it "the duty of the Service, in order to prevent

or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." *Id.* § 173(a). FMCS has explicitly made its grievance mediation services *un*available as of March 14, no matter the circumstances. *See* Compl. Ex. D (FMCS Memo) ("No new GM cases will be accepted. As of March 14 all GM cases should be complete."). And FMCS has so dramatically cut its staff—from approximately 200 employes down to 15—that it cannot possibly provide conciliation services at anything approaching the volume or frequency necessary to fulfill its statutory mission. *See* Kadish Decl. ¶ 11, Ex. 14.

> b. The Closure Decisions Violate Each Agency's Appropriations
> Statute.

The Executive Branch may not "spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.); *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."). This foundational separation-of-powers principle is reflected in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. And it has been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id.* § 684(b).

In recent months, several courts—including this one—have been confronted with challenges to Congress's primacy over appropriations. Each time, they have reaffirmed the Executive's obligation to spend money appropriated by Congress. *See, e.g.*, *New York v. Trump*,

--- F. Supp. 3d ---, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025) (holding that "[t]he Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct constitutional roles of each branch of our government"), *stay pending appeal denied*, --- F.4th ---, 2025 WL 914788 (1st Cir. Mar. 26, 2025); *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, --- F. Supp. 3d ---, 2025 WL 752378, at *17 (D.D.C. Mar. 10, 2025) (holding that the Executive's refusal to expend appropriated foreign aid funding intruded on "Congress's own, core constitutional power to determine *whether and how much* money is spent").

This case presents a variant on this increasingly familiar theme.  On March 15, 2025, the day after issuing the Closure Order, the President signed the Continuing Appropriations Act, by which Congress appropriated funds to IMLS, MBDA, and FMCS for the remainder of fiscal year 2025 in the same amounts that they received the prior year.  *See* Continuing Appropriations Act § 1101(a)(2), (8) (incorporating applicable 2024 appropriations acts by reference).  In particular, Congress appropriated $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. 4.  It appropriated $53,705,000 to FMCS "to carry out the functions vested in it by the" Taft-Hartley Act.  *Id.*  And it appropriated $68,250,000 "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law."  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, tit. 1.

Because it has dismantled each of these agencies, the Administration will not spend the full amount of funding appropriated by Congress—or anything close to it.  All three agencies have dramatically curtailed the activities that constituted the largest line items on their 2024 budgets. Both IMLS and MBDA currently have a fraction of the staff dedicated to grant administration that

they did in 2024, making it virtually certain that they will be unable to disburse all of the tens or hundreds of millions of dollars in grants they are budgeted to award.[26]  *See* Blake Doe Decl. ¶¶ 16–21, Ex. 40; Alex Doe Decl. ¶¶ 11–12, Ex. 41.  And FMCS has 15 or fewer employees performing the work previously conducted by a staff of 200, meaning that it will incur only a small share of the expenses it otherwise would have paid for mediations, arbitrations, and conciliation services.[27]  The Closure Order precludes the possibility the agencies will make up for these dramatic cuts with increases elsewhere by requiring each agency to minimize its footprint to the greatest extent possible, and by ordering OMB to "reject funding requests" inconsistent with that instruction.  *See* Closure Order §§ 2(a), 2(b).

The Closure Decisions thus effectively amount to orders rescinding any funds above the minimal level the Administration deems necessary to operate these agencies in a dramatically stripped-down form.  Congress, however, made the choice to appropriate funds for these agencies to operate at full force—at precisely the same level, in fact, that they did the prior year.  Because the orders are inconsistent with that congressional determination, they are unlawful.

### B.    The Closure Order and the Closure Decisions Violate the Separation of Powers.

The Executive Branch's attempts to dismantle IMLS, MBDA, and FMCS, to withhold from these agencies any funds beyond the minimum necessary to fulfill their statutory functions, and to prevent the agencies from disbursing funds appropriated to them by Congress, violates the constitutional separation of powers.  The separation of powers doctrine is "foundational" and

---

[26] *See* IMLS, Fiscal Year 2024 Appropriations Request to the United States Congress, (Mar. 2023), https://www.imls.gov/sites/default/files/2023-03/fy24cj.pdf (allocating more than $250 million for grants and $20 million for administrative expenses); MBDA, Fiscal Year 2024 Congressional Justification (Mar. 2023), https://www.commerce.gov/sites/default/files/2023-04/MBDA-FY2024-Congressional-Budget-Submission.pdf.
[27] *See* FMCS, Fiscal Year 2024 Congressional Budget Submission, at 23 (Mar. 13, 2023), https://www.fmcs.gov/wp-content/uploads/2023/03/2024-Congressional-Budget.pdf (allocating $42.3 million out of $55 million budget request to mediations, training, outreach, and workshops).

"evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637–638 (2024). Article I of the Constitution allows Congress—and only Congress—to make law. U.S. Const. art. I, § 1. Article I further allows Congress—and only Congress—to create and define federal agencies. *See Myers v. United States,* 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices" and "the determination of their functions and jurisdiction").

By contrast, it is well-settled that the Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Under "the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587. And because the Constitution "exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F. 3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7), "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d at 259 (Kavanaugh, J.).

Pursuant to its lawmaking authority, Congress duly established FMCS, MBDA, and IMLS, and gave these agencies detailed sets of duties, including implementing congressional appropriations. And on March 14, Congress passed a statute appropriating funds to FMCS, MBDA, and IMLS, which the President signed into law the very next day. *See* Continuing Appropriations Act § 1101(a)(2), (8). These appropriations pay for the agencies to continue

operating at full capacity through the end of the fiscal year.  By issuing a Closure Order that slashes the agencies' staff to the bare minimum, shutters many of their programs, and directs them not to use or disburse Congressionally appropriated funds, the Executive is usurping Congress's authority to create and abolish federal agencies, as well as usurping Congress's power of the purse by disregarding congressional appropriations.

Several courts have recently found that the Trump Administration's efforts to dismantle other federal agencies via Executive Order violate the separation of powers doctrine.  In *Aids Vaccine Advoc. Coal.*, the District Court for the District of Columbia found that the plaintiffs were likely to prevail on the merits of their claim that the Administration's executive order directing a pause on all funding provided by U.S. Agency for International Development (USAID) violated the separation of powers doctrine by disregarding the appropriations that Congress ordered spent. 2025 WL 752378, at *14-17.  And the District Court for the Southern District of New York recently granted a temporary restraining order enjoining the Administration from taking any actions to implement this very same Closure Order with respect to the United States Agency for Global Media. *Widakuswara*, 2025 WL 945869, at *11.  The court found that, among other things, plaintiffs had established a likelihood of success on the merits of their claim that the Closure Order was "not in accordance with the law" and "contrary to constitutional right, power, privilege, or immunity" because it violated the separation of powers doctrine.  *Id.* at *7 (citation omitted).  This Court should do the same.

### C.    The Closure Order and the Closure Decisions Violate the Take Care Clause.

Article II of the Constitution provides that the Executive shall "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see also Morrison v. Olson*, 487 U.S. 654, 690 (1988) (explaining that the President has a "constitutionally appointed duty to 'take care that the laws be

faithfully executed.'") (quoting U.S. Const. art. II, § 3).  The Supreme Court has explained that "[u]nder our system of government, Congress makes laws and the President . . . faithfully execute[s] them." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 307 (2014) (internal quotation marks and citation omitted). "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President—and his subordinates—do not wield 'authority to set aside congressional legislation by executive order.'" *New York v. Trump*, --- F. Supp. 3d ---, No. 25-CV-01144, 2025 WL 573771, at *24 (S.D.N.Y. Feb. 21, 2025) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999)).

The Executive violates the Take Care Clause when it overrides statutes enacted by Congress. *In re United Mine Workers*, 190 F.3d at 551; *see Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").  Here, the agencies subject to the Closure Order were established by Congress and given detailed sets of statutory duties.  *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (establishing IMLS); and Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (authorizing MBDA).  By dismantling FMCS, IMLS, and MBDA and disabling them from carrying out many of their statutory duties, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587.  "[T]he President may not ... decline to follow a statutory mandate ... simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259.  And as the Southern District

32

recently found, the President's "job . . . is limited to 'tak[ing] Care' that such statutes be 'faithfully executed.'" *Widakuswara*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *7 (quoting U.S. Const. art. II, § 3). "Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate," to "take Care that the Laws be faithfully executed." *Id.*

## II.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INTERIM RELIEF.

Plaintiffs will suffer immediate and irreparable harm if the Closure Decisions are permitted to remain in effect. State libraries and museums are entitled to millions of dollars in grant payments from IMLS in the coming weeks. As a result of the dismantling of IMLS, some of those payments have been terminated, while many others will be delayed, causing immediate and costly disruptions to critical state library and museum services. Similarly, because MBDA has been reduced to a caretaker staff, it is virtually certain to miss payments to State-run business centers, and it will miss the critical window to solicit grants in time to replace expiring awards. FMCS, meanwhile, furnishes a critical mediation and conciliation service that States were actively using at the time the agency was closed; in its absence, States will need to turn to more costly and less effective alternatives for addressing and preventing labor strife.

### A.    Plaintiffs Will Be Irreparably Harmed by the Termination and Delay of IMLS Funding to State Libraries and Museums.

