**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF RHODE ISLAND; et al.,

      Plaintiffs,

    v.

DONALD J. TRUMP, et al.,

      Defendants.

C.A. No.

---

## DECLARATION OF JESSE MARTIN

Pursuant to 28 U.S.C. § 1746, I, Jesse Martin, hereby declare as follows:

1.    I am over the age of eighteen and understand the obligations of an oath.

2.    I have personal knowledge of all facts stated herein or have knowledge of the matters based on my review of information and records gathered by my staff.

3.    I am currently employed by the New England Health Care Employees Union, District 1199NE as the Executive Vice President, RI.

4.    As Executive Vice President of SEIU 1199NE, I represent nearly 5,000 union employees across the healthcare and related service industries. Our members work as nurses, CNAs, technicians, clerical employees, service and maintenance workers, and other positions in hospitals, community health centers, nursing homes, community programs for developmentally disabled individuals, and other critical social service programs across the State of Rhode Island.

5.    Over the last 13 years, I have participated in over 50 management-labor disputes on behalf of SEIU 1199NE, including negotiations involving collective bargaining agreements, grievances, strikes, lockouts, and arbitrations.

6.    Disputes between SEIU 1199NE and employers may be referred to mediation by the Federal Mediation and Conciliation Service (FMCS). To my knowledge, 10 disputes have been referred to FMCS over the past 3 years. Many of those disputes were successfully mediated, preventing escalations that could have had devastating impact on critical health and social services throughout Rhode Island.

7.    When healthcare workers are forced to strike, public disruption results. Whenever negotiations break down and a strike appears imminent, the Rhode Island Department of Health (RIDOH) is immediately involved as the employer's facility is required to submit to RIDOH a strike preparedness plan for RIDOH approval. RIDOH then needs to expeditiously review that

2

plan, pulling resources away from other key RIDOH functions, such as code enforcement at other facilities, and frequently requiring overtime by RIDOH employees. Once the strike begins, RIDOH has to place inspectors in the facility for 24 hours per day, 7 days a week, to ensure that vulnerable patient populations within these facilities are not endangered by the disruption in care. Those costs are borne by the State.

8.    In addition to paying for an exceedingly high cost of labor to replace striking staff, hospitals/facilities must also redirect resources towards training and orienting replacement staff to the many complex systems and policies of each facility.  All non-union staff are reassigned to additional duties above their regular job functions during strikes, and most facilities accommodate those non-union staff who work around the clock during strikes with "overtime" compensation or bonuses.

9.    Despite paying a very high premium for temporary labor, it is my experience that the quality of care at striking facilities suffers without the workers who are most familiar with the unique needs of the facility and its patients.  For example, every electronic medical record system is unique to the specific build and specific use at each facility, and medical professionals need training and time to learn new systems before they can be proficient with them.  The same is true for facility policies and procedures, many of which exist because adherence to them is necessary in order to prevent human error and/or to ensure optimization of patient care in a specific patient care environment.  No matter how skilled or experienced travel staff may be, there is no possible way for them to download the institutional and facility-specific knowledge that the staff who routinely care for those patients have from their lived experience within that facility and within those patient care teams.

3

10.      Medical care is delivered at Women & Infants and Butler, and in other care settings represented by the Union, in a team-based model, and the medical professionals work and train together, as teams, to deliver the most effective, safest, highest quality of care possible. It is well studied and evidenced that most medical errors are rooted in failures in communication among teams, and for that reason, the medical care teams at Women & Infants cross-train on teamwork and communication so that their care can be of the highest quality possible. There is simply no substitution for those care teams who are trained to communicate well together, for the benefit and safety of their patients.

11.      In addition, employees who are locked out of the facility can apply to the State for unemployment benefits, further increasing the cost to the State of failed contract negotiations.

12.      As recently as December 2024, SEIU 1199NE represented workers at a negotiation with Women & Infants Hospital of Rhode Island. Women & Infants is the major teaching affiliate of Brown University for OBGYN, maternal-fetal-medicine, gyn-oncology and neonatal care, and is one of the largest stand-alone obstetrical hospitals in the country, delivering approximately 8,500 infants per year with an 85-bed neonatal intensive care unit. Women & Infants cares for almost all of the state's high-risk pregnancies and is a tertiary care referral center for high-risk patients in other regions. It is my opinion that SEIU 1199NE's negotiation with Women & Infants Hospital would have gone to strike but for mediations facilitated by FMCS. FMCS's involvement prevented a potentially devastating strike.

13.      Further, an SEIU strike at Women & Infants would impact all the services provided by the Hospital at its main location and approximately 35 offsite clinical locations through RI and south eastern MA. New England Health Care Employees Union District 1199NE; represents over 90% of the employees at Women & Infants Hospital all Nurses, Technical Employees, Clerical

4

Employees and Service and Maintentance Employees.   To replace over 90% of the staff would cost the Hospital tens of millions of dollars in contracts for the replacement staff.   Such an expenditure would create a significant fiscal crisis for the Hospital that it would have a long-lasting impact on institution and the services it provides. Currently, SEIU 1199NE has open contracts with three nursing homes, one federally qualified health clinic (FQHC), and Butler Hospital. We also have contracts with another nursing home and another qualified clinic opening within the next two months. Those contract negotiations implicate around 2,000 healthcare workers that may go on strike if the agreement cannot be reached through other means.

14.    It is my belief that at least one of those negotiations, with Butler Hospital, is extremely likely to lead toward a strike without the benefit of FMCS mediation. During the course of recent contract negotiations there are significant issues on the bargaining table have the parties very far apart for examples are wages, retirement, healthcare, training benefits along scheduling practices. These issues in my experience are the largest economic problems faced at the bargaining table and the hardest to overcome if the parties are unable to use a neutral to bridge a divide. Furthermore the collective bargaining agreement at Bulter Hospital expired on April 1, 2025 therefore both the employer and the union are operating without labor peace. It is my understanding that a one-week strike could cost Butler Hospital  millions of dollars, and those costs would pass on to Rhode Islanders as explained above. Butler Hospital, at the time of drafting this statement, has 29 monitored community detox spots, 15 adolescent behavioral health beds, 81 general behavioral health beds, 20 geriatric psychology beds, and 45 intensive/violent behavioral health beds filled.[1]   The hospital has approximately 2 open beds at the moment. These 161 vulnerable

---

[1] Rhode Island Behavioral Health Open Beds » Available Beds

patients would be harmed in the event those who provide care go on strike. Rhode Islanders would suffer from the disruption of the only in-house psychological treatment facility in Providence.

15.    I submit this declaration in connection with Executive Order 14,238, "Continuing the Reduction of the Federal Bureaucracy," which directed seven federal agencies, including the Federal Mediation and Conciliation Service (FMCS), to eliminate any non-statutory components and functions to the maximum extent consistent with applicable law, and to reduce the performance of any statutory functions and associate personnel to the minimum presence and function required by law.

16.    In my opinion, FMCS's dispute resolution services outlined above are critical for resolving labor disputes in Rhode Island because the agency provides experienced, third-party mediators from outside the State to resolve entrenched conflicts where the State is a party.

17.    If FMCS ceased to function in a meaningful way, it is my opinion that the State would suffer from prolonged labor disputes that could disrupt healthcare and other critical services throughout the State. The likelihood of costly strikes would rise exponentially.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed on April 4, 2025, at Providence, RI.

Jesse Martin