# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF RHODE ISLAND, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al*., <br><br> Defendants. | No. 25-cv-00128 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.    Statutory Background ............................................................................................... 2

        A.  IMLS ............................................................................................................. 3

        B.  MBDA ........................................................................................................... 3

        C.  FMCS ........................................................................................................... 4

    II.   Factual Background .................................................................................................. 4

    III.  Procedural History .................................................................................................. 5

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.    Plaintiffs Cannot Establish Likelihood of Success on the Merits. ......................... 8

        A.  Plaintiffs Have No Standing to Demand the Broad Relief Sought in their Motion. ..... 8

        B.  Plaintiffs' Claims Regarding Potential Future Injury are not Ripe. ........................... 11

        C.  To the Extent they are Justiciable, Plaintiffs' Claims Must Be Heard by Another Court or Administrative Body. ...................................................... 13

            1.   Insofar as Plaintiffs Challenge Defendants' Actions Concerning their Grants, the Tucker Act Vests Exclusive Jurisdiction Over Such Claims in the Court of Federal Claims. .......... 14

            2.   Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals ........... 19

        D.  Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action. ............................................... 20

        E.  Defendants' Staffing Determinations are Themselves Committed to Agency Discretion. ........................................................................ 24

        F.  Plaintiffs Cannot Show a Likelihood of Success on their Claims Grounded in Each Agency's Appropriations Statute. .................................. 27

        G.  Plaintiffs Cannot Show a Likelihood of Success on their Constitutional Claims. .... 28

    II.   Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief. ............................................ 31

        A.  MBDA ......................................................................................................... 33

B.  IMLS ................................................................................................ 34

C.  FMCS ............................................................................................... 35

III.  The Balance of the Equities and the Public Interest Support Rejection of the Plaintiffs' Motion. .......................................................................................................... 36

IV.  Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration of Whether to Appeal ............................................................................................ 37

CONCLUSION .......................................................................................... 38

# TABLE OF AUTHORITIES

**CASES**

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ....................................................................................... 18

*Alfred L. Snapp & Son, Inc., Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982) ...................................................................................................... 10

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ................................................................................... 22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ..................................................................................... 20

*Appalachian Energy Grp. v. EPA*,
33 F.3d 319 (4th Cir. 1994) .......................................................................................... 23

*Baker v. Carr*,
369 U.S. 186 (1962) ...................................................................................................... 30

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................................... 23

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010) ................................................................................. 8, 31, 32

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........................................................................................ 32

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ................................................................................................. 23, 30

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ....................................................................................... 24

*Clapper v. Amnesty Intern. USA*,
568 U.S. 398 (2013) ...................................................................................................... 12

*Clinton v. Jones*,
520 U.S. 681 (1997) ...................................................................................................... 31

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir.1995) ............................................................................................. 32

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ........................................................................................ 21

*Com. of Mass. by Dept. of Pub. Welfare v. Departmental Grant Appeals Bd. of U.S. Dept. of Health & Human Services*,
815 F.2d 778 (1st Cir. 1987) ........................................................................................... 14

*Commonwealth of Massachusetts v. Mellon*,
262 U.S. 447 (1923) ........................................................................................................ 10

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) ........................................................................................... 22

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................. 28, 29, 30

*Department of Education v. California*,
No. 24A910, 2015 WL 1008354 (Apr. 4, 2025) ..................................................... passim

*DeVillers v. Blue Cross & Blue Shield of Rhode Island*,
No. CA 13-173 ML, 2014 WL 1338420 (D.R.I. Mar. 31, 2014) ................................... 25

*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*,
18 F.4th 38 (1st Cir. 2021) .............................................................................................. 37

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) .......................................................................................... 26

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) .......................................................................................... 38

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ............................................................................................................ 20

*EPA v. Brown*,
431 U.S. 99 (1977) .......................................................................................................... 23

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................................................................ 25

v

*Flores v. Wall*,
No. CA 11-69 M, 2012 WL 4471103 (D.R.I. Sept. 5, 2012) ....................................................... 8

*Foxboro Co. v. Arabian Am. Oil. Co.*,
805 F.2d 34 (1st Cir. 1986) ............................................................................................................ 32

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................................................................ 31

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ........................................................................................................................ 24

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ................................................................................................................... 11

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U. S. 204 (2002) ...................................................................................................................... 17

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........................................................................................................................ 10

*Harris v. Wall*,
217 F. Supp. 3d 541 (D.R.I. 2016) .................................................................................................. 7

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................................................................................................ 26

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ....................................................................................................... 24

*Lampon-Paz v. OPM*,
732 F. App'x 158 (3d Cir. 2018) .................................................................................................... 20

*Lincoln v. Vigil*,
508 U.S. 191 (1993) .......................................................................................................... 25, 26, 28

*Littlefield v. U.S. Dep't of the Interior*,
85 F.4th 635 (1st Cir. 2023) ........................................................................................................... 25

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......................................................................................................................... 32

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................................... 21, 22

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .................................................................... 30

*Maryland v. King*,
567 U.S. 1301 (2012) ................................................................................. 37

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ................................................................................... 7

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ..................................................................... 30, 31

*Murthy v. Missouri*,
603 U.S. 43 (2024) ..................................................................................... 1, 8

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ................................................................................... 11

*New York v Trump*,
--- F. Supp. 3d ---, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ...................... 32

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................... 8, 36

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ..................................................................................... 21

*Nunez-Soto v. Alvarado*,
956 F.2d 1 (1st Cir. 1992) .......................................................................... 32

*Open Tech. Fund v. Pack*,
470 F. Supp. 3d 8 (D.D.C. 2020) ............................................................... 37

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*,
87 F.3d 1242 (11th Cir. 1996) ................................................................... 22

*Printz v. United States*,
521 U.S. 898 (1997) ................................................................................... 31

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
45 F.4th 353 (D.C. Cir. 2022) ........................................................................................... 24

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) ................................................................................................. 32

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*,
66 F. Supp. 2d 317 (D.R.I. 1999) ....................................................................................... 8

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991) ............................................................................................ 20

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .......................................................................................................... 25

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .......................................................................................................... 16

*Sullivan v. United States*,
395 U.S. 169 (1969) .......................................................................................................... 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............................................................................................................ 9

*Trump v. New York*,
529 U.S. 125 (2020) .......................................................................................................... 11

*United States Conference of Catholic Bishops v. U.S. Dep't of State*,
No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..................... 17

*United States v. Fausto*,
484 U.S. 439 (1988) .......................................................................................................... 20

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ............................................................................................................ 8

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) ....................................................................................... 32, 33

*Veit v. Heckler*,
746 F.2d 508 (9th Cir. 1984) ............................................................................................ 20

*Vill. W. Associates v. Rhode Island Hous. & Mortg. Fin. Corp.*,
618 F. Supp. 2d 134 (D.R.I. 2009)..................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................................... 7

