# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | Case No.: 1:25-cv-128 |
| Plaintiffs, | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

   I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................... 3

     A.  This Court Has Jurisdiction. ................................................................................... 4

        1.   Plaintiffs Have Standing. ................................................................................... 4

        2.   Plaintiffs' Claims Are Ripe. ............................................................................... 5

        3.   No Statute Channels Plaintiffs' Claims to Another Forum. ................................. 6

            a.   The Tucker Act does not channel Plaintiffs' claims to the Court of Claims. ......... 6

            b.   The Civil Service Reform Act does not channel Plaintiffs' claims to the Merit System Protection Board. .......................................................................................... 9

     B.  Defendants' Objections to Plaintiffs' APA Claims Lack Merit. ................................. 12

        1.   The Closure Decisions Are Final Agency Actions. .............................................. 12

        2.   The Closure Decisions Are Not Committed to Agency Discretion. ...................... 14

        3.   The Closure Decisions Are Arbitrary, Capricious, and Contrary to Law. ............... 15

     C.  Plaintiffs Are Likely to Succeed on Their Constitutional Arguments. ........................ 17

        1.   Defendants Have Violated the Separation of Powers Doctrine. ........................... 17

        2.   Defendants Have Violated the Take Care Clause. ................................................ 18

   II.   PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE INJURY. ........................... 20

     A.   States Have Suffered and Will Continue to Suffer Irreparable Harm from the Dismantling of IMLS. ................................................................................................. 20

     B.  The Complete Closure of MBDA Will Inflict Irreparable Harm. ............................... 21

     C.  The Gutting of FMCS Will Cause Irreparable Harm to State Labor- Management Relations and Contribute to Labor Strife. ...................................................................... 22

   III.   THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF PRELIMINARY RELIEF. ...................................................................................................................... 23

   IV.  A BOND IS UNWARRANTED AND THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE IT. ............................................................................................ 24

CONCLUSION ....................................................................................................................... 26

## INTRODUCTION

Defendants do not deny that they have dismantled "three Congressionally created agencies," Opp. 2, and rendered them incapable of fulfilling their statutory duties. Indeed, Defendants do not contest a single fact underlying Plaintiffs' motion. They do not deny that the Institute for Museum and Library Services (IMLS) has terminated "well over 1,000 grants" and reduced its staff to a caretaker crew incapable of fulfilling basic agency functions. Blake Doe Supp. Decl. ¶¶ 5–8, ECF No. 35-3. They do not dispute that no employees are currently working at the Minority Business Development Agency (MBDA), and that the agency will be "abolishing all positions within MBDA" in four weeks. Alex Doe Supp. Decl. ¶¶ 4–6, ECF No. 35-4. And they do not contest that the Federal Mediation and Conciliation Service (FMCS) has terminated all of its public-sector bargaining work and permanently reduced its staff from roughly 200 to 15. *See* Burgess Decl. ¶ 7, Ex. 42; Compl. Ex. D.[1]

Even more remarkably, Defendants do not attempt to argue that any of these actions are lawful. The opposition brief does not contain a single word in response to Plaintiffs' argument that Defendants acted arbitrarily and capriciously by dismantling these agencies without explanation. *See* Mem. 20–23. Nor do Defendants attempt to rebut Plaintiffs' argument that Defendants acted contrary to law by abandoning the agencies' statutory functions. *See* Mem. 23–29. It is difficult to escape the conclusion that Defendants simply could not identify a colorable defense of the Closure Order or the Closure Decisions. And small wonder: these actions are palpably illegal.

---

[1] All references to declarations attached to Plaintiffs' original Motion for a Temporary Restraining Order, ECF No. 3, are to the exhibit number attached to that Motion. References to Plaintiffs' supplemental declarations submitted with its Notice of Supplemental Filing, ECF No. 35, are referenced by their ECF Number. Three additional declarations are submitted as exhibits to this Reply, and any references thereto note as much.

That leaves Defendants with the unenviable task of arguing that this manifestly unlawful conduct should nonetheless evade judicial review. But here, Defendants' arguments founder on the law, the uncontested factual record, and common sense. Plaintiff States have a judicially cognizable interest in the destruction of three agencies that—until recently—provided them with millions of dollars in annual funding and numerous direct services. Each agency took "final" action when it adopted a policy of eliminating all of its non-statutorily mandated functions and gutting its statutory functions. And Plaintiffs do not need to bring this suit in the Court of Federal Claims, given that "the terms and conditions of each individual grant that the States receive from the Agency Defendants *are not at issue*," Plaintiffs do not seek "money damages," and Plaintiffs are challenging a "broad, categorical" policy that extends well beyond the termination of grant funding. *New York v. Trump*, No. 1:25-cv-39-JJM-PAS, 2025 WL 1098966, at *2 (Apr. 14, 2025).

At bottom, the situation is simple. The President issued an executive order so illegal that Defendants cannot defend it on the merits. That order and its implementing decisions are inflicting serious and ongoing harm on Plaintiff States and the public at large. And no jurisdictional barrier stands in the way of the Court enjoining those decisions and protecting the agencies that Congress created. The motion for a preliminary injunction or a stay under 5 U.S.C. § 705 should be granted.

