# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; | Case No.: 1:25-cv-128 <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in his official capacity as Acting Executive Director of the U.S. Interagency Council on Homelessness; | |
| Defendants. | |

**INTRODUCTION**

1.      President Trump is leading a campaign to dismantle vast swaths of the federal government.  He has directed agencies to freeze the expenditure of funds appropriated by Congress, orchestrated the mass firings of federal probationary employees without following the requisite statutory procedures, and ordered agency after agency established by Congress—the Department of Education, the U.S. Agency for International Development, the Consumer Financial Protection Bureau, the U.S. Institute of Peace, and still others—to be shut down.  But whatever the President's policy preferences, he cannot override the congressional enactments that authorize federal agencies, appropriate funds for them to administer, and define how they must operate.

2.      This case concerns one of the President's most recent attempts to dismantle agencies in defiance of Congress's directives—and this time, seven agencies are in the crosshairs.  On March 14, the President issued an Executive Order (the "Closure Order") directing the Institute of Museum and Library Services, the Minority Business Development Agency, the Federal Mediation and Conciliation Service, the United States Interagency Council on Homelessness, and three other agencies to eliminate every one of their programs and components not mandated by statute, and to reduce their statutorily mandated functions and associated staff to the minimum required by law.  Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," § 2(a) (Mar. 14, 2025).  The President also ordered the Office of Management and Budget to deny these agencies authorization to spend federal funds for any functions beyond the minimum required by statute.  *Id.* § 2(c).  Within one week, all seven agencies were required to report that they had achieved "full compliance" with the President's order.  *Id.* § 2(b).

3.      For at least four agencies, "full compliance" has meant gutting every one of their operations—statutorily mandated or not.  The Institute of Museum and Library Services (IMLS) has placed 85% of its staff on administrative leave, dramatically curtailed the administration of hundreds of grants and grant applications, and terminated statutorily mandated grant awards to several States.  The Minority Business Development Agency (MBDA) has cut its staff from roughly 40 to just five individuals and effectively ceased new grant solicitations.  The Federal Mediation and Conciliation Service (FMCS) has slashed its staff from roughly 200 to fewer than 15 individuals and announced the termination of several of its core programs, including its mediation program for public sector entities.  And the United States Interagency Council on Homelessness (USICH) has placed all but two of its employees on administrative leave and ceased performing any of its program functions.

4.      If permitted to stand, the shredding of these statutorily mandated agencies will inflict immediate and irreparable harms on the Plaintiff States, their residents, and the public at large.  The States rely on IMLS, MBDA, FMCS, and USICH to support their public libraries and museums, assist state entities in extending contracting opportunities to disadvantaged individuals, prevent and resolve public-sector labor disputes involving State entities, and address the complex challenges of homelessness on a national level.  The sudden halting of the agencies' work after decades of close cooperation will immediately put at risk hundreds of millions of dollars in grant funding on which the States depend, and undermine library programs, economic opportunity, housing stability, and the free flow of commerce throughout the country.

5.      The Administration cannot dismantle federal agencies in this way.  The Closure Order and the actions that Defendants have taken to implement it are illegal several times over.

6. First, the Closure Order directs agencies to take action that is, on its face, arbitrary and capricious. It orders the agencies named in the Closure Order to categorically abandon every one of their discretionary functions, programs, and offices, and to strip their statutory programs to the bare minimum, without weighing the costs and benefits of these programs, accounting for the reliance interests they have created, considering alternatives, or otherwise engaging in reasoned analysis. Just five years ago, when *one* agency attempted to eliminate *a single* discretionary program without reasoned analysis, the Supreme Court instructed that "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy],'" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). The Closure Order compels *seven* agencies to abandon *all* of their discretionary programs without engaging in a shred of reasoned analysis—and the agencies have carried out that categorical directive just as the President instructed. The Administrative Procedure Act violation is palpable.

7. Second, by stripping these agencies well past the studs, the Administration has flouted Congress's directives. All of the agencies subject to the Closure Order were established by Congress and given a detailed set of statutory duties. In their spree to gut these agencies, Defendants have eliminated many of the programs that the agencies are statutorily required to carry out. In addition, the day after the President issued this order, Congress passed and the President signed a statute appropriating tens or hundreds of millions of dollars to each of these agencies. Those appropriations pay for the agencies to continue operating at full strength through the end of the fiscal year. The Executive may not decline to spend those funds by

slashing the agencies' staff to the bare minimum, shuttering most of their offices and programs, and refusing to use or disburse the money that Congress appropriated.

8. Third, and for much the same reasons, the orders violate the Constitution's separation of powers, which assigns Congress the power of the purse, and the Take Care Clause, which entrusts the President with the responsibility to faithfully carry out the laws Congress enacted.

9. If the President disagrees with Congress's decision to support the Nation's libraries and museums, enable the peaceful mediation of labor disputes, and coordinate nationwide efforts to address homelessness, he is free to seek legislation abolishing the agencies that perform these—and many other—vital functions.  One option that our Constitution does not give the President is to shutter the agencies himself, in defiance of the administrative procedures that Congress required to be followed, the appropriations that Congress ordered to be spent, and the separation of powers that every officer of our government has sworn to uphold.  Accordingly, the Closure Order should be declared unlawful, and Defendants' actions implementing that unlawful order should be vacated.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

11. There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201– 2202, 5 U.S.C. §§ 704–706, and the Court's equitable powers.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Rhode Island

is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### I.    Plaintiffs

13.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

14.    Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.

15.    Plaintiff State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, Hawai'i's chief legal officer and chief law enforcement officer, who is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

16.    Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona is represented by Attorney General Kristin K. Mayes, who is the chief law enforcement officer for Arizona and authorized to pursue this action on behalf of the State. *See* Ariz. Rev. Stat. § 41-192(A).

17.    Plaintiff the State of California is a sovereign state in the United States of America.  California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

18.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

19.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.     Plaintiff State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

21.     Plaintiff the State of Illinois is a sovereign state of the United States.  It is represented in this action by the Attorney General of Illinois Kwame Raoul, who is the chief legal officer of the State and is authorized to pursue this action on behalf of the State pursuant to Article V, Section 15 of the Illinois Constitution and Chapter 15, Act 205, Section 4 of the Illinois Compiled Statutes.

22.     Plaintiff the State of Maine is a sovereign state of the United States of America.  Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

23.     Plaintiff the State of Maryland is a sovereign state of the United States of America.  Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.  Under the Constitution of Maryland, and as directed by the Maryland

General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

24.    The Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

25.    Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

26.    Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief legal officer of Minnesota.

27.    Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

28.    Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

29.    Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

30.    Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is Oregon's chief legal officer and is authorized to represent the State in this Court.

31.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

32.    Plaintiff the State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

33.    Plaintiff State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

**II.    Defendants**

34.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

35.    Defendant Institute of Museum and Library Services is an independent federal agency. *See* 20 U.S.C. § 9102. It is an agency for the purposes of the Administrative Procedure Act.

36.    Defendant Keith E. Sonderling is the Acting Director of the Institute of Museum and Library Services and is the statutory head of IMLS. *Id.* § 9103(a)(1). In that capacity, he is responsible for implementing the Closure Order. He is sued in his official capacity.

37.    Defendant Minority Business and Development Agency is a bureau of the United States Department of Commerce.  15 U.S.C. § 9502(a).  It is an agency for purposes of the Administrative Procedure Act.

38.    Defendant Madiha D. Latif is the Deputy Under Secretary of Commerce for Minority Business Development and the statutory head of the MBDA.  *Id.* § 9502(b)(1).  She is sued in her official capacity.

39.    Defendant Howard Lutnick is the United States Secretary of Commerce, to whom the head of the MBDA directly reports.  *Id.* § 9502(b)(1)(C).  He is sued in his official capacity.

40.    Defendant Federal Mediation and Conciliation Service is an independent agency of the United States.  29 U.S.C. § 172(a).  It is an agency for purposes of the Administrative Procedure Act.

41.    Defendant Gregory Goldstein is the Acting Director of the Federal Mediation and Conciliation Service.  In that capacity, he is responsible for implementing the Closure Order.  He is sued in his official capacity.

42.    Defendant the United States Office of Management and Budget is an office in the Executive Office of the President.  31 U.S.C. § 501.  It is an agency for purposes of the Administrative Procedure Act.

43.    Defendant Russell T. Vought is the Director of the Office of Management and Budget.  He is sued in his official capacity.

44.    Defendant United States Interagency Council on Homelessness (USICH) is an "independent establishment" in the Executive Branch.  42 U.S.C. § 11311.  It is an agency for purposes of the Administrative Procedure Act.

45.    Defendant Kenneth Jackson is the Acting Executive Director of USICH. In that capacity, he is responsible for implementing the Closure Order.  He is sued in his official capacity.

## **FACTUAL ALLEGATIONS**

## I.    **The Administration's Efforts to Dismantle Disfavored Federal Agencies**

46.    The Closure Order is the most recent—and among the most brazen—of a lengthening series of efforts this Administration has undertaken to dissolve federal agencies established by Congress.

47.    The first of those efforts began within hours of the President's inauguration.  That day, the President ordered a pause on all funding provided by the U.S. Agency for International Development (USAID).  *See* Exec. Order. No. 14,169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025).  Shortly thereafter, the Administration attempted to fire or put on leave thousands of USAID workers, close the agency's headquarters, and cancel the bulk of its $40 billion in contracts and grants.[1]  One court has enjoined these efforts in part, finding a likelihood of success on plaintiffs' claims that the Administration lacked a reasoned basis for categorically suspending the agency's foreign aid programs, and that the Administration violated the separation of powers by refusing to spend the funds that Congress appropriated.  *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 752378, at *10-11, *14-17 (D.D.C. Mar. 10, 2025) (granting preliminary injunction); --- F. Supp. 3d ---, 2025 WL 1380421, D.D.C.,

---

[1] *See* USAID, *Notification of Administrative Leave*, available at https://www.usaid.gov/; Center for Global Development, *New Estimates of the USAID Cuts* (Mar. 20, 2025) available at https://www.cgdev.org/blog/new-estimates-usaid-cuts.

