# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, | Case No. 1:25-cv-00128-JJM-AEM **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

      Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in his official capacity as Acting Executive Director of the U.S. Interagency Council on Homelessness,

      Defendants.

**Table of Contents**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 4

   I.   The *Reduction* EO ....................................................................................................... 4

   II.   The Implementation of the *Reduction* EO ............................................................... 5

   III.  Institute of Museum and Library Sciences (IMLS) ................................................ 6

   IV.  Minority Business Development Agency (MBDA) ............................................... 10

   V.   Federal Mediation and Conciliation Service (FMCS) ....................................... 13

   VI.  United States Interagency Council on Homelessness (USICH) ....................... 16

   VII. Procedural History ................................................................................................. 20

ARGUMENT ......................................................................................................................... 21

   I.   Summary Judgment is Appropriate. ..................................................................... 21

   II.   This Court Has Jurisdiction Over Plaintiffs' Claims. ......................................... 22

     A.   Plaintiffs Have Demonstrated Article III Standing. ..................................... 22

     B.   No Statute Channels Plaintiffs' Claims to Another Forum. ....................... 23

       i.   The Tucker Act Does Not Divest the Court of Jurisdiction. ................... 23

       ii.   The Civil Service Reform Act Does Not Bar the Court From Ordering Reinstatement of Agency Personnel. ........................................................ 24

   III.  The Closure Decisions Violate the Administrative Procedure Act. ................. 25

     A.   The Closure Decisions Are Final Agency Actions. ..................................... 25

     B.   The Closure Decisions Are Arbitrary and Capricious................................. 27

     C.   The Closure Decisions Are Contrary to Law. ........................................... 30

       i.   The Closure Decisions Are Inconsistent with the Agencies' Mandatory Statutory Duties.............................................................................................. 31

ii.     The Closure Decisions Violate Each Agency's Appropriations Statute. ................... 35

IV.  The *Reduction* EO and the Closure Decisions Violate the Constitution. ........................ 38

A.       The *Reduction* EO and the Closure Decisions Violate the Separation of Powers. ... 38

B.       The *Reduction* EO and the Closure Decisions Violate the Take Care Clause. ......... 40

V.   Plaintiffs Are Entitled to the Relief Prayed for in Their First Amended Complaint. ....... 41

A.       Vacatur is Appropriate Under the APA. .................................................................. 41

B.       The Court Should Enter a Permanent Injunction ......................................................42

i.     Implementation of the *Reduction* EO and the Closure Decisions Would Inflict
        Irreparable Harm on Plaintiff States......................................................................... 43

1.     Plaintiff States Suffer Irreparable Harm From the Dismantling of IMLS. ............. 43

2.     Plaintiff States Suffer Irreparable Harm From the Dismantling of MBDA........... 46

3.     Plaintiff States Suffer Irreparable Harm From the Dismantling of FMCS............. 49

4.     Plaintiff States Suffer Irreparable Harm From the Dismantling of USICH........... 51

ii.   The Balance of Hardships and the Public Interest Both Clearly Favor the Plaintiff
        States. ...................................................................................................................... 55

CONCLUSION....................................................................................................................... 57

## INTRODUCTION

President Trump is leading a campaign to dismantle vast swaths of the federal government. He has directed agencies to freeze the expenditure of funds appropriated by Congress, orchestrated the mass firings of federal probationary employees without following the requisite statutory procedures, and ordered agency after agency established by Congress to be shut down. But whatever the President's policy preferences, he cannot override the congressional enactments that authorize federal agencies, appropriate funds for them to administer, and define how they must operate.

This case concerns one of the President's recent attempts to dismantle agencies in defiance of Congress's directives. On March 14, the President issued an Executive Order (the "*Reduction EO*") directing the Institute of Museum and Library Services, the Minority Business Development Agency, the Federal Mediation and Conciliation Service, the United States Interagency Council on Homelessness, and three other agencies not at issue here, to eliminate every one of their "non-statutory components and functions[,]" and "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," § 2(a) (Mar. 14, 2025). The President also ordered the Office of Management and Budget to deny these agencies authorization to spend federal funds for any functions "inconsistent" with the order. *Id.* § 2(c). Within one week, all seven agencies were required to report that they had achieved "full compliance" with the President's order. *Id.* § 2(b).

For at least four agencies, "full compliance" meant gutting all operations—statutorily mandated or not. After the *Reduction* EO was issued, the Institute of Museum and Library Services (IMLS) placed 85% of its staff on administrative leave, dramatically curtailed the administration of hundreds of grants and grant applications, and terminated statutorily mandated grant awards to

several States.  The Minority Business Development Agency (MBDA) cut its staff from roughly

49 to just five individuals, reassigned those five individuals to positions outside of the MBDA, and

effectively ceased new grant solicitations.  The Federal Mediation and Conciliation Service

(FMCS) slashed its staff from roughly 200 to fewer than 15 individuals and announced the

termination of several core programs, including its mediation program for public sector entities.

And the United States Interagency Council on Homelessness (USICH) placed all but two of its

employees on administrative leave and ceased performing any program functions.

     If permitted to stand, the shredding of these statutorily mandated agencies will inflict

severe and irreparable harms on the Plaintiff States.  The States rely on IMLS, MBDA, FMCS,

and USICH to support their public libraries and museums, assist state entities in extending

contracting opportunities to disadvantaged individuals, prevent and resolve public-sector labor

disputes involving State entities, and address the complex challenges of homelessness.  The sudden

halting of the agencies' work after decades of close cooperation will immediately undermine

library programs, economic opportunity, housing stability, and the free flow of commerce

throughout the country.

     The Administration cannot dismantle federal agencies in this way.  The *Reduction* EO and

the actions that Defendants took to implement it are illegal several times over.  First, the *Reduction*

EO directs agencies to take action that is, on its face, arbitrary and capricious.  It orders the agencies

named in the *Reduction* EO to categorically abandon every one of their discretionary functions,

programs, and offices, and to strip their statutory programs to the bare minimum, without weighing

the costs and benefits of these programs, accounting for the reliance interests they have created,

considering alternatives, or otherwise engaging in reasoned analysis.  Just five years ago, when

one agency attempted to eliminate a single discretionary program without reasoned analysis, the

Supreme Court instructed that "when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy]'" and "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). The *Reduction* EO compels the agencies to abandon all of their discretionary programs without engaging in a shred of reasoned analysis—and the agencies carried out that categorical directive just as the President instructed. The Administrative Procedure Act violation is palpable.

Second, by stripping these agencies well past the studs, the Defendants flouted Congress's directives. All of the agencies subject to the *Reduction* EO were established by Congress, given detailed statutory duties, and funded to carry out their functions. In gutting these agencies, Defendants eliminated many programs the agencies are required to carry out. In addition, the day after the President issued this order, Congress passed, and the President signed, a statute appropriating millions of dollars to each of these agencies. Those appropriations pay for the agencies to continue operating at full strength through the end of the fiscal year. The Executive may not decline to spend those funds by slashing the agencies' staff to the bare minimum, shuttering most of their offices and programs, and refusing to use or disburse money that Congress appropriated.

Third, and for much the same reason, the orders violate the Constitution's separation of powers, which assigns Congress the power of the purse, and the Take Care Clause, which entrusts the President with the responsibility to faithfully carry out the laws Congress enacted. As this Court explained, Defendants cannot "ignore[] the unshakeable principles that Congress makes the

law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated."  ECF 57 at 2.

If the President disagrees with Congress's decisions to support the Nation's libraries and museums, expand economic opportunity to disadvantaged individuals, enable the peaceful mediation of labor disputes, and coordinate nationwide efforts to address homelessness, he is free to ask Congress to consider legislation addressing these agencies' vital functions.  If the President wants to cancel previously-appropriated funds, he can request that Congress reconsider its funding decisions.  But our Constitution does not allow the President to shutter agencies himself, in defiance of the administrative procedures that Congress required to be followed, the appropriations Congress ordered to be spent, and the separation of powers that constrain every officer of our government.

Accordingly, the *Reduction* EO should be declared unlawful, and the Agency Defendants should be enjoined from taking any further action to implement it.  There is no genuine issue as to any of the material facts, so summary judgment in favor of the Plaintiffs should be granted.

## BACKGROUND

### I.  The *Reduction* EO

On March 14, 2025, the President issued the *Reduction* EO, formally entitled "Continuing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14,238 (Mar. 14, 2025).  The order directs seven congressionally created agencies, including the Institute of Museum and Library Services, the Minority Business Development Agency, the Federal Mediation and Conciliation Service, and the United States Interagency Council on Homelessness,[1] to eliminate their non-

---

[1] The other agencies, which are not the subject of this lawsuit, are the Community Development Financial Institutions Fund, the United States Agency for Global Media, and the Woodrow Wilson International Center for Scholars.

statutorily mandated functions "to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2(a).

The *Reduction* EO provides that "[i]n reviewing budget requests submitted by" the entities, "the Director of the Office of Management and Budget . . . shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order." *Id.* § 2(c). The *Reduction* EO further requires the heads of these entities to submit "[w]ithin 7 days . . . a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* § 2(b).

Within one day of the President's signing of the *Reduction* EO, Congress passed, and the President signed, a continuing resolution funding the government through September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025). That statute maintains funding for every agency subject to the *Reduction* EO at the same level as they were funded in fiscal year 2024.

## II.    The Implementation of the *Reduction* EO

In the weeks after it was issued, the *Reduction* EO devastated IMLS, MBDA, FMCS, and USICH. Each of these agencies was established by Congress, has a detailed list of statutory duties, and was appropriated funds by Congress—often numbering in the tens or hundreds of millions of dollars—as recently as March 15, 2025. Nonetheless, before the *Reduction* EO was preliminarily enjoined, each of these agencies made a final decision (the "Closure Decision") to implement the EO and to gut agency operations. As USICH is not subject to the preliminary injunction order this Court entered on May 13, 2025, its operations remain gutted.

### III.    Institute of Museum and Library Sciences (IMLS)

1.  IMLS is the primary federal agency responsible for supporting the country's museums and libraries through grantmaking, research, and policy development.  SOUF ¶ 17.  Although funding for IMLS only constitutes 0.0046% of the federal budget, IMLS provides critical resources to libraries and museums across the United States.  *Id.* ¶ 18.

Congress established IMLS in the Museum and Library Services Act of 1996.  Pub. L. 104-208, 110 Stat. 3009 (1996).  It has reauthorized and extended IMLS three times since then—most recently in a law signed by President Trump in 2018.  *See* Museum and Library Services Act of 2018, Pub. L. 115-410, 132 Stat. 5412 (2018) (codified at 20 U.S.C. §§ 9101 *et seq.*).

By statute, IMLS is required to have both an Office of Museum Services and an Office of Library Services.  20 U.S.C. § 9102.  It is required to engage in regular research and data collection to "extend and improve the Nation's museum, library, and information services."  *Id.* § 9108.  And it is charged with supporting museums and libraries across the States by disbursing and expending appropriated funds and providing other forms of assistance.  *Id.* §§ 9121-9165 (libraries), 9171-9176 (museums).

IMLS's largest funding program—and the largest source of federal funding for library services—is the Grants to States Program.  20 U.S.C. § 9133(a).  Under this program, IMLS awards a formula grant directly to State library administrative agencies to advance eight enumerated purposes, including expanding library services and access; improving librarian training, professional development, and recruitment; and targeting library services to diverse communities.  *Id.* § 9141(a)(1)-(8).  To obtain the funds, States must submit five-year plans.  *Id.* § 9134(a).  After a plan has been approved, IMLS pays each State the Federal share of the activities in the plan, which is 66%.  *Id.* § 9133(b).  All 50 States and the District of Columbia receive these grants from

IMLS.  SOUF ¶ 27.  Prior to the implementation of the *Reduction* EO, the Grants to States program was administered by three program officers, one program specialist, and one supervisor.  *Id.* ¶ 28.