Starting in the next few days, the States will suffer immediate and irreparable harm from the dismantling of IMLS. Every one of the Plaintiff States receives millions of dollars in grant funding from IMLS through its Grants for States Program. Some Plaintiff States are expecting disbursements as early as next week: New Mexico's State Library is expecting a reimbursement of over $500,000 on April 8, Garcia y Griego Decl. ¶ 21, Ex. 24, while Arizona is expecting a disbursement on April 11, Fontes Decl. ¶ 23, Ex. 1. Other Plaintiff States expect to receive

33

disbursements of their grants awards over the weeks that follow. *See, e.g.*, Lucas Decl. ¶ 20, Ex. 3 (disbursement expected April 15); M. Miller Decl. ¶ 23, Ex. 15 (disbursement expected April 21), Nelson Decl. ¶ 40, Ex. 23 (disbursement expected April 22); Moore Decl. ¶ 2, Ex. 27 (disbursement expected April 22); B. Miller Decl. ¶ 28, Ex. 35 (disbursement expected April 22); Schander Decl. ¶ 21, Ex. 4 (disbursement expected by April 30).

Any delay in the payment of these funds will result in immediate, irreparable harms to the States. New Mexico explains that if it does not receive its expected disbursement on April 8, it will suffer "immediate and irreparable disruption to state library programs," including the delay, suspension, or reduction of interlibrary loan services. Garcia y Griego Decl. ¶¶ 18, 22, Ex 24. If Arizona does not receive the reimbursement anticipated on April 11, it will experience "an immediate and ongoing disruption of services," including disruptions to its academic and business databases and delays in the procurement of essential technology. Fontes Decl. ¶¶ 19, 23, Ex 1. Other States that expect payments in the coming weeks report that any delay will force libraries to "immediately . . . halt services and implement a hiring freeze," Moore Decl. ¶¶ 28, 42 Ex. 27, or cause them to "stop statewide and local public library programs immediately," Lucas Decl. ¶ 27, Ex. 3, hobbling state efforts to foster literacy, support learning and workforce development, and enhance community throughout the state, Mellor Decl. ¶ 24, Ex. 31.

With an 85% staff cut at IMLS, however, it is inevitable that many of these disbursements will be delayed, if they are processed at all. Since the Closure Order was announced on March 14, Plaintiff States have reported either unusual delays in receiving disbursements or have not received disbursements at all. For example, on March 17, IMLS approved the Connecticut State Library's request for a disbursement of $235,541.43 and the Library requested disbursement on March 20, 2025. Schander Decl. ¶ 24, Ex. 4. Typically, funds are disbursed in two or three days, but to date,

no funds have been disbursed.  *Id.*  Similarly, on March 18, 2025, the Wisconsin Department of Veterans Affairs, which operates the Wisconsin Veterans Museum, submitted an approved reimbursement request that is still pending.   McElgunn Decl. ¶ 20, Ex. 38.   Typically, reimbursements are paid within four to seven days after submission.  *Id.*  Michigan has likewise been waiting for a disbursement since March 26, Riley Decl. ¶ 18, Ex. 21, and Massachusetts has been waiting for a reimbursement since March 19, Amyot Decl. ¶ 24, Ex. 44.  If States already began experiencing a delay or a lapse in receiving funds while IMLS was still fully staffed between March 14 and March 31, it is inevitable that States will not receive funds timely—or at all—in the wake of the Closure Decision that resulted in a dramatic reduction in the agency's staff.

States whose grants that IMLS has already terminated will also plainly suffer irreparable harm absent interim relief.  On April 2, IMLS terminated an award to Washington for which the State had a pending drawdown request of approximately $1 million.  Jones Decl. ¶ 20, Ex. 34. This sudden, massive loss of resources "is already harming" the State's library system, and will continue to do so "if that funding is not restored."  *Id.* ¶¶ 20, 22.  On April 2, IMLS terminated a grant to California from which the State expected a disbursement on April 15.  Lucas Decl. ¶¶ 18, 20, Ex. 3.  This loss has "create[d] both immediate and ongoing harm" to the State, including by causing "[p]rograms targeted to seniors, veterans and English learners" to be "diminished or halted."  *Id.* ¶ 31.  Connecticut had a $235,541.43 disbursement request pending since March 17. Schander Decl. ¶ 24, Ex. 4.  Now that its grant has been terminated, those funds remain on indefinite pause—resulting in an "immediate inability to pay invoices and salaries, meet contractual obligations, operate the statewide delivery service, [or] support statewide collections." *Id.* ¶ 22.