## STATUTES

15 U.S.C. § 9102 ................................................................................................................. 3
15 U.S.C. § 9502 ................................................................................................................. 3
15 U.S.C. § 9522 ................................................................................................................. 3
15 U.S.C. § 9524 ........................................................................................................... 4, 15
15 U.S.C. §§ 9511–26 ......................................................................................................... 3
20 U.S.C. § 9103 ................................................................................................................. 3
20 U.S.C. § 9105 ................................................................................................................. 3
20 U.S.C. § 9108 ........................................................................................................... 3, 15
28 U.S.C. § 1491 ......................................................................................................... 14, 17
29 U.S.C. § 172 ................................................................................................................... 4
29 U.S.C. § 173 ................................................................................................................... 4
5 U.S.C. § 701 ................................................................................................................... 26
5 U.S.C. § 704 ................................................................................................................... 23
5 U.S.C. § 706 ................................................................................................................... 23
Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978).......... 19

## OTHER AUTHORITIES

Electronic Order, *Mass. Fair Housing Ctr* v. *Dep't of Housing and Urban Dev.*,
No. 3:25-cv-30041-RGS (Apr. 14, 2025), ECF No. [42] ....................................... 2, 17

Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025) ........................................... 3, 4

Fed. R. Civ. P. 65(c). .............................................................................................. 38

## **INTRODUCTION**

Defendants respectfully submit this opposition to Plaintiffs' Request for Emergency Temporary Restraining Order, ECF No. 3. Plaintiffs are twenty-one states, who attempt to join together their widely varying claims regarding some subset of three federal agencies that have taken or may take steps to comply with Executive Order 14,238: the Institute of Museum and Library Services, the Minority Business Development Agency, and the Federal Mediation and Conciliation Service. Plaintiffs also seek to enjoin the Office of Management and Budget from taking steps to oversee the Executive Order's implementation. Some states assert that specific federal grants have been terminated; others anticipate grants may not be renewed; still others complain of anticipated increased costs in the resolution of their labor disputes. Plaintiffs demand expansive emergency relief against the Defendant agencies taking *any* steps to implement Executive Order 14,238, whether or not those steps would impact Plaintiffs.

Article III does not permit litigation via such broad strokes. As the Supreme Court recently reiterated: "standing is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). For each form of relief they seek—and as to each Defendant—Plaintiffs must demonstrate their standing. This, Plaintiffs cannot do.

Nor can Plaintiffs use artful pleading to circumvent the jurisdictional bars that prevent litigation of their claims before this Court. Plaintiffs label all steps any Defendant agency may have taken or may take in the future to comply with Executive Order 14,238 as "Closure Decisions." ECF No. 3 at 2. But in reality, Plaintiffs' grievances target two broad categories of disparate agency activities: administration of grant agreements and personnel decisions. Neither category of claim may be litigated before this Court. Indeed, the Supreme Court recently emphasized that the Tucker Act requires litigation over the disbursement of grant funds to occur

1

before the Court of Federal Claims. *See Department of Education v. California*, No. 24A910, 2015 WL 1008354, *2 (Apr. 4, 2025) (per curiam). Earlier today, another court in this Circuit dissolved a temporary restraining order that had required an agency to reinstate terminated grants and prohibited the agency from terminating other grants; in so doing, the court cited "the Supreme Court's unmistakable directive" that the proper forum for such a case is the Court of Federal Claims. Electronic Order, *Mass. Fair Housing Ctr* v. *Dep't of Housing and Urban Dev.*, No. 3:25-cv-30041-RGS (Apr. 14, 2025), ECF No. [42]. And personnel claims, like employee terminations and reductions in force, must first be litigated before Congressionally designated entities before a plaintiff can bring an Article III action. Plaintiffs cannot jump the line.

For these and several other reasons discussed herein, Plaintiffs cannot show a likelihood of success on their claims. Indeed, none of the four factors informing whether a party is entitled to preliminary relief favors entry of an injunction. Plaintiffs have made no showing of cognizable irreparable harm likely to result in the absence of the broad relief they seek, particularly in the exceptional context of a preliminary injunction, and the balance of equities and the public interest cut against the Plaintiffs' request.

For all the reasons discussed herein, the Court should deny the Plaintiffs' Motion.

## BACKGROUND

### I.  Statutory Background

This suit concerns three Congressionally created agencies—the Institute of Museum and Library Services ("IMLS"), the Minority Business Development Agency ("MBDA"), and the Federal Mediation and Conciliation Service ("FMCS").[1]

---

[1] Plaintiffs have also sued the Office of Management and Budget ("OMB"), claiming that "OMB's oversight of the [Executive Order's implementation] precludes the possibility the agencies will make up for their dramatic cuts with increases elsewhere and makes certain that the

2

**A. IMLS**

Congress established IMLS in 1996. 20 U.S.C. § 9102. IMLS is headed by a director, whose "primary responsibility" is the "development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." *Id.* § 9103(a), (c). To that end, the director is entitled to "appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute." *Id.* § 9105(a). The director is also "authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate" to carry out policy objectives and fulfill statutory responsibilities. *Id.* § 9108(c).

**B. MBDA**

Congress created MBDA, which is located within the Department of Commerce, in 2021. 15 U.S.C. § 9502. MBDA is headed by the Under Secretary of Commerce for Minority Business Development. *Id.* § 9102(b)(1). MBDA has various ongoing initiatives. *See, e.g.*, *id.* §§ 9511–26. For example, the MBDA Business Center Program is intended to (1) assist minority business in "accessing capital, contracts, and grants" and "creating and maintaining jobs"; (2) "provide counseling and mentoring to minority business enterprises"; and (3) "facilitate the growth of minority business enterprises by promoting trade." *Id.* § 9522. The Under Secretary has authority to provide grants to entities approved to participate in the Business Center Program. *Id.*

---

Administration will fail to spend the full amount of funding appropriated by Congress." ECF No. 1 ¶ 145. Although the Executive Order places certain obligations upon OMB in overseeing the Executive Order's implementation, OMB is not itself subject to the Order. *See* Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025).

§ 9524.

### C. FMCS

Congress established FMCS in 1947 "to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. §§ 172, 173(a). Specifically, FMCS services are available "either upon its own motion or upon the request of one or more of the parties to the dispute, whenever in its judgment such dispute threatens to cause a substantial interruption of commerce." *Id.* § 173(b).

## II.   Factual Background

On March 14, 2025, President Trump issued Executive Order No. 14,238, titled "Continuing the Reduction of the Federal Bureaucracy." Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025). The Order calls for the "reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." *Id*. § 1. The Order directs that IMLS, MBDA, FMCS, and four other agencies not at issue in this litigation—the United States Agency for Global Media, the Woodrow Wilson International Center for Scholars in the Smithsonian Institution, the United States Interagency Council on Homelessness, and the Community Development Financial Institutions Fund—"shall be eliminated to the maximum extent *consistent with applicable law*, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id*. § 2(a) (emphasis added). The Order instructs the head of each agency to submit a report to OMB "confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id*. § 2(b).

In accordance with the Executive Order, reorganization efforts are currently underway at

IMLS, MBDA, and FMCS.