## ARGUMENT

Plaintiffs' motion is governed by the familiar four-factor test for preliminary relief. *See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Defendants attempt to stack the deck by claiming (Opp. 8) that Plaintiffs seek a "mandatory injunction" to which a heightened standard applies. That is doubly incorrect. Plaintiffs seek an injunction that would simply restore three agencies to the status quo that existed for years—and, in some cases, decades—before the Closure Order was issued on March 14, 2025. Because that

relief would preserve "[t]he 'last uncontested status which preceded the pending controversy,'" it is properly viewed "not as mandatory, but as prohibitory." *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (Breyer, J.) (citation omitted).  In any event, as Defendants' own authority explains, the First Circuit applies "the same four-factor test" to mandatory injunction as to other forms of preliminary relief.  *Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010).  All four of those factors overwhelmingly favor Plaintiffs.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Although the opening section of Defendants' argument is entitled "Plaintiffs Cannot Establish Likelihood of Success on the Merits," Opp. 8, Defendants do not actually contest the merits of Plaintiffs' central claims.  They say nothing in response to Plaintiffs' arguments that the Closure Decisions are arbitrary and capricious and that they violate the agencies' governing statutes—despite the fact that those arguments form the heart of Plaintiffs' brief.  *See* Mem. 20–29.  Instead, Defendants largely rest their opposition on a series of threshold objections.  They contend that Plaintiff States have not suffered any cognizable harm from the gutting of IMLS, MBDA, and FMCS; that Plaintiffs' claims must proceed in a suit for money damages before the Court of Claims or in an administrative claim brought by aggrieved employees before the Merit Systems Protection Board; that, even though the agencies have already been gutted, the Closure Decisions are non-final; and that Defendants have unreviewable discretion to dismantle each agency at whim.  Those arguments uniformly lack merit.  And Defendants' responses to Plaintiffs' claims grounded in the appropriations statutes and the Constitution are similarly infirm.

A.    **This Court Has Jurisdiction.**

1.  *Plaintiffs Have Standing.*

Defendants offer nothing to contradict the extensive evidence Plaintiffs provided that establishes their standing to bring this case. Plaintiffs receive numerous direct benefits from the agencies at issue, they are already suffering substantial harm as a direct result of Defendants' gutting of the agencies, and those harms would be remedied by an order staying or enjoining the Closure Decisions. *See* Mem. 33–42. Nothing more is required to establish standing.

Instead of engaging with any of these fundamental standing principles, Defendants raise various complaints about arguments that Plaintiffs do not make. Defendants argue that Plaintiffs cannot seek relief as to agencies not included in their Complaint. Opp. 8–9. But that is not disputed: Plaintiffs' Complaint and Motion encompass Defendants' actions as to IMLS, MBDA, and FMCS, and do not seek relief as to any of the other four agencies listed in the Closure Order. *See* Mem. 10 n.3. Defendants also observe that Plaintiffs cannot seek relief for harms to third parties and lack standing to remedy others' injuries. Opp. at 10. Again, Plaintiffs' Complaint and preliminary injunction motion assert harms to Plaintiffs themselves as a result of Defendants' actions. Plaintiffs are not seeking to represent the interests of parties not before this Court.

To the extent Defendants contend that the scope of relief should be limited to funding or services provided to the Plaintiffs themselves, Defendants offer no proposal as to how that can be accomplished while still providing "complete relief" to Plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The source of Plaintiffs' injuries is that Defendants' have shuttered the agencies, discontinued programs, and terminated or placed on leave employees who perform functions on which Plaintiffs rely. Defendants do not identify any administrable means by which they could reverse the closure of the agencies as to only Plaintiffs themselves.

4

## 2. *Plaintiffs' Claims Are Ripe.*

Plaintiffs' claims are also ripe. First, the decisions being challenged are final and fit for judicial review. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). The President has issued a Closure Order that contained clear (and unlawful) directives to the three defendant agencies. And each of those agencies has carried out those directives by publicly adopting a policy of eliminating all non-statutorily required functions and dramatically slashing their statutory functions. In particular, MBDA has issued a memorandum describing "the Department's plan to eliminate the non-statutory components and functions of MBDA," which it says it will carry out by "abolishing all positions within MBDA." Alex Doe Supp. Decl. Ex. A, at 1, ECF No. 35–4. FMCS has issued a notice to agency staff stating that "we are required to perform only statutorily mandated functions," and directing the "resulting" elimination of several programs. Compl. Ex. D, ECF No. 1–4. And the IMLS Acting Director has issued notices to numerous grant recipients stating that "the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions," and terminating more than 1,000 grants as a result. Compl. Ex. B, ECF No. 35–5; *see* Blake Doe Supp. Decl. ¶ 5, ECF No. 35–3.

Furthermore, these policies have already begun to inflict concrete hardship on Plaintiff States. *Driehaus*, 573 U.S. at 167–68. Plucking out a handful of lines from Plaintiffs' numerous declarations, Defendants suggest that Plaintiffs' harms are speculative and that all of their claims are therefore unripe. Opp. 11–13. But Defendants ignore the myriad examples of harms that have already materialized or that are certainly impending. For example, numerous States have attested that the gutting of IMLS—resulting in both terminated grants and missed grant payments—already has compelled them to make staff cuts and close programs. *See* Jones Decl. ¶ 10–12, 20, 22, Ex. 33 (Washington); Lucas Decl. ¶¶ 17–18, 20, 31 Ex. 2 (California); Schander Decl. ¶ 16, 22, 24,

5

31–33, Ex. 3 (Connecticut).  States that receive MBDA funding have said that "[a]ny pause" in funding will require them to cut important programming—a harm that is all but certain to occur now that MBDA has reduced its workforce to zero.  Hokoana Decl. ¶¶ 13, 20, Ex. 11; Lundy Decl. ¶¶ 9, 16, Ex. 12.  And FMCS has announced that it is no longer carrying out any public sector conciliation services, Compl. Ex. D (FMCS Memo), which Plaintiff States have demonstrated that they regularly use and benefit from.  *See*, *e.g.*, Thornton Decl. ¶ 7, Ex. 38; Vaile Decl. ¶ 13(a), Ex. 24; Delgado Decl. ¶ 9, Ex. 29.  Plaintiffs' injuries, to the extent they have not already occurred, are "certainly impending."  Opp. at 12 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

### 3.  No Statute Channels Plaintiffs' Claims to Another Forum.

#### a.  The Tucker Act does not channel Plaintiffs' claims to the Court of Claims.

Defendants argue that Plaintiffs are required to bring this suit in the Court of Federal Claims.  Opp. 13–19.  They note that, in *Department of Education v. California*, 145 S. Ct. 966 (2025), the Supreme Court issued a brief per curiam opinion holding that the federal government was likely to succeed in its argument that States challenging the termination of certain education-related grants were required to file suit in the Court of Federal Claims, on the ground that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what" the district court ordered in that case.  *Id.* at 968.  Relying on this preliminary ruling, Defendants argue that because some Plaintiffs have identified grant terminations as one harmful consequence of the Closure Decisions for one of the three agencies at issue, all of Plaintiffs' claims must be channeled to the Court of Federal Claims. Claims.