May 13, 2025 (denying federal government's request for an indicative ruling, and dissolving an earlier-entered administrative stay).[2]

48.    The Administration next attempted to kneecap the Consumer Financial Protection Bureau (CFPB).  On February 10, the Acting Director of the CFPB ordered all employees to stop work and engaged in "a hurried effort to dismantle and disable the agency entirely—firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force (RIF) that would cover everyone else." *Nat'l Treasury Emps. Union v. Vought*, --- F. Supp. 3d ---, 2025 WL 942772, at *1 (D.D.C. Mar. 28, 2025).  A district court enjoined those efforts, holding that the Administration's attempt to shut down an agency created by statute was likely unconstitutional and contrary to law.  *Id*. at *20, *40.[3]

49.    On February 11, the Administration made clear that its demolition campaign would extend throughout the federal government.  That day, the President issued an executive order directing every federal agency to "submit a plan to reduce the size of the Federal Government's workforce," and to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)."  Exec. Order. No. 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," § 3(a), (c) (Feb. 11, 2025).  He required these RIFs

---

[2] In a separate suit, the District Court for the District of Maryland held that the Department of Government Efficiency (DOGE) unlawfully directed the closure of USAID and issued a preliminary injunction ordering DOGE officials to reverse the closure.  *See Does 1-26 v. Musk*, --- F. Supp. 3d ---, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025).  The Fourth Circuit stayed the district court's injunction because it concluded DOGE was likely not a proper defendant.  *Does 1-26 v. Musk*, No. 25-1273 (4th Cir. Mar. 28, 2025).  Judge Gregory wrote separately to explain that, while he agreed DOGE was likely not a proper defendant, the Administration's "actions in closing USAID" were "likely unconstitutional."  *Id.* at 16 (Gregory, J., concurring only in the result).

[3] That injunction is currently stayed in part pending appeal.  No. 25-5091 (D.C. Cir. Apr. 28, 2025).

to prioritize the elimination of "[a]ll offices that perform functions not mandated by statute or other law." *Id.* § 3(c). The Office of Management and Budget and the Office of Personnel Management issued a companion memorandum emphasizing that agencies should "focus on the maximum elimination of functions that are not statutorily mandated."[4]

50.     On February 19, the President targeted four more federal agencies for elimination. In an order entitled "Commencing the Reduction of the Federal Bureaucracy," Exec. Order. No. 14,217, § 1 (Feb. 19, 2025), he instructed four federal entities, including the U.S. Institute of Peace, to eliminate their "[t]he non-statutory components and functions," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a). Since then, the Administration has taken aggressive steps to shut down the Institute of Peace: it has fired all of the voting members of the Institute's Board, replaced its president, and enlisted the aid of law enforcement to remove the Institute's staffers from its headquarters.[5]

51.     The President has also undertaken aggressive efforts to abolish the Department of Education. On March 11, the Department of Education announced a nearly 50% cut to its

---

[4] *See* Memorandum for Heads of Executive Agencies and Departments, from Russell T. Vought, Director, Office of Management and Budget, and Charles Ezell, Acting Director, Office of Personnel Management, "Guidance on Agency RIFs and Reorganization Plans Requested by *Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative*," at 2 (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

[5] *See United States Institute of Peace, et al. v. Jackson et al.*, --- F.Supp.3d ---, 2025 WL 1428641 (D.D.C. May 19, 2025) (granting summary judgement, and declaratory and permanent injunctive relief, to plaintiffs challenging the dismissal of board members and the institute's president, and the seizure and transfer of the institute's real property). This decision is currently on appeal. No. 25-5185 (D.C. Cir. May 21, 2025).

workforce.[6]  And on March 20, President Trump issued an executive order directing the Secretary to "facilitate the closure of the Department of Education and return authority over education to the States and local communities."  Exec. Order No. 14,242, "Improving Education Outcomes by Empowering Parents, States, and Communities," § 2(a) (Mar. 20, 2025).  The Plaintiff States have filed suit to challenge that closure.  *See New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.). The U.S. District Court for the District of Massachusetts granted a preliminary injunction on May 22, 2025, --- F.Supp.3d ---, 2025 WL 1463009 at *1, stay pending appeal denied, No. 25-1495 (1st Cir. June 4, 2025).

## II.    The Closure Order

52.    On March 14, the President ordered the dismantling of seven more agencies.  That day, he issued the Closure Order, formally entitled "Continuing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14,238 (Mar. 14, 2025).  In terms nearly identical to the order that led to the forcible takeover of the Institute of Peace, the order directs seven congressionally created agencies, including the Institute of Museum and Library Services, the Minority Business Development Agency, the Federal Mediation and Conciliation Service, and the United States Interagency Council on Homelessness[7] to eliminate their non-statutorily mandated functions "to the maximum extent consistent with applicable law," and to "reduce the performance of their

---

[6] *See* White House, Fact Sheet: President Donald J. Trump Empowers Parents, States, and Communities to Improve Education Outcomes (March 20, 2025) available at: https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-empowers-parents-states-and-communities-to-improve-education-outcomes/.

[7] The other agencies, which are not the subject of this lawsuit, are the Community Development Financial Institutions Fund, the United States Agency for Global Media, and the Woodrow Wilson International Center for Scholars.

statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a).

53.    The Closure Order provides that "[i]n reviewing budget requests submitted by" the entities, "the Director of the Office of Management and Budget . . . shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order." *Id.* § 2(c).

54.    The Closure Order further requires the heads of these entities to submit "[w]ithin 7 days . . . a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* § 2(b).

55.    Within one day of the President's signing of the Closure Order, Congress passed, and the President signed, a continuing resolution funding the government through September 30, 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025).  That statute maintains funding for every agency subject to the Closure Order at the same level as they were funded in fiscal year 2024.

## III.    At Least Four of the Seven Agencies Subject to the Closure Order Have Already Been Gutted, Inflicting Severe Harm on the Plaintiff States.

56.    In the weeks since it was issued, the Closure Order has resulted in the devastation of the Institute of Museum and Library Services, the Minority Business Development Agency, the Federal Mediation and Conciliation Service, and the United States Interagency Council on Homelessness.  Each of these agencies was established by Congress, has a detailed list of statutory duties, and was appropriated funds by Congress—often numbering in the hundreds of millions of dollars—as recently as March 15.  Nonetheless, each of these agencies has made a final decision (the "Closure Decision") to implement the Closure Order and to gut its operations.

57. These unlawful actions are inflicting immediate harm on the Plaintiff States, which rely on every one of these agencies to provide services of vital importance to the States and the public at large, including funding their libraries, enhancing government contracting, mediating labor disputes, and coordinating responses to homelessness.

A. **Institute of Museum and Library Services**

1. ***Statutory Authority and Programs***

58. The Institute of Museum and Library Services is the primary federal agency responsible for supporting the country's museums and libraries through grantmaking, research, and policy development.[8] Although funding for IMLS only constitutes 0.0046% of the federal budget, IMLS provides critical resources to libraries and museums across the United States.[9]

59. Congress established IMLS in the Museum and Library Services Act of 1996. Pub. L. 104-208, 110 Stat. 3009 (1996). It has reauthorized and extended the Institute three times since then—most recently in a law signed by President Donald J. Trump in 2018. *See* Museum and Library Services Act of 2018, Pub. L. 115-410, 132 Stat. 5412 (2018) (codified at 20 U.S.C. §§ 9101 *et seq.*). The current reauthorization of the Institute extends until September 30, 2025.

60. By statute, IMLS is required to have both an Office of Museum Services and an Office of Library Services. 20 U.S.C. § 9102. It is required to engage in regular research and data collection to "extend and improve the Nation's museum, library, and information services." *Id.* § 9108. And it is charged with supporting museums and libraries across the States by

---

[8] Institute of Museum and Library Services, FY 2022–2026 Strategic Plan, at 3, https://www.imls.gov/sites/default/files/2022-02/imls-strategic-plan-2022-2026.pdf
[9] American Alliance of Museums, *AAM Statement on the Placing of IMLS Staff on Administrative Leave* (Mar. 31, 2025), https://www.aam-us.org/2025/03/31/aam-statement-on-the-placing-of-imls-staff-on-administrative-leave/.

disbursing and expending appropriated funds and providing other forms of assistance. *Id.* §§ 9121-9165 (libraries), 9171-9176 (museums).

61.    IMLS's largest funding program—and the largest source of federal funding for library services—is the Grants to States Program. 20 U.S.C. § 9133(a). Under this program, IMLS awards a formula grant directly to State library administrative agencies to advance eight enumerated purposes, including expanding library services and access; improving librarian training, professional development, and recruitment; and targeting library services to diverse communities. *Id.* § 9141(a)(1)-(8). To obtain the funds, States must submit five-year plans. *Id.* 9134(a). After the plan has been approved, IMLS pays each State the Federal share of the activities in the plan, which is 66%. *Id.* § 9133(b). All 50 States and the District of Columbia receive these grants from the IMLS.[10] Upon information and belief, prior to the implementation of the Closure Order, the Grants to States program was administered by four program officers and one supervisor.

62.    IMLS also administers a variety of competitive grant programs for libraries and museums.[11] Its competitive grant programs for libraries include the Native American and Native Hawaiian Library Services Grants, which are awarded to eligible communities to establish, sustain, and improve library services, 20 U.S.C. § 9161; the National Leadership Grants for Libraries Program, which support projects that strengthen, develop, or enhance library services, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program grants, which support projects to recruit the next generation of librarians, including librarians from diverse and underrepresented backgrounds, *id.* § 9165(a)(1)-(3). Its competitive grant programs for

---

[10] Institute of Museum and Library Services, *Grant Programs*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs (last visited Apr. 4, 2025).

[11] *Id.*

museums include Museums for America grants, which support individual museums' abilities to serve the public through programs, exhibits, professional development, and collections management;[12] Native American/ Native Hawaiian Museum Service grants, which support Native tribes and organizations that primarily serve and represent Native groups by supporting a variety of projects, such as workforce development and community engagement;[13] National Leadership Grants for Museums to "support projects that address critical needs of the museum field;"[14] and the 21st Century Museum Professional Program grant, which supports projects to offer professional development and recruit future generations of museum professionals.[15]

63.     In addition to IMLS's statutory obligations under the Museum and Library Services Act, IMLS has statutory obligations under other statutes, including the National Museum of the American Latino Act, 20 U.S.C. § 80u(f)(2), and the National Museum of African American History and Culture Act, 20 U.S.C. § 80r-5(b).