IMLS also administers a variety of competitive grant programs for libraries and museums. *Id.* ¶ 29.  Its competitive grant programs for libraries include the Native American and Native Hawaiian Library Services Grants, which are awarded to eligible communities to establish, sustain, and improve library services, 20 U.S.C. § 9161; the National Leadership Grants for Libraries Program, which support projects that strengthen, develop, or enhance library services, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program, which supports projects to recruit the next generation of librarians, including librarians from diverse and underrepresented backgrounds, *id.* § 9165(a)(1)-(3).  Its competitive grant programs for museums include Museums for America grants, which support individual museums' abilities to serve the public through programs, exhibits, professional development, and collections management, along with Native American/Native Hawaiian Museum Service grants, which support Native tribes and organizations that primarily serve and represent Native groups.  SOUF ¶ 31.

In addition to IMLS's statutory obligations under the Museum and Library Services Act, IMLS has obligations under other statutes, including the National Museum of the American Latino Act, 20 U.S.C. § 80u(f)(2), and the National Museum of African American History and Culture Act, *id.* § 80r-5(b).  IMLS has also developed several initiatives to support libraries and museums. In 2014, for example, IMLS launched Museums for All, a national access initiative under which visitors who receive Supplemental Nutrition Assistance Program benefits are eligible for deeply discounted or free admission to more than 1,400 museums throughout the United States.  SOUF ¶ 34.  In 2024, IMLS launched InformationLiteracy.gov, a website designed for museum and library professionals and community-based organizations to provide resources and training on a variety

of information literacy subject areas. *Id.* ¶ 35. And the IMLS Office of Research and Evaluation conducts ongoing research and disseminates data annually to improve the Nation's museum, library, and information services. *Id.* ¶ 33.

In fiscal year 2024, IMLS distributed $180,000,000 to libraries across the United States via its Grants to States Program; $31,050,000 in other competitive library grant programs; and $55,450,000 to support museums across the United States. Of the remaining appropriations, the Institute spent $5,650,000 on research and evaluation, and $22,650,000 on its administration. *Id.* ¶ 26.

Congress appropriated IMLS $294.8 million for Fiscal Year 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 div. D 138 Stat. 697 (2024). As of March 14, IMLS had a staff of approximately 77. SOUF ¶ 37.

2. On March 31, 2025, in the wake of the *Reduction* EO, the Director of Human Resources for IMLS informed agency staff that the entirety of IMLS would be placed on leave and that all grants would be terminated, with the potential exception of the Grants to States Program. *Id*. ¶ 54. The Director of Human Resources advised that staff should expect a reduction in force within 30 days or less. *Id*. ¶ 54. On that same day, IMLS staff received a letter by email formally placing all IMLS staff on paid administrative leave and suspending IMLS email accounts. *Id.* ¶ 56. The American Federation of Government Employees Local 3403, the union that represents IMLS staff, advised the heads of state library systems that without staff, "all work processing 2025 applications has ended" and the "status of previously awarded grants is unclear . . . [but] [w]ithout staff to administer the programs, it is likely that most grants will be terminated." *Id.* ¶¶ 211, 299, 340, 368, 434, 492, 609, 658, 674.

On April 1, IMLS recalled a skeleton crew of approximately twelve staff members, including one deputy director for museums, one program officer for museums, one deputy director for libraries, and one program officer for libraries. *Id.* ¶¶ 60-61. The remaining staff members included lawyers, a chief financial officer, the head of human resources, and the Director. *Id.*

Because the rest of IMLS's staff had been placed on administrative leave, IMLS was not capable of processing new grant applications or servicing existing grants. *Id.* ¶ 62. Prior to March 31, thirty-five employees administered the agency's grant programs, of whom five were specifically responsible for administering the Grants to States Program. *Id.* ¶¶ 63-66. As of April 1, only four employees with experience administering grants were not on administrative leave, of whom only one administered the Grants to States program. *Id.* ¶¶ 68-69. In addition, because none of the twelve employees recalled worked in IMLS's Office of Research and Evaluation, it appears that this office ceased to exist. *Id.* ¶¶ 72-73.

On April 2, Washington's State Librarian received notification from the Acting Director of IMLS, Keith Sonderling, that Washington State Library's $3,948,629 "Grants to States" award had been terminated effective April 1, because it was "inconsistent with IMLS's priorities" and the cancelation was "mandate[d]" by the President's Executive Order. *Id.* ¶ 383. The State Libraries of California and Connecticut received similar notices on April 2 informing them that California's $15.7 million and Connecticut's $2.1 million "Grants to States" awards were terminated. *Id.* ¶¶ 76, 448-450, 663-64. At the time of cancelation, there remained nearly $3.4 million promised under California's award, and $984,000 under Connecticut's award, that had not yet been disbursed. *Id.* ¶¶ 449, 654.

On April 3, 2025, the President began dismantling the Board of IMLS. For example, Annie Norman, the State Librarian of Delaware, received an email from the Deputy Director of

9

Presidential Personnel terminating her Board membership, notwithstanding the fact that she had been reappointed to a new five-year term in December 2024.  *Id.* ¶ 84.

## IV.    Minority Business Development Agency (MBDA)

1.  MBDA is an agency within the Department of Commerce whose purpose is "to promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs."  SOUF ¶ 744.  Initially created in 1969 by Executive Order 11,458 (Mar. 7, 1969), the MBDA was authorized by statute in 2021.  *See* Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (MBD Act), *codified at* 15 U.S.C. § 9501 *et seq.*  By law, the Under Secretary of Commerce for Minority Business Development heads the MBDA.  15 U.S.C. § 9502(b)(1).

MBDA's principal statutory responsibility is to provide financial support to MBDA Business Centers—public-private partnerships that help minority business enterprises access capital and contracting opportunities, provide counseling and technical assistance to minority business enterprises, and otherwise facilitate the growth of such enterprises.  15 U.S.C. §§ 9522, 9523(a)(1)–(3); *see id.* § 9524(a)(1)(A).  The MBDA Office of Business Centers is administered by a Director, *id.* § 9502(d)(2), and is required to have "a regional office . . . for each of the regions of the United States," *id.* § 9502(e)(2)(A).

As of 2024, MBDA funded 41 MBDA Business Centers in 34 States and territories.  SOUF ¶ 749.  MBDA Business Centers are essentially business consultancies that support the growth of Minority Business Enterprises ("MBEs") by offering analytics, networking opportunities, and trainings.  MBDA also funds a number of specialty centers.  As of 2024, it funded 21 MBDA Rural Business Centers, which focus on assisting minority business enterprises in rural areas; four MBDA Advanced Manufacturing Centers, which aim to help manufacturers of domestic products;

four MBDA Export Centers, which are dedicated to expanding access to global markets; and a Federal Procurement Center, which is designed to increase federal procurement. *Id.* ¶¶ 750-751.

The MBD Act also authorizes the Under Secretary to establish a number of other programs. She "shall, whenever [she] determines such action is necessary or appropriate," (1) provide financial assistance directly or indirectly to minority business enterprises, (2) establish programs to encourage minority business enterprises to establish joint ventures and projects, and (3) engage in joint efforts with private and public sector entities to advance the growth of minority business enterprises. 15 U.S.C. §§ 9511(1)-(3), 9523(a)(1)-(3). Using this authority, MBDA has established several projects and programs to assist minority business enterprises. In 2024, these projects supported entrepreneurship education for formerly incarcerated persons, programs at minority colleges and universities, and American Indian, Alaska Native, and Native Hawaiian MBEs. SOUF ¶ 752. Likewise, the MBDA's Capital Readiness Program has supported and continues to support incubator and technical assistance programs like the Rhode Island Small Business HUB, *id.* ¶¶ 871-73; the Northern Great Lakes Initiative, *id.* ¶¶ 778-83; the Office of Business & Entrepreneurship at the University of Wisconsin System, *id.* ¶¶ 878-81; and the Arizona Hispanic Chamber of Commerce, *id.* ¶ 923.

In addition to providing financial assistance, the MBDA is required to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least 5 languages, *id.* § 9513(a)(1)(C).

In Fiscal Year 2023, the MBDA reported that its projects and programs served more than 2,000 MBE clients, produced more than $5.4 billion in economic benefit to MBEs, and contributed to MBEs creating nearly 19,000 jobs. SOUF ¶ 753.

11

President Trump has repeatedly attempted to eliminate or gut the MBDA. For fiscal year 2018, President Trump proposed to eliminate the MBDA and requested a $6 million budget "to be used to close out the agency." The first Trump Administration's Fiscal Year 2019, 2020, and 2021 budget requests all proposed to reduce the MBDA's budget to approximately $10 million. Congress declined these requests and appropriated $39 million, $40 million, $52 million, and $70 million, respectively, in each of these years. *Id.* ¶ 754.

For Fiscal Year 2025, Congress passed—and President Trump signed—an act appropriating $68,250,000 to the MBDA. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(2); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, 138 Stat. 25, 123 (2024). As of March 14, the MBDA employed approximately 49 full-time personnel. SOUF ¶ 755.

2. After the *Reduction* EO was issued, MBDA placed all but three of its employees—the Deputy Under Secretary of Commerce for Minority Business Development, the Chief Operating Officer, and the Chief of the Office of Legislative, Education, and Intergovernmental Affairs—on paid administrative leave. *Id.* ¶ 757. Subsequently, two additional employees began working at the agency. *Id.* But later, all of the five remaining employees at the MBDA that had not been placed on administrative leave were reassigned to positions outside of the MBDA. *Id.* ¶ 771.

On March 21, the union representing MBDA employees received a notification from the Deputy Under Secretary, stating that "[i]n accordance with the March 13, 2025, Executive Order, 'Continuing the Reduction of the Federal Bureaucracy,' . . . the Department of Commerce will be implementing a Reduction in Force (RIF) of the Minority Business Development Agency (MBDA)." SOUF ¶ 758. The RIF Notification indicated that "[a]ffected MBDA employees will be placed in a paid non-duty status today." *Id.*

According to a current MBDA employee, this RIF would likely result in the termination of all General Schedule (GS)-level employees at the MBDA—i.e., all but three of those placed on leave—within 30 days of the notice. SOUF ¶ 758. Without any remaining employees, the MBDA could not carry out its statutorily mandated functions, administer its existing programs, or spend its appropriated funds. *Id.* ¶ 759. It could not adequately monitor the existing portfolio of more than 100 grants or issue new grant awards in a timely manner. *Id*. ¶¶ 760-62. Nor could it feasibly have awarded new grants before many of the existing grants terminated, or in time to expend all of the remaining funds appropriated to the agency for fiscal year 2025. *Id*. ¶¶ 763-64.

In addition to terminating or reassigning all of its employees—including those responsible for maintaining the agency's statutorily-mandated information clearinghouse, *see* 15 U.S.C. § 9513(b)—the MBDA allowed contracts to lapse or terminated them for convenience; ceased sharing information with stakeholders and accepting speaking engagements; eliminated its Minority Business Center Advisory Council; and declined to schedule its annual Forum on Capital Formation. *Id*. ¶ 765. The MBDA also allowed its contract with the data storage and customer relationship management platform Salesforce to expire, thereby losing access to a wide suite of analytical tools for sales, customer service, marketing automation, e-commerce, analytics, artificial intelligence, and application development. *Id*. ¶ 762.