States that receive competitive library or museum grants will also suffer immediate and irreparable harms if IMLS remains dismantled. The University of Wisconsin-Stevens Point's Natural History Museum is currently awaiting disbursements under a grant it was awarded through the IMLS's Inspire Grants for Small Museums program. Cornell-Swanson Decl. ¶¶ 11, 14, 16, Ex. 36. Continued delay in the receipt of these funds will stop the purchase of improvements needed to allow users with disabilities to access the museum's full collection. *Id.* ¶ 16. Likewise, in the next four weeks, Maryland's State-operated Banneker-Douglass-Tubman Museum expects to draw down funds awarded through the Museum Grant for African American History and Culture. Compton Decl. ¶¶ 9, 14, Ex. 13. Because the museum cannot be confident this funding will be provided, it has been forced to delay portions of a project to identify and inter 13 sets of human remains from the antebellum era. *Id.* ¶¶ 11, 16. The University of Maryland's David C. Driskell Center also has hesitated to onboard temporary staff, contract vendors for digitization services, or initiate public programming under an IMLS grant due to the chilling effects of the Closure Decision. Ball Decl. ¶¶ 17 & 22, Ex. 17.

In short, Plaintiffs are entitled to receive millions of dollars in IMLS funding in the coming weeks. Those funds must be paid on time in order to prevent immediate and serious disruptions to the States' library and museum services. But the destruction of IMLS means that some of those payments will be, at best, substantially delayed, and, at worst, terminated altogether.

   **B.**   **Plaintiffs Will Be Irreparably Harmed by Delays in the Disbursement of MBDA Funds and Delays in the Solicitation and Award of New MBDA Grants.**

Plaintiff will also be immediately and irreparably harmed by the dismantling of MBDA. Several Plaintiff States (or their instrumentalities) operate Business Centers that receive grant funding from MBDA, including New Mexico, Connecticut, Hawaiʻi, and Maryland. *See* Compl.

¶ 82.  Some States also receive funding from MBDA through its pilot projects and programs.  *Id.*  If the closure of MBDA is not promptly enjoined, these Plaintiffs will suffer irreparable harm in at least two respects.

First—much as with IMLS—several States expect the payment of funds from MBDA in the coming weeks, and any delay in the disbursement of those funds will cause them immediate harm.  The University of Wisconsin Office of Business and Entrepreneurship, for instance, operates a program that receives $3 million from the MBDA to provide trainings and other services to advance capital readiness among women-owned businesses.  Wikenheiser Decl. ¶ 12, Ex. 37.  The University will submit its next payment request to MBDA by April 15, and expects to receive a disbursement of grants funds by April 30.  *Id.* ¶ 21.  If the University does not receive this disbursement "as scheduled," it will not be able to pay students, independent contractors, or staff, and will need to draw funds from its own pocket to meet expenses.  *Id.*

Similarly, the University of Hawaiʻi Maui College—which receives MBDA funding to provide entrepreneurship training to students—expects to receive its next reimbursement payment on April 28.  Hokoana Decl. ¶¶ 13, 20, Ex. 11.  "Any pause in funding would displace the students currently in training programs" and cause three staff members to lose their jobs.  *Id.* ¶¶ 16, 17.

The Entrepreneurial Development and Assistance Center (EDAC) at Maryland's Morgan State University faces a similar situation.  It is still owed $109,000 under existing grant awards from MBDA and has been unable to draw down funds for those awards since March 29, 2025, after 90% of MBDA staff were placed on administrative leave.  Muhammad Decl. ¶ 10, Ex. 16.  If EDAC's MBDA funding is not promptly restored, then it will need to halt essential programs such as entrepreneurship education, one-on-one business guidance, and access to resources such as the content library for continued learning.  *Id.* ¶ 12.  And the uncertainty of not getting paid or

reimbursed already has had a chilling effect upon EDAC, eroding confidence among program participants and partners and limiting EDAC's ability to foster economic development and entrepreneurship within underserved communities. *Id.* ¶ 13; *see also* Lundy Decl. ¶¶ 9, 16, Ex. 12 ("[a]ny pause in funding" will have "immediate" impacts on the ability of the Baltimore MBDA Advanced Manufacturing Center to provide technical assistance and other services to disadvantaged manufacturing businesses).

It is quite likely that MBDA, with only five employees, will fail to make payments as scheduled—or at all—in the coming weeks. The agency's remaining staff is woefully insufficient to manage MBDA's portfolio of more than 100 grants. Alex Doe Decl. ¶¶ 8-9, Ex. 41. And, since the Closure Decision, recipients have reported "unprecedented challenges in receiving MBDA funds." Muhammad Decl. ¶ 9, Ex. 16; *see* Sangalli Decl. ¶ 24, Ex. 20 (describing "limited communications" from MBDA after its staff reductions). It is inevitable that some recipients will not be paid when due, and that the States and their instrumentalities will either need to forgo services to disadvantaged businesses or shell out their own money as a result.