## III.    Procedural History

On April 4, 2025, Plaintiffs, twenty-one states, filed a Complaint for Declaratory and Injunctive Relief.  ECF No. 1.  The Complaint asserts seven counts: (1) Count I—arbitrary and capricious abuse of discretion under the APA against Defendants IMLS, MBDA, FMCS, and OMB, *id*. at 44–45; (2) Count II—actions contrary to law under the APA "by failing to expend funds appropriated by Congress, or by delaying the expenditure of such funds" against Defendants IMLS, MBDA, FMCS, and OMB, *id*. at 46; (3) Count III—notice and comment violations under the APA against Defendants IMLS, MBDA, FMCS, and OMB, *id*. at 47–48; (4) Count IV—violation of the Appropriations Clause against all Defendants, *id*. at 48–49; (5) Count V—violation of the separation of powers doctrine by usurping legislative authority against all Defendants, *id*. at 49–50; (6) Count VI—violation of the separation of powers doctrine through failure to comply with the Take Care Clause against all Defendants, *id*. at 50–51; and (7) Count VII—equitable *ultra vires* against all Defendants, *id*. at 52.

On the same day, Plaintiffs filed a Request for Emergency Temporary Restraining Order. ECF No. 3.  Plaintiffs request that the Court issue a stay under 5 U.S.C. § 705 of IMLS, MBDA, and FMCS's plans to effectuate the Executive Order.  *Id*. at 49.  In the alternative, Plaintiffs request an order enjoining Defendants from implementing the Executive Order and each agency's Executive Order compliance plans.  *Id*.  This would include any employee terminations or reductions in force as well as any grant terminations.  *Id*. at 43–44.  Plaintiffs have since converted their request for a temporary restraining order into a request for a preliminary injunction. ECF No. 31.

In support of their Motion, Plaintiffs submitted fifty-four declarations.  *See* ECF Nos. 3-

1–45, 35-1–9. Eighteen states claim that "Executive Order 14,238 and the ensuing federal agency action to put all staff on administrative leave will cause IMLS to be unable to administer financial awards and/or programs on which the State Library relies and on which it expects to rely in the future, causing significant harm to the State [institutions]." ECF No. 3-1 ¶ 8, 35-1 (Arizona); *see also* ECF Nos. 3-3 (California); 3-4 (Connecticut); 3-5 (Delaware); 3-7 (Hawaii); 3-15 (Maryland); 3-18–19 (Maine); 3-21 (Michigan); 3-22 (Minnesota); 3-23 (New Jersey); 3-24–25 (New Mexico); 3-27 (New York); 3-28 (Oregon); 3-31 (Rhode Island); 3-34 (Washington); 3-35, 38 (Wisconsin); 3-43 (Illinois); 3-44 (Massachusetts). Six organizations that receive IMLS grants filed declarations noting that they would experience harm if their IMLS grants were terminated. *See* ECF Nos. 3-8 (Friends of the Judiciary History Center of Hawaii); 3-9 (University of Hawaii); 3-13 (Maryland Commission on African American History and Culture); 3-17 (University of Maryland); 3-33 (University of Washington Information School); 3-36 (University of Wisconsin-Stevens Point). Five states and three organizations claim that they have been harmed by IMLS's termination of existing grants. *See* ECF Nos. 3-3 ¶ 17 (California); 3-4 ¶ 31 (Connecticut); 3-34 ¶ 10 (Washington); 35-6 (New Jersey); 35-7 (New Mexico); 35-5 (University System of Maryland); 35-8 (University of Washington Information School); 35-9 (University of Wisconsin-Stevens Point).

Similarly, two states claim that they will be harmed by MBDA's potential grant terminations, potential grant disbursement delays, and potential elimination of support services. *See* ECF Nos. 3-12 (Maryland); 3-29 (Rhode Island). Six organizations that receive MBDA grants filed supporting declarations. *See* ECF Nos. 3-2, 35-2 (Arizona Hispanic Chamber of Commerce); 3-10 (University of Hawaii System); 3-11 (University of Hawaii); 3-16 (Morgan State University); 3-20 (Northern Great Lakes Initiative) 3-37 (University of Wisconsin). None

of those states or organizations claim that that any of their MBDA grants have been terminated.

Three states claim that FMCS's compliance with the Executive Order would lead to greater costs and increased risk of litigation.  *See* ECF Nos. 3-14 (Maryland); 3-26 (New Mexico); 3-30 (Rhode Island).  Four organizations that utilize FMCS services filed supporting declarations. *See* ECF Nos. 3-6 (Hawaii Pacific Health); 3-32 (General Teamsters Local 251); 3-39 (American Federation of State, County and Municipal Employees); 3-45 (New England Health Care Employees Union).  None of those states or organizations claim that current mediation efforts have been interrupted.[2]

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted); *see also, e.g., Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016) ("When considering a request for interim injunctive relief, the court must be guided by the traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right.").

To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The third and fourth factors of the analysis—harm to others and the public interest— "merge when the

_____

[2] Plaintiffs also submitted declarations from IMLS and MBDA employees placed on administrative leave after the issuance of the Executive Order, as well as from the National Representative for the National Association of Government Employees who services FMCS. *See* ECF Nos. 3-40–42, 35-3–4.

Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Typically, preliminary injunctive relief is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A mandatory injunction, such a Plaintiffs seek here, is different—"[b]ecause a mandatory preliminary injunction alters rather than preserves the status quo, it normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Braintree Labs., Inc. v. Citigroup Glob. Mkts, Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (internal citation omitted). *See also, e.g., Flores v. Wall*, No. CA 11-69 M, 2012 WL 4471103, at *7 (D.R.I. Sept. 5, 2012) (when injunction sought is mandatory, courts should exercise more caution); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 327 (D.R.I. 1999) (same).

Plaintiffs cannot meet this high burden in this case.

## ARGUMENT

**I.    Plaintiffs Cannot Establish Likelihood of Success on the Merits.**

**A.  Plaintiffs Have No Standing to Demand the Broad Relief Sought in their Motion.**

As a threshold matter, Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). The Supreme Court recently emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted) (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified

whole"). Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). The Supreme Court highlighted that "[h]eeding these conditions is critically important" in a "sprawling suit" with multiple plaintiffs, defendants, and claims, where plaintiffs had alleged different impacts stemming from varying conduct by different defendants. *Id.* The same requirement for careful analysis applies here.