That argument founders at every turn.  Most fundamentally, as this Court explained two days ago, the logic of the *Department of Education* stay decision does not extend to cases in which

plaintiffs are challenging a "broad, categorical" policy, and "the terms and conditions of each individual grant that the States receive from the Agency Defendants *are not at issue*." *New York*, 2025 WL 1098966, at *2. In that circumstance, the Court explained, plaintiffs are not seeking to "enforce a contractual obligation to pay money." *Id.* Rather, their claims fall squarely within the holding of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910).

The Court's logic in *New York* applies with at least equal force here. As Defendants themselves acknowledge, "Plaintiffs do not challenge specific grant terminations [or] specific payments they claim to be entitled to," Opp. 21, let alone put at issue the terms or conditions of individual grants. Instead, Plaintiffs are challenging each agency's categorical policy of eliminating all non-statutorily mandated functions and gutting its remaining functions to the point that the agency cannot perform its statutory duties. Plaintiffs' challenge is thus grounded in statutory and constitutional violations independent of any specific obligation to provide funding under the terms of any grant. And the relief Plaintiffs seek is an order enjoining the Closure Decisions, not an order to require specific performance or compensation under the grant agreements. Just as the challenge to the Federal Funding Freeze falls outside the ambit of *Department of Education*, this case does, as well. *Accord Pacito v. Trump*, No. 25-cv-255, 2025 WL 1077401, at *5 (W.D. Wash. Apr. 9, 2025) (rejecting federal government's invocation of *Department of Education* because plaintiffs "assert rights derived from statutory mandates, not contractual promises, and seek equitable enforcement of statutory obligations, not contractual remedies"); *Maine v. U.S. Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (similar).

Furthermore, although Defendants seek to portray the grant terminations as the "heart of this action," Opp. 15, the role those terminations play in this case is quite limited. Plaintiffs' harms from the dismantling of FMCS do not stem from grant terminations, but from the elimination of agency programs and the dismantling of key agency functions. Mem. 39-42. The harms from the closure of MBDA turn primarily on the agency's inability to perform its statutory functions, service existing MBDA centers, and issue new grant solicitations. Mem. 36-39; see Alex Doe Supp. Decl. ¶ 6, ECF No. 35–4. Even as to IMLS, the States' harms are caused principally by delays in the disbursement of *existing* grant funding. Mem. 33–36. Only some States have had IMLS grants terminated, and their harms are not limited to those terminations. Mem. 35; *see, e.g.,* Jones Decl. ¶¶ 22, 23, Ex. 34 (jobs supported by federal funding, the library's eBook, audiobook, and research database, and programming at the Talking Book and Braille Library all face elimination); Schander Decl. ¶ 22, Ex. 4 (lack of funding will result in "immediately inability to pay invoices and salaries, meet contractual obligations, operate the statewide delivery services, [or] support statewide collections"). Nothing in *Department of Education* supports the implausible conclusion that where *some* of the Plaintiffs in this suit allege that *some* of the harms they suffer from the dismantling of *one* of three agencies at issue entailed the termination of grants, the entire suit must be channeled to the Court of Claims. Nor do any of Defendants' other authorities support that overbroad claim. *Cf. U.S. Conference of Catholic Bishops v. U.S. Department of State*, No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) (channeling suit to the Court of Claims where the "*one* thing" the plaintiffs sought was an order requiring the government "to stop withholding the money due" (emphasis added)).

In addition, *Department of Education* only identified potential limits on suits brought "under the APA." 145 S. Ct. at 968. As the federal government has elsewhere conceded, the

jurisdictional limits it relies on here do not apply to constitutional claims.  *See  AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. 1:25-cv-400, 3/8/25 Tr. at 87, ECF No. 56 (The Court: "The sovereign immunity arguments you're making are kind of explicitly grounded in the text of the APA . . . so they wouldn't apply—if they foreclosed the APA claims, they wouldn't apply to the separation of powers claims? . . . [Counsel for the Government]: Yes, that's right.").   So even if Defendants' arguments were correct—which they are not—they would have no effect on Plaintiffs' ability to pursue claims in this Court under Separation of Powers principles and the Take Care Clause.

> b.  The Civil Service Reform Act does not channel Plaintiffs' claims to the Merit System Protection Board.

Defendants' invocation of the Civil Service Reform Act (CSRA) similarly lacks merit. Defendants take the position that because they have effectuated the Closure Decisions in part by terminating or placing on administrative leave vast swathes of their workforces, States may only challenge the Closure Decisions through the administrative scheme Congress established for aggrieved federal employees to raise employment-related complaints.  *See* Opp. 19–20.

That is incorrect.  Plaintiffs have not brought a challenge to any specific employment actions.  *Cf. United States v. Fausto*, 484 U.S. 439, 440 (1988) (channeling individual employee's challenge to disciplinary suspension through CSRA scheme); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 7 (2012) (channeling former employees' challenge to discharge for failure to register for Selective Service through CSRA scheme).   They have raised statutory and constitutional challenges to *the Closure Decisions*, which are policies under which the Defendants have eliminated all non-statutorily mandated functions and reduced any statutory functions to the bare minimum.  Although Defendants have *effectuated* those Closure Decisions in part by terminating or placing on leave employees who perform functions the agencies have decided are no longer

9

needed, Plaintiffs' claims challenge a decision upstream from any employment-related action. It would make no sense to channel Plaintiffs' statutory and constitutional challenges to those broad agency policies through a scheme for hearing employment grievances, to be adjudicated by a tribunal—the Merit Systems Protection Board (MSPB)—whose expertise is in claims of employment discrimination and wrongful discharges. As the Supreme Court has explained in a closely related context, challenges to "the structure or very existence of an agency"—rather than to a "specific substantive decision" such as "fining a company" or "firing an employee"—are not subject to jurisdiction channeling and "belong[] in district court" *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 189 (2023).).