64.     IMLS has also developed several initiatives to support libraries and museums.  In 2014, for example, IMLS launched Museums for All, a national access initiative under which visitors who receive Supplemental Nutrition Assistance Program benefits are eligible for deeply discounted or free admission to more than 1,400 museums throughout the United States.[16]  In

---

[12] Institute of Museum and Library Services, *Museums for America*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/museums-for-america (last visited Apr. 4, 2025).
[13] Institute of Museum and Library Services, *Native American/Native Hawaiian Museum Services*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/native-american-native-hawaiian-museum-services (last visited Apr. 4, 2025).
[14] Institute of Museum and Library Services, *National Leadership Grants for Museums*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/national-leadership-grants-for-museums (last visited Apr. 4, 2025).
[15] Institute of Museum and Library Services, *21st Century Museum Professionals Program*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/21st-century-museum-professionals-program (last visited Apr. 4, 2025).
[16] Museums for All, *About*, https://museums4all.org/about/ (last visited Apr. 4, 2025).

2024, IMLS launched InformationLiteracy.gov, a website designed for museum and library professionals and community-based organizations to provide resources and training on a variety of information literacy subject areas.

65.    In fiscal year 2024, IMLS distributed $180,000,000 to libraries across the United States via its Grants to States Program; $31,050,000 in other competitive library grant programs; and $55,450,000 to support museums across the United States.  Of the remaining appropriations, the Institute spent $5,650,000 on research and evaluation and $22,650,000 on its administration.[17]

66.    Congress appropriated IMLS $294.8 million for Fiscal Year 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 div. D (2024).

67.    As of March 14, IMLS had a staff of approximately 77.

**2.    *Implementation of the Closure Order***

68.    On March 31, the Director of Human Resources for IMLS informed agency staff that the entirety of IMLS would be placed on leave and that all grants would be terminated, with the potential exception of the Grants to States program.  The Director of Human Resources advised that staff should expect a reduction in force within 30 days or less.

69.    On that same day, IMLS staff received the below letter, Exhibit A, by email formally placing all IMLS staff on paid administrative leave for 90 days and suspending IMLS email accounts.

---

[17] Institute of Museum and Library Services, *FY 2023 – FY 2025 Budget Appropriations Table* (Mar. 2024), https://www.imls.gov/sites/default/files/2024-05/imls-budget-table-fy-2023-2025.pdf.

**INSTITUTE of Museum and Library SERVICES**

Acknowledged Receipt:_____

Date:_____

March 31, 2025

To:  ALL IMLS Employees

From:  Director of Human Resources

Re:  Administrative Leave for IMLS Employees

This is to inform you that you are being placed on administrative leave (i.e., non-duty paid status) starting Monday, March 31, 2025, up to a period of 90-days.  You will be on administrative leave with full pay and benefits.  This administrative leave is not being done for any disciplinary purpose.

While you are on administrative leave, you are not permitted on IMLS premises.  I regret that such directions are necessary, but we must safeguard legitimate IMLS interests and systems. If you wish to enter IMLS premises for official IMLS business, you must first contact me to arrange your visit.

While you are on administrative leave, OHR will handle your time and attendance.  Your email will be suspended.  You can reach me at my desk number, 202-653-4728, or via email: adotson@imls.gov

Please understand that this action is not punitive but rather is taken to facilitate the work and operations of the agency.  Your pay and benefits will not be affected and will continue during this period.

Please contact me if you have any questions about this letter.

Sincerely,

*Antoine L. Dotson*

Antoine L. Dotson
Director of Human Resources

70.     The American Federation of Government Employees Local 3403, the union that represents IMLS staff, advised that without staff, "all work processing 2025 applications has

ended" and the "status of previously awarded grants is unclear . . . [but] [w]ithout staff to administer the programs, it is likely that most grants will be terminated."[18]

71.    Upon information and belief, as of April 1, IMLS recalled a skeleton crew of approximately 12 staff members, including one deputy director for museums, one program officer for museums, one deputy director for libraries, and one program officer for libraries. The remaining staff members include lawyers, a chief financial officer, the head of human resources, and the Director.

72.    Because the remainder of IMLS staff have been placed on administrative leave, IMLS is not capable of processing new grant applications or servicing existing grants, and it has begun terminating existing grants. On April 2, 2025, Washington's State Librarian received notification from the Acting Director of IMLS, Keith Sonderling, that Washington State Library's $3,948,629 "Grants to States" award had been terminated effective April 1, because it was "inconsistent with IMLS' priorities" and the cancelation was "mandate[d]" by the President's Executive Order. The State Libraries of California and Connecticut received similar notices on April 2, 2025, that California's $15.7 million and Connecticut's $2.1 million "Grants to States" awards were terminated. At the time of cancelation, there remained nearly $3.4 million promised under California's award, and $984,000 under Connecticut's award, that had not yet been disbursed.

73.    On April 3, 2025, the President began dismantling the Board of the IMLS. For example, Annie Norman, the State Librarian of Delaware, received an email from the Deputy

---

[18] Book Riot, *The Institute for Museum and Library Services Was Just Gutted* (Mar. 31, 2025), https://bookriot.com/imls-gutted/.

Director of Presidential Personnel terminating her Board membership, notwithstanding the fact that she had been reappointed to a new five-year term in December 2024.

### 3. *Harms to the Plaintiff States*

74.    All the Plaintiff States receive funding through the Grants to States Program and rely on this funding to support a number of vital library services and functions and to pay the salaries of state library staff.

75.    On information and belief, the Plaintiff States rely on the Grants to States Program funding to pay the salaries of its state library employees who work to carry out the goals of the approved five-year library plans identified *supra* in paragraph 59. These funds pay the salaries either in part or in full of 12 full-time state library department employees and 12 temporary employees  in Arizona, 34 state library department employees s in California, 13 state library department employees in Connecticut, 20 state library department employees in New Jersey, 14 state library department employees  in New Mexico, 55 state library department employees in New York, 12 state library department employees in Oregon, 6 state library department employees in Rhode Island, 16 state library department employees in Vermont, 32 state library department employees in Washington, and 17 state library department employees in Wisconsin. Delaware uses federal funding to pay 50% of the salaries of state employees in addition to several contractual staff members, while Maryland uses IMLS funds to pay the full or partial salaries of 10 employees and 3 consultants. In Rhode Island, 45% of the budget of its Office of Library and Information Services ("OLIS"), including the equivalent of 6 full-time employees, was covered by IMLS's Grants to States Program.

76.    These state library employees are essential to the critical operations of the State Libraries and provide a wide variety of crucial services to thousands of libraries across the

Plaintiff States, which benefit the millions of patrons who use these libraries annually. Such services include, but are not limited to, processing and administering state aid and subgrants to libraries; providing technical assistance to libraries; providing consulting services on early literacy, digital equity, continuing education, reference services, and public library data to the libraries; developing training for library staff; preserving historical collections; digitizing collections; providing expert research assistance; and developing statewide library services.

77.     In addition to paying the salaries of critical staff members, Plaintiff States also use these Grants to States program funds to support a wide variety of programs, including, but not limited to, developing and implementing reading and literacy programs for children, teens, and adults; providing braille and audio services to library patrons who are unable to utilize traditional print materials; providing access to the internet; providing access to library materials to those who are homebound or live in rural areas; and providing access to statewide resources such as databases, interlibrary loan software, digital library eBook and eAudio content, and online reference programs. Plaintiffs States also use this federal funding to provide resources to their communities related to job training, business development, and digital, financial, and health literacy.

78.     In April of 2025, IMLS cancelled Washington's grant, which was intended to support a number of programs, including literacy and reading, and lifelong learning programs; state-wide digital initiative programs; the Washington Talking Book and Braille Library and other accessible library and information resources; support for the incarcerated and hospitalized in their recovery, release, and re-entry. That grant was supposed to run until 2027, and the State Librarian received the grant termination notice on the same day that she submitted a drawdown

request seeking reimbursement for approximately $1 million. The cancellation or even temporary interruption of the grant may cause the library to fail to meet its financial obligations.

79.     The California State Library's recently cancelled grant made possible, among other things, support for tutors helping adults and children read, write, and learn English and efforts to ensure that summer reading and activity programs, including those that feed hungry, underserved kids, are available to its residents. IMLS funds also pay for the salaries of 34 State Library employees of whom 20 provide services to 800,000 blind, visually impaired, or dyslexic residents. Without the funding support of IMLS, those programs are likely to end, and layoffs would ensue.[19]

80.     In Rhode Island, the Office of Library and Information Services ("OLIS") allocates IMLS Grants to States Program funding to individual libraries and library-serving organizations through subgrants. The IMLS grant, allocated through OLIS, funds, among other things, 42 of Rhode Island's public libraries for their summer reading programs, projects such as digitization of historic copies of local newspapers, services for veterans and differently abled individuals, social services, learning programs, and collection development. The Grants to States Program supports many Rhode Island initiatives, including but not limited to: A Resource Sharing Program to facilitate efficient statewide sharing of materials among public, academic, school and other libraries, and achieves savings for municipalities and academic institutions while expanding access to educational, informational, and recreational reading materials for all Rhode Islanders; The Talking Books Library, Rhode Island's Regional Library for the Blind and Print Disabled, providing access to public library services for state residents who are unable to

---

[19] While IMLS may have temporarily restored funding of the Washington and California grants, as well as other grants pursuant to the entry of a preliminary order by the Court (ECF 60), permanent injunctive relief is necessary to fully address the harm.

use traditional print materials due to visual or print disability; A Digitization, Preservation and Disaster Preparedness Program to provide tools and resources to assist with disaster preparedness; and A Reading and Literacy Program to coordinate reading programs for children, teens and adults at public and school libraries statewide; and partnerships with organizations to promote, support or develop statewide programs focused on early literacy, grade level reading, and statewide reading.  In 2024, Rhode Island received a total of $1,413,623 through the Grants to States Program. Rhode Island does not have the budgetary resources or flexibility to make up for the lost funding, and these services will suffer without it.

81.    Massachusetts received $3,642,371 from IMLS in Fiscal Year 2024. The Massachusetts Board of Library Commissioners has used these federal funds to support many of its programs, including: statewide electronic research databases that are used most by school libraries; the only statewide eBook platform; direct grant program to public, school, and academic libraries; a statewide interlibrary loan platform (ComCat); statewide collection preservation and disaster response programs; and statewide librarian training programs. The pauses and termination of federal funding and federal support would result in cancellation of essential services used by approximately 1,200 school and public libraries across Massachusetts.