## V.    Federal Mediation and Conciliation Service (FMCS)

1. FMCS is the federal agency responsible for "assist[ing] parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a); FMCS, "Fast Facts about the Agency" (updated Jan. 2024), https://www.fmcs.gov/wp-content/uploads/2024/02/FMCS-Fast-Facts-FY23-update-Jan-2024.pdf. Congress established FMCS in the Taft-Hartley Act of 1947. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202.

13

By statute, FMCS is required to perform several functions related to the resolution of labor disputes. It provides labor mediation and conciliation services to assist parties to labor disputes affecting commerce to settle such disputes. 29 U.S.C. § 173(a)–(c). It conducts grievance mediations "as a last resort in exceptional cases" to resolve "grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). And it "encourage[s] and support[s] the establishment and operation of joint labor management activities." 29 U.S.C. § 173(e). FMCS provides mediation services at low or no cost to the recipients. SOUF ¶ 954.

FMCS also provides a variety of other services to promote the peaceful resolution of labor disputes. It appoints arbitration panels and arbitrators; conducts skills development and conflict resolution training; and verifies signed union authorization cards when employers agree to use that method to recognize a union. *Id.* ¶¶ 963, 1057-59, 1136, 1147. FMCS generally provides its educational and training services at no cost to the recipients, and it provides its arbitration panels and arbitrators to the parties at a below-market cost. *Id.* ¶ 945-55.

FMCS is headquartered in the District of Columbia, and prior to the *Reduction* EO, had nine field offices and dozens of home offices located throughout the nation. SOUF ¶ 962. In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases; conducted 1,477 single or multi-day training and intervention panels; provided 10,004 arbitration panels; and appointed 4,350 arbitrators. *Id.* ¶ 963.

Congress appropriated FMCS $53,705,000 for Fiscal Year 2025. Continuing Appropriations Act § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No.

14

118-47, div. D, 138 Stat. 460, 697 (2024).  Prior to March 14, FMCS had approximately 200 full-time employees, including approximately 140 field mediators.  SOUF ¶ 961.

2. On March 18, 2025, FMCS's Deputy Director of Field Operations Javier Ramirez issued a memorandum to "Field Operations and HQ" in response to the *Reduction* EO.  *Id.* ¶ 965.  In the memorandum, the Deputy Director provided a list of "Operational Adjustments" that were "Effective Immediately." *Id.* ¶ 966.  Among the adjustments was a freeze on services to the "Public Sector." *Id.* ¶ 967.  The memorandum states that FMCS would accept "[n]o new public sector cases . . . to include CBM [Collective Bargaining Mediation] work," that "all Public Sector RDT [Relationship Development and Training] cases should be complete" as of March 14, and that "[a]ll Public Sector work, including CMBs, must be completed by April 18, 2025." *Id.*

The memorandum also provided that no new grievance mediation cases would be accepted, and that "[a]s of March 14 all GM [grievance mediation] cases should be complete." *Id.*  It provided that no new, in-person Education, Advocacy and Outreach meetings should be scheduled. And it provided that as of March 14, 2025, all card checks cases should be complete, and no new card checks would be accepted after that date.  *Id.* ¶ 968.  This memorandum resulted in the immediate cessation of all FMCS assistance in the mediation of labor management disputes in the public sector and the immediate cessation of all FMCS assistance in grievance mediation in the public sector.  *Id.* ¶ 976.

One day after eliminating its public sector programs, FMCS issued a news release, stating: "FMCS is not a drain on taxpayer dollars as the article would suggest.  In fact, our operations are managed on a $55 million budget (representing less than 0.0014% of the federal budget) yet we generate an impressive return on investment exceeding $500 million annually for the US economy. This remarkable economic impact underscores FMCS's role as a sound investment that drives

substantial growth and innovation by fostering stable labor-relations, minimizing or preventing work stoppages, and keeping Americans working." *Id.* ¶ 969.

On March 26, 2025, FMCS informed its staff that nearly all employees would be placed on administrative leave, effective the following day. *Id.* ¶ 971. Only fifteen employees, all located in the agency's DC headquarters, were permitted to continue working. *Id.* ¶¶ 970, 973. Because the agency had only a "skeleton crew," one employee explained that "[n]early all of the services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace"— were no longer going to be provided. *Id.* ¶ 971. Some unions were told that FMCS "is basically being shut down." *Id.* ¶ 1155. The agency initiated a RIF to terminate all but fifteen of the employees remaining at the agency. *Id.* ¶ 973.

## VI.    United States Interagency Council on Homelessness (USICH)

1. USICH is the only Federal agency focused solely on ending homelessness. SOUF ¶ 1189. Congress established USICH in 1987 "to coordinate the Federal response to homelessness and to create a national partnership at every level of government and with the private sector to reduce and end homelessness in the nation while maximizing the effectiveness of the Federal Government in contributing to the end of homelessness." 42 U.S.C. § 11311. Congress reauthorized the agency in the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (Pub. L. No. 111-22, div. B, §§ 1001–1505). The agency's authorization currently extends until October 1, 2028. *See* 42 U.S.C. § 11319.

By statute, USICH is composed of representatives of at least 20 agencies who meet "not less often than four times each year." *Id.* § 11312(a)-(c). It also must employ an Executive Director, *id.* § 11314(a), and "not less than 5 . . . regional coordinators," *id.* § 11313(a)(5). Further, the Secretary of Housing and Urban Development (HUD) must provide USICH with "such

administrative and support services as are necessary to ensure that the Council carries out its functions . . . in an efficient and expeditious manner." *Id.* § 11314(d).

Congress has assigned USICH a lengthy list of statutory duties, many of which expressly benefit States. 42 U.S.C. § 11313. Among other duties, USICH is required to: (1) develop and annually update "a National Strategic Plan to End Homelessness," *id.* § 11313(a)(1); (2) "monitor, evaluate, and recommend improvements in programs and activities to assist homeless individuals conducted by Federal agencies, State and local governments, and private voluntary organizations," *id.* § 11313(a)(4); (3) provide "professional and technical assistance . . . to States, local governments, and other public and private nonprofit organizations," to enable governments and organizations to interpret federal regulations, provide assistance on federal programs, develop recommendations, and establish biennial regional workshops, *id.* § 11313(a)(5); (4) encourage "the creation of State Interagency Councils on Homelessness" and the formulation of plans to "end homelessness at State, city, and county levels," *id.* § 11313(a)(6); (5) "develop mechanisms to ensure access by persons experiencing homelessness to all Federal, State, and local programs for which the persons are eligible," *id.* § 11313(a)(7); (6) "conduct research and evaluation" related to its mission to end homelessness, *id.* § 11313(a)(8); (7) "prepare and distribute to States . . . a bimonthly bulletin" that describes available Federal resources, *id.* § 11313(a)(11); and (8) notify the head or the inspector general of the relevant agency if USICH encounters any significant problem, abuse, or deficiency in programs to assist unhoused individuals, *id.* § 11313(d).

Beyond these mandatory functions, USICH provides substantial additional support to States and other entities working to address homelessness. For example, prior to the *Reduction* EO, USICH was executing its 2022 Federal Strategic Plan entitled "All In," which sets out an "all-hands-on-deck response" for Federal efforts to prevent and end homelessness. SOUF ¶ 1208. The

Plan notes the current crisis in America, which was exacerbated by the COVID-19 pandemic and rising housing costs. It sets forth a vision for "a nation in which no one experiences the tragedy and indignity of homelessness, and everyone has a safe, stable, accessible, and affordable home." *Id*. It then provides a strategic plan and implementation framework to reduce homelessness by 25% by 2025. *Id.* ¶ 1209. In its January 2025 Annual Report to the President, USICH reported that the Federal Strategic Plan has helped approximately 300,000 individuals per year find permanent housing. *Id.* ¶ 1215.

In 2024, USICH also oversaw the ALL INside Initiative, dedicating full-time Federal employees to facilitate access to resources for unhoused populations in seven communities across the United States. USICH provided guidance and peer-to-peer networks to States wishing to establish their own Interagency Councils on Homelessness. It conducted over 58 site visits to local communities to provide feedback and support. It helped the U.S. Department of Veterans' Affairs (VA) house 48,000 veterans, resulting in the lowest level of veteran homelessness since HUD began collecting data on the problem in 2009. And it produced the first federal homelessness prevention framework, a guide intended for a wide range of partners, including local, tribal, and state governments. ¶¶ 1210-14.

To ensure that States benefit from the services and resources that USICH provides, Congress directed each State to "designate an individual to serve as a State contact person for the purpose of receiving and disseminating information and communications received from the Council, including the bimonthly bulletin described in section 11313(a)(7)." 42 U.S.C. § 11320(a). Congress also encouraged each State to establish a "State interagency council on the homeless or designate a lead agency" for the purpose of coordinating and interacting with USICH. *Id.* § 11320(b).

18

Congress appropriated $4.3 million to USICH for Fiscal Year 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); *see* Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, 138 Stat. 388 (2024). As USICH informed Congress, funding at this level is "critical to supporting USICH's mission to prevent and end homelessness in America." SOUF ¶ 1194. As of March 14, 2025, USICH was funded at 18 full-time equivalent positions, approximately 13 of which were filled. *Id.* ¶ 1206.

2. In response to the *Reduction* EO, on March 13, USICH leadership submitted an Agency RIF and Reorganization Plan to OMB and Kenneth Jackson (Acting Executive Director of USICH) stating that a minimum of 13 USICH staff were required to fully carry out USICH's statutory duties. *Id.* ¶ 1216. On April 8, Kenneth Jackson authorized Nate Cavanaugh, an operative of the Department of Government Efficiency (DOGE), to carry out the duties of the Executive Director of USICH. *Id.* ¶ 1217.

Despite the Agency RIF and Reorganization Plan's determination that USICH required at least 13 full-time employees to fulfill its statutory duties, on April 14, 2025, DOGE informed USICH leadership that all staff, including the statutorily required regional coordinators, were being placed on administrative leave as of the next day, April 15, 2025. In this communication, USICH staff were told that, without prior permission of Kenneth Jackson or a supervisor, they could not enter USICH premises, access USICH systems, or attempt to use their position or authority within USICH in any way. *Id.* ¶ 1218.

As of June 12, all but two employees remained on administrative leave. *Id.* ¶ 1221. The GSA has also terminated its lease for USICH's office space, deeming it no longer necessary. *Id.* ¶ 1220. Shortly after being placed on administrative leave, all but the two remaining USICH employees were presented with a Deferred Resignation Agreement. Employees that entered the

19

agreement would be kept on administrative leave through September 30, 2025, and dismissed thereafter. *Id*. ¶ 1219.

USICH is not performing any programmatic functions as required by statute. USICH is not organizing Council meetings; preparing a National Strategic Plan; monitoring or evaluating Federal, State, local, or private programs and activities; providing professional or technical assistance; encouraging the creation of State Interagency Councils; developing mechanisms to ensure access to Federal, State, and local programs; conducting research; preparing or distributing bimonthly bulletins or other communications; or reporting on significant problems, abuses, or deficiencies in agency programs meant to assist unhoused individuals. *Id*. ¶ 1222.

The only two employees remaining at USICH are responsible for processing payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown. *Id*. ¶ 1223. They are not performing any work related to USICH's statutory mission. *Id*. By the end of Fiscal Year 2025, a substantial portion of the congressionally appropriated budget for USICH is expected to be left unspent due to the cessation of USICH activities and programming based on the implementation of the *Reduction* EO. *Id*. ¶ 1224.