Second, unless MBDA is immediately restored to full operation, it will likely be impossible for Plaintiffs' grants to be renewed in time to prevent a lapse of funding. As noted above, all MBDA grants will expire on June 30 or August 30. Alex Doe Decl. ¶ 8, Ex. 41. Even when MBDA is fully staffed, it typically takes four months from the posting of a new grant solicitation for MBDA to award new grant funds. *Id.* ¶ 11. Accordingly, MBDA must post a grant solicitation in the next few weeks in order to award new grants before the current grants expire on June 30. But, since the Closure Order, MBDA has not posted *any* new solicitations—and its current staff of five could not realistically award grants by June 30 even if it did. *Id.*

38

This will inevitably result in Plaintiffs suffering a lapse of funding, causing serious and irreparable harms to the services their MBDA-funded projects provide. To take one example: The University of Hawaiʻi operates the MBDA Business Center Hawaiʻi under an agreement with MBDA, and relies on MBDA for funding and access to the Salesforce platform. Deane Decl. ¶¶ 8, 14, 19-20, Ex. 10. For the next fiscal year, the MBDA Business Center Hawaiʻi is scheduled to receive disbursements and reimbursements of $410,000 under its current awards. *Id.* ¶ 19. That grant must be renewed—along with all other MBDA Business Center grants—by June 30, which cannot feasibly be done by a barebones staff. Alex Doe Decl. ¶ 8, Ex. 41. Any loss of funding would prevent the Center from continuing to support clients' projects and force it to default on a contract with the Hawaiʻi YWCA to provide services to other small Hawaiʻi businesses. Deane Decl. ¶ 16, Ex. 10.

Similarly, the Baltimore City Mayor's Office of Small & Minority Business & Advocacy operates the Baltimore MBDA Advanced Manufacturing Center under a $400,000 annual grant. Lundy Decl. ¶¶ 2–3, 8 & 13, Ex. 11. If the MBDA's handful of remaining employees do not reissue Baltimore's funding as scheduled, then the Advanced Manufacturing Center will cease operations. *Id.* ¶¶ 19–20. Likewise, the Rhode Island Small Business HUB in Providence relies on MBDA Capital Readiness Program funding to provide its consulting and networking services to startups across the State. Tanner Decl. ¶¶ 10-11, Ex. 29

### C. Plaintiffs Will Be Irreparably Harmed by the Inability to Use FMCS Services to Mediate and Arbitrate Labor Disputes.

The Administration's gutting of FMCS will also inflict immediate and irreparable harm on the States. Plaintiff States depend on FMCS to help mediate a wide range of labor disputes. Some state laws require the use of FMCS to mediate public sector labor disputes. *See, e.g.*, Vaile Decl. ¶ 6, Ex. 26 (New Mexico). Forty-two states have entered collective bargaining agreements that

expressly call for the use of FMCS. *See* Thornton Decl. ¶ 7, Ex. 39; Vaile Decl. ¶ 13(a), Ex. 26. And states often choose to request FMCS's assistance because it is an experienced, impartial entity that is effective at resolving labor-management disputes, and that does so at minimal or no cost. *See* Boivin Decl. ¶¶ 8, 11, Ex. 6; Delgado Decl. ¶ 9, Ex. 30.

All but 10 to 15 of FMCS's more than 200 employees have been placed on leave. The effective closure of FMCS—and the elimination of *all* of its services to the public sector—has inflicted ongoing and immediate harms on the States by preventing them from using FMCS to resolve labor disputes. Indeed, a number of States have pending labor disputes for which they would be using FMCS's services but for the closure of the agency. The New Mexico Public Employee Labor Relations Board, for instance, had eight pending cases at the time of the Closure Decision in which the parties "hoped to obtain FMCS mediation services." Vaile Decl. ¶ 21, Ex. 26. Once FMCS benched 95% of its staff, however, those hopes "withered," and the State—which is not "able and prepared to assist" the disputants in resolving the case—has been forced to turn to more expensive and less effective alternatives to try to resolve the matters. *Id.* Similarly, in Illinois, a school district had spent five months working with an FMCS mediator to resolve a labor-management dispute at the time the agency shut down. *Id.* ¶ 8.b. n.1. Since FMCS's services "ceased to be available," the union has issued a notice of intent to strike unless the dispute is resolved by early April. *Id.*

The Associated Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")—a private and public sector union—likewise explains that it had multiple pending mediations in which the parties were using FMCS services at the time of the Closure Decision. *See* Thornton Decl. ¶¶ 20-22, Ex. 39. That closure has resulted in "the immediate cessation of all FMCS assistance in the mediation of labor management dispute in the public and private sector."