Although Plaintiffs frame their request for relief in sweeping terms—seeking a complete stay of what they refer to as three different agencies' "Closure Decisions" or an injunction prohibiting the implementation of Executive Order 14,238 altogether—Plaintiffs are twenty-one different states, challenging the conduct of four different agencies,[3] as to an unspecified number of grant, employment, and programmatic terminations, some alleged to have occurred, and some which may—or may not—occur in the future. Plaintiffs concede that four additional agencies included in Executive Order 14,238 "[a]re not the subject of this lawsuit," ECF No. 3 at 10 n.3, yet draw their request for relief so broadly that OMB would be prohibited from implementing Executive Order 14,238 even with respect to them, if the Court ordered their requested relief. *See* ECF No. 3 at 49 (requesting that the Court enjoin Defendants "from implementing the Closure Decisions and the Closure Order"). Plainly, Plaintiffs have no standing to seek relief as to those agencies, having alleged no injury stemming from their conduct, and this Court therefore lacks jurisdiction to enter any relief as to the United States Agency for Global Media, the Woodrow Wilson International Center for Scholars in the Smithsonian Institution, the United

---

[3] Plaintiffs challenge IMLS, MBDA, and FMCS's implementation of the Executive Order and OMB's oversight of that implementation. *See* ECF No. 3 at 33.

States Interagency Council on Homelessness, and the Community Development Financial Institutions Fund.

Plaintiffs likewise lack standing to seek broad relief against the Defendant agencies as to other states and parties that are not plaintiffs before this Court—they can only assert standing, if at all, to remedy injury to themselves.  To the extent Plaintiffs seek relief to remedy others' injuries, that would be a *parens patriae* suit, but the Supreme Court has made clear that "'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government,' *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quoting *Alfred L. Snapp & Son, Inc., Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)); *see also Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae"). Therefore, Plaintiffs do not have standing to seek injunctive relief regarding assistance that is disbursed directly or otherwise provided via direct services to entities or citizens other than the Plaintiff states in this suit. *See e.g.* ECF No. 3 at 43–46 (citing forty-two states' collective bargaining agreements that "call for the use of FMCS"); *id.* at 44 (citing that a private and public sector union "had multiple pending mediations in which the parties were using FMCS services").

For the reasons explained further herein, Plaintiffs are not likely to prevail on the merits of their claims, and the Court should deny relief in full.  To the extent the Court is inclined to grant any relief, Article III—and the related requirement that the remedy sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill* v.

*Whitford*, 138 S. Ct. 1916, 1931 (2018)—necessitates that any relief be drawn narrowly to address only demonstrated injuries to Plaintiffs in this case.

### B.  Plaintiffs' Claims Regarding Potential Future Injury are not Ripe.

Article III further requires that the Court only adjudicate those claims that are ripe for review.  Ripeness requires that an alleged injury be "certainly impending"; a claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 529 U.S. 125, 131 (2020) (citation omitted).  A court lacks jurisdiction over un-ripe claims that do not satisfy the Constitution's case or controversy requirements.  "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

Under these standards, Plaintiffs' alleged potential future injuries cannot form the basis for the Court's subject-matter jurisdiction. Plaintiffs claim that "some [IMLS grant] payments have been terminated, while many others will be delayed," "MBDA has been reduced to a caretaker staff [making it] virtually certain to miss payments to State-run business centers [and] miss the critical window to solicit grants in time to replace expiring awards," and the absence of FMCS services will potentially "force more costly and less effective alternatives for addressing and preventing labor strife." ECF No. 3 at 37. While Plaintiffs claim that they will be irreparably harmed by future delays or failures to receive IMLS, MBDA, and FMCS funds and services, nearly all of the claimed harm they assert is speculative. *See id.* at 33–42.

Specifically, as to IMLS, the twenty-one Plaintiff states identify only eight grants that have been terminated.  *Id.* at 39; ECF Nos. 3-3, 3-4, 3-34, 35-5–9.  Plaintiffs speculate that "it is

inevitable that many of these disbursements will be delayed, if they are processed at all." ECF No. 3 at 38. Indeed, as to some cited grants, the Plaintiffs have not even submitted draw-down requests. *See id.* at 40 ("in the next four weeks, Maryland's State-operated Banneker-Douglass-Tubman Museum expects to draw down funds"). Such allegations fall far short of the concrete "certainly impending" harms that must be alleged for a claim to be ripe. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (cleaned up). Even more so as to Plaintiffs' allegations regarding MBDA: Plaintiffs identify *no* grants that have already been cancelled and, instead, speculate that "[i]t is quite likely that MBDA, with only five employees, will fail to make payments as scheduled—or at all—in the coming weeks." ECF No. 3 at 42. It is notable that, as with IMLS, Plaintiffs cite, as their first example of why they are entitled to relief, a grant on which they have yet to even make a request for payment. *See id.* at 41 ("The University will submit its next payment request to MBDA by April 15, and expects to receive a disbursement of grant funds by April 30").

Plaintiffs' second example likewise features a grantee that does not expect payment for over two weeks. *See id.* ("the University of Hawai'i Maui College . . . expects to receive its next reimbursement payment on April 28."). As to grant funds not yet received, Plaintiffs identify no concrete harm that has resulted apart from a "chilling effect" and "eroding confidence among program participants and partners," which is not a cognizable form of injury. *Cf. Clapper*, 568 U.S. at 418 ("allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm") (quotation omitted). Plaintiffs also speculate that their grants will not be renewed absent injunctive relief, but they

12

acknowledge that any lapses stemming from non-renewal would be months away. *See* ECF No. 3 at 42 ("all MBDA grants will expire on June 30 or August 30"). Plaintiffs claim harm based on the length of time "typically" taken in the past to renew a grant, *id.*, but do not cite any reason why that length of time is required—or why the possibility of non-renewal months from now could, even if there is standing, justify emergency injunctive relief now. *See id.*

Finally, as to FMCS: Plaintiffs rely largely on speculative assertions about potential future harm to labor relations because participants in labor-management disputes will need to select a service other than FMCS for dispute resolution. Indeed, while Plaintiffs suggest that their inability to use FMCS for dispute resolution will result in "costly—even life-threatening—disruptions" in critical industries, they cite only one dispute, that of a school district in Illinois, in which the Plaintiff states were actively using FMCS's services when it stopped offering such services to the public sector. *See* ECF No. 3 at 44. And, while Plaintiffs allege that a "huge influx of contract disputes" is anticipated in New Mexico as a result of FMCS no longer offering such services, they identify no disputes that were pending before FMCS at that time. *Id.* at 44–45. Plaintiffs point to the "increased risk of strikes, labor strife, and litigation," *id.* at 46, if they are not able to use FMCS services, but these asserted harms are wholly grounded in a speculative chain of possibilities. Plaintiffs cite no reason—other than their unsupported assertions that other dispute resolution options would be "inferior," *id.*—to support their position that any of these harms is likely to result from the potential future unavailability of FMCS dispute resolution services.

## C. To the Extent they are Justiciable, Plaintiffs' Claims Must Be Heard by Another Court or Administrative Body.

While Plaintiffs characterize their claims as challenges to what they call "Closure Decisions," those are not discrete agency actions. *See infra* part I(D). In reality, Plaintiffs

claims are aimed either at grant delays or terminations, as to IMLS and MBDA, *see* ECF No. 3 at 37–43, and the placement of the majority of IMLS, MBDA, and FMCS's employees on administrative leave, *id*. at 24, 44. Both categories of claims, under federal law, must be heard by another body. As explained below, even if Plaintiffs had standing to seek the expansive relief they request, and even if their claims were ripe, they could not be adjudicated before this Court.