The doctrine governing CSRA preclusion confirms that Defendants' argument is without merit. To demonstrate that the CSRA precludes jurisdiction over a class of claims, Defendants must satisfy the two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), which requires both that (1) "Congress's intent to preclude district-court jurisdiction is fairly discernible in the statutory scheme," and (2) plaintiffs' claims are of "the type [] Congress intended to be reviewed within [that] scheme." *Elgin*, 567 U.S. at 9-10, 15. Nothing in the CSRA scheme indicates that Congress intended to preclude jurisdiction over claims challenging the elimination of agency functions. Nor does the scheme suggest Congress intended to preclude claims brought by States, which are far afield from the employees or former employees subject to the scheme in the first place. *See Fausto*, 484 U.S. at 443-447.

Furthermore, these claims are plainly not "the type that Congress intended to be reviewed within the CSRA scheme." *Elgin*, 567 U.S. at 15. To assess this question, courts look at whether (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) "the suit is 'wholly collateral to a statute's review provisions,'" and (3) ""the claims are 'outside the agency's

expertise.'" *Id.* (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010))  All of these factors point decisively against preclusion.  Because States cannot bring claims through the CSRA scheme, finding CSRA preclusion would foreclose all meaningful judicial review—including as to constitutional claims, for which preclusion is strongly disfavored. *See Webster v. Doe*, 486 U.S. 592, 603 (1988).  Furthermore, the States' claims are wholly collateral to the statute's review provisions, which concern employment grievances, not challenges to the termination of agency functions, the failure to carry out statutory duties, or the refusal to expend appropriations.  *See Axon*, 598 U.S. at  193-95.  And the MSPB has no expertise in adjudicating such claims; its experience is in hearing employment grievances, not statutory or constitutional challenges to agency policies. *Id.* at 194-98; cf. *Am. Fed. of Gov't Employees, AFL-CIO v. Trump*, 929 F.3d 748, 752, 755-61 (D.C. Cir. 2019) (channeling union's claims concerning "relations between the federal government and its employees" because the scheme preserved avenues for the union to seek relief, the claims were of a type regularly adjudicated by the agency, and the agency had expertise in labor-management relations).

Finally, like Plaintiffs' Tucker Act argument, Defendants' CSRA argument sweeps too far. Widescale terminations are only one means by which Defendants have implemented the Closure Order and the Closure Decisions.  They have also taken other actions—including canceling programs, *see, e.g.*, Compl. Ex. D (FMCS notice), and terminating grants, *see*, *e.g.*, Blake Doe Decl. ¶ 13, Ex. 39; Compl. Ex. B (IMLS Email).  It would make no sense to transfer the entirety of a case with harms so far afield from employment issues to the MSPB.  And the irrelevance of these actions to the CSRA scheme only underscores that Plaintiffs' claims fall outside of that scheme altogether.

11

### B.    Defendants' Objections to Plaintiffs' APA Claims Lack Merit.

#### 1.    The Closure Decisions Are Final Agency Actions.

Defendants contend that Plaintiffs are not challenging a "discrete agency action" reviewable under the APA but rather are raising an improper "programmatic" challenge to a variety of agency actions.  Opp. 20–21.  That is incorrect.  Plaintiffs are challenging each agency's decision to adopt a policy of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions.  The decision to adopt such a policy is a "rule" or an "order" reviewable under the APA.  *See* 5 U.S.C. § 551(4) (defining "rule" to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); *N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 2 F.4th 989, 992 (D.C. Cir. 2021) (an "order" is "virtually any authoritative agency action other than a rule").  And these policies satisfy the other requirements for finality, as well.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Each agency has "'consummate[ed]' [its] decisionmaking process," *id.* at 178, by publicly announcing the policy and making clear it believes itself required by the Closure Order to adopt that policy.  *See supra* pp. 4-5.  And each agency's policy has had numerous legal consequences—including the mass termination of agency employees, rescission of agency programs, and elimination of grant funding for States and other recipients.  *See id.*; Mem. 19–20.

The First Circuit recently upheld this Court's conclusion that a challenge to another "broad, categorical" policy satisfied the APA's finality requirement.  *New York v. Trump*, — F.4th —, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025).  It explained that the federal government failed to make a strong showing that a challenge to the Federal Funding Freeze was the type of "broad programmatic attack" the Supreme Court disapproved of in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).  *See New York*, 2025 WL 914788, at *12.  And it noted that the

12

Supreme Court had itself recognized that a challenge to an "across the board" policy could satisfy the APA's finality requirement. *Id.* (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 890 n.2 (1990), and citing *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018)).

The federal government's opposition brief largely reprises its unsuccessful arguments in *New York* without acknowledging that adverse precedent or grappling with any of its holdings. Defendants once again analogize this challenge to *Lujan* and *Norton*. Opp. 21. But as the First Circuit explained, "the 'broad programmatic attack' at issue in *Lujan* was an attempt to seek 'wholesale' 'programmatic improvements' 'by court decree' by 'couch[ing]' '[the Bureau of Land Management's] land withdrawal review program' as an 'unlawful agency 'action.'" *Id.* at *11 (quoting *Norton*, 542 U.S. at 64); *see also Cobell v. Kempthorne*, 455 F.3d 301, 305-06 (D.C. Cir. 2006) (disapproving of suit where plaintiffs sought a "plan" encompassing "all-purpose supervision of the defendants' compliance with . . . sixteen general fiduciary duties"). This challenge looks nothing like that; Plaintiffs are challenging a discrete, categorical policy the agencies themselves acknowledge they have adopted. That is exactly the sort of challenge to an "across the board" policy that *Lujan* itself made clear was proper. *New York*, 2025 WL 914788, at *12 (quoting *Lujan*, 497 U.S. at 890 n.2).