82.    Plaintiff States also apply to IMLS for competitive grants that are used to support a variety of library programs across the Plaintiff States.  For example, the Connecticut State Library was recently awarded a $249,948 grant from the National Leadership Grants program to collaborate with eight public libraries to design and implement a model for regional sharing of digital navigation services to underserved residents. In 2023, a $748,588 National Leadership Grant was awarded to the New Jersey State Library to allow it to partner with the New Jersey State Department of Education and others to develop professional development, an instructional

framework, and learning activities to support New Jersey's upcoming implementation of information literacy standards. Recently, Washington received a National Leadership Grant for $149,668 for a multi-year project in collaboration with the Washington State Department of Corrections to develop strategies and tools to address disparities in library services for the incarcerated to develop best practices, performance standards, and adaptable models for other States.  And since 1998, Hawai'i library and museum organizations have received nearly $18 million in grants from IMLS to support projects that collect, digitize, and make available important Native Hawaiian collections.

83.     Plaintiff States also apply to IMLS for competitive grants to support museums by hiring project-related employees, developing educational programs, developing new exhibits, and improving existing exhibits.  Museums in Plaintiff States have been awarded grants and are relying on the fulfilment of those grants to complete specific projects ranging from developing new exhibits to improving the accessibility of existing exhibits.  Any pause or cancellation in federal funding will delay the completion of these projects to the detriment of the museum and its visitors.  For example, the University of Wisconsin-Stevens Point's Natural History Museum was recently awarded a grant from the IMLS's Inspire! Grants for Small Museums program, which it intends to use to fund staffing, design, and purchase of improvements to make its collection accessible to visitors with physical limitations and visual impairments.  If the museum does not receive disbursements and reimbursements under this grant, 50% of the museum's collection will remain inaccessible to visitors with physical limitations and visual impairments.

84.     In addition to federal funding, Plaintiff States also rely on IMLS for its leadership, programs, and data collection services.  For example, IMLS's Office of Research and Evaluation conducts ongoing research and collects and disseminates data annually to the public to improve

the nation's museum, library, and information services.  The consistent data reports about public libraries, such as the Public Library Survey, are used by the Plaintiff States to better understand the status of their public libraries and provide guidance on enacting best practices, to ensure local funding and support, and to inform legislators and stakeholders about the impact of library services.  In Rhode Island, for example, IMLS supports the State's libraries by providing guidance with its National Strategic Plan, input into the formation of Rhode Island's Five-Year State Plan, regular conferences and peer-to-peer meetings on library development, data collection and analyses, and various other trends in library science. On March 31, 2025, the same day that IMLS placed all staff on Administrative Leave, it informed Rhode Island's OLIS that IMLS staff would no longer be available to assist with the grant programs or other services. *See* Exhibit B.

85.    Upon information and belief, none of the 12 employees who will be brought back from administrative leave works in the Office of Research and Evaluation.  As a result, this office will effectively no longer exist at the agency. This indicates that the Public Library Survey will cease to be issued.  Additional program evaluations and data collection will also cease.

86.    Without this data and guidance, Plaintiff States will lack information needed for future program development and be forced to reduce the scope of consulting services provided to public libraries across their States.

87.    The severe reduction in staff at IMLS will prevent it from meeting its statutory obligations, both in library services and museum services.  Without a fully staffed IMLS, it is inevitable that funds the States are entitled to receive will be delayed, if they are processed at all. States will be unable to obtain counsel from IMLS staff to ensure that they are spending the grant money in ways authorized by the statute.  IMLS will also be unable to process thousands of applications for competitive grant programs mandated by statute.

88.    The disruption of grant funding will result in severe diminution of library and museum services.  States will be required to furlough or terminate local librarians and museum staff, curtail or shutter programs for training and recruitment of new staff, and cut back or eliminate critical services, such as literacy programs, investment in new technologies, public access to the internet, and technical assistance.  Local libraries relying on the State Library for support will experience financial pressure and reduced guidance, leading to a cutback in local services and access to physical and digital library materials.  The disruption of grant funding will also hamper the States' ability to digitize and preserve records, impeding research and academic efforts while also eroding cultural and historical identity.  Further, States may be forced to pause or cancel existing contracts for essential technology and software, as well as ongoing initiatives.

**B.    Minority Business Development Agency**

**1.    *Statutory Authority and Programs***

89.    The Minority Business Development Agency is an agency within the Department of Commerce whose purpose is "to promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs."[20]

90.    Initially created in 1969 by Executive Order 11,458 (Mar. 7, 1969), the MBDA was authorized by statute in 2021.[21]  *See* Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (MBD Act),

---

[20] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 16 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.
[21] *See* Cong. Rsch. Serv., R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 5 (2024), https://www.congress.gov/crs-product/R46816.

*codified at* 15 U.S.C. § 9501 et seq. By law, the Under Secretary of Commerce for Minority

Business Development heads the MBDA.  15 U.S.C. § 9502(b)(1).

91.    MBDA's principal statutory responsibility is to provide financial support to

MBDA Business Centers—public-private partnerships that help minority business enterprises

access capital and contracting opportunities, provide counseling and technical assistance to

minority business enterprises, and otherwise facilitate the growth of such enterprises.  15 U.S.C.

§§ 9522, 9523(a)(1)–(3); *see id.* § 9524(a)(1)(A).  The MBDA Office of Business Center is

administered by a Director, *id.* § 9502(d)(2), and is required to have "a regional office . . . . for

each of the regions of the United States," *id.* § 9502(e)(2)(A).

92.    As of 2024, MBDA funded 41 MBDA Business Centers in 34 States and

territories.[22]  MBDA Business Centers are essentially business consultancies that support the

growth of Minority Business Enterprises ("MBEs") by offering analytics, networking

opportunities, and trainings.

93.    MBDA also funds a number of specialty centers.  As of 2024, it funded 21 MBDA

Rural Business Centers, which focus on assisting minority business enterprises in rural areas;

four MBDA Advanced Manufacturing Centers, which aim to help manufacturers of domestic

products; four MBDA Export Centers, which are dedicated to expanding access to global

markets; and a Federal Procurement Center, which is designed to increase federal procurement

and acquisition opportunities for minority business enterprises.[23]

---

[22] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 18–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

[23] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 16–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

94.     The MBD Act also authorizes the Under Secretary to establish a number of other programs.  She "shall, whenever the Under Secretary determines such action is necessary or appropriate," (1) provide financial assistance directly or indirectly to minority business enterprises, (2) establish programs to encourage minority business enterprises to establish joint ventures and projects, and (3) engage in joint efforts with private and public sector entities to advance the growth of minority business enterprises.  15 U.S.C. §§ 9511(1)–(3), 9523(a)(1)–(3).  Using this authority, MBDA has established several projects and programs to assist minority business enterprises.  In 2024, these projects supported entrepreneurship education for formerly incarcerated persons, programs at minority colleges and universities, and American Indian, Alaska Native, and Native Hawaiian MBEs.[24] Likewise, the MBDA's Capital Readiness Program has supported and continues to support incubator programs like the Rhode Island Small Business HUB, a federal- and State-funded nonprofit that provides workshops, counseling, and networking opportunities to entrepreneurs as they scale their ideas in the marketplace.

95.     In addition to providing financial assistance, the MBDA is required to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least 5 languages, *id.* § 9513(a)(1)(C).

96.     In Fiscal Year 2023, the MBDA reported that its projects and programs served more than 2,000 MBE clients, produced more than $5.4 billion in economic benefit to MBEs, and contributed to MBEs creating nearly 19,000 jobs.[25]

---

[24] *Id.* at 20-21.
[25] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 8, 57, 59 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

97.     President Trump has repeatedly attempted to eliminate or gut the MBDA.  For fiscal year 2018, President Trump proposed to eliminate the MBDA and requested a $6 million budget "to be used to close out the agency."[26]  The first Trump Administration's Fiscal Year 2019, 2020, and 2021 budget requests all proposed to reduce the MBDA's budget to approximately $10 million.[27] Congress declined these requests and appropriated $39 million, $40 million, $52 million, and $70 million, respectively, in each of these years.[28]

98.     For Fiscal Year 2025, Congress passed—and President Trump signed—an act appropriating $68,250,000 to the MBDA.  *See* Continuing Appropriations Act § 1101(a)(2); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, 138 Stat. 25, 123 (2024).  As of March 14, the MBDA employed approximately 49 full-time personnel.[29]

### 2.     *Implementation of the Closure Order*

99.     Since the Closure Order was issued, MBDA placed all but three of its employees on paid administrative leave.  Subsequently two additional employees began working at the agency.  The only exceptions were the Deputy Under Secretary of Commerce for Minority Business Development; the Chief Operating Officer; the Chief of the Office of Legislative, Education, and Intergovernmental Affairs; a senior advisor; and a budget analyst.

100.    On March 21, 2025, the union representing MDBA employees received a notification from the Deputy Under Secretary, stating that "[i]n accordance with the March 13,

---

[26] *See* Cong. Rsch. Serv., R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 31 (2024), https://www.congress.gov/crs-product/R46816.

[27] *See* Cong. Rsch. Serv., R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 31, 33 (2024), https://www.congress.gov/crs-product/R46816.

[28] *See* Cong. Rsch. Serv.,  R46816, *The Minority Business Development Agency:  An Overview of Its History and Programs* 31, 33 (2024), https://www.congress.gov/crs-product/R46816.

[29] U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 46 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

2025, Executive Order, 'Continuing the Reduction of the Federal Bureaucracy,' . . . the Department of Commerce will be implementing a Reduction in Force (RIF) of the Minority Business Development Agency (MBDA)."  Exhibit C.  The RIF Notification indicated that "[a]ffected MBDA employees will be placed in a paid non-duty status today."  *Id.*

101.    According to a current MBDA employee, "this RIF will likely result in the termination of all General Schedule (GS)-level employees at the MBDA"—i.e., all but three of those currently on leave—"within 30 days of the notice."

102.    In addition to terminating nearly all of its employees—including those responsible for maintaining the agency's statutorily-mandated information clearinghouse, *see* 15 U.S.C. § 9513—the MBDA has allowed contracts to lapse or terminated them for convenience; it has ceased sharing information with stakeholders and accepting speaking engagements; and it has eliminated its Minority Business Center Advisory Council and declined to schedule its annual Forum on Capital Formation.

103.    The MBDA also has allowed its contract with the data storage and customer relationship management platform Salesforce to expire, thereby losing access to a wide suite of analytical tools for sales, customer service, marketing automation, e-commerce, analytics, artificial intelligence, and application development.

### 3.    *Harms to the Plaintiff States*

104.    Plaintiff States will be directly and irreparably harmed by the MBDA's termination of its discretionary functions and the reduction of its active staff to five employees.