Constituents, including State officers, are calling USICH for assistance and reporting a growing homelessness problem across the United States. *Id*. ¶ 1226, 1228. In response, USICH personnel fielding and responding to these calls inform callers that USICH was shut down by DOGE and is no longer able to provide its statutorily mandated services. *Id*. ¶ 1227. USICH's website, USICH.gov., had also been removed as of August 7, 2025. *Id*. ¶ 1252.

## VII.    Procedural History

Plaintiffs filed this action in April 2025 and moved for a preliminary injunction to enjoin Defendants' implementation of the *Reduction* EO as to IMLS, MBDA, and FMCS. In support of that motion, Plaintiffs submitted dozens of declarations explaining the steps that Defendants had

taken to dismantle those three agencies and cataloguing how Plaintiffs had been or would be harmed as a result. Defendants disputed none of Plaintiffs' factual claims and submitted no evidence in response to Plaintiffs' motion. This Court granted the preliminary injunction motion, holding, among other things, that Defendants' actions were likely arbitrary and capricious, contrary to law, and unconstitutional, and that Plaintiffs had established irreparable harm. In June and July 2025, Plaintiffs filed an amended complaint and the parties stipulated to a summary judgment briefing schedule.

## ARGUMENT

### I.     Summary Judgment is Appropriate.

Summary judgment is appropriate "when the record 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Cash v. Cycle Craft Co., Inc.*, 508 F.3d 680, 682 (1st Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). The court must "take the facts of record in the light most favorable to the nonmovant[s] . . . and draw all reasonable inferences in [their] favor." *Id.*

Plaintiffs are entitled to summary judgment on their claims because each agency's Closure Decision is textbook arbitrary and capricious agency action; because the Closure Decisions contravene each agency's statutory obligations and flout their governing appropriations; and because the *Reduction* EO and the Closure Decisions violate the separation of powers and the Take Care Clause. The dissolution of these agencies would also inflict immediate, irreparable harm on Plaintiffs, justifying a permanent injunction. Before the *Reduction* EO was preliminarily enjoined, IMLS began terminating or delaying the payment of funds that States need to operate their libraries and museums; MBDA proved itself incapable of timely disbursing existing grant awards or soliciting new ones; and FMCS froze all of its services to the public sector, which States were actively relying on. USICH, which is not subject to the preliminary injunction, has ceased

providing resources and expertise to States.  Furthermore, the public interest in preserving federal support for libraries, museums, disadvantaged business enterprises, peaceful resolution of labor disputes, and combatting homelessness outweighs the Administration's interest in continuing its lawless campaign to shutter agencies established by Congress.

## II.        This Court Has Jurisdiction Over Plaintiffs' Claims.

### A.        Plaintiffs Have Demonstrated Article III Standing.

A State has standing to challenge a federal official's or agency's conduct if the State has suffered "a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).  The extensive factual record assembled by Plaintiffs identifies numerous actual and imminent injuries traceable to Defendants' actions and redressable by judicial relief.  Plaintiffs are certainly "relying on more than mere speculation when asserting harms . . . stemming from the Defendants' efforts to significantly reduce agency services and personnel under the *Reduction EO*."  ECF 57 at 12.

Overwhelming record evidence disputes any assertion that Plaintiffs' injuries are "generalized," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974), "abstract," *Raines v. Byrd*, 521 U.S. 811, 829 (1997), "divorced from any concrete harm," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), or not fairly traceable to the challenged agency actions. Nor can Defendants credibly argue that redressing Plaintiffs' injuries would intrude on government policymaking.  The Court need not "stop[] the Defendants from taking lawful steps to manage the [four] agencies going forward."  ECF 67 at 3.  Plaintiffs' injuries derive not from Defendants' exercise of their duties in a particular way, but from the agencies' inability to perform any functions whatsoever.

**B.    No Statute Channels Plaintiffs' Claims to Another Forum.**

**i.    The Tucker Act Does Not Divest the Court of Jurisdiction.**

The Tucker Act grants the Court of Federal Claims exclusive jurisdiction over claims "founded" on "any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1). A claim falls within the Tucker Act's exclusive jurisdiction if it "is at its essence a contract claim." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (cited by *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025)).  The "longstanding test" for evaluating a claim's essential character under the Tucker Act hinges on (i) "the source of the rights upon which the plaintiff bases its claims" and (ii) "the type of relief sought."  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 967).  This Court already correctly found that "because the States' challenges are based on alleged statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act."  ECF 57 at 18 (citing *Crowley*, 38 F.4th at 1106).

A close review of Plaintiffs' complaint and the record confirms this Court's prior conclusion.  *First*, the legal rights on which Plaintiffs base their claims stem from the Constitution and statutory law—rights that "exist[ed] prior to and apart from rights created under" grant agreements or any other contract with the federal government. *See Crowley*, 38 F.4th at 1107 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)).  As this Court correctly stated, "nowhere are the parties quibbling over whether the States subject to those grant terminations breached the terms or conditions of the underlying agreements as to transform this action into one sounding in contract."  ECF 57 at 16.  *Second*, this Court, rather than the Court of Federal Claims, is capable of affording plaintiffs the equitable relief they seek.  Plaintiffs seek an order enjoining Defendants' implementation of the *Reduction* EO, not an order compelling

specific performance or compensation under the grant agreement.  Under the APA, district courts have jurisdiction to grant equitable relief enforcing an agency's compliance with federal law.  5 U.S.C. § 706.  And district courts do not lose that jurisdiction just because an agency's compliance with federal law may result in "the payment of money," *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988), or "the disbursement of funds," *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025).  *Third*, grant terminations comprised only one facet of Defendants' demolition campaign at the agencies. "[T]he States' suit challenges each agency's actions implementing a categorical policy to eliminate their 'non statutory components and functions' and 'reduce the performance of their statutory function and associated personnel' under the *Reduction* EO."  ECF 57 at 16 (quoting *Reduction* EO § 2(a)).  That Plaintiffs cite grant terminations as one component of harm resulting from Defendants' actions does not transform this case into a contract dispute.

### ii.    The Civil Service Reform Act Does Not Bar the Court From Ordering Reinstatement of Agency Personnel.

"Provisions for agency review," like the Civil Service Reform Act (CSRA), "do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within th[e] statutory structure."  *Free Enter. Fund v. Pub. Co. Accounting. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).  To guide that inquiry, courts ask three questions derived from the Supreme Court's decision in *Thunder Basin*: (i) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?"; (ii) "is the claim 'wholly collateral to [the] statute's review provisions'?"; and (iii) "is the claim 'outside the agency's expertise'?"  *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185-86 (2023) (quoting 510 U.S. 212-13).  If "the answer to all three questions is yes," the court presumes "that Congress does not intend to limit jurisdiction."  *Id*. at 186 (quoting *Free Enter. Fund*, 561

U.S. at 489). However, even if the factors point in different directions, the "ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id*.

This Court correctly determined that the answer to all three questions is "yes" because (i) "a finding of CSRA preclusion would foreclose all meaningful judicial review over the States' claims," ECF 57 at 19; (ii) "the States' claims are 'wholly collateral' to CSRA's review provisions because they invoke constitutional and administrative questions about the propriety of the agencies' actions," *id*. at 20-21; and (iii) "the States' claims fall outside the 'competence and expertise' of the administrative bodies that handle employee grievance arising under the CSRA," *id*. at 20. "Accordingly, the CSRA statutory scheme does not reflect Congress's intent to preclude the Court's jurisdiction to review the States' claims here." *Id*. at 21.

## III.    The Closure Decisions Violate the Administrative Procedure Act.

### A.  The Closure Decisions Are Final Agency Actions.

The Closure Decisions are "final agency actions" subject to review under the Administrative Procedure Act (APA). 5 U.S.C. § 704. The APA's definition of "agency action" "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *see* 5 U.S.C. § 551(13). And an action is "final" if it (1) concludes an agency's decision-making process and (2) determines rights or obligations or imposes legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

The Closure Decisions mark the conclusion of each agency's process of deciding how to comply with the *Reduction* EO and curtail its operations. Each of the agencies listed in the *Reduction* EO was required to certify that it was in "full compliance" with the *Reduction* EO as of March 21. *Reduction* EO § 2(b). And IMLS, MBDA, FMCS, and USICH each carried out that directive by dramatically cutting their programs and staff. IMLS slashed its staff by 85%, informed

grant recipients that its employees would no longer be able to "work or respond to your emails," left in place a skeleton crew unable to monitor existing grants or handle new grant applications, and terminated multiple existing grants. SOUF ¶¶ 54-83. MBDA cut its staff from approximately 49 to 5, reassigned those 5 remaining employees to positions outside of MBDA, discontinued new grant solicitations, emptied the office responsible for its information clearinghouse, and "effectively closed the agency." *Id.* ¶¶ 756-67. FMCS cut its staff from approximately 200 to 15 and announced that it was halting several of its core programs, including public sector cases, grievance mediations, and education, advocacy, and outreach. *Id.* ¶¶ 961-76. And USICH has placed all but two employees on administrative leave, terminated its lease for office space, and ceased performing any of its statutory functions. *Id.* ¶¶ 1218-1225.

These decisions plainly determine "rights or obligations" and have "legal consequences." *Bennett*, 520 U.S. at 178. IMLS and MBDA halted grant solicitation and gutted offices that are necessary for the agencies to award hundreds of millions of dollars in funding to States and private entities. *Id.* ¶ 70-73, 757-67. FMCS flatly stated that it would cease providing entire classes of services to States and the public. *Id.* ¶¶ 965-68. And USICH is telling callers that it is no longer capable of providing any of its statutorily-mandated services. *Id.* ¶ 1227. The agencies took concrete actions that curtailed their ability to carry out their functions on which the States rely. Each agency responded to the *Reduction* EO by placing most of its workforce on administrative leave—with IMLS immediately depriving its staff of access to email and locking them out of their offices—and initiating large-scale reductions in force. *Id.* ¶¶ 56-59, 757-58, 970-974, 1218. Agencies take action when they "adopt[] a policy to eliminate all non-statutorily required activities and function and reduce their statutory functions and personnel to the bare minimum[.]" ECF 57 at 25. The agencies' decisions to terminate large portions of what they do will have legal

consequences for the Plaintiff States, program beneficiaries, employees, and the public at large. They are therefore final and subject to review under the APA. *See Biden v. Texas*, 597 U.S. 785, 807 (2022) (holding that "attempt[] to terminate" programming constituted "final agency action"); *Widakuswara v. Lake*, 773 F. Supp.3d 46, 53-55 (S.D.N.Y. 2025) (holding that the U.S. Agency for Global Media's implementation of the *Reduction* EO constituted final agency action).

### B.    The Closure Decisions Are Arbitrary and Capricious.

The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy" and "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33; *see FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 916-18 (2025) (describing the "change-in-position doctrine"). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

The Closure Decisions flunk this standard. IMLS, MBDA, FMCS, and USICH terminated vast swaths of their existing programs and operations—they shut down core functions, SOUF ¶¶ 965-68, eliminated established components, *id*. ¶ 765, ended significant funding opportunities, *id*. ¶¶ 62, 76-79, and reduced their staff to caretaker crews incapable of carrying out basic agency functions, *id*. ¶ 511. Yet the agencies did not attempt to offer any reasoned explanation for these

consequential decisions. For example, in its memorandum informing employees that they would be placed on administrative leave, IMLS simply stated that this action was being "taken to facilitate the work and operations of the agency." *Id*. ¶ 56. Similarly, in its memorandum terminating core agency programs, FMCS did nothing more than cite the *Reduction* EO's directive to "perform only statutorily mandated functions." *Id*. ¶ 965. And despite stating in its own Report of Full Compliance to the Executive Order *Continuing the Reduction of the Federal Bureaucracy* that a minimum of 119.5 employees were necessary to fulfill its statutory obligations, FMCS came to a "mutual agreement" with DOGE to decimate the agency and leave only fifteen staff members remaining. *Id*. ¶ 970. MBDA never publicly acknowledged, let alone explained, the gutting of its staff and programs. And USICH complied with an instruction from DOGE to reduce its staff to two people after stating in its own RIF and Reorganization Plan that a minimum of thirteen employees were necessary to fulfill its statutory obligations. *Id*. ¶¶ 1218, 1221. The APA requires an agency to "explain 'why it chose to do what it did,'" and these sorts of "conclusory statements"—or, in MBDA and USICH's case, no statement at all— "will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citations omitted); *see* ECF 57 at 29 ("mere conclusory statements—most of which merely defer to the *Reduction* EO" are "grossly insufficient and fall[] far short of reasoned analysis" (quoting *Widakuswara*, 773 F. Supp. 3d at 55)).