*Id.* ¶ 23.  And the result has been the need to "find and utilize other more costly and time expansive method to resolve disputes," and labor disputes that are "more likely to result in work disruptions." *Id.*

The dismantling of FMCS has also severely frustrated the state laws and collective bargaining agreements that depended on FMCS to function, imposing immediate costs on the States.  In New Mexico, for instance, most public-sector collective bargaining agreements expressly incorporate FMCS "strike lists" or panel services to help the disputants select an arbitrator.  Vaile Decl. ¶ 8.c, Ex. 26.  Because FMCS no longer provides public sector services, New Mexico anticipates "immediate harm to and obstruction of non-federal public sector labor relations in New Mexico," as the parties will lack a clear path for selecting an arbitrator or resolving their disputes.  *Id.*  Further, because disputants will be unable to use FMCS-provided arbitration and mediation services, the New Mexico Public Employee Labor Relations Board anticipates a "huge influx of contract disputes" that it is "wholly unprepared in the short and medium term" to handle.  *Id.* ¶ 9.  Likewise, Rhode Island anticipates "prolonged labor disputes that could disrupt the provision of essential state services," such as child welfare, and put the health and welfare of its residents at risk. Delgado Decl. ¶¶ 11-13, Ex. 30.

Finally, the devastation of FMCS will cause irreparable harm to States that rely on its services to prevent costly—even life-threatening—disruptions to critical public- and private-sector industries.  In Rhode Island, for example, FMCS ensures the peaceful resolution of labor disputes across the healthcare industry.  *See* Taibi Decl. ¶ 10, Ex. 32.  When healthcare workers strike, the public pays the price.  *See* Martin Decl. ¶ 7, Ex. 45.  Healthcare facilities must prepare and execute State-approved strike plans with constant State oversight, including State inspectors placed within the facility 24/7 to ensure vulnerable patient populations are not endangered.  *Id.*  Those costs are

borne by the State. *Id.* So, too, are the costs of hiring exorbitant contract workers, *id.* at ¶ 8, which can be passed on to the State Medicaid/Medicare systems. Furthermore, Rhode Islanders suffer from lower-quality care as experienced union employees are replaced by temporary replacements who are unfamiliar with the particular processes and facilities they are suddenly running. *Id.* at ¶ 9. Finally, in overtaxed healthcare systems like Rhode Island's, even a week-long strike can topple vital facilities, such as the State's only Level-1 Trauma Center, busiest maternity hospital, or largest psychiatric facility, into bankruptcy, leaving Rhode Islanders with few or no options for lifesaving care. *Cf. id.* at ¶¶ 9, 13 (describing costs of strikes). Other states face similarly dire consequences if critical industries are held up by unresolved labor disputes, from school closures, *see* Vaile Decl. ¶¶ 13, 16, Ex. 26, to public transit strikes, *see id.* ¶¶ 13, 16, 25, to public safety, *see* Kadish Decl. ¶¶ 3, 10, Ex. 14.

Put simply, the Plaintiff States relied on FMCS—an especially effective and inexpensive mediator—to helps resolve disputes with public sector unions or to prevent disruptions of critical state industries. As long as FMCS remains shuttered, they will be deprived of those services, will need to turn to inferior options, and will face increased risk of strikes, labor strife, and litigation. That harm is imminent and irreparable.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR INTERIM RELIEF.

Where the government is a party, as it is here, the Court's inquiry into the balance of the equities and the public interest merges. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *see also Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). These factors strongly favor preliminary injunctive relief in this case.

As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). *See also Massachusetts v. NIH*, -- F. Supp. 3d--, 2025 WL 702163, at \*32 (D. Mass. March 5, 2025). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned up); *accord League of Women Voters*, 838 F.3d at 12. Plaintiff States have established a high likelihood that the Executive has violated both constitutional and statutory safeguards. And as detailed *supra*, the States have also established a high likelihood of irreparable harm resulting from the dismantling of agencies established by Congress. Thus, there is a weighty public interest in favor of granting interim relief to stop the enforcement of these likely unconstitutional and unlawful agency actions. *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) (where "Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief.") (citing *Issa v. Sch. Distr. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

On the other side of the balance, the Defendant agencies cannot demonstrate how the public interest would be harmed by a temporary pause in the dismantling of three federal agencies while the court determines whether such a dismantling is legally permissible. Indeed, "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (citation omitted). Moreover, it is well-established that "the government 'cannot suffer harm from an injunction that merely ends an unlawful

practice.'" *Massachusetts v. NIH*, --F. Supp. 3d--, 2025 WL 702163, at *32 (D. Mass. March 5, 2025) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Furthermore, practical considerations recommend preliminary relief. Plaintiff States have identified numerous ways in which the public would suffer significant and imminent harm should they lose access to the expertise and funding offered by these agencies. States have a strong sovereign interest in promoting commerce while negotiating labor disputes, educating and inspiring future generations through their libraries and museums, and giving disadvantaged business enterprises a chance at the American dream. Should IMLS, MBDA, and FMCS close tomorrow, Plaintiff States would be thrown into chaos and uncertainty as they race to replace the funding and expertise that has suddenly been interrupted. The federal government, on the other hand, suffers not at all if it were to spend the appropriations as already planned and directed by with the passage of the Continuing Appropriations Act. To the extent the Defendants assert an interest in saving taxpayer dollars or reducing bureaucracy, such concerns "are insufficiently grave to overcome the much more substantial countervailing harms" to Plaintiff States. *Newby*, 838 F.3d at 13.