### 1. Insofar as Plaintiffs Challenge Defendants' Actions Concerning their Grants, the Tucker Act Vests Exclusive Jurisdiction Over Such Claims in the Court of Federal Claims.

Some of the Defendant agencies' activities in compliance with Executive Order 14,238 involve the termination of grant agreements that the agencies have determined are not required by statute. *See, e.g.*, ECF No. 3-3 ¶ 19 (noting termination of IMLS grant). Plaintiffs challenge these grant terminations as part of their lawsuit. *See*, *e.g.*, ECF No. 3 at 38–39 (citing delays in grant funding); *id.* at 39 (citing terminated grants). But because—as the Supreme Court recently emphasized—Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks jurisdiction over such grant terminations, whether challenged independently, or as part of each agency's larger compliance with Executive Order 14,238.

The Tucker Act, 28 U.S.C. § 1491(a), "provides jurisdiction *and* waiver of immunity in the Claims Court so long as the action: 1) is against the United States; 2) seeks relief over $10,000; and 3) is founded upon the Constitution, federal statute, executive regulation or governmental contract." *Vill. W. Associates v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009) (emphasis supplied). As a result, the Court of Federal Claims "has exclusive jurisdiction over claims 'founded upon a contract.'" *Com. of Mass. by Dept. of Pub. Welfare v. Departmental Grant Appeals Bd. of U.S. Dept. of Health & Human Services*, 815 F.2d 778, 785 (1st Cir. 1987).

14

Here, Plaintiffs' claims are grounded in the alleged need for undisrupted funding pursuant to grant agreements with IMLS and MBDA.  *See* ECF No. 3 at 40 ("[IMLS] funds must be paid on time in order to prevent immediate and serious disruptions to the states' library and museum services."); *id*. at 41 ("States expect the payment of funds from MBDA in the coming weeks, and any delay in the disbursement of those funds will cause them immediate harm."). Plaintiffs posit that as a result of IMLS and MBDA's implementation of the Executive Order, the agencies will likely default on upcoming grant payments and fail to timely renew future grants to prevent lapses in funding.[4]  *Id*. at 42–43.  The heart of this action, then, is a request to prevent the termination of those agreements or the enforcement of monetary obligations of the government pursuant to those agreements.

For purposes of the Tucker Act, Plaintiffs' grant agreements are contracts because they set out obligations that must be fulfilled in exchange for consideration from the government. Indeed, Congress has made clear that any funds disbursed to grantees like Plaintiffs are paid via grant agreements, *i.e.* contracts, between the subject agencies and the grantees.  *See* 20 U.S.C. § 9108(c) ("The Director [of the IMLS] is authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate . . . ."); 15 U.S.C. § 9524(c)(1) ("The amount of financial assistance provided by the Under Secretary under an MBDA Business Center agreement shall be not less than $250,000 for the term of the agreement.").  Plaintiffs attempt to sidestep the Tucker Act's jurisdictional mandate by depicting their claims as requests for equitable relief stemming from statutory mandates.  *See* ECF No. 3 at 48 ("Should IMLS, MBDA, and FMCS close tomorrow, Plaintiff states would be thrown into chaos and uncertainty

---

[4] FMCS does not issue grants.  *See* ECF No. 3 at 19–20.

as they race to replace the funding and expertise that has suddenly been interrupted.  The federal government, on the other hand, suffers not at all if it were to spend the appropriations as already planned and directed by with the passage of the Continuing Appropriations Act.").  But this misstates the record:  Congress did not directly appropriate funds to the states; it authorized the Defendant agencies to issue grants.  Those grants are contracts, and suits challenging their termination—and Plaintiffs' demand that the government keep paying funds out from these terminated grants—belong in the Court of Federal Claims.

The government acknowledges that the subject grants are funded via appropriations, but that is true for all government contracts—after all, virtually no federal funds can be paid absent appropriations.  *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding).  Nothing in the statutory framework mandates payment by methods other than grant agreements.  Indeed, Plaintiffs' request to enjoin implementation of the Executive Order is premised on the notion that the Defendant agencies will be unable to distribute grant funds to Plaintiffs.  *See, e.g.*, ECF No. 3-2 ¶¶ 26–27 ("In the next four months, we are scheduled to receive disbursements/reimbursements of $3,392,933.27 . . . If we do not receive such disbursements/reimbursements, it will stop statewide and local public library programs immediately and before they can be completed . . . ."); ECF No. 3-16 ¶¶ 9–12 (Maryland MBDA center "experienced unprecedented challenges in receiving MBDA funds" through a $109,000 "delay in or loss of funding.").

Such challenges to grant terminations belong in the Court of Federal Claims.  Recently, the Supreme Court in *Department of Education v. California*, 2025 WL 1008354 (Apr. 4, 2025), considered a temporary restraining order "enjoining the Government from terminating various

education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at *1.  The Supreme Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.*  This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)).  "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U. S. C. § 1491(a)(1)); *see also* Electronic Order, *Mass. Fair Housing Ctr* v. *Dep't of Housing and Urban Dev.*, No. 3:25-cv-30041-RGS (Apr. 14, 2025), ECF No. [42] (recognizing that the Supreme Court's ruling comprises an "unmistakable directive" that challenges to grant terminations—even those purporting to be grounded in federal statutes— must be litigated in the Court of Federal Claims).

The Supreme Court's conclusion was foreshadowed in *United States Conference of Catholic Bishops v. U.S. Department of State*, which amplifies upon *California*'s reasoning. No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed*, No. 25-5066 (D.C. Cir. Mar. 14, 2025).  In that case, a grantee that had been receiving funds via cooperative agreements with the State Department sought a temporary restraining order preventing the State Department from terminating cooperative agreements with that grantee. *Id.* at *2–3.  The court noted that the grantee had millions of dollars in requested reimbursements pending and that without ongoing funding the grantee claimed "thousands of refugees already in its care would soon lack enough support." *Id.* at *2.  Nonetheless, the court declined to grant preliminary relief, holding the Tucker Act stripped it of jurisdiction to entertain such a claim. *See*

17

*id*. at \*4–8.  The court explained that "the ultimate inquiry of whether a claim is 'essentially a contract action' turns on two key considerations: '[t]he source of rights upon which the plaintiff bases its claims' and the type of relief sought." *Id*. at \*5 (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)).  The court found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract." *Id*. (quoting *Albrecht*, 357 F.3d at 68).  There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant.  *See id*.  As the Court explained, however, "[s]tripped of its equitable flair, the requested relief seeks one thing: [plaintiff] wants the Court to order the Government to stop withholding the money due under [its grant agreements].  In even plainer English: [the plaintiff] wants the Government to keep paying up.  Thus [the plaintiff] seeks the classic contractual remedy of specific performance." *Id*. at \*7 (quotation omitted).  The court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since plaintiffs asked the court "to reverse the Government's decision to cease a financial relationship with the [plaintiff]." *Id*.