Defendants also suggest that the Closure Decisions are non-final because they have led the agency to take numerous *additional* actions to shut down agency functions or terminate employees. Opp. 21. But the fact that agencies have implemented their categorical policies in a number of ways does not render those policies non-final; it simply confirms the categorical nature of the policies. *See New York*, 2025 WL 914788, at *13 (crediting finding that numerous individual funding freezes were "taken pursuant to such categorical decisions").

Nor are the Closure Decisions "interim" or "preliminary." Opp. 23. The agencies have publicly announced those policies, stated that they are "required" or "mandated" by Executive Order, and issued sweeping directives to the agencies' staffs and third parties on the basis of those policies. *See supra* pp. 4-5; *see also* Opp. 23 (acknowledging that the agencies' actions reflect "decisions by agency leadership to realign their policy goals and actions consistent with the current administration's directives"). There is no basis to believe the agency will "reconsider" those decisions. *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 823 F.2d 608, 614-615 & n.5 (D.C. Cir. 1987). And the parties can litigate this case based on whatever administrative record defendant agencies assembled in the course of reaching the Closure Decisions. *See* Opp. 22.

### 2.  *The Closure Decisions Are Not Committed to Agency Discretion.*

Defendants also argue that Plaintiffs' APA claims cannot be adjudicated because they challenge "staffing decisions" that are committed to agency discretion by law. *See* Opp. 24–27. But Plaintiffs are not challenging mere "staffing decisions." Opp. 24. The Closure Order and the Closure Decisions explicitly mandate the elimination of agency "functions" and "components." Closure Order § 2(a)*; see, e.g.,* Alex Doe Supp. Decl. Ex. A, at 1, ECF No. 35-4 (describing "the Department's plan to eliminate the non-statutory components and functions of MBDA"). And the agencies have carried out these directives by terminating programs, eliminating funding, and implementing large-scale RIFs of agency employees—all in a manner that has resulted in the abdication of the agencies' statutory duties. Defendants offer no evidence or declarations to support their suggestion that the Closure Decisions are simply "internal" reorganizations.

Once this erroneous premise is eliminated, nothing is left of Defendants' committed-to-agency-discretion arguments. Defendants' own authorities make clear that the challenged actions

14

do not fall within the scope of agency discretion. *Lincoln v. Vigil* states that "an agency is *not* free simply to disregard statutory responsibilities" and that "Congress may *always* circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 508 U.S. 182, 193 (1993) (emphases added). And *FCC v. Prometheus Radio Project* affirms that the arbitrary-and-capricious standard requires a court to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues *and reasonably explained the decision*." 592 U.S. 414, 423 (2021) (emphasis added). Plaintiffs do not seek to circumscribe the agency's prosecutorial discretion, *cf. Heckler v. Cheney*, 470 U.S. 821 (1985), or to impose any extra-statutory procedural requirements on the agency, *cf. Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978). They simply seek to hold the agency to its obligations to follow statutory restrictions and the reasoned decision-making requirements of the APA when eliminating agency functions and programs. Defendants offer no argument that they have done so.

3. *The Closure Decisions Are Arbitrary, Capricious, and Contrary to Law.*

As noted above, when Defendants finally get around to the merits, they make no attempt to deny that the Closure Decisions are arbitrary, capricious, and contrary to the statutes imposing mandatory duties on IMLS, MBDA, and FMCS. Defendants do briefly address the claim that the Closure Decisions violate the governing appropriations statutes. But their claim on that score is non-responsive to the arguments Plaintiffs actually make.

Defendants do not dispute that the Executive Branch is obligated to spend money appropriated by Congress. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018); *New York v. Trump*, — F. Supp. 3d —, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025), *stay pending appeal denied*, —

15

F. 4th —, 2025 WL 914788 (1st Cir. Mar. 26, 2025).  Defendants also do not dispute that IMLS, MBDA, and FMCS have been so substantially dismantled that it will be impossible for them to expend the full amount appropriated by Congress for the remainder of the fiscal year.  Nor could they: MBDA has announced that it will abolish every position in four weeks' time; FMCS has reduced its workforce by 90% and shuttered its major programs; and IMLS has canceled over 1,000 grants and decimated its workforce.  It follows that Defendants have violated each agency's appropriations statute by failing to spend the money Congress appropriated.

Entirely ignoring those issues, Defendants instead devote their response to a red herring. They argue that, contrary to the argument they ascribe to Plaintiffs, Defendants do not have "a statutory obligation . . . to spend the money appropriated for grant funding or provision of services *for Plaintiffs*."  Opp. 27 (emphasis added).  But that is not Plaintiffs' argument.  Plaintiffs do not contend that Congress appropriated *to them* the funds allocated to IMLS, MBDA, or FMCS.  Nor do Plaintiffs claim that the agencies lack discretion in awarding grants.  Rather, Plaintiffs argue that Defendants are improperly refusing to spend the money appropriated *to IMLS, MBDA, and FMCS*.  Defendants offer no response to that straightforward assertion.

Defendants also make the puzzling argument that Plaintiffs "do not . . . explain how the specific services the agencies provide are statutorily mandated, much less that they have been terminated."  *Id.*  But the Complaint, Plaintiffs' opening brief, and the supporting declarations and exhibits all make clear that IMLS, MBDA, and FMCS provide a host of statutorily mandated services and that many of these services have been effectively terminated.  *See* PI Mot. at 24–27, Blake Doe Decl., Ex. 40, Alex Doe Decl., Ex. 41, Jones Decl., Ex. 34, Lucas Decl., Ex. 3, Schander Decl., Ex. 4, Lundy Decl., Ex. 12, and Exhibits B and D to the Complaint.  In any event, Plaintiffs' appropriations claim does not depend on a contention that any specific functions are statutorily

mandated.  It depends on the contention that Defendants must spend the funds that Congress appropriated them, which the agencies manifestly cannot do if they have been dismantled.