105.    Several MBDA Business Centers are operated by Plaintiff States' instrumentalities (i.e., agencies, universities, or local governments).  These include centers operated by New Mexico State University, the University of Connecticut, the University of Hawai'i, and the cities of

Baltimore and Albuquerque. The centers' statutory mission will be fatally undermined by the Closure Order's directive to "reduce the performance of [the MBDA's] statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14,238, § 2; *cf.* 15 U.S.C. §§ 9522–9524.

106.    For example, the University of Hawaiʻi operates the MBDA Business Center Hawaiʻi under an agreement with the MBDA. Through training, technical assistance, and networking opportunities, the MBDA Business Center Hawaiʻi helps local businesses secure commercial lending or financing and enter contracts for facilitates, goods, and services. Those services are especially important to Hawaiʻi due to its geographic and economic isolation from the rest of the United States and its unique Pacific culture.

107.    The MBDA Business Center Hawaiʻi relies on the MBDA for funding and for access to the Salesforce platform. Any loss of funding would prevent the Center from continuing to support clients' projects and force it to default on a contract with the Hawaiʻi YWCA to provide services to other small Hawaiʻi businesses.

108.    For the next fiscal year, the MBDA Business Center Hawaiʻi is scheduled to receive disbursements/reimbursements of $410,000 under its current awards. That grant must be renewed—along with all other MBDA Business Center grants—by June 30, which cannot feasibly be done by the MBDA's skeleton crew of five staff.

109.    Under an agreement with the MBDA, the Mayor and City Council of Baltimore, Maryland operate the Baltimore MBDA Advanced Manufacturing Center through the Baltimore City Mayor's Office of Small & Minority Business & Advocacy (MOSMBA&D). The Baltimore MBDA Advanced Manufacturing Center offers targeted assistance to manufacturers—such as identification of immediate and long-term business needs; access to financing, contracts and other

sales opportunities; specialized consulting and training; and business and industry advocacy—to increase the number of "Made in America" products that can be sold domestically and globally. The Baltimore MBDA Advanced Manufacturing Center is one of only four in the country and fills a void by providing services targeted at small local manufacturers.

110.    The Baltimore MBDA Advanced Manufacturing Center is funded solely by a $400,000 annual grant from the MBDA, which MOSMBA&D received in 2021 to operate the Center through June 30, 2026 (for a total of $2,000,000). MOSMBA&D intended to apply for a renewed grant to continue to operate the Advanced Manufacturing Center beyond June 30, 2026. Loss of funding as a result of the MBDA's effective elimination will force the Advanced Manufacturing Center to suspend operations and prevent it from supporting local manufacturers in Maryland and the Mid-Atlantic region.  Maryland manufacturers cannot feasibly turn to other Advanced Manufacturing Centers for support because the nearest ones are hundreds of miles away in Kentucky and Connecticut.

111.    Already, MOSMBA&D has lost access that MBDA provided to the Salesforce platform, which the Baltimore MBDA Advanced Manufacturing Center used to document client interactions.  Without access to Salesforce, MOSMBA&D cannot complete the Cumulative Goals Reports through which the Advanced Manufacturing Center was instructed to document its work. In addition, the MBDA program analyst to whom MOSMBA&D previously could turn appears to have been placed on leave and is no longer available to answer questions or provide support.

112.    Many of Plaintiff States' agencies, instrumentalities, and local governments also have received funding through the MBDA's pilot projects and programs, including the University of Wisconsin, the University of Hawai'i, and Morgan State University in Maryland.  The Executive Order's directive to "eliminate[ ]" the MBDA's "non-statutory components and functions"

threatens to halt the continuation or renewal of the Agency's pilot projects and programs, directly and irreparable harming Plaintiff States' instrumentalities that receive the funds. *See* Exec. Order No. 14,238, § 2.

113.    For example, in 2023, the University of Wisconsin System's Office of Business & Entrepreneurship (OBE) received a $3,000,000 grant for an MBDA Capital Readiness Program entitled "Advancing Capital Readiness Among Women-Owned Businesses Through Integrated Curriculum, Community and Connections." This project supports women's leadership training and personal finance development by developing comprehensive, customized financial literacy curriculum for early-stage, growth state, food/farm/agriculture and technology cohort accelerators, as well as by offering personal finance reviews, business planning information, and tools for entrepreneurs to use between sessions; online and on-demand webinars and podcasts on key business topics; and one-on-one consultations. MBDA funding will last through 2027 and has enabled OBE to cover the costs of research, cohort development, subject matter experts, student employees, ten-week accelerator programs in Early, Growth, Technology, and Food/Agriculture pathways, webinar and podcast production costs, Small Business Clinic costs, marketing efforts, data collection, compliance, and management expenses.

114.    OBE was, for example, scheduled to receive reimbursements of $45,913.07 under its MBDA grant in April of 2025. OBE had $117,706.23 in planned encumbrances on this award and a $2,305,705.85 balance available for draw on the award as of March 31, 2025. All funds available on this award already have been allocated and will be spent by August 31, 2027.

115.    OBE's next disbursement request was scheduled to be transmitted to MBDA by April 15, 2025, and OBE expected payment by April 30, 2025, to compensate for services already provided. If OBE does not receive its disbursements as scheduled, then it will not be able to pay

students or independent contractors working with small businesses on their financial projections, financial health and business plans; pay subject matter experts to consult with companies enrolled in the accelerators; or pay staff assigned to activities allocable to the project, such as the creation of online content, business clinic operations, and communications.

116.    In 2021, the University of Hawai'i Maui College received a $902,133.00 MBDA PĀʻOIHANA Grant to provide curriculum development and new entrepreneurship training programs, as well as business start-up coaching and mentoring.  This program has infused $1 million in business revenue into Maui's economy by supporting the creation of 27 new companies and 54 jobs.

117.    In the next eight months, the University of Hawai'i Maui College is scheduled to receive disbursements/reimbursements of $549,005.47 under the current MBDA award.  If MBDA's handful of remaining staff are unable to provide the funds on time, then the university will be forced to lay off three grant program staff and terminate training courses, coaching, and mentoring support services.

118.    In 2021, the University of Hawai'i received a $2,050,000 award to provide technical assistance and business development services to businesses in Hawai'i, and it was promised to receive $410,000 in the next fiscal year. Without that funding, the Hawai'i MBDA Business Center will default on its contract with the Hawai'i YWCA to provide critical business services to the YWCA, which in turn serves many Hawai'i small businesses.

119.    The Entrepreneurial Development and Assistance Center (EDAC) at Morgan State University, a public historically Black research university in Maryland, has received a $300,000 annual grant from the MBDA for each of the past four years to support entrepreneurship education for formerly incarcerated individuals through the RIDE (Returning Citizens Inspired to Develop

Entrepreneurial Ventures) program.  The RIDE program depends upon these MBDA funds, which are crucial for expanding EDAC's efforts to provide tailored entrepreneurship education, one-on-one business guidance, and support for marginalized communities.

120.    EDAC is still owed $109,000 under its existing grant awards and has been unable to draw down funds for those awards since March 29, 2025, after the vast majority of MBDA staff were placed on administrative leave.

121.    If EDAC's MBDA funding is not promptly restored, then it will need to halt essential programs such as entrepreneurship education, one-on-one business guidance, and access to resources such as the content library for continued learning.  And the uncertainty of not getting paid or reimbursed already has had a chilling effect upon EDAC, eroding confidence among program participants and partners and limiting EDAC's ability to foster economic development and entrepreneurship within underserved communities.

122.    Upon information and belief, and in the opinion of current MBDA employees, the five remaining staff members at MBDA will not be able to timely process grants, provide technical advice, or support capital development at the MBDA Business Centers as the MBD Act requires, directly and irreparably harming Plaintiff States' instrumentalities that operate those centers and receive those grants.

C.      Federal Mediation and Conciliation Service

        1.      *Statutory Authority and Programs*

123.    The Federal Mediation and Conciliation Service is the federal agency responsible for "assisting parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation."[30]  29 U.S.C. § 173(a).

124.    Congress established FMCS in the Taft-Hartley Act of 1947.  *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202.

125.    By statute, FMCS is required to perform several functions related to the resolution of labor disputes.  It provides labor mediation and conciliation services "to assist parties to labor disputes affecting commerce to settle such disputes."  29 U.S.C. § 173(a)–(c).  It conducts grievance mediations "as a last resort in exceptional cases" to resolve grievance disputes arising out of the application or interpretation of an existing collective-bargaining agreement."  29 U.S.C. § 173(d).  And it "encourage[s] and support[s] the establishment of joint labor management activities."  29 U.S.C. § 173(e).  FMCS provides mediation services at no cost to the recipients. [31]

126.    FMCS also provides a variety of other services to promote the peaceful resolution of labor disputes.  It appoints arbitration panels and arbitrators; conducts skills development and conflict resolution training; and verifies signed union authorization cards when employers agree to use that method to recognize a union.  Upon information and belief, FMCS generally provides

---

[30] FMCS, "Fast Facts about the Agency" (updated Jan. 2024), https://www.fmcs.gov/wp-content/uploads/2024/02/FMCS-Fast-Facts-FY23-update-Jan-2024.pdf.

[31] Federal Mediation & Conciliation Service, *FAQs*, https://www.fmcs.gov/resources/faqs/#cbm-faqs.

its educational and training services at no cost to the recipients, and it provides its arbitration panels and arbitrators to the parties at a below-market cost.

127.    FMCS is headquartered in the District of Columbia and has nine field offices and dozens of home offices located throughout the nation.  In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases; conducted 1,477 single or multi-day training and intervention panels; provided 10,004 arbitration panels; and appointed 4,350 arbitrators.[32]

128.    Congress appropriated FMCS $53,705,000 for Fiscal Year 2025.  Continuing Appropriations Act § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, 138 Stat. 460, 697 (2024).

129.    Upon information and belief, prior to March 14, FMCS had approximately 200 full-time employees, including approximately 140 field mediators.[33]

### 2.    *Implementation of the Closure Order*

130.    Upon information and belief, on March 18, 2025, FMCS's Deputy Director of Field Operations Javier Ramirez issued a memorandum to "Field Operations and HQ" in response to the Closure Order.  Exhibit D.

131.    In the memorandum, the Deputy Director provided a list of "Operational Adjustments" that were "Effective Immediately."

132.    Among the adjustments was a freeze on services to the "Public Sector."  The memorandum states that FMCS would accept "[n]o new public sector cases . . . to include CBM

---

[32]  FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

[33] *Id.*

[Collective Bargaining Mediation] work," that "all Public Sector RDT [Relationship Development and Training] cases should be complete" as of March 14, and that "[a]ll Public Sector work, including CMBs, must be completed by April 18, 2025."