There was much for the agencies to consider before shuttering their offices and programs. Prior to selecting this course of action, the agencies should have assessed the degree to which program beneficiaries—libraries, museums, business centers, contractors, labor unions, States and local governments, to name just a few—relied on the services and funding these agencies provided and whether they would be detrimentally affected by the sudden elimination of so many of the agencies' programs and personnel. *Regents*, 591 U.S. at 33. The agencies should have assessed

the available alternatives to complete termination of these programs: phasing programs out gradually, for instance, or consolidating components to achieve efficiencies. *Id.* at 30. In addition, they should have weighed the purported benefits of elimination against the many apparent costs, such as the impairment of the agencies' ability to facilitate the mediation of labor disputes, support minority business enterprises, coordinate homeless assistance programs, and enhance the programming provided by the Nation's libraries and museums. *See Michigan*, 576 U.S. at 753 ("reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions"). The agencies considered none of these things, however. And "[t]he reviewing court . . . may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43.

Indeed, it is not surprising that the Closure Decisions lacked any reasoned explanation. The *Reduction* EO on its face directed the agencies to engage in arbitrary and capricious action: it instructed IMLS, MBDA, FMCS, USICH, and three other agencies that their "non-statutory components and functions . . . *shall* be eliminated" and that the agencies "*shall* reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law," for no reason other than that "the President has determined [they] are unnecessary"—that is, for no reason at all. *Reduction* EO § 2(a) (emphases added). It then required them to certify "full compliance" with these directives within one week. *Id.* § 2(b). These directives left no room for the agencies to engage in reasoned analysis, assess alternatives, consider reliance, or do anything but eliminate their discretionary programs and gut their remaining operations. The agencies understood the President's directive as just such a result-oriented command. SOUF ¶ 965 (stating that FMCS was required to perform "only statutorily mandated functions"); *id*. ¶ 450 (terminating grants on the ground that the *Reduction* EO "mandates that the

29

IMLS eliminate all non-statutorily required activities and functions"). But—needless to say—the President does not have the power to order agencies to disregard the APA. *See In re United Mineworkers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order").

*Regents* provides a helpful point of comparison. In that case, the Supreme Court held that the Department of Homeland Security violated the APA when it terminated a single discretionary program—Deferred Action for Childhood Arrivals (DACA)—without considering alternatives to total rescission or taking into account the legitimate reliance interests of DACA recipients, States, and other entities. *Regents*, 591 U.S. at 20-33. In this case, the President has ordered four agencies to eliminate all of their discretionary programs—and to gut their statutory programs, as well—in a matter of days. The agencies complied with that command without offering a word of reasoned explanation. The APA violation is inescapable, and the Closure Decisions are unlawful on that basis alone.

### C.    The Closure Decisions Are Contrary to Law.

The Closure Decisions are also inconsistent with the statutory requirements and appropriations laws that each agency is obligated to follow. *See* 5 U.S.C. § 706(1), (2)(A) (directing courts to "compel agency action unlawfully withheld" and "set aside agency action . . . not in accordance with law"). IMLS, MBDA, FMCS, and USICH were all created by statute and vested with a lengthy list of statutory responsibilities. The same day that the President signed the *Reduction* EO, Congress passed—and the President one day later signed—a law appropriating each agency tens of millions of dollars to continue operating through the end of the Fiscal Year 2025. The Closure Decisions violate these congressional enactments in two respects: first, they prevent the agencies from carrying out many of their statutory responsibilities; and, second, they render the agencies unable to spend the funds Congress appropriated. *See New York v. Kennedy*,

No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *18 (D.R.I. July 1, 2025) ("The Defendants here have failed to submit any evidence that [each agency] can meet its Congressional orders without applying the federal appropriations and employing the essential staff and experts who run its programs.").

### i. The Closure Decisions Are Inconsistent with the Agencies' Mandatory Statutory Duties.

It is well-settled that federal agencies are "creatures of statute," *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022), and that they "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013); *see City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013))). The Closure Decisions flout this basic principle by disabling IMLS, MBDA, FMCS, and USICH from fulfilling a long litany of statutory duties that Congress assigned them. When they terminated their "core services and grant programs," the four agencies "effectively abscond[ed] their statutory mandate[s]," and "violated the APA." ECF 57 at 38-39. *See New York v. Kennedy*, 2025 WL 1803260, at *18 ("An examination of the relevant statutes supports the conclusion that Congress never meant to confer [the agencies] the power to self-destruct."); *see also Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (courts will not "rubber stamp" agency decisions that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute") (internal quotation marks and citation omitted).

IMLS, for example, is responsible for administering the Grants to States Program—work that, by statute, includes evaluating 59 State and territorial plans each year, 20 U.S.C. § 9134(e)(1), "immediately notify[ing]" jurisdictions of noncompliant plans, *id.* § 9134(e)(3)(A), providing

jurisdictions "technical assistance" to help bring them into compliance, *id.* § 9134(e)(3)(C), distributing funding in accordance with the plan, *id.* § 9133(a), and monitoring states to ensure they are making appropriate expenditures (and taking appropriate corrective measures if they are not), *id.* § 9133(c).   Congress also required IMLS to administer a series of competitive grant programs each year, including the Native American and Native Hawaiian Library Services Grant Program, 20 U.S.C. § 9161, the National Leadership Grants for Libraries Program, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program, *id.* § 9165(a)(1)-(3). Congress also made the agency responsible for administering grants and programs relating to the National Museum of the American Latino, *id.* § 80u(f)(2), and the National Museum of African American History and Culture, *id.* § 80r-5(b).    And, among still other responsibilities, Congress instructed IMLS to engage in regular research and data collection to "extend and improve the Nation's museum, library, and information services."   *Id.* § 9108.

IMLS ordinarily carries out these responsibilities with a staff of 77, approximately 35 of whom are assigned to administer its grants programs.  SOUF ¶¶ 37, 63-65.  It is not possible for the agency to fulfill all of this work with a barebones crew of twelve—its post-*Reduction* EO number of staff.  *Id.* ¶ 70.  IMLS itself recognized that it needed a minimum of 35 employees in order perform its statutorily mandated functions.  *Id.* ¶ 59.  At any given time, there are hundreds of grants at some point in the award lifecycle.  *Id.* ¶ 67.  Twelve individuals, most of whom are not experienced with grant administration, could not fulfill the agency's statutory obligation to review applications, assist applicants, issue awards, monitor the use of funding, and take corrective action as to all of those grants.    *See generally id.* ¶¶ 60-71.  Prior to the Court's preliminary injunction order, IMLS had made clear that it would not fulfill the agency's grant-related obligations.  It told employees that it planned to terminate existing grants and stop

awarding new ones, *id.* ¶ 54; it told state agencies that its employees would no longer communicate with them, *id*. ¶ 55; and it terminated mandatory statutory grants to at least three States, *see id*. ¶¶ 383-85, 448, 663-64. Furthermore, it would have been impossible for the agency to engage in the regular, statutorily-required research and data collection since the agency emptied its Office of Research and Evaluation. *See* 20 U.S.C. § 9108.

Similarly, Congress instructed that MBDA "shall" provide financial awards and technical assistance to MBDA business centers, 15 U.S.C. § 9523(a)(3), and laid out criteria the agency must use in awarding funds, *id.* § 9524. It required MBDA to establish a "regional office for each of the regions of the United States," *id.* § 9502(e)(2)(A), and listed the "[d]uties" of each of those offices, which include outreach, cooperation, and information-gathering, *id.* § 9502(e)(2)(B). Further, Congress required MBDA to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id.* § 9513(a)(1)(C).

MBDA cannot perform these duties with no staff—the remaining five employees not placed on administrative leave had been reassigned to positions outside of MBDA as of April 3, 2025. SOUF ¶ 771. Without any staff, MBDA is incapable of monitoring existing grants for compliance or awarding new grants in a timely manner. *Id*. ¶¶ 762-64. Unsurprisingly, MBDA stopped performing several of its statutory duties after the *Reduction* EO was issued: it ceased putting out new grant solicitations, performing statutorily-mandated data collection, or engaging in required communications with MBDA centers. *Id*. ¶¶ 765, 847. And it no longer staffed a "regional office for each of the regions of the United States." 15 U.S.C. § 9502(e)(2)(A); SOUF ¶¶ 748, 757-59, 770-71.

FMCS likewise abandoned its statutory responsibilities. Congress "directed" FMCS to "make its conciliation and mediation services available in the settlement of . . . grievance disputes" arising out of the application or interpretation of an existing collective-bargaining agreement. 29 U.S.C. § 173(d). And Congress made it "the duty of [FMCS], in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." *Id.* § 173(a). As of March 14, FMCS had explicitly made its grievance mediation services *un*available, no matter the circumstances. *See* SOUF ¶ 968 ("No new [grievance mediation] cases will be accepted. As of March 14 all GM cases should be complete."). And FMCS so dramatically cut its staff—from approximately 200 employes down to 15—that it could not possibly provide conciliation services at anything approaching the volume or frequency necessary to fulfill its statutory mission. *Id.* ¶¶ 961, 970, 988-89. FMCS itself recognized that it needed a minimum of 119.5 employees to perform its statutorily mandated duties. *Id.* ¶ 970.

Congress has assigned USICH a lengthy list of statutory duties, many of which expressly benefit States, 42 U.S.C. § 11313, and Congress has also mandated certain staffing requirements, including that USICH employ an Executive Director, 42 U.S.C. § 11314(a), and "not less than 5 … regional coordinators," 42 U.S.C. § 11313(a)(5). Despite USICH leadership submitting an Agency RIF and Reorganization Plan to OMB indicating that a minimum of 13 USICH staff were required to fully carry out USICH's statutory duties, SOUF ¶ 1216, all but two USICH employees were placed on administrative leave, *id.* ¶ 1219.

USICH is currently not performing any programmatic functions as required by statute. *Id.* ¶ 1222. USICH is not organizing Council meetings; preparing a National Strategic Plan; monitoring or evaluating Federal, State, local, or private programs and activities; providing

34

professional or technical assistance; encouraging the creation of State Interagency Councils; developing mechanisms to ensure access to Federal, State, and local programs; conducting research; preparing or distributing bimonthly bulletins or other communications; or reporting on significant problems, abuses, or deficiencies in agency programs meant to assist unhoused individuals. *Id*. The only two employees remaining at USICH are responsible for processing payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown. *Id*. ¶ 1223. They are not performing any work related to USICH's statutory mission, but instead are informing State officers calling USICH for assistance that USICH was shut down by DOGE and is no longer able to provide its statutorily mandated services. *Id*. ¶ 1226-27.