Finally, the requested relief would "do no more than maintain a status quo that has been in place" for decades. *Doe v. Trump*, --F. Supp. 3d--, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025), *aff'd sub nom.*, *New Jersey v. Trump*, --F.4th--, 2025 WL 759612 (1st Cir. March 11, 2025). The oldest of these agencies—FMCS—was established by the Truman Administration. The youngest—IMLS—has served the American public for more than a quarter of a century and is itself a continuation of an agency created by Lyndon B. Johnson. Given this history, there is no reason to believe that the public would suffer from allowing these agencies to promote peaceful labor relations, child literacy, and local businesses for at least a little bit longer.

**CONCLUSION**

For the foregoing reasons, the Court should issue a stay of the Closure Decisions under 5 U.S.C. § 705.  In the alternative, the Court should issue a temporary restraining order enjoining Defendants from implementing the Closure Decisions and the Closure Order.

Respectfully submitted,

PETER F. NERONHA

*Attorney General for the State of Rhode Island*

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Keith D. Hoffmann (RI Bar No. 9872)
Chief of Policy
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
khoffmann@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov

*Attorneys for the State of Rhode Island*

LETITIA JAMES

*Attorney General for the State of New York*

By: */s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu*
Assistant Attorney General
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Sean Bunny*
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov

*Attorneys for the State of New York*

ANNE E. LOPEZ

*Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

46

**KRISTIN K. MAYES**

*Attorney General for the State of Arizona*

/s/ Syreeta A. Tyrell
Syreeta A. Tyrell*
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-8310
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**

*Attorney General for the State of California*

/s/ Jay C. Russell
Jay C. Russell*
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Anya M. Binsacca
Supervising Deputy Attorney General
Zelda Vassar*
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**

*Attorney General of Colorado*

By: /s/ David Moskowitz
David Moskowitz*
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**

*Attorney General for the State of Connecticut*

/s/ Ashley Meskill
Ashley Meskill*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**

*Attorney General of the State of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**

*Attorney General of Illinois*

/s/ Holly F.B. Berlin
HOLLY F.B. BERLIN*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

**AARON M. FREY**

*Attorney General for the State of Maine*

/s/ Vivian A. Mikhail
Vivian A. Mikhail*
Deputy Attorney General
Office of the Attorney General
 6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Vivian.Mikhail@maine.gov

*Attorney for the State of Maine*

**ANTHONY G. BROWN**

*Attorney General for the State of Maryland*

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us

*Attorney for the State of Maryland*

**ANDREA JOY CAMPBELL**

*Attorney General of Massachusetts*

/s/ *Katherine Dirks*
Katherine Dirks*
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
kiatherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**

Attorney General for the People of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti*
BreAnna Listermann*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**

Attorney General for the State of Minnesota

By: */s/ Jacob Harris*
Jacob Harris*
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

48

**AARON D. FORD**

Attorney General of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**MATTHEW J. PLATKIN**

Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn*
Max Lesser*
   *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
Max.Lesser@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**

Attorney General of New Mexico

/s/ Anjana Samant
Anjana Samant*
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov

*Attorney for Plaintiff State of New Mexico*

**DAN RAYFIELD**

Attorney General for the State of Oregon

By: /s/ Brian Simmonds Marshall
Brian Simmonds Marshall*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**

Attorney General for the State of Vermont

By: /s/ Ryan P. Kane
Ryan P. Kane*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**

Attorney General for the State of Washington

/s/ Kate S. Worthington
KATE S. WORTHINGTON, WSBA #47556*
SARAH E. SMITH-LEVY, WSBA #55770*
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov

*Attorneys for State of Washington*

49

**JOSHUA L. KAUL**

*Attorney General for the State of Wisconsin*

/s/ Colin T. Roth
COLIN T. ROTH*
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