Because Plaintiffs seek to ensure the government's continued compliance with the terms of their grant agreements, their claims sound in contract.  Indeed, Plaintiffs' Motion and accompanying affidavits repeatedly emphasize that uninterrupted grant funding is necessary to ensure that continued viability of their programs.  Plaintiffs' claims rest on the need for assurances that the government will continue to comply with existing grant agreements.  In other words, Plaintiffs want the Government to keep paying up.  As such, jurisdiction for Plaintiffs' claims related to those grant agreements lies exclusively in the Court of Federal Claims.  Because Plaintiffs cannot establish jurisdiction, they cannot succeed on the merits of claims related to grant agreements, and their request for extraordinary injunctive relief should be

18

rejected on that basis alone.

**2.    Administrative Bodies Identified in the Civil Service Reform Act of 1978 are the Exclusive Channels for Any Challenge to the Propriety of Federal Employee Removals.**

While Plaintiffs' allegations concerning IMLS and MBDA focus on those agencies' administration of grant agreements, Plaintiffs' allegations concerning FMCS (and to a lesser extent, the other two agencies) focus on its employment actions.  Specifically, Plaintiffs assert that "[e]ach agency has [] placed most of its workforce on administrative leave—immediately depriving them of access to email and locking them out of their offices—and initiated large-scale reductions in force." ECF No. 3 at 24.  Federal law does not permit Plaintiffs to employ an APA action to challenge the removal of federal employees—much less the removal of third-party employees.

Rather, in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress established a comprehensive framework for evaluating adverse employment actions against federal employees and presenting an integrated scheme of both administrative and judicial review of challenged personnel practices of challenged personnel practices. In so doing, Congress balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). With limited exceptions not relevant here, Congress explicitly sought to reduce the participation of the federal courts, preferring the use of the CSRA's grievance procedures over all other remedies.

Specifically, in passing the CSRA, Congress made the Office of Special Counsel, the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees, applicants, labor unions and other

interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988), even when those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

The Supreme Court has long recognized that Congress established the CSRA as a comprehensive scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455.  Indeed, the Supreme Court has held that, even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12.  The CSRA thus precludes "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 835–42 (9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Veit v. Heckler*, 746 F.2d 508, 510–11 (9th Cir. 1984).

Because federal law requires channeling of all claims related to federal employment via the administrative bodies that Congress created in the CSRA, this Court lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge the placement of federal employees on leave.  Indeed, such a holding is consistent with the Supreme Court's emphasis earlier this month in *California* that the APA does not allow litigants to forestall properly applicable channeling regimes that Congress established. *See California*, 2025 WL 1008354, at *1.

### D. Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action.

Plaintiffs' claims also fail because they are not challenging a discrete agency action, but

rather a collection of grant terminations, personnel actions, and programmatic activities.  Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004).  Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).  "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*.

Plaintiffs improperly seek wholesale judicial review of IMLS, MBDA, and FMCS's implementation of the Executive Order.  For example, Plaintiffs argue that their "libraries and museums are entitled to millions of dollars in grant payments from IMLS in the coming weeks" and "some of those payments have been terminated, while many others will be delayed."  ECF No. 3 at 37.  Plaintiffs further state "because MBDA has been reduced to a caretaker staff, it is virtually certain to miss payments to State-run business centers, and it will miss the critical window to solicit grants in time to replace expiring awards." *Id*.  In addition, Plaintiffs contend that FMCS "furnishes a critical mediation and conciliation service that sates were actively using at the time the agency was closed; in its absence, states will need to turn to more costly and less effective alternatives for addressing and preventing labor strife." *Id*.  Notably, Plaintiffs do not challenge specific grant terminations; specific payments they claim to be entitled to; or specific

provision of mediation services—they challenge the entire course of conduct of three agencies moving forward. The APA does not permit such challenges.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892–93 (footnote omitted). Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to the possibility that the agencies will fail to disburse grant funds as they become due and the prospect that they may be unable to comply with generalized purported statutory obligations given their current staffing decisions. But these are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions.

Wholesale challenges like Plaintiffs' are impossible to litigate under the mechanics of judicial review that the APA contemplates. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision." *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it possible for the Court to apply the applicable

standard of review, *see* 5 U.S.C. § 706, to the agency action.  Accordingly, Plaintiffs are unlikely

to succeed on their APA claims because they are sweeping programmatic challenges and thus not

cognizable under the APA.

Moreover, IMLS, MBDA, and FMCS's ongoing compliance with the Executive Order

does not itself constitute final agency action reviewable under the APA.  To constitute final

agency action: (1) "the action must mark the consummation of the agency's decisionmaking

process" and (2) it "must be one by which rights or obligations have been determined, or from

which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned

up).  Plaintiffs' argument that "[b]y terminating large portions of what these agencies do," IMLS,

MBDA, and FMCS have taken final agency actions under *Bennett*, ECF No. 3 at 23–24, misses

the mark.

Under *Bennett*'s first prong, the agencies' ongoing implementation of the Executive

Order marks the initiation, not the consummation, of the agency's decision-making process.  The

agencies' actions reflect decisions by agency leadership to realign their policy goals and actions

consistent with the current administration's directives.  Those decisions are "preliminary" in

nature and "not directly reviewable[.]"  *See* 5 U.S.C. § 704.  "[They] may be a step, which if

erroneous will mature into a prejudicial result[.]"  *Chi. & S. Air Lines, Inc. v. Waterman S.S.

Corp.*, 333 U.S. 103, 112 (1948).  But that does not make the interim decisions themselves the

"consummation of the administrative process" reevaluating the agency's priorities.  *Id*. at 113; *see

EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet

promulgated, the final form of which has only been hinted at, would be wholly novel.");

*Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action

where agency "has not taken any action at this point triggering [the court's] power to review its

position").

Nor do the agencies' attempts to implement the Executive Order satisfy the second *Bennett* prong. Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). Plaintiffs' claims would not stem from the programmatic efforts of the agency writ large, but from specific challenges to specific activities stemming from programmatic plans—from a grant termination (were such terminations reviewable under the APA, which they are not), or the specific cancellation of services to which the Plaintiffs had a legal entitlement. But they do not bring those specific challenges—and they cannot subsume concrete final agency action within the banner of a programmatic challenge more generally.

### E. Defendants' Staffing Determinations are Themselves Committed to Agency Discretion.

Plaintiffs repeatedly complain about Defendants' staffing decisions, which they say may—though they have not yet—hindered the provision of what Plaintiffs claim are the Defendants' legally mandated obligations. But this conflates two distinct inquires: (1) agency staffing determinations, on one hand, and (2) specific provision of specific services, on the other.

The former is committed to agency discretion, and Plaintiffs cannot use their fears about the latter to justify challenges to the former, particularly in the absence of concrete actions to terminate statutorily required obligations.