### C.    Plaintiffs Are Likely to Succeed on Their Constitutional Arguments.

In addition to violating the APA, Defendants have violated "bedrock principles of constitutional law," *Aiken County*, 725 F.3d at 259, by issuing the Closure Order and the Closure Decisions.  Mem. 27–33.

#### 1.    *Defendants Have Violated the Separation of Powers Doctrine.*

Defendants have violated the separation of powers by usurping Congress's exclusive power to make law, appropriate funds, and create and define federal agencies.  Mem. 29–30.  Defendants claim that *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses Plaintiffs' separation-of powers claim because it "rejected the proposition that 'whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine.'"  Opp. 28 (quoting *Dalton*, 511 U.S. at 471).  But as the D.C. Circuit has explained, *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available."  *Chamber of Comm. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996).  By contrast, "*Dalton* is inapposite where the claim instead is that the presidential action . . . independently violates . . . a statute that delegates no authority to the President" to engage in the challenged action.  *Id.* at 1332; *accord Sierra Club v. Trump*, 963 F.3d 874, 889 (9th Cir. 2020), *vacated and remanded as moot mem. sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) ("*Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not.").

Here, there is no contention that the President has been specifically entrusted with authority to dismantle IMLS, MBDA, and FMCS, or that there are "no limitations on the President's exercise

17

of that authority." *Reich*, 74 F.3d at 1331. To the contrary, numerous statutes restrict the President's and the agency defendants' authority to curtail the agencies' functions. Thus, the District Court for the Southern District of New York recently found that plaintiffs had a likelihood of success on their claim that the application of the Closure Order to the U.S. Agency for Global Media violated the separation of powers. *See Widakuswara v. Lake*, — F. Supp. 3d —, 2025 WL 945869, at *7 (S.D.N.Y. Mar. 28, 2025). And, in a case challenging the withholding of appropriated funds from the U.S. Agency for International Development, the District Court for the District of Columbia rejected similar arguments made by the Government based on *Dalton*, finding that "there is no asserted or plausible argument that the President is simply exercising discretionary authority conferred by statute" where the Plaintiffs claim that "the Executive has attempted to usurp Congress's power over the purse in violation of the separation of powers." *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, — F. Supp. 3d —, 2025 WL 752378, at *17 (D.D.C. Mar. 10, 2025)

### 2. Defendants Have Violated the Take Care Clause.

Defendants have violated the Take Care Clause by refusing to faithfully carry out the statutes Congress enacted. Mem. 31–33. Defendants argue that Plaintiffs cannot maintain this claim because that Clause entrusts the President with "broad, discretionary authority." Opp. 30. But whatever the outer limits of the President's discretion to execute the laws, it does not include authority to disregard statutes that create agencies, assign them responsibilities, appropriate them funds, and—through the APA—mandate that they engage in reasoned decision making. *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (the obligation imposed by the Clause "to see the laws faithfully executed" does not "impl[y] a power to forbid their execution"); *Widakuswara*, 2025 WL 945869, at *7 (holding that "effectively shuttering a congressionally

18

created agency simply cannot be construed as following through on this constitutional mandate" to "take Care that the Laws be faithfully executed"). Defendants do not attempt to rebut Plaintiffs' argument that the Closure Order flouts all of those statutes. Instead, they assert without support that Plaintiffs' arguments are "based on Plaintiffs' subjective views about how to best implement and administer" the agencies. Opp. 29. But that bald assertion is belied by Plaintiffs' extensive explanation of the statutes that the Closure Order disregards or openly violates. *See* Mem. 20–29.

Defendants' remaining objections to the Take Care claim fare no better. Courts have recognized that plaintiffs may invoke the Take Care Clause in litigation. *See, e.g.*, *Widakuswara*, 2025 WL 945869, at *6 (finding likelihood of success in Take Care Clause challenge); *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561-62 (9th Cir. 2019) (considering merits of Take Care claim). Plaintiffs do not seek declaratory or injunctive relief "against the President," Opp. 29; their requested relief would run against the agency defendants and their officers. *See Reich*, 74 F.3d at 1328 ("We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive'") (citation omitted). And the President's subordinates, no less than the President himself, have an obligation to follow the Take Care Clause. *See Printz v. United States*, 521 U.S. 898, 922 (1997) ("The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, 'shall take Care that the Laws be faithfully executed,' Art. II, § 3, personally *and through officers whom he appoints*." (emphasis added)); *see also In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1137-38 (S.D. Cal. 2018) ("the Court disagrees with Defendants' argument that the Take Care Clause applies only to the President, and not his cabinet members") (collecting cases).

## II.    PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE INJURY.

Plaintiffs have produced dozens of declarations demonstrating that the dismantling of IMLS, MBDA, and FMCS will inflict irreparable harm on the States—including by compelling them to abandon critical library programs, forgo projects to support disadvantaged businesses, and lose the benefits of services needed to prevent strife with labor unions.  Plaintiffs' TRO motion demonstrated that these harms would materialize even during the short period in which a TRO would have been in effect.  It is even clearer that those irreparable harms will occur during the monthslong period in which a preliminary injunction would be in effect—and, indeed, many of those harms have already materialized.