133.    Further, the memorandum provided that no new grievance mediation cases would be accepted, and that "[a]s of March 14 all GM [grievance mediation] cases should be complete."  It provided that no new in-person Education, Advocacy and Outreach meetings should be scheduled.  And it provided that as of March 14, 2025, all card checks cases should be complete, and no new card checks would be accepted after that date.

134.    This memorandum has resulted in the immediate cessation of all FMCS assistance in the mediation of labor management disputes in the public sector and the immediate cessation of all FMCS assistance in grievance mediation in the public sector.

135.    One day after eliminating its public sector programs, FMCS issued a news release, stating: "FMCS is not a drain on taxpayer dollars as the article would suggest. In fact, our operations are managed on a $55 million budget (representing less than 0.0014% of the federal budget) yet we generate an impressive return on investment exceeding $500 million annually for the US economy.  This remarkable economic impact underscores FMCS's role as a sound investment that drives substantial growth and innovation by fostering stable labor-relations, minimizing or preventing work stoppages, and keeping Americans working."[34]

---

[34] FMCS, Press Release, *FMCS Condemns Overtly Misleading Online Article* (Mar. 19, 2025), https://www.prnewswire.com/news-releases/fmcs-condemns-overtly-misleading-online-article-302406542.html.

136.    On March 26, 2026, FMCS informed its staff that nearly all employees would be placed on administrative leave, effective the following day.[35]  Only approximately 10-15 employees, all located in the agency's DC headquarters, were permitted to continue working. Because the agency has only a "skeleton crew," one employee has explained that "[n]early all of the services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided."[36]  Some unions were told that FMCS "is basically being shut down."  The agency has initiated a RIF to terminate all but 15 of the employees remaining at the agency.

### 3.    *Harms to the Plaintiff States*

137.    The Administration's gutting of FMCS, and its termination of all public sector mediation and conciliation services, is already inflicting immediate and irreparable harms on the States.

138.    Several Plaintiff States have laws that either require or strongly encourage that a mediator or arbitrator in public labor disputes come from FMCS.  For instance, in New Mexico, in public employee impasse resolution, a mediator from FMCS is required to be assigned to assist in negotiations (absent agreement of the parties) and, if the impasse persists, either party may request a list of seven arbitrators from FMCS.  N.M. Stat. § 10-7E-18.  In Illinois, public employees can only strike if a mediator has been requested; if either party requests the use of FMCS, the other party shall join, or otherwise bear the additional cost of mediation services. 5

---

[35]*See* Fed. News Network, *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton-crew/

[36] *Id.*

Ill. Consol. Stat. § 315/17(a).  Maryland requires that FMCS mediators be used to resolve labor disputes in public libraries.  *See* Md. Code, Educ. § 23-907.

139.    Some Plaintiff States have collective bargaining agreements that specifically call for a mediator or arbitrator from FMCS to be used. In all, there are approximately 1,900 American Federation of State, County, and Municipal Employees ("AFSCME") collective bargaining and other contracts at all levels of government, in forty-two states and the District of Columbia that either allow for or mandate using the FMCS in labor relations.  In Maryland, for instance, the State's Department of Public Safety and Corrections, which has a unionized staff of over 8,500 employees, has collective bargaining agreements with four unions that provide for the use of FMCS for neutral fact-finding on appeal from a decision by the Secretary of Budget and Management or their designee.  New Mexico also uses FMCS mediation services (for free or at reduced cost) for labor disputes in its State and local government sectors.

140.    Maryland also has a memorandum of understanding with the AFSCME that allows either party to request a mediator from FMCS when the union or the employer cannot come to an agreement on a mandatory subject of bargaining.  Under the terms of this agreement, complaints concerning alleged violations of the terms of the agreement can be heard by a fact finder provided by FMCS, with costs to be shared equally by the parties.

141.    Many AFSCME agreements with state employees provide for the use of FMCS arbitrators or fact finders to serve as impartial decision makers and/or mediators in disputes over the meaning of terms in an agreement or in employee discipline cases.  AFSCME relies on FMCS to help facilitate the negotiation of collective bargaining and other labor-management agreements, and in the handling of grievances concerning state employees, in Rhode Island,

California, Delaware, the District of Columbia, Illinois, Maryland, Michigan, Nevada, New

Mexico, and New York.

142.    Many Plaintiff States rely on and benefit from FMCS's services, including

mediation, arbitration, and training services. Most non-federal public sector CBAs in New

Mexico expressly incorporate FMCS arbitration services by name, and curtailing those services

is very likely to escalate labor State and local government labor disputes. The same is true in

Rhode Island, where thousands of students rely on unionized school bus drivers to get an

education, and local governments have successfully negotiated contracts—and avoided strike—

through FMCS mediation. In Illinois, AFSCME depends upon FMCS to mediate contract

negotiations for the approximately 38,000 AFSCME represented state employees there, to avoid

labor disruption including the potential for strikes. For example, in 2021, FMCS mediated a

dispute between AFSCME and Eastern Illinois University, a public state university, after over a

year of bargaining. Similarly, FMCS's services are critical for resolving labor disputes in

Maryland, because the availability of qualified neutrals that are trusted by both the State and its

union partners is essential for reducing litigation costs and delays by promoting confidence in the

decision-makers and the dispute resolution process."  For instance, FMCS has provided services

to the State's Department of Public Safety and Corrections—at "minimal cost" to the state—that

assisted in resolving critical and high-profile matters, such as a major dispute dealing with

overtime and drafting policies. And in Rhode Island, FMCS helped resolve a grievance between

the Department of Children, Youth and Families and one of their unions in Fall 2024. Had the

dispute continued, the State faced a serious disruption to critical child protection services.

143.    The use of FMCS appointed mediators has helped to resolve disputes that

otherwise may have escalated and caused both the union and the state to expend greater

resources in both time and money to resolve the dispute. Mediation frequently is less costly and takes significantly less time to resolve disputes in contrast to labor disruptions, administrative hearings, or other litigation.

144.     Because FMCS has dramatically reduced its personnel and has ceased all public sector services, State agencies that previously relied on FMCS must now find and utilize other more costly and time intensive methods to resolve disputes with public sector unions. In New Mexico, its Public Employee Labor Relations Board has only two staff members and a small budget. Because of New Mexico's statutory requirements related to use of FMCS mediation and/or arbitration services in non-federal public sector labor disputes, a potentially large number of contract disputes may overwhelm the agency. Additionally, labor disputes are more likely to result in work disruptions when the path to otherwise mediating the dispute has been eliminated.

145.     In the absence of FMCS, for instance, the Maryland Department of Public Safety and Corrections needs to resolve labor disputes by either relying on its early overstretched State Labor Relations Board, hiring costly arbitrators, or risking litigation that could result in a major judgment against the State.  Any of these alternatives will increase costs, delay, or the risk of an unfavorable outcome.  In fact, in New Mexico, the resolution of at least eight pending public sector labor disputes has currently been, and will continue to be, significantly delayed by the discontinuation of FMCS services. And in Rhode Island, much of the healthcare system relies on FMCS mediations, which have averted costly strikes at Rhode Island Hospital, the State's only Level-1 Trauma Center, and other critical medical facilities operating on razor-thin margins. State stakeholders in labor relations also rely on FMCS training and educational opportunities to increase their own capacity. Losing these services will place additional financial and logistical burdens on State agencies. In Minnesota and Illinois, ongoing labor negotiations have been

44

abruptly canceled due to FMCS's closure. Without FCMS assistance in ongoing negotiations, parties will need to use much more costly private arbitrators, or risk strikes or other work stoppages.

### D.    United States Interagency Council on Homelessness

#### 1.    *Statutory Authority and Programs*

146.    USICH is the only Federal agency focused solely on ending homelessness.  Congress established USICH in 1987 "to coordinate the Federal response to homelessness and to create a national partnership at every level of government and with the private sector to reduce and end homelessness in the nation while maximizing the effectiveness of the Federal Government in contributing to the end of homelessness."  42 U.S.C. § 11311.  Congress reauthorized the agency in the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (Pub. L. No. 111-22, div. B, §§ 1001–1505).  The agency's authorization currently extends until October 1, 2028.  *See* 42 U.S.C. § 11319.

147.    By statute, USICH is composed of representatives of at least 20 agencies who meet "not less often than four times each year."  *Id.* § 11312(a)-(c).  It also must employ an Executive Director, *id.* § 11314(a), and "not less than 5 . . . regional coordinators" *id.* § 11313(a)(5).   Further, the Secretary of Housing and Urban Development (HUD) must provide USICH with "such administrative and support services as are necessary to ensure that the Council carries out its functions . . . in an efficient and expeditious manner."  *Id.* § 11314(d).

148.    Congress has assigned USICH a lengthy list of statutory duties, many of which expressly benefit States.  42 U.S.C. § 11313.  Among other duties, USICH is required to:

a.    develop and annually update "a National Strategic Plan to End Homelessness," *id.* § 11313(a)(1);

b.      "monitor, evaluate, and recommend improvements in programs and activities to assist homeless individuals conducted by Federal agencies, State and local governments, and private voluntary organizations," *id.* § 11313(a)(4);

c.      provide "professional and technical assistance . . . to States, local governments, and other public and private nonprofit organizations," to enable governments and organizations to interpret federal regulations, provide assistance on federal programs, develop recommendations, and establish biennial regional workshops, *id.* § 11313(a)(5);

d.      encourage "the creation of State Interagency Councils on Homelessness" and the formulation of plans to "end homelessness at State, city, and county levels," *id.* § 11313(a)(6);

e.      "develop mechanisms to ensure access by persons experiencing homelessness to all Federal, State, and local programs for which the persons are eligible," *id.* § 11313(a)(7);

f.      "conduct research and evaluation" related to its mission to end homelessness, *id.* § 11313(a)(8);

g.      "prepare and distribute to States . . . a bimonthly bulletin" that describes available Federal resources, *id.* § 11313(a)(11); and

h.      notify the head or the inspector general of the relevant agency if USICH encounters significant problem, abuse, or deficiency in programs to assist unhoused individuals, *id.* § 11313(d).

149.    Beyond these mandatory functions, USICH provides substantial additional support to States and other entities working to address homelessness.