### ii.    The Closure Decisions Violate Each Agency's Appropriations Statute.

"The Constitution's Appropriation Clause, U.S. Const. art. I, § 9, cl. 7, grants 'Congress "exclusive power" over federal spending.'" ECF 57 at 35 (quoting *Nat'l Council of Nonprofits v. OMB*, F.Supp.3d 36, 55 (D.D.C. 2025)). "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But . . . even the President does not have unilateral authority to refuse to spend the funds." *Aiken Cty.*, 725 F.3d at 261 n.1; *see also City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."). This foundational separation of powers principle has been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id.* § 684(b). If the President wants to spend "less than the full

amount appropriated by Congress," the President "must propose recission of the funds, and Congress may decide whether to approve a recission bill." *Aiken Cty.*, 725 F.3d at 261 n.1.

In recent months, several courts—including this one—have been confronted with challenges to Congress's primacy over appropriations, and they have reaffirmed the Executive's obligation to spend money appropriated by Congress. *See, e.g.*, *New York v. Trump*, 769 F. Supp 3d. 119, 127 (D.R.I. 2025) (holding that "[t]he Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct constitutional roles of each branch of our government"), *stay pending appeal denied*, 133 F.4th 51 (1st Cir. 2025); *Washington v. U.S. Dep't of Transp.*, No. 2:25-CV-00848-TL, 2025 WL 1742893, at *24 (W.D. Wash. June 24, 2025) ("[T]he President is without authority to thwart congressional will by canceling appropriations passed by Congress. Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" (quoting *City & Cty. of S.F.*, 897 F.3d at 1232)).

This case presents a variant on this increasingly familiar theme. On March 15, 2025, the day after issuing the *Reduction* EO, the President signed the Continuing Appropriations Act, by which Congress appropriated funds to IMLS, MBDA, FMCS, and USICH for the remainder of fiscal year 2025 in the same amounts that they received the prior year. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (incorporating applicable 2024 appropriations acts by reference). In particular, Congress appropriated $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act." *See id*. § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, 138 Stat. 460, 697. It appropriated $53,705,000 to FMCS "to carry out the functions vested in it by the" Taft-Hartley Act. *Id*. It appropriated $68,250,000 "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as

36

authorized by law." *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(2); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, 138 Stat. 25, 123.  And it appropriated $4,3000,000 to USICH "[f]or necessary expenses" to "carry [] out the functions pursuant to title II of the McKinney-Vento Homeless Assistance Act." *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, div. F, 138 Stat. 25, 388.

"But the records show that these agencies are rescinding or deferring appropriated funds and do not plan to spend them." ECR 57 at 36.  At their almost non-existent staffing levels, IMLS, MBDA, and FMCS could not have spent anything close to the full amount of funding appropriated by Congress.  USICH, which currently has only two employees, clearly cannot either.  SOUF ¶¶ 1193-94, 1221-22.  All four agencies dramatically curtailed the activities that constituted the largest line items on their 2024 budgets.  IMLS had a fraction of the staff dedicated to grant administration than it did in 2024, and MBDA had no one, making it virtually certain that both agencies would have been unable to disburse all of the tens or hundreds of millions of dollars in grants they were budgeted to award.  *See* SOUF ¶¶ 62-71, 763-64.  FMCS had fifteen or fewer  employees to perform the work previously conducted by a staff of approximately 200, and shuttered its major programs, meaning that it would have incurred only a small share of the expenses it otherwise would have paid for mediations, arbitrations, and conciliation services.  *Id.* ¶¶ 961, 970-77.  USICH's two employees are responsible for processing payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown.  *Id.* ¶ 1223.  It is clearly not spending appropriated funds on performing statutorily-required programmatic functions.  *Id.*  The dismantled agencies manifestly could not spend the funds that Congress appropriated them.

By requiring each agency to minimize its footprint to the greatest extent possible, and by ordering OMB to "reject funding requests" inconsistent with that instruction, the *Reduction* EO precludes the possibility that the agencies could have made up for these dramatic cuts with increases elsewhere.   *See Reduction* EO §§ 2(a), 2(c).  The Closure Decisions thus effectively amounted to orders rescinding any funds above the minimal level the Administration deemed necessary to effectively shutter these agencies.  Congress, however, made the choice to appropriate funds for these agencies to operate at full force—at precisely the same level, in fact, that they did the prior year.   Because the Closure Decisions are inconsistent with that congressional determination, they are unlawful.

### IV.    The *Reduction* EO and the Closure Decisions Violate the Constitution.

#### A.  The *Reduction* EO and the Closure Decisions Violate the Separation of Powers.

The *Reduction* EO "disregards the fundamental constitutional role of each of the branches of our federal government; specifically, it ignores the unshakable principles that Congress makes the law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated."  ECF 57 at 2.  Defendants have violated the separation of powers by usurping Congress's exclusive power to make law, appropriate funds, and create and define federal agencies.  The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see Trump v. United States*, 603 U.S. 593, 637–38 (2024).  Article I of the Constitution allows Congress—and only Congress—to make law.  U.S. Const. art. I, § 1.  Article I further allows Congress—and only Congress—to create and define federal agencies.  *See Myers v. United States,* 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices" and "the determination of their functions and jurisdiction.").

38

By contrast, it is well-settled that the Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).   The Executive has no power "to enact, to amend, or to repeal statutes."   *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).    Under "the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587.   And because the Constitution "exclusively grants the power of the purse to Congress, not the President," *City & Cty. of S.F.*, 897 F. 3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7), "settled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates, *Aiken Cty.*, 725 F.3d at 259. "To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Id.* at 260.

Pursuant to its lawmaking authority, Congress duly established FMCS, MBDA, IMLS, and USICH, gave the agencies detailed sets of duties, and appropriated to them the funds Congress deemed necessary to carry out those duties.   On March 14, Congress passed a statute appropriating funds to FMCS, MBDA, IMLS, and USICH, which the President signed into law the very next day. *See* Full Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 § 1101(a)(2), (8), (12).    These appropriations pay for the agencies to continue operating at full capacity through the end of the fiscal year.   By issuing a *Reduction* EO that slashes the agencies' staff to the bare minimum, shutters many of their programs, and directs them not to use or disburse congressionally appropriated funds, the Executive usurped Congress's authority to create and abolish federal agencies, as well as Congress's power of the purse. *See* ECF 57 at 39-40.  As recently as July 28, 2025, the District Court for the District of

39

Columbia found that the Department of Housing and Urban Development's actions in allowing congressionally appropriated funding "to lapse would . . . violate the Separation of Powers." *Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urban Dev.*, No. CV 25-1965 (SLS), 2025 WL 2105567, at *7 (D.D.C. July 28, 2025).

**B.    The *Reduction* EO and the Closure Decisions Violate the Take Care Clause.**

Article II of the Constitution provides that the Executive shall "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see also Morrison v. Olson*, 487 U.S. 654, 690 (1988). The Supreme Court has explained that "[u]nder our system of government, Congress makes laws and the President . . . ' faithfully execute[s]' them."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quoting U.S. Const. art. II, § 3).  "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President—and his subordinates—do not wield 'authority to set aside congressional legislation by executive order.'" *New York v. Trump*, 767 F. Supp. 3d 44, 81 (S.D.N.Y. 2025) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999)).

The Executive violates the Take Care Clause when it overrides statutes enacted by Congress.  *United Mine Workers*, 190 F.3d at 551; *see also Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").   Here, the agencies subject to the *Reduction* EO were established by Congress and given detailed sets of statutory duties.  *See* Labor Management Relations Act of 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (establishing IMLS); Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (authorizing MBDA); and Stewart B. McKinney Homeless

Assistance Act of 1987, Pub. L 100-77, 101 Stat 482 (establishing USICH).  The "[d]efendants' acts '[w]ithholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause].'"  ECF 57 at 39-40 (quoting *Widakuswara v. Lake*, 779 F.Supp.3d 10, 36 (D.D.C. 2025)).  By dismantling FMCS, IMLS, MBDA, and USICH and disabling them from carrying out many of their statutory duties, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

## V.    Plaintiffs Are Entitled to the Relief Prayed for in Their First Amended Complaint.

### A.  Vacatur is Appropriate Under the APA.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2).  "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action.  *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring).  "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court."  *Id*. at 830.  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 739 (9th Cir. 2025) ("Vacatur of the agency action 'is the presumptive remedy under the APA'" (quoting *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022)); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287

(D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) (acknowledging continuing vitality of this rule). Because the Closure Decisions implementing the *Reduction* EO are arbitrary and capricious and contrary to law, that agency action should be vacated.

### B. The Court Should Enter a Permanent Injunction.

Plaintiff States are also entitled to a permanent injunction against future implementation of the Closure Decisions. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de P. R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987)).

As an initial matter, the APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigration & Customs Enf't*, 568 F. Supp.3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury, as that is merely one

possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Fed. Prac. & Proc. § 2944 (1995)). This principle alone suffices to support the issuance of permanent injunctive relief against future enforcement of the Closure Decisions and implementation of the *Reduction* EO as Plaintiff States have established that the *Reduction* EO and the Closure Decisions violate both the APA and the Constitution. *See supra*. In any event, this Court has already concluded that the equitable factors favor a preliminary injunction, and those same factors call for a permanent injunction as well.

i.    **Implementation of the *Reduction* EO and the Closure Decisions Would Inflict Irreparable Harm on Plaintiff States.**

Allowing the four agencies to implement the *Reduction* EO and Closure Decisions would cause the Plaintiff States irreparable harm. Plaintiffs have presented "a plethora of declarations," ECF 57 at 41, demonstrating that the dismantling of IMLS, MBDA, FMCS, and USICH will inflict irreparable harm on the States—including by compelling them to abandon critical library programs, forgo projects to support disadvantaged businesses, lose the benefits of services needed to prevent strife with labor unions, and lose invaluable resources in their efforts to prevent and end homelessness.

1.    **Plaintiff States Suffer Irreparable Harm From the Dismantling of IMLS.**

Every one of the Plaintiff States receives millions of dollars in grant funding from IMLS through its Grants for States Program. Any delay in grant payments from IMLS would cause immediate and costly disruptions to critical state library and museum services. For instance, a delay in disbursements of funds would cause New Mexico to suffer "immediate and irreparable disruption to state library programs," including delay, suspension, or reduction of interlibrary loan services. SOUF ¶¶ 360-61, 364-66. Other libraries would be forced to "immediately . . . halt

services and implement a hiring freeze," *id*. ¶¶ 420-21, or "stop statewide and local public library programs immediately," *id*. ¶ 459, hobbling state efforts to foster literacy, support learning and workforce development, and enhance community throughout the state, *id*. ¶ 526. States were experiencing unusual delays in disbursement of funds prior to the Court's Preliminary Injunction Order. *Id*. ¶¶ 656, 509, 721. And these delays caused the Maine State Library to close the public location for its services for two weeks starting April 10 and pause all its online materials requests until "after the staff reorganization and reopening of [its] public space." *Id*. ¶ 302.

Termination of IMLS grants would similarly cause Plaintiffs to suffer irreparable harm. When IMLS previously terminated an award to Washington for which the State had a pending drawdown request of approximately $ 1 million, the sudden, massive loss of resources harmed Washington's library system, and would have continued to do so had the funding not been restored. *Id*. ¶¶ 393-99. When IMLS terminated a grant to California, the loss "create[d] both immediate and ongoing harm" to the State, including by causing "[p]rograms targeted to seniors, veterans and English learners" to be "diminished or halted." *Id*. ¶ 463; *see generally* ¶¶ 448-64. Termination of a grant to Connecticut would result in an "immediate inability to pay invoices and salaries, meet contractual obligations, operate the statewide delivery service, [or] support statewide collections." *Id*. ¶ 654. The New Jersey Library "issued stop work orders" and would not have been able to work on a project developing tools to teach informational literacy to K-12 students due to terminated IMLS grant funding. *Id*. ¶¶ 582-84.