*Applications for pro hac vice forthcoming

**INDEX OF EXHIBITS**

| Exhibit | State | Declarant Name | Declarant Title |
|---|---|---|---|
| 1 | AZ | Adrian P. Fontes | Secretary of State |
| 2 | AZ | Monica S. Villalobos | President/CEO Arizona Hispanic Chamber of Commerce |
| 3 | CA | Greg Lucas | State Librarian |
| 4 | CT | Deborah Schander | State Librarian |
| 5 | DE | Annie Norman | State Librarian |
| 6 | HI | Jan Boivin | Senior VP of Human Resources and Organizational Effectiveness, Hawaiʻi Pacific Health |
| 7 | HI | Stacey Aldrich | State Librarian |
| 8 | HI | Trevor Kainoa Daines | President, Friends of the Judiciary History Center of Hawaii |
| 9 | HI | Laura E. Lyons | Interim Vice Provost for Academic Excellence for the University of Hawaiʻi at Mānoa |
| 10 | HI | James R. Deane | Director of the Office of Innovation & Commercialization, UH |
| 11 | HI | Lui Hokoana | Chancellor, UH Maui |
| 12 | MD | Christopher R. Lundy | Director of Baltimore MOSMBA&D |
| 13 | MD | Chanel Compton | Executive Director of Maryland Commission on African American History & Culture |
| 14 | MD | Chelsea Kadish | Director of Labor Relations |
| 15 | MD | Morgan Lehr Miller | State Librarian |
| 16 | MD | Omar Muhammad | Director of the Entrepreneurial Development and Assistance Center, Morgan State University |
| 17 | MD | Gregory Ball | VP for Research, UMD |
| 18 | ME | Bernard Fishman | Museum Director of the Maine State Museum |
| 19 | ME | Lori Fisher | State Librarian |
| 20 | MI | Elizabeth "Elissa" Sangalli | Northern Great Lakes Initiatives CEO |
| 21 | MI | Randy Riley | State Librarian |
| 22 | MN | Bobbie Burnham | Assistant Commissioner for Office of Teaching and Learning |
| 23 | NJ | Jennifer R. Nelson | State Librarian |
| 24 | NM | Debra Garcia Y Griego | Cabinet Secretary for New Mexico Department of Cultural Affairs |
| 25 | NM | Debra Garcia Y Griego (Supplemental Declaration) | Cabinet Secretary for New Mexico Department of Cultural Affairs |
| 26 | NM | Pilar Vaile | Public Employee Labor Relations Board Executive Director |

| 27 | NY | Lauren Moore | Assistant Commissioner for Libraries and the New York State Librarian |
|----|----|----|----|
| 28 | OR | Wendy Cornelisen | State Librarian |
| 29 | RI | Elizabeth Tanner | Secretary of Commerce |
| 30 | RI | Misty Delgado | Chief of Staff, DCYF |
| 31 | RI | Karen Mellor | Chief of Library Services, OLIS |
| 32 | RI | Matthew Taibi | Secretary-Treasurer, General Teamsters Local 251 |
| 33 | WA | Anind Dey | Dean UW School |
| 34 | WA | Sara Jones | State Librarian |
| 35 | WI | Benjamin Miller | Director of the Library Services Team, Wisconsin Department of Public Instruction (DPI) |
| 36 | WI | La Vonne J. Cornell-Swanson | Provost and Vice Chancellor for Academic Affairs, University of Wisconsin-Stevens Point |
| 37 | WI | Bon M. Wikenheiser | Executive Director of the Office of Business & Entrepreneurship |
| 38 | WI | Christopher J. McElgunn | Deputy Secretary for the Wisconsin Department of Veterans Affairs |
| 39 | AFSCME | Dalia Thornton | Director of the Research and Collective Bargaining Services |
| 40 | IMLS | Blake Doe | IMLS |
| 41 | MBDA | Alex Doe | MBDA |
| 42 | NAGE | Darcy Burgess | NAGE National Representative |
| 43 | IL | Alexi Giannoulias | State Librarian & Secretary of State |
| 44 | MA | Maureen Amyot | Director, MA Board of Library Commissioners |
| 45 | RI | Jesse Martin | Executive Vice President of SEIU 1199NE |

## <u>CERTIFICATE OF SERVICE</u>

I, Natalya A. Buckler, certify that on April 4, 2025, I provided a copy of the foregoing document to individuals at the U.S. Department of Justice by electronic mail:

Alex Haas
Co-Director, Federal Programs Branch
U.S. Department of Justice
Alex.haas@usdoj.gov

Diane Kelleher
Co-Director, Federal Programs Branch
U.S. Department of Justice
Diane.kelleher@usdoj.gov

Daniel S. Schwei
Special Counsel
U.S. Department of Justice
Daniel.S.Schwei@usdoj.gov

Kevin Hubbard
Civil Division Chief
United States Attorney's Office, District of Rhode Island
Kevin.Hubbard@usdoj.gov

/s/ Natalya A. Buckler
Assistant Attorney General