As a result, Plaintiffs are unlikely to succeed on the merits of their arbitrary and capricious claim regarding staffing changes, which involve actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied sub nom. Littlefield v. Dep't of the Interior*, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). Plaintiffs bear the burden of making such a showing. *See generally DeVillers v. Blue Cross & Blue Shield of Rhode Island*, No. CA 13-173 ML, 2014 WL 1338420, at *4 (D.R.I. Mar. 31, 2014) (noting that the plaintiff carries the burden of showing that agency action is arbitrary and capricious).

Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vt. Yankee*, 435 U.S. at 524–25 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are

traditionally left to an agency's discretion. *See id.* at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments").  To override these principles and enjoin agency leadership from exercising procedural control over its own staff so as to ensure that staff is carrying out statutory obligations or otherwise exercising agency leadership's policies would be an extraordinary violation of the separation of powers. Such activities are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln*, 508 U.S. at 191–92 (quoting 5 U.S.C. § 701).  Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best first the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821 (1985).  "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions.  Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute.

26

*See Vt. Yankee*, 435 U.S. at 543.

Ultimately, if Plaintiffs are dissatisfied with the provision of specific services in a manner that would constitute final agency action, they may challenge that action. And they cannot preemptively challenge staffing determinations antecedent to those actions on the fear that the agency may not be able to comply with any statutory mandates. Said differently, a person may be able to challenge a final agency action that injures them; they cannot challenge the staffing determinations that decided which line employee made that determination. But it is the latter challenge Plaintiffs bring, because they cannot bring the former.

### F. Plaintiffs Cannot Show a Likelihood of Success on their Claims Grounded in Each Agency's Appropriations Statute.

Plaintiffs' claims grounded in statute, *see* ECF No. 3 at 31–33, likewise cannot succeed. Plaintiff's arguments rest on the notion that the Continuing Appropriations Act, in which Congress appropriated funds to IMLS, MBDA, and FMCS for the remainder of fiscal year 2025 to carry out their obligations under their respective statutes, creates a statutory obligation for IMLS, MBDA, and FMCS to spend the money appropriated for grant funding or provision of services *for Plaintiffs*, thus transforming the inquiry into one of statutory assessment. *See id.* But the Continuing Appropriations Act comprises instructions for appropriations, and *those appropriations have been made*. When Congress demands direct expenditures, it knows how to do so. *Compare, e.g.*, *Sullivan v. United States*, 395 U.S. 169, 172 (1969) (quoting statutory language providing that funds "shall be allocated to *and expended for*") (emphasis added).

Neither that statute, nor the agency-specific statutes under which Plaintiffs claim reliance, create an obligation as to specific funds owed to Plaintiffs or services to be provided to Plaintiffs, or creates a statutory prohibition on terminating any particular grant or service. The appropriations are not to any of the Plaintiffs; rather, the appropriations are to each agency. And,

since there is no statutory directive to the contrary, each agency—having received its appropriation from Congress—has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 193.  In other words, Plaintiffs cannot challenge their access to funding via the appropriations channel.

Fundamentally, Plaintiffs are not funded through direct congressional appropriations, rather, they are explicitly funded through grant agreements with IMLS and MBDA. *See supra* part I(C)(1). Execution of those grant agreements—and their terminations—are governed by the applicable grant agreements. Defendants' conduct under those grant agreements are reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant agreement is funded through an appropriation does not mean that the routine execution of that grant agreement takes on statutory—let alone constitutional—dimensions.

Notably, Plaintiffs do not otherwise explain how the specific services the agencies provide are statutorily mandated, much less that they have been terminated.  That is their burden at this stage.

### G.  Plaintiffs Cannot Show a Likelihood of Success on their Constitutional Claims.

Plaintiffs' constitutional claims alleging violations of the Separation of Powers and the Take Care Clause, *see* ECF No. 3 at 33–36, are meritless.  As a threshold matter, Plaintiffs' asserted constitutional claims are the same claims discussed above, dressed up in constitutional language—as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of

28

powers doctrine." *Id.* at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472.  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).  The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute.  *Id.* at 473 & n.5. Here, Plaintiffs' claims focus entirely on their contentions that the Defendant agencies have not acted consistent with statutory obligations.  ECF No. 3 at 33–37.  Under *Dalton*, such claims cannot succeed.

Plaintiffs' claim under the Take Care Clause, *see* ECF No. 1 ¶¶ 192–97 (Count VI), also fails on its own merits.  It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief.  In reality, that claim comprises a broad programmatic attack against the President as well as the agency Defendants in an attempt to circumvent the limitations of the APA.  Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims.  *See Dalton*, 511 U.S. at 473.  Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing the Defendant agencies, but rather, are based on Plaintiffs' subjective views about how to best implement and administer those agencies.

Through the Take Care Clause, the Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  Inevitably, the laws that the President executes are those enacted by Congress.  But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws.  Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction.  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character.").  To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone.  *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that

"embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Defendants' alleged attempt to undermine the statutes recognizing IMLS, MBDA, and FMCS, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

\* \* \* \* \* \* \*

In sum, for all the reasons discussed above, Plaintiffs cannot show a likelihood of success on their claims.

## II.   Plaintiffs Have Failed to Demonstrate that They Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief.

Apart from the lack of any likelihood of success, Plaintiffs also have failed to demonstrate that they will suffer irreparable harm if the Court does not enter the requested preliminary injunction. Irreparable harm is "the essential prerequisite for equitable relief." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quotation

omitted); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm.").

"The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 18 (1st Cir. 2000)). To meet this burden, Plaintiffs must demonstrate a "likelihood of substantial and immediate irreparable injury, as opposed to speculative claims of future injury." *Nunez-Soto v. Alvarado*, 956 F.2d 1, 3 (1st Cir. 1992) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). Furthermore, the irreparable harms pled must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting a preliminary injunction. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir.1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties") (emphasis in original).

In general, economic harm does not compromise "irreparable injury" under First Circuit precedent. *See Foxboro Co. v. Arabian Am. Oil. Co.*, 805 F.2d 34, 36 (1st Cir. 1986); *see also Braintree Lab'ys, Inc.*, 622 F.3d at 41 (noting that damages, with prejudgment interest, could provide an adequate remedy at law if, after litigation on the merits, the Court were to determine that plaintiff was entitled to relief).[5] A narrow exception exists "where the potential economic loss is so great as to threaten the existence of the movant's business." *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).

---

[5] Defendants recognize that this Court recently entered a temporary restraining order in response to claims challenging a pause in federal funding, *see New York v Trump*, --- F. Supp. 3d ---, 2025 WL 357368 (D.R.I. Jan. 31, 2025), but respectfully submit that the Court did not have before it argument on this point, *i.e.*, that grant terminations must be heard in the Court of Federal Claims, which is empowered to grant monetary relief if appropriate.

Here, none of the alleged injuries Plaintiffs plead can support the entry of the requested preliminary injunction preventing MBDA, IMLS, and FMCS from taking any steps to implement Executive Order 14,238.  As detailed below, the harms pled all are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief.