### A.    States Have Suffered and Will Continue to Suffer Irreparable Harm from the Dismantling of IMLS.

Defendants assert that although the States may be harmed by the dismantling of IMLS, the harms alleged do not threaten "the very existence" of any States' library programs and are therefore not irreparable.  Opp. 34–35.  But Defendants simply ignore the numerous declarations that say just that—that the dismantling of IMLS will cause, and indeed has already caused, Plaintiffs to cancel programming and eliminate critical services.  For example, the declarations state that any delay in funding from IMLS will force libraries to "immediately . . . halt services and implement a hiring freeze," Moore Decl. ¶¶ 29, 42 Ex. 27, and cause them to "stop statewide and local public library programs immediately."  Lucas Decl. ¶ 27, Ex. 3.[2]  In fact, at least one library has had to shut down operations due to not receiving funds timely: the Maine State Library has had to close its doors for two weeks starting April 10 and has had to pause all its online services for requests until "after the staff reorganization and reopening of our public space." Fisher Suppl. Decl. ¶¶ 9,

---

[2] Upon information and belief, between April 11 and April 14, Arizona, Maine, and New Mexico, Oregon have received disbursements from IMLS.

10 (attached as Exhibit 1 to this Reply).  Likewise, several States have attested that terminations in grant funding have already required them to cancel library programs or halt work on ongoing museum projects.  *See, e.g.*, Nelson Decl. ¶ 8, ECF No. 36-6 (as a result of cancellation, New Jersey library has "issued stop work orders" and will be unable to carry out literacy program); Jones Decl. ¶ 20, Ex. 34 (termination of grant award to Washington "is already harming" State's library system); O'Neill Decl. ¶ 11, ECF No. 35-5 (loss of grant funding "will lead to . . . canceled regional events . . . and canceled subcontracts with university and community partners"); Lucas Decl. ¶¶ 18, 20, Ex. 3 (programs for seniors, veterans, and English learners have been "diminished or halted"); Fisher Decl. ¶ 19, Ex. 19 ("The threat of not receiving our FY24 funding has had an immediate chilling effect on staff and their ability to carry out daily operations"); Aldrich Decl. ¶ 19, Ex. 7 (because of the uncertainty of funding, the State library has not "not moved forward with the subscriptions for many of our online resources"); Compton Decl. ¶¶ 9, 14, Ex. 13 (Maryland's state-operated Banneker-Douglass-Tubman Museum has been forced to delay portions of a project because of funding uncertainty); Ball Decl. ¶¶ 30, 33, Ex. 17 (explaining that any pause in federal funding would require the immediate closure of a research project).  Defendants do not grapple with, let alone contest, any of these declarations.  They are more than sufficient to establish irreparable harm from the gutting of IMLS.

### B.    The Complete Closure of MBDA Will Inflict Irreparable Harm.

It has also become clear that all of the States that receive funding from MBDA will suffer irreparable harm absent a preliminary injunction.  It is uncontested that no employees are currently working at MBDA and that the agency's workforce will be abolished in four weeks.  *See* Alex Doe Supp. Decl. ¶¶ 4–5. ECF No. 35-3.  As a result, the agency will be unable to make any disbursements on existing grants, provide services to grant recipients, issue grant solicitations, or renew grants when they expire on June 30 and August 30.  *Id.* ¶ 6.

There is no question that existing grant recipients will suffer irreparable injury from the effective closure of the agency.  For instance, the declaration of the University of Hawaii—which Defendants ignore—states that "[a]ny pause in funding would displace the students currently in training programs" and cause three staff members to lose their jobs.  Hokoana Decl. ¶¶ 13, 20, Ex. 11.  The Baltimore MBDA Advanced Manufacturing Center would likewise suffer "immediate" impacts from any pause in funding.  Lundy Decl. ¶¶ 9, 16, Ex. 12.  And any delay or halt in funding will force Maryland's Entrepreneurial Development and Assistance Center to halt "essential programs." Muhammad Decl. ¶ 12, Ex. 16. Similarly, all of the grantees will be required to halt their programs if grants cannot be renewed before June 30 or August 30.  *See, e.g.*, Deane Decl. ¶¶ 8, 14, 19–20, Ex. 10; Wikenheiser Decl., ¶ 23, Ex. 37 ("if the MBDA does not continue the cooperative agreement as awarded, OBE will cancel any upcoming training and accelerator services for participants already enrolled and expecting these services").  Defendants scoff that those dates are far off.  Opp. 12-13. But an MBDA employee has explained—subject to no factual rebuttal from the government—that the grant solicitation process typically takes several months and would be impossible to complete by then unless the agency quickly begins work at full staff. *See* Alex Doe Decl. ¶ 8, Ex. 41.  It is obvious that MBDA will not be able to conduct, let alone complete, grant solicitations by those dates if it has zero employees.

### C.     The Gutting of FMCS Will Cause Irreparable Harm to State Labor-Management Relations and Contribute to Labor Strife.

Defendants do not dispute that FMCS has entirely ceased providing services to the public sector.  Nor do they dispute that many Plaintiff States regularly rely on FMCS to provide mediation and conciliation services to resolve public-sector labor disputes—including pursuant to State laws and collective-bargaining agreements that require the use of such services.  Mem. 39–40.  It is

foreseeable that, over the next several months, States will therefore be deprived of FMCS services they would otherwise have used to resolve labor disputes.

Defendants dismiss this injury as "economic."  Opp. 35.  But the declarations—which Defendants do not contest—make clear that the benefits of FMCS's services are more that economic.  FMCS mediators are trusted and highly skilled "neutrals" whose services are "critical for resolving labor disputes" and "promoting confidence in the decision-makers and the dispute resolution process." Kadish Decl. ¶ 10, Ex. 14; *see* Vaile Decl. ¶¶ 18, 22, Ex. 26 (FMCS mediators are "exceedingly competent and well-trained"; State will "not be able to replace those services in the near or medium term").  The absence of such mediators will cause the States to "suffer from prolonged labor disputes and could disrupt transportation, healthcare, and other critical services." Taibi Decl. ¶ 13, Ex. 32.  Further, pending mediations in which parties were using FMCS services at the time of the Closure Decision—such as those referenced by the American Federation of State, County and Municipal Employees—will be disrupted, prolonging negotiations and making work stoppages more likely.  *See* Thornton Decl. ¶¶ 20–22, Ex. 39; DeLorenzo Decl. ¶¶ 11–15 (attached as Exhibit 2 to this Reply).