150.    For example, prior to its dismantling, USICH was executing its 2022 Federal Strategic Plan entitled *All In* (The Plan), which sets out an "all-hands-on-deck response" for Federal efforts to prevent and end homelessness.  The Plan notes the current crisis in America, which was exacerbated by the COVID-19 pandemic and rising housing costs.  It sets forth a vision for "a nation in which no one experiences the tragedy and indignity of homelessness, and

everyone has a safe, stable, accessible, and affordable home." It then provides a strategic plan and implementation framework to reduce homelessness by 25% by 2025.[37]

151.    In its January 2025 Annual Report to the President, USICH reported that the Federal Strategic Plan has helped approximately 300,000 individuals per year find permanent housing.[38]

152.    In 2024, USICH also oversaw the ALL INside Initiative, dedicating full-time Federal employees to facilitate access to resources for unhoused populations in seven communities across the United States. USICH provided guidance and peer-to-peer networks to States wishing to establish their own Interagency Councils on Homelessness. It conducted over 58 site visits to local communities to provide feedback and support. It helped the U.S. Department of Veterans' Affairs (VA) house 48,000 veterans, resulting in the lowest level of veteran homelessness since HUD began collecting data on the problem in 2009. And it produced the first federal homelessness prevention framework, a guide intended for a wide range of partners, including local, tribal, and state governments.

153.    To ensure that States benefit from the services and resources that USICH provides, Congress directed each State to "designate an individual to serve as a State contact person for the purpose of receiving and disseminating information and communications received from the Council, including the bimonthly bulletin described in section 11313(a)(7)." *Id.* § 11320(a). Congress also encouraged each State to establish a "State interagency council on the

---

[37] USICH, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness*, https://www.usich.gov/sites/default/files/document/All_In.pdf, accessed June 12, 2025.

[38] USICH, Annual Report to the President of the United States for FY 2024 (Jan. 2025), https://www.usich.gov/sites/default/files/document/FY%202024%20USICH%20Annual%20Report%20to%20the%20President%2FINAL.pdf, accessed June 12, 2025.

homeless" or designate a lead agency for the purpose of coordinating and interacting with USICH. *Id.* § 11320(b).

154.    Congress appropriated $4.3 million to USICH for Fiscal Year 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); *see* Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, Tit. 3, 138 Stat. 388 (2024). As USICH informed Congress, funding at this level is "critical to supporting USICH's mission to prevent and end homelessness in America."[39]

155.    As of March 14, 2025, USICH was funded at 18 full-time equivalent positions, approximately 13 of which were filled.

2.    ***Implementation of the Closure Order***

156.    In response to the Closure Order, on or around March 13, 2025, USICH leadership submitted an Agency RIF and Reorganization Plan to OMB and Kenneth Jackson (Acting Executive Director of USICH) stating that a minimum of 13 USICH staff were required to fully carry out USICH's statutory duties.

157.    On or around April 8, 2025, Kenneth Jackson authorized Nate Cavanaugh, a known operative of the Department of Government Efficiency (DOGE), to carry out the duties of the Executive Director of USICH.

158.    Despite the Agency RIF and Reorganization Plan's determination that USICH required at least 13 full time employees to fulfill its statutory duties, on or around April 14, 2025, DOGE informed USICH leadership that all staff, including the statutorily required regional

---

[39] USICH, Fiscal Year 2024 Congressional Budget Request 2 (Mar. 2023), https://usich.gov/sites/default/files/document/FY_2024_Congressional_Budget_Justification.pdf accessed June 12, 2025; *see* USICH, Fiscal Year 2025 Congressional Budget Justification 2, https://www.usich.gov/sites/default/files/document/FY%202025%20Congressional%20Budget%20Justification_0.pdf, accessed June 12, 2025 (same).

coordinators, were being placed on administrative leave as of the next day, April 15, 2025. In this communication, USICH staff were told that, without prior permission of Kenneth Jackson or a supervisor, they could not enter USICH premises, access USICH systems, or attempt to use their position or authority within USICH in any way.

159.    Upon information and belief, as of the date of this first amended complaint, all but two employees remain on administrative leave.

160.    Moreover, USICH has terminated its lease for office space, deeming it no longer necessary.

161.    Shortly after being placed on administrative leave, all but the two remaining USICH employees were presented with a Deferred Resignation Agreement.  Employees that entered the agreement would be kept on administrative leave through September 30, 2025, and dismissed thereafter.

162.    USICH is not performing any programmatic functions as required by statute.  USICH is not organizing Council meetings; preparing a National Strategic Plan; monitoring or evaluating Federal, State, local, or private programs and activities; providing professional or technical assistance; encouraging the creation of State Interagency Councils; developing mechanisms to ensure access to Federal, State, and local programs; conducting research; preparing or distributing bimonthly bulletins or other communications; or reporting on significant problems, abuses, or deficiencies in agency programs meant to assist unhoused individuals.

163.    The only two employees remaining at USICH are responsible for processing payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown. They are not performing any work related to USICH's statutory mission.

164.    By the end of Fiscal Year 2025, a substantial portion of the Congressionally appropriated budget for USICH is expected to be left unspent due to the cessation of USICH activities and programming based on the implementation of the Closure Order.

165.    Constituents, including State officers, are calling USICH for assistance and reporting a growing homelessness problem across the United States.  In response, USICH personnel fielding and responding to these calls informs callers that USICH was shut down by DOGE and is no longer able to provide its statutorily mandated services.

### 3.    *Harms to the Plaintiff States*

166.    Without staff, USICH cannot perform the role assigned to it by Congress. Since the dismantling of the agency, Plaintiff States have lost and will continue to lose the assistance of a federal agency specifically charged by Congress to help them address homelessness. This, in turn, has shifted the burden fully to Plaintiff States to help unhoused individuals access Federal resources and programs designed to help them.

167.    The work USICH does to coordinate homeless assistance programs across federal agencies is invaluable to Plaintiff States.  In Fiscal Year 2023, Congress appropriated nearly $10 billion for targeted programs to end homelessness administered by 9 separate agencies,[40] in addition to billions of dollars in other federal programs that address homelessness, including among 19 USICH member agencies.[41]

---

[40] USICH, *Annual Report to Congress on Targeted Programs That Help People Experiencing or At Risk of Homelessness*, https://www.usich.gov/sites/default/files/document/FY%202023%20Targeted%20Programs%20That%20Help%20People%20Experiencing%20or%20At%20Risk%20of%20Homelessness.pdf, Table 1, accessed June 12, 2025.
[41] USICH, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness*, https://www.usich.gov/sites/default/files/document/All_In.pdf, Appendix B (inventorying "Targeted and Non-Targeted Federal Programs to Prevent and End Homelessness" across 20 agencies), accessed June 12, 2025.

168.    Plaintiff States, including Rhode Island, Washington, Illinois, Michigan, and Wisconsin, likewise use resources provided by USICH to help unhoused individuals obtain the support available to them.  USICH leverages its unparalleled access to Cabinet-level leadership across Federal agencies, addressing institutional barriers to Federal services in a way Plaintiff States cannot.

169.    USICH also facilitates access to support programs through site visits, guidance, presentations, workgroups, and other forms of technical and professional assistance. For example, Wisconsin's Interagency Council on Homelessness has benefitted for years from visits by USICH's executive directors and research team to help develop its state homelessness plan, Welcoming Wisconsin Home.

170.    Similarly, USICH has provided instrumental guidance at the annual Building Michigan Communities Conference and Homelessness Summit that has allowed the Michigan State Housing Development Authority to more effectively do its work.

171.    Without adequate staff, USICH will be unable to perform its statutory role to assist Plaintiff States with inquiries, and coordinate responses across Federal agencies. Rather than having the single and efficient point of contact mandated by Congress, the Plaintiff States will need to identify the specific agency or agencies for particular inquiries, then hope for coherent responses from up to 19 separate agencies and 150 programs.

172.    The Illinois Interagency Task Force on Homelessness, for example, has relied on USICH resources to navigate the various Federal systems and programs that affect Illinois' unhoused population.  Effectively shuttering USICH will undermine the Illinois Interagency Task Force's efforts. Vulnerable individuals in Illinois will be less likely to access Federal and State assistance and programs designed to help them avoid or escape homelessness.

173.    The Plaintiff States will also find it harder to establish their own Interagency Councils on Homelessness, as USICH will be unavailable for timely consultation.  For example, Rhode Island has met and planned to meet with USICH repeatedly as the State reconvenes its Interagency Council on Homelessness, which by State law must align with the USICH Federal Strategic Plan.  R.I. Gen. Laws § 40-17-3.  Rhode Island is just one of 27 States and Territories relying on USICH guidance to establish and maintain Interagency Councils on Homelessness.[42]

174.    Because of the cuts, USICH will also be unable to build on its successes from the ALL INside Initiative.  The Initiative drew on USICH expertise and resources to identify and act on unsheltered homelessness in six cities (Chicago, Dallas, Denver, Los Angeles, Phoenix, and Seattle) as well as in California.[43]  For example, as part of the initiative, Denver, Colorado implemented an encampment resolution pilot, moving unhoused individuals into transitional housing through partnerships between the municipal public housing authority, HUD, and the VA.  The cuts to USICH make it impossible for such dedicated efforts to continue, contrary to the will of Congress and to the detriment of Plaintiff States.

175.    Plaintiff States will also lose the vital inter-state connections that USICH facilitates. For example, USICH convenes a monthly meeting series called "West Coast Cities Peer to Peer Call on Homelessness" that allows a variety of stakeholders to present and discuss their successes, failures, and lessons learned on both broad strategies and specific intervention types, which helps these West Coast cities more effectively address homelessness.

---

[42] USICH, *Creating and Sustaining State Interagency Councils on Homelessness* (May 2024), https://www.usich.gov/sites/default/files/document/Creating%20and%20Sustaining%20State%20Interagency%20Councils%20on%20Homelessness.pdf, accessed June 12, 2025 (listing 26 other states and territories with active Interagency Councils on Homelessness).
[43] USICH, *ALL INside Initiative Strategic Reflections, Progress & Opportunities* (Jan. 2025), https://usich.gov/sites/default/files/document/ALL%20INside%20Report%202025%20Final_0.pdf, accessed June 12, 2025.

176.     Plaintiff States also benefit from the National Youth Homelessness Partnership, which empowers young people who have experienced homelessness to engage directly with Federal partners to address root causes of youth homelessness in their communities.  Dismantling USICH will end that partnership, denying Plaintiff States the benefit of Federal resources and programs informed by input from people who experienced homelessness as children and young adults.