States that receive competitive library or museum grants will also suffer immediate and irreparable harm if IMLS is dismantled. Delay in the receipt of funds awarded through the IMLS's "Inspire Grants for Small Museums" program would cause the University of Wisconsin-Stevens Point's Natural History Museum to stop the purchase of improvements needed to allow

users with disabilities to access the museum's full collection. *Id.* ¶¶ 237-42. Likewise, Maryland's State-operated Banneker-Douglass-Tubman Museum was forced to delay portions of a project to identify and inter thirteen sets of human remains from the antebellum era because of a delay in expected funds awarded through the Museum Grant for African American History and Culture. *Id.* ¶¶ 165-89. The University of Maryland's David C. Driskell Center also hesitated to onboard temporary staff, contract vendors for digitization services, or initiate public programming under an IMLS grant due to the chilling effects of the Closure Decision. *Id.* ¶¶ 104-13.

In addition to relying on IMLS for grant funding, States also rely on IMLS for its "leadership, programs, data collection, and role as a convener of State library administration agencies." *Id.* ¶ 427. IMLS's Office of Research and Evaluation conducts ongoing research and disseminates data annually to the public to improve the nation's museum, library, and information services. *Id.* ¶ 33. Researchers seeking to understand national trends in library services and practitioners who are planning the future of libraries rely on IMLS's Public Library Survey, a critical collection of library data that is not available anywhere else. *Id.* ¶ 427. The "loss of this data set and data collection tool would represent the loss of decades of information that is critical for community development and planning." *Id.* For example, elimination of the Public Library Survey collection and analysis would disrupt New Jersey State Library's "operations related to the distribution of State aid, its ability to provide guidance to library trustees and directors related to service levels, and to plan new buildings or adapt services to community changes." *Id.* ¶ 576. States also rely on IMLS for essential publications and guidance. For example, the University of Hawaiʻi at Manoa relies on IMLS to provide guidance on topics like "digital preservation, inclusive metadata, and knowledge organization systems." *Id.* ¶ 470. "Without timely access to

national surveys, guidance, and studies," the University's ability to prepare students and collaborate with community partners will suffer. *Id*. ¶ 479. Additionally, elimination of these resources "would impede the University's ability to make evidence-based decisions and stay current with emerging best practices in the field." *Id*.

### 2. Plaintiff States Suffer Irreparable Harm From the Dismantling of MBDA.

Plaintiffs also suffer irreparable harm from the dismantling of MBDA. Several Plaintiff States (or their instrumentalities) operate Business Centers that receive grant funding from MBDA, including Hawai'i and Maryland. SOUF ¶¶ 800, 854-55. Some States also receive funding from MBDA through its pilot projects and programs. *See*, *e.g.*, *id*. ¶ 804. If the closure of MBDA is not enjoined, these Plaintiffs will suffer irreparable harm in at least two respects.

First—much as with IMLS—any delay in the disbursement of funds from MBDA would cause States immediate harm. If the University of Wisconsin Office of Business and Entrepreneurship did not receive expected disbursements "as scheduled," it would not be able to pay students, independent contractors, or staff, and would need to draw funds from its own pocket to meet expenses. *Id*. ¶ 896. Similarly, for the University of Hawai'i Maui College—which receives MBDA funding to provide entrepreneurship training to students— "[a]ny pause in funding would displace the students currently in training programs" and cause three staff members to lose their jobs. *Id*. ¶¶ 826-27. And if the Entrepreneurial Development and Assistance Center (EDAC) at Maryland's Morgan State University's MBDA funding had not been promptly restored, it would have had to halt essential programs such as entrepreneurship education, one-on-one business guidance, and access to resources such as the content library for continued learning. *Id*. ¶ 861. And the uncertainty of not getting paid or reimbursed already had a chilling effect on

EDAC, eroding confidence among program participants and partners and limiting EDAC's ability to foster economic development and entrepreneurship within underserved communities. *Id.* ¶ 862.

After implementation of the Closure Decision, MBDA's remaining staff was woefully insufficient to manage MBDA's portfolio of more than 100 grants. *Id.* ¶¶ 760-61. And, following the Closure Decision, recipients reported "unprecedented challenges in receiving MBDA funds." *Id.* ¶ 858; *see also id.* ¶ 793 (describing "limited communications" from MBDA after its staff reductions). It is inevitable that as a result of the Closure Decision, some recipients would not have been paid when due, and that the States and their instrumentalities would either need to forgo services to disadvantaged businesses or shell out their own money as a result.

Second, after the Closure Decisions, it would likely have been impossible for Plaintiffs' grants to be renewed in time to prevent a lapse of funding. Even when MBDA is fully staffed, it typically takes four months from the posting of a new grant solicitation for MBDA to award new grant funds. *Id.* ¶ 763. But, after the *Reduction* EO, MBDA had not posted *any* new solicitations—and without any staff, it could not realistically have awarded grants by June 30, 2025, even if it did. *Id.* This would have inevitably resulted in Plaintiffs suffering a lapse of funding, causing serious and irreparable harms to the services their MBDA-funded projects provide. To take one example: The University of Hawaiʻi operates the MBDA Business Center Hawaiʻi under an agreement with MBDA and relies on MBDA for funding and access to the Salesforce platform. *Id.* ¶¶ 800-06, 812. For the next fiscal year, the MBDA Business Center Hawaiʻi is scheduled to receive disbursements and reimbursements of $410,000 under its current awards. *Id.* ¶ 811. That grant must be renewed—along with all other MBDA Business Center grants—by June 30, which could not feasibly have been done when MBDA had no staff. *Id.* ¶ 760. Any loss of funding would prevent the Center from continuing to support clients' projects and force it to default on a

47

contract with the Hawaiʻi YWCA to provide services to other small Hawaiʻi businesses.  *Id*. ¶¶ 808-09.

Similarly, the Baltimore City Mayor's Office of Small & Minority Business & Advocacy operates the Baltimore MBDA Advanced Manufacturing Center under a $400,000 annual grant. *Id*. ¶¶ 834-43.  If the MBDA did not reissue Baltimore's funding as scheduled, the Advanced Manufacturing Center would have ceased operations.  *Id*. ¶¶ 850.  Similarly, the termination of Arizona's MBDA Business Center's grant would have forced it to close and to terminate ten employees and release twenty contractors without notice.  *Id*. ¶¶ 940-46.

In addition to grant funding, the MBDA plays a critical role in providing access to "technical assistance, procurement opportunities, and tailored training programs, all of which are vital for minority entrepreneurs to compete and thrive." *Id.* ¶ 863. Many minority-owned businesses would "struggle to navigate the challenges of entrepreneurship and achieve long-term success" without these services.  *Id.* ¶ 865.  Specifically, MBDA provides data storage and customer relationship management services via Salesforce and other information technology tools. *Id.* ¶¶ 802, 847.  After MBDA implemented the Closure Decision, the Hawaiʻi MBDA Business Center's access to Salesforce was blocked and unavailable for the calendar year.  *Id*. ¶ 812. Without access to Salesforce, the Hawaiʻi MBDA Business Center was unable to complete critical reporting efforts of its metrics.  *Id*.  MBDA's Program Analysts also field questions or concerns, and they were not available to provide that assistance after MBDA placed all of its staff on administrative leave or reassigned them to positions outside of the agency. *Id.* ¶ 847.  Furthermore, Rhode Island utilizes MBDA's Research Library and Data Warehouse to inform State initiatives that benefit minority-owned businesses.  *Id.* ¶ 873. If MBDA ceased to function in a meaningful

way, the State of Rhode Island would experience "depressed economic development as Rhode Island businesses lose the support they rely upon to grow and flourish." *Id.* ¶ 876.

### 3. Plaintiff States Suffer Irreparable Harm From the Dismantling of FMCS.

Gutting FMCS will also inflict immediate and irreparable harm on the Plaintiff States. Plaintiff States depend on FMCS to help mediate a wide range of labor disputes. Some state laws require the use of FMCS to mediate public sector labor disputes. *See, e.g.*, SOUF ¶¶ 995-96 (New Mexico). There are approximately 1,900 collective bargaining agreements across forty-two states that either allow for or expressly call for the use of FMCS. *Id.* ¶¶ 1134-35. And States often choose to request FMCS's assistance because it is an experienced, impartial entity that is effective at resolving labor-management disputes, and it does so at minimal or no cost. *Id.* ¶¶ 1180-85, 957-60.

The effective closure of FMCS—and the elimination of all of its services to the public sector—would inflict ongoing and immediate harms on the States by preventing them from using FMCS to resolve labor disputes. Indeed, a number of States had pending labor disputes for which they would have used FMCS's services but for the closure of the agency. The New Mexico Public Employee Labor Relations Board, for instance, had eight pending cases at the time of the Closure Decision in which the parties "hoped to obtain FMCS mediation services." *Id.* ¶ 1048. Once FMCS benched 95% of its staff, however, those hopes "withered," and the State was not "able and prepared to assist" the disputants in resolving those cases. *Id.* ¶ 1049-50. Similarly, in Illinois, a school district had spent five months working with an FMCS mediator to resolve a labor-management dispute at the time the agency shut down. *Id.* ¶ 1007. After FMCS's services "ceased to be available," the union issued a notice of intent to strike unless the dispute is resolved by early April. *Id.* Additionally, the Associated Federation of State, County and Municipal Employees,

AFL-CIO ("AFSCME")—a private and public sector union that uses FMCS for handling grievances concerning the States' public employees—attested to having multiple pending mediations in which the parties were using FMCS services. *Id.* ¶¶ 1129; *see generally* 1137-70. After the "immediate cessation of all FMCS assistance," AFSCME unions representing public sector employees in the States will have to "find and utilize other more costly and time expansive method to resolve disputes." *Id.* ¶¶ 1171-72.

The dismantling of FMCS also severely frustrated the state laws and collective bargaining agreements that depended on FMCS to function, imposing immediate costs on the States. In New Mexico, for instance, most public-sector collective bargaining agreements expressly incorporate FMCS "strike lists" or panel services to help the disputants select an arbitrator. *Id.* ¶ 1013. When FMCS no longer provided public sector services, New Mexico anticipated "immediate harm to and obstruction of non-federal public sector labor relations in New Mexico," as the parties would lack a clear path for selecting an arbitrator or resolving their disputes. *Id.* Further, because disputants would be unable to use FMCS-provided arbitration and mediation services, the New Mexico Public Employee Labor Relations Board anticipated a "huge influx of contract disputes" that it was "wholly unprepared in the short and medium term" to handle. *Id.* ¶ 1017. Likewise, Rhode Island anticipated "prolonged labor disputes that could disrupt the provision of essential state services," such as child welfare, and put the health and welfare of its residents at risk. *Id.* ¶ 1076.