### A.  MBDA

Plaintiffs' allegations regarding MBDA illustrate why economic harms generally are not cognizable as "irreparable harm" for purposes of preliminary equitable relief; money is generally fungible, and, unless the very existence of an enterprise is threatened, *see Vaquería Tres Monjitas, Inc.*, 587 F.3d at 485, a litigant suffering financial loss may be made whole through money damages.  Plaintiffs effectively concede the point in arguing alleged irreparable harm to the University of Wisconsin Office of Business and Entrepreneurship, asserting that it will submit its next payment request by April 15 and "expects to receive a disbursement of grant funds by April 30."  ECF No. 3 at 41.  Plaintiffs add that "[i]f the University does not receive this disbursement 'as scheduled,' it will not be able to pay students, independent contractors, or staff, *and will need to draw funds from its own pocket to meet expenses*."  *Id.* (emphasis added).  More broadly, Plaintiffs argue that "if MBDA grant payments 'are not paid when due . . . the States and their instrumentalities will either need to forgo services to disadvantaged businesses *or shell out their own money as a result*."  *Id.* at 42 (emphasis added).

In *Department of Education v. California*, the Supreme Court considering an analogous suit found it "compelling" that grantees—that had been granted a temporary restraining order enjoining the Government from terminating various education-related grants—"[had] the financial wherewithal to keep their programs running."  2015 WL 1008354, *2.  Against that backdrop, the Supreme Court held it was appropriate to stay the temporary restraining order,

33

reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum.' *Id.* Just so in this case.

Moreover, even if economic injuries were cognizable as irreparable harm: Plaintiffs have identified just one grant as to which payment was expected and has not yet occurred: $109,000 which they allege Maryland's Morgan State University has been unable to draw down since March 29, 2025. ECF No. 3 at 41. While Maryland could have chosen to bring its own action in an appropriate forum, *i.e.* the Court of Federal Claims, to litigate whether payment on that grant must be made, there is no authority under which another State can bootstrap onto Maryland's alleged harm an order that all future payments to it must be made by MBDA, regardless of the President's or agency's judgment, let alone to twelve other Plaintiff states. Yet that is the expansive relief that Plaintiff states now demand.

Finally, it is striking that, apart from the $109,000 to Morgan State University, Plaintiffs point to just one example of funds expected from MBDA—those funds, on Plaintiffs' telling, would not be due to be disbursed until April 30, more than three weeks after Plaintiffs' Motion was filed. *See* ECF No. 3 at 41. Plaintiffs' Motion offers no reason why emergency injunctive relief is necessary *now*, *see id.*, much less make a showing that they would be irreparably harmed in the absence of such an order. For this reason, too, the Court should deny the Plaintiffs' Motion.

### B.  IMLS

Plaintiffs' allegations of harm related to IMLS fare no better. With respect to IMLS, Plaintiffs point to several grant awards that are delayed or that have been terminated. *See* ECF No. 3 at 37–39. None of those assertions of harm, however, includes any allegation that the very existence of the program or library funded by that grant would be threatened if a preliminary

injunction were not issued.  *See id.*  Indeed, the declaration of Secretary Garcia y Griego of New Mexico notes: "[a] protracted pause in federal funding would require the appropriation of other funds to ensure ongoing services."  ECF No. 3-24, ¶ 18.  This acknowledgement confirms what the precedent already recognizes—absent a situation in which the very existence of an entity is threatened, economic harms are not "irreparable."  *See supra* part II(A).

Furthermore, as with MBDA, to the extent Plaintiffs identify any grant terminations, *see* ECF No. 3 at 39 (identifying three), or disbursements that have been delayed, *see id.* at 38–39 (identifying four), the states in such situations could have brought individual actions in the appropriate forum to address their concrete interests.  The expansive reach of the relief that the twenty-one Plaintiff states seek instead—rather than targeting relief to any concrete injuries identified in Plaintiffs' Motion—just underscores the overbreadth of the requested preliminary injunction.

### C.  FMCS

Finally, with respect to FMCS, Plaintiffs' allegations of irreparable harm depend likewise on economic injuries, which are not cognizable, and altogether speculative allegations.  *See* ECF No. 3 at 44–46.  Although Plaintiffs note that forty-two states have collective bargaining agreements that expressly call for the use of FMCS, they identify only one matter as to which they were actively using FMCS's services when they became unavailable.  *See id.* at 44.  As to another eight cases, Plaintiffs note the parties had "hoped" to obtain FMCS's mediation services.  Given these limited allegations, there is no basis to credit the speculation that the states will see a "huge influx of contract disputes" in the absence of FMCS's services.

The other potential harms alleged by the Plaintiff states are either 1) even more speculative than the assumption that Plaintiff states will see an overwhelming rise in labor

disputes; or 2) economic, and therefore not cognizable as irreparable harm at all. As to the latter: Plaintiffs assert that, in the absence of FMCS's services, they had to turn to "more expensive and less effective alternatives." *Id*. Plaintiffs offer no support for their assertion that the alternatives are less effective, and the economic harm of paying more for the service cannot support the entry of a preliminary injunction.

Nor can unsupported speculation about the "increased risk of strikes, labor strife, and litigation" be grounds for preliminary relief. *Id*. at 46. Each of the dire outcomes that Plaintiffs identify depends on an attenuated chain of possibilities. And each could likewise be prevented with the use of another dispute resolution service. Perhaps most importantly, for purposes of assessing the relief that Plaintiffs request, Plaintiffs offer no basis upon which to conclude that such dire consequences would obtain during the next couple of weeks. For all these reasons, Plaintiffs have failed to establish irreparable harm that could support the entry of a preliminary injunction; to the extent they have alleged economic harm, none of the Plaintiffs have met the narrow exception made for circumstances in which economic harm threatens an entity's very existence.

## III.  The Balance of the Equities and the Public Interest Support Rejection of the Plaintiffs' Motion.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the preliminary injunction that Plaintiffs seeks would disrupt the agencies' efforts to comply with Executive Order 14,238, and act as responsible stewards of public funds. In another case seeking preliminary equitable relief against a federal agency, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the

public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020).

Contrary to Plaintiffs' assertions that the public interest will suffer no cognizable harm if a preliminary injunction is entered, ECF No. 3 at 47, such an order here would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted); *see also See Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. *See Department of Education v. California*, No. 24A910, 2015 WL 1008354, *2 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants).

**IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief And Any Preliminary Relief Should Be Stayed To Allow Consideration of Whether to Appeal**

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been

wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiffs are, in part, seeking the disbursement of grant funds, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. California*, No. 24A910, 2015 WL 1008354, at *2 ("respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond") (quotation omitted).

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## <u>CONCLUSION</u>

For all the reasons discussed herein, the Court should deny the Plaintiffs' Motion.

Dated: April 14, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General
                                         Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch


/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/ *Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
HEIDY L. GONZALEZ (FL Bar No. 1025003)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov

*Attorneys for Defendants*