## III.    THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF PRELIMINARY RELIEF.

Plaintiffs' motion details the substantial public interest in enjoining the Closure Decisions and restoring the status quo that prevailed for decades.  This relief would ensure that libraries may continue to offer vital services to the public, minority business centers may expand opportunities for entrepreneurship and economic development, and States and the private sector can promote the peaceful resolution of labor disputes.  Mem. 36-37.

Defendants contend that a preliminary injunction is not in the public interest because it would "disrupt the agencies' efforts to comply with Executive Order 14,238." Opp. 36.  To the

23

contrary, disrupting an agency's efforts to comply with an unlawful directive is always in the public interest. *See, e.g.*, *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022) ("[i]t is hard to conceive of  situation where the public interest would be served by enforcement of an unconstitutional law or regulation") (citation and internal quotation marks omitted); *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (citation and internal quotation marks omitted); *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) ("it is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up).  And there is similarly no interest in allowing Defendants to "implement[] the President's priorities" under the Closure Order where those priorities are manifestly unlawful. Opp. 37.

## IV.     A BOND IS UNWARRANTED AND THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE IT.

The Court should exercise its discretion to waive the requirement to post a bond under Rule 65(c). Rule 65(c) leaves district courts "wide discretion" in determining the amount of any bond. *Axia NetMedia Corp v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018) (citation and internal quotation marks omitted).  To determine whether to impose a bond, district courts in this Circuit consider: (1) the burden of compliance on the Defendant; (2) the plaintiffs' ability to pay; and (3) impact on the enforcement of a federal right.  *Crowley v. Local No 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir 1982), *rev'd on other grounds*, 467 U.S. 526 (1984); *see, e.g.*, *Maine v. U.S. Dep't of Agriculture*, 1:25-cv-131, 2025 WL 1088946, at *29–30 (D. Me. Apr. 11, 2025).  A finding that likelihood of success is "extraordinarily high" can provide "an additional reason not to require a bond."  *Crowley*, 679 F.2d at 1000 n.25; *see Maine*, 2025 WL 1088946, at *30.  This test favors the imposition of no (or a nominal) bond here.

First, Defendants have not demonstrated a compliance burden justifying a bond in this case. They have not quantified any costs or damages likely to occur from the requested injunctive relief. Nor can they since the State Plaintiffs request nothing more than an injunction against the agencies' unlawful Closure Decisions.  The only burden such an order would impose on Defendants would be the continuation of the legal obligations these agencies have fulfilled for decades and, until the March 14th Order, were planning on fulfilling for the foreseeable future.  Likewise, the Federal Government has not demonstrated that it would be unable to recover any funds disbursed as a consequence of the requested injunctive relief.  *See Dep't of Educ.,* 145 S. Ct. at 974 (Jackson, J., dissenting) ("[E]ven if the feared flood of recipient withdrawals occurs, the Government has various legal mechanisms to recoup these kinds of funds."); *see also* J. Shaffer & D. Ramish, Federal Grant Practice §36:29 (2024 ed.) ("In the end, the Government usually gets its money").

Regarding the second and third *Crowley* factors, the record indicates that requiring State Plaintiffs to pay a bond equal to the federal funding jeopardized by the unlawful Closure Actions would impose an undue burden on the States' ability to challenge the illegality of those actions. As demonstrated above, the loss of federal funding would require States to cut critical programs, lay off staff, and terminate important services.  *See supra* Part II.  It is foreseeable that requiring States to post a bond in an amount comparable to the grants at issue would impose the very costs a preliminary injunction is necessary to avoid.  Thus, the second and third factors also weigh in favor of no bond in this matter.

Finally, for all the reasons set forth *supra*, Plaintiffs' merits argument is exceptionally strong in this case, and Defendants hardly contend otherwise. Thus, this Court should exercise its wide discretion and set no bond, or at most, a nominal bond, under Rule 65(c). *See Maine*, 2025 WL 1088946, at *29–30  (collecting cases);  *Pineda v. Skinner Services, Inc*., 22 F.4th 47, 57 (1st

Cir. 2021) (district court did not abuse its discretion when defendant "failed to show how it has been harmed without the bond"); *Int'l Assoc. of Machinists & Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction or a stay under 5 U.S.C. § 705.

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Keith D. Hoffmann (RI Bar No. 9872)
Chief of Policy
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
Khoffmann@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu
Assistant Attorney General
Rabia Muqaddam
Special Counsel for Federal Initiatives
Sean Bunny
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov
*Attorneys for the State of New York*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-8310
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

*/s/ Jay C. Russell*
Jay C. Russell
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Anya M. Binsacca
Supervising Deputy Attorney General
Zelda Vassar
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
Ashley Meskill
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Holly F.B. Berlin*
HOLLY F.B. BERLIN
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for
the State of Maine

*/s/ Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney
General
Office of the Attorney
General
6 State House Station
Augusta, ME  04333-
0006
Tel.:  207-626-8800
Fax:  207-287-3145
Vivian.Mikhail@maine.gov

28

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**
Attorney General for the People of Michigan

*/s/ Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Jacob Harris*
Jacob Harris
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn
Max Lesser*
   *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
Max.Lesser@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

/s/ *Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
Attorney for Plaintiff State of New Mexico

**DAN RAYFIELD**
Attorney General for the State of Oregon

/s/ *Brian Simmonds Marshall*
Brian Simmonds Marshall
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: /s/ *Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

/s/ *Kate S. Worthington*
KATE S. WORTHINGTON, WSBA #47556
SARAH E. SMITH-LEVY, WSBA #55770
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
Attorneys for Plaintiff State of Washington

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

/s/ *Colin T. Roth*
COLIN T. ROTH
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
Attorney for Plaintiff State of Wisconsin

*Applications for pro hac vice forthcoming

30

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I filed the within via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to counsel of record on this 16th day of April, 2025.

*/s/ Paul T.J. Meosky*