177.     Plaintiff States also rely on the research and best practices identified by USICH experts.  As a result of the dismantling of the agency, those resources will evaporate.  For example, USICH will no longer be able to pursue its Federal Homelessness Research Agenda, which promised to supply Plaintiff States with evidence-based practices to prevent and end homelessness.[44]

178.     Plaintiff States will also lose access to USICH guidance and recommendations. The Illinois Interagency Task Force on Homelessness programs, for example, relies on guidance developed by USICH, including toolkits, webinars, and sample documents.  This Task Force currently uses USICH's Federal Homelessness Prevention Framework as well as its "19 Strategies for Communities to Address Encampments Humanely & Effectively."  The gutting of the agency will deprive Plaintiff States of the research-based Federal expertise Congress has directed USICH to develop specifically for the benefit of state governments.

179.     Plaintiff States will also lose the benefit of direct, community-specific expert assistance from USICH. For example, in May 2024, USICH visited Newark, New Jersey, and

---

[44] USICH, *From Evidence to Action: A Federal Homelessness Research Agenda* 2024-2028 (Nov. 2023), https://www.usich.gov/sites/default/files/document/From%20Evidence%20to%20Action_A%20 Federal%20Homelessness%20Research%20Agenda%20November%202023.pdf, accessed June 12, 2025.

New York City to meet with people experiencing homelessness, their representatives in State and local government, as well as private partners, in order to coordinate access to Federal resources for innovative housing efforts.  As part of the same trip, USICH participated in the first-ever statewide meeting of Continuums of Care and public housing authorities in New Jersey. Likewise in 2024, USICH visited Phoenix, Arizona, and Southern California to understand and address the root causes of homelessness.  USICH designed a response for each community.  The effective shuttering of USICH will deprive Plaintiff States of such beneficial services.

180.     Without the benefit of USICH's resources, expertise, and assistance, Plaintiff States will be less effective at combatting homelessness, providing support to unhoused individuals, and ensuring that their residents can access federal programs rather than relying on already overburdened State service providers.

### IV.     The Office of Management and Budget's Role

181.     To ensure its implementation, the Closure Order directs the Office of Management and Budget (OMB) and its Director, Russell Vought, to "reject funding requests" by the IMLS, the MBDA, the FMCS, or USICH "to the extent they are inconsistent with this order." Exec. Order No. 14,238 § 2(c).

182.     OMB's oversight of the Closure Decisions precludes the possibility the agencies will make up for their dramatic cuts with increases elsewhere and makes certain that the Administration will fail to spend the full amount of funding appropriated by Congress.

183.     OMB's involvement also underscores that the purpose of the agencies' planned RIFs is to "[e]liminat[e] non-statutorily mandated functions," as Director Vought previously ordered in his February 26, 2025, Memorandum to Heads of Executive Departments and

Agencies [Memo. at 3], and as the Closure Order now commands.  Exec. Order No. 14,238

§ 2(a).

## **CLAIMS FOR RELIEF**

### **COUNT I**
**Administrative Procedure Act**
**Arbitrary and Capricious and Abuse of Discretion**
**(Agency Defendants)**

184.    Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs.

185.    Defendants include "agenc[ies]" under the APA.  5 U.S.C. §§ 551(1), 701.

186.    Defendants took final agency actions that are subject to judicial review when they

made decisions ("Closure Decisions") to implement the Closure Order and substantially curtail

their operations.

187.    The APA requires courts to "hold unlawful and set aside" agency actions that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.*

§ 706(2).

188.    An agency action is arbitrary or capricious where the agency fails to "articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

189.    When an agency "rescinds a prior policy," the agency must, at minimum,

"consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there

were reliance interests," and "weigh any such interests against competing policy concerns."

*Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30, 33 (2020).

190. A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

191. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it or did not take into account "legitimate reliance interests." *Regents*, 591 U.S. at 25 (quoting *State Farm*, 463 U.S. at 43).

192. Defendants provided no reasoned explanation for their Closure Decisions.

193. Defendants failed to consider the legitimate reliance interests of States, grantees, the public, and other interested entities on the functions, programs, and offices that have been reduced or eliminated.

194. Defendants failed to consider reasonable alternatives to the elimination or reduction of functions, programs, and offices in Defendant agencies.

195. Defendants failed to weigh the purported benefits of eliminating their functions and programs against the costs.

196. The Closure Order on its face directs the agencies to engage in arbitrary and capricious actions by requiring them to eliminate discretionary functions and reduce to the minimum their statutory functions, without leaving room for the agencies to engage in reasoned analysis, assess alternatives, consider reliance, or do anything but eliminate their discretionary programs and minimize their remaining operations.

197. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Closure Decisions violate the APA.

198.     Plaintiff States are also entitled to vacatur of the Closure Decisions and a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Closure Decisions.

**COUNT II**
**Administrative Procedure Act**
**Contrary to Law**
**(Agency Defendants)**

199.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

200.     Defendants include "agenc[ies]" under the APA.  5 U.S.C. §§ 551(1), 701.

201.     Defendants took final agency actions that are subject to judicial review when they made the Closure Decisions.

202.     The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

203.     Defendants have acted contrary to law by terminating or failing to implement programs mandated by statute.

204.     Defendants have acted contrary to law by failing to expend funds appropriated by Congress, or by delaying the expenditure of such funds, in a manner not permitted by the appropriations acts or the Impoundment Control Act.

205.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Closure Decisions violate the APA.

206.     Plaintiff States are also entitled to vacatur of the Closure Decisions and a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Closure Decisions.

**COUNT III**
**Administrative Procedure Act**
**Notice and Comment**
**(Agency Defendants)**

207.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

208.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

209.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

210.    Notice-and-comment requirements may not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). "The alternative to an interpretive rule is a legislative rule (interchangeably called a substantive rule), for which, absent another exception, the APA requires the agency to follow notice-and-comment procedures." *N.H. Hosp. Ass'n*, 887 F.3d at 70. A legislative or substantive rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992).

211.    Defendants' actions implementing the Closure Order constitute legislative rules that could lawfully be issued only following notice-and-comment procedures.

212.    Without having proceeded through notice-and-comment procedures, the agencies' actions implementing the Closure Order are procedurally invalid under the APA.

213.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Closure Decisions violate the APA.

214.    Plaintiff States are also entitled to vacatur of the Closure Decisions and a preliminary and permanent injunction preventing Defendants from enforcing or implementing the Closure Decisions.

## COUNT IV
### Violation of the Appropriations Clause
### (Against All Defendants)

215.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

216.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

217.    The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

218.    Here, Congress has expressly directed that funds be expended for the operations of agencies that it has created.  Defendants' unilateral executive action to decline to expend appropriated funds therefore infringes on Congress's appropriations power and is unconstitutional.

219.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment."  *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

220.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the Closure Order and the Closure Decisions violate the Appropriations Clause.

### COUNT V
### Violation of the Separation of Powers Doctrine – Usurping Legislative Authority
### (Against All Defendants)

221.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

222.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies."  *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637–38 (2024).

223.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

224.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

225.    Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

226.    Here, where Congress has created the Defendant Agencies and the programs they administer, the Executive cannot do away with the Agencies or effectively incapacitate their ability to administer appropriated grants or carry out statutorily assigned duties. The actions challenged herein thus violate Constitutional and statutory mandates, contravene Congressional intent, and are unlawful.

227.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co*, 103 F. Supp. at 576, *aff'd*, 343 U.S. 579.  Plaintiff States are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

228.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, and impermissibly arrogate to the executive power that is reserved to Congress.

### COUNT VI
### Violation of the Separation of Powers – Take Care Clause
### (Against All Defendants)

229.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

230.    The Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted).

231.    The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

232.    By dismantling the Defendant Agencies and the programs they administer, which are creatures of Congress, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

233.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co.*, 103 F. Supp. at 576, *aff'd*, 343 U.S. 579. Plaintiff States are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

234.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the actions challenged herein violate the Take Care Clause.

## COUNT VII
## Equitable *Ultra Vires*
## (Against All Defendants)

235.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

236.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

237.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27. Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com Corp.*, 337 U.S. 682, 689 (1949).

238.    The actions challenged herein are contrary to law and outside of Defendants' authority because Defendants cannot dismantle federal agencies and terminate their programs by eliminating the staff and resources the agencies require to meet their statutory obligations.

239.    Plaintiff States are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

240.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are also entitled to a declaration that the actions challenged herein are contrary to law and outside of Defendants' authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

i.    Declare that the Closure Order and the Closure Decisions are unlawful and/or unconstitutional because they violate the APA and/or the United States Constitution;

ii.    Pursuant to 5 U.S.C. § 705, postpone the effective date of the Closure Decisions;

iii.    Pursuant to 5 U.S.C. § 706, vacate the Closure Decisions;

iv.    Preliminarily and permanently enjoin the Agency Defendants from implementing the

Closure Order and the Closure Decisions;

v.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees,

pursuant to 28 U.S.C. § 2412; and

vi.    Grant other such relief as this Court may deem proper.

June 12, 2025

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Katherine Connolly Sadeck (RI Bar No. 8637)
Solicitor General
Assistant Attorney General
Keith D. Hoffmann (RI Bar No. 9872)
Chief of Policy
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
ksadeck@riag.ri.gov
khoffmann@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

*/s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu
Assistant Attorney General
Rabia Muqaddam
Special Counsel for Federal Initiatives
Sean Bunny
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov
*Attorneys for the State of New York*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

*/s/ Jay C. Russell*
Jay C. Russell
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Seth E. Goldstein*
Supervising Deputy Attorney General
Zelda Vassar
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
Ashley Meskill
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

/s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
Attorney General of Illinois

/s/ *Holly F.B. Berlin*
HOLLY F.B. BERLIN
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for
the State of Maine

/s/ *Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
Office of the Attorney
General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Vivian.Mikhail@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

/s/ *Keith M. Jamieson*
Keith M. Jamieson
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ *Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**
Attorney General for the People of Michigan

/s/ *Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

*/s/ Jacob Harris*
Jacob Harris
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

/s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn
  *Deputy Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
Attorney for Plaintiff State of New Mexico

**DAN RAYFIELD**
Attorney General for the State of Oregon

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

*/s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

/s/ *Kate S. Worthington*
Kate S. Worthington, WSBA #47556
Sarah E. Smith-Levy, WSBA #55770
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
Attorneys for Plaintiff State of Washington

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

/s/ *Colin T. Roth*
COLIN T. ROTH
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
Attorney for Plaintiff State of Wisconsin

*Applications for pro hac vice forthcoming if required