Finally, the devastation of FMCS would cause irreparable harm to States that rely on its services to prevent costly—even life-threatening—disruptions to critical public- and private-sector industries. In Rhode Island, for example, FMCS ensures the peaceful resolution of labor disputes across the healthcare industry. *Id.* ¶¶ 1087-90. When healthcare workers are forced to

strike, the public pays the price. *Id.* ¶ 1102. Healthcare facilities must prepare and execute State-approved strike plans with constant State oversight, including State inspectors placed within the facility 24/7 to ensure vulnerable patient populations are not endangered. *Id.* ¶ 1103. Those costs are borne by the State. *Id.* So, too, are the costs of hiring exorbitant contract workers. *Id.* at ¶¶ 1094, 1105. Furthermore, Rhode Islanders suffer from lower-quality care as experienced union employees are replaced by temporary replacements who are unfamiliar with the particular processes and facilities they are suddenly running. *Id.* ¶¶ 1094, 1104-05. In overtaxed healthcare systems like Rhode Island's, even a week-long strike can topple vital facilities, such as the State's only Level-1 Trauma Center, busiest maternity hospital, or largest psychiatric facility, into bankruptcy, leaving Rhode Islanders with few or no options for lifesaving care. *Cf. id.* at ¶¶ 1094, 1118-19, 1121 (describing costs of strikes). At Butler Hospital, for instance, union negotiations were "extremely likely to lead toward a strike" without FMCS mediation. *Id.* ¶ 1121. These concerns came to fruition when, following FMCS's Closure Decision, a federal mediator abandoned Butler Hospital and union employees at a crucial juncture in mediation and those parties then became engaged in a prolonged strike that materially impacted Rhode Island's largest mental health hospital. *Id.* ¶¶ 1123-28.

Other states face similarly dire consequences if critical industries are held up by unresolved labor disputes, from school closures, *see id.* ¶¶ 1024-25, to public transit strikes, *see id.* ¶¶ 1028, to public safety, *see id.* ¶¶ 980-987.

### 4. Plaintiff States Suffer Irreparable Harm From the Dismantling of USICH.

The Administration's dismantling of USICH, which currently has only two staff members not placed on administrative leave, continues to inflict irreparable harm on the Plaintiff States. SOUF ¶¶ 1219-24. Without staff, USICH cannot perform the role assigned to it by Congress, and

51

it cannot assist Plaintiff States in addressing homelessness. *Id*. In Fiscal Year 2023, Congress appropriated well over $9 billion for targeted programs to end homelessness administered by nine separate agencies, in addition to billions of dollars in other federal programs that address homelessness, including among nineteen USICH member agencies. *Id*. ¶ 1205. Without assistance from USICH, Plaintiff States now bear the full burden of helping unhoused individuals access Federal resources and programs designed to help them.

The work USICH does to coordinate homeless assistance programs across federal agencies is invaluable to Plaintiff States. Congress established USICH to create "a national partnership at every level of government" and "[maximize] the effectiveness of the Federal Government's response to ending homelessness." *Id*. ¶ 1190. Plaintiff States, including Illinois, Michigan, and Wisconsin, as well as the City of Seattle, use resources provided by USICH to help unhoused individuals obtain the support available to them. *Id*. ¶¶ 1238-39, 1256, 1274-80, 1282-88. Without adequate staff, USICH is unable to perform its statutory role of assisting Plaintiff States with inquiries and coordinating responses across Federal agencies. *Id*. ¶¶ 1199, 1222. Rather than having the single and efficient point of contact mandated by Congress, the Plaintiff States now need to identify the specific agency or agencies for particular inquiries, then hope for coherent responses. *Id*. ¶¶ 1256, 1264-66, 1286-87. For example, the Illinois Interagency Task Force on Homelessness has relied on USICH resources to navigate the various Federal systems and programs that affect Illinois' unhoused population. *See generally id*. ¶¶ 1245-64. Effectively shuttering USICH will undermine the Illinois Interagency Task Force's efforts. *Id*. ¶¶ 1265-66. Vulnerable individuals in Illinois will be less likely to access Federal and State assistance and programs designed to help them avoid or escape homelessness. *Id*.

Without USICH available for timely consultation, it will also be harder for the Plaintiff States to establish their own Interagency Councils on Homelessness. For example, Rhode Island has met and planned to meet with USICH repeatedly as the State reconvenes its Interagency Council on Homelessness, which by State law must align with the USICH Federal Strategic Plan. R.I. Gen. Laws § 40-17-3; SOUF ¶¶ 1267-68, 1270. Rhode Island is just one of twenty-seven States and Territories relying on USICH guidance to establish and maintain Interagency Councils on Homelessness. SOUF ¶¶ 1267-68. Because of the cuts, USICH will also be unable to build on its successes from the ALL INside Initiative. *Id.* ¶¶ 1210-14, 1229. The Initiative drew on USICH expertise and resources to identify and act on unsheltered homelessness in six cities (Chicago, Dallas, Denver, Los Angeles, Phoenix, and Seattle) as well as in California. *Id.* ¶ 1229. As part of the initiative, Denver, Colorado implemented an encampment resolution pilot, moving unhoused individuals into transitional housing through partnerships between the municipal public housing authority, HUD, and the VA. *Id.* ¶ 1230. Without the necessary staff, it will be impossible for USICH to continue such dedicated efforts, contrary to the will of Congress and to the detriment of Plaintiff States. *Id.*

Plaintiff States will also lose the vital inter-state connections that USICH facilitates. For example, USICH convenes a monthly meeting series called "West Coast Cities Peer to Peer Call on Homelessness" that allows a variety of stakeholders to present and discuss their successes, failures, and lessons learned on both broad strategies and specific intervention types. *Id.* ¶ 1232. These monthly meetings help participating West Coast cities more effectively address homelessness. *Id.* Plaintiff States also benefit from the National Youth Homelessness Partnership, which empowers young people who have experienced homelessness to engage directly with Federal partners to address root causes of youth homelessness in their communities. *Id.* ¶ 1233.

Dismantling USICH will end that partnership, denying Plaintiff States the benefit of Federal resources and programs informed by input from people who experienced homelessness as children and young adults.

Plaintiff States also rely on the research, best practices, guidance and recommendations provided by USICH experts, which will no longer be available. *Id.* ¶ 1234-37. For example, the Illinois Interagency Task Force on Homelessness relies on guidance developed by USICH, including toolkits, webinars, and sample documents, like USICH's Federal Homelessness Prevention Framework as well as its "19 Strategies for Communities to Address Encampments Humanely & Effectively." *Id.* ¶ 1261. The gutting of the agency will deprive Plaintiff States of the research-based Federal expertise Congress directed USICH to develop specifically for the benefit of state governments.

Plaintiff States will also lose the benefit of USICH's direct, community-specific expert assistance. Wisconsin's Interagency Council on Homelessness, for example, has benefitted for years from visits by USICH's executive directors and research team to help develop its state homelessness plan, Welcoming Wisconsin Home. *Id.* ¶ 1284. Similarly, USICH has provided instrumental guidance at the annual Building Michigan Communities Conference and Homelessness Summit, allowing the Michigan State Housing Development Authority to more effectively do its work. *Id.* ¶ 1241. In May 2024, USICH visited Newark, New Jersey, and New York City to meet with people experiencing homelessness, their representatives in State and local government, and private partners, in order to coordinate access to Federal resources for innovative housing efforts. *Id.* ¶ 1236. As part of the same trip, USICH participated in the first-ever statewide meeting of Continuums of Care and public housing authorities in New Jersey. *Id.* And in 2024, USICH also visited Phoenix, Arizona, and Southern California to understand and address the root

causes of homelessness and designed a response for each community. *Id.* ¶ 1237. The effective shuttering of USICH will deprive Plaintiff States of this invaluable technical expertise and assistance. Without the benefit of USICH's resources, expertise, and assistance, Plaintiff States will be less effective at combatting homelessness, providing support to unhoused individuals, and ensuring that their residents can access federal programs instead of relying entirely on already overburdened State service providers.

### ii.    The Balance of Hardships and the Public Interest Both Clearly Favor the Plaintiff States.

The harm to the Plaintiff States far outweighs any harm to the Defendants and an injunction is in the public interest. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (applying the merged factors in permanent injunction context). While the Plaintiff States would be irreparably harmed without a permanent injunction, the requested relief would simply require Defendants to comply with the duly enacted laws that establish the agencies, direct and empower the agencies to perform work Congress determined was in the national interest, and provide the agencies with congressionally appropriated funding to perform that work. *See Massachusetts v. NIH*, 770 F.Supp.3d 277, 326 (D. Mass 2025) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). A permanent injunction would not prevent Defendants from asking Congress to revisit its assessment of these agencies going forward. Nor would a permanent injunction prevent President Trump from using the statutory mechanisms provided by the Impoundment Control Act to seek more immediate Congressional review of his choices regarding these agencies.

On the other hand, Plaintiff States have identified numerous ways in which the public would suffer significant and imminent harm should they lose access to the expertise and funding offered by these agencies. States have a strong sovereign interest in promoting commerce while negotiating labor disputes, educating and inspiring future generations through their libraries and museums, giving disadvantaged business enterprises a chance at the American dream, and preventing and ending homelessness. Should FMCS, IMLS, MBDA, and USICH be permanently closed, Plaintiff States would be thrown into chaos and uncertainty as they race to replace the funding and expertise that has suddenly been interrupted.

While Defendants have claimed that an injunction is not in the public interest because it would "disrupt the agencies' efforts to comply with Executive Order 14,238," ECF 41 at 45, the agencies' efforts are plainly unlawful. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id*. (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Additionally, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 191 (D.D.C. 2015) (quoting *N. Mariana Islands v. United States*, 686 F.Supp.2d 7, 21 (D.D.C. 2009)). The oldest of these agencies—FMCS—was established by the Truman Administration. The youngest—IMLS—has served the American public for more than a quarter of a century and is itself a continuation of an agency created by Lyndon B. Johnson. Given this history, there is no reason to believe that the public would suffer from allowing these agencies to fulfill their congressional mandates of promoting peaceful labor relations, child literacy, local businesses, and an end to homelessness.

**CONCLUSION**

For the foregoing reasons, the Court should enter judgment in the Plaintiff States' favor, vacate the Closure Decisions, and permanently enjoin defendants from implementing the *Reduction* EO and the Closure Decisions.

Plaintiffs request oral argument on this motion.

August 22, 2025

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Katherine Connolly Sadeck (RI Bar No. 8637)
Solicitor General
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
ksadeck@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu
Assistant Attorney General
Rabia Muqaddam
Special Counsel for Federal Initiatives
Sean Bunny
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov
*Attorneys for the State of New York*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

*/s/ Jay C. Russell*
Jay C. Russell
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Zelda Vassar
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
Ashley Meskill
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Holly F.B. Berlin*
HOLLY F.B. BERLIN
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for
the State of Maine

/s/ *Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
Office of the Attorney
General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
Vivian.Mikhail@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: /s/ *Keith M. Jamieson*
Keith M. Jamieson
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6960
kjamieson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ *Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**
Attorney General for the People of Michigan

/s/ *Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: /s/ *Jacob Harris*
Jacob Harris
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

60

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn
  *Deputy Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
Attorney for Plaintiff State of New Mexico

**DAN RAYFIELD**
Attorney General for the State of Oregon

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

*/s/ Kate S. Worthington*
Kate S. Worthington, WSBA #47556
Sarah E. Smith-Levy, WSBA #55770
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
Attorneys for Plaintiff State of Washington

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

*/s/ Colin T. Roth*
COLIN T. ROTH
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
Attorney for Plaintiff State of Wisconsin

61

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on August 22, 2025, I provided a copy of the foregoing document to counsel of record for the Defendants via the ECF filing system:

**Abigail Stout**
DOJ-Civ
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
404-731-2159
Email: abigail.stout@usdoj.gov

**Heidy L Gonzalez**
DOJ-Civ
1100 L St., N.W.
Ste #3408
Washington, DC 20005
202-598-7409
Email: heidy.gonzalez@usdoj.gov

**Julia Heiman**
DOJ-Civ
Poc Agostinho, Jean
1100 L St., N.W.
Washington, DC 20530
202-616-8480
Email: julia.heiman@usdoj.gov

/s/ *Katherine Connolly Sadeck*
Solicitor General
Assistant Attorney General