# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;<br><br>     Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget;<br><br>     Defendants. | Case No.: 1:25-cv-128 |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule Cv 56(a) of the Local Rules of the United States District Court for the District of Rhode Island, Plaintiffs respectfully submit this Statement of Undisputed Facts, which Plaintiffs contend are undisputed and entitle them to judgment as a matter of law.[1]

**STATEMENT OF UNDISPUTED FACTS**

I.     **The *Reduction* EO**

1.   On March 14, 2025, President Donald J. Trump issued Executive Order No. 14,238 entitled "Continuing the Reduction of the Federal Bureaucracy" ("*Reduction* EO"). *See* Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," 90 Fed. Reg. 13,043 (Mar. 14, 2025), https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy.

2.   The Reduction EO directed seven agencies, including the Institute of Museum and Library Services ("IMLS"), the Minority Business Development Agency ("MBDA"), the Federal Mediation and Conciliation Service ("FMCS"), and the United States Interagency Council on Homelessness ("USICH") to eliminate their non-statutorily mandated functions "to the maximum extent consistent with applicable law." *Id*. § 2(a).

3.   The *Reduction* EO further directed the seven agencies to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id*. § 2(a).

---

[1] Given the size of the record, instead of re-filing duplicate exhibits, Plaintiffs respectfully incorporate in full the preliminary injunction record previously filed with the Court by Plaintiffs, including all declarations and exhibits submitted by Plaintiffs in connection with the briefing of Plaintiffs' motion for a preliminary injunction. Where applicable in the Statement of Undisputed Facts, Plaintiffs have cited to exhibits already in the record and expressly incorporate these materials by reference.

4.  The *Reduction* EO further directed the Director of the Office of Management and Budget to "the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order." *Id*. § 2(c).

5.  The *Reduction* EO further directed the heads of the seven agencies to submit "[w]ithin 7 days . . . a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent."  *Id*. § 2(b).

6.  On March 15, 2025, President Trump signed into law the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025) ("Continuing Appropriations Act") maintaining funding for every agency subject to the *Reduction* EO at the same level as they were funded in fiscal year 2024. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025), https://www.congress.gov/bill/119th-congress/house-bill/1968.

7.  On April 4, 2025, 21 States filed a complaint in the United States District Court for the District of Rhode Island seeking declaratory and injunctive relief against the *Reduction* EO and its implementation. *Compl*., ECF 1.

8.  On the same day, the State Plaintiffs filed a motion for a temporary restraining order. *Mot. for TRO*, ECF 3.

9.  On April 9, 2025, the parties stipulated that the motion for a temporary restraining order would be treated as a motion for a preliminary injunction. *Stip.*, ECF 31.

10. On May 6, 2025, the District Court granted the preliminary injunction. *Mem. and Order*, ECF 57.

11. The preliminary injunction order enjoins Defendants from implementing Section 2 of Executive Order 14,238 with respect to IMLS, MBDA, and FMCS. *Prelim. Inj.*, ECF 60.

12. The preliminary injunction further requires Defendants to "take all necessary steps to reverse any policies, memoranda, directives, or actions . . . designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out" the Executive Order. *Id*.

13. The preliminary injunction further requires Defendants to restore all personnel involuntarily placed on leave or terminated due to the Executive Order. *Id*.

14. The preliminary injunction further prohibits Defendants from pausing, cancelling, or otherwise terminating IMLS or MBDA grants or contracts for reasons other than the grantees' or contractors' non-compliance with applicable grant or contract terms. *Id*.

15. The preliminary injunction further requires Defendants to take "immediate steps to resume the processing, disbursement, and payment of already-awarded funding, and to release awarded funds previously withheld or rendered inaccessible due to or in reliance on" the Executive Order "with respect to recipients in plaintiff States." *Id*.

16. On May 16, 2025, the Defendants appealed the preliminary injunction, and as of the filing of this Motion, that appeal is ongoing. *Appeal*, ECF 61.

**II.    The Implementation of the *Reduction* EO at IMLS, MBDA, FMCS, and USICH**

**A.  Institute of Museum and Library Sciences**

17. The Institute of Museum and Library Services is the primary federal agency responsible for supporting the country's museums and libraries through grantmaking, research, and policy development.   Institute of Museum and Library Services, *FY 2022–2026 Strategic Plan*, at 3, https://www.imls.gov/sites/default/files/2022-02/imls-strategic-plan-2022-2026.pdf (last visited Aug. 21, 2025).

18. Although funding for IMLS only constitutes 0.0046% of the federal budget, IMLS provides critical resources to libraries and museums across the United States. American Alliance of Museums, *AAM Statement on the Placing of IMLS Staff on Administrative Leave* (Mar. 31, 2025), https://www.aam-us.org/2025/03/31/aam-statement-on-the-placing-of-imls-staff-on-administrative-leave/.

19. By statute, IMLS is required to have both an Office of Museum Services and an Office of Library Services. 20 U.S.C. § 9102.

20. IMLS is also required by statute to regularly engage research and data collection to "extend and improve the Nation's museum, library, and information services." *Id*. § 9108.

21. IMLS is also charged with supporting museums and libraries across the States by disbursing and expending appropriated funds and providing other forms of assistance. *Id*. §§ 9121-9165 (libraries), 9171-9176 (museums).

22. IMLS's largest funding program—and the largest source of federal funding for library services—is the Grants to States Program. 20 U.S.C. § 9133(a).

23. Under this program, IMLS awards a formula grant directly to State library administrative agencies to advance eight enumerated purposes, including expanding library services and access; improving librarian training, professional development, and recruitment; and targeting library services to diverse communities. *Id*. § 9141(a)(1)-(8).

24. To obtain the funds, States must submit five-year plans. *Id*. § 9134(a).

25. After a plan has been approved, IMLS pays each State the Federal share of the activities in the plan, which is 66%. *Id*. § 9133(b).

26. In fiscal year 2024, IMLS distributed $180,000,000 to libraries across the United States via its Grants to States Program; $31,050,000 in other competitive library grant programs; and

$55,450,000 to support museums across the United States. Of the remaining appropriations, the Institute spent $5,650,000 on research and evaluation and $22,650,000 on its administration. Institute of Museum and Library Services, *FY 2023 – FY 2025 Budget Appropriations Table* (Mar. 2024), https://www.imls.gov/sites/default/files/2024-05/imls-budget-table-fy-2023-2025.pdf; *see also* ECF 3-1 – Fontes Dec., ¶ 14; ECF 3-7 – Aldrich Dec., ¶ 13; ECF 3-28 – Cornelison Dec., ¶ 12; ECF 3-31 – Mellor Dec., ¶ 17.

27. All 50 States and the District of Columbia receive these grants from the IMLS. Institute of Museum and Library Services, *Grant Programs*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs (last visited August 12, 2025).

28. Prior to the implementation of the *Reduction* EO, the Grants to States program was administered by three program officers, one program specialist, and one supervisor. ECF 3-40 – Doe Dec., ¶ 17.

29. IMLS also administers a variety of competitive grant programs for libraries and museums. Institute of Museum and Library Services, *Grant Programs*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs (last visited August 12, 2025).

30. Its competitive grant programs for libraries include the Native American and Native Hawaiian Library Services Grants, which are awarded to eligible communities to establish, sustain, and improve library services, 20 U.S.C. §§ 9161; the National Leadership Grants for Libraries Program, which support projects that strengthen, develop, or enhance library services, *id.* § 9162(a)(1)-(5); and the Laura Bush 21st Century Librarian Program grants, which support projects to recruit the next generation of librarians, including librarians from diverse and underrepresented backgrounds, *id.* § 9165(a)(1)-(3).

31. Its competitive grant programs for museums include Museums for America grants, which

support individual museums' abilities to serve the public through programs, exhibits, professional development, and collections management; Native American/Native Hawaiian Museum Service grants, which support Native tribes and organizations that primarily serve and represent Native groups by supporting a variety of projects, such as workforce development and community engagement; National Leadership Grants for Museums to "support projects that address critical needs of the museum field"; and 21st Century Museum Professional Program grants, which support projects to offer professional development and recruit future generations of museum professionals. *See* Institute of Museum and Library Services, *Museums for America*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/museums-for-america (last visited Aug. 12, 2025); Institute of Museum and Library Services, *Native American/Native Hawaiian Museum Services*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/native-american-native-hawaiian-museum-services (last visited Aug. 12, 2025); Institute of Museum and Library Services, *National Leadership Grants for Museums*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/national-leadership-grants-for-museums (last visited Aug. 12, 2025); and Institute of Museum and Library Services, *21st Century Museum Professionals Program*, https://www.imls.gov/find-funding/funding-opportunities/grant-programs/21st-century-museum-professionals-program (last visited Aug. 12, 2025).

32. IMLS also administers grants and programs under the National Museum of the American Latino Act, 20 U.S.C. § 80u(f)(2), and the National Museum of African American History and Culture Act, *id*. § 80r-5(b).

33. IMLS also runs several other programs to support libraries and museums. For instance,

IMLS's Office of Research and Evaluation conducts ongoing research and collects and disseminates data annually to the public to improve the nation's museum, library, and information services. *See* Institute of Museum and Library Services, *Research & Evaluation*, https://www.imls.gov/research-evaluation (last visited Aug. 13, 2025).

34. In 2014, IMLS launched Museums for All, a national access initiative under which visitors who receive Supplemental Nutrition Assistance Program benefits are eligible for deeply discounted or free admission to more than 1,400 museums throughout the United States. *See* Institute of Museum and Library Services, *Museums for All*, About, https://museums4all.org/about/ (last visited Aug. 12, 2025).

35. In 2024, IMLS launched InformationLiteracy.gov, a website designed for museum and library professionals and community-based organizations to provide resources and training on a variety of information literacy subject areas. *See* Institute of Museum and Library Services, *Information Literacy*, https://informationliteracy.gov/ (last visited Aug. 13, 2025).

36. In the 2025 continuing resolution, Congress appropriated IMLS $294.8 million for Fiscal Year 2025. See Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 div. D (2024).

37. Prior to issuance of Executive Order 14,238, "Continuing the Reduction of the Federal Bureaucracy," approximately 77 employees worked at IMLS. ECF 3-40 – Doe Dec., ¶ 4.

38. On Friday, March 14, at 8:57 p.m.—hours before the President issued this executive order—Chief of Staff Katherine Maas emailed IMLS staff to state: "We received word from the White House this evening that [IMLS Acting Director] Cyndee [Landrum]'s term

as acting director is over. She is returning to the deputy director position, effective immediately, and we have updated the website to reflect this change. At this time, we have no further word about next steps, but stand ready for whatever comes next." ECF 3-40 – Doe Dec., ¶ 5.

39. On Monday, March 17, at 11:00 a.m., IMLS leadership held an agency-wide town hall. ECF 3-40 – Doe Dec., ¶ 6.

40. At this town hall, Laura Huerta Migus, the Deputy Director of the Office of Museum Services, told IMLS staff that the agency would look "very different" following the President's executive order and that it might be stripped "down to the studs." ECF 3-40 – Doe Dec., ¶ 6.

41. Migus told staff to assume that they would be dismissed the following week, if not sooner, and that a Reduction in Force (RIF) plan could be implemented as early as the following week. ECF 3-40 – Doe Dec., ¶ 6.

42. Migus further advised staff to consider what option was best for them personally, and specifically mentioned that employees could take Voluntary Separation Incentive Payments or Voluntary Early Retirement Authority. ECF 3-40 – Doe Dec., ¶ 6.

43. Migus told staff that they had a same-day deadline to indicate interest in those options to Human Resources. ECF 3-40 – Doe Dec., ¶ 6.

44. On Wednesday, March 19, at 2:00 p.m., IMLS leadership held a town hall to announce that Keith E. Sonderling will serve as Acting Director of IMLS, effective the following day. ECF 3-40 – Doe Dec., ¶ 7.

45. At approximately 3:45 p.m. that day, advanced security personnel arrived to prepare for Sonderling's visit. After touring the office, they informed staff that Sonderling was

expected to arrive around 9:15 a.m. the next morning. ECF 3-40 – Doe Dec., ¶ 7.

46. One of the security officials remarked that Sonderling would not stay at the agency long, and that IMLS staff would not stay at the agency long, either. ECF 3-40 – Doe Dec., ¶ 7.

47. At 4:30 p.m. on March 19, IMLS leadership convened an emergency town hall. ECF 3-40 – Doe Dec., ¶ 8.

48. Migus advised staff to report to the office the next day prepared to collect their personal belongings, as all agency staff would likely be placed on administrative leave that day. ECF 3-40 – Doe Dec., ¶ 8.

49. On Thursday, March 20, at approximately 9:30 a.m., Keith Sonderling arrived at the IMLS office and was sworn in as Acting Director in the agency lobby." ECF 3-40 – Doe Dec., ¶ 9.

50. He and his team proceeded to the main conference room for a meeting with IMLS leadership that lasted approximately two hours. ECF 3-40 – Doe Dec., ¶ 9.

51. Visitors accompanying him included a security detail of two Secret Service agents; Nate Cavanaugh, a member of Department of Government Efficiency (DOGE); a lawyer from the Department of Labor; and Courtney Parella, the Labor Deputy Assistant Secretary for Communications. ECF 3-40 – Doe Dec., ¶ 9.

52. This team assumed administrative control of IMLS systems, and a few were assigned computers and IMLS email addresses. ECF 3-40 – Doe Dec., ¶ 9.

53. On Monday, March 31, at 11:30 a.m., four visitors, including Cavanaugh, met with Antoine Dotson, the IMLS Director of Human Resources, and Tom Browder, the IMLS General Counsel, for approximately one hour. ECF 3-40 – Doe Dec., ¶ 10.

54. At approximately 1:30 p.m. on Monday, March 31, each office head met separately with

their staff to inform them that the entirety of IMLS would be placed on administrative leave and that all grants would be terminated, with a potential exception of the Grants to States program. Office Heads indicated that staff should expect that a RIF would be implemented in 30 days or less, and that some staff might be recalled once DOGE determined minimal staffing needed for the agency. ECF 3-40 – Doe Dec., ¶ 11.

55. At approximately 2:39 on March 31, Teresa Devoe, Associate Deputy Director of the IMLS Grants to States Program, notified chief officers and LSTA coordinators that "[w]ithin the last hour IMLS received word that all staff are going to be placed on administrative leave effective today.  We will not be able to work or respond to your emails, and we don't have any information about future timelines related to this action."  A copy of the email is available as Exhibit B to the First Amended Complaint.  *See* ECF 68-3.

56. Separately, on March 31, agency staff received a letter by email from Dotson, which placed all IMLS staff on administrative leave and suspended all IMLS email accounts. ECF 3-40 – Doe Dec., ¶ 12. The letter stated that this action was being "taken to facilitate the work and operations of the agency." A copy of the letter is available as Exhibit A to the First Amended Complaint.  *See* ECF 68-2.

57. Staff were ushered out of the building by HR and IT disabled all accounts by end of day. ECF 3-40 – Doe Dec., ¶ 12.

58. Consistent with these instructions, in April 2025, employees were placed on administrative leave and had no access to IMLS premises or their IMLS email. All but twelve employees at IMLS were placed on administrative leave. ECF 3-40 – Doe Dec., ¶ 13.

59. IMLS took these actions notwithstanding its own Revised Agency RIF and Reorganization Plan, which indicated that IMLS needed a minimum of thirty-five employees in order to

perform its statutorily mandated functions.  ECF 73-1 at IMLS00021. A full copy of the

administrative record as of August 1, 2025 is available at ECF 73.

60. The twelve IMLS employees who were not placed on administrative leave included one

Deputy Director for Museums, one Program Officer for Museums, one Deputy Director

for Libraries, one Program Officer for Libraries, the Head of Human Resources and one

HR officer, four attorneys, one Chief Financial Officer, and one communications staff

member. ECF 3-40 – Doe Dec., ¶ 14.

61. On April 1, Dotson informed staff through unofficial channels that only twelve employees

would be brought back from administrative leave to staff IMLS. The clear implication of

this statement was that all of the remaining employees will be terminated in RIF, possibly

within 30 days. ECF 3-40 – Doe Dec., ¶ 15.

62. Because the remainder of IMLS staff was placed on administrative leave in April 2025,

IMLS lost the ability to process new grant applications or service existing grants. ECF 3-

40 – Doe Dec., ¶ 16.

63. Prior to March 31, thirty employees worked in the Office of Museum Services and the

Office of Library Services, which processes and services approximately $269.5 million in

grants per year to libraries and museums in all fifty states, the District of Columbia, five

U.S. Territories, and three Freely Associated States. ECF 3-40 – Doe Dec., ¶ 17.

64. An additional five employees in the Office of Grants Policy and Management assisted with

the financial aspects of the grants. ECF 3-40 – Doe Dec., ¶ 17.

65. Of these thirty-five employees, three program officers, one program specialist, and one

supervisor were responsible for administering the Grants to States Program. ECF 3-40 –

Doe Dec., ¶ 17.

66. These employees were responsible for every aspect of the grant cycle for the hundreds of grants that IMLS awards. These responsibilities included:

    a. Coordinating the submission of hundreds of grants applications under multiple programs;

    b. Coordinating peer review of grant applications;

    c. Awarding grants;

    d. Working with grantees to ensure that they understand compliance with the terms and conditions governing the grants;

    e. Throughout the grant cycle, providing guidance to grantees on technical questions and best practices, as well as periodic requests to draw down the grant funds;

    f. Reviewing interim narrative and financial reports from grantees;

    g. At the end of the grant period, reviewing final financial and narrative reports to ensure completion of the project;

    h. Putting a completed grant through the closeout process. ECF 3-40 – Doe Dec., ¶ 18.

67. At any given time, hundreds of awarded grants are at different phases in the grant cycle. ECF 3-40 – Doe Dec., ¶ 19.

68. Of the thirty employees who processed or administered grant programs and the five employees who handled the financial aspects of grants prior to March 31, only four were not on administrative leave in April 2025. ECF 3-40 – Doe Dec., ¶ 20.

69. Only one of the five employees who administering the Grants to States program—the supervisor—was not placed on administrative leave. ECF 3-40 – Doe Dec., ¶ 20.

70. It would not have been possible for a staff of twelve employees to complete this workload or administer the volume of existing grants and incoming grant applications for the

upcoming year. ECF 3-40 – Doe Dec., ¶ 21.

71. As a result, it was likely that no new grants would be awarded, and most existing grants were to be terminated. ECF 3-40 – Doe Dec., ¶ 21.

72. In addition, none of the twelve employees who were to be brought back from administrative leave worked in the Office of Research and Evaluation. ECF 3-40 – Doe Dec., ¶ 22.

73. As a result, this office effectively no longer existed at the agency. ECF 3-40 – Doe Dec., ¶ 22.

74. Without the Office of Research and Evaluation, the Public Library Survey, which is conducted every two years and is essential to understanding the library field, will cease to be issued. ECF 3-40 – Doe Dec., ¶ 22.

75. Additional program evaluations and data collection was also expected to cease. ECF 3-40 – Doe Dec., ¶ 22.

76. On or before April 2, 2025, IMLS terminated at least fifteen grants, including grants to California, Connecticut, and Washington under its "Grants to States" program and a number of other grants to museums and libraries. ECF 35-3 – Doe Dec., ¶ 4.

77. On April 9, 2025, IMLS terminated the large majority of its remaining grants, well over 1,000 grants. ECF 35-3 – Doe Dec., ¶ 5.

78. Each termination notice stated both that the grant was "no longer consistent with the agencies priorities" and that the President's March 14, 2025, executive order "mandates that the IMLS eliminate all non-statutorily required activities and functions." ECF 35-3 – Doe Dec., ¶ 5.

79. Each termination notice stated both that the grant was "no longer consistent with the agencies priorities" and that the President's March 14, 2025, executive order "mandates

that the IMLS eliminate all non-statutorily required activities and functions." ECF 35-3 – Doe Dec., ¶ 5.

80. As of April 11, 2025, only two individuals were working in the Office of Library Services. ECF 35-3 – Doe Dec., ¶ 6.

81. Only one of those individuals had experience as a program officer. The other individual, who was at that time serving as the acting deputy director of the Office of Library Services, was an administrative assistant who had no experience administering the agency's grants or library grant programs. ECF 35-3 – Doe Dec., ¶ 6.

82. As of April 11, 2025, only two individuals were working in the Office of Museum Services. Only one of those individuals was a program officer and the other was an acting deputy director. ECF 35-3 – Doe Dec., ¶ 7.

83. As of April 11, 2025, the only individual working in the Office of the Chief Financial Officer was the Chief Financial Officer.  That individual did not have experience handling the technical aspects of processing payment requests, including issuing disbursements or reimbursements in a timely manner. ECF 35-3 – Doe Dec., ¶ 8.

84. In addition, on April 3, 2025, the President began dismantling the Board of the IMLS, with members of the Board receiving emails from the Deputy Director of Presidential Personnel terminating Board memberships notwithstanding reappointment. ECF 3-5, Norman Dec., ¶ 3.

85. The State of Maryland received $3,332,465.00 from the 2024 Grants to States Program, representing the 66-percent Federal share of the activities in the approved Five-Year Plan under the Library Services and Technology Act, 20 U.S.C. § 9134.1. ECF 3-17 – Ball Dec., ¶ 7.

86. In Maryland, the University of Maryland, College Park ("UMCP") uses its portion of these federal funds to support many of its programs. ECF 3-17 – Ball Dec., ¶ 8.

87. Losing these funds would greatly impact the various colleges, researchers, faculty, staff, and students. ECF 3-17 – Ball Dec., ¶ 8.

88. With groundbreaking research and innovative academic programs, UMCP's College of Information strengthens information institutions, fosters responsible information use, increases information reliability, and ensures equitable access to information. ECF 3-17 – Ball Dec., ¶ 9.

89. The College of Information—in particular, its highly-ranked Library and Information Science Program—relies on IMLS funding to harness data and technology for social, economic, and environmental good. ECF 3-17 – Ball Dec., ¶ 9.

90. In the current fiscal year, the College of Information has $2,225,641.09 in active ILMS awards. ECF 3-17 – Ball Dec., ¶ 10.

91. Of this total, $1,387,785.62 had been expensed as of December 31, 2024, yielding an approximate balance of $837,855.47. ECF 3-17 – Ball Dec., ¶ 10.

92. Additionally, the college had $298,789.07 in new proposals under review at IMLS as of April 2, 2025. ECF 3-17 – Ball Dec., ¶ 10.

93. The latter two figures would be in jeopardy with any stopwork order (none was received at the time of filing).   ECF 3-17 – Ball Dec., ¶ 10.

94. The College of Information at UMCP uses these federal funds to support many of its programs, including conducting cutting-edge information science research, presenting that research at scholarly venues, creating new software tools and techniques, developing curricula, running community workshops, orchestrating national webinars, and publishing

16

free-to-access guides for the general public. ECF 3-17 – Ball Dec., ¶ 11.

95. IMLS funds currently support faculty summer salaries and enable the employment of fifteen graduate student research assistants for an average of 2.1 years (with a range of one to four years), two IMLS doctoral fellows (2 years each), and three graduate and two undergraduate hourly research assistants for one to four years. ECF 3-17 – Ball Dec., ¶ 11.

96. The College of Information at UMCP's budget for this year is dependent on receiving the full amount of these awards and the College has made plans and allocated funding for staffing based on the anticipated receipt of Federal funding promised. This includes cost-sharing commitments by the College on most of the funded projects. ECF 3-17 – Ball Dec., ¶ 12.

97. Any pause in the College of Information at UMCP's federal funding would stall the progress of the research and curriculum development, jeopardize critical partnerships, cancel key public educational events, and bring employment uncertainty to all non-faculty working on the projects, as the College has no means of covering for any lost funds. ECF 3-17 – Ball Dec., ¶ 13.

98. Most of these funded projects involve extensive networks of partners and collaborators across the region, the State of Maryland, the nation, and abroad. ECF 3-17 – Ball Dec., ¶ 14.

99. After direct funding of personnel employed on the projects, compensating partners is the second highest expense. ECF 3-17 – Ball Dec., ¶ 14.

100. Most provide services with the expectation of being reimbursed by UMCP, which in turn expects reimbursement by IMLS. ECF 3-17 – Ball Dec., ¶ 14.

101. For many non-profit partners, these financial outlays can be significant, but they

are willing to take the risk given the stability of their relationship with UMCP and IMLS. ECF 3-17 – Ball Dec., ¶ 14.

102.    Breaching this trust through non-payment could set these key relationships back years and cause irreparable harm. ECF 3-17 – Ball Dec., ¶ 14.

103.    If the College of Information does not receive such disbursements/reimbursements, it will not be able to cover any expenses listed in the grant budget that occur after the date of the five "stop work" orders. This includes salaries, honorariums, supplies and expenses related to the College's various projects. ECF 3-17 – Ball Dec., ¶ 15.

104.    The David C. Driskell Center located on UMCP's campus is a creative incubator dedicated to a world where Black artists exist at its center. Through programs, exhibitions, and scholarship, the Driskell Center actively engages with the richness and diversity of Black artistic expressions and promotes a more inclusive and equitable artistic landscape. ECF 3-17 – Ball Dec., ¶ 16.

105.    In July 2024, the Driskell Center received an IMLS grant entitled *From Canvas to Community: Unlocking the African American Art Archive* (the "Canvas to Community Grant"), in the amount of $289,223.00. ECF 3-17 – Ball Dec., ¶ 17.

106.    The PI of this Grant is responsible for overseeing the implementation of the archival development project, including the planning, staffing, infrastructure enhancement, and community outreach necessary to ensure broad public access to these materials. ECF 3-17 – Ball Dec., ¶ 17.

107.    The Canvas to Community Grant allows the Driskell Center to begin processing, preserving, and making publicly available archival materials from its collections that document critical chapters in American cultural history. ECF 3-17 – Ball Dec., ¶ 18.

108.     The Driskell Center also uses the Canvas to Community Grant to pay the salaries of two employees and two students. ECF 3-17 – Ball Dec., ¶ 19.

109.     The Driskell Center plans to seek continued funding from IMLS to support the expansion and long-term sustainability of its archival program. Building on the momentum of the current project, the Driskell Center anticipates future applications that will support digitization, community-access initiatives, preservation of audiovisual materials, and professional development for staff and student workers. ECF 3-17 – Ball Dec., ¶ 20.

110.     These efforts are central to UMCP's mission of making American cultural materials accessible to the public and to researchers. IMLS funding is critical to advancing this work and to ensuring that these historically significant materials are preserved and made available to future generations. ECF 3-17 – Ball Dec., ¶ 20.

111.     Any pause in UMCP's federal funding would significantly delay the processing and accessibility of archival collections, halt planned hires of essential staff, and limit public and scholarly engagement with materials that document histories in American art. ECF 3-17 – Ball Dec., ¶ 21.

112.     The uncertainty around potential reimbursement has already introduced hesitation in advancing key aspects of the project, including the onboarding of temporary staff, contracting vendors for digitization services, and initiating public programming. ECF 3-17 – Ball Dec., ¶ 22.

113.     This chilling effect disrupts momentum, limits the Driskill Center's ability to commit to timelines, and compromises UMCP's ability to deliver the archival access and educational services promised in the original grant proposal. ECF 3-17 – Ball Dec., ¶ 22.

114.     The Driskell Center has a strong track record of timely reporting and compliance

with federal grant requirements and has received consistent positive feedback from IMLS regarding its administration and performance. ECF 3-17 – Ball Dec., ¶ 23.

115.    The uncertainty introduced by this Executive Order threatens to chill planning for future initiatives, limit innovation, and discourage collaboration with public-serving institutions. ECF 3-17 – Ball Dec., ¶ 23.

116.    The Grant funds have been disbursed but have not yet been completely exhausted, as they are being drawn down incrementally in accordance with the project timeline and approved budget. ECF 3-17 – Ball Dec., ¶ 24.

117.    The Driskell Center has committed its own institutional funding as a 30% cost share to support this work. ECF 3-17 – Ball Dec., ¶ 25.

118.    If the federal portion of the award is not reimbursed or fully utilized, the Center will face serious financial strain, potentially forcing it to scale back or suspend key components of the project, including staffing, digitization, and public access efforts that are critical to its success. ECF 3-17 – Ball Dec., ¶ 25.

119.    In September 2022, UMCP was awarded a Laura Bush 21st Century Librarian Early Career three-year research grant from the IMLS entitled Crowdsourced Data: Accuracy, Accessibility, Authority (CDAAA Grant). This Grant was awarded in the amount of $458,151.00 with a period of performance through August 2025. ECF 3-17 – Ball Dec., ¶ 26.

120.    The PI for the CDAAA Grant at the College of Information is responsible for executing the planned research activities, which include recruiting and interviewing members of the Library, Archive, and Museum (LAM) community who conducted crowdsourced text transcription projects between 2017 and 2024, as well as blind and low-

vision members of the public who tested the usability and accessibility of resulting transcriptions. ECF 3-17 – Ball Dec., ¶ 27.

121.    LAM Partners took part in semi-structured interviews and technical demonstrations of their content management systems, while blind and low vision users took part in a structured usability and accessibility test codesigned by the PI and her doctoral student, an assistant research scientist. The PI is ultimately responsible for meeting the grant objectives and has communicated progress in annually scheduled reports to the IMLS through the .eGOV system. ECF 3-17 – Ball Dec., ¶ 27.

122.    The CDAAA Grant, under the direction of the PI, employs a doctoral candidate for 20 hours per week, 12 months per year, along with fringe benefits and tuition, and in year two of the grant employed an assistant research scientist for 15% of their time. The Grant has provided course releases and summer salary for the PI, as well as funds to cover the cost of conference participation and publication in open access journals where the research can reach the largest audience at no direct cost. ECF 3-17 – Ball Dec., ¶ 28.

123.    Any pause in federal funding would harm the work of the PI's doctoral student, who is undertaking time-sensitive research and analysis of the CDAAA data collection as planned in the original grant application. The student is in the final year of their dissertation research and needs to spend the maximum number of hours writing and analyzing the data for their work. A loss of funding would require the student to undertake 20 hours of teaching work as part of their contract at the University of Maryland and could derail their degree progress and professional development. ECF 3-17 – Ball Dec., ¶ 29.

124.    Furthermore, a loss of funding would impede the PI and her team as they attempt to disseminate findings—including best practices for making transcriptions accessible for

people with print disabilities—to LAMs in a timely manner. ECF 3-17 – Ball Dec., ¶ 29.

125.　　　Already, the PI and her team cancelled one public talk about their research outcomes following the President's signing of Executive Order 14,151 that targeted "DEI, DEIA, or 'environmental justice' programs." ECF 3-17 – Ball Dec., ¶ 30.

126.　　　By threatening to derail federal support from the IMLS, the current executive order only compounds those chilling effects and sows confusion and reticence across the cultural heritage and academic research sectors. ECF 3-17 – Ball Dec., ¶ 30.

127.　　　In August 2024, UMCP was awarded a $249,999 IMLS grant for a project entitled The Hatchlings Project: Community-Library Partnerships to Reduce Childhood Literacy Inequities (the "Hatchlings Grant"). The Hatchlings Grant supports efforts to empower underserved new parents to engage their babies in early language and literacy building activities both in and out of the library. The ultimate goal is to create a sustainable asset-based program for improving children's literacy and academic outcomes, starting from birth. ECF 3-17 – Ball Dec., ¶ 31.

128.　　　This project fulfills IMLS's goal to champion lifelong learning by advancing shared knowledge and learning opportunities for all, and meets a national, persistent need to improve children's literacy development. ECF 3-17 – Ball Dec., ¶ 31.

129.　　　It additionally contributes to building the workforce and institutional capacity for managing the national information structure and serving the information and education needs of the public. All products and deliverables of the project will be made freely and openly available to the public and libraries across the United States. ECF 3-17 – Ball Dec., ¶ 31.

130.　　　UMCP uses the Hatchlings Grant to pay the full salary of a graduate student

researcher for two years and to provide partial salary support for five more employees (four research faculty and one consultant, the program developer). ECF 3-17 – Ball Dec., ¶ 32.

131.    The funded 3-phase project critically depends on the Hatchlings Grant and could not continue without the committed funds. ECF 3-17 – Ball Dec., ¶ 32.

132.    Any pause in federal funding would require the research project to close immediately. This would bar libraries and the public from accessing the curriculum being developed. The graduate student researcher would have to be laid off, since there are no other funds to support her. The research faculty would lose part of their salaries. Finally, it would waste the funds already spent, since no project results or deliverables will be able to be produced. ECF 3-17 – Ball Dec., ¶ 33.

133.    The PI for this Grant has received more than $2 million in federal funding over her career, primarily from the National Institutes of Health and, more recently, the IMLS. She has a perfect record of submitting comprehensive and timely project reports. Her work has resulted in nearly one hundred publications and presentations to disseminate findings and ultimately has improved the lives of thousands of children and families. ECF 3-17 – Ball Dec., ¶ 34.

134.    The Hatchlings Grant discussed here received a perfect score from external reviewers, indicating that it was of the highest priority.    ECF 3-17 – Ball Dec., ¶ 34.

135.    The PI will submit the first interim project report in August 2025, where she will describe the project's successes so far. ECF 3-17 – Ball Dec., ¶ 34.

136.    In the next 2.5 years, UMCP is scheduled to receive disbursements/reimbursements of all $249,999 under this Federal awards. ECF 3-17 – Ball Dec., ¶ 35.

137.    At the time of filing, the full award amount had been disbursed but less than

$50,000 was spent down, as it is intended to be spent across all 3 years. ECF 3-17 – Ball Dec., ¶ 35.

138.     In August 2022, UMCP was awarded a $390,308 IMLS grant for a project titled "Libraries, Integration, and New Americans" (the "LINA Grant"). The primary purpose of the LINA Grant is to co-create professional development training alongside librarians to strengthen library service to immigrant and refugee communities. This three-year early career grant project aims to use evidence-based insight on immigrant acculturation to assist libraries in responding to a changing immigration landscape. ECF 3-17 – Ball Dec., ¶ 36.

139.     This Grant supports librarian professional development and further community partnerships, with the deliverables including a free, self-paced mini-course for library staff, a curriculum on Immigration & Information; and a workbook for immigrant groups. The purpose is to advance library information science knowledge of immigrant wellbeing and increase capacity for libraries to serve as trusted spaces. ECF 3-17 – Ball Dec., ¶ 37.

140.     The LINA Grant also pays the salaries of two researchers at UMCP. ECF 3-17 – Ball Dec., ¶ 38.

141.     The LINA Grant aligns with the Institute of Museum and Library Services' mission of understanding on a national level the conditions under which libraries improve the quality of life of communities across the United States. This project fulfills IMLS's charge to explore not just the material standard of living but cultural plurality, civic engagement, and social connections. ECF 3-17 – Ball Dec., ¶ 39.

142.     Any pause in this Grant would disrupt the dissemination of vital community services and partnerships. This project team has connected with over 300 library workers across the United States. Currently, 135 library workers are matriculating through the

Improving Library Partnerships with Immigrants course offered by UMCP, which has become a leader in furthering immigrant information access. ECF 3-17 – Ball Dec., ¶ 40.

143.    Dismantling IMLS and ending the LINA Grant would effectively destabilize library outreach in many realms. As it relates to immigrant services, libraries of all kinds—particularly school, public, and academic libraries—assist with preventing information fraud, improving digital skills, furthering workforce readiness, providing families with educational and recreational pursuits, and offering access to e-government services such as immigration and naturalization procedures. ECF 3-17 – Ball Dec., ¶ 41.

144.    The work supported by the LINA Grant reflects more than one hundred years of library outreach to immigrants, and many of the staple services that libraries are recognized for today— for example, children's storytime, language learning, and job preparation—emanate directly from longstanding library programs with and for immigrants. ECF 3-17 – Ball Dec., ¶ 41.

145.    This project was scheduled to receive several thousands of dollars in reimbursements for expenses incurred administering this award and conducting this critical research. ECF 3-17 – Ball Dec., ¶ 42.

146.    If the UMCP does not receive such disbursements/reimbursements, it will be unable to compensate staff, vendors, and community members and provide vital training in a time of unprecedented immigration policy changes impacting rapid library response. ECF 3-17 – Ball Dec., ¶ 42.

147.    Any resulting delay from the dismantling of IMLS would hinder the work supported by the LINA Grant in a time in which libraries are relying on and immigrant communities are benefiting from evidence-based, research-driven training and professional

development.  ECF 3-17 – Ball Dec., ¶ 43.

148.    The University System of Maryland ("USM") is Maryland's public higher education system and includes 12 constituent institutions of higher education and three regional higher education centers. ECF 35-5 – O'Neill Dec., ¶ 3.

149.    Established in 2013 by the USM Board of Regents, the William E. Kirwan Center for Academic Innovation ("Kirwan Center") at USM coordinates efforts among USM's institutions and regional higher education centers to increase access, affordability, and achievement of high-quality credentials for students across Maryland. ECF 35-5 – O'Neill Dec., ¶ 4.

150.    In 2023, USM was awarded Grant No. LG-254836-OLS-23 by the Institute of Museum and Library Services (IMLS) in the amount of $149,877.  ECF  35-5  –  O'Neill Dec., ¶ 5.

151.    The purpose of the Grant was to "plan a project to articulate the role of academic libraries and library consortia in increasing the relevance of open educational resources through [open educational resources (OER)] localization," thereby "contributing to student success through the development and sustained support of relevant, constituency-oriented instructional materials and practices." ECF 35-5 – O'Neill Dec., ¶ 6.

152.    The Grant also "s[ought] to explicate the replicable practices and partnerships that enable localization of OER to benefit the constituencies that academic libraries and consortia across the country serve: their students, faculty, institutions, and larger communities." ECF 35-5 – O'Neill Dec., ¶ 7.

153.    On April 9, 2025, at 10:15 p.m., the Kirwan Center received a Notice of Grant Termination signed by IMLS's Acting Director, Keith Sonderling. ECF 35-5 – O'Neill

Dec., ¶ 8. A copy of the letter is available at ECF 35-5.

154.     The Notice, dated April 8, 2025, announced that the Grant would be terminated effective that day (i.e., one day before the Kirwan Center received the Notice). ECF 35-5 – O'Neill Dec., ¶ 9.

155.     The Notice stated that "IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program. IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. 14238 (Mar. 14, 2025)."  ECF 35-5 – O'Neill Dec., ¶ 10.

156.     The cancellation of this Grant has resulted in USM's loss of $67,780 in federal funds and will lead to the loss of an important framework that was in development at the time of the cancellation; canceled regional events with university library leaders, staff, and other key stakeholders; and canceled subcontracts with university and community partners. ECF 35-5 – O'Neill Dec., ¶ 11.

157.     The cancellation of this Grant with minimal explanation also will have a chilling effect on USM's work. ECF 35-5 – O'Neill Dec., ¶ 12.

158.     USM will not be able to dedicate the resources to complete the framework this Grant was designed to deliver. ECF 35-5 – O'Neill Dec., ¶ 12.

159.     As a planning Grant, the deliverables and ideas generated from the dedicated Grant resources were intended to lead to additional grant-seeking and opportunities for the Kirwan Center, the USM, and the State of Maryland. ECF 35-5 – O'Neill Dec., ¶ 12.

160.    This Grant created a unique opportunity that brought together key stakeholders across universities, libraries, and the community to collaborate on programs and planning that will ultimately improve student success outcomes while simultaneously saving students money through increased localization of open educational resources. ECF 35-5 – O'Neill Dec., ¶ 12.

161.    The cancellation will impact the nascent relationships between USM universities' teaching faculty and libraries, as libraries have not traditionally been foregrounded in the adaptation of open educational resources in university settings as part of the Kirwan Center's OER leadership efforts within Maryland. ECF 35-5 – O'Neill Dec., ¶ 12.

162.    The Maryland Commission on African American History & Culture ("Commission"), has existed since 1969 as the statewide clearinghouse for the preservation and documentation of the African American experience in Maryland. ECF 3-13 – Compton Dec., ¶ 2.

163.    The Commission assists research and collects historical materials—e.g., art objects, memorabilia, manuscripts, photographs—of significance to African American history and culture. ECF 3-13 – Compton Dec., ¶ 2.

164.    The Commission also provides exhibits, programs, and resource materials for the community at large and for educational systems and institutions within the State. ECF 3-13 – Compton Dec., ¶ 2.

165.    In addition, the Commission operates the Banneker-Douglass-Tubman Museum ("Museum") located in Annapolis, Maryland. As the State of Maryland's official museum of African American heritage, the Museum serves to document, interpret, and promote African American history and culture (particularly in Maryland) through exhibitions,

programs, and projects to improve the understanding and appreciation of America's rich cultural diversity for all. ECF 3-13 – Compton Dec., ¶ 3.

166.     In partnership with Maryland Historical Trust, the Commission co-administers the African American Heritage Preservation Grant Program, which annually awards capital grants to fund the restoration and preservation needs of African American heritage sites, such as historic homes, churches, cemeteries, and museums throughout Maryland. ECF 3-13 – Compton Dec., ¶ 3.

167.     The Banneker-Douglass-Tubman Museum Foundation, Inc. ("Foundation") is a private, non-profit 501(c)(3) corporation, created, and operated for the benefit of the Museum. ECF 3-13 – Compton Dec., ¶ 4.

168.     The Foundation was established in March of 1976 to support the Commission in establishing and maintaining the Museum as the State of Maryland's repository of African American History and Culture. ECF 3-13 – Compton Dec., ¶ 4.

169.     The Banneker-Douglass-Tubman Museum was scheduled to receive $100,000 through IMLS grant No. MH-255727-OMS-24, which was awarded to the Foundation on May 10, 2024. ECF 3-13 – Compton Dec., ¶ 9.

170.     The grant, which runs from July 1, 2024, to June 30, 2027, was issued under Assistance Listing Number 45.309, which covers Museum Grants for African American History and Culture. ECF 3-13 – Compton Dec., ¶ 9.

171.     The grant was awarded to support the Museum's effort to identify, repatriate, and reinter 13 sets of African Americans' human remains that had been discovered throughout Maryland during construction and archeological investigations and were preserved for many years in the Maryland Archaeological Conservation Laboratory ("MAC Lab"). ECF

3-13 – Compton Dec., ¶ 10.

172.     The MAC Lab is the State Museum of Archaeology; it is a state-of-the-art archaeological research, conservation, and curation facility located at Jefferson Patterson Park & Museum ("JPPM") in Calvert County, Maryland. Both JPPM and the MAC Lab are part of the Maryland Historical Trust, which is situated within the Maryland Department of Planning. ECF 3-13 – Compton Dec., ¶ 10.

173.     The grant-funded "African Ancestral Human Remains Project" aims to identify lineal descendants or culturally affiliated communities connected to individuals of African descent who lived during Maryland's slave-holding era. ECF 3-13 – Compton Dec., ¶ 11.

174.     The remains were discovered through various circumstances, including construction projects, a bulldozing operation, and formal archaeological investigations. ECF 3-13 – Compton Dec., ¶ 11.

175.     The project involves research into the origin of the human remains and their connection to existing communities, DNA testing, and reinterment, with facial reconstruction of the reinterred individuals envisioned for a subsequent project. ECF 3-13 – Compton Dec., ¶ 11.

176.     The project serves dual purposes: to facilitate the dignified reinterment of ancestral remains in culturally appropriate cemeteries or churchyards, and to document and research these individuals' lives to enhance the collective understanding of Maryland's complex historical narrative. ECF 3-13 – Compton Dec., ¶ 11.

177.     By combining archaeological expertise, genealogical research, and community engagement, the Project addresses a significant gap in documented history while honoring cultural traditions and acknowledging the contributions of these individuals to Maryland's

development, ultimately creating a more inclusive historical record that illuminates previously marginalized narratives for scholars, educators, and the public alike. ECF 3-13 – Compton Dec., ¶ 11.

178.     A university research fellow will assist in creating a local history research report, which will be made accessible online for a public audience. ECF 3-13 – Compton Dec., ¶ 11.

179.     The Project involves considerable public outreach. It has already held five meetings with communities throughout Maryland to describe the Project and solicit their assistance in locating existing African American communities that are culturally affiliated with the individuals whose remains are to be reinterred. ECF 3-13 – Compton Dec., ¶ 12.

180.     The Project team will continue to invite descendants and interested communities to associated programming and will lead public workshops on how to conduct genealogical research. ECF 3-13 – Compton Dec., ¶ 12.

181.     The Commission's budgets for fiscal years 2025 (ending on July 1, 2025) and 2026 were formulated in reliance on the $100,000 IMLS grant, and it has made plans and allocated funding for staff and other Museum-related projects based on the anticipated receipt of the awarded IMLS grant funding. ECF 3-13 – Compton Dec., ¶ 13.

182.     The Maryland Commission on African American History & Culture has already incurred significant costs under the Project, and it began drawing down the grant award in April 2025. ECF 3-13 – Compton Dec., ¶ 14.

183.     The Commission has and will continue to draw down funds as it incurs the hard expenses associated with the research, DNA analysis, and reinterment phases of the Project. ECF 3-13 – Compton Dec., ¶ 14.

31

184.     Any pause in the Commission's IMLS funding will jeopardize the viability of the Project. ECF 3-13 – Compton Dec., ¶ 15.

185.     If grant funds are delayed or cancelled, the Maryland Commission on African American History & Culture will not be able to carry out several aspects of the Project, including research, DNA testing, and reinterment, all of which involve expenses that have not otherwise been budgeted. Chanel Compton, Executive Director of the Commission, testified that given the extraordinarily tight budget situation in Maryland and elsewhere, she did not believe other sources of funding would be forthcoming. ECF 3-13 – Compton Dec., ¶ 15.

186.     Without funds, the Commission faces the immediate risk of halting ongoing repatriation efforts for the human remains and forgoing research into the deceased individuals themselves, whose lives tell an important story of Maryland history. ECF 3-13 – Compton Dec., ¶ 15.

187.     The uncertainty surrounding the IMLS funding has already begun to compromise the Project. ECF 3-13 – Compton Dec., ¶ 16.

188.     The Commission designed the project schedule to allow time to procure the DNA analysis that is an important part of the Project. ECF 3-13 – Compton Dec., ¶ 16.

189.     Because the Commission will not be able to pay for these aspects of the Project if the IMLS funding is cancelled or significantly delayed, it had to hold off on arranging those services. That uncertainty thus compromises the Commission's ability to complete the Project by its July 1, 2027 end date. ECF 3-13 – Compton Dec., ¶ 16.

190.     In addition to the one current IMLS grant, the Museum has previously received other types of grant funding from IMLS. ECF 3-13 – Compton Dec., ¶ 17.

191.    In 2019, the Museum (when it was known by its former name, the "Banneker-Douglass Museum") received a $50,000 Museum Grant for African American History and Culture from IMLS to build the capacity of African American museums and support the growth of museum professionals. The grant was used to upgrade the Museum's collections room by installing museum shelving units for larger artifacts and their fine art collection and to make upgrades to their research areas. ECF 3-13 – Compton Dec., ¶ 17.

192.    The project represented a significant improvement to its collections and preservation practices, and it made the facility more accessible to researchers, staff, and the public. ECF 3-13 – Compton Dec., ¶ 17.

193.    Amid increasing budget pressures, the Museum, like libraries and museums nationwide, is urgently seeking committed funding sources to sustain their innovative and community-based approach to research and educational services. IMLS is an important part of that effort, and the Commission will seek IMLS grant-funding in the future. ECF 3-13 – Compton Dec., ¶ 18.

194.    IMLS is critically important as a resource for museums, public and private alike. It has allowed this agency to execute on critical projects that will significantly enhance research capabilities and educational offerings, ultimately strengthening its service to diverse communities across Maryland. ECF 3-13 – Compton Dec., ¶ 19.

195.    A loss of IMLS funding would drastically reduce or eliminate educational programs that bring these types of important historical narratives to other universities, museums, and community groups in Maryland, while permitting technological infrastructure for digital preservation and access to deteriorate. ECF 3-13 – Compton Dec., ¶ 19.

196.    Chanel Compton, Executive Director of the Commission, testified that "the

museum field as we know it would not be possible without the guidance, collaboration, and financial support that IMLS has traditionally provided." ECF 3-13 – Compton Dec., ¶ 19.

197.     Chanel Compton, Executive Director of the Commission, testified that support of IMLS is particularly valuable for museums, like the Banneker-Douglass-Tubman Museum, whose collections curate and explore cultural and historical artifacts related to Americans who have historically been underrepresented in the collections and offerings of mainstream museums. ECF 3-13 – Compton Dec., ¶ 20.

198.     Chanel Compton, Executive Director of the Commission, paraphrased the Reverend Martin Luther King, Jr., noting that museums that focus on the lives and legacies of African Americans "have come a long, long way, but we have a long, long way to go." ECF 3-13 – Compton Dec., ¶ 20.

199.     Chanel Compton, Executive Director of the Commission, testified that IMLS is an indispensable partner on that journey. ECF 3-13 – Compton Dec., ¶ 20.

200.     IMLS also provides federal funding under the Library Services and Technology Act ("LSTA") to the Minnesota Department of Education. MN SLS is the division within the Minnesota Department of Education charged with administering and overseeing LSTA funds. MN SLS is the State of Minnesota's "State library administrative agency" as defined by 20 U.S.C. § 9122(4). ECF 3-22 – Burnham Dec., ¶ 5.

201.     To receive federal LSTA funds, the Minnesota Department of Education submits a five-year state plan that describes the MN SLS's needs, goals and the ways in which the Minnesota intends to use the federal LSTA funds meet those needs. *Id*. § 9134. The Minnesota Department of Education submitted its operative five-year plan on June 30,

2022, covering the period 2023 to 2027. ECF 3-22 – Burnham Dec., ¶ 6.

202.    Minnesota's five-year state plan was approved by the Director of IMLS pursuant to 20 U.S.C. § 9134(e). As a result, Minnesota was allocated the Federal share of the activities in the plan, which is 66 percent according to the population-based formula set forth in the statute. See *Id*., §§ 9131(b), 9133(b). ECF 3-22 – Burnham Dec., ¶ 7.

203.    In 2024, Minnesota received $3,165,524.00 which represents the 66 percent Federal share of the activities in Minnesota's IMLS-approved state plan. The IMLS Official Award states that the award "reflect[s] the purposes and priorities of the Library Services and Technology Act" and states further: In Minnesota, specific goals address: 1) Building coalitions to increase collective impact – creating networks across the state to forward the work of libraries and librarians in meeting community needs; 2) Partnering for reimagined access – engaging in community and government partnerships to reduce or eliminate barriers to information access for all Minnesotans; and 3) Refining narratives to showcase LSTA-funded library contributions to thriving communities – supporting libraries in communicating effectively with decision makers about the full scope of the library's contributions. ECF 3-22 – Burnham Dec., ¶ 7. The Official Award Notification for Grants and Cooperative Agreements, dated April 18, 2024, is available at ECF 3-22.

204.    MN SLS uses these federal funds to support many of its programs, including:

   a.  administration and oversight of LSTA-funded activities;

   b.  competitive subgrants to libraries of all types;

   c.  program outreach;

   d.  the Minnesota Braille and Talking Book Library ("MBTBL"), which serves Minnesotans with impaired eyesight and hearing; and

35

e.   Minitex, an information and resource-sharing platform that is utilized by every public library and most school libraries in Minnesota. ECF 3-22 – Burnham Dec., ¶ 9.

205.    For fiscal year 2024, approximately $820,000 in federal LSTA funding was budgeted to operate MBTBL. MBTBL is a unit of MN SLS and carries out the Minnesota Department of Education's statutory obligation to "provide specialized services to people with visual and physical disabilities . . . under a cooperative plan with the National Library Services for the Blind and Print Disabled." Minn. Stat. § 134.31, subd. 4a. These funds are used by MBTBL, for example, to purchase large print and print-alternative books, purchase large-print and braille materials mailed to patrons, provide outreach and educational activities, maintain MBTBL's automation server that is shared with State Services for the Blind, and the salaries of seven MBTBL staff members. During the 2022 to 2023 reporting period, for example, MBTBL circulated 318,655 items among its users. ECF 3-22 – Burnham Dec., ¶ 10 (citing Minn. Stat. § 134.31, subd. 4a).

206.    For fiscal year 2024, approximately $1,150,000 in federal LSTA funding was budgeted to support MinitExhibit. The Minitex platform helps local libraries save money by providing a platform for inter-library loans, "elibrary Minnesota" (a standard collection of information databases available to all public libraries), cooperative purchasing for library products, supports digital/digitizing historical collections, librarian training and education, and 24/7 online support for library patrons. ECF 3-22 – Burnham Dec., ¶ 11.

207.    The federal LSTA funding ultimately funds the salaries of nine full-time employees at MN SLS and MBTBL. ECF 3-22 – Burnham Dec., ¶ 12.

208.    Based on guidance received from IMLS to date, MN SLS had been planning on

receiving a similar, if not identical, award level for fiscal year 2025 and had budgeted for its fiscal year obligations in 2025 accordingly. ECF 3-22 – Burnham Dec., ¶ 13.

209.     As of April 1, 2025, not all fiscal year 2024 LSTA funds had been withdrawn by MN SLS. As of that date, MN SLS had outstanding obligations for competitive grant awards, MBTBL, and MinitExhibit. ECF 3-22 – Burnham Dec., ¶ 14.

210.     On March 31, 2025, MN SLS received an email from IMLS advising that all of its staff members were going to be placed on administrative leave effective immediately. ECF 3-22 – Burnham Dec., ¶ 15.  A copy of the email is available at ECF 3-22.

211.     On March 31, 2025, MN SLS also received notice from AFGE Local 3403 on the status of IMLS, advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-22 – Burnham Dec., ¶ 16.

212.     Without staff to administer the Grants to States program, it is unlikely that Minnesota will receive its forthcoming grant awards as planned, if at all, which will cause immediate and irreparable harm to MN SLS. ECF 3-22 – Burnham Dec., ¶ 17.

213.     MN SLS is a small, but highly impactful agency division. It is the second smallest state library administrative team in the nation. It has four full-time employees. Yet, it administers and oversees over $50 million that flows annually to nearly every community in Minnesota. The MBTBL, for example, provides critical library services to people with disabilities and there is no comparable alternative resource. Over 7,700 individuals and 800 institutions are registered to use MBTBL's services, and 1,179 new patron applications were processed during the 2022 to 2023 reporting period. An online survey of 565 MBTBL patrons conducted during that reporting period showed that 99% rated their experience as

positive. ECF 3-22 – Burnham Dec., ¶ 18.

214.　　IMLS reviews state library administrative agencies every year in its annual state program report. Despite its small number of staff, MN SLS has received at least one "exceptional" project rating in the annual state program report for each of the last three years. MN SLS' five-year plan was approved by IMLS without incident, and IMLS has never notified MN SLS of any compliance concerns relating to its LSTA-funded programs. ECF 3-22 – Burnham Dec., ¶ 19.

215.　　A loss of the LSTA funding outlined above would cause a serious negative impact on communities across Minnesota. ECF 3-22 – Burnham Dec., ¶ 20.

216.　　Without this funding, MN SLS would lose staff needed to oversee and administer its grant programs, eliminate subgranting funds for competitive grants, eliminate outreach and programs, and eliminate professional education and development for staff and Minnesota libraries. ECF 3-22 – Burnham Dec., ¶ 20.

217.　　Without this funding, there would be no dollars for in-person oversight or problem resolution of library construction grants, arts and cultural heritage funding, Regional Library Basic System Support, or Regional Library Telecomm Aid. There would be no dollars to collect library related data in Minnesota. ECF 3-22 – Burnham Dec., ¶ 20.

218.　　LSTA funds provide needed resources used by Minnesota's disabled population through MBTBL. Demand for these services is increasing, and this trend is expected to continue. MBTBL services people of all ages, but 74% of its patrons are older than 65, and 93% are legally blind or visually impaired. MBTBL is the only library in the state that provides specialized library services to this population. Loss of this funding would likely have the following impacts: loss of support staff; reduced telephone services hours and

increased use of voicemail and more complaints about service delivery; longer wait times to process new applications, voicemail, and emails; reduced personalized service to new and long-time library patrons; reduction in the number of materials sent out per day; reduction in new large print materials available; suspension of in-house recordings of Minnesota-related materials; and little to no outreach to eligible new patrons. ECF 3-22 – Burnham Dec., ¶ 21.

219.     LSTA funds also support electronic platforms and shared resources used by every public library in Minnesota, and most school libraries. Loss of this funding will cause a reduction in their ability to service inter-library loans, support e-Library Minnesota, and data collection used by libraries in the community. In the 2022-2023 reporting period, for example, Minnesota's statewide interlibrary loan platform circulated over 340,000 items. MN SLS used LSTA funds to update old and aging equipment necessary to run the interlibrary loan program. MN SLS also created twelve emergency supply caches throughout the state for local libraries and museums to access during disaster response efforts. Historical materials in Roseau, Glenwood, and Bemidji were digitized and transcribed. LSTA funds make significant contributions to all of these projects. ECF 3-22 – Burnham Dec., ¶ 22.

220.     The mission of the State Library of Oregon is to cultivate, preserve, and deliver library and information services to foster lifelong learning and community engagement. Its statutory duties (ORS 357.008) include maintaining library services to meet the state government's reference and research needs; supporting local library services in the state; providing library services to persons who are print-disabled; and promoting library services for children and youth. ECF 3-28 – Cornelisen Dec., ¶ 3.

221.     The State Library of Oregon is a State library administrative agency. ECF 3-28 –
Cornelisen Dec., ¶ 8.

222.     In order to receive funds under the Library Services and Technology Act (LSTA),
each State library administrative agency must submit to IMLS its five-year state plan,
which describes the State library administrative agency's needs and goals and the ways in
which the State intends to use the federal funding to meet those needs. *Id*. § 9134., ECF 3-
28 – Cornelisen Dec., ¶ 9.

223.     Five-year plans that satisfy the statutory criteria are approved by the Director of
IMLS. 20 U.S.C. § 9134(e). After the plan has been approved, IMLS allocates funding
through a population-based statutory formula, *Id*. § 9131(b), and pays to each State the
Federal share of the activities in the plan, which is 66 percent. *Id*. § 9133(b). Independent
of the matching requirement, a state must also meet the LSTA's "maintenance of effort"
requirement. Under the maintenance-of-effort requirement, the amount otherwise allotted
under LSTA to a state for a fiscal year is reduced if the level of state expenditures for the
previous fiscal year is less than the average of the total of such expenditures for the three
fiscal years preceding that year. Oregon has met the maintenance-of-effort requirement
throughout the life of the program, and it anticipates doing so in future years. ECF 3-28 –
Cornelisen Dec., ¶ 10.

224.     In 2024, Oregon was awarded $2,597,695 through the Grants to States Program,
which represents the 66 percent Federal share of the activities in the approved plan. ECF
3-28 – Cornelisen Dec., ¶ 12.

225.     The State Library of Oregon's budget for this year has relied on federal funding of
$2,597,695 and the State Library has made plans, allocated funding for staffing, and issued

subgrants to local libraries and other institutions based on the anticipated receipt of Federal funding as promised. ECF 3-28 – Cornelisen Dec., ¶ 13.

226.     The State Library of Oregon uses these federal funds to support many of its programs, including, but not limited to, (a) funding staff for the Library Support and Development Services division, which provides leadership, grants, statewide services, and consulting to approximately 1,600 academic, public, school, and special libraries, and tribal nations throughout Oregon, and (b) funding subgrants to support local libraries and their outreach activities. ECF 3-28 – Cornelisen Dec., ¶ 14.

227.     The State Library of Oregon uses these federal funds to support all or part of the salaries of twelve employees, principally in the Library Support and Development Services division (Library Support). These staff advise libraries on children and teens services, early literacy, digital equity, continuing education, community outreach, reference services, school libraries, intellectual freedom, digitization, and public library data. They also manage the program that provides access to statewide databases and services for all Oregonians using federal block-grant funding. Library Support also coordinates statewide library services in partnership with other libraries and library associations, such as the Answerland online reference service, the Oregon School Library Information System, and the Statewide Database Licensing Program. ECF 3-28 – Cornelisen Dec., ¶ 15.

228.     The State Library of Oregon also uses these federal funds to award subgrants to local libraries and non-profit organizations to support library services and literacy. The current list of subgrants is Attachment 2 to ECF-28. The State Library of Oregon anticipates using its FY25 allotment to award a similar number of subgrants in the second quarter of 2025. ECF 3-28 – Cornelisen Dec., ¶ 16.

41

229.     Under IMLS's official FY24 award notification dated April 18, 2024, the State Library of Oregon is scheduled to receive more than $975,000 of additional disbursements by September 30, 2025. More than $450,000 of that figure is anticipated to be provided to subgrantees. More than $250,000 of that figure is anticipated to support staff salaries. ECF 3-28 – Cornelisen Dec., ¶ 17.

230.     The State Library seeks reimbursements on an ongoing basis for expenses as it incurs them, submitting requests via the IMLS online portal at least once a month. Historically, before March 14, 2025, it received reimbursements in the next 1-to-3 business days. When the State Library submitted a reimbursement request on March 14, it was informed that it would be reimbursed in 10-to-12 business days and received the funds on March 26. ECF 3-28 – Cornelisen Dec., ¶ 18.

231.     In addition to administering federal funding to States, IMLS also funds and disseminates research useful to libraries, which the State Library of Oregon relies on for its own programs and further disseminates to libraries throughout the state. For example, in June 2020, IMLS research determined that library materials could be safely circulated without spreading the COVID-19 virus. IMLS, *Research Shows Virus Undetectable on Five Highly Circulated Library Materials After Three Days* (June 19, 2020), available at https://www.imls.gov/news/researchshows-virus-undetectable-five-highly-circulated-library-materials-after-three-days. Termination of IMLS's research function will impair the State Library of Oregon's ability to meet its mission to serve its patrons and to support local libraries in Oregon. ECF 3-28 – Cornelisen Dec., ¶ 19.

232.     Termination of IMLS's research function will impair the State Library of Oregon's ability to meet its mission to serve its patrons and to support local libraries in Oregon.  ECF

3-28 – Cornelisen Dec., ¶ 19.

233.    If the Oregon State Library does not receive reimbursements in a timely manner, it will not have funds available to meet its payroll needs or reimburse its subgrantees in a timely manner. ECF 3-28 – Cornelisen Dec., ¶ 21.

234.    Based on the enactment of Public Law 119-4, commonly known as the Full-Year Continuing Appropriations and Extensions Act, 2025, and the State Library's continuing compliance with IMLS conditions for federal block-grants, the State Library has anticipated continuing to receive federal funds in future years. That expectation would be formalized through an award letter, which was expected in April 2025. Based on that anticipated award, the State Library of Oregon continues to employ its current workforce and is preparing to award subgrants 9 for the coming year. ECF 3-28 – Cornelisen Dec., ¶ 22.

235.    Wendy Cornelisen, Oregon's State Librarian, testified that the uncertainty created by Executive Order 14,238 is likely to undermine the State Library's ability to attract and retain employees and may undermine subgrantees willingness to perform their projects due to the uncertainty of repayment. ECF 3-28 – Cornelisen Dec., ¶ 22.

236.    The University of Wisconsin-Stevens Point ("UWSP") is one of 13 universities and campuses that make up the Universities of Wisconsin. ECF 3-36 – Cornell-Swanson Dec., ¶ 2.

237.    UWSP's Museum of Natural History was awarded a $74,637 grant from the ILMS's "Inspire Grants for Small Museum" on July 17, 2024, with a performance period of September 1, 2024 through August 31, 2026. UWSP's budget for this year includes $39,500 from this ILMS grant award to fund staffing, design, and purchase of exhibit cases,

displays, and equipment based on the anticipated receipt of Federal funding promised. ECF 3-36 – Cornell-Swanson Dec., ¶ 11.

238.     The UWSP Museum of Natural History's collections are used in over 20 classes and by more than 1,350 students each year and more engaging and accessible displays will benefit faculty, researchers, students, and museum visitors. The UWSP Museum of Natural History is the only natural history museum in the Universities of Wisconsin and the single such entity in the central and northern tier of the state. ECF 3-36 – Cornell-Swanson Dec., ¶ 12.

239.     Dr. La Vonne J. Cornell-Swanson, Provost and Vice-Chancellor for Academic Affairs at University of Wisconsin-Stevens Point, testified that any pause in UWSP's federal funding would delay the completion of this project to the detriment of the museum and UWSP faculty, researchers, students, and museum visitors. ECF 3-36 – Cornell-Swanson Dec., ¶ 13.

240.     Dr. La Vonne J. Cornell-Swanson, Provost and Vice-Chancellor for Academic Affairs at University of Wisconsin-Stevens Point, testified that the UWSP Museum of Natural History intends to apply for the next round of IMLS Inspire Grant funding to create a North American vertebrate display and Wisconsin woodlands exhibit that is fully accessible. Additionally, new grant funds will be used to create and implement an interpretive plan incorporating accessible measures such as touchscreen media to provide a more comprehensive, full, educational experience impaired visitors and for K-12 students throughout central Wisconsin who attend museum programs as part of their classroom studies. ECF 3-36 – Cornell-Swanson Dec., ¶ 14.

241.     As of April 4, 2025, UWSP was awaiting payment of $9,410.24 for grant activity

through March 21, 2025, with a remaining grant award balance of $63,791.79. ECF 3-36 – Cornell-Swanson Dec., ¶ 15, corrected in ECF 44-3 – Cornell-Swanson Dec., ¶ 2

242.    Dr. La Vonne J. Cornell-Swanson, Provost and Vice-Chancellor for Academic Affairs at University of Wisconsin-Stevens Point, testified that if UWSP does not receive such disbursements/reimbursements, it will stop the purchase of improvements such as accessible display cases and software offering touchscreen learning resources. These items are needed to allow users with barriers to access the full collection. ECF 3-36 – Cornell-Swanson Dec., ¶ 16.

243.    UWSP faculty have attended professional development activities offered remotely by IMLS grantees such as webinars focusing on how to design effective exhibits. These opportunities have been offered by IMLS grantees such as the Texas Historical Society. The ability to access fee-free professional development offered by IMLS grantees has saved the university travel, research, and professional development costs for museum staff. ECF 3-36 – Cornell-Swanson Dec., ¶ 17.

244.    Dr. La Vonne J. Cornell-Swanson, Provost and Vice-Chancellor for Academic Affairs at University of Wisconsin-Stevens Point, testified that if funding is suspended or no longer available, 50% of the collection will remain inaccessible to persons with physical and visual impairments as current display cases have display shelves that cannot be seen by wheelchair users due to their low height and by visually impaired individuals due to the presence of mirrors and the angle of the shelving. ECF 3-36 – Cornell-Swanson Dec., ¶ 18.

245.    Dr. La Vonne J. Cornell-Swanson, Provost and Vice-Chancellor for Academic Affairs at University of Wisconsin-Stevens Point, testified that a suspension of IMLS funding will prohibit users who have physical or visual impairments from accessing

approximately half of the collection and will remove the opportunity for these users to access companion programming such as touchscreen media tools that can enhance their learning experience. ECF 3-36 – Cornell-Swanson Dec., ¶ 19.

246.    The Hawaiʻi State Public Library System is an administrative agency of the State of Hawaiʻi. The mission of the Hawaiʻi State Public Library System is to inspire curiosity and create opportunities for all to read, learn and connect. ECF 3-7 – Aldrich Dec., ¶ 3.

247.    The Hawaiʻi State Public Library System has 51 library branches across six islands-Hawaiʻi island, Kauaʻi, Lanaʻi, Maui, Molokaʻi, and Oʻahu. ECF 3-7 – Aldrich Dec., ¶ 4.

248.    The Hawaiʻi State Librarian is responsible for the operation, planning, programming, and budgeting of all community/school and public libraries within Hawaiʻi, in accordance with Hawaiʻi Revised Statutes (HRS) § 312-2.1. The State Librarian is authorized to expend moneys appropriated by the Hawaiʻi legislature and the U.S. Congress and otherwise acquired for the development, use, support, and maintenance of libraries and other related purposes, in accordance with HRS § 312-2.1.  ECF 3-7 – Aldrich Dec., ¶ 5.

249.    In 2024, Hawaiʻi received $1,541,630 from the Grants to States Program, which represents the federal share of the activities in the approved plan, totaling 66 percent. ECF 3-7 – Aldrich Dec., ¶ 13.

250.    The Hawaiʻi State Public Library System uses these federal funds to support many of its programs, including public access to the internet and online resources that provide: news, health and wellness, legal forms, business development, interactive ebooks that support literacy for students and families, language learning, student homework support, testing resources for students and adults for higher education and career development, learning digital literacy skills and connection to their collections through their  Integrated

Library System. The funding also supports the skill development of staff, so that they can effectively serve their communities. ECF 3-7 – Aldrich Dec., ¶ 14.

251.    In addition to administering federal funding to states, IMLS also provides the following programs and services through data and grants for research for the development of services and programs that serve communities across the United States. National data collection and analysis of library and museum programs and services is done yearly. The data is used nationally to understand trends and patterns that are affecting the nation's libraries and museums, so that data driven decisions can be made. Hawai'i is actively engaged in the collection of data and analysis, which helps it identify strengths and gaps in their services for Hawai'i in comparison to other communities. There are additional grants that are vital to the development and support of libraries and museums, which include: National Leadership Grants, Native American/Hawaiian Library Services, Laura Bush 21st Century Librarian Program, Museums for America, Native American/Native Hawaiian Museum Services. Since 1998, Hawai'i library and museum organizations have received about $18,000,000 to support projects that collect, digitize and make available important Native Hawaiian collections for today and future generations. For example, the Ulukau online digital repository project has become a cornerstone of Hawaiian knowledge preservation because it makes historical texts, genealogical records and language resources available worldwide. This would not have been possible without the support of the Native American/Hawaiian grant support. The funding has also supported literacy and digital literacy skill building in the community. In Fiscal Year 2024, Hawai'i library and museum organizations received 9 grants totaling $1,644,313. ECF 3-7 – Aldrich Dec., ¶ 15.

252.    The Hawai'i State Public Library System's budget for this year has relied on

receiving $1,541,630, and it made plans and allocated funding for continuing to ensure that their communities across 6 islands have access to resources that cannot be afforded by purchasing separately for each of the 51 library branches based on the anticipated receipt of federal funding promised. For example, Bookflix is an interactive online ebook program that supports the building of early literacy skills. Children and families can read the books or follow along as books are read. There are also comprehensive games to reinforce learning. In Fiscal Year 24, the collection titles were read over 23,000 times. This tool is vital for families who want to make sure their youngest learners are ready for school and can keep improving their reading skills. ECF 3-7 – Aldrich Dec., ¶ 16.

253.    The LSTA Grants to States Program is the only program that provides this level of direct support to communities and ensures that each state can identify the programs and services that are relevant to their communities through the LSTA Five-Year Plan. There are no other consistent sources of funding that make such a large impact. ECF 3-7 – Aldrich Dec., ¶ 17.

254.    Stacey Aldrich, the Hawaiʻi State Librarian, testified that any pause in Hawaiʻi's federal funding would result of a reduction of force in IMLS will have a direct impact the 1.4 million residents of Hawaiʻi and their access to the internet, technology, integrated library system, programs, and vetted online resources to support education, employment, literacy, and learning across 51 libraries on six islands by hobbling the Hawaiʻi State Public Library System's ability to implement the Five-Year State Plan as described above. ECF 3-7 – Aldrich Dec., ¶ 18.

255.    Stacey Aldrich, the Hawaiʻi State Librarian, testified that given the uncertainty of the full funding for Fiscal Year 2024 and Fiscal Year 2025, Hawaiʻi has not moved forward

with the subscriptions for many of its online resources because it does not have the budgetary resources or flexibility to make up for the lost funding. Communities across Hawai'i will experience the loss of resources that help them stay informed and connected to the rest of the world. ECF 3-7 – Aldrich Dec., ¶ 19.

256.     The Hawai'i State Public Library System has a good history of working with IMLS to meet its requirements for receiving funding from IMLS. They communicate frequently, submit required reporting, participate in national meetings, and respond to any concerns in a timely manner. ECF 3-7 – Aldrich Dec., ¶ 20.

257.     In the second half of 2025, Hawai'i is scheduled to receive disbursements/ reimbursements of $492,412 under current federal awards. These funds have been budgeted for continuation of subscriptions for statewide public access to online databases for their catalog, literacy, information, legal forms, and learning. The funding is also budgeted for technology to support equipment for internet connectivity in its branches, books that specifically support literacy and reading, and presentation technology to support programming in 51 branches. ECF 3-7 – Aldrich Dec., ¶ 21.

258.     The Hawai'i State Public Library System would apply to draw down the remaining funding and reimbursements by July 2025. Stacey Aldrich, the Hawai'i State Librarian, testified that if Hawai'i does not receive such disbursements/reimbursements, it will directly impact communities in Hawai'i by removing access to online resources that ensure each community has access to the same resources through internet access. As a remote and multiple island state, online access creates opportunities for all to connect to vetted resources online. More specifically, the following are examples of the impact: (1) Students will lose access to literacy and homework resources; (2) Business entrepreneurs will lose

access to resources that support their success; (3) Learners will lose the ability to use professionally developed language tools; (4) Patrons who are learning how to use technology and the internet will lose access to the tools that are referenced in classes; and (5) Families will lose access to interactive ebooks to build strong literacy skills in their youngest of learners. ECF 3-7 – Aldrich Dec., ¶ 22.

259.    Since the appointment of a new IMLS Director, Stacey Aldrich, the Hawaiʻi State Librarian, testified that there has been no clear communication on the remaining funding for Fiscal Year 2024 and the allotment for Fiscal Year 2025. While Hawaiʻi has plans for spending the remaining IMLS funding for Fiscal Year 2024, it is deeply concerned that the remaining funding will be redrawn, and it will not have what it needs to implement the LSTA Five-Year Plan. Its concern is based upon, among other things, the removal of grant funding from other federal agency programs across government. ECF 3-7 – Aldrich Dec., ¶ 23.

260.    Hawaiʻi is located in one of the most remote places one can live on Planet Earth. Its libraries are the only spaces that are open to everyone and, in some communities, offer the only broadband connectivity. Access to professionally curated information and learning opportunities are vital to the success of students, individuals, and their communities. Without IMLS and the programs and funding described in the Museum and Library Services Act, Hawaiʻi will lose access to the online resources that extend connections across its islands and support the education, employment, life-long learning, and literacy of its communities. ECF 3-7 – Aldrich Dec., ¶ 24.

261.    The purpose of Friends of the Judiciary History Center of Hawaiʻi ("Friends") is to support the King Kamehameha V Judiciary History Center (hereafter "JHC") as a

permanent educational institution for research, collection, preservation and presentation of information and objects relating to the judicial and legal history of Hawai'i, and to serve the public interest. ECF 3-8 – Daines Dec., ¶ 3.

262.     In the past, the Friends has received the following sources of funding from IMLS:

   a.   In 2024, the Friends received $250,000 from IMLS through IMLS's Native American/Native Hawaiian Museums Services Program.

   b.   The grant funds initial design planning for the complete redesign and renovation of JHC's permanent museum exhibits and visitor experience. (The existing exhibits and visitor flow are based on 1980s research, analysis, and technology). Upon receipt of funding, the Friends and JHC conducted a week-long site meeting with exhibit design firm, Solid Light, Inc., an award-winning exhibit design firm based in Louisville, Kentucky. The site visit culminated with a day-long meeting of JHC's stakeholders (educators, historians, Native Hawaiian community members, museum professionals, and judiciary personnel) to finalize interpretive themes and content. Following the site visit, Solid Light, Inc. has provided monthly increments of design progress. To date, approximately $58,000 of the grant remains for completion of the project.

   c.   Last November 2024, the Friends submitted an application and anticipate a renewal of this project for an additional $250,000 – again through IMLS's Native American/Native Hawaiian Museums Services Program. With this additional $250,000 award, the entire design planning stage for the Friends redesign of JHC will be completed by June 2026. Federal support and funding for the Friends' planning project allows JHC to not only create a new educational and orientation

space for the public within the State of Hawaiʻi's Supreme Court building, but also new community partnerships, public programming, research publications and curriculum, and intern and volunteer support with the Judiciary's historic collections. ECF 3-8 – Daines Dec., ¶ 10.

d. This year, the Friends budget for JHC's renovation has relied on a grant of $75,000 from the National Endowment for the Humanities, and $250,000 from IMLS. The Friends' Board of Directors are comprised primarily of young working professionals who serve the board on a volunteer basis. The majority of fund raising is achieved through grant writing. Approximately $105,000 has been raised through direct fundraising to individuals. ECF 3-8 – Daines Dec., ¶ 11.

263. Trevor Kainoa Daines, President for Friends of the Judiciary History Center for Hawaiʻi, testified that following the completion of the exhibit design phase, the Friends intend to seek further funding from IMLS for exhibit construction. ECF 3-8 – Daines Dec., ¶ 12.

264. Trevor Kainoa Daines, President for Friends of the Judiciary History Center for Hawaiʻi, testified that any suspension in their federal funding would bring JHC's exhibit renovation plans to a halt. Nor would the Friends be able to compensate Solid Light, Inc. for work already completed. This project has already unearthed formerly unknown historical materials resulting in an abundance of new contemporary scholarship. This information will remain unknown to the public if IMLS funding is terminated. ECF 3-8 – Daines Dec., ¶ 13.

265. Friends has an excellent track record of meeting state and federal grant benchmarks including timelines, grant reporting, and payment to vendors. In 2024, it was one of three

Hawai'i organizations awarded IMLS' Native American/Native Hawaiian Museums Services Program. Trevor Kainoa Daines, President for Friends of the Judiciary History Center for Hawai'i, testified that it has received very positive feedback regarding the most recent application for an additional $250,000 under the same program. ECF 3-8 – Daines Dec., ¶ 14.

266.      On June 30, 2025, Friends is scheduled to receive reimbursements of $58,000 under its current Federal awards. This is the remaining amount of unspent funds from the $250,000 award. ECF 3-8 – Daines Dec., ¶ 15.

267.      Trevor Kainoa Daines, President for Friends of the Judiciary History Center for Hawai'i, testified that if Friends does not receive such disbursements/reimbursements, it will negatively impact the vendors working on the redesign. Friends' scholarship and community partnerships already accomplished through this project will face setbacks if funding is terminated. ECF 3-8 – Daines Dec., ¶ 16.

268.      On February 11, 2025, the Friends were notified that an Executive Order issued by President Trump was terminating a Department of Education "Seeking Effective Education Development" (SEED) grant of which the Friends was a sub awardee. Fortunately, on April 11, the grant was restored following a March 10, 2025, Temporary Restraining Order issued by the U.S. District Court for the District of Massachusetts in *California v. Department of Education*. The temporary pause of that grant's funding had a chilling effect on JHC's teacher development plans. A teacher workshop was canceled. Mentor teachers working with 28 teachers participating in the grant were instructed to stop their mentoring. The pause resulted in the delay of teacher development and they are scrambling to fulfill the grant's objectives by the end of the school year. This also causes significant hardship

for the middle school teachers. ECF 3-8 – Daines Dec., ¶ 17.

269.    The Hawai'i State Judiciary provides JHC's annual operating budget, which averages $300,000 per year. The majority of JHC's annual budget covers staff salaries, with about 5-10% available for office equipment, supplies, and subscriptions. JHC relies entirely on external funding sources raised by the Friends to carry out many of its core services, such as civic education and K-12 curriculum development, teacher professional development workshops, research and exhibition development, preservation, digitization, and public access to its historic collections and archives, student internship opportunities, and public programming partnerships. The museum serves as a vital community resource for local residents and an informative hub for tourists, and many more critical activities with far-reaching local and national impacts. ECF 3-8 – Daines Dec., ¶ 18.

270.    Trevor Kainoa Daines, President for Friends of the Judiciary History Center for Hawai'i, testified that if IMLS is terminated, their current redesign of the JHC will cease. Vendors will not be paid for services they have already provided. Partnerships associated with this project will suffer needlessly. New scholarship regarding the civic and public policy history in Hawai'i will remain untold. These setbacks will significantly undermine their important mission. ECF 3-8 – Daines Dec., ¶ 19.

271.    The University of Washington Information School (iSchool) includes undergraduate and graduate programs in the fields of informatics, library science, information management, and museum studies. The iSchool has roots dating back over 100 years, when the University of Washington established a program for educating untrained librarians in the Pacific Northwest. The iSchool is nationally recognized for its leadership on information literacy and librarianship in the 21st century. ECF 3-33 – Dey Dec., ¶ 2.

272.      iSchool faculty currently receive eleven grants totaling $3.3 million. Anind Dey, Dean of the University of Washington Information School, testified that if this funding is lost, many of these projects will be forced to stop. In addition, critical funding for paying graduate students would be lost. The iSchool has some general account funding that it can provide to partially fill the gap, but only through the end of this academic year. ECF 3-33 – Dey Dec., ¶ 4.

273.      iSchool faculty receive a number of grants through the Laura Bush 21st Century Librarian Program. The Laura Bush 21st Century Librarian Program supports large-scale, robust professional training programs for libraries and librarians, which ultimately ensures that all communities—including rural communities—have access to high quality library services. IMLS is the only funder of the Laura Bush 21st Century Librarian Program. The Laura Bush grants received by iSchool faculty include:

   a.   *Empowering Neurodivergent Librarians to Lead Inclusion in Libraries.* This project researches the capacity of libraries to recruit, onboard, retain, and advance neurodivergent librarians. The project includes conducting interviews with neurodivergent librarians, library supervisors, and peer employees; conducting a nation-wide survey of neurodivergent librarians; creating a curricular module using participatory design; and delivering training at American Library Association and MLIS programs. The project will produce training programs to be used across libraries and information schools to foster inclusivity of neurodivergent library staff. iSchool faculty received an award of $491,500 for a multi-year project and runs through July 31, 2025.

   b.   *Valuing Library and Archives Labor: Assessing the Implications of Internships and*

*Fellowships on the Library and Archives Community.* This research examines how internships and fellowships impact the recruitment, training, and retention of a diverse workforce in libraries and archives. The underrepresentation of racial and ethnic minorities in library and archives workforces limits those institutions' abilities to effectively serve diverse communities. This project is funded by a $318,989 grant and runs through July 31, 2025. Without research-driven strategies to address these disparities, libraries and archives will continue to struggle to meet the information needs of all Americans, undermining their mission to provide equitable access to knowledge. This funding also supports a PhD student.

c. *Open-Source Hardware Assembly, Repair, and Sustainability.* This program develops tools for scientists and clinicians to better document, share, and assemble software, and enables scientific instruments to be shared in cost-effective ways. The UW iSchool is one of the only laboratories in the United States supporting open-source hardware of this kind. This grant funds the work and stipends of two PhD students. The program is funded by a $317,332 grant and runs through July 31, 2025. ECF 3-33 – Dey Dec., ¶ 5.

274.     The UW iSchool also receives several IMLS grants through its National Leadership Grants for Libraries Program. The National Leadership Grants for Libraries Program supports projects that develop, enhance, or disseminate replicable practices, programs, models, or tools to strengthen library and archival services for the American public. National Leadership Grants received by iSchool faculty include:

a. *Misinformation Media Literacy: Supporting Libraries as Hubs for Misinformation Education*. The goal of this grant is to build a national media literacy program,

designed specifically for librarians, to help everyday citizens identify and deal with online scams, deepfakes, and other challenges in today's online environments. The program has already trained over 1,000 librarians and others. This project is funded by a $749,727 grant, and runs through September 30, 2026. Anind Dey, Dean of the University of Washington Information School, testified that if this grant is lost, the program would have to be shut down—including all resource development, websites, and training sessions for librarians who use these resources.

b. *Supporting the development of digital playful exploratory resources to combat mis/disinformation through online intergenerational co-design.* This project uses co-design methods with children, teens, educators, and librarians to develop (1) a flexible tabletop role-playing game focused on digital civic engagement and (2) a curriculum that helps librarians design their own activities to support youth. This project is funded by a $249,917 grant and runs through January 31, 2026. Anind Dey, Dean of the University of Washington Information School, testified that if this grant is lost, work on the project will have to stop, which would mean losing an unfinished prototype of a potentially strong game-based learning curriculum that helps youth navigate challenges such as misinformation, cyberbullying, trolling, sexting, and other online risks.

c. *Scaling Community Through Archives: A National Program to Expand Community Archives.* In conjunction with the Tacoma Public Library and Internet Archive, this project examines how urban and rural public libraries can develop and sustain community archives. The project equips public library staff with the skills and resources necessary to document their communities' histories, ensuring that local

stories are preserved for future generations. This project is funded by a $399,485 grant, and runs through July 31, 2027. Anind Dey, Dean of the University of Washington Information School, testified that if this grant is lost, the project will be forced to shut down; this would mean halting training sessions and resource development and ending financial support for eight public library partners. They also testified that it would further mean community archive projects, particularly those representing marginalized or underrepresented communities, would be lost from the official historical record and their collective memory.

d. *Improving Access to Critical Games for Game Education at Cultural Heritage Institutions*. This research project, in collaboration with the Video Game History Foundation and The Strong National Museum of Play, aims to improve access to significant games in game education and cultural heritage institutions and aims to establish best practices for wider access by researchers, educators, and archivists. This project is supported by a $249,628 grant and runs through July 31, 2026. Anind Dey, Dean of the University of Washington Information School, testified that losing this grant would hinder efforts to identify and preserve historically significant video games and would diminish the ability to preserve and study video games as a vital part of American cultural heritage and technological history.

e. *LIS Forward: Shaping Future Directions for LIS in iSchools*. This grant supports engagement and coalition building across information schools and the library profession to strengthen research and education that broadly and directly benefits libraries and students of librarianship. This project is funded by a $149,832 grant and runs through August 31, 2025. Anind Dey, Dean of the University of

Washington Information School, testified that without this grant, the iSchool would need to discontinue outreach and engagement activities. The loss will undermine academic and professional endeavors to improve librarianship programs to support the needs of libraries and the communities they serve.

f.  *This Site is Fake Dot Com*. This grant supports collaboration between researchers and public and K-12 librarians to create resources and programs for teaching information literacy skills to youth. This project is funded by a $249,884 grant and runs through July 31, 2027. Anind Dey, Dean of the University of Washington Information School, testified that this project will be shut down immediately if funding is lost. The project was about to launch a series of workshops for their cohort of 13 libraries. These partner libraries would also collectively lose $39,000 over the period of the grant. In addition, the termination of this program would result in the loss of library staff training opportunities, information literacy resources, curricula, and other support for literacy programs, and online access to project resources.

g.  *Supporting the Development of Youth Digital Civic Engagement Through the Co-Design of Table-Top Games*. This project focuses on the co-design of digital play-based resources to help librarians support youth around mis and disinformation learning. Anind Dey, Dean of the University of Washington Information School, testified that losing this grant would mean that iSchool faculty cannot run final testing and evaluation on the designs to understand the potential learning impact of the project. ECF 3-33 – Dey Dec., ¶ 6.

275.  iSchool faculty also receive federal IMLS funding as subrecipients of other

institutions' grant awards, and had anticipated additional funding in the coming months. ECF 3-33 – Dey Dec., ¶ 7.

276.    The IMLS is a significant source of funding for the iSchool's academic research and outreach activities to libraries and librarians across Washington State. IMLS is the most significant funder of libraries, archives, and museums, driving innovation and essential services nationwide. Although it composes only a small portion of the overall federal budget, its impact is far-reaching. It is one of the few federal agencies devoted to the pursuit of creating a public that is well-informed—a vital public good. ECF 3-33 – Dey Dec., ¶ 8.

277.    Anind Dey, Dean of the University of Washington Information School, testified that beyond the immediate loss of funding to the iSchool, eliminating IMLS support would disrupt vital community programs, like job skills training, English language classes, and internet access, and would hobble programs for supporting and developing the librarianship profession. These harms would be acutely felt by rural and tribal libraries that are already under-resourced and at risk. Dr. Dey further testified that if iSchool faculty are forced to end partnerships with these libraries, Dr. Dey worries that some of them may be forced to reduce their services, if not entirely close. Losing IMLS funding will end one of the primary sources for building the capacity of thousands of libraries across the United States to support their communities. ECF 3-33 – Dey Dec., ¶ 10.

278.    On April 9, 2025, iSchool faculty members that received funding from IMLS began receiving Notices of Grant Terminations. ECF 35-8 – Dey Dec., ¶ 3.

279.    Of the IMLS grants that supported iSchool faculty's work and scholarship, eight

have been terminated as of the signing of this declaration. ECF 35-8 – Dey Dec., ¶ 3.

280. Each termination notice contained the same language explaining why the grants have been terminated. ECF 35-8 – Dey Dec., ¶ 4.

281. The notices stated that the terminated grants were "no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program." ECF 35-8 – Dey Dec., ¶ 4.

282. The notices also indicated that the "IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda" and that the President's Executive Order mandates that IMLS "eliminate all non-statutorily required activities and functions." ECF 35-8 – Dey Dec., ¶ 4.

283. The Maine State Librarian is responsible for "the proper management of the library and the safety of its contents" (Title 27, Chapter 1, Subchapter 1 of the Maine Revised Statutes) which includes overseeing all funds that come to MSL, including state, federal, and private grant funds. ECF 3-19 – Fisher Dec., ¶ 4.

284. In 2024, Maine received $1,526,754.00 from the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-19 – Fisher Dec., ¶ 12.

285. The Maine State Library (MSL) uses these federal funds to support many of its programs, including: 1) outreach programs which include Books by Mail for residents in un-served and underserved areas or who are homebound and Talking Books PLUS for eligible residents who are blind, visually impaired, print disabled, or who have a reading disability, 2) public programs including circulation of their lending library collection and reference services to their 18,000 card holders and over 10,000 annual

visitors and programming in partnership with other cultural institutions, 3) services required by Maine State statute to serve libraries in counties in central and western Maine, some of the least resourced in the state, 4) consulting services which include one-on-one consultations, regional outreach services, statewide professional development, and strategic partnerships with state and regional organizations, 5) membership to the Maine Association of Nonprofits for Maine's nonprofit libraries, which account for just over half of all public libraries in the state, 6) resource sharing through Maine InfoNet which is managed through a cooperative agreement with the University of Maine and oversees the state's online catalog available to all libraries in the state and the catalogs for 167 individual public, school, and academic libraries, 7) interlibrary loan which enables even the most rural residents in the state access to over 10 million items, and 8) digital content, including the popular Ancestry Library Edition for genealogical research, accessed by Mainers 93,650 times in the first six months of FY25. ECF 3-19 – Fisher Dec., ¶ 13. Maine also uses these federal funds to pay the salaries of thirteen employees. ECF 3-19 – Fisher Dec., ¶ 14.

286.    In addition to administering federal funding to States, IMLS also provides the following programs and services: data sets from the annual Public Library Survey, biennial reports on State Library Administrative Agencies, the Library Search and Compare data tool, research reports analyzing data the Agency receives through its grant programs, and reports on best practice and emerging trends related to library services and programming. ECF 3-19 – Fisher Dec., ¶ 15.

287.    MSL's budget for this year has relied on receiving the same amount of Grants-to-States funding that they received for federal FY24: $1,526,754.00. Lori Fisher, the

Maine State Librarian, testified that the Maine State Library made plans and allocated funding for staffing and various programmatic and service initiatives, such as meeting their cooperative agreement deliverables with the University of Maine to fund half of the Maine InfoNet Executive Director's salary; continuing to fund the Niche Academy platform for library staff professional development; statewide public library access to the Ancestry database; offering services through the National Library Service for the Talking Books Plus program for the blind and visually handicapped; and offering the Books by Mail service to the homebound and Maine residents who do not have access to a local public library. ECF 3-19 – Fisher Dec., ¶ 16.

288. The Grants to States program accounts for approximately one third of MSL's annual budget each year. Lori Fisher, the Maine State Librarian, testified that without reliable, full funding from IMLS, MSL is in danger of losing thirteen federally funded staff and would suffer a significant reduction and/or complete elimination of services they provide to the public and libraries across the state. ECF 3-19 – Fisher Dec., ¶ 17.

289. Lori Fisher, the Maine State Librarian, testified that any pause in the library's federal funding would immediately impact its ability to pay the salaries of the thirteen staff funded through their LSTA funding. She further testified that the library put a freeze on programmatic expenses in April 2025. These include travel for site visits and other in-person consultations with libraries, purchases for workshops and trainings for library staff, and all purchases that support public programs that are supported with LSTA funding. To minimize the impact of this freeze the Maine State Library shifted expenses for purchasing that would normally have come out of LSTA funding to state funding but are limiting expenses to those already committed to and/or those that are

essential in running the agency. ECF 3-19 – Fisher Dec., ¶ 18.

290.    Lori Fisher, the Maine State Librarian, testified that the threat of not receiving the Library's FY24 funding in April 2025 had an immediate chilling effect on staff and their ability to carry out daily operations. For example, the staff in the Library Development department planned to conduct regional site visits with up to one-third of the public libraries in calendar year 2025. Such visits build trust between staff and local libraries, which is essential component in mitigating issues that lead to turnover among library directors (between 2019 and 2025 there have been 237 changes in directors. There are 257 public libraries in Maine). Library Development staff also serve as liaisons to one or more of nine library regions. A priority this year was to conduct in-region meetings and continuing education activities. Lori Fisher testified that staff are leery about scheduling these at this time given the uncertainty of the status of LSTA funding. All of these services require advance scheduling, and it is likely that the MSL will not be able to follow through with these services. ECF 3-19 – Fisher Dec., ¶ 19.

291.    MSL routinely submits its required reporting in a timely manner, including regular financial reports. Additionally, MSL is frequently one of the first states to certify and submit its Public Library Survey results. MSL staff respond to requests from IMLS for clarification on the data promptly. ECF 3-19 – Fisher Dec., ¶ 20.

292.    On January 16, 2025, MSL received approval from IMLS for an advance on its federal FY25 IMLS LSTA Grants-to-States funding in the amount of $381,689.00 (25% of the federal FY24 funded had already been already received).  MSL applied for this advance due to the staff salaries that would not be able to be paid until Congress passed the FY25 budget and appropriated monies for the FY25 Grants-to-States

program. ECF 3-19 – Fisher Dec., ¶ 21.

293.    On 3/24/25, MSL submitted a drawdown request from the FY25 LSTA Grants-to-States advance in order to fund payroll that is disbursed on March 26, 2025. Without such disbursements, it will cause State of Maine HR to begin the layoff process for MSL's 13 federally funded employees, using the state union contracts in place for those employees. As of April 3, 2025, Maine State Treasury had not received the monies requested in the 3/24/25 drawdown request, despite the approval of the request shown in the IMLS eGMS Reach portal. ECF 3-19 – Fisher Dec., ¶ 22.

294.    MSL submitted a drawdown request on 3/12/2025 for payroll disbursements made on 3/12/2025 for MSL's thirteen federally funded employees. The drawdown was approved on 3/12/25 in IMLS eGMS Reach portal. However, the treasury for the State of Maine did not receive the funds until Monday March 24, 2025. This was seven days beyond the timeframe when monies are usually received after a drawdown request (five days maximum). MSL did not receive an explanation of why the funds were delayed for a week beyond the stated timeframe to receive approved drawdown monies. ECF 3-19 – Fisher Dec., ¶ 23.

295.    MSL staff use the resources from IMLS to inform its professional development and continuing education programs for library staff as well as benchmarks and best practice guidance for public libraries across the state. As a state library administrative agency, MSL's ability to track and maintain data over time from the Public Library Survey in the IMLS eGMS Reach portal is most relevant for MSL. The portal also allows it to compare data to that of other similarly situated states. ECF 3-19 – Fisher Dec., ¶ 24.

296.    If MSL cannot provide the Public Library Data Survey annually, this will seriously hamper the ability of MSL to identify trends over time that would allow mitigation of problems before they become untenable and also would hamper the ability of Maine public libraries to use data to inform their communities and stakeholders about trends that could affect their future funding needs. ECF 3-19 – Fisher Dec., ¶ 25.

297.    Lori Fisher, the Maine State Librarian, testified that the impact of a termination or delay of MSL's funding from IMLS would be most keenly and immediately felt by some of Maine's most vulnerable residents.  Should MSL's services be reduced or terminated the individuals who stand to lose are residents who are blind or visually impaired, residents in rural and remote corners of the state, veterans, jobseekers, low-income families, Maine's current and future workforce, and the oldest and youngest residents. ECF 3-19 – Fisher Dec., ¶ 26.

298.    On March 31, 2025, Lori Fisher received an email from the Institute of Museum and Library Services advising that all of its staff members were going to be placed on administrative leave effective immediately. ECF 3-19 – Fisher Dec., ¶ 27.

299.    On March 31, 2025, Lori Fisher also received a statement from AFGE Local 3403 on the status of Museum and Library Services, advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-19 – Fisher Dec., ¶ 28.

300.    Without staff to administer the Grants to States program in April 2025, Lori Fisher, the Maine State Librarian, testified that it would be unlikely that Maine would receive the remainder of its 2025 Grants to States Award by April 22, 2025, as communicated by IMLS to her by email on 3/1482025, which would cause immediate and irreparable

harm to Maine. ECF 3-19 – Fisher Dec., ¶ 29.

301.    If all IMLS staff is placed on administrative leave, Lori Fisher, the Maine State Librarian, testified that there is a huge risk to grantees that their questions about appropriate grant expenses will go unanswered, potentially costing the federal government even more money around the areas of liability and auditing/accountability. As of April 3, 2025, Fisher had not received any communication from IMLS related to Maine's FY25 LSTA fund advance since the IMLS staff were placed on administrative leave. ECF 3-19 – Fisher Dec., ¶ 30.

302.    On Tuesday, April 8, 2025, MSL still had not received its drawdown submitted on Monday, March 24, 2025, in the amount of $44,142.53 (for March 26, 2025, payroll), and its drawdown submitted on Monday, April 7, 2025, in the amount of $53,301.95 (for April 9, 2025, payroll) was still in "submitted" mode. This was unusual because drawdown requests have been always approved on the day of submission if on a Monday through Friday. ECF 44-1 – Fisher Dec., ¶ 6.

a.   Lori Fisher had no way to reach anyone at IMLS due to their entire staff being placed on administrative leave, so she emailed Maine's congressional delegation to ask if they could contact IMLS Acting Director Sonderling for information about the status of their submitted drawdowns. At 7:04 p.m. on April 8, 2025, she received an email from Thomas M. Browder III, General Counsel for IMLS, which did not address the inquiry about submitted drawdowns.  ECF 44-1 – Fisher Dec., ¶ 7. The email is available at ECF 44-1, Exhibit A.

b.   Lori Fisher shared Mr. Browder's email with state HR. Because the March 24, 2025 drawdown was then over two weeks delinquent and MSL had received no

information about drawdown status, the State Human Resources Director was forced to initiate a layoff process for thirteen Library Services and Technology Act-funded employees due to inaccessibility of federal grant funds. ECF 44-1 – Fisher Dec., ¶ 8.

c.  MSL had to close the public location of MSL services at 242 State Street in Augusta, Maine for two weeks beginning April 10, 2025, due to the layoffs and the necessary reorganization after the layoff process is complete. ECF 44-1 – Fisher Dec., ¶ 9.

d.  As of April 11, 2025, MSL has also had to pause all online services for MSL material requests by patrons and other libraries statewide until after the staff reorganization and reopening of its public space. ECF 44-1 – Fisher Dec., ¶ 10.

303.   The Maine State Museum is responsible for developing and maintaining substantial collections of original material related to the history, archaeology, and biology of the state of Maine and related areas, and uses these collections, and certain borrowed collections, to develop public exhibits, educational presentations, publications, and research presenting or interpreting these aspects of Maine's historical and environmental heritage to the public. ECF 3-18 – Fishman Dec., ¶ 3.

304.   Bernard Fishman, Museum Director of the Maine State Museum testified that in response to Executive Order 14,238, the Maine State Museum may lose access to a grant award (MA253190-OMS-23) from the IMLS, which is vital to the installation of the "Meet Maine Here" exhibit intended to be a central component of the displays which the museum will shortly install in the "Cultural Building," a major facility in Maine's state capital of Augusta. In addition to bearing a substantial part of the cost of

building and installing this exhibit, the awarded IMLS funding, if withdrawn, will eliminate the hiring of an exhibit preparator and of a firm intended to analyze public reaction to the installed exhibit. ECF 3-18 – Fishman Dec., ¶ 6.

305.    Bernard Fishman, Museum Director of the Maine State Museum, testified that he believes that Executive Order 14,238, and the actions taken to reduce the agency, will gut IMLS and cause it to be unable to administer financial awards and/or programs on which Maine relies and on which it expects to rely in the future, causing significant harm to the Maine State Museum and other state agencies. ECF 3-18 – Fishman Dec., ¶ 7.

306.    In the past, the Maine State Museum has received the following sources of funding from IMLS:

a.   The Maine State Museum received $ 85,397 through a 2016 IMLS grant.

b.   The Maine State Museum received $ 39,485 through a 2009 IMLS grant. ECF 3-18 – Fishman Dec., ¶ 11.

307.    These funds have been used for essential collection-related surveys and planning, often in conjunction with other collecting institutions, collections assessments and object conservation, and exhibit research, planning and implementation. These grants have enabled the hiring of project-related employees, consultants, and the purchase of construction materials. Each of these grants has been an essential part of the museum's work of preserving and making accessible the material and environmental heritage of Maine. ECF 3-18 – Fishman Dec., ¶ 12.

308.    The Maine State Museum has relied on a grant of $ 244,375 this year for the construction and installation of the "Meet Maine Here" exhibit and the hiring of an

exhibit preparator and an audience consultant service, based on the anticipated receipt of promised federal funding. ECF 3-18 – Fishman Dec., ¶ 13.

309.    The Maine State Museum would expect to seek from the IMLS future funding for certain future exhibits and the future assessment and care of important historical and biological collections, including the purchase of needed preservation-related equipment or services. ECF 3-18 – Fishman Dec., ¶ 14.

310.    Bernard Fishman, Museum Director of the Maine State Museum, testified that any pause in the Museum's federal funding would cast doubt on the Maine State Museum's ability to complete its exhibit installation as planned and would undoubtedly add damaging delays to the re-opening schedule of the museum. The museum's exhibits have been closed for four years as a result of the renovation of its main building, and official and public expectation is high that the museum can re-open in 2026; but the loss of IMLS funding would certainly delay and compromise this schedule. ECF 3-18 – Fishman Dec., ¶ 15.

311.    Bernard Fishman, Museum Director of the Maine State Museum, testified that loss of IMLS funding would result in the Maine State Museum being unable to purchase the supplies and construction services necessary for the installation of this essential exhibit and would interrupt all the museum's re-opening plans. ECF 3-18 – Fishman Dec., ¶ 16.

312.    Bernard Fishman, Museum Director of the Maine State Museum, testified that the potential loss of this funding has already affected staff morale negatively, resulting in an unusually high number of staff visits to the museum director, seeking reassurance and support. ECF 3-18 – Fishman Dec., ¶ 16.

313.    The Maine State Museum has in living memory properly discharged the grants it
has received from all sources, including federal ones. The museum, for instance,
received a matching-funds grant from the National Endowment for the Humanities, for
$ 95,000, in connection with the raising of money for a new Education Center for
students and families to be built within the re-opened museum. COVID required an
extension of the period needed to achieve the full satisfaction of the grant terms, but
they were met and the museum received the needed funds. ECF 3-18 – Fishman Dec.,
¶ 17.

314.    The Maine State Museum is scheduled to receive disbursements/reimbursements
of $ 244,375 under its current Federal awards. These funds have been awarded by the
IMLS for the "Meet Maine Here" exhibit mentioned above. Because the museum has
not yet moved into the renovated Cultural Building (that move is anticipated to occur
during April-June of 2025), the museum has not yet been able to begin construction of
the exhibit and seek reimbursement for funds spent from the award. ECF 3-18 –
Fishman Dec., ¶ 18.

315.    If the Maine State Museum does not receive such disbursements/reimbursements,
it will result in a damaging inability to complete the exhibit as planned and will also
delay the museum's re-opening. ECF 3-18 – Fishman Dec., ¶ 19.

316.    The elimination or delay in this funding will adversely affect informal education in
Maine, especially among the 15,000 students that typically visit the museum each year.
Many of these students are from rural areas and receive during their schooling no other
exposure to major history/natural history museums and their exhibits beyond what they
experience at the Maine State Museum. ECF 3-18 – Fishman Dec., ¶ 20.

317.    Bernard Fishman, Museum Director of the Maine State Museum, testified that the loss of this grant will wreak a severe setback to the museum's ability to install this major exhibit and to the museum's ability to open to the public as scheduled. The loss of this funding will damage the museum's credibility with the people and government of Maine, will diminish support for the exhibit, and will demoralize the museum's staff. If the museum loses this funding, it will be the museum's greatest reverse in over 40 years. ECF 3-18 – Fishman Dec., ¶ 20.

318.    Arizona Revised Statute ("A.R.S.") § 41-151.01 establishes the Arizona State Library, Archives and Public Records ("State Library") as part of the Office of the Arizona Secretary of State. ECF 3-1 – Fontes Dec., ¶ 3.

319.    The State Library consists of the following branches: Archives, Arizona Talking Book Library, E-rate, Library Development, Records Management, and the State of Arizona Research Library. ECF 3-1 – Fontes Dec., ¶ 4.

320.    The State Library was founded in 1915 to collect, preserve, and provide access to materials relating to law, political science, economics, sociology, subjects pertaining to the theory and practice of government, genealogy, and Arizona history. The State Library's mission is to provide Arizonans access to information about their government, their state, and their world by offering content in a variety of formats, preserving Arizona's history for future generations, and empowering local institutions to engage their communities in learning. ECF 3-1 – Fontes Dec., ¶ 5.

321.    Adrian Fontes, Arizona Secretary of State, testified that they are responsible for assisting the State Library in effectuating its statutory mandate set forth in A.R.S. § 41-151.01. ECF 3-1 – Fontes Dec., ¶ 6.

322.    The Arizona State Library is a State library administrative agency. ECF 3-1 – Fontes Dec., ¶ 10 (citing A.R.S. § 41-151.06).

323.    In order to receive funds under the LSTA, the State Library submits to IMLS a five-year state plan, which describes the State Library's needs and goals and the ways in which the State intends to use the federal funding to meet those needs. ECF 3-1 – Fontes Dec., ¶ 11 (citing 20 U.S.C. § 9134) (*see also* Arizona's LSTA Five-Year Plan is attached as Exhibit A to Fontes Decl.)"

324.    In 2024, the Arizona State Library received $3,804,635 as part of the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-1 – Fontes Dec., ¶ 14.

325.    The State Library uses these federal funds to support the goals of its Five-Year Plan for FY 2023-2027, which reflect the purposes and priorities of the LSTA. In Arizona, specific goals include:

a.    Information Preservation and Access – support preservation and stewardship of information in libraries and the State Archives, and encourage equitable access to information in a variety of formats;

c.    Informal Education – support lifelong learning programs that help to develop life literacies, including digital/technological, workforce, parenting, health, and financial literacies;

d.    Institutional Improvements – support technology resources, staff skills, programs, and collections in libraries while addressing barriers to accessing these resources and services; and

e.    Inclusive Communities – support the efforts of libraries to engage with community

members from diverse backgrounds, foster connections with other community organizations, and collaborate with partners to contribute to community well-being. ECF 3-1 – Fontes Dec., ¶ 15.

326. The State Library budgeted the LSTA funds for twelve full time employee positions for LSTA 2024 grant year (October 1, 2024-September 30, 2025). ECF 3-1 – Fontes Dec., ¶ 16.

327. The State Library's budget relies on receiving $3,804,635 of LSTA funds, which was awarded to the State Library in Federal FY 2024. The State Library made plans and allocated funding for staffing to support statewide initiatives and competitive subgrants that benefit public, tribal, and school libraries, and to support innovative programs that improve literacy, digital access, and community engagement based on this award of LSTA funds. For Federal FY 2025, IMLS awarded a partial grant to the State Library of $951,159. In April of each year, IMLS allocates the full award for the year and the State Library anticipates the use of the full award for Federal FY 2025. The State Library expects to receive and is relying on receiving approximately an additional $2,200,000 to complete the Federal FY 2025 award. ECF 3-1 – Fontes Dec., ¶ 17.

328. The State Library anticipates relying on LSTA funds in the same manner in the future should Congress reauthorize the Museum and Library Services Act. ECF 3-1 – Fontes Dec., ¶ 18.

329. Adrian Fontes, Arizona Secretary of State, testified that any pause in Arizona's federal funding will cause an abrupt funding shortfall: the cessation of federal funds creates an immediate budgetary gap, forcing the State Library to pause or cancel

ongoing projects and initiatives. This includes suspending competitive subgrants that public, tribal, and school libraries currently rely on to launch new programs to meet the evolving needs of their communities. ECF 3-1 – Fontes Dec., ¶ 19.

330.    Additionally, any pause will cause a disruption of statewide programs: many current statewide initiatives—such as the Connect Arizona Digital Navigator program, access to academic and business databases, interlibrary loan systems, and digitization projects (e.g., the Arizona Memory Project)—depend on LSTA funding. The termination will result in immediate service disruptions. ECF 3-1 – Fontes Dec., ¶ 19.

331.    A pause will also cause operational and administrative challenges: without the federal funds, the State Library faces immediate administrative strain. This will require cost-cutting measures such as reducing staff, delaying procurement of essential technology, and scaling back existing public programs that Arizona communities rely upon. ECF 3-1 – Fontes Dec., ¶ 19.

332.    A long-term pause in federal funding would have long-term effects, including reduced capacity for innovation and service expansion: over time, the loss of LSTA funding would lead to a diminished ability to implement and sustain statewide initiatives. The State Library's long-range planning—outlined in its five- year plan—would be significantly altered, with fewer resources available for mission-critical areas such as information access and preservation, technology infrastructure, and continuing education. ECF 3-1 – Fontes Dec., ¶ 20.

333.    A long-term pause would impact local libraries: public, tribal, and school libraries that depend on State Library support could experience long-term financial pressures. Many of these institutions operate with limited local funding, so the absence of LSTA

supported statewide resources (databases, interlibrary-loan software, e-books & magazines, summer reading program supplies) could lead to reduced local services, diminished access to emerging technologies, and fewer opportunities for staff collaboration and professional development.    ECF 3-1 – Fontes Dec., ¶ 20.

334.    A long-term pause would widen the digital divide and service disparities: without federal IMLS funding, underserved and rural communities, including many tribal areas, will face increased disparities in access to digital resources, educational programs, and cultural and historic preservation initiatives. This erosion of services could contribute to a widening digital divide and reduce overall community engagement. ECF 3-1 – Fontes Dec., ¶ 20.

335.    The immediate and/or long-term effects of a pause of federal funding will diminish access to information and resources for Arizona residents: Arizonans will have fewer opportunities to access trusted sources of information in the form of peer-reviewed databases, government publications, educational programs, and historic and cultural materials. The decline in statewide initiatives will reduce the availability of free or low-cost resources that support lifelong learning and civic engagement. ECF 3-1 – Fontes Dec., ¶ 21.

336.    A pause will impact community programs and local outreach: programs that foster early literacy, digital skills, and community cohesion—often run by public, tribal, and school libraries—may be scaled back or eliminated. This reduction could adversely affect educational outcomes and the overall quality of life, particularly for vulnerable populations. ECF 3-1 – Fontes Dec., ¶ 21.

337.    A pause could erode cultural and historical preservation: long-term funding losses

will hamper efforts to digitize and preserve historical records and unique Arizona collections. This would not only affect academic and research endeavors but could also diminish community heritage and identity. ECF 3-1 – Fontes Dec., ¶ 21.

338.    As of April 4, 2025, the State Library had been scheduled to receive disbursements/reimbursements of $1,177,690.32 under the current federal award over a period of several months. ECF 3-1 – Fontes Dec., ¶ 22.

339.    The State Library continues to rely on the anticipation that the next disbursement of funds will occur on April 11, 2025, and cover 30 days, with additional funds requested thereafter in 30-day increments through the end of the Federal FY 2025, September 30, 2025. If Arizona does not receive such disbursements, the State Library would experience an immediate and ongoing disruption of services. ECF 3-1 – Fontes Dec., ¶ 23.

340.    On March 31, 2025, the State Library also became aware of the below statement from AFGE Local 3403 on the status of Museum and Library Services, advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-1 – Fontes Dec., ¶ 25.

341.    Adrian Fontes, Arizona Secretary of State, testified that if there are no IMLS staff to administer the Grants to States program, it is unlikely that Arizona will receive the remainder of its 2025 Grants to States Award in April 2025, or receive any further disbursements from the FY 2024 funds totaling $3,804,635 that have been awarded to the State Library and for which contractual obligations have already been entered into that are pending payment by the State Library. The inability to access these funds will

cause immediate and irreparable harm to Arizona. The State Library expects Arizona to experience similar immediate and irreparable harm even in a scenario where not all – but most – IMLS staff have been placed on leave. ECF 3-1 – Fontes Dec., ¶ 26.

342.    Adrian Fontes, Arizona Secretary of State, testified that "[t]his action, hastily taken by unknown federal officials, to dismantle an entire, congressionally funded agency, and the attendant chaos at the local level, is unprecedented." Because of the elimination of all staff at IMLS, Arizona is taking the following immediate action:

a.    Eliminating the Digital Navigator Program, which provides one-on-one phone assistance to help Arizona communities get online and serve as a free tech support hotline for digital learning and information on accessing low-cost internet and computer offers;

b.    Eliminating twelve positions with the Arizona State Library effective May 29, 2025, and ensuring wind-down of all business associated with those positions in the intervening weeks. ECF 3-1 – Fontes Dec., ¶ 27.

343.    The Arizona State Library also had to eliminate ten temporary contractor positions that facilitated the Digital Navigator Program. ECF 35-1 – Fontes Dec., ¶ 8.

344.    The Arizona State Library also had to eliminate its Summer Library Institute— Arizona's long-standing library development program. The program was to take place at an Arizona college campus in the first week of June 2025. It is a week-long professional development event that brings together rural library staff from all regions of Arizona to learn about new trends, technologies and best practices in the field. Individuals from rural libraries apply for the program and have the opportunity to form lasting connections as they experience a variety of workshops, sessions, and keynote

speeches by renowned experts and practitioners. Topics cover a variety of areas, including library collection development and programming, outreach, community engagement, and project management. ECF 35-1- Fontes Dec., ¶ 9.

345.    Additionally, the following beloved programs are now in peril due to this reckless federal action:

a.    Access to Electronic Resources: Collaborative digital collections, databases, and eZines across the 15 county library systems;

b.    Arizona Memory Project: Online access to historical records from Arizona's archives, libraries, and museums;

c.    Arizona Reading Program: Literacy development programming for all ages;

d.    Youth Services: Informal learning and educational programming for school-aged children;

e.    Legal Resources: Access to state legal and legislative history materials;

f.    E-rate Support: Assistance for libraries applying for discounted internet and telecommunications services. " ECF 3-1 – Fontes Dec., ¶ 28.

346.    In FY 2024 alone, the Library Development division facilitated over $800,000 in subgrants awarded to libraries statewide to support the libraries below, located in eight of Arizona's nine congressional districts. Based on previous years' allocations, the Arizona State Library now faces a planning shortfall of $2.2 million in FY 2025 due to the elimination of IMLS staff who could disburse formula-based funding, in addition to the shortfall of the current grant year of $1.17 million. Libraries that received FY 2024 subgrants:

a.    Ak-Chin Indian Community Library (AZ-07, $54,000)

b.  Apache Junction Public Library (AZ-05, $3,000)

c.  Arizona State Museum Library and Archives (AZ-07, $38,246)

d.  Casa Grande Public Library (AZ-06, $14,600)

e.  Chandler Public Library (AZ-04, $9,000)

f.  Cochise College Libraries (AZ-06, $4,000)

g.  Desert Foothills Library (AZ-01, $10,980)

h.  Douglas Public Library (AZ-07, $4,000)

i.  Duncan Public Library (AZ-06, $4,000)

j.  Eastern Arizona College Alumni Library (AZ-06, $17,500)

k.  Elsie S. Hogan Community Library (AZ-06, $12,250)

l.  Flagstaff City-Coconino County Public Library (AZ-02, $4,000)

m.  Florence Community Library (AZ-02, $29,000)

n.  Fort McDowell Tribal Library (AZ-01, $4,000)

o.  Glendale Community College (AZ-08, $4,000)

p.  Glendale Public Library (AZ-08, $18,000)

q.  Globe Public Library (AZ-02, $4,000)

r.  Holmes Elementary Library (AZ-04, $9,986.79)

s.  Huachuca City Public Library (AZ-06, $18,000)

t.  Kaibab Paiute Tribal Library (AZ-02, $23,000)

u.  Mesa Public Library (AZ-04, $9,000)

v.  Navajo County Library District (AZ-02, $75,396.80)

w.  Page Public Library (AZ-02, $4,000)

x.  Peoria Public Library System (AZ-08, $35,000)

  y. Pima County Public Library (AZ-07, $65,910)

  z. Prescott Public Library (AZ-02, $42,683.35)

  aa. Prescott Valley Public Library (AZ-02, $38,720)

  bb. Scottsdale Public Library (AZ-01, $3,000)

  cc. Sedona Public Library (AZ-02, $33,396)

  dd. Snowflake-Taylor Public Library (AZ-02, $4,000)

  ee. Superior Court Law Library (AZ-07, $37,543)

  ff. Tempe Public Library (AZ-04, $13,000)

  gg. University of Arizona Libraries (AZ-07, $43,240.89)

  hh. Williams Public Library (AZ-02, $4,000)

  ii. Winslow Public Library (AZ-02, $4,000)

  jj. Yavapai County Free Library District (AZ-02, $84,500)

  kk. Youngtown Public Library (AZ-09, $15,616)

  ll. Yuma County Library District (AZ-07, $18,260). ECF 3-1 – Fontes Dec., ¶ 29.

347. On April 8, 2025, the Arizona State Library, Archives and Public Records ("Arizona State Library") requested a drawdown of $67,000 from its Library Services and Technology Act ("LSTA") 2025 grants administered by IMLS. ECF 35-1 – Fontes Dec., ¶ 1.

348. The Arizona State Library submitted a separate drawdown request on April 10. 2025, for $108,100 from its LSTA 2024 grant. ECF 35-1 – Fontes Dec., ¶ 4.

349. In the normal course, and prior to the issuance of Executive Order 14,238, the Arizona State Library received a response from IMLS to its drawdown request within one to two business days. Such a response would either inform the Arizona State

Library that there will be additional review or that the request will be granted. ECF 35-1 – Fontes Dec., ¶ 2.

350.    As of April 11, 2025, the Arizona State Library had not received a response. ECF 35-1 – Fontes Dec., ¶¶ 3, 4.

351.    The New Mexico Department of Cultural Affairs is responsible for preservation, protection, and presenting New Mexico's cultural resources, including administration and oversight of the state library division. ECF 3-24 – Garcia y Griego Dec., ¶ 3.

352.    Debra Garcia y Griego, Secretary for the New Mexico Department of Cultural Affairs, is responsible for the operation of the department, which includes a duty to manage all operations of the department and to administer and enforce the laws with which the secretary or the department is charged. The secretary may apply for and receive, in the name of the department, any public or private funds, including United States government funds, available to the department to carry out its programs, duties, or services. This includes receiving, managing, and ensuring effective use of Library Services and Technology Act Grants to States ("LSTA") funding from the Institute of Museum and Library Services ("IMLS") through the state library. The secretary may delegate authority to subordinates as the secretary deems necessary and appropriate, including to the state librarian who is charged with administering the state library division. ECF 3-24 – Garcia y Griego Dec., ¶ 4.

353.    The New Mexico Department of Cultural Affairs, via its state library division is a State library administrative agency. ECF 3-24 – Garcia y Griego Dec., ¶ 8..

354.    In 2024, New Mexico received $1,797,977 through the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66

percent. ECF 3-24 – Garcia y Griego Dec., ¶ 12.

355.    New Mexico uses these federal funds to support and improve library services statewide through programs and grants, including: bookmobiles serving over 5,000 rural New Mexicans, which hosting summer reading programs for kids and families in rural communities to improve literacy; books by mail for homebound New Mexicans, delivering library materials to mailboxes around the state; library for the blind and print disabled, which provides library materials to those who cannot read standard print, via direct digital download or through the mails, which provides access to hundreds of thousands of digital audio downloads and braille books, with over 150,000 books circulated in 2024; STEM kits and educational outreach that are circulated to communities throughout the state; the "El Portal" statewide database provide access to research databases, homework and career help, and historic newspapers, which were accessed over 4.6 million times last year; interlibrary loan services to 39 small or rural public libraries, eight prison libraries, five school and academic libraries, seven special libraries, and four tribal libraries throughout the state; and summer reading programs to over 107,000 youth. ECF 3-24 – Garcia y Griego Dec., ¶ 13.

356.    New Mexico also uses these federal funds to pay the salaries of fourteen full time employees. ECF 3-24 – Garcia y Griego Dec., ¶ 14.

357.    In addition to administering federal funding to States, IMLS also provides the following programs and services: collection, archiving, and dissemination of annual Public Libraries Survey data for all public libraries in the country; grants that maintain and enhance tribal libraries; competitive grants to libraries and museums of all types; supporting professional development; preservation of cultural materials; programming;

and literacy initiatives. ECF 3-24 – Garcia y Griego Dec., ¶ 15.

358.    The state library division's budget for this year has relied on receiving $1,797,977, with plans and allocated funding for staffing and the ongoing critical state services discussed above based on the anticipated receipt of federal funding per the funding contract. For example, if those funds are not received, students in K-12 schools will lose access to online databases and homework help, which was accessed 4.6 million times last year. New Mexico schools will not be able to afford to purchase databases and homework help on their own, causing detrimental harm to the education of students statewide. ECF 3-24 – Garcia y Griego Dec., ¶ 16.

359.    The New Mexico State Legislature passed the General Appropriation Act of 2025 on March 20, 2025. When signed by the Governor, this bill establishes the fiscal year 2026 operating budget for the department and the state library division. The state appropriation for the library division relies upon $1.8 million in federal Library Services and Technology Act funding to ensure the ongoing delivery of fundamental library services as well as support for fourteen staff positions. ECF 3-24 – Garcia y Griego Dec., ¶ 17.

360.    Debra Garcia y Griego, Secretary for the New Mexico Department of Cultural Affairs, testified that any pause in their federal funding would have an immediate adverse effect on the continuity of service, including delaying, suspending, or reducing rural bookmobile services, books by mail for homebound individuals, distribution of STEM kits and education outreach to communities statewide, processing of interlibrary loans, and summer reading programs. A protracted pause in federal funding would require the appropriation of other funds to ensure ongoing services and avoid having to

expire the term of employment for federally funded staff. ECF 3-24 – Garcia y Griego Dec., ¶ 18.

361.    The New Mexico Department of Cultural Affairs is preparing procurement on renewal of hundreds of thousands of dollars of online databases, summer reading software, and interlibrary loan software, as well as leases of rural bookmobile buildings. Uncertainty about receiving reimbursements makes it very difficult to renew contracts with vendors. Breaks in service due to an inability to commit to federally funded purchases will have immediate detrimental impacts on students of all ages, remote rural residents, and New Mexicans with blindness, low vision, and print disabilities. Uncertainty surrounding potential reimbursement of funds has a chilling effect on the staffing of the fourteen funded positions, impacting the department's ability to recruit staff that is essential to provide these services. This includes the redistribution of job duties rather than recruiting in the present state of unpredictability as well as morale issues that could ultimately result in the loss of staff that collectively represent decades of expertise in effectively serving unique needs of students of all ages, remote rural residents, and New Mexicans with blindness, low vision, and print disabilities. ECF 3-24 – Garcia y Griego Dec., ¶ 19.

362.    The New Mexico Department of Cultural Affairs and its state library division have a history of adequate performance relating to federal funding going back decades. This history includes timely submission of financial and compliance reports. Annually, the state library submits a "State Program Report" detailing progress towards five-year plan goals, including detailed financial information, narrative of successes and challenges, and supporting data. Every two years, it submits a "State Library

Administrative Agency Report" detailing all services of the state library, both state and federally funded. In addition to the five-year plan that is attached, the state library conducts a five-year evaluation of library services based on that plan. These reports and evaluations provide an opportunity via IMLS to learn and disseminate knowledge about effective library programs and services, and to ensure compliance with federal rules and regulations. ECF 3-24 – Garcia y Griego Dec., ¶ 20.

363.    In April 2025, New Mexico was scheduled to receive reimbursement of $585,29.16 under its current Federal award, representing two months of federally funded expenses the department has already incurred. As of March 27, 2205, the state library division had received $791,463.21 in disbursement for its current Federal award. An additional $138,941.71 was obligated and expended, but not drawn down, while $44,255.53 was encumbered but not expended. ECF 3-24 – Garcia y Griego Dec., ¶ 21.

364.    If New Mexico does not receive such reimbursements, Debra Garcia y Griego, Secretary for the New Mexico Department of Cultural Affairs, testified that it will cause immediate and irreparable disruption to state library programs. The disruption will have a critical impact on the citizens of New Mexico, particularly those living in small, rural, or tribal communities, with blindness, low vision, and print disabilities, individuals that cannot travel to libraries and rely upon digital and mail delivery of materials, and children developing reading and language skills and their caregivers. ECF 3-24 – Garcia y Griego Dec., ¶ 22.

365.    The annual "Public Libraries Survey" managed by the IMLS is critical to the operations of the state library and public libraries statewide. The state library relies upon the survey to establish eligibility guidelines for state grants in aid to public

libraries, rural library endowment grants, tribal library grants, and general obligation bond funding. ECF 3-24 – Garcia y Griego Dec., ¶ 23.

366.    Debra Garcia y Griego, Secretary for the New Mexico Department of Cultural Affairs, testified that termination or delay of funding and other services will have an immediate and significant negative impact on all New Mexico citizens, especially the most vulnerable. The most impacted will be rural and tribal residents, students of all ages, the homebound, and people with blindness, low vision, and print disabilities. ECF 3-24 – Garcia y Griego Dec., ¶ 24.

367.    On March 31, 2025, Debra Garcia y Griego received notice from MLA advising that all of its staff members were going to be placed on administrative leave effective immediately.

368.    On March 31, 2025, Debra Garcia y Griego also received notice from AFGE Local 3403 on the status of IMLS advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-25 – Garcia y Griego Dec., ¶ 3.

369.    On March 31, 2025, Debra Garcia y Griego was notified by Accounts Receivable/Federal Manager that the New Mexico State Library's reimbursement request, approved by IMLS on March 21, had still not been received. As of April 2, 2025, it was still not received. The eGMS Reach online system through which those reimbursements are processed displayed a notice that processing times may be impacted by the *Reduction* EO, however no IMLS staff were available to answer questions about the status and timeline of reimbursement requests already approved, and no alternate contact was provided to answer questions at that time. ECF 3-25 –

Garcia y Griego Dec., ¶ 5.

370.    As of April 11, 2025, the $585,219.16 payment approved in eGMS Reach system on March 21, 2025, still had not been received by the State of New Mexico. ECF 35-7 – Garcia y Griego Dec., ¶ 2.

371.    It had been twenty-one (21) since the reimbursement was approved, well past the ten (10) days for receipt of funds indicated by the federal government. New Mexico considered this payment delayed. ECF 35-7 – Garcia y Griego Dec., ¶ 2.

372.    For March 2025, New Mexico had at least a total of $189,787.80 in expenditures. Following a planned reimbursement request, the total amount due to the State of New Mexico by IMLS as of April 11, 2025, was $775,007.02. ECF 35-7 – Garcia y Griego Dec., ¶ 3.

373.    On April 10, 2025, notice was received of cancellation of additional IMLS funds appropriated to units of State of New Mexico that are divisions of the New Mexico Department of Cultural Affairs. ECF 35-7 – Garcia y Griego Dec., ¶ 4.

374.    The National Hispanic Cultural Center received notification canceling a $60,000 grant for which no funds had been requested as of April 11, 2025. ECF 35-7 – Garcia y Griego Dec., ¶ 4.

375.    The New Mexico Museum of Natural History and Science received notice via the New Mexico Museum of Natural History & Science Foundation that a $195,533.000 grant award made to the Foundation as the Museum's fiscal agent was canceled. ECF 35-7 – Garcia y Griego Dec., ¶ 4.

376.    As of April 10, 2025, $132,106.76 had been received by the Foundation. Two reimbursements requests totaling $5,751.01 were made on April 2, 2025, and April 4,

2025. ECF 35-7 – Garcia y Griego Dec., ¶ 4.

377.    They remained unpaid as of April 11, 2025. ECF 35-7 – Garcia y Griego Dec., ¶ 4.

378.    The Washington State Library has existed in some form since territorial times. The State Library's duties are set forth in statute. *See* RCW 27.04.045. Among other duties, the State Library is responsible for "exerting leadership in information access and the development of library services," maintaining a library at the state capitol grounds in Olympia, Washington, serving as a depository for state and federal government documents and newspapers, and promoting and facilitating electronic access to public information and services. In addition, the State Library provides services to the disabled and those held in Department of Corrections facilities and state hospitals. The Washington State Library is nationally recognized for its leadership in providing services to incarcerated and hospitalized communities. ECF 3-34 – Jones Dec., ¶ 3.

379.    In addition to these statutorily-mandated duties, the State Library supports libraries and librarians of all types in Washington State. For example, the State Library licenses research databases, ensuring affordable access to high-quality research tools. The State Library oversees the Washington Digital Library Consortium, which serves 40 library systems; the Consortium lends over one million eBooks and audiobooks annually. The State Library also hosts the Washington Digital Heritage program. Through this program, the State Library provides grants to local and tribal libraries, museums, and historical societies to digitize newspapers and local materials and host them online for access by all. The State Library also provides 24/7 reference help through its AskWA Chat service; the State Library covers 50% of the cost for this service, with participating libraries covering the rest. ECF 3-34 – Jones Dec., ¶ 4.

380.    The State Library also provides significant support for libraries in rural and underserved communities. The State Library purchases hardware and contracts for broadband internet for libraries through its LibTech program. The State Library also hosts, maintains, and provides technical support for websites for thirteen small rural libraries. Further, the State Library helps tribal libraries secure funding, update technology, and improve services. ECF 3-34 – Jones Dec., ¶ 5.

381.    The State Library also supports the librarian profession. The State Library provides continuing education and training opportunities; offers grant funding for professional development; develops best practices; and generally, provides support and advocacy on behalf of the profession. In addition, the State Library offers certified trainings for K-12 school librarians. ECF 3-34 – Jones Dec., ¶ 6.

382.    Sara Jones is employed by the Washington State Library as the State Librarian and is responsible for accepting and managing grants received by the State Library. The State Library receives significant funding from a small federal agency called the Institute of Museum and Library Services (IMLS). ECF 3-34 – Jones Dec., ¶ 7.

383.    On April 2, 2025, Sara Jones, State Librarian of Washington, was notified by IMLS Acting Director Keith Sonderling that the Washington State Library's Grants to States award (Grant Application No. ASST_NON_LS- 256847-OLS-24_5950) was terminated effective April 1. The notice stated that the grant was "inconsistent with IMLS' priorities," and that the President's Executive Order "mandates" that all of IMLS's "non-statutorily required activities and functions" be eliminated. ECF 3-34 – Jones Dec., ¶ 10. A copy of the notice is available at ECF 3-34.

384.    Sara Jones, State Librarian of Washington, testified that the Executive Order and

the minimalization of IMLS has and will cause significant harm to the existence and functions of not only the State Library, but also to libraries and librarians writ large. ECF 3-34 – Jones Dec., ¶ 11.

385.    The State Library of Washington received a block grant for $3,948,629 for FY 2023-2027 as part of the Grants to State Library Administrative Agencies Program. Sara Jones, State Librarian of Washington, testified that her understanding is that federal law requires IMLS to award each State grants pursuant to the Library Services and Technology Act. Any funding on top of the base grant is calculated by a formula that awards States additional funding based on population. ECF 3-34 – Jones Dec., ¶ 12.

386.    In order to receive funds under the Library Services and Technology Act, each State's library administrative agency must submit to IMLS a five-year state plan, which describes the State library administrative agency's needs and goals and the ways in which the State intends to use the federal funding to meet those needs. 20 U.S.C. § 9134. Five-year plans that satisfy the statutory criteria are approved by the Director of IMLS. *Id*. § 9134(e). After the plan has been approved, IMLS allocates funding through a population-based statutory formula, *Id*. § 9131(b), and pays to each State the federal share of the activities in the plan, which is 66 percent. ECF 3-34 – Jones Dec., ¶ 13.

387.    Washington's recently cancelled grant plan was approved in 2023 and was scheduled to run through 2027. Pursuant to the five-year plan submitted by the State Library, the State Library intended to use its Grants to States funding to provide access to high-quality education, literacy and reading, and lifelong learning programs to all Washingtonians; continue developing statewide digital initiative programs; expand the

reach of the Washington Talking Book and Braille Library and other accessible library and information resources; continue to support the incarcerated and hospitalized in their recovery, release, and re-entry by providing direct library and information services to these communities; and develop a library profession that reflects the statewide community and fosters the capacity of libraries to serve all constituents. ECF 3-34 – Jones Dec., ¶ 14.

388.    In addition to the Grants to States Program, the State Library is currently receiving funds from two grants awarded as part of IMLS's National Leadership Grant program. In cooperation with the Wisconsin State Library and the University of Wisconsin, the State Library received a $249,500 grant to develop and disseminate a report and digital toolkit to guide libraries in implementing games-based services, centered around tabletop games. Although not traditionally within the scope of what many believe to be a library's job, this project recognizes the larger role that libraries play in these communities and fosters connections between constituents and public services. This grant was awarded in Fiscal Year 2024, and work on this project has only just begun. ECF 3-34 – Jones Dec., ¶ 15.

389.    The State Library also received a National Leadership Grant for $149,668 for a multi-year project in collaboration with the Washington State Department of Corrections. The State Library is in the final year of a project piloting a national effort to develop strategies and tools to address disparities in library services for the incarcerated. As part of this project, the State Library and the Department of Corrections worked together to develop best practices, performance standards, and adaptable models for other States to use as they develop their own programs for

offering library services to the incarcerated. Around $60,000 of this grant award remains to be disbursed to Washington. ECF 3-34 – Jones Dec., ¶ 16.

390.    In addition to awarding grants, IMLS serves as a repository for information about libraries across the nation. As the State Librarian, one of Ms. Jones' duties is to collect data from local libraries about attendance, book check-out rates, and other information about how their constituents use their libraries. That information is then shared with IMLS, along with information from libraries from all 50 states. This information is important for several reasons. For example, if a community wants to build a library for the first time, the IMLS data contains information the community can review to determine what resources and facilities might be appropriate, given what worked for libraries in similar communities. ECF 3-34 – Jones Dec., ¶ 17.

391.    The State Library of Washington also awards grants to public, tribal, K-12, and community college libraries. As discussed above, the State Library is involved in preserving Washington State's heritage and provides funding and technological assistance to local and tribal libraries and historical societies to digitize important pieces of Washington history. ECF 3-34 – Jones Dec., ¶ 18.

392.    The State Library of Washington offers a number of other funding sources for local, tribal, and school and college libraries. For instance, the State Library recently offered grants to local libraries to fund summer jobs for teens interested in a career in libraries. The State Library also provides funding for hardware and technology contracts for local libraries through the LibTech program. The State Library truly exerts statewide influence; it has ensured broadband internet access for libraries from Island and Skagit Counties in the far northwest, to rural Asotin and Benton Counties in the southeast, to

central Kittitas and Adams Counties. Without the support of the State Library, the libraries serving these areas would likely have no reliable access to broadband internet. In addition, the State Library provides funding and support to local libraries that host summer reading programs. Studies show that youth who participate in summer reading programs do not experience a "summer slide" and do not require remedial education when they return to school in the fall. ECF 3-34 – Jones Dec., ¶ 19.

393.    Sara Jones, State Librarian of Washington, testified that the minimalization of IMLS is already harming Washington and the State Library. Sara Jones, State Librarian of Washington, testified that she learned in April 2025 that IMLS placed all staff on administrative leave, and its Associate Deputy Director has indicated that no work will be done for the foreseeable future. Moreover, Washington has received notice that its statutorily-mandated Grants to States award has been terminated. Indeed, the State Library submitted a drawdown request on April 1, seeking reimbursement for around $1 million under its federal awards. Rather than receiving reimbursement, however, Jones received the Notice terminating Washington's award. Sara Jones, State Librarian of Washington, testified that she had not received notice as of April 2025 as to whether the State Library's National Leadership Grants will be terminated, though given the action taken on their Grants to States award, Jones testified that she suspected that those grants will be terminated, too. Jones further testified that she had significant concerns about the State Library's ability to meet its financial obligations. ECF 3-34 – Jones Dec., ¶ 20.

394.    This threat to Washington State Library's funding comes at a precarious time for Washington. It is one of several states facing a budget shortfall. Washington is facing

a forecasted budget deficit of more than $12 billion over the next four years. Moreover, the State Library was already underfunded. The State Library is funded in part by a $3 surcharge on the filing of recording instruments. In recent years, however, due to the economic climate, fewer people have been buying or refinancing homes, which has translated into the filing of fewer and fewer recording instruments and the subsequent transfer of fewer and fewer dollars to the State Library. In the current fiscal year, the State Library has already been receiving stabilizing funds from the State general fund. For the upcoming fiscal biennium, the State Library is requesting an additional $6.7 million from the Legislature to help close the gap, but, given the statewide budget shortfall, it is unlikely that the State Library will receive even a fraction of this request. That request assumed that the State Library would continue to receive its statutorily-required Grants to States award; with the loss of this federal funding, the State Library is likely to be significantly underfunded. ECF 3-34 – Jones Dec., ¶ 21.

395.    Sara Jones, State Librarian of Washington, testified that loss of federal funding from IMLS will cause significant harm to the Washington State Library. The State Library's Grants to States federal funding supported thirty-two partially or fully funded Library Development Staff, staff at the Washington Talking Book and Braille Library, and prison and hospital library staff. Jobs supported by federal funding will have to be eliminated if that funding is not restored. Moreover, the State Library will have to significantly cut back—if not entirely eliminate—its eBook, audiobook, research database, and reference offerings. Washington's nationally recognized institutional library programs for the hospitalized and incarcerated will be endangered, as will programming at the Talking Book and Braille Library. Innovative community projects

like the tabletop gaming grant and digital newspaper pilots will cease if those grants are terminated too. Local, tribal, K-12, or community college libraries will not be able to fill this tremendous gap in services. ECF 3-34 – Jones Dec., ¶ 22.

396.    Sara Jones, State Librarian of Washington, testified that in addition to the financial losses that will be caused by the Executive Order, the lack of funding from IMLS and the lack of support for libraries will cause significant harm to Washington. Local and tribal libraries trusted that the State Library would be able to host their communities' histories through the Digital Heritages program. Over one million pages from more than one hundred historical Washington newspapers, and over one million other local historical records from more than 300 contributors across Washington have been digitized as part of this program. ECF 3-34 – Jones Dec., ¶ 23.

397.    Jones further testified that if the State Library is no longer able to support the program, entire communities could lose access to their history. Moreover, the State Library's important work for literacy and access to materials for those who cannot read print books will be significantly hampered. ECF 3-34 – Jones Dec., ¶ 23.

398.    Sara Jones, State Librarian of Washington, testified that she heard from a talented library professional on her staff that she is going to have to start looking for another, more stable position that is not subject to the whims of federal funding. Beyond seeing many librarians leave the profession if funding cannot support their positions, a lack of funding for those pursuing careers in library services may result in the loss of an entire generation of librarians. ECF 3-34 – Jones Dec., ¶ 24.

399.    Sara Jones, State Librarian of Washington, testified that libraries are essential to Washington communities. They provide free internet, job training, and access to books

and resources for people of all backgrounds. Federal funds make this possible. Without them, countless programs and services would disappear, leaving many communities without access to the resources upon which they rely. Fewer librarians means fewer individuals dedicated to fostering literacy, community, and access to information, and their society cannot afford to leave anyone behind. ECF 3-34 – Jones Dec., ¶ 25.

400.    The New York State Library is part of the Office of Cultural Education within the New York State Education Department. ECF 3-27 – Moore Dec., ¶ 2.

401.    The New York State Library serves three constituencies in New York State: (1) the Research Library; (2) the Talking Book and Braille Library; and (3) the Division of Library Development. ECF 3-27 – Moore Dec., ¶ 3.

402.    The Research Library, which is the principal library for New York State government, is over 200 years old and is one of the largest research libraries in North America. The Research Library collects, preserves, and makes available materials that support State government work. Its collection, which exceeds 20 million items, is available to researchers via interlibrary loan, online, and on-site in Albany, New York. ECF 3-27 – Moore Dec., ¶ 4.

403.    The Talking Book and Braille Library lends braille and audio magazines and books, in addition to digital talking books and talking book players, to all New Yorkers outside of New York City and Long Island who are unable to utilize printed materials.  ECF 3-27 – Moore Dec., ¶ 5.

404.    The Division of Library Development works in partnership with 72 library systems across New York State to bring services to the people who use nearly 7,000 public, school, and reference libraries. Staff experts work with librarians, school

administrators, public officials, and others to make library services available in New York communities. Division staff also administer more than $150 million annually in State aid to New York's libraries through a local assistance formula aid program of $104.6 million, the State Aid for Library Construction program, and discretionary grant programs established by the New York State Legislature. Division staff also facilitate participation in federal, state, and private funding programs. ECF 3-27 – Moore Dec., ¶ 6.

405.    As the Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore leads the operations of the New York State Library and its statewide services. She manages approximately 100 employees, interns and volunteers, a $12 million operating budget, over 20 million collection items, and oversight of approximately $158 million in State and Federal aid to libraries. ECF 3-27 – Moore Dec., ¶ 7.

406.    The New York State Library is a State library administrative agency. ECF 3-27 – Moore Dec., ¶ 11.

407.    A copy of the New York State Library's five-year plan for period October 1, 2022, through September 30, 2027 is available here: https://www.nysl.nysed.gov/libdev/lsta/LSTA227Final.pdf. ECF 3-27 – Moore Dec., ¶ 12.

408.    In 2024, New York received $8,125,215.00 from the Grants to States Program (the "2024 Grants to States Award"), which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-27 – Moore Dec., ¶ 15.

409.    The New York State Library also uses these federal funds to pay the salaries of 55 of its 84 employees who work to carry out the New York State Library's five-year plan

Case 1:25-cv-00128-JJM-AEM    Document 76    Filed 08/22/25    Page 99 of 301 PageID #: 4645


as approved by the Institute. These staff administer aid programs, provide technical assistance to the state's seventy-two regional library systems and 762 public libraries, oversee statewide coordinated outreach services, develop training for library staff and trustees, preserve the New York State Library's historic collections, provide expert research assistance, digitize collections, and develop statewide library services that benefit New York's 7,000 libraries of all types and the communities who use these libraries. ECF 3-27 – Moore Dec., ¶ 17.

410.    In addition to administering federal funding to the State Library through its Grants to States program, the Institute also provides the following grant programs and services, the loss of which would be devastating to New York's cultural institutions:

a.    Peer to peer information sharing facilitated through the Institute's Office of Library Services, under the direction of the Director and Deputy Director of the Office of Library Services.

b.    Collection and analysis of national library data, necessary to inform the improvement of library services across the state and the country.

c.    Dissemination of library data, reports, findings, studies, surveys, and other information obtained through its library data collection program.

d.    Inspire! Grants for Small Museums, which provided $498,809 to small museums in New York in 2024.

e.    Native American Library Services and Museum Services Grants, which provided a total of $304,897 in 2024 to the Seneca Nation of Indians and the Oneida Indian Nation to support library and museum services.

f.    Laura Bush 21st Century Librarian Program, which provided $629,844 to two

99

libraries in New York in 2024.

g.  Museum Grants for African American History and Culture, which provided $846,372 to museums in New York in 2024.

h.  Museums Empowered: Professional Development Opportunities for Museum Staff program, which provided $189,956 to the New-York Historical Society in 2024 to improve K-12 museum programming for students with disabilities.

i.  Save America's Treasures, which provided $1,740,051 to six cultural institutions in New York in 2024, including $165,000 to the American Jewish Historical Society to preserve records of the Anti-Defamation League's Civil Rights Information Center and its Center on Extremism.

j.  Museums for America program which provided $3,194,338 to 16 museums in New York in 2024, including $160,000 to the National September 11 Memorial and Museum to create an exhibition of children's artwork of 9/11, highlighting the experience of children as witness to the events of 9/11.

k.  Library National Leadership Grants, which provided $1,610,762 to six organizations in New York in 2024, including $249,996 to the University at Albany, SUNY to improve access to digital collections.

l.  Museum National Leadership Grants, which provided $1,393,485 to three organizations in New York in 2024, including $552,679 to the Rochester Institute of Technology to develop strategies to improve the preservation of organic objects in the face of collection emergencies. ECF 3-27 – Moore Dec., ¶ 18.

411.  Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore testified that it is her understanding that the Grants to States Program is

administered by four program officers and one supervisor. Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore testified that the loss of even one of those staff members could significantly disrupt the administration of the grant program. ECF 3-27 – Moore Dec., ¶ 19.

412.    The New York State Library's budget for this year relied on receiving $8.1 million in federal funding and it made plans and allocated funding for staffing, subgrants, and contracted services based on the anticipated receipt of Federal funding promised. ECF 3-27 – Moore Dec., ¶ 20.

413.    Over the next eighteen months, New York is scheduled to receive additional disbursements/reimbursements of $6.8 million under its two current Federal awards— the $8.1 million awarded under the 2024 Grants to States Award and the $8.1 million awarded under the Grants to States Program for Fiscal Year 2025 (the "2025 Grants to States Award"). As of April 2025, $7.2 million of the $8.1 million 2024 Grants to States Awards had been expended, with roughly $735,000 obligated but not yet expended. As of April 2025, 25% of the $8.1 million 2025 Grants to States Award had been apportioned to the States. Additional expenditures against the 2025 award will not be reimbursed until the remaining 75% of the award is obligated to the state. ECF 3-27 – Moore Dec., ¶ 21.

414.    The New York State Library has fully spent its 25% advance on the 2025 Grants to States Award. As of now, the only funding that it has available to draw down is the remaining balance of the 2024 Grants to States Award, which will lapse on September 30, 2025. This balance that is not already encumbered can support staff payroll until June 4, 2025. New York is expecting the remainder of the 2025 Grants to States Award

to be issued by April 22, 2025. ECF 3-27 – Moore Dec., ¶ 22.

415.    The New York State Library's core services rely on continued and reliable funding.  Currently, 55 of the New York State Library's 84 staff members are federally funded. These staff operate the technical and research services of the Research Library and administer a variety of statewide services through the Division of Library Development, including technical assistance to regional library systems, who in turn support their public, school, academic, and special libraries. Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore testified that if New York does not receive the expected remainder of the 2025 Grants to States award by June 4, 2025, it may need to terminate staff. ECF 3-27 – Moore Dec., ¶ 23.

416.    The fifty-five staff members affected are essential to the critical operations of the New York State Library's Research Library and its Division of Library Development. ECF 3-27 – Moore Dec., ¶ 24.

417.    Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore testified that the loss of these 55 staff members would be so severe that New York would have to close the Research Library to the public, hindering its ability to fulfill its responsibilities as a Federal Depository and Preservation Steward. Additionally, it would lose all but two staff members in the Division of Library Development, which would obstruct its capacity to process state aid, oversee library governance and chartering, and provide technical assistance to regional library systems and public libraries. Aid payments would be significantly delayed, and the Library would lose the capacity to provide the necessary review to ensure that aid is spent according to law and regulation. ECF 3-27 – Moore Dec., ¶ 25.

418.    Assistant Commissioner for Libraries and New York State Librarian, Lauren Moore testified that any pause in New York State Library's federal funding would cause delays in service and harm to its patrons, which include libraries and other entities, state government employees, attorneys, and individuals. ECF 3-27 – Moore Dec., ¶ 26.

419.    Without certainty of reimbursement, New York would have to initiate the termination of all discretionary services and ultimately the termination of staff. ECF 3-27 – Moore Dec., ¶ 27.

420.    This situation would cause immediate and irreparable harm to regional public library systems that rely on the timely processing of aid to support their critical services. Library systems do not maintain excessive fund balances, so delays in aid would force them to halt essential services. The State Library would also be unable to charter and register new libraries, process new Public Librarian Certifications, or provide technical assistance to library systems, local governments, public libraries, state agencies, or legislators on pressing library legal issues. ECF 3-27 – Moore Dec., ¶ 28.

421.    Additionally, Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that if New York does not receive the necessary disbursements or reimbursements, it would also immediately need to halt services and implement a hiring freeze. New York's Office of Cultural Education lacks the resources to compensate for this loss of federal funding. Until funding is disbursed, the State Library will be unable to enter into new contracts, such as those supporting initiatives like the America 250th Celebrations, or to renew or continue existing contracts for essential tools, including the software that operates the State Library's online catalog and

supports access to its digital collections, as well as the online tools that facilitate participation in the Summer Reading program and their DayByDayNY Early Literacy platform. ECF 3-27 – Moore Dec., ¶ 29.

422.    The loss or delay of federal funding would also impact state-funded services, as they would need to redirect funds set aside for discretionary purchases to cover staff salaries. This would result in a suspension of book and database purchases that support researchers and document New York's history, as well as ongoing conservation, preservation, and digitization efforts. ECF 3-27 – Moore Dec., ¶ 30.

423.    Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that the loss or delay of federal funding is also impacting several new initiatives that the New York State Library had planned to take in 2025 but uncertainty around federal funding has forced us to pause these initiatives. If funding is delayed past its expected distribution date, the projects will be eliminated, as we will lack the time necessary to complete the projects within federal and state timelines. ECF 3-27 – Moore Dec., ¶ 31.

424.    For example, New York had planned to announce a program to subgrant $500,000 of federal funding to the state's public libraries to support innovative practices in libraries across the state on March 24, 2025. However, Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that it cannot launch a competitive grant program without certainty about the remainder of the 2025 Grant to States Award. ECF 3-27 – Moore Dec., ¶ 32.

425.    New York had also planned to develop an activity guide to help libraries and cultural institutions participate in America's 250th Celebrations and were preparing to

launch a statewide platform for community service in commemoration of America's 250th. Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that it planned to conserve and digitize 17th and 18th century Dutch documents relating to the early settlements in New York, and mass scan New York State Legislative Documents. The State Library planned to work with the New York State ConnectAll Office to develop a statewide digital inclusion program through the State's network of public libraries. ECF 3-27 – Moore Dec., ¶ 33.

426.    The New York State Library has a history of timely submissions of quarterly, interim and final financial reports and state program reports for the Grants to States program.  Most projects reported on in the state program reports are continued from year to year and have been in place for many years. The Institute provides feedback each year after the annual financial and program reports are completed and the New York State Library always receives positive feedback and compliments on New York State Library projects and what has been accomplished. In addition, the Institute has cited components of the New York State Library's annual report as exemplary, using them as a model for other states to consider. ECF 3-27 – Moore Dec., ¶ 34.

427.    In addition to funding, the New York State Library relies on the Institute for its leadership, programs, data collection, and role as a convener of State library administration agencies. For example, the Institute's Public Library Survey is a critical collection of library data that is not available elsewhere.  This data set, and its careful coordination, is essential to researchers seeking to understand national trends in library services and practitioners who are planning the future of libraires. It is extremely helpful for states to compare themselves with other states and for libraries to compare

themselves to similar libraries in other states to ensure that best practices are being implemented. Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that loss of this data set and data collection tool would represent the loss of decades of information that is critical for community development and planning. ECF 3-27 – Moore Dec., ¶ 35.

428.     New York State relies on the Grants to States program through the Institute to support its technical assistance and grant funding for local libraries across New York. The libraries in every local community in New York need the State Library, its staff, and its services.  Every action of the State Library is driven by its mission to empower New York State libraries. As local libraries face numerous and varied challenges, the State Library is committed to designing policies that strengthen their resilience, expand access, and support their long-term success which cannot be achieved unless the State Library has the adequate staff to provide critical support and services. Without the State Library, there is no organization to establish the policies and priorities that guide its libraries, leaving them exposed to threats that could undermine their very existence. ECF 3-27 – Moore Dec., ¶ 36.

429.     Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that libraries are not merely symbols of access and opportunity; they are the driving force behind those values in every community across the state. The State Library is unwavering in its commitment to this mission, diligently supporting libraries through every facet of its work—whether through essential administrative functions or ambitious statewide initiatives. ECF 3-27 – Moore Dec., ¶ 36.

430.     Assistant Commissioner for Libraries and New York State Librarian Lauren Moore

testified that threats to the State Library will undermine library services in local communities, including services that New Yorkers rely on.     ECF  3-27 – Moore Dec., ¶ 36.

431.    The uninterrupted continuation of the following services depends on a stable State Library:

    a.  Serving vulnerable New Yorkers. New York's public libraries provide a wide range of materials and services to their communities, providing computer access, job training, literacy education, and more. In 2020 at the height of the COVID-19 epidemic, over 90% of their libraries extended their public services to include telephone or online reference assistance and curbside delivery, virtual programs and homebound delivery, and 85% provided Wi-Fi to those outside the building.

    b.  Providing lifelong learning opportunities for all New Yorkers. In 2023, 62 million New Yorkers visited their libraries (a 10 million increase from 2022), and checked out 54 million physical books and 27 million e-books. Librarians helped nearly 13 million people with research questions and offered library programs to 2.7 million adults and 4.5 million children and teens. Libraries are a central provider of literacy programs, offering early literacy programs for 2.3 million families, adult literacy programs for 150,000 adults, digital literacy programs for 250,000 community members, and English classes for nearly 400,000 speakers of other languages.

    c.  Providing internet access. Many New Yorkers rely on libraries for internet access. 8% of households in New York State have no online connectivity, and an additional 8% only access the internet via a mobile device. Thirteen percent of households have no broadband connection, and 29% of households with income under $35,000

do not have any internet access. Libraries across the state have over 18,000 internet connected computers, offering 6.4 million wired and 19.3 million Wi-Fi sessions in 2023. More than half of their public libraries rely on the New York State Library's administration of the Institute's e-rate funds to support this level of connectivity.

d.  Providing accessible spaces and resources. Libraries are committed to serving all New Yorkers. Eighty-one percent of libraries are fully wheelchair-accessible, and nearly every public library in New York State has an accessible entrance. Eighty-two percent of libraries provide services to those who are not able to visit the library, 62% offer virtual reference, and all offer online access to their catalog from outside the library.

e.  Providing meeting spaces. In many communities, the library provides the only free public meeting space. Ninety percent of New York's libraries provide this, with nearly one-third making these spaces available beyond their open hours. ECF 3-27 – Moore Dec., ¶ 36.

432.    On March 26, 2025, Lauren Moore accessed the Institute's eGMS portal, which is used by awardees to manage their grants. The portal had the following message: "Recent executive orders may impact IMLS response and processing times. At this time, you may continue to submit payment requests and required reports for your open awards." ECF 3-27 – Moore Dec., ¶ 38. A copy of the message is available at ECF 3-27.

433.    As of March 31, 2025, the message in the eGMS portal had been removed. ECF 3-27 – Moore Dec., ¶ 39.

434.  On March 31, 2025, Moore also received a statement from AFGE Local 3403 on the status of Museum and Library Services advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-27 – Moore Dec., ¶ 41. A copy of the message is available at ECF 3-27.

435.  Without staff to administer the Grants to States program, Assistant Commissioner for Libraries and New York State Librarian Lauren Moore testified that it is unlikely that New York will receive the remainder of its 2025 Grants to States Award by April 22, 2025, as expected, which will cause immediate and irreparable harm to New York for the reasons identified above. ECF 3-27 – Moore Dec., ¶ 42.

436.  In 2014, Greg Lucas was appointed as the California State Librarian. ECF 3-3 – Lucas Dec., ¶ 2.

437.  Established in 1850, the California State Library is the central reference and research library for California State government and the Legislature.  The library collection includes more than 4 million titles, 6,000 maps, and 250,000 photographs.  It has an extensive collection of documents from and about the state's rich history and is one of the major genealogical reference libraries on the West Coast.  It also holds significant collections from Mexico, the United Kingdom and Europe, with manuscripts dating back to the 13th and 14th centuries.  The State Library is both a State and Federal Depository Library, providing free and open access to government information, and is a U.S. Patent and Trademark Resource Center.  It is home to the Bernard E. Witkin State Law Library and the Braille and Talking Book Library. It also directs state and federal funds to support local public libraries and statewide library

programs and services. ECF 3-3 – Lucas Dec., ¶ 3.

438.    As California State Librarian, Lucas oversees the acquisition, cataloging, maintenance, and preservation of the State Library's collections.  Lucas further oversees the Library Development Services Bureau, which administers state and federal grant programs for California's libraries, works to enhance library collaboration and resource-sharing, and provides consulting services to public libraries and associated groups and organizations.      ECF 3-3 – Lucas Dec., ¶ 4.

439.    The California State Library is a state library administrative agency. ECF 3-3 – Lucas Dec., ¶ 8.

440.    Pursuant to California State's Library plan, the California State Library received approximately $15.7 million in 2024 from the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-3 – Lucas Dec., ¶ 12.

441.    The California State Library uses these federal funds to support many of its programs. It also uses these federal funds to pay the salaries of its employees. ECF 3-3 – Lucas Dec., ¶ 13.

442.    In addition to administering federal funding to States, IMLS also provides the following programs and services: the Public Library Survey and the five-year plan California creates to draw down federal money. Both provide data to guide the State Library in deploying scarce federal and state money by prioritizing areas where the greatest needs exist and measuring whether it is addressing those needs as well as it could or should. ECF 3-3 – Lucas Dec., ¶ 14.

443.    The California State Library budget for this year has relied on receiving $15.7

million and the State Library made plans and allocated funding for staffing and continued operations based on the anticipated receipt of federal funding promised. IMLS funds pay for multiple statewide programs — just as they have for more than 40 years. The funds support a foundation of statewide services upon which local libraries can add services specific to their communities. Among the statewide programs supported by IMLS are support for tutors helping adults and children read, write, and learn English and efforts to ensure that summer reading and activity programs, including feeding hungry poor kids, are available to members of California communities less aware of the services libraries offer them and their families. ECF 3-3 – Lucas Dec., ¶ 15.

444.    IMLS funds also pay for continuing education for librarians and library workers, a 300,000-title eBook library accessible to all Californians and digital efforts to protect California's cultural heritage and local history. ECF 3-3 – Lucas Dec., ¶ 15.

445.    Additionally, IMLS offers several grant programs for tribal nations, of which California has the most in the nation. No California state money has ever been specifically earmarked for support of tribal libraries or cultural centers. If IMLS funds end, so do these grant opportunities. ECF 3-3 – Lucas Dec., ¶ 15.

446.    IMLS funds also pay for the salaries of thirty-four State Library employees of whom twenty provide services to 800,000 blind, visually impaired, or dyslexic Californians. ECF 3-3 – Lucas Dec., ¶ 15.

447.    On March 31, 2025, the California State Library received notice via email from the IMLS that its staff is to be placed on administrative leave effective immediately. ECF 3-3 – Lucas Dec., ¶ 16.

448.    On April 2, 2025, the California State Library received a termination notice for the federal grant from the Institute of Museum and Library Services, immediately terminating the grant in its entirety. The termination notice refers to the $15.7 million award referred to as "Grants to States." ECF 3-3 – Lucas Dec., ¶ 17.

449.    In April 2025, there remained $3,392,933.27 promised to the California State Library from the award that it has not received. ECF 3-3 – Lucas Dec., ¶ 18.

450.    In the termination notice, IMLS's acting director claims that the grant is "inconsistent with IMLS's priorities" and refers to the federal executive order that "mandates that the IMLS eliminate all non-statutorily required activities and functions." He also refers to the termination clause found in Section 29 of the approved grant's General Terms and Conditions. Until April 2, 2025, the grant has been completely consistent with IMLS priorities, and the Grants to States Program is specifically mandated by federal statute. ECF 3-3 – Lucas Dec., ¶ 19.

451.    Greg Lucas, California State Librarian, testified that because there is no staff to administer the Grants to States program, it is unlikely that California will receive the first half of the remaining 2025 Grants to States Award by April 15, 2025, and the final portion of that funding due by June 15, 2025. Lucas testified that the loss of this funding will cause immediate and irreparable harm to California. ECF 3-3 – Lucas Dec., ¶ 20.

452.    The California State Library has sought out state funding to replace IMLS funds, but no state funding has been available to replace potentially lost IMLS funds. The portion of the California State Library's budget derived from state funding cannot absorb the current functions or programs currently paid for with federal funds. This means all functions paid for with IMLS funding will cease if funding ceases. ECF 3-3

– Lucas Dec., ¶ 21.

453.    Greg Lucas, California State Librarian, testified that any pause in California's
federal funding of IMLS funds effectively ends programs that local libraries and the 23
million Californians with library cards rely on. Without federal funding, no coordinated
upskilling or continuing education exists for the approximately 17,000 employees of
California who staff the State's 1,127 libraries. In the rapidly changing world of
information sharing and delivery, a loss of those training opportunities puts California
at a competitive disadvantage and harms lower income families, seniors and veterans
who rely on libraries to help them navigate an increasingly digital world. ECF 3-3 –
Lucas Dec., ¶ 22.

454.    Lucas further testified that a loss of IMLS funds disadvantages lower income
communities who rely on the statewide eBook library program to offer better access to
opportunity for their residents, to say nothing of other communities, who use the eBook
library to not only augment their collections but provide more materials in languages
other than English — part of the eBook library's mission.  A loss of IMLS funds
eliminates salaries for the State Library team that provides Braille and other free
services to the 800,000 Californians who are blind, visually impaired or dyslexic. An
additional fourteen (14) State Library employees have their salaries paid with federal
funding.  Federal funds have also been helpful in forcing California to spend state
money to support local libraries — without doing so, support ends. ECF 3-3 – Lucas
Dec., ¶ 22.

455.    Greg Lucas, California State Librarian, testified that uncertainty over the
continuation of IMLS funding is already creating retrenchment among local libraries

— their budgets for the fiscal year starting July 1, 2025, are usually set before the end of April — and prudent budget-making does not rely on funding that might not materialize. In April 2025, the State Library notified local libraries and partners who administer programs paid for with federal funds that services may not continue next year. Similarly, at that time it prepared to warn the blind and visually impaired it serves that their services may end on July 1, 2025, with the new state fiscal year approaching. ECF 3-3 – Lucas Dec., ¶ 23.

456.    Greg Lucas, California State Librarian, testified that during the nearly eleven years he has been State Librarian, the IMLS has been a valued partner to California and its tribal nations.  Lucas testified that as administer of these federal funds, the State Library has done its best to comply with federal funding requirements—in part to ensure these needed resources keep flowing to California. In turn, it has been praised by the IMLS both for its diligence and for creating spending plans that leverage federal dollars to more effectively impact a state with a population larger than 160 of the 195 nations in the world. ECF 3-3 – Lucas Dec., ¶ 24.

457.    The California State Library's performance has been lauded by IMLS on multiple occasions. After the 2021 site visit performed by IMLS staff, feedback included the following about California's work with federal funds: "Overall, the LSTA [Library Services and Technology Act] program is exceptionally well-organized and well-run. The administrative and financial processes are in order, and certain elements, like engagement with your stakeholders and outcomes evaluation practices, could serve as a model for other states. I commend you and your staff for the attention to federal funding requirements and best practices." In addition, the IMLS feedback on their State

Program Reports has been highly complimentary. The most recently approved State Program Report (SPR) received the following praise: "In short: wow, thank you! You have managed so many wonderful projects with very clear high impacts in the SPR, and I great appreciate your thoroughness and clarity. Overall, including the Activity Outcome Surveys and Project Outcomes is so helpful and it makes your projects shine. You also utilize the additional materials which is not always the case with other reports, and it helps us so much. And it is also clear you are communicating that required IMLS acknowledgement to your sub-awardees, which is important." The California State Library has a long history of submitting reports on time and has continued to meet a high standard of Maintenance of Effort. ECF 3-3 – Lucas Dec., ¶ 25.

458.    In 2025, California was scheduled to receive disbursements/reimbursements of $3,392,933.27 under its current federal awards. The funds have been appropriated under the current state fiscal year ending June 30, 2025, and have been obligated for local assistance grant funds to libraries as well as for California State Library staff salaries and programming.        ECF 3-3 – Lucas Dec., ¶ 26.

459.    The next expected disbursement will be in April 2025.  Greg Lucas, California State Librarian, testified that if California did not receive such disbursements/reimbursements, it will stop statewide and local public library programs immediately and before they can be completed, contracted services will be denied payment.  Much-needed library services to Californians will cease. Money for the salary and benefits for a significant portion of the California State Library's staff (34 positions) would be unavailable, and layoffs would ensue. ECF 3-3 – Lucas Dec., ¶ 27.

460.    A variety of potential federal budget delays have occurred recently. Prior to the

March 2025 continuing resolution, California was instructed by IMLS that "[i]f an appropriations bill or a continuing resolution is not passed by midnight March 14, 2025, the Institute of Museum and Library Services (IMLS) will be prohibited, by law, from incurring further financial obligations and will begin the necessary activities to prepare for a shutdown." If federal funds stop flowing due to the Executive Order, Lucas testified that a similar scenario would play out and the California State Library would cease to receive the remaining federal funds which would lead to immediate program and activity shutdown at libraries throughout California. ECF 3-3 – Lucas Dec., ¶ 28.

461.    Although funding has continued to be available for drawdown at this time, Lucas testified that he anticipates that, due to the Executive Order, funding could cease to be available for the California State Library and California statewide library programs. ECF 3-3 – Lucas Dec., ¶ 29.

462.    The California State Library relies heavily on both the funding and the certifications provided by the IMLS. The five-year plan approved by IMLS guides all federal and state spending for libraries throughout California. The IMLS certifications are critical. ECF 3-3 – Lucas Dec., ¶ 30.

463.    Greg Lucas, California State Librarian, testified that an abrupt end to federal funding creates both immediate and ongoing harm. Loss of funds, at this proximity to the beginning of the new State fiscal year leaves both the State Library, local libraries and tribal nations in the lurch. More importantly, that means millions of Californians will not receive many of the services they rely on for their children and themselves. Programs targeted to seniors, veterans and English learners will be diminished or halted. Digital access to eBooks in English and other languages will end and, absent

some alternative solution that has not been presented, services to the blind and visually impaired will halt. ECF 3-3 – Lucas Dec., ¶ 31.

464.    Greg Lucas, California State Librarian, testified that if California does not receive such disbursements/reimbursements, it will stop statewide and local public library programs immediately and before they can be completed, contracted services will be denied payment. Much-needed services to Californians will cease. Money for the salary and benefits for a significant portion of the California State Library's staff (thirty-four positions) would be unavailable, and layoffs will ensue. The millions of library card holders throughout California will suddenly lose access to a host of programs. The most vulnerable 800,000 California citizens who are blind or otherwise print disabled will lose critical services and information. ECF 3-3 – Lucas Dec., ¶ 32.

465.    Laura Lyons is the Interim Vice Provost for Academic Excellence at the University of Hawaiʻi at Manoa (the "University"). She testified that she is responsible for overseeing the development and review of all academic programs offered at the University, which includes the Library and Information Science ("LIS") degrees in the School of Communication and Information Sciences in the College of Social Sciences. As such, she is familiar with the programs and the externally funded research undertaken by the LIS ("Program"). ECF 3-9 – Lyons Dec., ¶ 3.

466.    The University of Hawaiʻi at Manoa hosts the Program, the only professionally-accredited library science graduate program in the state. Through the Program, the University is responsible for the education of leaders in diverse information environments, with an emphasis on Hawaiʻi and the Asia-Pacific region. The Program's graduates constitute roughly two thirds of the library, museum and archive

professionals in Hawaiʻi. ECF 3-9 – Lyons Dec., ¶ 4.

467.    In 2024, IMLS invested $15.287 million in libraries across the United States under its National Leadership Grants – Libraries program. The University is set to receive $147,420, which represents the Federal share of the activities in the approved proposal, totaling 100 percent. ECF 3-9 – Lyons Dec., ¶ 11.

468.    The University uses these federal funds to support many of its programs, including: research about libraries, archives, and museums; education of graduate university students; collection management and development of its library materials; outreach and engagement with University stakeholders and community members. ECF 3-9 – Lyons Dec., ¶ 12.

469.    The University will also use these federal funds to pay a portion of the salaries for one full time employee and one graduate student research assistant. ECF 3-9 – Lyons Dec., ¶ 13.

470.    In addition to administering federal funding to institutions of higher education, IMLS also facilitates national and international communities of practice—such as those supporting indigenous librarianship and cultural stewardship— that have directly enhanced the University's ability to implement community-led, place-based information practices. The IMLS also provides essential publications and guidance on topics like digital preservation, inclusive metadata, and knowledge organization systems, which faculty and students use to develop globally-informed approaches to cataloging, archiving, and access for Hawaiʻian and Pacific collections. ECF 3-9 – Lyons Dec., ¶ 14.

471.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University

of Hawaiʻi at Manoa, testified that the University's budget for this year has relied on receiving $147,420 and they made plans and allocated funding for research and student support based on the anticipated receipt of Federal funding promised. For example, the University's IMLS-funded, 1-year planning grant (Application No. LG-256733-OLS-24) includes budget allocations for compensating 16 community consultants, convening a national advisory board of four cultural heritage collections experts, and supporting one graduate student's tuition, research training, and travel. These components are essential to the University's ability to fulfill its mission of serving the people of Hawaiʻi and the Pacific region through high-impact research, collaborative engagement, and the advancement of knowledge stewardship. ECF 3-9 – Lyons Dec., ¶ 15.

472.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University of Hawaiʻi at Manoa, testified that the University plans to continue seeking support from IMLS for future initiatives that build upon current research and partnerships. For example, the University is preparing an Applied Research proposal that will extend the work of the current planning grant by expanding participation, deepening national collaboration, and implementing tested models for improved access to cultural heritage materials across institutions. In addition, the University was invited to submit a full proposal earlier this year (March 2025) for IMLS funding to support workforce development as part of the Ehuehuʻo Mānoa: An Immersive Place-Based Experience project (Application No. RE-257110-OLS, IMLS Laura Bush 21st Century Librarian Program). ECF 3-9 – Lyons Dec., ¶ 16.

473.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University

of Hawaiʻi at Manoa, testified that any pause in the University's federal funding would disrupt the implementation timeline of active projects and compromise their ability to fulfill planned obligations to community partners, students, and advisory board members. She further testified that it would delay critical research activities, including national data collection and analysis, and prevent timely disbursement of consultant and student support. She also testified that these setbacks would erode trust with collaborators and undermine the University's capacity to contribute to national efforts in information science innovation. ECF 3-9 – Lyons Dec., ¶ 17.

474.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University of Hawaiʻi at Manoa, testified that the uncertainty of getting reimbursed has an immediate chilling effect on the University's ability to provide services, support students, and advance research. Faculty are forced to delay hiring graduate assistants, committing to travel, and initiating consultant agreements—all of which are foundational to the success of its projects. Students face uncertainty around tuition support and professional development opportunities, while community partners may experience delays in engagement, causing strain on relationships and momentum. ECF 3-9 – Lyons Dec., ¶ 18.

475.    The University has a long-standing record of responsible stewardship and successful performance in administering IMLS funding. Between 2009 and 2024, the University has been awarded a total of $1,370,325 to support seven different projects across multiple campuses and divisions. IMLS program officers have consistently engaged with University project teams and provided constructive feedback, reflecting a strong and collaborative working relationship grounded in trust and accountability.

ECF 3-9 – Lyons Dec., ¶ 19.

476.    In 2025, the University is scheduled to receive disbursements/ reimbursements of
$147,420 under their current Federal awards. These monies have been appropriated by
IMLS but by April 2025 had not been received or spent down by the University. ECF
3-9 – Lyons Dec., ¶ 20.

477.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University
of Hawaiʻi at Manoa, testified that if the University does not receive such
disbursements/reimbursements, it will significantly hinder the University's ability to
carry out planned project activities, compensate consultants and advisory board
members, and provide tuition and travel support to students. Delays will disrupt the
carefully sequenced phases of research, damage timelines for deliverables, and risk the
loss of participation from community partners and collaborators who have committed
their time and expertise. ECF 3-9 – Lyons Dec., ¶ 21.

478.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University
of Hawaiʻi at Manoa, testified that the University has relied on IMLS-funded programs,
studies, and national assessments to guide institutional planning, inform curriculum
development, and align their practices with evolving field-wide standards. Publications
and resources related to digital stewardship, inclusive cataloging, and indigenous
knowledge systems have been particularly valuable to their research and instructional
efforts. ECF 3-9 – Lyons Dec., ¶ 22.

479.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University
of Hawaiʻi at Manoa, testified that the elimination or delay of these resources would
impede the University's ability to make evidence-based decisions and stay current with

emerging best practices in the field. Without timely access to national surveys, guidance, and studies, their programs risk becoming misaligned with professional standards, and its ability to prepare students and collaborate with community partners would suffer as a result. ECF 3-9 – Lyons Dec., ¶ 23.

480.    Laura Lyons, the Interim Vice Provost for Academic Excellence at the University of Hawaiʻi at Manoa, testified that the termination or delay of IMLS funding will cause immediate harm to communities that rely on timely, responsive access to information, research, and educational support. It will disrupt services to indigenous practitioners, halt planned engagements with community consultants, and interrupt student support at a critical stage in their academic and professional development. Laura Lyons, the Interim Vice Provost for Academic Excellence at the University of HawaiʻiHawaiʻi at Manoa, testified that these harms extend beyond the University to affect citizens across multiple states who are part of national collaborative efforts, particularly those in Native Hawaiian and Pacific Islander communities seeking connection to cultural heritage through libraries, archives, and museums. ECF 3-9 – Lyons Dec., ¶ 24.

481.    Morgan Lehr Miller is the State Librarian for the Maryland State Library Agency. ECF 3-15 – Miller Dec., ¶ 2.

482.    The State Library Agency is responsible for providing leadership and consultation in technology, training, marketing, funding, resource sharing, research, and planning, so that Maryland libraries can fulfill their missions for the people of Maryland. ECF 3-15 – Miller Dec., ¶ 3.

483.    Among other things, the State Library Agency "[a]dminister[s] federal and State funds appropriated to it by the State for library purposes," Md. Code, Educ. § 23-

106(b)(5), "[a]dminister[s] the State grant program for county public library capital projects," *Id*. § 23-106(b)(9), and "[c]ooperate[s] with national library agencies and those of any other state," *Id*. §23-106(b)(11). ECF 3-15 – Miller Dec., ¶ 4.

484.    As State Librarian, Miller oversees the administration of state and federal funds to ensure the most effective distribution of resources for Maryland public libraries and their customers. ECF 3-15 – Miller Dec., ¶ 5.

485.    In 2024, Maryland received $3,332,465 from the Grants to States Program, which represents the Federal share (66 percent) for the activities in Maryland's approved Five-Year Plan. ECF 3-15 – Miller Dec., ¶ 11.

486.    The Maryland State Library Agency uses these federal funds to support many of its programs, including:

a.    Staff, professional, and leadership development programs to fulfill State-mandated certification requirements.

b.    Grants for innovation to help public libraries meet the changing needs of their customers.

c.    Funding to support lifelong learning, workforce development, early learning skills, and support for veterans.

d.    Grants to public libraries to plan for short- and long-term goals. ECF 3-15 – Miller Dec., ¶ 12.

487.    The State Library Agency also uses IMLS funds to pay the full and/or partial salaries of ten employees (6.25 full-time equivalent) and three consultants. ECF 3-15 – Miller Dec., ¶ 13.

488.    In addition to administering federal funding to States, IMLS offers the following

programs and services:

    a.  Providing benchmarks and access to library data from around the country through nationwide  surveying.

    b.  Consulting on the direction for library services.

    c.  Devising best practices for grants management.

    d.  Circulating resources developed by other IMLS-funded projects. ECF 3-15 – Miller Dec., ¶ 14.

489.   The State Library Agency's budget for this year relies on receiving $3,332,465 in federal funding, which includes funding allocations for staffing as well as 55 subgrants directed to Maryland's local public libraries. ECF 3-15 – Miller Dec., ¶ 15.

490.   Projects funded by IMLS subgrants include:

    a.  A series of short heritage videos to promote the role of Worcester County in American history;

    b.  Expansion of internet access in Baltimore County;

    c.  Seed libraries to promote agricultural literacy in Howard and Kent Counties;

    d.  Enhanced trade education in Charles County;

    e.  Artificial intelligence training in Howard and Frederick Counties;

    f.  A makerspace in St. Mary's County to provide skills necessary for a changing workforce;

    g.  Sensory learning to serve children with special needs and their families in Talbot County;

    h.  Digital preservation in Wicomico County; and

    i.  Multiple strategic planning and feasibility study activities in various counties. ECF

3-15 – Miller Dec., ¶ 16.

491.    On March 31, 2025, Morgan Lehr Miller, the State Librarian for the Maryland State Library Agency, received an email from Teri DeVoe, Associate Deputy Director, Grants to States, IMLS, stating that "that all staff are going to be placed on administrative leave, effective today." ECF 3-15 – Miller Dec., ¶ 17.

492.    Later that day, Miller was emailed a statement from the American Federation of Government Employees Local 3403—which represents IMLS employees—reporting that IMLS "notified the entire staff that they are being placed on administrative leave immediately" and that "[i]n the absence of staff, all work processing 2025 applications has ended. The status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-15 – Miller Dec., ¶ 18.

493.    Although the State Library Agency has preliminarily identified replacement funds if IMLS grants are no longer available, some of those funds would need to be provided by the subgrantees themselves. With a projected increase in Maryland unemployment rates, however, it is unclear that counties—especially rural ones—will be able to support their public library systems at the current level, much less bear any portion of the cost of these subgrants. ECF 3-15 – Miller Dec., ¶ 19.

494.    The State Library Agency has no plans in place to replace IMLS funding for subgrants beyond the current cycle, and given the State of Maryland's anticipated budget deficit, it is unlikely that State funds will be available to offset the loss of IMLS funding. ECF 3-15 – Miller Dec., ¶ 20.

495.    Any pause in federal funding will have a chilling effect on public libraries

throughout the State. IMLS's failure to reimburse project costs—or its delay in providing reimbursements—would force county public libraries to cover outlays themselves, bringing planned projects to a halt. A loss of funds also would compel the State Library Agency to reduce expenses funded by federal dollars, which include the salaries for one-third of its employees, the lease on its current office, and contracts for services such as teleconferencing, grants management, and specialized consultants. Finally, the uncertainty about the reliability of federal funds in the future would lead libraries to rely more on their limited local funds to cover unanticipated expenses, which would, in turn, restrict their ability to meet the needs of their communities. ECF 3-15 – Miller Dec., ¶ 21.

496.    In 2025 the State Library Agency was scheduled to receive $1,833,960 under its current Federal awards. These funds already have been obligated for disbursement. ECF 3-15 – Miller Dec., ¶ 22.

497.    If the State Library Agency does not receive IMLS funds when requested, it will sustain a debt to the State of Maryland, which has already reimbursed subgrantees and the agency for operation costs. That would create uncertainty in the public library community as to the State Library Agency's ability to pay for services contracted and/or delivered and would undermine the authority of the State Library Agency as a reliable source of resources and information. ECF 3-15 – Miller Dec., ¶ 23.

498.    Eliminating the functions of the IMLS would have immediate, dire, and irrevocable consequences for Maryland's public libraries and their customers. 52% of Marylanders have active library cards, and a statewide opinion poll conducted for the State Library Agency in 2020 found that 75% of Marylanders believe the library is "important" or

"very important" and that "public libraries are a good investment of tax dollars."2 Defunding the IMLS would cripple the State Library Agency's ability to provide resources and funds for a much needed and valued service. ECF 3-15 – Miller Dec., ¶ 24.

499.    Christopher McElgunn is the Deputy Secretary for the Wisconsin Department of Veterans Affairs (hereinafter, "the Department"). ECF 3-38 – McElgunn Dec., ¶ 2.

500.    The Department operates the Wisconsin Veterans Museum, administering funds including federal and state funds for operations. The mission of the Wisconsin Veterans Museum is to acknowledge, commemorate, and affirm the role of Wisconsin veterans in the United States of America's military past and present. ECF 3-38 – McElgunn Dec., ¶ 3.

501.    The Department's budget for this year has relied on the grant of $23,425.06 and has made plans and allocated funding for staffing and equipment based on the anticipated receipt of federal funding promised. The $23,425.06 is the state fiscal year 2024-25 total based on allocating the $66,371 federal award amount over the 34 months of the performance period. Funding pays for equipment upgrades and a dedicated staff person to do the project. ECF 3-38 – McElgunn Dec., ¶ 12.

502.    The Department plans to apply for future IMLS grant funding for the next phase of the digital access and photographic materials preservation project, which includes World War I materials and WWI-era images. ECF 3-38 – McElgunn Dec., ¶ 13.

503.    Christopher McElgunn, the Deputy Secretary for the Wisconsin Department of Veterans Affairs, testified that any pause in their federal funding will halt the project, which is currently in the middle of a 34-month performance period, and prevent them

from hiring a dedicated staff person to perform the digitization and preservation work. ECF 3-38 – McElgunn Dec., ¶ 14.

504.    Christopher McElgunn, the Deputy Secretary for the Wisconsin Department of Veterans Affairs, testified that because of the current uncertainty regarding the status of IMLS and the grant award, the Department cannot currently recruit for a dedicated staff person without confidence that the Department will receive federal reimbursement of incurred project costs as appropriated in the state budget. ECF 3-38 – McElgunn Dec., ¶ 15.

505.    Limited Term Employment (LTE) staff positions do not require position authority but the expenditure authority for this grant project is in the Federal projects; museum acquisitions and operations appropriation [Wis. Stat. § 20.485 (5)(mn)] and requires that the Department has sufficient federal revenues before making commitments. ECF 3-38 – McElgunn Dec., ¶ 16.

506.    The Department is in compliance with all IMLS grant requirements and deadlines, including the timely submission and acceptance of interim reports and payment requests. The Department is subjected to annual state single audits and other federal audits and reviews of the Department's administration of federal funding and there are no findings of noncompliance in the past seven (7) years. ECF 3-38 – McElgunn Dec., ¶ 17.

507.    Christopher McElgunn, the Deputy Secretary for the Wisconsin Department of Veterans Affairs, testified that in the coming months, the Department is scheduled to receive reimbursements of $50,841.08 under their current federal award. The Department has requested and received reimbursement of $15,529.92 for the

September 1, 2023 through June 30, 2026 period of performance and has submitted a request for reimbursement of $2,893.64 which is approved but not yet paid. ECF 3-38 – McElgunn Dec., ¶ 18.

508.    If the Department does not receive further reimbursements under the IMLS grant award, they will be left with $2,893.64 of unsupported costs requiring the Wisconsin Veterans Museum to make cuts in other museum services and programs. Further, the museum cannot continue to perform the digitization and preservation work funded by the IMLS grant award without reimbursement of the costs. ECF 3-38 – McElgunn Dec., ¶ 19.

509.    The Department's most recent reimbursement request was approved promptly but is taking longer to be reimbursed than the prior payments which took 4-7 days from submission date. The latest payment request was submitted on March 18, 2025, and was pending for at least 13 days. ECF 3-38 – McElgunn Dec., ¶ 20.

510.    Karen Mellor is the Chief of Library Services at the Rhode Island Office of Library and Information Services ("OLIS"). As Chief, she is responsible for the strategic vision and programming of OLIS, the state library agency for Rhode Island. As of August 2023, she is also responsible for the strategic vision and management of Digital Services, which includes knowledge management, web services, and online government applications available through RI.gov. Both units are part of the Rhode Island Division of Enterprise Technology Strategy and Services within the Department of Administration. ECF 3-31 – Mellor Dec., ¶ 3.

511.    On March 31, 2025 Mellor received an email from IMLS informing her that IMLS staff would no longer be available to assist with the grant programs or other services.

One day later, on April 1, 2025, she received notice that IMLS would recall 12 staff as a "skeleton crew." ECF 3-31 – Mellor Dec., ¶ 5.

512.    OLIS was created by R.I. Gen. Laws § 29-3.1-1 "to cooperate with the Institute of Museum and Library Services of the United States of America in the carrying out of the purposes of any and all acts of Congress for the benefit of library and information services within this state." ECF 3-31 – Mellor Dec., ¶ 7.

513.    OLIS has the mission of "strengthening, connecting and empowering libraries to advance knowledge, connect communities. and enrich the lives of all Rhode Islanders." ECF 3-31 – Mellor Dec., ¶ 8.

514.    As Chief of OLIS, Mellor testified that she is responsible for allocating IMLS funding to support the OLIS-administered library network coordinating resources, access, programs, and services to 48 public library systems, 12 academic libraries, 81 public school libraries, and eight special libraries for a total of 149 libraries with 178 library facilities, and to residents of the state of Rhode Island. Approximately 370,725 Rhode Islanders (34% of the population) hold public library cards. Approximately 1,000 Rhode Islanders are served through OLIS' Talking Books Library. 136,154 K-12 students and 32,190 undergraduates at Rhode Island's state colleges and universities have access to learning tools and research databases coordinated by OLIS. In total, more than half (over 540,000 people) of the state's population have direct access to services and programs provided by or coordinated by OLIS, and the entire population of the state has the opportunity to freely use the state's libraries and OLIS online services. ECF 3-31 – Mellor Dec., ¶ 9.

515.    As noted above, the Grants to States program is a formula grant program whereby

IMLS must pay State Library Administrative Agencies ("SLAAs"), including OLIS, the Federal share of the cost of activities described in the State plan as approved by the IMLS Director. ECF 3-31 – Mellor Dec., ¶ 11 (citing 20 U.S.C. §§ 9133-34).

516.    OLIS is the State library agency that submits the Five-Year State Plan, as required by 20 U.S.C. § 9134, and receives reimbursement from IMLS for the Federal Government's share of the costs of implementing that Plan every two months. Every grant under the Grants to States Program is active for a two-year period. All funding for the execution of this plan has been expended on services and programs that directly benefit Rhode Island's libraries and residents of the state since the inception of the IMLS in 1996. ECF 3-31 – Mellor Dec., ¶ 12.

517.    OLIS allocates a significant amount of IMLS Grants to States Program funding to individual libraries and library-serving organizations through subgrants. For example, in FY2024, OLIS distributed $42,084 in IMLS funding to 42 public libraries for their summer reading programs via a formula grant process. OLIS also distributed $203,760 in IMLS funding via competitive grants to libraries for various projects, including digitization of historic copies of local newspapers, services for veterans and differently abled individuals, social services, learning programs, and collection development. OLIS funds projects both big and small. For example, OLIS provided $900 in funding to Jamestown Philomenian Library to support summer reading programs for children and teens. Libraries in the City of Providence received a total of $37,865 to support summer reading programs; a project at the Community Libraries of Providence for engaging children with local nature through outdoor programming, implementation of interactive nature stations using technology, and exhibits at the library; and an

internship in digital librarianship at the Providence Public Library for a student from the University of Rhode Island Graduate School of Library and Information Studies. ECF 3-31 – Mellor Dec., ¶ 13.

518.    OLIS also relies on Grants to States funding for its own staff, programs, and contractual services. In 2024, 45% of the OLIS budget, including the equivalent of six full-time employees, was covered by the Grants to States Program. ECF 3-31 – Mellor Dec., ¶ 14.

519.    The State of Rhode Island has received Grants to States funds from the federal government every year since the program's inception in 1996. ECF 3-31 – Mellor Dec., ¶ 15.

520.    Rhode Island is currently in year three of its Five-Year State Plan for Library Services and Technology Act Funding (2023-2027), which was approved by the Library Board of Rhode Island on June 13, 2022, submitted to the IMLS State Programs Office in June, 2022, and approved by IMLS on September 14, 2022. ECF 3-31 – Mellor Dec., ¶ 16.

521.    In 2024, Rhode Island received $1,413,623 through the Grants to States Program. ECF 3-31 – Mellor Dec., ¶ 18.

522.    In accordance with its Five-Year State Plan, OLIS allocates the Grants to States funding to support the following programs:

a.    A Resource Sharing Program to facilitate efficient statewide sharing of materials among public, academic, school and other libraries, and achieves savings for municipalities and academic institutions while expanding access to educational, informational, and recreational reading materials for all Rhode Islanders; facilitate

borrowing and sharing of physical materials among libraries through an interlibrary loan program outside of the state; and provide access to databases, learning resources, and ebooks through a centralized online portal (AskRI) and partner websites;

b.  The Talking Books Library, Rhode Island's Regional Library for the Blind and Print Disabled, providing access to public library services for state residents who are unable to use traditional print materials due to visual or print disability;

c.  A Digitization, Preservation and Disaster Preparedness Program to provide tools and resources to assist with disaster preparedness; increase access to collections at libraries through digitization; develop a single point of access to the digital collections of libraries, museums and cultural heritage organizations through the establishment of a RI Digital Library;

d.  A Continuing Education Program to develop a regular schedule of training, workshops, and meetings aligned with needs identified in the library community, including topics such as youth services, library management, adult services, special collections, and trustee training; develop programs in partnership with other organizations; provide physical materials and online resources to support learning; and coordinate with other organizations to develop a systematic and coordinated approach to the professional development of librarians and library staff;

e.  A Reading and Literacy Program to coordinate reading programs for children, teens and adults at public and school libraries statewide and partnerships with organizations to promote, support or develop statewide programs focused on early literacy, grade level reading, and statewide reading; provide training for library staff

on the implementation of local reading programs for youth of all ages and abilities; support for book award programs and collection development activities; and subgrants to public libraries to support summer reading programs for children and teens;

f.   A 21st-Century Literacy Program to coordinate and provide trainings statewide at libraries on topics such as digital, financial, health, and information literacy, plus partnerships with state agencies and organizations to expand access to relevant programs and trainings;

g.   A Community Outreach and Engagement Program to work with partnering organizations to lead programs and identify resources to create welcoming environments in libraries that minimize linguistic, cultural and other barriers to access; work with partners to increase participation in the profession; identify resources, programs, and partners to better meet the needs of underserved groups such as veterans, older adults, individuals with disabilities, minorities, families with economic challenges, and individuals who are incarcerated or families impacted by incarceration; award subgrants to support the development of programs and services to address specific library and information needs in local communities;

h.   A Community Connectors Program to seek partnerships and collaborate with organizations to expand access to statewide programs in adult education, workforce development, and small business support, and identify and promote opportunities for libraries to collaborate with statewide or local social service agencies to deliver services or resources at libraries;

i.   A Local Library Development Program to provide consultant services to support

and advance youth services, adult services, and library management; collect data, publish analyses, and provide evaluative tools and information; publish online resources for the public and library community such as library directories, library job postings, news, and events; strengthen library connections through participation in library organizations and networks; provide grants to support innovative projects and programs at libraries; and conduct a systematic program of outreach to libraries to better align project objectives and services. ECF 3-31 – Mellor Dec., ¶ 19.

523.    Karen Mellor, the Chief of Library Services at the Rhode Island Office of Library and Information Services, testified that any delays, interruptions, or reductions in funding as a result of a reduction of force in IMLS will have a direct impact on access to libraries and library materials across the State by hobbling OLIS's ability to implement the Five-Year State Plan as described above. ECF 3-31 – Mellor Dec., ¶ 20.

524.    Karen Mellor, the Chief of Library Services at the Rhode Island Office of Library and Information Services, testified that the State currently anticipates receiving the above-listed funds and continuing to fund the programs. ECF 3-31 – Mellor Dec., ¶ 21.

525.    Karen Mellor, the Chief of Library Services at the Rhode Island Office of Library and Information Services, testified that the State does not have the budgetary resources or flexibility to make up for the lost funding. ECF 3-31 – Mellor Dec., ¶ 22.

526.    In addition to administering funds, IMLS supports Rhode Island libraries by providing guidance with its National Strategic Plan, input into the formation of Rhode Island's Five-Year State Plan, regular conferences and peer-to-peer meetings on library development, data collection and analyses, and various other trends in library science. Karen Mellor, the Chief of Library Services at the Rhode Island Office of Library and

Information Services, testified that if IMLS funding is disrupted, library access for thousands of Rhode Islanders would suffer, hobbling OLIS in its efforts to foster literacy, support learning and workforce development, and enhance community throughout the State. ECF 3-31 – Mellor Dec., ¶ 23-24.

527.    Benjamin Miller is the Director of the Library Services Team (within the Division for Libraries and Technology) for the Wisconsin Department of Public Instruction (DPI). ECF 3-35 – Miller Dec., ¶ 2.

528.    DPI serves as Wisconsin's State library administrative agency and is responsible for empowering Wisconsin libraries to best serve their communities by: overseeing compliance with State law by Wisconsin's school and public libraries and library systems; providing consulting to all libraries in Wisconsin in a wide variety of areas; and administering state and federal aid to Wisconsin's library systems. ECF 3-35 – Miller Dec., ¶ 3.

529.    As the Director of the Library Services Team, Miller is responsible for the administration of any State-based or federal funding directed to libraries across Wisconsin. ECF 3-35 – Miller Dec., ¶ 4.

530.    DPI is the State library administrative agency in Wisconsin. ECF 3-35 – Miller Dec., ¶ 8.

531.    In 2024, Wisconsin received $3,230,831.00 from the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-35 – Miller Dec., ¶ 12.

532.    DPI uses these federal funds to support many of its programs, including: workforce development training for public library staff; summer reading, including resources and

support for all ages; all-age literacy; training and collaboration between public library staff serving youth and school media specialists; interlibrary loan via the "WISCAT" statewide catalog; cooperative cataloging for public library systems; digital access to digital resources; and creation of Wisconsin's "Internet Discount Finder." DPI also supports innovation and collaboration between libraries and public library systems which has led to the development of self-sustaining programs like the "Wisconsin Public Library Consortium Digital Library". DPI staff funded by these federal funds also provide consulting to libraries across Wisconsin on topics such as youth services, inclusive services, literacy for all ages and library administration and policy, in addition to specific school library media services. IMLS-funded projects have resulted in the development of resources for public and school libraries including: library trustee and director administrative handbooks; a public library system merger guide; a public library staff compensation report; a statewide data landscape study report; and library space planning and facilities management tools. ECF 3-35 – Miller Dec., ¶ 13.

533.    Wisconsin also uses these federal funds to pay the salaries of 16.1 full-time employees. ECF 3-35 – Miller Dec., ¶ 14.

534.    In addition to administering federal funding to States, IMLS also provides the following programs and services: the collection of nationwide data, which libraries and State library administrative agencies use to compare and better understand their communities and address their libraries' emerging issues and changing service needs; and funding for Wisconsin's tribal nation libraries to develop and enhance library services for American Indian communities. ECF 3-35 – Miller Dec., ¶ 15.

535.    DPI's budget for DPI's fiscal year has relied on receiving $3,230,831.00 in IMLS

funds and DPI made plans and allocated funding for staffing who execute statutorily-required services and who provide consulting services for all libraries in areas including youth services, continuing education, workforce development and building spaces projects. DPI also, based on the anticipated receipt of Federal funding promised, made plans and allocated funding for grants which support core public library system services support; cooperative cataloging projects; professional learning opportunities for public library staff; collaborative data projects; "WebJunction" professional learning support; backup and digitized materials archives collaboration projects; and teen internship pilot programs. ECF 3-35 – Miller Dec., ¶ 16.

536.    DPI relies on annual funding from IMLS to fund staff positions that provide consulting, access to state digital resources, and efficiencies for collaborative programs that benefit libraries and residents across the State. DPI also utilizes IMLS funding for grant programs to public library systems used to provide direct services to Wisconsin residents. Those grants are in service of the three goals within Wisconsin's "LSTA Five-Year Plan": cultivating connections and collaborations with other libraries, organizations, and stakeholder groups in order to engage community members, address challenges, maximize strengths, and implement impactful, scalable ideas; providing easy access to residents  to information, tools, resources, people and spaces to make learning, exploration and discovery possible for all individuals and communities statewide; and equipping library staff with tools and support to serve the needs of their communities. ECF 3-35 – Miller Dec., ¶ 17.

537.    Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified that any pause in DPI's federal funding

would result in the loss of 16.1 DPI staff positions, leaving only 2.9 full-time employees to fulfill all statutorily required library functions. A staff reduction like this would lead to a delay, or total discontinuation, of services to the 467 public libraries in Wisconsin and of services provided directly to Wisconsin library users, such as the interlibrary loan program, which saw 15 million materials loaned between libraries in 2023. Public libraries would lose consulting services on youth services, continuing education, workforce development, games and learning and adult services. ECF 3-35 – Miller Dec., ¶ 18.

538.    If DPI does not receive its expected FY 2024 reimbursement, DPI will be unable to pay grants already awarded. Such a loss of funding would result in libraries with grant-funded projects either having to take on unexpected costs or abandon those projects/programs. Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified, upon information and belief, the loss of this funding would also result in the termination of support to Badgerlink, Wisconsin's online library and the process would begin to terminate the 16.1 full-time employees of DPI providing services to public libraries. ECF 3-35 – Miller Dec., ¶ 19.

539.    Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified that DPI and its staff are strong fiscal stewards; and in fact, the staff was awarded the 2023 Francis Keppel award for "excelling in the completeness, promptness, and high quality of local public library data." IMLS recognized Wisconsin for expending American Rescue Plan Act funding down to the penny in response to the COVID-19 pandemic. Wisconsin has consistently received praise from IMLS for completing annual state program reports in a timely and

efficient manner, according to the required format. ECF 3-35 – Miller Dec., ¶ 20.

540.    Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified that, upon information and belief, for FFY 2025, DPI would expect to receive disbursements/reimbursements of dollar amounts similar to last FFY's allotments under their current Federal awards. ECF 3-35 – Miller Dec., ¶ 21.

541.    Miller testified that if DPI does not receive its promised disbursements/reimbursements, DPI will freeze its grant program, wind down all non-statutory program activities, and reduce or dismiss Library Services staff funded through LSTA funding. ECF 3-35 – Miller Dec., ¶ 22.

542.    In addition to funds, DPI's Library Services staff utilize the data collected by IMLS, as well as reports and studies generated by the IMLS National Leadership grant and Laura Bush 21st Century librarian programs, to inform best practices and consulting services provided to Wisconsin public and school libraries and public library systems. ECF 3-35 – Miller Dec., ¶ 23.

543.    Without the data provided by IMLS annual surveys and IMLS-funded research into library services and best practices, DPI and Wisconsin's school and public libraries and public library systems would lack the information they need for effective future planning, program development, and innovation to meet the changing information needs of Wisconsin's residents. ECF 3-35 – Miller Dec., ¶ 24.

544.    Benjamin Miller testified that terminating LSTA funding already allocated to Wisconsin and possibly ending future LSTA funding will irreparably harm Wisconsin's libraries and the communities they serve. In particular, Miller testified that

rural libraries and tribal nation libraries dependent on this funding and services from IMLS project will likely be forced to close, as they have limited financial options. Miller testified that potential program cuts in libraries across the state will result in students without summer reading programs or unemployed residents without the resources they rely on to improve job readiness and help find them new employment. Upon information and belief, Miller further testified that without statewide programs like the "WISCAT Interlibrary Loan Platform" and interlibrary loan services, public libraries will struggle to provide access to the materials their residents need for education, small business support, and recreation. Further, and upon information and belief, Miller testified that public library systems will be forced to reduce services such as interlibrary delivery and professional learning opportunities. Libraries are the centers of their communities. The loss of federal funding will force libraries to cut back on programs and services that offer life-changing opportunities to the citizens of Wisconsin. ECF 3-35 – Miller Dec., ¶ 25.

545.    Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified that with no staff to administer the Grants to States program, Wisconsin would unable to ascertain the status of receiving the 2025 Grants to States Award as expected, which will cause immediate and irreparable harm to Wisconsin and its libraries. ECF 3-35 – Miller Dec., ¶ 28.

546.    Benjamin Miller, Director of the Library Services Team for the Wisconsin Department of Public Instruction, testified that due to immediate placement of all IMLS staff on administrative leave, Wisconsin will suffer the harms described above. Further, in the total absence of ability to consult with IMLS staff on matters of comparative

data, research and grant guidance, DPI's response to libraries across the state will be delayed and the scope of services DPI's consultants and other staff are able to provide to those libraries will be significantly reduced. These delays and reduction in services will cause harm to Wisconsin and its libraries. ECF 3-35 – Miller Dec., ¶ 29.

547.    Jennifer Nelson is the State Librarian for the New Jersey State Library, an affiliate of Thomas Edison State University. ECF 3-23 – Nelson Dec., ¶ 2.

548.    New Jersey State Library ("NJSL") is responsible for maintaining library resources and information services over a broad range of subjects and for providing special library services for the legislative, executive and judicial branches of state Government, supplemental library service for New Jersey libraries and direct library services for persons with disabilities. NJSL is also charged with coordinating a statewide system of libraries in New Jersey and administering State and federal programs for the development of libraries, library facilities, library resources and library services in New Jersey. NJSL requires reports that are necessary for the proper administration of its duties. This includes gathering and publishing annual and occasional statistics on libraries in the State. ECF 3-23 – Nelson Dec., ¶ 3.

549.    Jennifer Nelson testified that as State Librarian, she is responsible for directing and administering the work of the New Jersey State Library and administering all laws which are included under the jurisdiction of the library, including the fiscal oversight and management of federal and State grant and aid programs. Further, she testified that she is certified by New Jersey's Legal Officer to assure and certify that the New Jersey State Library is a State Library Administrative Agency with the fiscal and legal authority and capability to administer all aspects of the Library Services and

Technology subchapter 20 U.S.C. Chapter 72. Under her direction, NJSL establishes the State's policies, priorities, criteria, and procedures necessary to the implementation of all programs under this subchapter. ECF 3-23 – Nelson Dec., ¶ 4.

550.    Jennifer Nelson testified that given her 15 years of experience working directly with IMLS in several different capacities, she believes that Executive Order 14,238 will cause IMLS to be unable to administer financial awards and/or programs (specifically the Grants to States program) on which the New Jersey State Library relies and on which it expects to rely in the future, causing significant harm to New Jersey residents, including those with disabilities, K-12 and higher education students, and the New Jersey State Library. ECF 3-23 – Nelson Dec., ¶ 6.

551.    New Jersey State Library is New Jersey's designated State library administrative agency. ECF 3-23 – Nelson Dec., ¶ 8.

552.    In 2024, New Jersey received $4.5 million through the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-23 – Nelson Dec., ¶ 15.

553.    The New Jersey State Library uses these federal funds to support many of its programs. In the Federal Fiscal Year 2024 Budget, New Jersey State Library is using these federal funds to support the following programs:

a.    $1,743,500 to the Talking Book & Braille Center.

b.    $1,715,240 for Statewide  – Databases

c.    $26,000 for Subscriptions.

d.    $40,000 to Digital Literacy.

e.    $801,423  to  State  Library  Technology  Services,  including  $569,090  to

JerseyConnect and $232,334 to Library Support Services. " ECF 3-23 – Nelson Dec., ¶ 16.

554.    The New Jersey IMLS Grants to State Programs amounts to $4,326,163 in Total Direct Costs and $180,257 in Indirect Costs, totaling $4,506,420 for the Total FFY 2024 Budget. ECF 3-23 – Nelson Dec., ¶ 17.

555.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that loss of these funds would severely impact NJSL's ability to provide direct services to almost 13,000 blind and print-disabled library patrons through the NJSL Talking Book and Braille Center (TBBC), technology services to 350+ NJ public libraries through JerseyConnect, and curtail access to a suite of 24 online databases for research, education, and business development available to all residents. Nelson also testified that NJSL would also lose the software needed to collect and analyze statistical data and the software that facilitates interlibrary loan between libraries in the state. ECF 3-23 – Nelson Dec., ¶ 18.

556.    In addition, Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that the loss of funds would impact 17.5 FTE (20 people) at NJSL in jobs that accomplish these projects and other smaller scale initiatives. ECF 3-23 – Nelson Dec., ¶ 19.

557.    TBBC, formerly known as the Library for the Blind and Physically Handicapped, is the only NJ library geared exclusively to serving the state's Blind and print-disabled population. Services are provided directly to TBBC patrons and to other eligible residents through the state's public libraries. TBBC is fully funded with Federal Grants to States funds. ECF 3-23 – Nelson Dec., ¶ 20.

558.   JerseyConnect provides a range of backbone technology services to 350+ libraries in the state such as internet and managed WiFi services, email hosting, network access and cloud services at no cost to the libraries. JerseyConnect serves libraries in all 21 counties and covers 80% of the state's population. While the technology used by JerseyConnect itself is funded with state Library Network funds, Grants to States funds three highly skilled technical FTE who run the program. ECF 3-23 – Nelson Dec.,  21.

559.   The online databases purchased with Grants to States funds are used in public, academic, and K-12 libraries throughout the state and in some cases are the only online research tools available to NJ's smaller, needier libraries. These resources are also available to any New Jersey resident through geolocation. In calendar year 2024, these resources were searched 42,069,786 times. ECF 3-23 – Nelson Dec., ¶ 22.

560.   The $4.5 million annual allotment from IMLS represents approximately 30% of NJSL's operating funds, which include New Jersey's Direct State Service and Library Network appropriations. ECF 3-23 – Nelson Dec., ¶ 23.

561.   In addition to the Grants to States program, libraries and museums in New Jersey may apply to IMLS for discretionary grants or special initiatives. These are competitive awards and the amounts vary annually. These are typically project-based. While the amount may represent a large percentage of a small museum's annual budget, funds are intended to be for short-term use and not for operational expenditures. ECF 3-23 – Nelson Dec., ¶ 24.

562.   IMLS allocated a total of $1,765,604 to libraries and museums in New Jersey through discretionary grants and special initiatives. The following is a list of NJ recipients of IMLS discretionary grants or special initiatives from 2022-2024:

a.  Rutgers University School of Communication, Dept. of Library and Information Science, National Leadership Grants-Libraries ($150,000)

b.  Rowan University, Inspire! Grants for Small Museums ($23,488)

c.  Lawnside Historical Society, Museum Grants for African American History and Culture ($34,180)

d.  Long Branch Free Public Library, National Medals for Library Services ($10,000)

e.   Grounds for Sculpture, Museums for America ($250,000)

f.  New Jersey State Library, National Leadership Grants-Libraries ($748,588)

g.  Newark Museum of Art, Museums of America ($91,000)

h.  Visual Arts Center of New Jersey, Museums of America ($50,760)

i.  Atlantic City Free Public Library, American Rescue Plan for Museums and Libraries ($50,000)

j.  The College of New Jersey, Save America's Treasures ($311,594)

k.  Visual Arts Center of New Jersey, American Rescue Plan for Museums and Libraries ($21,359). ECF 3-23 – Nelson Dec., ¶ 24.

563.  In 2023, a $748,588 National Leadership Grant was awarded to NJSL to work with the NJ Department of Education and other partners to develop professional development, an instructional framework, and learning activities to support NJ's upcoming implementation of its Information Literacy Standards. Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that losing this grant would have implications for the capacity of the state's teachers and librarians to address information literacy in the classroom and result in the cancellation of three consultant contracts and a subgrant worth approximately $622,000 total. Nelson testified that the

project is poised to have a national impact, as NJ is the first state in the US to require that K-12 information literacy learning standards be addressed in classrooms. ECF 3-23 – Nelson Dec., ¶ 25.

564.    In addition to administering federal funding to States, IMLS also provides the following programs and services: the annual Public Library Survey, the bi-annual State Library Administrative Agency Survey, as well as statistical analyses of these data collection efforts; technical assistance in the management of federal data and federal programs; and convenings that increase knowledge and capacity of librarians to address community needs. The Library Statistics Working Group, of which Nelson is a member, is a federal-state cooperative on library data, establishes the criteria and processes for the Public Library and State Library Administrative Agency surveys with IMLS, ensuring that data collected is accurate, relevant and accessible. ECF 3-23 – Nelson Dec., ¶ 26.

565.    The New Jersey State Library's budget for this year has relied on receiving $4.5 million from IMLS, and it made plans and allocated funding for staffing, services, software, data collection, and online resources based on the anticipated receipt of Federal funding promised. In addition to annual outlays from the Grants to States program, the National Leadership Grant on information literacy has engaged consultants to create instructional activities, establish professional development and conduct program evaluation. The project is scheduled to roll out training and instructional activities in the next six to eight weeks, while preparing educators for Fall 2025 implementation of the project. These funds were allocated in 2023. ECF 3-23 – Nelson Dec., ¶ 27.

566.    The New Jersey State Library relies on its partnership with IMLS through the Grants to States program to complete its mission. The annual allocation supplements its state budget and offers services that reduce or eliminate costs for local libraries and library users. With an approved Five-Year Plan in place, The Library anticipates IMLS funding of the full range of services already described through at least federal fiscal year 2027. ECF 3-23 – Nelson Dec., ¶ 28.

567.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that any pause in New Jersey's federal funding would reduce the staff complement of the entire NJSL. 350+ public libraries would lose access to an integrated technology infrastructure that supports internet access. In addition to the service disruption caused, this would put an undue burden on local library budgets to fund costs in a mid-budget year revision. Nelson testified that New Jerseyans would lose access to library services for at least a short period of time, and access to online databases for at least the next three years. NJSL provides internet services to its affiliate, Thomas Edison State University, and a pause on funding would be detrimental to this online university's ability to carry out its educational activities. ECF 3-23 – Nelson Dec., ¶ 29.

568.    As reimbursement-based programs, Grants to States and National Leadership grants depend on the availability of knowledgeable IMLS staff to efficiently review and make payments. This is critical in a reimbursement-based program in which grantees, including NJSL, incur costs up front and any delays in payments impact NJSL's overall budget. ECF 3-23 – Nelson Dec., ¶ 30.

569.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that a reduction in IMLS staff would pose a significant challenge for NJSL's ability to

148

manage the Grants to States Program grant, as IMLS staff regularly provide critical on-demand technical assistance in interpreting federal requirements and processing reimbursement requests. ECF 3-23 – Nelson Dec., ¶ 31.

570.    Other IMLS programming plays a critical role in enabling NJSL to fulfill its mission. An annual Grants to States Conference provides an opportunity for NJSL program staff to receive updates on federal programmatic changes as well as to learn best practices from other states. IMLS likely could not continue to hold this two-and-a-half day conference if its staff complement were reduced. Similarly, IMLS staff play a central role in the annual public library survey data collection process. A loss of staff to this program would remove unique statistical and methodological expertise that NJSL relies on when interpreting data and understanding how to apply definitions of terms to the collection of data. An annual State Data Coordinators Conference brings together IMLS staff and consultants to review and make decisions on the universe of data collection through the Library Statistics Working Group. Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that the loss of this conference would result in NJSL staff having fewer resources available for completing this complex task. ECF 3-23 – Nelson Dec., ¶ 32.

571.    NJSL staff and the larger library community have been impacted by the uncertainty of reimbursements and concerns related to their ability to pay current contracts and obligations. At this point in time, New Jersey is unable to provide certainty that any of their Grants to States funded services will continue for the remainder of this year and future years. The Library is unable to carry out activities that require service contracts or consultants using federal funds, which would cause delays in project

implementation. As the recipient of a National Leadership Grant, the uncertainty
around the status of this grant has caused the Library's consultants, partners and
contractors to express concerns about the viability of the project, and questions related
to their ability to move forward on contract objectives. ECF 3-23 – Nelson Dec., ¶ 31
[sic].

572.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that
NJSL has a history of timely submissions of all performance and financial reports
related to Federal IMLS funding, as well as meeting all matching and Maintenance of
Effort (MOE) requirements. Meeting annual MOE requirements has allowed for full
funding of NJ's annual Grants to States allotment each year with no reduction due to
missed targets. NJSL regularly receives high marks on annual submissions and Federal
site visits, the most recent one of which was conducted in 2023. ECF 3-23 – Nelson
Dec., ¶ 32 [sic].

573.    In 2025, New Jersey is scheduled to receive disbursements/reimbursements of
$3,215,561 under its current Federal awards, including $2,476,657 in Grants to States
funds and $738,904 in National Leadership Grant funds. These funds have been
obligated by IMLS. ECF 3-23 – Nelson Dec., ¶ 33.

574.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that
if New Jersey does not receive such disbursements/reimbursements, NJSL will need to
shut down all of the programs discussed and lay off up to 20 staff, as it does not have
funds to cover the shortfall. ECF 3-23 – Nelson Dec., ¶ 34.

575.    NJSL relies on the Public Library Survey conducted by IMLS to better understand
the status and condition of the State's public libraries. It provides technical support and

guidance to libraries with this data, assessing if libraries are meeting state standards. NJSL uses the State and local data to benchmark changes in libraries over the years, and the data are used to inform legislators and other stakeholders about the impact of library services. ECF 3-23 – Nelson Dec., ¶ 35.

576.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that the elimination or delay in the survey collection and analysis would disrupt NJSL operations related to the distribution of State aid, its ability to provide guidance to library trustees and directors related to service levels, and to plan new buildings or adapt services to community changes, for example. ECF 3-23 – Nelson Dec., ¶ 36.

577.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that should the termination of the Grants to States program occur, more than 13,000 people who are blind or print-disabled would suffer from the lack of access to library materials; the users of more than 350 libraries in all 21 counties would lose access to core library services which rely on the internet; and all residents  of the state would be harmed by the loss of access to online databases that support student success, employment and business development.  A termination or delay in the National Leadership Grant will risk causing the state's K-12 educators to be unprepared for the implementation of K-12 student academic information literacy standards. ECF 3-23 – Nelson Dec., ¶ 37.

578.    Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that if there is no staff to administer the Grants to States program, it is unlikely that New Jersey will receive the remainder of its 2024 Grants to States award of $2,476,657 as expenditures are incurred, which will cause immediate and irreparable harm to New Jersey. Nelson also testified that it is further unlikely that New Jersey will timely

receive its estimated 2025 Grants to States Award of approximately $4.5 million by April 22, 2025, as expected, which will cause immediate and irreparable harm to New Jersey. New Jersey will also suffer immediate and irreparable harm from the loss of its National Leadership Grant remaining dollar amount of $738,904. ECF 3-23 – Nelson Dec., ¶ 40.

579.    Without IMLS staff availability, NJSL will be unable to complete its 2024 Public Library Survey data collection effort. This data collection effort is used to calculate State aid, and the inability to complete it is an additional harm that affects more than 275 public libraries in the state. Jennifer Nelson, the State Librarian for the New Jersey State Library, testified that NJSL would also be unable to receive reimbursement for funds spent through March 31, 2025 from the Grants to States program ($441,577) and National Leadership Grant ($15,230), or to fulfill its statutory obligations under both programs. ECF 3-23 – Nelson Dec., ¶ 41.

580.    On April 9, 2025, at 10:16 PM, the NJSL received an email from grantsadmin@imls.gov stating that IMLS would be terminating Grant Application No. LG-255048-OLS-23 effective April 8, 2025. The email contained an Action Memorandum and Notice of Grant Termination. ECF 35-6 – Nelson Dec., ¶ 6.

581.    The terminated grant amounted to $748,588 in discretionary funds, but as of April 11, 2025, only $24,914 had been disbursed. ECF 35-6 – Nelson Dec., ¶ 7.

582.    The NJSL relies upon these funds to carry out Teaching Information Literacy, a project that is developing an instructional framework and educational activities that will be used by K-12 teachers and school librarians to teach K-12 students in New Jersey statutorily required information literacy skills. The project also calls for a

National Forum (Reimagining Information Literacy) to be held in summer 2026. ECF 35-6 – Nelson Dec., ¶ 7.

583.    A significant portion ($622,000) of the funds are being used for four primary projects: 1) developing the instructional framework and learning activities for each K-12 grade band; 2) creating evaluation tools for educators and students; 3) creating online interactive modules for professional development sessions on information literacy and developing in person training sessions, and; 4) planning a national event that will draw experts from across the United States to discuss information literacy and learn about New Jersey's new teaching model. ECF 35-6 – Nelson Dec., ¶ 7.

584.    Without access to these NJSL will be unable to work on the project and has issued stop work orders to the consultants, advisory and working groups effective April 8, 2025. ECF 35-6 – Nelson Dec., ¶ 8.

585.    The primary consequence of the termination is that New Jersey K-12 teachers and librarians will not have specially designed tools and learning activities with which to teach to New Jersey's emerging information literacy skill standards. Each school district will need to create its own curriculum, which is a significant expense. ECF 35-6 – Nelson Dec., ¶ 8.

586.    The National Forum will have to be cancelled and preparations, including site selection, will have to be terminated. ECF 35-6 – Nelson Dec., ¶ 8.

587.    There will not be any online professional development modules for self-paced learning, and no in-person training sessions allowing teachers to learn together. ECF 35-6 – Nelson Dec., ¶ 8.

588.    The status of reimbursement requests is unclear; as a result, NJSL may need to

identify sources of funding to meet their contractual obligations to these vendors. ECF 35-6 – Nelson Dec., ¶ 8.

589.    In addition, since the termination arrived after the business day had closed on April 9 but with the termination effective April 8, NJSL is left to find resources to pay its consulting partners for work completed on April 9, 2025. ECF 35-6 – Nelson Dec., ¶ 8.

590.    Annie Norman is the Librarian / Division Director for the [Delaware] Department of State, Division of Libraries. ECF 3-5 – Norman Dec., ¶ 2.

591.    In November 2023, Norman was appointed to the National Museum and Library Services Board, and she was reappointed to a new five-year term in December 2024. On April 3, 2025, she received a letter, sent on behalf of President Trump, terminating her membership on the board. ECF 3-5 – Norman Dec., ¶ 3. A copy of the letter is available at ECF 3-5.

592.    The Delaware Division of Libraries provides leadership and support for the timely development of Delaware's libraries, to ensure convenient access to, and encourage use of current information resources and reading material by all Delawareans. Members of the Delaware library community are unified in the values of service, access, and excellence, and are committed to the vision of progressive libraries and the transformational impact they have on the people who use them. ECF 3-5 – Norman Dec., ¶ 4.

593.    The Delaware Division of Libraries is a State library administrative agency. ECF 3-5 – Norman Dec., ¶ 9.

594.    In 2024, Delaware received $1,389,442.00 from the Grants to States Program,

which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-5 – Norman Dec., ¶ 13.

595.    Delaware Division of Libraries uses these federal funds to support many of its programs, including: statewide services to improve Delawareans' literacy levels across the lifespan, improving student library services in Delaware's K-12 schools, supporting statewide library infrastructure including a shared catalog for easy access to libraries' materials, statewide social innovation support specialists to assist with basic needs and workforce development, reading services for print-disabled Delawareans, and professional development training for library staff statewide. ECF 3-5 – Norman Dec., ¶ 14.

596.    Delaware also uses these federal funds to pay 50% of the salaries of state employees plus several contractual staff.    ECF 3-5 – Norman Dec., ¶ 15.

597.    In addition to administering federal funding to States, IMLS also provides the following programs and services: administration of the Public Libraries Survey and the State Library Administrative Agency Survey; reports on activities by other state library agencies and libraries nationwide which provide inspiration and benchmarks for the Delaware Division of Libraries; best practices training for Delaware Division of Libraries staff and peer networking opportunities to enable them to better perform their duties; and a variety of research publications on timely and relevant topics. A recent example of inspiration and support for the Delaware Division of Libraries initiative called the Delaware Literacy Alliance was the 2023 IMLS report Research on Motivation, Literacy and Reading Development: A Review of Best Practices. ECF 3-5 – Norman Dec., ¶ 16.

598.    The Delaware Division of Libraries' budget for this year has relied on receiving
$1,389,442.00, allocating funding for staffing, library services support, and statewide
infrastructure support based on the anticipated receipt of Federal funding promised.
ECF 3-5 – Norman Dec., ¶ 17.

599.    Annual funding from IMLS is an integral part of the Delaware Division of Libraries
budget. ECF 3-5 – Norman Dec., ¶ 18.

600.    Annie Norman, the Librarian/Division Director for the Department of State,
Division of Libraries testified that any pause in Delaware's federal funding would
affect Delaware's ability to pay staff and support statewide library services and
statewide library infrastructure. Norman testified that annual funding from IMLS is
relied upon and is expected to continue. ECF 3-5 – Norman Dec., ¶ 19.

601.    Annie Norman, the Librarian/Division Director for the Department of State,
Division of Libraries testified that uncertainty about reimbursements for activities
planned as part of the LSTA Five Year Plan is having an immediate effect on current
activity planning and preparations for the next state fiscal year which starts on July 1,
2025. ECF 3-5 – Norman Dec., ¶ 20.

602.    Norman testified that the Delaware Division of Libraries has a long history of
adequate performance, timely submissions and compliance with IMLS requirements
for all IMLS funding received. Feedback from Delaware's IMLS program officer after
the June 2024 site visit included "Overall the LSTA program is consistently well-
organized and well run. The administrative and financial processes are in order, and
certain elements, like your work in social innovation and tapping into the power of
consortia, could serve as a model for other states. I commend you and your staff for the

attention to federal funding requirements and best practices." ECF 3-5 – Norman Dec., ¶ 21.

603.    In 2025, the Delaware Division of Libraries is scheduled to receive the remaining $1,018,912.65 in disbursements/reimbursements of the current federal fiscal year 2024 Grants to States award. Most of these funds are currently encumbered/obligated, and the small remainder will be obligated in the next few months. ECF 3-5 – Norman Dec., ¶ 22.

604.    Annie Norman, the Librarian/Division Director for the Department of State, Division of Libraries testified that if such disbursements/reimbursements are not received, funds from other sources previously designated for other purposes must be used instead or planned activities will be reduced or cancelled, and staff pay may also be affected. ECF 3-5 – Norman Dec., ¶ 23.

605.    The Delaware Division of Libraries uses the data submitted by individual Delaware public libraries to the annual IMLS Public Libraries Survey to help complete the annual distribution calculations for State aid to public libraries. Information from the State Library Administrative Agency Survey results provide inspiration and benchmarks. ECF 3-5 – Norman Dec., ¶ 24.

606.    Annie Norman, the Librarian/Division Director for the Department of State, Division of Libraries testified that elimination or delay in delivery of statewide library services and support for statewide library infrastructure will result in harm to all Delawareans, especially when increased demand for local public libraries' assistance with basic needs, skills retraining and job seeking is expected shortly due to the uncertain economic environment. Libraries also play an important role in improving

the dire student literacy levels in Delaware, and reduction in library services will reduce

progress. ECF 3-5 – Norman Dec., ¶ 25.

607.    Annie Norman, the Librarian/Division Director for the Department of State,

Division of Libraries testified that termination or delay of the Grants to State funding

will reduce, or may eliminate, various statewide library services and infrastructure that

support Delaware's print-disabled residents, job seekers, those needing assistance with

applying for social services benefits, students, seniors and the general public. ECF 3-5

– Norman Dec., ¶ 26.

608.    On March 31, 2025, Norman received an email from the Institute of Museum and

Library Services advising that all of its staff members were going to be placed on

administrative leave effective immediately. ECF 3-5 – Norman Dec., ¶ 27.

609.    On March 31, 2025, Norman also received a statement from AFGE Local 3403 on

the status of Museum and Library Services, advising that "[t]he status of previously

awarded grants is unclear. Without staff to administer the programs, it is likely that

most grants will be terminated." ECF 3-5 – Norman Dec., ¶ 28.

610.    Annie Norman, the Librarian/Division Director for the Department of State,

Division of Libraries testified that because there is no, or greatly reduced, staff to

administer the Grants to States program, it is unlikely that Delaware will receive the

remainder of its 2025 Grants to States Award timely, as expected, which will cause

immediate and irreparable harm to Delaware. ECF 3-5 – Norman Dec., ¶ 29.

611.    Norman testified that the loss of such funds would harm the Delaware's ability to

pay for transit of books throughout the State, Delaware Library Access Services

(DLAS, which provides books in Braille and audio books in accessible formats for the

blind and physically handicapped residents of Delaware), 50% of the salaries of State employees and of contractors who provide direct services to customers in libraries. ECF 3-5 – Norman Dec., ¶ 30.

612.    Randy Riley is the State Librarian for the Library of Michigan. ECF 3-21 – Riley Dec., ¶ 1.

613.    The Michigan Legislature created the Library of Michigan to guarantee that the people of Michigan, as well as its government, would have one perpetual institution to collect and preserve Michigan publications, conduct reference and research, and support libraries statewide. As such, the Library of Michigan is responsible for, among other things, providing local libraries with administrative, statistical, and continuing education tools for staff development and management. The Library of Michigan also provides access to subscription resources, books, and articles to Michigan residents both online and in-person. ECF 3-21 – Riley Dec., ¶ 2.

614.    As the State Librarian, Riley is responsible for the annual funding allotted to the Library of Michigan through the Institution of Museum and Library Services (IMLS) Grants to States Program. This funding is utilized to provide services to libraries statewide that meet the priorities and purposes of the Museum and Library Services Act of 2018, 20 U.S.C. § 9101 et seq. ECF 3-21 – Riley Dec., ¶ 3.

615.    The Library of Michigan is a State library administrative agency. ECF 3-21 – Riley Dec., ¶ 7.

616.    The Library of Michigan's Five-Year Plan was approved on September 14, 2022. (See Exhibit 2 – 9/14/22 Ltr From IMLS.). ECF 3-21 – Riley Dec., ¶ 9.

617.    The Library of Michigan has received funding from IMLS since its inception and

has successfully used the annual funds without compliance or performance issues. IMLS rules require a detailed annual financial and narrative report for all funded projects, a site visit every four to five years, and a formal evaluation of the LSTA program in Michigan every five years. The Library of Michigan has successfully completed all requirements. ECF 3-21 – Riley Dec., ¶ 12.

618.    In 2024, Michigan received $4,788,124 from the Grants to States Program, which represents the Federal share of dollars, or 66% of the total dollars, to support the activities in Michigan's approved plan, with Michigan contributing $2,466,609.33 (34%) in state matching funds.  As the Grants to States grant allocations are based on populations, the Library of Michigan estimated a similar budget to 2024 for IMLS funding for fiscal year 2025, estimating approximately $4,775,000. ECF 3-21 – Riley Dec., ¶ 13.

619.    The Library of Michigan's budget for this year relies heavily on the $4,788,124 in promised federal funding. In fact, this IMLS funding provides 75% of the funding for all statewide services, resources, and support to Michigan libraries and their users. ECF 3-21 – Riley Dec., ¶ 14.

620.    The Library of Michigan uses these federal funds primarily for statewide resources and programs that benefit school, public, and academic libraries; library users; and Michigan residents directly. ECF 3-21 – Riley Dec., ¶ 15.

621.    The Library of Michigan programs that the federal funds support include:

a.   Michigan eLibrary (MeL) Databases: MeL databases contain hundreds of thousands of subscription magazine and newspaper articles, reference book articles, art images, eBooks, historical documents and images, and other full-text materials.

Content ranges from PreK-12 to professional and research levels in science, medicine, technology, humanities, arts, social sciences, law, and genealogy. Spanish language materials are available for PreK-12 students and translation is available in magazine and newspaper databases to support learners who are learning or speak other languages. State funds also support early literacy resources.

b.  The statewide MeL resource sharing catalogue (MeLCat): Michigan residents are using MeLCat to easily identify and request convenient, quick, and free delivery of materials from other participating Michigan libraries to their own library for pick up. The program currently loans well over a million items a year.

c.  eBooks: The Library of Michigan supports a collection of thousands of non-fiction and reference electronic books for K-12 students and teachers, college-level academics, and professionals. Topics include science, computers, business, education, and humanities, among others.

d.  Tests, Tutorials, and Workforce Development: The Library of Michigan offers a comprehensive, interactive site with occupational, licensing, and academic practice tests and tutorials for K-16 and job seekers, from the GED to the GRE.

e.  Continuing Education for Librarians and Trustees: The Library of Michigan supports training for staff and partner organizations, such as conferences, workshops, topical learning cohorts, and webinars.  The Library of Michigan provides a range of online continuing education resources for librarians and trustees, as well as continuing education stipends, giving library staff the opportunity to learn new techniques and methods to reach underserved residents. The Library of Michigan maintains a Library Science collection for use by the

Michigan library community and provides law, trustee, and financial manuals for library staff.

f.  Early Literacy Support: The Library of Michigan provides high-quality, resource-filled summer reading manuals from the Collaborative Summer Library Program to public libraries, saving the library staff time and money. It also offers an online reading support platform. Support for the Ready to Read early literacy program also helped provide quality early literacy programming and training to children's librarians as they work with families in their communities.

g.  Digitization Support: The Library of Michigan participates in statewide digitization efforts such as the Michigan Digital Preservation Network, Michigan newspaper digitization work at Central Michigan University's Clarke Historical Library, support for Making of Modern Michigan and Michigan Memories projects, and grants funding local history and special collections work.

h.  Grants: The federal funds support various grants through the Library of Michigan. For example, Public Library Services grants are small summer programming grants for public libraries in the areas of technology, children & teen programs, and literacy. Improving Access to Information grants are one-year grants for public and academic libraries to increase capacity to provide access to library collections and information. For federal fiscal year 2023, the Improving Access to Information grant was offered, and 18 academic and public libraries received approximately $346,00 for various projects. This year's budget also includes the award of $234,265 in grants to 12 academic and public libraries, of which $152,892 remains outstanding.

i. Technology Support: Michigan participates in Ploud, a nationwide collaborative to provide high quality, easy to use web sites for public libraries, giving their communities online access to statewide resources. The Library of Michigan also provides consulting support for public libraries to participate in the federal E-Rate program. ECF 3-21 – Riley Dec., ¶ 15.

622.    In addition to these programs, the Library of Michigan uses federal funds to pay the salaries of 1.2 full-time employees. ECF 3-21 – Riley Dec., ¶ 16.

623.    To obtain the promised federal funding, the Michigan Department of Education (MDE)—the state agency that operates the Library of Michigan—requests drawdowns on the current Federal awards at irregular intervals. As of April 2025, the Library of Michigan had $648,938 remaining for fiscal year 2025 to expend and be reimbursed. Of that, $552,802 has been committed for expenditures such as grants to libraries, staff salaries, etc. ECF 3-21 – Riley Dec., ¶ 17.

624.    MDE requested a disbursement on March 26, 2025. However, as of April 1, 2025, the disbursement had not been received. Randy Riley, the State Librarian for the Library of Michigan, testified that if the Library of Michigan does not receive this disbursement, every facet of its operations will be impaired, including public and academic libraries' active grants; access to ongoing programs, including those required for certification and eligibility to receive state aid; and staff salaries. ECF 3-21 – Riley Dec., ¶ 18.

625.    IMLS informed the Library of Michigan that the implementation of current Executive Orders, including Executive Order 14,238, may delay reimbursements. ECF 3-21 – Riley Dec., ¶ 19.

626.    Randy Riley, the State Librarian for the Library of Michigan, testified that if there is no staff to administer the IMLS Grants to States program, it is unlikely that the Library of Michigan will receive the remainder of its 2025 Grants to States Award by October 31, 2025, as expected, which will cause immediate and irreparable harm to Michigan. ECF 3-21 – Riley Dec., ¶ 22.

627.    Randy Riley, the State Librarian for the Library of Michigan, testified that any pause in Michigan's federal funding would severely impact the Library of Michigan's operations. For example, Riley testified that the MeLCat service would be immediately impaired. In Michigan, 368 out of 397 public libraries, and 52 out of 79 academic libraries, use MeLCat as an integral part of their daily circulation of library materials. In 2024, libraries shared 1,061,217 items, an average of 2,907 books a day. That same year, Michigan residents accessed 19,236,855 articles and journals. This service is of vital importance to residents—in particular, K-12 students, and higher education students—and is used in every county of the state. Residents and schools would be unable to individually purchase the vast number of resources available through MeL and MeLCat. ECF 3-21 – Riley Dec., ¶ 23.

628.    Randy Riley, the State Librarian for the Library of Michigan, testified that a pause in federal funding would also greatly reduce training resources and online and in-person training activities for libraries—including access to training that is required in Michigan for certification and eligibility to receive state aid. ECF 3-21 – Riley Dec., ¶ 24.

629.    As a result of Executive Order 14,238, the Library of Michigan has canceled a summer grant program for summer 2025, which is primarily used to support small and

rural libraries, out of concern that the Library of Michigan would be unable to reimburse their costs after awarding grants. This summer grant program provides approximately 130 to 150 grants of up to $2,000 each for summer programming. ECF 3-21 – Riley Dec., ¶ 25.

630.     The Library of Michigan has also delayed all grant program applications for 2026 due to the lack of an approved budget for that period. Randy Riley, the State Librarian for the Library of Michigan, testified that even if grant funding is approved, at this point, the funded programs could only operate for six to nine months, as opposed to a full year. ECF 3-21 – Riley Dec., ¶ 26.

631.     Additionally, Randy Riley, the State Librarian for the Library of Michigan, testified that with the loss of LSTA funding from IMLS, the Library of Michigan will not be able to honor contracts connected to MeL or MeLCat. As a result, the Library of Michigan will need to cancel MeL-related business, resulting in a loss of jobs. ECF 3-21 – Riley Dec., ¶ 27.

632.     The Library of Michigan, supported by LSTA funds through IMLS, provides significant training and support for academic, public, and school libraries in, among other things: (1) using MeL eContent for residents  and students; (2) using MeLCat to provide physical content to residents  and students; (3) library administration; (4) grants management; (5) financial management; (6) digitization and preservation of historic materials; (7) early literacy and children's programming support; and (8) legal issues relating to libraries and information access. ECF 3-21 – Riley Dec., ¶ 28.

633.     IMLS further provides the following surveys and data sets:

a.    The Public Library Survey (PLS), which examines library services to the public

across the county and allows policymakers and library stakeholders to make informed decisions about the management and support for libraires. The PLS also provides a source of vetted data for researchers and the public.

b.  The State Library Administrative Agency (SLAA) Survey, which is a biennial survey collected from state libraries to allow state library agencies to compare with peers. The SLAA Survey also helps stakeholders and policymakers make informed decisions regarding library services at the state level.

c.  A search and compare tool that allows anyone to compare public libraries across the United States.

d.  A data tool that allows users to compare all State Library Agencies.

e.  A Data Catalog with over 30 years of PLS data sets.

f.  Publications discussing the state of libraries in the United States.

g.  Compilations of IMLS funding reports for all states and the District of Columbia. ECF 3-21 – Riley Dec., ¶ 29.

634.  All of these services will be impacted by the implementation of Executive Order 14,238, including the placement of IMLS staff on administrative leave, which will have repercussions on the Library of Michigan's operations. ECF 3-21 – Riley Dec., ¶ 30.

635.  For instance, the Library of Michigan uses the SLAA Survey and the PLS to make comparisons among Michigan public libraries and with other states in order to identify usage trends and financial needs, and to show evidence-based examples of how libraries are effectively used in communities. ECF 3-21 – Riley Dec., ¶ 31.

636.  The PLS and SLAA Survey provide necessary data to allow users to understand how libraries are being funded and used across the nation. PLS houses a large amount

of longitudinal data, including financial, service, and use trends across the country over the last 30 or more years. Losing access to this information, and no longer collecting new data, will have a detrimental effect on library services in the United States. Libraries will have more difficulty in making sound financial decisions regarding use of public funds without this data and other evidence showing how the public is using libraries across the state and nation. ECF 3-21 – Riley Dec., ¶ 32.

637.    In addition, the Library of Michigan routinely seeks advice on funding compliance issues from IMLS program staff to ensure the legal and fiscally responsible use of LSTA funds and are unable to seek compliance direction when all IMLS staff are on administrative leave. ECF 3-21 – Riley Dec., ¶ 33.

638.    Randy Riley, the State Librarian for the Library of Michigan, testified that ultimately, a termination or delay in IMLS financial awards and programs—on which the Library of Michigan relies and expects to rely on in the future—will effectively eliminate access to a vast number of informational resources for the residents of Michigan. Riley further testified that this will have a particular impact on those who live in small or rural areas of their state and those who are unable to afford to purchase these resources. ECF 3-21 – Riley Dec., ¶ 34.

639.    Additionally, Riley testified that termination or delay may interrupt certification processes for librarians, impacting libraries' ability to receive state aid funds. Librarians also will be left without data or evidence to make informed financial and service decisions. ECF 3-21 – Riley Dec., ¶ 35.

640.    Finally, Riley testified that termination or delay will deprive Michigan children of summer reading enrichment and limit the ability of libraries to improve access to

information, including access to local historical documents and even to their basic website presence. ECF 3-21 – Riley Dec., ¶ 36.

641.    In short, according to the testimony of Michigan's State Librarian, IMLS funds and programs have a profound impact on improving outcomes in Michigan for students, professionals, and lifelong learners. Their loss will be felt across the state. ECF 3-21 – Riley Dec., ¶ 37.

642.    Deborah Schander is the State Librarian for the Connecticut State Library. ECF 3-4 – Schander Dec., ¶ 2.

643.    The Connecticut State Library ("CSL") is an independent and non-partisan Executive Branch agency of the State of Connecticut. Founded in 1854, the Connecticut State Library's mandate includes the State Archives, Office of the Public Records Administrator, Museum of Connecticut History, the Division of Library Development and the Connecticut Library for Accessible Books, three reference departments (History & Genealogy; Law and Legislation; and Government Information), and various internal units. Through these units, the agency provides a variety of archival, public records, museum, library, information, and administrative services. Open to both residents and users beyond state borders, the Connecticut State Library serves the employees and officials of all three branches of state government, libraries, students, teachers, researchers, town governments, and anyone seeking information within its collections. ECF 3-4 – Schander Dec., ¶ 3.

644.    As State Librarian, Schander is responsible for administering the Library Services and Technology Act grant from the Institute of Museum and Library Services, by which funds the State Library amplifies the capacity of public, school, academic, and special

libraries across the state with a suite of library infrastructure, services, and development opportunities. ECF 3-4 – Schander Dec., ¶ 4.

645.    The Connecticut State Library is a State library administrative agency. ECF 3-4 – Schander Dec., ¶ 8.

646.    In 2024, Connecticut received $2,164,184 from the Grants to States Program, which represents the Federal share of the activities in the approved plan, totaling 66 percent. ECF 3-4 – Schander Dec., ¶ 12.

a.    The Connecticut State Library uses these federal funds to support many of its programs, including: the Connecticut Library for Accessible Books, the Middletown Library Service Center and its collections and equipment, digital connectivity and digital navigation, early literacy and summer reading, support for veterans and military families, professional development for librarians and library staff, professional consultants, workforce development, resource sharing, a statewide digital library, and a statewide eBook and eAudio lending platform. In approximately 5,565 square miles, Connecticut contains 191 public libraries. Also counting school, academic, special, and government libraries, Connecticut has more than 950 libraries, all of which are eligible to benefit in some way from the services provided through Connecticut's LSTA funding. ECF 3-4 – Schander Dec., ¶ 13.

b.    Connecticut also uses these federal funds to pay the salaries of thirteen employees. ECF 3-4 – Schander Dec., ¶ 14.

c.    In addition to administering federal funding to States, IMLS also provides the following programs and services: ongoing research, collection of consistent data,

and policy evaluation related to libraries and museums which it disseminates to the public and the field to extend and improve the Nation's museum, library, and information services; coordination of IMLS activities with other federal agencies; annual national awards and medals for outstanding libraries and museums that have made significant contributions in service to their communities; and additional grants to libraries and museums, including but not limited to: National Leadership, Laura Bush 21st Century Librarian Program, 21st Century Museum Professional Program, and Services to Native Americans. The Connecticut State Library has been awarded a $285,000 grant from the Laura Bush 21st Century Librarian Program to partner with TSFX to provide strategic foresight training to 300 public, academic, school, and special librarians and a $249,948 grant from the National Leadership Grants program to collaborate with eight public libraries to design and residents. ECF 3-4 – Schander Dec., ¶ 15.

647.    The Connecticut State Library's budget for this year has relied on receiving $2,164,184, and they made plans and allocated funding for staffing and entered into contracts and agreements pursuant to providing the activities described in paragraph 13 based on the anticipated receipt of federal funding promised. For example, the Connecticut Library for Accessible Books circulates audio and braille books to 5,500+ active patrons including 316 veterans; the eRate program provides funds for schools and libraries to improve their broadband access; the statewide delivery service shares 1.5 million+ library items between 215 public and academic libraries each year; and the statewide eBook platform offers more than 50,000 titles to Connecticut residents for free. In 2024, Connecticut libraries offered 8,827 summer reading programs and

activities to 229,470 kids, teens, and families; a loss of IMLS funding would jeopardize 2025 summer reading initiatives across the state. ECF 3-4 – Schander Dec., ¶ 16.

648.   The Connecticut State Library has relied upon funding from IMLS to support mandated programs and services since 1996. Deborah Schander, the State Librarian for the Connecticut State Library, testified that it has every intention to seek and rely on both mandatory and discretionary IMLS funds in the future. ECF 3-4 – Schander Dec., ¶ 17.

649.   Deborah Schander, the State Librarian for the Connecticut State Library, testified that any pause in its federal funding would result in postponement of contracted continuing education and programming services, inability to pay salaries, inability to pay invoices for contracted services rendered, halt of collection development supporting public libraries and public schools, inability to pay operating costs for the Middletown Library Service Center and Connecticut Library for Accessible Books, cancellation of workforce development resources; inability to purchase digital library eBook and eAudio content for the statewide eBook platform and public schools' Community Shares program; and cancellation of their remaining Laura Bush 21st Century Librarian program activities (three additional cohorts to train 90 librarians). ECF 3-4 – Schander Dec., ¶ 18.

650.   Deborah Schander, the State Librarian for the Connecticut State Library, testified that the uncertainty of not receiving IMLS funding has had an immediate chilling effect on the Connecticut library community. Connecticut State Library staff do not know if their salaries will be paid. Libraries do not know if the services they rely upon so heavily will be in operation tomorrow. Schander further testified that Library patrons

do not know if the resources they rely on for education and edification will still be available to them. The day-to-day atmosphere and work of libraries is permeated by uncertainty and apprehension. ECF 3-4 – Schander Dec., ¶ 19.

651.    The Connecticut State Library has a proven history of adequate performance related to federal funding, including timely submissions of its five-year plans and a record of achievement in meeting program goals set out in said plans, e.g. CSL successfully fulfilled each of the five projects and 18 accompanying activities laid  out in its Library Services and Technology Act, Five Year Plan 2018-2022. In the mandatory evaluation of said   plan, the independent team noted: "CSL continues to rise to meet the challenges of the day, poised by the double-edged sword of a financially difficult state economy and the global pandemic. Throughout these trials, [the Division of Library Development] has tirelessly lent their efforts to supporting and establishing Connecticut's libraries as community anchors, providing consulting, professional development, and programming aimed to expand libraries institutional capacity and community partnerships." ECF 3-4 – Schander Dec., ¶ 20.

652.    The Connecticut State Library has a proven history of adequate performance related to federal funding, including timely submissions of its five-year plans and a record of achievement in meeting program goals set out in said plans, e.g. CSL successfully fulfilled each of the five projects and 18 accompanying activities laid out in its Library Services and Technology Act, Five Year Plan 2018-2022. In the mandatory evaluation of said plan, the independent team noted: "CSL continues to rise to meet the challenges of the day, poised by the double-edged sword of a financially difficult state economy and the global pandemic. Throughout these trials, [the Division

172

of Library Development] has tirelessly lent their efforts to supporting and establishing Connecticut's libraries as community anchors, providing consulting, professional development, and programming aimed to expand libraries institutional capacity and community partnerships." ECF 3-4 – Schander Dec., ¶ 20.

653.    In April 2025, for March expenditures, it anticipated receiving disbursements / reimbursements of around $170,000 under its Federal awards. ECF 3-4 – Schander Dec., ¶ 21.

654.    The Connecticut State Library typically spends between $144,000 and $231,000 per month and submits disbursement requests every one to three months, depending on need. As of April 2025, $984,405.25 remained to be disbursed to Connecticut in Federal Fiscal Year 2025 for its state award. Deborah Schander, the State Librarian for the Connecticut State Library, testified that if the Library does not receive such disbursements/reimbursements, it will result in its immediate inability to pay invoices and salaries, meet contractual obligations, operate the statewide delivery service, support statewide collections, and other harms. ECF 3-4 – Schander Dec., ¶ 22.

655.    On March 18, 2025, IMLS staff notified Connecticut State Library regarding finalized numbers for FY2025 awards to states: "we are *awaiting review of our funding levels* by program from the Office of Management and Budget (OMB)" and "*[a]fter we receive our final review* from OMB, *our plan* is to issue awards to all states" and "[b]ased on our grant processes, we expect to issue these awards by April 22, *unless you hear otherwise from us* (emphasis added)." As of April 2025, Connecticut State Library had received no further communications from IMLS regarding awards to states. At that time Connecticut State Library had also received no communication at all

regarding Laura Bush and National Leadership Grant disbursements. CSL requested, and received, the full $249,948 disbursement for its National Leadership Grant up front; however, Schander testified that a possible two-year program extension and the additional requisite grant award remains uncertain. Of the $285,000 grant from the Laura Bush 21st Century Librarian Program, $83,000 remained undisbursed as of April 2025. ECF 3-4 – Schander Dec., ¶ 23.

656.    On March 17, 2025, $235,541.43 were approved in IMLS's eGMS system for the Connecticut State Library. Connecticut State Library requested the disbursement of said funds on March 20, 2025. Typically, funds are disbursed in 2-3 days. By April 2025, no funds had been disbursed. ECF 3-4 – Schander Dec., ¶ 24.

657.    On March 31, 2025, Schander received an email from the Institute of Museum and Library Services advising that all of its staff members were going to be placed on administrative leave effective immediately. ECF 3-4 – Schander Dec., ¶ 25.

658.    On March 31, 2025, Schander was also forwarded a statement from AFGE Local 3403 on the status of Museum and Library Services, advising that "[t]he status of previously awarded grants is unclear. Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-4 – Schander Dec., ¶ 26.

659.    If there is no staff to administer the Grants to States program, Deborah Schander, the State Librarian for the Connecticut State Library, testified that it is unlikely that Connecticut will receive the remainder of its 2025 Grants to States Award monthly allotments through September 30, 2025, as expected, which will cause immediate and irreparable harm to Connecticut. ECF 3-4 – Schander Dec., ¶ 27.

660.    The Connecticut State Library, and the Connecticut library community, are heavily

reliant on the programs and resources of IMLS. The annual collection and dissemination of consistent statistics and information about public libraries is used to ensure local funding and support and benchmarking in decision-making. National Leadership Grants and Laura Bush 21st Century Librarian Program grants allow libraries to pilot new ideas, collectively expand services, and ensure the long-term growth and development of the profession. The staff and services provided by the Connecticut State Library allow local libraries to support their communities with initiatives they might not otherwise be able to provide, e.g. early literacy services. Public libraries and school libraries rely on the Connecticut State Library's provision of summer reading training, LSTA funded grants, print and eBook collections, and programming, services, and consulting. Distressed communities and the large number of Connecticut libraries which do not have children's or young adult librarians are particularly reliant on these offerings. ECF 3-4 – Schander Dec., ¶ 28.

661.    Deborah Schander, the State Librarian for the Connecticut State Library, testified that the elimination or delay in the delivery of the programs and services would have a direct and widespread adverse impact on the Connecticut library community and the citizens they serve. ECF 3-4 – Schander Dec., ¶ 29.

662.    Deborah Schander, the State Librarian for the Connecticut State Library, testified that the resulting loss of these program services and funding would disproportionately harm the state's most vulnerable populations, including children, seniors, job seekers, and students who rely on the digital navigator programs, eRate, services and resources to rural and under resourced libraries, print and digital collections, the statewide delivery service, and the consulting and support of staff to develop the skills needed

for library services. ECF 3-4 – Schander Dec., ¶ 30.

663.    On April 2, 2025, at 7:30 p.m., Deborah Schander received an email from IMLS Acting Director, Keith Sonderling, with the subject line: "Notice of Grant Termination LS-256810-OLS-25." An Action Memorandum and letter was attached to the email, notifying the Connecticut State Library that the grant is "unfortunately inconsistent with IMLS' priorities. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions." ECF 3-4 – Schander Dec., ¶¶ 31-32.  A copy of the memorandum is available as Exhibits A ECF 3-4.

664.    The letter, signed by Acting Director Keith Sonderling, terminated this grant as of April 1, 2025.  ECF 3-4 – Schander Dec., ¶ 33.

665.    It is the stated policy of the State of Illinois "to promote, support, and implement library services on a statewide basis, including the effective sharing of resources and services among libraries to promote access to information in both print and electronic format." 15 ILCS 320/3. ECF 3-43 – Giannoulias Dec., ¶ 5.

666.    The Illinois State Library ("ISL") receives approximately $5.7 million each year through the IMLS Grants to States Program. ECF 3-43 – Giannoulias Dec., ¶ 6.

667.    ISL is responsible for distributing grants to over 1,700 public, academic, school, and special library agencies across the state to support and expand library services, assuring library services are available and continue to be relevant to the state's residents. ECF 3-43 – Giannoulias Dec., ¶ 7.

668.    Executive Order 14,238 will cause IMLS to be unable to administer financial awards and/or programs on which the Illinois State Library relies on and which it

expects to rely in the future, causing significant harm to the Illinois State Library, the
Illinois Secretary of State, and the State of Illinois. ECF 3-43 – Giannoulias Dec., ¶ 9.

669.    In 2024, Illinois received approximately $5.7 million, the sixth-largest grant in the
country, which represents a federal share of the activities in the approved plan, totaling
66      percent.              See      https://wwww.imls.gov/sites/default/files/2024-
04/imlslstastateallotmenttablefy2024.pdf. ECF 3-43 – Giannoulias Dec., ¶ 15.

670.    ISL uses these federal funds to support many of its programs, including: $2.5
million allocated to the Illinois Heartland and Reaching Across Illinois Library Systems
(IHLS and RAILS), a program that facilitates the delivery of books and other library
materials to support interlibrary loan services; $1.8 million for a subscription to the
Online Computer Library Center (OCLC) WorldCat Discovery/FirstSearch Services,
used by more than 1,000 libraries in Illinois to support cataloging, the interlibrary loan
program, and information needs; $526,000 for Project Next Generation, which
educates at-risk students and provides access to computers, software, and technologies
to students who may not otherwise have access; and $420,000 allocated to the Illinois
Department of Corrections for the purchase of library materials and services at 28 state
corrections facilities in the state, aimed at reducing recidivism. ECF 3-43 – Giannoulias
Dec., ¶ 16.

671.    ISL's budget for the state's fiscal year has relied on receiving approximately $5.7
million from IMLS, and ISL made plans and allocated funding for the grants described
above and others, based on the anticipated receipt of federal funding promised. ECF 3-
43 – Giannoulias Dec., ¶ 17.

672.    ISL planned to apply for and use funds from the Grants to States Program in all

future budget years. ECF 3-43 – Giannoulias Dec., ¶ 18.

673.    On March 31, 2025, the Director of the State Library received notice from IMLS advising that all of its staff members were going to be placed on administrative leave effective immediately. ECF 3-43 – Giannoulias Dec., ¶ 19

674.    On March 31, 2025, the Director of the State Library also received notice from AFGE Local 3403, through the Chief Offices of State Library Agencies, advising that "[t]he status of previously awarded grants is unclear.  Without staff to administer the programs, it is likely that most grants will be terminated." ECF 3-43 – Giannoulias Dec., ¶ 20.

675.    ISL received no further instruction from IMLS about how to proceed. ECF 3-43 – Giannoulias Dec., ¶ 21.

676.    Because there is no staff to administer the Grants to States program, it is unlikely that Illinois will receive the remainder of its 2024 Grants to States Award by September 30, 2025, as expected. ECF 3-43 – Giannoulias Dec., ¶ 22.

677.    Without the remaining funding granted by IMLS for this state fiscal year, which ended on June 30, 2025, ISL will be responsible for $804,892.01 to the grantees that expected this funding. ECF 3-43 – Giannoulias Dec., ¶ 23.

678.    This will cause immediate and irreparable harm to Illinois. ECF 3-43 – Giannoulias Dec., ¶ 24.

679.    Because ISL's budget has relied on consistent annual funding from IMLS since its inception (and even before, from its predecessor agency), ISL and libraries across Illinois have no alternative funding streams to support these programs. ECF 3-43 – Giannoulias Dec., ¶ 25.

680.    Any pause or cessation of the federal funding awarded by IMLS would result in drastic disruption of services to the public in libraries across the state. ECF 3-43 – Giannoulias Dec., ¶ 25.

681.    For example, last fiscal year, the IHLS and RAILS program, using $2.5 million from IMLS funding, facilitated the transfer of over 11 million items between more than 1,700 libraries in Illinois. ECF 3-43 – Giannoulias Dec., ¶ 25.

682.    This program is critical to supporting libraries that are dependent on borrowing materials from districts with larger collections and more financial resources. ECF 3-43 – Giannoulias Dec., ¶ 25.

683.    If the RAILS program were eliminated due to a lapse in funding from IMLS, sending the same number of materials through the U.S. Mail would cost Illinois taxpayers over $55 million. ECF 3-43 – Giannoulias Dec., ¶ 25.

684.    Further, in the last fiscal year, using the OCLC subscription purchased with IMLS funds, Illinois libraries conducted nearly one million citation searches to serve their library patrons and support their library operations. ECF 3-43 – Giannoulias Dec., ¶ 25.

685.    If ILS can no longer support Project Next Generation without federal funding, children will lose opportunities to access the technology that has boosted their learning and life skills necessary for future success. ECF 3-43 – Giannoulias Dec., ¶ 25.

686.    Seven percent of Illinoisans lack adequate broadband infrastructure, and 62% live in an area with only one Internet Service Provider.  Even where Internet Service Providers exist, Internet access may still be inaccessible.  For example, as set forth in ISL's most recent five-year plan, in Menard County, Illinois, 54% of households could

get broadband, but only 9% actually had it.  And in Sangamon County, Illinois, 91% of households could get broadband, but only 47% actually had it. ECF 3-43 – Giannoulias Dec., ¶ 25.

687.    Project Next Generation assists in bridging this digital divide. ECF 3-43 – Giannoulias Dec., ¶ 25.

688.    Losing funding that provides these services would have a devastating impact on libraries across Illinois and the communities they serve. ECF 3-43 – Giannoulias Dec., ¶ 25.

689.    Because of the Executive Order dismantling IMLS, and the steps that have been taken to place all IMLS staff on administrative leave, the ability of ISL to serve Illinois communities and library patrons throughout the state will be harmed. ECF 3-43 – Giannoulias Dec., ¶ 26.

690.    The Massachusetts Board of Library Commissioners ("MBLC") is an agency of state government with the statutory authority to support, develop, coordinate, improve, and promote library services throughout the Commonwealth. It was established in 1890 under Chapter 78 of the Massachusetts General Laws. ECF 3-44 – Amyot Dec., ¶ 3.

691.    Executive Order 14,238 will cause IMLS to be unable to administer financial awards and/or programs on which the Massachusetts Board of Library Commissioners relies and on which it expects to rely in the future, causing significant harm to the Commonwealth of Massachusetts and the Massachusetts Board of Library Commissioners. ECF 3-44 – Amyot Dec., ¶ 4.

692.    For Federal Fiscal Year 2024, Massachusetts received $3,642,371 from the Grants to States Program, which represents a federal share of the activities in the approved

plan, totaling 66 percent. *See* https://www.imls.gov/sites/default/files/2024-04/imlslstastateallotmenttablefy2024.pdf. ECF 3-44 – Amyot Dec., ¶ 12.

693.   The MBLC used these federal funds to support many of its programs, including statewide electronic research databases that are used most by school libraries; the only statewide E Book platform; direct grant program to public; school, and academic libraries; a statewide  interlibrary loan platform (ComCat); statewide collection preservation and disaster response programs; and statewide librarian training programs. ECF 3-44 – Amyot Dec., ¶ 13.

694.   The MBLC also uses these federal funds to pay the salaries, in full or in part, of thirteen staff members (8.75 FTE out of 23 total agency FTE). ECF 3-44 – Amyot Dec., ¶ 14.

695.   In addition to administering federal funding to States, IMLS also provides programs and services to both the MBLC and to other institutions and programs in Massachusetts. ECF 3-44 – Amyot Dec., ¶ 15.

696.   These programs include the Laura Bush 21st Century Librarian Program (LB21), which supports the training and professional development of library and archives professionals; developing faculty and information leaders; and recruiting, educating, and retaining the next generation of library and archives professionals in order to develop a diverse library and archival workforce and meet the information needs of their communities. ECF 3-44 – Amyot Dec., ¶ 15.

697.   They include the National Leadership Grants for Libraries, which provides grants for projects that develop, enhance, or disseminate replicable practices, programs, models, or tools to strengthen library and archival services for the American public.

ECF 3-44 – Amyot Dec., ¶ 15.

698.    They include the Native American Library Services Grants, which assist eligible Native Communities in establishing, sustaining, and improving library services and operations with their communities. ECF 3-44 – Amyot Dec., ¶ 15.

699.    They include Save America's Treasures, a Historic Preservation Fund grant program administered by the National Park Service in partnership with the Institute of Museum and Library Services, the National Endowment for the Arts, and the National Endowment for the Humanities. Grants in this program are used by libraries, museums, and archives to preserve nationally significant collections of artifacts, museum collections, documents, sculptures, and other works of art; and for planning and "bricks and mortar" preservation/conservation work on historic buildings and structures listed in the National Register of Historic Places or designated as National Historic Landmarks. ECF 3-44 – Amyot Dec., ¶ 15.

700.    They include the Digital Humanities Advancement Grants, a joint effort of IMLS and the National Endowment for the Humanities to support innovative, experimental, and/or computationally challenging digital projects at different stages of their lifecycles, from early start-up phases through implementation and sustainability. Projects are collaborations between library and archives professionals, humanities professionals, information scientists, and relevant public communities to advance preservation of, access to, and public engagement with digital collections and services that will strengthen community learning, foster civic cohesion, advance research, and enhance knowledge networks. ECF 3-44 – Amyot Dec., ¶ 15.

701.    In addition to the library-specific programs mentioned above, IMLS supports ten

museum industry specific programs, and two programs solely for Native Hawaiian library and museum services. ECF 3-44 – Amyot Dec., ¶ 15.

702.    The MBLC's budget for this year has relied on receiving $3,642,371. ECF 3-44 – Amyot Dec., ¶ 16.

703.    MBLC made plans, and allocated funding for, agency staffing, a direct grants program for libraries, extensive statewide  databases, state library networks, the Commonwealth Catalog (a statewide  catalog that allows library users in Massachusetts to search and request materials from participating libraries across the state), extensive learning resources for library staff across the Commonwealth, various financial reporting systems, operational costs, key memberships in library-related organizations, resource sharing, book purchase, participation in conferences and meetings, professional development, membership in the library network so the MBLC can operate active library, preservation, disaster preparedness programs, and the Summer Reading program, based on anticipated receipt of the Federal funding promised. ECF 3-44 – Amyot Dec., ¶ 16.

704.    The MBLC plans to rely on the Grants to States program until or unless it ceases to exist. ECF 3-44 – Amyot Dec., ¶ 17.

705.    This is critical funding that provides essential services to libraries statewide and helps cover salary costs for staff at MBLC. ECF 3-44 – Amyot Dec., ¶ 17.

706.    MBLC was notified by other State Library Administrative Agencies (Washington state, California, and Connecticut) that they received Notices of Grant Termination from IMLS on April 2, 2025. ECF 3-44 – Amyot Dec., ¶ 17.

707.    The termination notice stated that those three states' Grants to States grants were

terminated effective April 1, 2025. ECF 3-44 – Amyot Dec., ¶ 17.

708.    As of 2 p.m. on April 3, 2025, the MBLC had not received a letter but was expecting one imminently. ECF 3-44 – Amyot Dec., ¶ 17.

709.    Any pause in federal funding would result in cancellation of essential services that are used by 1,200 school and public libraries across the Commonwealth. ECF 3-44 – Amyot Dec., ¶ 18.

710.    It would mean payroll and accounting staff would have to continue working in multiple scenarios, contingency planning, and functioning in emergency mode rather than counting on funds that are allocated but are not flowing from Washington. ECF 3-44 – Amyot Dec., ¶ 18.

711.    And it would mean that MBLS would have to cut absolutely every expenditure outside of payroll and office rent in order to cover the gap between state and federal funds. ECF 3-44 – Amyot Dec., ¶ 18.

712.    The immediate chilling effect on service provision from the uncertainty of not getting reimbursed will impact the MBLC's ability to carry out current programs and services and plan any future programs using IMLS funds. ECF 3-44 – Amyot Dec., ¶ 19.

713.    In this uncertainty, the MBLC will cancel MBLC's direct grants to library program. ECF 3-44 – Amyot Dec., ¶ 19.

714.    The MBLC will not renew current contracted statewide research databases, forcing MBLC to have to repeat a labor- and time-intensive procurement to reestablish services if funding starts flowing again.  This will cause a suspension in a program that serves 1,200 libraries. Agency staff time and effort would be diverted from other required

work. ECF 3-44 – Amyot Dec., ¶ 19.

715.    The MBLC will shift IMLS-funded staff salaries to MBLC state budget lines,

resulting in the elimination or reductions to established programs and services currently

using these state budget lines. If this uncertainty carries forward into FY26, MBLC

would be forced to look at the elimination of staff and reduction of services it is

mandated to provide. MGL c. 78. ECF 3-44 – Amyot Dec., ¶ 19.

716.    IMLS funds are monitored on a continuous basis and reported annually in MBLC's

State Program Report (SPR). The SPR accounts for every dollar of IMLS funding spent

for a given fiscal year and provides a narrative of program activities and impact. ECF

3-44 – Amyot Dec., ¶ 20.

717.    The MBLC annually meets all reporting deadlines and consistently receives

successful report certification signifying ongoing good stewardship of federal funding.

ECF 3-44 – Amyot Dec., ¶ 20.

718.    In the next six months, the MBLC is scheduled to receive reimbursements of

$1,971,586.11 under their current Federal award. These funds have been appropriated

by Congress but are disbursed to the MBLC on a reimbursement basis, so have not yet

been received by the MBLC. ECF 3-44 – Amyot Dec., ¶ 21.

719.    MBLC requests to receive reimbursements from IMLS each month, with the

amount of the request reflecting the actual spend each month. If MBLC does not receive

such reimbursements, it would be required to pay back to the Commonwealth of

Massachusetts for those funds already spent but not yet reimbursed by IMLS. ECF 3-

44 – Amyot Dec., ¶ 22.

720.    As of March 25, 2025, IMLS's reimbursement website indicated: "Recent

executive orders may impact IMLS response and processing times.  At this time, you may continue to submit payment requests and required reports for your open awards." ECF 3-44 – Amyot Dec., ¶ 23.

721.    As of March 26, 2025, MBLC had not yet received reimbursement for its most recent reimbursement request to IMLS, which was submitted on March 19, 2025. Reimbursements are usually processed within two business days and funds are received within seven calendar days. ECF 3-44 – Amyot Dec., ¶ 24.

722.    The MBLC has been a recipient of IMLS funding for more than 50 years through the Library Services and Technology Act's Grants to States program and its predecessor programs. Although the legislation has undergone numerous reauthorizations, the basic function of the program, which merges federal priorities with state-defined needs, continues to this day. ECF 3-44 – Amyot Dec., ¶ 25.

723.    During those years the MBLC has used funding for access to electronic databases, a statewide  summer reading program, digitization of historic documents, and development of outreach programs to underserved residents  including those in rural areas and in correctional facilities. ECF 3-44 – Amyot Dec., ¶ 25.

724.    Individual libraries have used MBLS subgrants to provide services to teens, early literacy programs, computer instruction, access to adaptive technology, STEM and STEAM programs, makerspaces, and staff training on topics like customer service and assisting new Americans. ECF 3-44 – Amyot Dec., ¶ 25.

725.    The impact of this small amount of funding has been far-reaching and transformational. ECF 3-44 – Amyot Dec., ¶ 25.

726.    If Grants to States funds are eliminated, the MBLC will no longer be able to pay

for the statewide database program provides critical access to research databases that no community or school system could afford to purchase on its own. On average 60% of database usage comes from schools. Last year, there were over 9 million full text downloads from these databases, an increase of 12% in just one year. ECF 3-44 – Amyot Dec., ¶ 26.

727.    It would not be able to pay for ComCat, which gives residents access to millions of items that their own local network doesn't have. Items are ordered through ComCat and delivered right to the residents' local library for pick-up. More than 103,000 items were circulated via ComCat in 2023. ECF 3-44 – Amyot Dec., ¶ 26.

728.    It would not be able to pay for Library eBooks and Audiobooks (LEA), which allows Massachusetts library users to access eBooks, audiobooks, and more from 375 libraries from across the Commonwealth. LEA circulation has more than doubled since 2019 with residents borrowing more than 1.9 million items from LEA in 2024, an increase of 19% in just one year. ECF 3-44 – Amyot Dec., ¶ 26.

729.    It would not be able to pay for Libraries.state.ma.us, the MBLC's consumer-facing website for residents. This site features services for new library users, including a library locator, how to get a library card, how to do online research, how to access eBooks and audiobooks, and a statewide calendar of programs and classes for learners of all ages and abilities. ECF 3-44 – Amyot Dec., ¶ 26.

730.    It would not be able to pay for summer reading programs.  More than 157,000 children, teens, and adults participated in statewide summer reading programs last year, in partnership with the Boston Bruins.  With MCAS reading scores (English Language Arts-ELA) for grades 3 through 10 in a downward trend, these programs help close the

literacy gap, a critical predictor of academic success. ECF 3-44 – Amyot Dec., ¶ 26.

731.    It would not be able to pay for disaster preparedness and catastrophic loss mitigation programs, including training and resources so libraries can minimize the impacts from disasters through risk assessment and mitigation planning. ECF 3-44 – Amyot Dec., ¶ 26.

732.    It would not be able to pay for MBCL grants to preserve historic collections. ECF 3-44 – Amyot Dec., ¶ 26.

733.    Massachusetts libraries are home to historic items that are an important part of the Commonwealth's rich cultural heritage. Preserving them and making them accessible to future generations is the goal of the annual Preservation Assessment Grants program from the MBLC. ECF 3-44 – Amyot Dec., ¶ 26.

734.    The MBLC funds the salaries, in full or in part, of 13 staff members (8.75 FTE out of 23 total agency FTE) with funding from IMLS, so those salaries would either need to move to state-funded lines where they would bump other program funding, or be eliminated. In an agency this small, every single employee is essential to its operation. The MBLC would not be able to carry out the programs and services required of the agency in MGL Chapter 78 if it had to reduce staffing. ECF 3-44 – Amyot Dec., ¶ 26.

735.    Termination of IMLS funds would result in cancellation of all of the MBLC's statewide research databases, loss, statewide, of the ability for residents to request items from other libraries through the Commonwealth Catalog, and cancellation of all funding for electronic content through the Library Ebooks and Audiobooks (LEA) program. ECF 3-44 – Amyot Dec., ¶ 27.

736.    The MBLC would have to shut down its public facing web service portal, and

cancel its statewide Summer Reading Program and its 17-year collaboration with the Boston Bruins. ECF 3-44 – Amyot Dec., ¶ 27.

737.    Libraries would no longer have MBLC's assistance with disaster preparedness, leaving them vulnerable to catastrophic loss in an era of climate change. ECF 3-44 – Amyot Dec., ¶ 27.

738.    The MBLC would no longer be able to help Massachusetts libraries protect or digitize the wealth of historic documents found in cities and towns that pre-date our nation. ECF 3-44 – Amyot Dec., ¶ 27.

739.    The loss of this funding would have catastrophic consequences for services that touch every single municipality in the Commonwealth. ECF 3-44 – Amyot Dec., ¶ 27.

740.    State legislators have made it clear that the Commonwealth absolutely cannot "make up" the loss of federal funds for this agency and likely for most others, so these essential services would have to be eliminated. ECF 3-44 – Amyot Dec., ¶ 27.

741.    In addition, if the MBLC were unable to fund staff positions through other lines in the budget, it would be forced to lay off staff. This would prevent us from being able to provide the services required in Massachusetts General Laws Chapter 78 and would cause long-lasting harm to every community in the Commonwealth. ECF 3-44 – Amyot Dec., ¶ 27.

742.    Delay of IMLS funding is already having an administrative impact on the MBLC. Staff in its Business Office are having to manage multiple scenarios as information changes, sometimes daily. Because it is so close to the end of the Massachusetts fiscal year, and because IMLS operates on a reimbursement basis, the MBLC has had to drastically cut the amount of money it spends on federally funded programs in order to

ensure they have enough state funding to cover all expenditures. The uncertainty makes it difficult or impossible to plan expenditures like database renewals, subgrant awards, salary costs, or LEA E Book purchases on any kind of timely basis.  ECF 3-44 – Amyot Dec., ¶ 27.

743.    On April 9, 2025, the University of Wisconsin – Stevens Point ("UWSP") received an email from IMLS indicating that the UWSP IMLS grant discussed at paragraph 81 of the Complaint had been terminated, thereby preventing the completion of the project to the detriment of the UWSP Museum of Natural History and its visitors. ECF 35-9 – Jore Dec., ¶ 6.

**B.  Minority Business Development Agency**

744.    The Minority Business Development Agency is an agency within the Department of Commerce whose purpose is "to promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs." U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification 16 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

745.    Initially created in 1969 by Executive Order 11,458 (Mar. 7, 1969), the MBDA was authorized by statute in 2021. Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (2021) (MBD Act), codified at 15 U.S.C. § 9501 et seq.; Cong. Rsch. Serv., R46816, The Minority Business Development Agency: An Overview of Its History and Programs 5 (2024), https://www.congress.gov/crs-product/R46816.

746.    By law, the Under Secretary of Commerce for Minority Business Development heads the MBDA. 15 U.S.C. § 9502(b)(1).

747.    MBDA's principal statutory responsibility is to provide financial support to MBDA Business Centers—public-private partnerships that help minority business enterprises access capital and contracting opportunities, provide counseling and technical assistance to minority business enterprises, and otherwise facilitate the growth of such enterprises. 15 U.S.C. §§ 9522, 9523(a)(1)-(3); see *Id.* § 9524(a)(1)(A).

748.    The MBDA Office of Business Centers is administered by a Director, *id.* § 9502(d)(2), and is required to have "a regional office . . . for each of the regions of the United States," *id.* § 9502(e)(2)(A). 15 U.S.C. §§ 9502(d)(2), 9502(e)(2)(A).

749.    As of 2024, MBDA funded 41 MBDA Business Centers in 34 states and territories. U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification 18–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

750.    MBDA Business Centers are essentially business consultancies that support the growth of Minority Business Enterprises ("MBEs") by offering analytics, networking opportunities, and trainings. *See generally* U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

751.    MBDA also funds a number of specialty centers. As of 2024, it funded twenty-one MBDA Rural Business Centers, which focus on assisting minority business enterprises in rural areas; four MBDA Advanced Manufacturing Centers, which aim to help

manufacturers or domestic products; four MBDA Export Centers, which are dedicated to expanding access to global markets; and a Federal Procurement Center, which is designed to increase federal procurement and acquisition opportunities for minority business enterprises. U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification 16–19 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

752.   The MBDA Act also authorizes the Under Secretary to establish several other programs. She "shall, whenever the Under Secretary determines such action is necessary or appropriate," (1) provide financial assistance directly or indirectly to minority business enterprises, (2) establish programs to encourage minority business enterprises to establish joint ventures and projects, and (3) engage in joint efforts with private and public sector entities to advance the growth of minority business enterprises. 15 U.S.C. §§ 9511(1)-(3), 9523(a)(1)-(3). Using this authority, MBDA has established several projects and programs to assist minority business enterprises. In 2024, these projects supported entrepreneurship education for formerly incarcerated persons, programs at minority colleges and universities, and American Indian, Alaska Native, and Native Hawaiian MBEs. U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification 20-21 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

753.   In addition to providing financial assistance, the MBDA is also required to collect and analyze data relating to minority business enterprises, 15 U.S.C. § 9513(a)(1)(A),

to conduct economic research, studies, and surveys, *id*. § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id*. § 9513(a)(1)(C). In Fiscal Year 2023, the MBDA reported that its projects and programs served more than 2,000 MBE clients, produced more than $5.4 billion in economic benefit to MBEs, and contributed to MBEs creating nearly 19,000 jobs. U.S. Dep't of Commerce, MBDA, Fiscal Year 2025 Congressional Justification 8, 57, 59 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf.

754.    President Trump has repeatedly attempted to eliminate or gut MBDA. During President Trump's first term, he proposed to eliminate MBDA and requested a $6 million budget "to be used to close out the agency" in fiscal year 2018. See Cong. Rsch. Serv., R46816, The Minority Business Development Agency: An Overview of Its History and Programs 31 (2024), https://www.congress.gov/crs-product/R46816. The Trump Administration's Fiscal Year 2019, 2020, and 2021 budget requests all proposed to reduce MBDA's budget to approximately $10 million. Congress declined these requests and appropriated $39 million, $40 million, $52 million, and $70 million, respectively, in each of these years. *Id*. at 31, 33.

755.    For Fiscal Year 2025, the Continuing Appropriations Act reappropriated $68,250,000 to MBDA. See Continuing Appropriations Act § 1101(a)(2); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, 138 Stat. 25, 123 (2024). As of March 14, MBDA employed approximately 49 full-time personnel. U.S. Dep't of Commerce, MBDA, *Fiscal Year 2025 Congressional Justification* 46 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-

Congressional-Budget-Submission.pdf.

756.    Currently, the MBDA is budgeted to have a staff of approximately seventy-five employees. Prior to the issuance of this executive order on March 14, approximately forty individuals were working at the MBDA. ECF 3-41 – Doe Dec., ¶ 4.

757.    Following the issuance of the *Reduction* EO, the MBDA placed all but three employees on paid administrative leave. The only employees who were not placed on administrative leave were the Deputy Under Secretary of Commerce for Minority Business Development, the Chief Operating Officer, and the Chief of the Office of Legislative, Education, and Intergovernmental Affairs. Since that date, two additional employes have also begun working at the agency. ECF 3-41 – Doe Dec., ¶ 5.

758.    On March 21, 2025, MBDA sent a notice stating that it was initiating a reduction in force (RIF) for the MBDA. Doe testified that they understood that this RIF will likely result in the termination of all General Schedule (GS)-level employees at the MBDA within 30 days of the notice. All but three MBDA employees on administrative leave at that time were GS-level. ECF 3-41 – Doe Dec., ¶ 6.  A copy of the notice is available as Exhibit C to the First Amended Complaint.  *See* ECF 68-4.

759.    The remaining five employees working at the MBDA at that time would not be capable of carrying out the MBDA's statutorily mandated functions, administering its existing programs, or spending its appropriated funds. ECF 3-41 – Doe Dec., ¶ 7.

760.    As of April 2025, MBDA administered a portfolio of more than 100 grants. All grants to minority business centers and specialty business centers were scheduled to terminate on June 30. All grants to specialty colleges and universities were scheduled to terminate on August 30. ECF 3-41 – Doe Dec., ¶ 8.

761.    An employee at MBDA ("Doe"), testifying anonymously, stated that it is not possible for five employees to monitor the existing portfolio of grants for waste, fraud, and abuse, or to ensure that they are being used for authorized purposes consistent with the grant award. Administration of these grants requires consistent contact with grantees to monitor and evaluate grantee performance, train, conduct site-visits, and to ensure compliance with the terms and conditions governing the grants. ECF 3-41 – Doe Dec., ¶ 9.

762.    Doe testified that it will be particularly difficult for five employees to adequately monitor existing grants because the MBDA allowed its contract with Salesforce to expire. Salesforce is the performance-management platform that MBDA previously used to track grantee performance and monitor how grant funds were being used. Doe further testified that without this platform it will be extremely challenging for MBDA to monitor grantee performance, especially with a skeleton staff. ECF 3-41 – Doe Dec., ¶ 10.

763.    In addition, Doe testified that it would not be possible for five employees to issue new grants awards by the time the existing grants expired. To award new grants, the MBDA must initiate a grant competition that runs for 60 days. Following the conclusion of that 60-day period, MBDA staff must conduct an initial review of proposals, assemble a peer review panel consisting of three individuals; one being a federal employee, evaluate the grant applications, and then select the awardees. This process typically takes roughly four months even when the MBDA is fully staffed. The MBDA has not initiated any grant competitions for the grants that are scheduled to expire on June 30 or August 30. Even if a grant competition were initiated tomorrow,

Doe testified that it would not be feasible for a skeleton crew of five staff to conclude the awards process in four months, let alone in less than 90 days. As a result, Doe testified that minority business development centers and specialty business centers are likely to see their grants lapse as of June 30. Doe testified that it is likely that other grant recipients will see their grants lapse on August 30. ECF 3-41 – Doe Dec., ¶ 11.

764.    In addition, Doe testified that it was highly unlikely that MBDA would be able to award grants in a timely enough manner to obligate all of the funds that Congress has appropriated for fiscal year 2025. Because no new grant competitions have been initiated, and because it is not feasible that a staff of five individuals could issue new grant awards in less than four months, Doe testified that it was unlikely that any new awards will be issued until August, at the earliest. Doe testified that on information and belief, the award of grants in August would not leave adequate time for the MBDA to obligate all of its appropriated funds before the conclusion of the fiscal year on September 30. ECF 3-41 – Doe Dec., ¶ 12.

765.    MBDA has also taken other steps to effectively close the agency. The agency has taken down grant solicitations for its MBDA Rural Business Center Program—a statutorily required program—and the MBDA's Women Entrepreneurship Program. MBDA has ceased sharing information with stakeholders and accepting speaking engagements. It also eliminated its Minority Business Center Advisory Council and declined to schedule its annual Forum on Capital Formation. In addition, it placed on administrative leave all staff responsible for its informational clearinghouse—a statutorily mandated activity to collect and share data on minority business enterprises. ECF 3-41 – Doe Dec., ¶ 13.

766.    Although the Administration has nominally left a skeleton staff in place at the MBDA, the Administration has effectively closed the Minority Business Development Agency. ECF 3-41 – Doe Dec., ¶ 14.

767.    The agency is no longer fulfilling its statutorily mandated functions or spending all of the funds appropriated by Congress. ECF 3-41 – Doe Dec., ¶ 14.

768.    The declarant who originally gave this testimony was an employee of MDBA. ECF 35-4 – Doe Dec., ¶ 1.

769.    On April 9, 2025, Doe received notice from the Office of the Deputy Secretary of Commerce stating that they had been identified for termination as part of a Reduction in Force ("RIF") that would become effective on May 9, 2025. ECF 35-4 – Doe Dec., ¶ 4.

770.    The notice stated that "[t]he Department is abolishing all positions within MBDA," and that "[b]ecause all positions in MDBA are being eliminated, [I] do not have an assignment right to another position in another competitive area, in the local commuting area or in another office." ECF 35-4 – Doe Dec., ¶ 4.

771.    All of the five MBDA employees who were not placed on administrative leave as of April 3, 2025, were subsequently reassigned to positions outside of the MBDA. ECF 35-4 – Doe Dec., ¶ 5.

772.    For instance, Chief Operating Officer Donald Smith has put in place an "Out of Office" message stating that "I am not longer with the Minority Business Development Agency." ECF 35-4 – Doe Dec., ¶ 5.

773.    As of April 11, 2025, the remaining four MBDA employees who were initially not placed on leave were also no longer performing work for the MBDA. ECF 35-4 – Doe

Dec., ¶ 5.

774.    As of April 11, 2025, the MBDA had already ceased performing all of its statutory and non-statutory functions, and all positions within the agency were scheduled to be abolished as of May 9, 2025. ECF 35-4 – Doe Dec., ¶ 6.

775.    On April 17, 2025, an individual named Nate Cavanaugh, purporting to act "[u]nder the authority of Keith Sonderling, Acting Undersecretary of MBDA," sent notices to recipients of MBDA grants informing them that their grants were being terminated effective April 17, 2025. ECF 45-1 – Doe Dec., ¶ 4.

776.    All preexisting MBDA grants were terminated pursuant to such notices. ECF 45-1 – Doe Dec., ¶ 4.

777.    Mr. Cavanaugh is an official at the Department of Government Efficiency ("DOGE"). ECF 45-1 – Doe Dec., ¶ 5.

778.    Elizabeth "Elissa" Sangalli is the Chief Executive Officer of the Northern Great Lakes Initiatives, a Michigan not-for-profit corporation which, among other things, assists entrepreneurs and small businesses with access to capital and technical assistance. ECF 3-20 – Sangalli Dec., ¶ 2-3.

779.    In 2023, Northern Great Lakes Initiatives as the lead recipient was awarded a four-year cooperative agreement grant totaling $3,000,000 ("MBDA Award") under the U.S. Department of Commerce Minority Business Development Agency ("MBDA") Capital Readiness Program, Fiscal Year 2023 Notice of Funding Opportunity Number MBDA-OBD-2023-200775 ("NOFO") as authorized by Section 3009(e)(2) of the Small Business Jobs Act of 2010, as amended by the American Rescue Plan Act of 2021 (codified at 12 U.S.C. § 5708(e)(2)). ECF 3-20 – Sangalli Dec., ¶ 4.

780.    Pursuant to the MBDA Award, Northern Great Lakes Initiatives provides capital readiness programming to socially and economically disadvantaged individuals ("SEDI") entrepreneurs and SEDI-owned businesses. ECF 3-20 – Sangalli Dec., ¶ 11.

781.    Pursuant to the MBDA Award and consistent with 12 U.S.C. § 5708(e)(2), Northern Great Lakes Initiatives capital readiness program services include technical assistance to SEDI entrepreneurs and SEDI-owned businesses, which helps them find and access sources of capital, understand business cash flow, develop business plans, and manage capital. ECF 3-20 – Sangalli Dec., ¶ 12.

782.    The technical assistance provided by Northern Great Lakes Initiatives under the MBDA Award helps prepare SEDI-owned businesses to access loans and other financial products. ECF 3-20 – Sangalli Dec., ¶ 13.

783.    In providing these services, Northern Great Lakes Initiatives is assisted by the MBDA's provision of funds under the MBDA Award. ECF 3-20 – Sangalli Dec., ¶ 14.

784.    Elizabeth "Elissa" Sangalli, the Chief Executive Officer of the Northern Great Lakes Initiatives, testified that the MBDA award is critical for the development of SEDI-owned businesses in Michigan because the funding allows the Northern Initiatives to provide technical assistance to SEDI entrepreneurs and SEDI-owned businesses it would not otherwise be able to serve, including to the more than 100 small businesses per year which receive services from Northern Initiatives supported by the MBDA Award. ECF 3-20 – Sangalli Dec., ¶ 15.

785.    Northern Great Lakes Initiatives' annual budget relies on the MDBA Award funding, as it allocated resources, developed programs, and hired staff based on the anticipated receipt of such funding. ECF 3-20 – Sangalli Dec., ¶ 16.

786.    Any pause or elimination of MDBA Award funding likely would cause Northern Great Lakes Initiatives to lay off staff who are providing services to SEDI entrepreneurs and SEDI-owned businesses. ECF 3-20 – Sangalli Dec., ¶ 17.

787.    Any pause or elimination of MBDA Award funding likely would cause Northern Initiatives to reduce its capital readiness programming, including the number of workshops and one-on-one technical assistance. ECF 3-20 – Sangalli Dec., ¶ 18.

788.    The MBDA Award is Northern Great Lakes Initiatives' first and only grant with the MBDA. ECF 3-20 – Sangalli Dec., ¶ 19.

789.    Northern Great Lakes Initiatives is in compliance with the MBDA Award and required reports for the first year of the MBDA Award were submitted on time by Northern Initiatives and accepted by the MBDA. ECF 3-20 – Sangalli Dec., ¶ 20.

790.    Northern Great Lakes Initiative's MBDA Award ends on August 31, 2027), and as the lead recipient it is scheduled to receive disbursements/reimbursements from MBDA under the MBDA Award in an amount totaling $1,875,000. ECF 3-20 – Sangalli Dec., ¶ 21.

791.    Elizabeth Sangalli, CEO of the Northern Great Lakes Initiatives, testified that if Northern Great Lakes Initiative does not receive the remaining disbursements/reimbursements under the MBDA Award, its ability to serve SEDI entrepreneurs and SEDI-owned businesses will be restricted and it will be forced to reduce its personnel. ECF 3-20 – Sangalli Dec., ¶ 22.

792.    Elizabeth Sangalli, CEO of the Northern Great Lakes Initiatives, testified that upon information and belief, on or about February 28, 2025, Northern Initiatives MBDA program officer's contract was not renewed. ECF 3-20 – Sangalli Dec., ¶ 23.

793.    In early March 2025, the Northern Great Lakes Initiatives was informed that the MBDA Capital Readiness Program Team was reduced to three people; and Northern Initiatives has received limited communications from MBDA since that time. ECF 3-20 – Sangalli Dec., ¶ 24.

794.    Elizabeth Sangalli, CEO of the Northern Great Lakes Initiatives, testified that if the MBDA ceased to function in a meaningful way, hundreds of SEDI entrepreneurs and SEDI-owned small businesses would not receive access to technical assistance and financial tools that could help them access capital and succeed, which would negatively impact the State of Michigan's economic development efforts. ECF 3-20 – Sangalli Dec., ¶ 25.

795.    A copy of the grant termination letter for the Northern Great Lakes Initiatives is available at ECF 45-6.

796.    James Deane is employed by the University of Hawaiʻi System as Director of the Office of Innovation & Commercialization. ECF 3-10 – Deane Dec., ¶ 2.

797.    The University of Hawaiʻi (UH) is the public university system for the State of Hawaiʻi, comprised of three four-year educational campuses (UH at Mānoa, UH at Hilo, UH at West Oʻahu) and seven community colleges. UH is a comprehensive research university (with strengths in Engineering, Medicine and Agriculture) with the Carnegie "R1" "high research activity" designation. ECF 3-10 – Deane Dec., ¶ 3.

798.    As Director of the Office of Innovation & Commercialization, Deane is the principal investigator for the MBDA grant and he supervises the Director of the Hawaiʻi MBDA Business Center. The Hawaiʻi MBDA Business Center has reported to Deane's position since 2021 following a reorganization of its funding and

administrative support. ECF 3-10 – Deane Dec., ¶ 4.

799.    Deane testified that in his experience, the UH Office of Innovation &
Commercialization has a rare asset in the form of the Hawai'i MBDA Business Center,
to amplify and increase the extent and value of its services supporting the local small
business ecosystem. Over the last 22 years, Deane has worked for four other flagship
state universities and none of them has had a similar MBDA business center to
reinforce their economic development needs. ECF 3-10 – Deane Dec., ¶ 5.

800.    Pursuant to an agreement with the MBDA, UH operates the MBDA Business
Center Hawai'i to provide important and valuable services to companies in the state
and region. ECF 3-10 – Deane Dec., ¶ 8.

801.    The services provided by MBDA Business Center Hawai'i include direct technical
assistance to support economic and business development assistance to local businesses
in securing commercial contracts for goods and services, as well as introductions and
connections in support of obtaining commercial lending or financing. ECF 3-10 –
Deane Dec., ¶ 9.

802.    In providing those services, MBDA Business Center Hawai'i is assisted by the
MBDA's provision of data storage and CRM services via SalesForce and other
information technology tools, as well as salaries and expenses to the business center
staff which include the Director and two additional business development managers
and administrative staff. ECF 3-10 – Deane Dec., ¶ 10.

803.    The MBDA's services are critical for the development of Minority Businesses
Enterprises in Hawai'i because of the comparatively lower population and the
significant geographic and economic isolation of the state compared to all other United

States. While businesses in any one of the lower 48 states in the USA can draw on contracting services and expertise from other nearby states at low cost and travel time, Hawai'i does not have the same advantages given that it is far from California and New York state, but with literally no population centers in between. The Hawai'i MBDA Business Center provides expertise that is simply not available elsewhere in the state, including access to university resources, such as faculty and staff specializing in topics unique to Hawai'i and the Pacific region.ECF 3-10 – Deane Dec., ¶ 11.

804.    The MBDA also provides grants through pilot projects and programs such as Entrepreneurship Education for Formerly Incarcerated Persons and Enterprising Women of Color Business Centers. ECF 3-10 – Deane Dec., ¶ 12.

805.    In 2021, the University of Hawai'i received MB21OBD8050204 in the amount of $2,050,000 to provide technical assistance and business development services to business enterprises in Hawai'i. ECF 3-10 – Deane Dec., ¶ 13.

806.    The University of Hawai'i's budget for this year has relied on this funding, and made plans and allocated funding, and offset other funding for programs supporting Hawai'i business enterprises and entrepreneurs based on the anticipated receipt of the promised funding. ECF 3-10 – Deane Dec., ¶ 14.

807.    The Hawai'i MBDA Business Center plans to continue its operations through the end of the current contract, and will be re-applying for continuing support under MBDA funding in the future. ECF 3-10 – Deane Dec., ¶ 15.

808.    James Deane, the University of Hawai'i System's Director of the Office of Innovation & Commercialization testified that any pause in funding would delay completion of client projects, resulting in clients losing access to capital and contracting

opportunities, prevent new clients from accessing these services and resources, and may lead to loss of jobs. Delay would also eliminate their ability to fill key staff positions currently open, and would therefore terminate the ability to restore vital business activity by the Hawai'i MBDA Business Center. ECF 3-10 – Deane Dec., ¶ 16.

809.    Deane testified that the uncertainty of funding will significantly affect the volume of services being provided. Deane further testified that without confidence in being paid or reimbursed, the MBDA Business Center Hawai'i cannot responsibly start new client projects with the possibility that the project will not be completed. In addition, plans for an annual contracting workshop will be stopped. Additionally, any pause in funding would cause the Hawai'i MBDA Business Center to default on its contract with the Hawai'i YWCA for the provision of critical business services to the YWCA who in turn serves other small Hawai'i businesses. ECF 3-10 – Deane Dec., ¶ 17.

810.    For over a decade, the Hawai'i MBDA Business Center has been one of the top-performing MBDA business centers nationwide, with the best-in-class metrics for contracts secured and client financing obtained. Loss of the MBDA funding would eliminate this high-achieving office and result in a significant loss of commercial contracts and financing to Hawai'i businesses.   ECF 3-10 – Deane Dec., ¶ 18.

811.    In   the   next   fiscal   year,   Hawai'i   is   scheduled   to   receive disbursements/reimbursements of $410,000 under its current awards. ECF 3-10 – Deane Dec., ¶ 19.

812.    The Hawai'i MBDA Business Center is supposed to have access to a SalesForce CRM platform for essential data reporting. Such access has been blocked and

unavailable for the current calendar year, which has prevented it from completing critical reporting efforts of its metrics. ECF 3-10 – Deane Dec., ¶ 20.

813.     The Hawaiʻi MBDA Business Center is a critical local service that supports Hawaiian businesses which are important to the state's economy and tax base. The Hawaiʻi MBDA Business Center is also an employer of UH students, which offers them rare learning experiences and trains them for important roles in the state economy. ECF 3-10 – Deane Dec., ¶ 21.

814.     James Deane, the University of Hawaiʻi System's Director of the Office of Innovation & Commercialization testified that if the MBDA ceased to function in a meaningful way, small businesses in the state will be significantly harmed and may cease their activity and close. ECF 3-10 – Deane Dec., ¶ 22.

815.     A copy of the grant termination letter for the University of Hawaiʻi is available at ECF 45-5.

816.     Lui Hokoana is Chancellor of University of Hawaiʻi Maui College. ECF 3-11 – Hokoana Dec., ¶ 2.

817.     As Chancellor of the University of Hawaiʻi Maui College, Hokoana serves as the Principal Investigator of the Minority Business Development Agency (MBDA) PĀʻOIHANA Grant MB21OBD8020251. ECF 3-11 – Hokoana Dec., ¶ 4.

818.     Pursuant to an agreement with the MBDA, University of Hawaiʻi Maui College operates the MBDA PĀʻOIHANA Grant MB21OBD8020251 to provide college-based entrepreneurship training and business coaching, mentoring, and incubation services. ECF 3-11 – Hokoana Dec., ¶ 8.

819.     The services provided by the MBDA PĀʻOIHANA Grant include offering new

entrepreneurship curricula and training programs, supporting student generation of business plans and market ready products, and providing business start-up coaching and mentoring. ECF 3-11 – Hokoana Dec., ¶ 9.

820.    In providing those services, the MBDA PĀ'OIHANA Grant Program is assisted by the MBDA's provision of grant funding, technical assistance, and networking with all other MBDA programs and affiliated national business organizations. ECF 3-11 – Hokoana Dec., ¶ 10.

821.    Lui Hokoana, Chancellor of University of Hawai'i Maui College, testified that the MBDA's services outlined above are critical for the development of Minority Businesses Enterprises in Hawai'i because of the State of Hawai'i's need for economic recovery and diversification. ECF 3-11 – Hokoana Dec., ¶ 11.

822.    The MBDA also provides grants through pilot projects and programs such as Entrepreneurship Education for Formerly Incarcerated Persons and Enterprising Women of Color Business Centers. ECF 3-11 – Hokoana Dec., ¶ 12.

823.    In October 2021, University of Hawai'i Maui College received the MBDA PĀ'OIHANA Grant MB21OBD8020251 in the amount of $902,133.00 to provide curriculum development and new entrepreneurship training programs, as well as business start-up coaching and mentoring. ECF 3-11 – Hokoana Dec., ¶ 13.

824.    University of Hawai'i Maui College's budget for this year has relied on this funding, and they made plans and allocated funding, and offset other funding for curriculum development, training, and coaching and mentoring based on the anticipated receipt of the promised funding. ECF 3-11 – Hokoana Dec., ¶ 14.

825.    University of Hawai'i Maui College plans to institutionalize MBDA funded

curriculum and courses through additional grants and philanthropy. ECF 3-11 – Hokoana Dec., ¶ 15.

826.  Lui Hokoana, Chancellor of University of Hawai'i Maui College, testified that any pause in funding would displace the students currently in training programs and disrupt the curriculum development and courses in progress. ECF 3-11 – Hokoana Dec., ¶ 16.

827.  Three grant program staff providing curriculum development, training, and coaching and mentoring services will lose their jobs if grant funding is withheld or delayed. ECF 3-11 – Hokoana Dec., ¶ 17.

828.  University of Hawai'i Maui College has consistently met reporting and compliance requirements for the MBDA PĀ'OIHANA Grant Program. The college possesses an excellent record of obtaining, administering and delivering positive outcomes for extramural grants. in spite of the COVID pandemic and Lāhaina wildfires disasters, the program has exceeded four out of five target metrics and is on track to exceed the remaining metric. ECF 3-11 – Hokoana Dec., ¶ 18.

829.  In the coming months, University of Hawai'i Maui College is scheduled to receive disbursements/reimbursements of $549,005.47 obligated under current awards. ECF 3-11 – Hokoana Dec., ¶ 19.

830.  Lui Hokoana, Chancellor of University of Hawai'i Maui College, testified that if University of Hawai'i Maui College does not receive such disbursements/reimbursements, it will negatively impact students by delaying the offering of training courses, coaching and mentoring services. This will diminish important economic recovery and diversification programming. ECF 3-11 – Hokoana Dec., ¶ 20.

831.    Hokoana further testified that termination of this grant or delays in reimbursement

funding will result in the loss of three grant program staff and negatively impact

students by eliminating training courses, coaching and mentoring support services, and

curriculum development. That would diminish timely and important economic

recovery and diversification programming. ECF 3-11 – Hokoana Dec., ¶ 21.

832.    Hokoana testified that Maui's economy has been significantly impacted by the

COVID pandemic and Maui wildfires, and the MBDA has helped to stimulate the Maui

economy by adding twenty-seven start-up companies, fifty-four jobs, and infusing $1

million in business revenue into Maui's economy. ECF 3-11 – Hokoana Dec., ¶ 22.

833.    A copy of the grant termination letter for the University of Hawai'i Maui College

is available at ECF 45-4.

834.    Christopher Lundy is Director of the Baltimore City Mayor's Office of Small &

Minority Business & Advocacy ("MOSMBA&D"). ECF 3-12 – Lundy Dec., ¶ 2.

835.    MOSMBA&D is responsible for operating the U.S. Department of Commerce

Baltimore Minority Business Development Agency Advanced Manufacturing Center.

ECF 3-12 – Lundy Dec., ¶ 3.

836.    As Director of the agency responsible for the operations of the MBDA Advanced

Manufacturing Center, Lundy testified that he is extremely familiar with their

operations. MOSMBA&D supports and oversees the operations of the Center. The

Center is staffed by business specialists who work with client businesses to provide

needed technical assistance. ECF 3-12 – Lundy Dec., ¶ 4.

837.    Lundy testified that in his experience as Director of MOSMBA&D, the Baltimore

MBDA Advanced Manufacturing Center has greatly benefited local and regional small

businesses. The Center offers targeted assistance to minority manufacturers that aim to employ new technologies and business methodologies to increase the number of "Made in America" products that can be sold domestically and globally. ECF 3-12 – Lundy Dec., ¶ 5.

838.    Pursuant to an agreement with the MBDA, MOSMBA&D operates the Baltimore MBDA Advanced Manufacturing Center. ECF 3-12 – Lundy Dec., ¶ 8.

839.    The Advanced Manufacturing Center offers targeted technical assistance to minority manufacturers that aim to employ new technologies and business methodologies to increase the number of "Made in America" products that can be sold domestically and globally. This assistance includes, but is not limited to, helping businesses categorize immediate and long-term business needs, goals, and to aid in gaining access to financing, contracts and other sales opportunities, domestic and global markets, specialized consulting and training, and support through business and industry advocacy. ECF 3-12 – Lundy Dec., ¶ 9.

840.    In providing those services, the Advanced Manufacturing Center is funded solely by the MBDA's provision of an annual grant. ECF 3-12 – Lundy Dec., ¶ 10.

841.    Christopher Lundy, Director of the Baltimore City Mayor's Office of Small & Minority Business & Advocacy, testified that in his opinion, the MBDA's services outlined above are critical for the development of Minority Businesses Enterprises in Maryland because of the specialized expertise provided by consultants with expertise in manufacturing.  Lundy further testified that the Center currently fills a void of services targeted at small local manufacturers. ECF 3-12 – Lundy Dec., ¶ 11.

842.    The MBDA also provides grants through pilot projects and programs such as

Entrepreneurship Education for Formerly Incarcerated Persons, Capital Readiness, and Enterprising Women of Color Business Centers. ECF 3-12 – Lundy Dec., ¶ 12.

843.    In 2021 MOSMBA&D received a five year MBDA grant to operate the Advanced Manufacturing Center through June 30, 2026, in the amount of two million dollars ($2,000,000) across the five year period, for four hundred thousand dollars ($400,000) per year to provide business clients with organization and financial management, business development, strategic planning, procurement, exporting, and technology adoption. ECF 3-12 – Lundy Dec., ¶ 13.

844.    MOSMBA&D's budget for this year has relied on this funding, and Lundy testified that it made plans and allocated funding, and offset other funding for small business development resources and programming based on the anticipated receipt of the promised funding. ECF 3-12 – Lundy Dec., ¶ 14.

845.    Lundy testified that MOSMBA&D fully intended to apply to continue to receive the MBDA to operate the Advanced Manufacturing Center beyond June 30, 2026. ECF 3-12 – Lundy Dec., ¶ 15.

846.    Lundy testified that any pause in funding would have immediate service impacts and negatively impact the business community. ECF 3-12 – Lundy Dec., ¶ 16.

847.    MBDA previously advised that the Center was required to utilize Salesforce. The Advanced Manufacturing Center no longer has access to Salesforce, the client records management system relied upon to document client interactions. Prior to fully losing access to the system the provided licenses to Salesforce were reduced from three to two. Lundy testified that the Center will be unable to complete the Cumulative Goals Report detailing their vital work absent access to the system.  Pursuant to MBDA's

guidance, the Center has been advised to manually track client interactions but was not provided with any template or guidance beyond that advisement. Furthermore, the Program Analyst assigned to field questions or concerns from the Center is no longer available to provide that assistance.          ECF 3-12 – Lundy Dec., ¶ 17.

848.    The Advanced Manufacturing Center for the Mid-Atlantic has had exemplary performance throughout its term as operators. Prior to the Executive Order, Lundy testified that its performance would not have posed any issue to the continuation of the MBDA grant beyond June 2025. ECF 3-12 – Lundy Dec., ¶ 18.

849.    The currently available funds have been disbursed and drawn down. ECF 3-12 – Lundy Dec., ¶ 19.

850.    Christopher Lundy, Director of the Baltimore City Mayor's Office of Small & Minority Business & Advocacy, testified that if the Center does not receive future disbursements/reimbursements, it will prevent the continuation of services to the small business community. ECF 3-12 – Lundy Dec., ¶ 20.

851.    Lundy testified that the lack of funding will result in the erasure of the support system that the Center has provided to help client businesses to grow and thrive. The Center will be unable to advance these businesses changing the manufacturing landscape by leveraging a network of local, state, regional, and national relationships to open doors for clients and customers to larger and emerging markets. ECF 3-12 – Lundy Dec., ¶ 21.

852.    Lundy testified that the loss of the Baltimore Advanced Manufacturing Center will make Maryland less competitive in the manufacturing sector. Lundy further testified that if the MBDA ceased to function in a meaningful way, it will have a nationwide

negative impact on domestic manufacturing. The lack of needed business assistance and resources will result in the closure of manufacturing businesses. Even if only the Baltimore MBDA Advanced Manufacturing Center were to cease operations, the next closest Centers in Kentucky and Connecticut would not be feasible for Baltimore businesses to take advantage of their services. ECF 3-12 – Lundy Dec., ¶ 22.

853.    Omar Muhammad is Director of the Entrepreneurial Development and Assistance Center (EDAC) at Morgan State University. ECF 3-16 – Muhammad Dec., ¶ 2.

854.    For over 20 years, EDAC has been dedicated to the development and growth of minority business enterprises (MBEs), providing a comprehensive range of entrepreneurial support services. EDAC has successfully worked with businesses across various industries, including retail, construction, technology, professional services, food services, and manufacturing. Through such initiatives as the Baltimore Metropolitan Women's Business Center, EDAC helps minority- and women-owned businesses access funding, procurement opportunities, and business training. The center also provides one-on-one business coaching, financial literacy education, and networking opportunities, enabling entrepreneurs to navigate the challenges of starting and scaling their businesses. Additionally, EDAC hosts numerous business development programs, including pitch competitions, procurement workshops, and accelerator programs, thereby ensuring that minority entrepreneurs gain access to capital, mentorship, and market expansion strategies. ECF 3-16 – Muhammad Dec., ¶ 3.

855.    For each of the past four years, EDAC has received a $300,000 annual grant from the MBDA to support entrepreneurship education for formerly incarcerated individuals

through the RIDE (Returning Citizens Inspired to Develop Entrepreneurial Ventures) program. These funds have been instrumental in providing comprehensive entrepreneurship training, one-on-one business guidance, and access to a content library for continued learning. The grant also has enabled EDAC to host an event that highlights the successes and challenges of program participants, showcasing their progress and the impact of entrepreneurship in their reintegration journey. ECF 3-16 – Muhammad Dec., ¶ 6.

856.  EDAC's budget for this year has relied on this funding, and they made plans, allocated funding, and offset other funding for the RIDE Program based on the anticipated receipt of the promised funding. ECF 3-16 – Muhammad Dec., ¶ 7.

857.  EDAC continues to seek funding opportunities from the MBDA, particularly in areas such as education for formerly incarcerated individuals, women entrepreneurship, and the Parren J. Mitchell Entrepreneurship Program. These funding opportunities are crucial for expanding EDAC's efforts to provide tailored entrepreneurship education, one-on-one business guidance, and support for marginalized communities. By securing these funds, EDAC aims to enhance its capacity to deliver impactful programs that empower individuals to start, grow, and sustain their businesses. Continued investment in these areas will help foster economic development, create jobs, and support the long-term success of MBEs in Maryland. ECF 3-16 – Muhammad Dec., ¶ 8.

858.  Although EDAC has a strong history of adequate performance relating to grant funding—with grants having been renewed after feedback that highlighted EDAC's commitment to delivering impactful services and achieving measurable outcomes— EDAC recently has experienced unprecedented challenges in receiving MBDA funds.

Director Muhammad testified that he believes these challenges may be related to the disruption at the agency caused by the executive order and its implementation. ECF 3-16 – Muhammad Dec., ¶ 9.

859.    On March 29, 2025, Muhammad received a summary email from Denise Bowers, Assistant Director, Restricted Funds Accounting, that expressed confusion regarding the RIDE program's end date in their system. Although the original end date was December 31, 2024, they have an approved no-cost extension (NCE) through August 31, 2025. The email also acknowledged that Morgan State University is still owed approximately $109,000 under a 2023 grant award for the same program. Ailing Zhang, Morgan State's Senior Grants Manager, requested that the grant be reopened as soon as possible so the university could once again submit the $109,000 drawdown. ECF 3-16 – Muhammad Dec., ¶ 10.  A copy of the email is available as Exhibit A to ECF 3-16.

860.    Omar Muhammad, Director of the Entrepreneurial Development and Assistance Center (EDAC) at Morgan State University, testified on information and belief that all but three of the MBDA's employees have been placed on administrative leave as part of the implementation of the executive order. Muhammad testified that he does not believe that the MBDA can manage its existing grant portfolio (including EDAC's grant), issue new funds, or oversee MBDA Business Centers as the law requires with only three employees. ECF 3-16 – Muhammad Dec., ¶ 11.

861.    The delay in or loss of funding indicated by the March 29, 2025 email will have immediate and detrimental impacts on EDAC's ability to serve minority entrepreneurs, particularly those in vulnerable communities such as formerly incarcerated individuals.

Without those funds, essential programs such as entrepreneurship education, one-on-one business guidance, and access to resources like the content library for continued learning will be halted, and the planned events to highlight participants' successes and challenges will be delayed, thus reducing opportunities for networking, visibility, and support. This disruption will ultimately hinder economic growth, job creation, and the empowerment of MBEs in Maryland. ECF 3-16 – Muhammad Dec., ¶ 12.

862.    Omar Muhammad, Director of the EDAC at Morgan State University, testified that the uncertainty of not getting paid or reimbursed for indirect charges already has created a chilling effect on service provision by EDAC.  Muhammad testified that without timely reimbursement, administrative and operational costs, including rent, utilities, and technology support, may become unsustainable, further disrupting service delivery. This financial instability can erode confidence among program participants and partners, limiting EDAC's ability to fulfill its mission of fostering economic development and entrepreneurship within underserved communities. ECF 3-16 – Muhammad Dec., ¶ 13.

863.    If the MBDA ceases to function in a meaningful way, as the executive order contemplates, Muhammad testified that it would severely impact the growth and sustainability of minority-owned businesses across the country. The MBDA plays a critical role in providing access to capital, technical assistance, procurement opportunities, and tailored training programs, all of which are vital for minority entrepreneurs to compete and thrive. Without the MBDA, many MBEs would face greater challenges in securing funding, gaining market access, and scaling their operations. Muhammad testified that, in turn, would likely lead to a decline in

economic opportunities for underserved communities, hindering job creation, wealth-building, and overall economic growth within these populations. The loss of the MBDA's support would disproportionately affect women and minority entrepreneurs, who rely heavily on its resources to navigate the complex landscape of business development. ECF 3-16 – Muhammad Dec., ¶ 14.

864.    Access to grant funding provides critical support for small businesses, enabling them to scale operations and enhance sustainability. During conferences, participants receive advice on such matters as grant management strategies and business development insights. Networking with other organizations receiving similar funding fosters collaboration, knowledge sharing, and potential partnerships. Additionally, introductions to complementary resources—such as mentorship programs, procurement opportunities, and additional funding sources—help recipients maximize the impact of their initial grant and build long-term success. ECF 3-16 – Muhammad Dec., ¶ 15.

865.    Omar Muhammad, Director of the EDAC, testified that the MBDA's services are critical for the development of MBEs in Maryland and elsewhere because they provide essential resources that help level the playing field for minority entrepreneurs. Through access to capital, business consulting, procurement opportunities, and specialized training, MBDA equips MBEs with the tools needed to scale and compete in the marketplace. Their expertise in connecting businesses to funding, mentorship, and strategic partnerships fosters sustainable growth and economic empowerment within underserved communities. Without these services, many minority-owned businesses would struggle to navigate the challenges of entrepreneurship and achieve long-term

success. ECF 3-16 – Muhammad Dec., ¶ 16.

866.    Elizabeth Tanner is the Secretary of Commerce for the Rhode Island Executive

Office of Commerce. ECF 3-29 – Tanner Dec., ¶ 2.

867.    The Executive Office of Commerce ("EOC") is a state agency which leads and

assists state departments in order to improve the economy, efficiency, coordination and

quality of the business climate in the state. The EOC has oversight authority of other

state agencies including the Department of Business Regulation and the Quonset

Development Corporation. As Secretary, Tanner serves as the Chief Executive Officer

of the Rhode Island Commerce Corporation ("RI Commerce"), a quasi-public agency

charged with acquiring and developing real and personal property and providing

financing to promote and encourage the preservation, expansion, and sound

development of new and existing industry, business, commerce, agriculture, tourism,

recreational, and renewable energy facilities, promoting the economic development of

the state and the general welfare of its citizens. ECF 3-29 – Tanner Dec., ¶ 3.

868.    RI Commerce supports businesses (including underserved businesses) through

programs such as Rhode Island Rebounds, a set of State Fiscal Recovery Fund funded

programs including technical assistance and direct grants to support small businesses

negatively impacted by the COVID-19 pandemic; Supply RI, a program connecting

suppliers and small businesses to larger businesses and institutions to grow in state

purchasing; the Minority Business Accelerator, a program providing technical

assistance and direct funding to minority- and woman-owned businesses; and the Small

Business Assistance Program, a state backed loan program that encourages banks and

credit unions to make slightly riskier loans. ECF 3-29 – Tanner Dec., ¶ 4.

869.    As Secretary of Commerce, Tanner has connected Minority Business Development
Agency resources to Rhode Island's small business and start up community through
financing, grant program management, and technical assistance. ECF 3-29 – Tanner
Dec., ¶ 5.

870.    The MBDA provides many valuable services to Rhode Island businesses. Those
services include one-on-one guidance and expertise at regional MBDA Business
Centers, which educate Rhode Islanders on business strategy, access to capital and
financial management, entering new markets, government procurement opportunities,
and global exports and international trade, among other matters. ECF 3-29 – Tanner
Dec., ¶ 9.

871.    The MBDA also provides grants through pilot projects and programs such as
Entrepreneurship Education for Formerly Incarcerated Persons and Enterprising
Women of Color Business Centers. For example, the Capital Readiness Program
provides technical assistance and invests millions in support of minority, veteran,
disabled, women, and other underserved entrepreneurs to help incubate new companies
in Rhode Island and across the country. ECF 3-29 – Tanner Dec., ¶ 10.

872.    Elizabeth Tanner, the Secretary of Commerce for the State of Rhode Island,
testified that one notable beneficiary of MBDA funding is the Rhode Island Small
Business HUB, which supports local Rhode Island businesses with free business
planning and operational assistance. The HUB consults with companies on their
accounting practices, legal issues, marketing ideas, customer experience, human
resource management, IT strategy, networking opportunities, and investment potential.
The HUB is managed by Skills for Rhode Island's Future, a 501(c)(3) nonprofit

economic development organization, and is funded by Congress in partnership with the State of Rhode Island. The HUB participates in the MBDA's Capital Readiness Program, providing a series of workshops, one-on-one counseling sessions, and networking opportunities to help entrepreneurs access the capital necessary to scale their ideas and bring more diversity to the market. ECF 3-29 – Tanner Dec., ¶ 11.

873.    MBDA also provides valuable resources such as the MBDA Research Library and the MBDA Data Warehouse, which inform State initiatives with much-needed information on the status of minority-owned businesses in Rhode Island. ECF 3-29 – Tanner Dec., ¶ 12.

874.    In providing those services and that funding, the MBDA supports Commerce's mission. ECF 3-29 – Tanner Dec., ¶ 13.

875.    Rhode Island runs on small businesses. Of the approximately 105,000 businesses registered in the state in 2023, approximately 98%—counting for about 51% of the state's workforce—employ under 100 people. Small businesses drive Rhode Island's economy. Nearly half of all Rhode Island small businesses are owned by members of historically underinvested communities. 91% of businesses surveyed that received RI Rebounds technical assistance services through RI Commerce between 2023 and 2024 reported those services were beneficial to their business. ECF 3-29 – Tanner Dec., ¶ 14.

876.    If the MBDA ceased to function in a meaningful way, Elizabeth Tanner, the Secretary of Commerce for Rhode Island, testified that the State of Rhode Island would experience depressed economic development as Rhode Island businesses lose the support they rely upon to grow and flourish. Tanner further testified that Rhode Islanders across the State would suffer when they struggle against generational barriers

to enter the market; when they struggle to find businesses that understand and cater to their diverse tastes and needs; and when they struggle to find representation in their government through diverse state vendors. ECF 3-29 – Tanner Dec., ¶ 15.

877.    A copy of the grant termination letter for Skills for Rhode Island's Future is available at ECF 45-7.

878.    Bon Wikenheiser is the Executive Director of the Office of Business & Entrepreneurship (OBE) at the University of Wisconsin System. ECF 3-37 – Wikenheiser Dec., ¶ 2

879.    The University of Wisconsin System is responsible for educating approximately 161,000 students each year while employing 40,000 faculty and staff at 13 universities and a statewide extension network with offices in every county. OBE helps entrepreneurs, businesses and economic development professionals in all 72 Wisconsin counties to achieve their goals through expert consulting, educational resources, technical assistance, and a dynamic statewide network. Since 2019, OBE's work has helped create over 1,800 new businesses, served 25,900 clients, supported 89,000 jobs, and assisted in capital investment of over $1.05 billion. ECF 3-37 – Wikenheiser Dec., ¶ 3.

880.    As OBE's Executive Director, Wikenheiser is responsible for OBE's mission— now ongoing for over 45 years—of providing technical assistance to small businesses (as defined by the U.S. Small Business Administration) and responsibly administering public and private funds to support those efforts—including funds received from the Minority Business Development Agency. ECF 3-37 – Wikenheiser Dec., ¶ 4.

881.    In particular, OBE offered a proposal and received a notice of award from the

Minority Business Development Agency (MBDA)'s Capital Readiness Program, through which MBDA awarded a four-year cooperative agreement for activities designed to aid entrepreneurs in launching and developing businesses as authorized by § 3009(e)(2) of the Small Business Jobs Act of 2010, as amended by the American Rescue Plan Act of 2021 (ARP) (codified at 12 U.S.C. § 5708(e)(2)). OBE's project provides women entrepreneurs cohort-based technical assistance to position them to acquire capital to start and grow sustainable businesses. The OBE was one of forty-three recipients selected from over 1,000 applicants to receive the MBDA Capital Readiness Program award, demonstrating its expertise in fostering entrepreneurship and economic development. The office has established comprehensive statewide business outreach services, leveraging a diverse network of industry experts to support business growth across Wisconsin. The Project awarded is rooted in extensive experience and proven success in serving entrepreneurs across all 72 Wisconsin counties. The Project integrates the resources of their Center for Technology Commercialization, Food Finance Institute, and Small Business Development Centers, providing tailored support across multiple sectors and industries. By aligning with MBDA's mission, their program delivers targeted training, mentorship, and access to capital, ensuring that women-owned businesses receive the strategic guidance and financial readiness they need to thrive.    ECF 3-37 – Wikenheiser Dec., ¶ 5.

882.    Wikenheiser testified that the programs within OBE are dedicated to supporting Wisconsin entrepreneurs, including a focus on advancing Minority Business Enterprises (MBEs), such as entrepreneurs in rural areas and veteran, women and minority-owned firms. OBE's long-standing experience allows it to provide tailored

221

support to businesses at every stage, from startup to expansion, ensuring equitable access to resources and opportunities. OBE has learned that entrepreneurs working with OBE's small business technical assistance programs that are focused on targeted, customized approaches to address specific populations result in increased business growth, hiring and wealth within those communities. ECF 3-37 – Wikenheiser Dec., ¶ 6.

883.    OBE serves over 9,000 entrepreneurs annually, providing one-on-one consultation and training using online, on-demand and in-person methodologies. OBE collects participant and client data, which, along with relevant economic and business research, informs technical assistance service array and drives improvement. OBE routinely collaborates with federal, state and local entities interested in addressing small business needs, including the MBDA. ECF 3-37 – Wikenheiser Dec., ¶ 7.

884.    In 2024 alone, OBE provided over 23,000 hours of confidential, one-on-one consultation and delivered over 250 training events to entrepreneurs in all 72 counties across the state. Clients receiving these services verified that the work done with OBE contributed to their success; they started 325 new businesses and acquired over $185M in capital for their ventures. ECF 3-37 – Wikenheiser Dec., ¶ 8.

885.    OBE's work spans a diverse range of industries, including agriculture, transportation, manufacturing, professional services, and management. OBE actively seeks out and engages small businesses in every sector, including MBEs, providing them with the expertise, financial readiness, and strategic support they need to thrive. By working alongside business owners, it not only offers critical resources but also celebrate their achievements, reinforcing its mission to drive inclusive economic

growth across Wisconsin. ECF 3-37 – Wikenheiser Dec., ¶ 9.

886.     Pursuant to an agreement with the MBDA, OBE operates an MBDA Capital Readiness Program titled the "Advancing Capital Readiness Among Women-Owned Businesses Through Integrated Curriculum, Community and Connections" project (the Project). ECF 3-37 – Wikenheiser Dec., ¶ 12.

887.     The Project provides women cohort-based technical assistance to start and grow sustainable businesses. Programming includes customer-defined services, integrated curriculum, consulting and resource networks designed to empower participants to acquire the capital appropriate for their businesses. A primary focus is customer engagement listening sessions to help craft integrated curriculum paths for capital access that meets women-owned business needs, including access to on-demand training, streamlined online/offline technical assistance with competency-based tools, and facilitated access to networks and resources. The service delivery model combines hybrid online/offline experiences providing self-paced learning targeting competencies for early-state and emerging companies, integrating guided checkpoints, and access to subject matter experts for starting, scaling, innovating and targeting appropriate capital. The services provided by the Project include two customized research studies to determine the barriers entrepreneurs face accessing capital. Using study results which identified factors contributing to the capital disparity faced by women entrepreneurs, the Project developed comprehensive, customized financial literacy curriculum for early-stage, growth state, food/farm/agriculture and technology cohort accelerators. The Project provides personal finance reviews, business planning information and tools for entrepreneurs to use between sessions, online and on-demand webinars and

podcasts on key business topics, in addition to one-on-one consultations. Participants work with subject matter experts and CPA-led student teams to assess their capital readiness, create plans to improve their financial health, discuss debt ratios and create proforma statements supported by industry-specific ratios. Participants are provided with additional workshops on business plan writing and related topics to enhance their understanding of business practices. The Project introduces participants to a network of support resources to address the unique needs of their business. Participants also receive a monthly newsletter and social media content to maintain engagement, announce additional resources, and foster a sense of community for women entrepreneurs. ECF 3-37 – Wikenheiser Dec., ¶ 13.

888.    In providing those services, the Project is assisted by the MBDA's provision of a $3,000,000 investment over four years, with services beginning September 1, 2023, and ending August 31, 2027. The MBDA funds critical costs allowable and attributable to the Project including research and development, key personnel, management expenses including a Client Relationship Management (CRM) system for data collection, and access to specialized experts, students and staff who provide targeted guidance in crucial business areas. MBDA funding also enhances their capacity to offer women's leadership training, personal finance development, and overall program compliance. These resources, combined with OBE's extensive network of Wisconsin stakeholders and economic development organizations, ensure that women-owned businesses receive the strategic support necessary for sustainable growth. ECF 3-37 – Wikenheiser Dec., ¶ 14.

889.    Bon Wikenheiser, Executive Director of the Office of Business & Entrepreneurship

(OBE) at the University of Wisconsin System, testified that the MBDA's services are critical for the development of Women-owned Businesses Enterprises in Wisconsin because data validates the need for dedicated curriculum and services for women seeking capital. Small businesses in rural areas and those owned by women were disproportionately impacted by the Covid-19 pandemic, based on research conducted by federal agencies. Wisconsin women entrepreneurs comprise over 41% of the state's small businesses, according to the U.S. Census Bureau. Yet, women-owned firms report receiving fewer investments and less capital for their ventures than other groups, according to their internal data. When women-owned enterprises are funded, they receive less than half of the average amount acquired by other clients they serve. The Project addresses pressing issues faced by women entrepreneurs. Information provided by the agency identified capital access disparities such as limited access to venture and angel investments compared to coastal areas, and difficulty in meeting traditional lending requirements due to credit or collateral issues. Geographic barriers rural entrepreneurs faced included fewer opportunities for networking and access to services, compounded by the limited access to high-speed internet in some areas. Knowledge gaps such as the lack of formal business training and difficulty navigating complex regulatory and financial compliance issues are cited. The Project also aims to improve communication with and between participants post accelerator completion, coordination within the ecosystem of entrepreneurial support organizations, and collect verifiable results of the project. ECF 3-37 – Wikenheiser Dec., ¶ 15.

890.    In 2023, OBE received its cooperative agreement in the amount of $3 million to operate the Project. ECF 3-37 – Wikenheiser Dec., ¶ 16.

891.    OBE's budget for this year has relied on this funding, and they made plans and allocated funding, and offset other funding for delivering this customized technical assistance designed for women seeking capital to grow their business enterprises. Specifically, the Project funding covers the allocable and attributable costs of research, cohort development, subject matter experts, student employees, ten-week accelerator programs in Early, Growth, Technology, Food/Agriculture pathways, webinar and podcast production costs, Small Business Clinic participation and marketing costs, data collection, compliance and management expenses, based on the anticipated receipt of the promised funding. ECF 3-37 – Wikenheiser Dec., ¶ 17.

892.    As future funding opportunities are presented, OBE will continue to submit proposals for technical assistance projects deemed priorities by federal, state and local entities and private sector partners, including MBDA. The Universities of Wisconsin have a long history of responsible management of public funds, have a statewide reach and are home to significant subject matter expertise necessary to address emerging small business needs. OBE builds its proposals using relevant data indicating needs and its experience administering technical assistance programs such as the Project funded by MBDA. Projects funded are often leveraged with private and public sector investments; all of these funding sources are critical to enhancing project effectiveness and reach. Without the on-going support of funding partners, OBE would cease services for the participants of this program. ECF 3-37 – Wikenheiser Dec., ¶ 18.

893.    Bon Wikenheiser, Executive Director of the OBE, testified that any pause in funding would hamper the ability to provide these vital services. ECF 3-37 – Wikenheiser Dec., ¶ 19.

894.    Should the Project be terminated, Wikenheiser testified that accelerator cohorts, training sessions, participation in Small Business Clinics and consultation funded by the Project would be cancelled. Students and staff employed to assist participants served by the Project would be terminated. ECF 3-37 – Wikenheiser Dec., ¶ 19.

895.    In May 2025, OBE was scheduled to receive reimbursements of $45,913.07 under its current award. OBE has $117,706.23 in planned encumbrances on this award and has a $2,305,705.85 balance available for draw on the award as of March 31, 2025. All funds available on this award are allocated and will be spent by August 31, 2027. ECF 3-37 – Wikenheiser Dec., ¶ 20.

896.    As of April 4, 2025, OBE expected to transmit its next disbursement request on April 15, 2025, and expected to receive payment by April 30, 2025, to compensate for services     already     provided.     If     OBE     does     not     receive     such disbursements/reimbursements, it will necessitate OBE's expending of program revenue to cover the cost of services already provided, causing undue harm to the department's ability to continue providing technical assistance, some of which are in partnership with other entities. If OBE does not receive the disbursement as scheduled, it will not be able to pay students or independent contractors working with small businesses on their financial projections, financial health and business plans, pay subject matter experts to consult with companies enrolled in the accelerators, and staff assigned to activities allocable to the Project, such as the creation of online content, business operations, and communications. ECF 3-37 – Wikenheiser Dec., ¶ 21.

897.    Wikenheiser testified that should the Project be cancelled, women entrepreneurs in the state who have demonstrated the ability, need and desire to start, grow and access

capital for their businesses will be unduly harmed. To be eligible for services provided by the Project, women entrepreneurs applied and completed an interview with a consultant to demonstrate ability, viability of their venture and dedication to participate prior to being enrolled in the accelerators. Their efforts to access the information and training they need will be in vain. Staff and participants will cease Project-sponsored activity, resulting in loss of momentum, unrealized plans, learning and outcomes, and wasted effort. All preparation executed to complete the customized curricula and proforma templates, identify and brief the subject matter experts, recruit and train students to work with the businesses, and program assessment tools will be wasted. ECF 3-37 – Wikenheiser Dec., ¶ 22.

898.    Wikenheiser testified that if the MBDA does not continue the cooperative agreement as awarded, OBE will cancel any upcoming training and accelerator services for participants already enrolled and expecting these services. Currently 270 women entrepreneurs are involved in the Project's programs and three accelerator cohorts are in session. OBE will inform its private sector partners of the cancelled services, cease development of on-line content and discontinue communications and resources funded by the Project. Contracts with subject matter experts, independent contractors, businesses and organizations funded by the Project will be terminated. Students and staff positions assigned to delivering services directly to women entrepreneurs and compliance will be eliminated. The extensive plan to build the program will not be fully implemented, the learning and resources available to entrepreneurs will be diminished, and the data collection associated with results of the Project will be lost. ECF 3-37 – Wikenheiser Dec., ¶ 23.

899.    Wikenheiser testified that if the MBDA ceased to function in a meaningful way, it would be detrimental to small businesses, including women-owned businesses, and entrepreneurs in rural areas. These businesses rely on valuable resources designed to enhance their competitiveness, secure capital, and access essential expertise for their success. The strength of the state's economy relies on small businesses, which not only create jobs and foster a sense of community, but also drive innovation by testing new technologies and approaches to the market. MBDA addresses specific needs that have hinder full participation in the small business ecosystem. By providing smart, data-based focus on identified needs, MBDA effectively targets service gaps, ensuring that technical assistance is both impactful and measurable, rather than adopting a broad-based approach without specific focus. ECF 3-37 – Wikenheiser Dec., ¶ 24.

900.    Wikenheiser testified that in addition to federal investments, the Project includes collaborations with other public and private entities interested in growing women-owned businesses. For instance, private lending organizations offer expertise in personal finance and lender readiness.  Independent contractors provide technical assistance to entrepreneurs and provide services to the Project. State regulatory agencies consult with participants regarding state regulation, tax issues and business formation. Students work directly with the businesses, enhancing their real-world work experience and introducing them to potential employers. These partnership investments are critically linked to the Project. Therefore, the collapse of Project support from MBDA would have devastating, rippling effects across Wisconsin. Without this program, access to essential business planning tools and consulting services will be lost, along with the significant efforts invested by women entrepreneurs. ECF 3-37 –

Wikenheiser Dec., ¶ 25.

901.    A copy of the grant termination letter for the University of Wisconsin OBE is available at ECF 45-2 – Wikenheiser Dec., ¶ 3.

902.    The Arizona Hispanic Chamber of Commerce ("AZHCC") was established in 1948 and is a non-profit with 501c6 Association, 501c3 Foundation, and 501c4 PAC tax designations. ECF 3-2 – Villalobos Dec., ¶ 2.

903.    It has a governing board of forty directors, membership of 1,200 small businesses, and 106 corporate partners. ECF 3-2 – Villalobos Dec., ¶ 2.

904.    Since 1997, the AZHCC Foundation has operated the Arizona MBDA Business Center, formerly the Phoenix MBDA Business Center ("the Center"). ECF 3-2 – Villalobos Dec., ¶ 3.

905.    The AZHCC's operation of the Center is made possible through a five-year grant funded through the Department of Commerce administered through the MBDA, which has been renewed for every grant cycle. ECF 3-2 – Villalobos Dec., ¶ 3.

906.    The MBDA is the primary federal agency tasked to assist Minority Business Enterprises (MBEs) in overcoming the history of social and economic disadvantage that has limited their participation in America's economy. ECF 3-2 – Villalobos Dec., ¶ 5.

907.    Pursuant to an agreement with the MBDA, the AZHCC Foundation operates the Center to foster the growth, expansion, and competitiveness of Arizona businesses by assuring access to credit, capital, markets, and consultation (business and professional) collateral, and other resources. ECF 3-2 – Villalobos Dec., ¶ 6.

908.    The Center provides access to capital through facilitation of access to loans,

working capital and lines of credit, loan packaging, and increase in bonding capacity; access to markets through bid opportunities by subscribing to numerous bid databases and providing opportunities to clients; capacity building through customized business consulting services, development of growth strategies, creating strong capability statements, certification assistance, teaming arrangements, and business mastery workshops; market research; and export readiness assessments. ECF 3-2 – Villalobos Dec., ¶ 6.

909.    In providing those services, the Center is currently assisted by the Department of Commerce's provision of a grant to the Center in the amount of $2 million, covering the period running from July 1, 2021 through June 30, 2026. This grant award is administered by the MBDA and disbursed annually in the amount of $400,000. ECF 3-2 – Villalobos Dec., ¶ 7.

910.    If Congress does not approve next year's disbursement to cover the period from July 1, 2025 through June 30, 2025, or the MBDA and/or its functions are eliminated, the Center will have to cease operations in June 2025. ECF 3-2 – Villalobos Dec., ¶ 8.

911.    The MBDA's services outlined above are critical for the development of MBEs in Arizona. ECF 3-2 – Villalobos Dec., ¶ 9.

912.    The impact of ending or losing MBDA funding and having to close operations of the Center will have significant adverse impacts on Arizona given its economic impact throughout the state, as demonstrated by the impact the Center has had just within this five-year grant cycle so far. ECF 3-2 – Villalobos Dec., ¶ 9.

913.    A glimpse at the Center's impact in this grant cycle, touching on procurement, financials and job creation is as follows. ECF 3-2 – Villalobos Dec., ¶ 10.

914.    Between 2020 and 2024, the Center was able to facilitate the procurement of contracts valued at a total of $901,298,563, exceeding a goal of $335,000,000. ECF 3-2 – Villalobos Dec., ¶ 10.

915.    Between 2020 and 2024, the Center facilitated access to financing to the tune of $60,546,880. ECF 3-2 – Villalobos Dec., ¶ 10.

916.    Between 2020 and 2024, the Center facilitated the creation of 2,677 new jobs in Arizona, nearly doubling its goal of 1,353 new jobs. ECF 3-2 – Villalobos Dec., ¶ 10.

917.    In 2019, the AZHCC Foundation was also awarded the American Indian, Alaska Native, and Native Hawaiian (AIANNH) project ("AIANNH Project NABEDC"), which receives funds from the Department of Commerce administered through the MBDA. ECF 3-2 – Villalobos Dec., ¶ 11.

918.    Through the AIANNH Project NABEDC, the AZHCC Foundation serves the noted communities in Arizona, Nevada, Utah and Southern California. The annual award for this project administered by the MBDA is $300,000, with the current grant cycle running through August 31, 2025. ECF 3-2 – Villalobos Dec., ¶ 11.

919.    The AIANNH Project NABEDC's services include training, capital access, United States Federal procurement assistance, networking & relationship management, partnership agreement, strategic infrastructure and economic planning assistance, and education for entrepreneurs, existing business owners, and tribal entities. ECF 3-2 – Villalobos Dec., ¶ 12.

920.    Project NABEDC has been assisting businesses scale, increase capacity and revenue, and create and retain jobs through regional, national, and international expansion by providing business development services, one-on-one technical

assistance, and outreach to existing and prospective NABEDC clients throughout tribal and rural communicates in Arizona, Nevada, Utah and Southern California. ECF 3-2 – Villalobos Dec., ¶ 12.

921.    In fiscal year 2023–2024, 180 clients were served facilitating $152,391,185 in contracts and projects, and $22,861,032 in grants, loans, and performance bonds. ECF 3-2 – Villalobos Dec., ¶ 12.

922.    The AIANNH Project NABEDC grant is awarded on an annual basis and no request for proposal has been issued at this time. Without funding going forward, the AZHCC Foundation will not be able to provide services under the AIANNH Project ABEDC. ECF 3-2 – Villalobos Dec., ¶ 13.

923.    In 2022, the AZHCC Foundation was awarded the Capital Readiness Program ("CRP") grant, in the amount of $3,000,000 for over four years. The grant was awarded from the U.S. Department of Treasury to the AZHCC Foundation and administered through the MBDA. ECF 3-2 – Villalobos Dec., ¶ 14.

924.    The CRP grant is to provide funding through 2026. ECF 3-2 – Villalobos Dec., ¶ 14.

925.    Without continuation of this funding, the AZHCC Foundation will not be able to provide services beyond this grant cycle. In fiscal year 2023-2024, the Arizona CRP program served 769 clients and facilitated $17,806,989 in access to capital. ECF 3-2 – Villalobos Dec., ¶ 14.

926.    If the MBDA ceases to function in a meaningful way, the aforementioned services and projects will also cease, causing significant economic loss to Arizona and its residents. ECF 3-2 – Villalobos Dec., ¶ 15.

927. Arizona will also suffer substantial immediate and long-term economic consequences from what would necessarily be the shuttering of the three federally funded centers/programs the AZHCC Foundation operates. ECF 3-2 – Villalobos Dec., ¶ 15.

928. As noted above, the Arizona Hispanic Chamber of Commerce ("AZHCC") operates the Center in reliance on multiple monetary awards from the federal government—two granted by the Department of Commerce, and another by the U.S. Department of the Treasury. ECF 35-2 – Villalobos Dec., ¶ 2.

929. Since the issuance of Executive Order 14,238, "Continuing the Reduction of the Federal Bureaucracy," the AZHCC has not received any correspondence or direction from the MBDA, the Department of Commerce, or the U.S. Department of the Treasury concerning its awards. ECF 35-2 – Villalobos Dec., ¶ 2.

930. Due to the uncertainty created by lack of communication and considering the extreme reduction in MBDA staff, the AZHCC anticipates that it will not receive funding to continue these programs, if at all. ECF 35-2 – Villalobos Dec., ¶ 3.

931. Some of the operators of the forty-three MBDA business centers and programs across the country have already lost access to their award funds administered by the MBDA. ECF 35-2 – Villalobos Dec., ¶ 3.

932. As of April 11, 2025, the Center anticipated that it would close on June 30, 2025, and release two full time employees and several contractors. ECF 35-2 – Villalobos Dec., ¶ 4.

933. Without funding for the AIANNH Project NABEDC, the AIANNH project will end on August 31, 2025, and the AZHCC will need to release two full-time employees

and several contractors working on the project. ECF 35-2 – Villalobos Dec., ¶ 5.

934.    Without the Capital Readiness Program ("CRP") grant, the AZHCC will end the
CRP program on August 31, 2026, releasing six employees and several contractors.
ECF 35-2 – Villalobos Dec., ¶ 6.

935.    On April 17, 2025, the Arizona Hispanic Chamber of Commerce (AZHCC), which
operates the Arizona MBDA Business Center ("the Center"), received a Notice of
Grant Termination from the Minority Business Development Agency ("MBDA"),
terminating its Grant No. MB23OBD0340294, effective the same day. ECF 45-3 –
Villalobos Dec., ¶ 1.

936.    On April 17, 2025, the Center also directly received a Notice of Grant Termination
from the MBDA, terminating its Grant No. MB21OBD8050207, effective the same
day. ECF 45-3 – Villalobos Dec., ¶ 1.

937.    The termination letters ("Letters") were sent via email by Nate Cavanaugh
(ncavanaugh@doc.gov). ECF 45-3 – Villalobos Dec., ¶ 2.

938.    The Letters were also electronically signed by Nate Cavanaugh followed by the
words Under the Authority of Keith Sonderling, Acting Undersecretary of MBDA.
ECF 45-3 – Villalobos Dec., ¶ 2.

939.    Both Letters included the same explanation for the termination of the grants:
"MBDA is repurposing its funding allocations in a new direction in furtherance of the
President's agenda. Independently and secondly, the President's March 14, 2025
executive order mandates that the MBDA eliminate all non-statutorily required
activities and functions . . . . Therefore, the MBDA hereby terminates your grant in its
entirety effective April 17, 2025." ECF 45-3 – Villalobos Dec., ¶ 3.

940.    The Letters immediately bring to fruition the feared detrimental consequences for Arizona and the closing of the Center and the cessation of related programs and services. ECF 45-3 – Villalobos Dec., ¶ 4.

941.    The termination of Grant No. MB21OBD8050207 means that the Center has lost the anticipated $400,000 disbursement expected on July 1, 2025, and the Center will need to cease operations on June 30, 2025. ECF 45-3 – Villalobos Dec., ¶ 4.

942.    The closure of the Center also means that Arizona businesses will no longer have access to the services the Center has effectively provided since 1997, including access to capital through facilitation of access to loans, working capital and lines of credit, loan packaging, and increase in bonding capacity; access to markets through bid opportunities by subscribing to numerous bid databases and providing opportunities to clients; capacity building through customized business consulting services, development of growth strategies, creating strong capability statements, certification assistance, teaming arrangements, and business mastery workshops; market research; and export readiness assessments. ECF 45-3 – Villalobos Dec., ¶ 4.

943.    As previously mentioned, these services are critical for the development of Minority Business Enterprises (MBEs) in Arizona, which have been historically disadvantaged in participating in the economy. ECF 45-3 – Villalobos Dec., ¶ 4.

944.    The termination of Grant No. MB23OBD0340294 takes away the $3,000,000 over-four-years award to the AZHCC Foundation for the Capital Readiness Program ("CRP"). ECF 45-3 – Villalobos Dec., ¶ 4.

945.    Without continuation of this funding, the AZHCC Foundation will not be able to provide services beyond this grant cycle and will cease to serve hundreds of clients and

facilitate millions in access to capital. ECF 45-3 – Villalobos Dec., ¶ 4.

946.    As a result of the termination of Grant No. MB23OBD0340294 and Grant No. MB21OBD8050207, the AZHCC and the Center anticipated having to terminate ten employees and twenty contractors on April 17, 2025, without prior notice.    ECF 45-3 – Villalobos Dec., ¶ 5.

947.    A copy of the grant termination letters for Grant No. MB23OBD0340294 and Grant No. MB21OBD8050207 is available at ECF 45-3.

**C. Federal Mediation and Conciliation Service**

948.    The Federal Mediation and Conciliation Service ("FMCS") is the federal agency responsible for "assisting parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a).

949.    Congress established FMCS in the Taft-Hartley Act of 1947. Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202.

950.    By statute, FMCS is required to perform several functions related to the resolution of labor disputes. It provides labor mediation and conciliation services "to assist parties to labor disputes affecting commerce to settle such disputes." 29 U.S.C. § 173(a)-(c).

951.    FMCS conducts grievance mediations "as a last resort in exceptional cases" to resolve grievance disputes arising out of the application or interpretation of an existing collective-bargaining agreement. 29 U.S.C. § 173(d).

952.    FMCS "encourage[s] and support[s] the establishment of joint labor management activities." 29 U.S.C. § 173(e).

953.    FMCS plays a crucial role in sustaining the American economy by preventing, minimizing, and resolving work stoppages and labor disputes. These efforts help avoid

costly disruptions in production, services, and supply chains, ensuring economic
stability and growth. ECF 3-42 – Burgess Dec., ¶ 2 (citing www.fmcs.gov).

954.    FMCS provides mediation services at low or no cost to the recipients.  Federal
Mediation & Conciliation Service, FAQs, https://www.fmcs.gov/resources/faqs/#cbm-
faqs (last visited Aug. 21, 2025).

955.    FMCS accomplishes this mission by offering mediation, training, and facilitation
services to employers and unions nationwide, fostering collaborative labor-
management relationships. ECF 3-42 – Burgess Dec., ¶ 2 (citing www.fmcs.gov).

956.    Additionally, FMCS enhances government efficiency by providing training,
mediation, facilitation, dispute systems design, and other alternative dispute resolution
services to federal agencies, allowing them to operate more effectively and serve the
public better. ECF 3-42 – Burgess Dec., ¶ 2 (citing www.fmcs.gov).

957.    FMCS offers experienced mediators, training, and facilitation services to
employers and unions nationwide, fostering collaborative labor-management
relationships, and preventing costly disruptions in production, services, and supply
chains, ensuring economic stability and growth. ECF 3-30 – Delgado Dec., ¶ 9.

958.    The use of FMCS appointed mediators has helped to resolve disputes that otherwise
may have escalated and caused both the union and the state to expend greater resources
in both time and money to resolve the dispute. ECF 3-39 – Thornton Dec., ¶ 12.

959.    Mediation frequently is less costly and takes significantly less time to resolve
disputes in contrast to labor disruptions, administrative hearings, or other litigation.
ECF 3-39 – Thornton Dec., ¶ 12.

960.    Historically FMCS has provided mediations services, free of charge or at reduced

cost, to labor relations actors in State and local government sectors, as well as to federal and private sector disputants, to avoid negotiation impasse. ECF No. 3-26 – Vaile Dec., ¶ 8; Federal Mediation & Conciliation Service, FAQs, https://www.fmcs.gov/resources/faqs/#cbm-faqs (last visited Aug. 21, 2025).

961.    As of March 14, 2025, FMCS had approximately 200 full-time employees, including approximately 140 field mediators. FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

962.    As of March 14, 2025, FMCS was headquartered in the District of Columbia with nine field offices and dozens of home offices located throughout the country. FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

963.    In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases; conducted 1,477 single or multi-day training and intervention panels; provided 10,004 arbitration panels; and appointed 4,350 arbitrators. FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

964.    Congress appropriated FMCS $53,705,000 for Fiscal Year 2025. Continuing Appropriations Act § 1101(a)(5); Further Consolidated Appropriations Act, 2024, Pub.

L. No. 118-47, div. B, 138 Stat. 460, 697 (2024).

965.    On March 18, 2025, FMCS's Deputy Director of Field Operations Javier Ramirez issued a memorandum to "Field Operations and HQ" in response to the *Reduction* EO. ECF 1-4 – Memorandum from Javier Ramirez, Deputy Director of FMCS Field Operations, to Field Operations and HQ.  The memorandum stated that FMCS was required to perform "only statutorily mandated functions."  A copy of the memorandum is available as Exhibit D to the First Amended Complaint.  *See* ECF 68-5.

966.    The March 18 Memorandum listed "Operational Adjustments" that were "Effective Immediately."  ECF 1-4 – Memorandum from Javier Ramirez, Deputy Director of FMCS Field Operations, to Field Operations and HQ.  A copy of the memorandum is available as Exhibit D to the First Amended Complaint.  *See* ECF 68-5.

967.    Among the adjustments was a freeze on services to the "Public Sector." The memorandum states that FMCS would accept "[n]o new public sector cases . . . to include CBM [Collective Bargaining Mediation] work," that "all Public Sector RDT [Relationship Development and Training] cases should be complete" as of March 14, and that "[a]ll Public Sector work, including CMBs, must be completed by April 18, 2025. ECF 1-4 – Memorandum from Javier Ramirez, Deputy Director of FMCS Field Operations, to Field Operations and HQ.  A copy of the memorandum is available as Exhibit D to the First Amended Complaint.  *See* ECF 68-5.

968.    Further, the memorandum provided that "[n]o new [grievance mediation] cases will be accepted," and that "[a]s of March 14 all GM [grievance mediation] cases should be complete." It provided that no new in-person Education, Advocacy and Outreach meetings should be scheduled. And it provided that as of March 14, 2025, all card

240

checks cases should be complete, and no new card checks would be accepted after that date. ECF 1-4 – Memorandum from Javier Ramirez, Deputy Director of FMCS Field Operations, to Field Operations and HQ.  A copy of the memorandum is available as Exhibit D to the First Amended Complaint.  *See* ECF 68-5.

969.    One day after eliminating its public sector programs, FMCS issued a news release, stating: "FMCS is not a drain on taxpayer dollars as the article would suggest. In fact, our operations are managed on a $55 million budget (representing less than 0.0014% of the federal budget) yet we generate an impressive return on investment exceeding $500 million annually for the US economy. This remarkable economic impact underscores FMCS's role as a sound investment that drives substantial growth and innovation by fostering stable labor-relations, minimizing or preventing work stoppages, and keeping Americans working." FMCS, Press Release, *FMCS Condemns Overtly Misleading Online Article* (Mar. 19, 2025), https://www.prnewswire.com/news-releases/fmcs-condemns-overtly-misleading-online-article-302406542.html.

970.    FMC stated in its own Report of Full Compliance to the Executive Order *Continuing the Reduction of the Federal Bureaucracy* that a minimum of 119.5 employees were necessary to fulfill its statutory obligations.  ECF 73-13 at FMCS_00058-59. Notwithstanding this assessment, FMCS came to a "mutual agreement" with DOGE to decimate the agency and leave only fifteen staff members remaining.  *Id.* at FMCS_00166-67. A full copy of the administrative record as of August 1, 2025 is available at ECF 73.

971.    On March 26, 2026, FMCS informed its staff that nearly all employees would be

placed on administrative leave, effective the following day. Because the agency has only a "skeleton crew," one employee explained that "[n]early all of the services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided." *See* Fed. News Network, "Federal labor mediation agency cuts staff down to 'skeleton crew'" (Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton-crew/.

972.    As directed by the Executive Order, FMCS began the immediate removal of some employees, and delayed removal of others, resulting in the total loss of seventy-two percent of the overall employees of FMCS; ten of those employees who were let immediately were former members of NAGE Local R3-118. ECF 3-42 – Burgess Dec., ¶ 6.

973.    Only fifteen of FMCS employees, overall, will remain by the time the RIF is fully effectuated. Of those remaining employees, zero will be bargaining unit members. ECF 3-42 – Burgess Dec., ¶ 7

974.    After full implementation of the *Reduction* EO, FMCS is expected to lose approximately 90% of its staff and all but the District of Columbia office. ECF No. 3-26 – Vaile Dec., ¶ 17.

975.    In the direct aftermath of the *Reduction* EO, FMCS ceased mediation services or arbitration related services for state and local government actors. ECF No. 3-26 – Vaile Dec., ¶ 14.

976.    The immediate effect of the *Reduction* EO was the immediate cessation of all

FMCS assistance in the mediation of labor management disputes in the public and private sector and the immediate cessation of all FMCS assistance in grievance mediation across the board. ECF No. 3-39 – Thornton Dec., ¶ 23.

977.    This will force parties to seek and use more costly and time-expensive methods to resolve disputes and increasing the likelihood of work disruptions. ECF No. 3-39 – Thornton Dec., ¶ 23.

978.    For example, if FMCS's services were "eliminated," the Maryland Department of Public Safety and Corrections ("DPSC") would need to rely on the already overstretched State Labor Relations Board; hire costly private arbitrators; or else risk litigation that could result in a major judgment against the State. ECF 3-14 – Kadish Dec., ¶ 12.

979.    These alternatives would increase costs, delay, or risk of an unfavorable outcome for Maryland.        ECF 3-14 – Kadish Dec., ¶ 12.

980.    In Maryland, the Department of Public Safety and Corrections (hereinafter "DCPSCS") is tasked with "protect[ing] the public, its employers, and those under its supervision, aiming to ensure a safe environment for all Marylanders by increasing security and providing tools for offenders to stay out of the criminal justice system." ECF 3-14 – Kadish Dec., ¶ 3.

981.    DPSCS has one of the largest unionized staffs in the State of Maryland with over 8,500 Union members across four unions. ECF 3-14 – Kadish Dec., ¶ 5.

982.    DPSCS staff are represented by the American Federation of State County and Municipal Employees (AFSCME), the American Federation of Teachers Healthcare (AFT–Healthcare), the Maryland Professional Employees Council (MPEC), and the

State Law Enforcement Officers Labor Alliance (SLEOLA). ECF 3-14 – Kadish Dec., ¶ 5.

983.    DPSCS has collective bargaining agreements with AFSCME, SLEOLA, AFT–Healthcare, and MPEC, all of which provide for the use of FMCS for neutral fact finding upon appeal from a decision of the Secretary of Budget and Management or their designee. ECF 3-14 – Kadish Dec., ¶ 7.

984.    Additionally, FMCS mediators have been utilized by DPSCS to assist in resolving larger matters. ECF 3-14 – Kadish Dec., ¶ 7.

985.    In the past, FMCS has assisted DPSCS in resolving critical and high-profile labor matters such as a major dispute dealing with overtime and drafting policies. ECF 3-14 – Kadish Dec., ¶ 8.

986.    FMCS's services—which were provided at minimal cost to the parties—successfully resolved the dispute and resulted in a major agreement between DPSCS and AFSCME around overtime policy which is still in place today. ECF 3-14 – Kadish Dec., ¶ 9.

987.    FMCS's dispute resolution services are critical for resolving labor disputes in Maryland. For DPSCS, specifically, the availability of qualified neutrals that are trusted by both DPSCS and union partners is essential for reducing litigation costs and delays by promoting confidence in the decision-makers and the dispute resolution process. ECF 3-14 – Kadish Dec., ¶ 10.

988.    According to public reporting, "almost the entire workforce" at FMCS has been placed on administrative leave and "only a 'skeleton crew' of about a dozen employees will remain." ECF 3-14 – Kadish Dec., ¶ 11.

989.    FMCS will be unable to perform its statutory mission with such a dramatic reduction in personnel. ECF 3-14 – Kadish Dec., ¶ 11.

990.    Likewise, the New Mexico Public Employee Labor Relations Board (NM-PELRB) will be impacted by reductions at FMCS. ECF 3-26 – Vaile Dec., ¶ 3.

991.    NM-PELRB is responsible for enforcing the Public Employee Bargaining Act ("PEBA"), NMSA 10-7E-1 et seq., which "guarantee[s] public employees the right to organize and bargain collectively with their employers, to promote harmonious and cooperative relationships between public employers and public employees and to protect the public interest by ensuring, at all times, the orderly operation and functioning of the state and its political subdivisions." ECF 3-26 – Vaile Dec., ¶ 6 (citing NMSA § 10-7E-2 (Purpose of act)).

992.    The PEBA vests the NM-PELRB with authority over all general collective bargaining matters among public employers, labor organizations and individual public employees subject to the Act. ECF 3-26 – Vaile Dec., ¶ 6.

993.    Enforcement of the PEBA routinely requires NM-PELRB to process Prohibited Practice Complaints ("PPCs"), process Representation Petitions, monitor Local Boards for compliance with PEBA, and engage in rulemaking activity as needed. ECF 3-26 – Vaile Dec., ¶ 6.

994.    The NM-PELRB also engages in outreach and training, monitors and reports to the Board and public on major trends affecting non-federal public sector labor relations in New Mexico and creates and maintains educational material such as the NM-PELRBS Practice Manual and the PEBA keyword and Phrase Index. ECF 3-26 – Vaile Dec., ¶ 6.

995.    Pursuant to Section 18 of PEBA, non-federal public sector labor disputes in New

Mexico regarding negotiation impasse are required to be resolved by FMCS mediation services and, if needed, FMCS arbitration services. ECF 3-26 – Vaile Dec., ¶ 7 (citing NMSA § 10-7E-18, 4(J)).

996.    This is a default mechanism to resolve collective bargaining disputes and thereby avoid prohibited strikes or lockout activity. ECF 3-26 – Vaile Dec., ¶ 7 (citing US DOJ Office of Justice Programs, "Arbitration and the Public Employee – an Alternative to the Right to Strike | Office of Justice Programs," available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/arbitration-and-public-employee-alternative-right-strike).

997.    Pursuant to Sections 19(G) and 20(D) of PEBA, the NM-PELRB is charged with hearing and resolving allegations of breach of a collective bargaining agreement (CBA). Although a prohibited practice complaint (PPC) for breach of contract may be deferred to grievance arbitration initiated pursuant to a CBA, in New Mexico such a CBA will usually expressly reference use of FMCS arbitration services for contract disputes as well. ECF 3-26 – Vaile Dec., ¶ 7 (citing NMSA § 10-7E-19(H) and § 10-7E-20(D) (making it a prohibited labor practice to refuse or fail to comply with a CBA or other agreement with the labor-management counterpart); NMRA 11.21.3.22 (Arbitration deferral).

998.    This is not unusual – most CBAs within the Western half of the states expressly incorporate FMCS strike list or paneling services by name, for purposes of arbitration. ECF 3-26 – Vaile Dec., ¶ 7.

999.    Director Vaile's communications with labor relations professionals in New Mexico suggest that many non-federal public sector labor contract disputes in New Mexico

may not come before the NM-PRLB because they were, up until recently, resolved at a lower level with free or reduced cost mediation services provided by the FMCS. ECF 3-26 – Vaile Dec., ¶ 7.

1000. If FMCS ceased providing mediation and/or arbitration services within the non-federal public sector, New Mexico's public sector labor relations statutory scheme and public sector CBAs throughout the State would be frustrated and impaired. ECF 3-26 – Vaile Dec., ¶ 8.

1001. FMCS services are directly and indirectly implicated throughout PEBA, as generally described above. ECF 3-26 – Vaile Dec., ¶ 8.

1002. For instance, FMCS is cited by name in Section 18 of PEBA, regarding the mediation and arbitration of "impasse" or "interest" disputes, which arise when management-side and union-side negotiators are unable to reach an agreement on the terms of a CBA, after bargaining in good faith. ECF 3-26 – Vaile Dec., ¶ 8 (citing § 10-7E-18; see also NMSA § 10-7E-4(J)).

1003. A loss of these services will create, and is already creating, significant obstacles to parties resolving impasse disputes. ECF 3-26 – Vaile Dec., ¶ 8.

1004. Historically FMCS has provided mediation services, free of charge or at reduced cost, to labor relations actors in State and local government sectors, as well as to federal and private sector disputants, to avoid negotiation impasses. ECF 3-26 – Vaile Dec., ¶ 8.

1005. On information and belief, there are no other comparable programs or grants available to fill the now unmet needs. ECF 3-26 – Vaile Dec., ¶ 8.

1006. NM-PELRB – a small, two-person office – does not have the budget or staff to

provide these services. ECF 3-26 – Vaile Dec., ¶ 8.

1007.   The likely consequence of the loss of free or reduced cost impasse mediation and arbitration services, in turn, is that there will be unresolved industrial strife across an impactful sector of the New Mexico economy, as well as across other States' economies and the national economy. ECF 3-26 – Vaile Dec., ¶ 8. For instance, NM-PELRB was approached by a school district in Illinois seeking emergency mediation services for negotiation impasse. The Parties spent five months working with an FMCS mediator before the mediator's services suddenly ceased to be available. The affected Union issued a Notice of Intent to Strike if an agreement could not be reached by their last bargaining session in early April 2025. NM-PELRB declined the case but referred them to several former FMCS mediators that had recently lost their FMCS employment as a result of EO 14,238. *Id.* n.1.

1008.   FMCS is also implicated under NM-PEBA Sections 19(G) and 20(D), which together impose reciprocal duties on public employees and certain bargaining representatives (e.g. unions) to abide by the provisions of any negotiated labor agreement or CBA. ECF 3-26 – Vaile Dec., ¶ 8 (citing NMSA § 10-7E-19(H); § 10-7E-20(D) (making it a prohibited labor practice to refuse or fail to comply with a CBA or other agreement with the labor-management counterpart)).

1009.   Whie impasse disputes deal with the formation of a contract, rights or contract grievances assert a violation of the contract itself. ECF 3-26 – Vaile Dec., ¶ 8.

1010.   Under Section 17(I) of PEBA, all CBAs "shall include a grievance procedure to be used for the settlement of disputes pertaining to employment terms and conditions and related personnel matters" and "[t]he grievance procedure shall provide for a final and

binding determination," i.e. final and binding arbitration. ECF 3-26 – Vaile Dec., ¶ 8.

1011.    Traditionally, Complaints or PPCs alleging a violation of the CBA will be first grieved under the contract, because of the usually shorter limitations periods in a CBA (usually between 10 and 30 or 45 days) as compared to PEBA (six months).  The PEBA then often defers such claims to the grievance arbitration process, if a PPC is also filed involving the same questions of fact.        ECF 3-26 – Vaile Dec., ¶ 8.

1012.    Now that FMCS has discontinued free or reduced cost mediation services for labor disputes at the State and local levels, more of these matters will have to proceed to arbitration. ECF 3-26 – Vaile Dec., ¶ 8.

1013.    However, that process will be frustrated and impaired in turn, if FMCS discontinues or has discontinued provision of Arbitrator "strike lists" for State and local labor disputants.  Because most CBAs in New Mexico expressly incorporate FMCS strike list or paneling services by name, this will cause immediate harm to and obstruction of non-federal public sector labor relations in New Mexico. ECF 3-26 – Vaile Dec., ¶ 8.

1014.    While parties to the CBA are generally able and welcome to mutually agree to their own arbitrator, that is usually too much to expect as a practical matter when they are already engaged in a labor dispute. ECF 3-26 – Vaile Dec., ¶ 8.

1015.    Instead, one party or another will likely be tempted to cite "impossibility," creating another layer of contract dispute and raising questions of bad faith bargaining. ECF 3-26 – Vaile Dec., ¶ 8.

1016.    Yet the State or local government disputants will still be without a clear path for resolution if FMCS will not be providing arbitration services in the non-federal public sector, so disputes may likely compound, cascade, and/or escalate. ECF 3-26 – Vaile

Dec., ¶ 8.

1017.  NM-PELRB is a small agency with only two staff members and a limited budget.  It is wholly unprepared in the short and medium term to handle a huge influx of contract disputes due to "impossible" provisions calling for or requiring use of FMCS mediation and/or arbitration services. ECF 3-26 – Vaile Dec., ¶ 9.

1018.  As a two-person Agency, the NM-PELRB is unable to collect and maintain comprehensive data on the number of collective bargaining agreements that expressly require or provide for the use of FMCS mediation and/or arbitration services. ECF 3-26 – Vaile Dec., ¶ 10.

1019.  It is difficult to calculate the number of cases not brought before the NM-PELRB due to resolution at a lower level through the use of FMCS free or reduced cost mediation services, or through the use of FMCS's very cost-effective labor arbitration services. ECF 3-26 – Vaile Dec., ¶ 10.

1020.  However, on information and belief, the percent of public sector disputes in New Mexico resolved in whole or part through free or reduced cost FMCS mediation or arbitration services is most likely near 100%. ECF 3-26 – Vaile Dec., ¶ 10.

1021.  The NM-PELRB has processed 380 Representation Petitions seeking certification of a collective bargaining representative and a collective bargaining unit over the past 20+ years. ECF 3-26 – Vaile Dec., ¶ 11.

1022.  While many were accretion petitions to add one more position, they still represent a large volume of CBAs and affected public employers and public employees in New Mexico. ECF 3-26 – Vaile Dec., ¶ 11.

1023.  NM-PELRB staff have been informed by an area labor practitioner that many

CBAs, public employers, and public employees are impacted in New Mexico by the *Reduction* EO. ECF 3-26 – Vaile Dec., ¶ 12.

1024.  For instance, the America Federation of Teachers of New Mexico (AFT-NM) and/or its affiliates alone have twenty-one CBAs with state or local public employers in New Mexico that explicitly mention the FMCS in their grievance-arbitration procedures. ECF 3-26 – Vaile Dec., ¶ 13.

1025.  These include CBAs for the Albuquerque Federation of Classified Professionals (AFCP), the Albuquerque Teachers Federation (ATF), Belen Schools, Carlsbad Schools, Chama Valley Schools, Las Cruces Schools, Cuba Schools, Dulce Schools, Gadsden Schools, Grants Schools, Jemez Mountain Schools, Las Cruces Transportation Federation (LTCF, for bus drivers), McKinely County Federation of Unified School Employees (MCFUSE), Mese Vista Schools, New Mexico Highlands University (NMHU), Northern New Mexico College, Sante Fe Community College, Socorro Schools, Taos Schools, University of New Mexico (UNM), and Zuni Schools. ECF 3-26 – Vaile Dec., ¶ 13.

1026.  Additional CBAs explicitly referencing FMCS are available on the NM-PELRB website. They include UNM / United Staff-UNM, Local 6155; Albuquerque / AFSCME Local 624 (Blue Collar); Albuquerque / AFSCME Local 264 (Transit); Albuquerque / Albuquerque Officers' Association, Local 1888; and Albuquerque / AFSCME Local 2962 (Clerical and Technical Employees) ECF 3-26 – Vaile Dec., ¶ 13.

1027. Notably, many of the Albuquerque CBAs – which would come under the jurisdiction of the City of Albuquerque's Labor Management Relocations Board –

explicitly state in several places that "[t]he only grievance procedure available for this provision is FMCS arbitration." ECF 3-26 – Vaile Dec., ¶ 13 (citing https://www.pelrb.nm.gov/collective-bargaining-agreements/).

1028. Additionally, many America Federation of State, County, and Municipal Employees (AFSCME) and Communication Workers of America (CWA) CBAs explicitly mention FMCS in their grievance-arbitration procedures, impacting approximately 6,000 employees (AFSCME / State); 2,000 employees (CWA / State); 200 employees (AFSCME Local 624 (Transit)); 500 employees (Clerical / Technical); 300 employees (M-Series for Supervisors); 200 employees (AFSCME 2260 (Clerks) / Bernalillo County; 50 employees (AFSCME Local 1536/Bernalillo County); 150 employees (AFSCME Local 1461 (Blue Collar)/Bernalillo County); 30 employees (AFSCME Local 3908 (Blue Collar)/Bernalillo County); 500 employees (AFSCME / Sante Fe); 760 employees (AFSME / NM State University). ECF 3-26 – Vaile Dec., ¶ 13.

1029. On information and belief, the following unions also have CBAs with New Mexico non-federal public employees that explicitly use FMCS for grievance mediation: New Mexico State Police Association; United Steelworkers (USW); International Brotherhood of Electrical Workers (IBEW); and New Mexico State Fraternal Order of Police Lodge (FOP). ECF 3-26 – Vaile Dec., ¶ 13.

1030. On information and belief, FMCS is no longer providing mediation services or arbitration related services for state and local government actors under EO 14,238, which limits the FMCS to its "core" services as mandated under its originating statute, the 1947 Taft-Hartley Act. ECF 3-26 – Vaile Dec., ¶ 14.

1031.  On information and belief, FMCS' core or mandated services are to provide mediation and arbitration paneling services within the federal sector, and for several large private sector or quasi-governmental industries such as health care and the Postal Services. ECF 3-26 – Vaile Dec., ¶ 14.

1032.  EO 14,238 has already had a significant impact on collective bargaining in New Mexico. ECF 3-26 – Vaile Dec., ¶ 15.

1033.  Union representatives report that they can no longer obtain free or cost-reduced mediation services in a variety of cases that have not yet reached the NM-PELRB or other labor boards. ECF 3-26 – Vaile Dec., ¶ 15.

1034.  EO 14,238 has and inevitably will continue to have an impact on labor relations in New Mexico's non-federal public sector and NM-PELRB cases, since FMCS mediation and arbitration services are explicitly cited as a mechanism in Section 18 of PEBA to resolve labor impasse, and are implicated under Sections 17(1)a, 19(H), and 20(D) regarding claims of breach of a CBA. ECF 3-26 – Vaile Dec., ¶ 16.

1035.  Both of these FMCS functions (impasse resolution and contract dispute resolution) help non-federal sector labor disputants in New Mexico to avoid strikes and lockout activities, by providing a clear mechanism for dispute resolution, in the form of final and binding arbitration. ECF 3-26 – Vaile Dec., ¶ 16.

1036.  The availability of a mechanism to avoid such destructive self-help is very important and cannot be understated. ECF 3-26 – Vaile Dec., ¶ 16.

1037.  EO 14,238 has been a recurrent subject of concern among NAA members, as well as among other labor neutrals and advocates. ECF 3-26 – Vaile Dec., ¶ 17.

1038.  According to information relayed by current and former FMCS personnel to me

directly and through NAA colleagues, approximately 90% of FMCS staff has or will be cut and all but the District of Columbia office closed.  It is estimated that FMCS will only maintain 10-15 employees in the future, and only at the District of Columbia office. ECF 3-26 – Vaile Dec., ¶ 17.

1039.   FMCS is one of the main providers of labor mediation and arbitrator services, particularly in the Western half of the United States. ECF 3-26 – Vaile Dec., ¶ 18.

1040.   FMCS' mediation services are provided directly and free of charge or at a reduced cost by FMCS Staff Mediators, who are exceedingly competent and well-trained. ECF 3-26 – Vaile Dec., ¶ 18.

1041.   For arbitration services, FMCS trains arbitrators; maintains panels of qualified arbitrators for appointment; and empanels Arbitrators upon request of FMSC's labor and management clients, with the payment from the parties of about $150.00. ECF 3-26 – Vaile Dec., ¶ 18.

1042.   This requires the FMCS to vet and screen the credentials of Arbitrators applying to be on the FMCS panel; admit them to the FMCS panel if qualified, subjecting them to FMCS regulation; and provide panels or "strike lists" of 10-15 arbitrators from which the parties to a labor dispute take turns striking names from the list until they reach one that neither objects to. ECF 3-26 – Vaile Dec., ¶ 18.

1043.   Although the NM-PELRB does not deal with FMCS mediators or arbitrators directly, FMCS's historic operations are implicated in NM-PELRB operations in multiple important respects, as discussed above.  ECF 3-26 – Vaile Dec., ¶ 18.

1044.   FMCS representatives regularly present at NAA conferences and have frequently partnered in programs related to labor relations, such as the NAA-FMCS

videoconferencing training put out at the start of the COVID-19 pandemic that kept labor mediation and arbitration services functioning almost seamlessly during that time. ECF 3-26 – Vaile Dec., ¶ 19.

1045.   The NM-PELRB expects to see a large increase in labor disputes that cannot, as a practical matter, be mediated or referred or deferred to arbitration under NMSA § 10-7E-18 (regarding impasse mediation and arbitration referrals) or NMRA 11.21.3.22 (regarding grievance arbitration deferral). ECF 3-26 – Vaile Dec., ¶ 20.

1046.   The NM-PELRB lacks the staffing and budget to recreate and provide FMCS mediator or arbitration services as described above. ECF 3-26 – Vaile Dec., ¶ 20.

1047.   The NM-PELRB has already encountered problems with its case load related to the loss of free or reduced cost FMCS mediation services for New Mexico public sector disputants. ECF 3-26 – Vaile Dec., ¶ 21.

1048.   At the time of filing, NM-PELRB had eight pending cases between the same two parties, several of which were on appeal at State District Court, and one of which was on appeal at the State Courts of Appeal.  At the last hearing on the merits, on January 29, 2025, the parties jointly sought a continuance because neither sides' witnesses had appeared despite being subpoenaed, and the parties hoped to obtain FMCS mediation services to try to settle all their pending cases on a global basis. ECF 3-26 – Vaile Dec., ¶ 21.

1049.   Since then, with the discontinuation of FMCS services, the parties hope for free or affordable FMCS mediation services has withered on the vine. ECF 3-26 – Vaile Dec., ¶ 21.

1050.   Neither the NM-PELRB nor any similar agency was able and prepared to assist

labor disputants in this situation. Although the State of New Mexico Court of Appeals has a Mediation Program, it is not free or for reduced fee and their mediators generally lack the special substantive knowledge of FMCS mediators. ECF 3-26 – Vaile Dec., ¶ 21.

1051.   FMCS's dispute resolution services outlined above are critical for resolving labor disputes in New Mexico because of their expertise in dispute resolution, their knowledge of the subject matter of labor relations, and their unique skills in negotiations related to collective bargaining.    ECF 3-26 – Vaile Dec., ¶ 22.

1052.   Additionally, free or reduced cost mediation and arbitration services through the FMCS are frequently what allows dispute resolution to take place at all in the labor relations industry. ECF 3-26 – Vaile Dec., ¶ 22.

1053.   Labor law is a niche area of specialized law, and it is a notoriously low- or under-paid market compared to such things as commercial mediation and arbitration. ECF 3-26 – Vaile Dec., ¶ 22.

1054.   As such, practitioners rely heavily on FMCS's free or reduced-cost services. ECF 3-26 – Vaile Dec., ¶ 22.

1055.   The NM-PELRB will not be able to replace these services in the near or medium term. ECF 3-26 – Vaile Dec., ¶ 22.

1056.   NM-PELRB's budget is already set through June 30, 2026, absent special or emergency funding, and was developed upon the assumption that the FMCS's free or low-cost mediation and arbitration services would continue to be available to New Mexico non-federal public employers, union, and public employees, as has been the case in the past. ECF 3-26 – Vaile Dec., ¶ 22.

1057.   FMCS also provides critical free or reduced cost services through its training and education of mediators, arbitrators, and labor practitioners alike; and its role as a respected federal agency able to rapidly convene major stakeholders to address pressing labor issues of the day. ECF 3-26 – Vaile Dec., ¶ 23.

1058.   All stakeholders in labor relations depend on well-trained advocates, mediators and arbitrators alike, and FMCS has been an essential provider of such education, often working with other paneling agencies, labor agencies, and the NAA. ECF 3-26 – Vaile Dec., ¶ 23.

1059.   FMCS routinely provides – at no or reduced cost – vital training to New Mexico public sector employers, unions and employees on interest-based bargaining, and other conflict management topics. ECF 3-26 – Vaile Dec., ¶ 23.

1060.   FMCS is instrumental in educating arbitrators to maintain its arbitrator panels, such as through the BALA course, which it has administered for several decades with the teaching assistance of NAA members. ECF 3-26 – Vaile Dec., ¶ 23.

1061.   FMCS plays a vital role in convening stakeholders such as other paneling agencies, the NAA, and the Labor and Employment Relations Association (LERA) to timely address issues of mutual concern, such as due process protocols for videoconferencing during a global pandemic. ECF 3-26 – Vaile Dec., ¶ 23.

1062.   Since FMCS arbitration services are provided for or required under Section 18 of PEBA and under most New Mexico CBAs, the quality and regularity of arbitrator training and the convening of necessary multi-lateral work groups are highly relevant to public employers, unions and public employees in New Mexico. ECF 3-26 – Vaile Dec., ¶ 23.

1063.   Arbitrator training, in particular, is relevant to State labor relations agencies such as NM-PELRB that might consider initiating an Arbitrator listing or paneling service in lieu of or in addition to the listing or paneling services previously provided by FMCS. ECF 3-26 – Vaile Dec., ¶ 23.

1064.   The loss to the labor relations community of FMCS training and educational services and support, and its power to convene stakeholders, are perhaps the hardest impairments to calculate, but on information and belief they are equally significant impairments, particularly in the medium and long term. ECF 3-26 – Vaile Dec., ¶ 23.

1065.   If FMCS ceased to function in a meaningful way, the NM-PELRB anticipates an unavoidable increased number of labor disputes before it, and perhaps increased acrimony in those disputes as the hope of low-cost resolution recedes. ECF 3-26 – Vaile Dec., ¶ 24.

1066.   Because State and local public employers, unions and public employees will no longer be able to comply with the PEBA's requirement to use FMCS for a negotiated grievance/arbitration process, they may also see some disputants resort to industrial self-help such as strike or lockout activity, which can negatively impact their state and local economies. ECF 3-26 – Vaile Dec., ¶ 24.

1067.   At a minimum, they can expect to see increased disorder and disturbance in the operations of the State and its political subdivisions with an increase of unresolved labor disputes. ECF 3-26 – Vaile Dec., ¶ 24.

1068.   While the NM-PELRB will take any actions in its power and means to "fill the void" and protect New Mexico public interest implicated in PEBA, they will not be able to replace FMCS's free and reduced cost mediation and arbitration services

without significant additional resources to expand their programs and staffing. ECF 3-26 – Vaile Dec., ¶ 24.

1069.   Rhode Island also finds FMCS's dispute resolution services critical for resolving labor disputes because the agency provides experienced, third-party mediators from outside the State to resolve entrenched conflicts where the State or a municipality is a party. ECF 3-30 – Delgado Dec., ¶ 12; Taibi Dec., ¶ 12.

1070.   For example, FMCS provided a mediator to help resolve a grievance between the Department of Children, Youth and Families (DCYF) and a union in Fall 2024. ECF 3-30 – Delgado Dec., ¶ 10.

1071.   The dispute involved determining whether there was a violation of a CBA by reassigning an employee from one division to another to handle critical event reviews. ECF 3-30 – Delgado Dec., ¶ 10.

1072.   Had the dispute continued, the State faced a serious disruption to critical state services such as monitoring and reviewing critical events including but not limited to near-fatalities and fatalities of children. ECF 3-30 – Delgado Dec., ¶ 10.

1073.   Instead, the crisis was averted through FMCS's mediation—which was provided at no cost. ECF 3-30 – Delgado Dec., ¶ 10.

1074.   FMCS provided a skilled mediator who was knowledgeable and objective.  Through their services, a resolution was reached and a strike averted. ECF 3-30 – Delgado Dec., ¶ 11.

1075.   If the matter had not been resolved through FMCS, DCYF's ability to provide its most vulnerable children with the security and stability they require could have been crippled for an indefinite period of time. ECF 3-30 – Delgado Dec., ¶ 11.

1076.  If FMCS ceased to function in a meaningful way, Rhode Island would suffer from
prolonged labor disputes that could disrupt the provision of essential state services,
including their child welfare support services. ECF 3-30 – Delgado Dec., ¶ 13.

1077.  If the State were forced to replace FMCS services with private mediators, the
estimated cost to the State could amount to hundreds of thousands of dollars per
year. ECF 3-30 – Delgado Dec., ¶ 13.

1078.  These costs would rise even higher if the State were pulled into costly litigation,
which could result in a major judgment against the State. ECF 3-30 – Delgado Dec., ¶
13.

1079.  FMCS also plays a key role in mediating disputes between employers and
Teamsters Local 251, located in East Providence. ECF 3-32 – Taibi Dec., ¶ 6.

1080.  Local 251 represents 5,000 union members in transportation and healthcare and
over 1,000 members in other industries. ECF 3-32 – Taibi Dec., ¶ 4.

1081.  By contract, disputes between Local 251 and employers may be referred to
mediation by FMCS. ECF 3-32 – Taibi Dec., ¶ 6.

1082.  Dozens of disputes in Rhode Island have been referred to FMCS over the past 11
years.  Many of these disputes were successfully mediated, preventing escalations that
could have had a devastating impact on critical infrastructure services throughout
Rhode Island. ECF 3-32 – Taibi Dec., ¶ 6.

1083.  For example, a 2018 strike over two weeks by school bus drivers in Providence
affected over 9,000 students and cost the city at least $600,000 for the eleven-day
walkout. ECF 3-32 – Taibi Dec., ¶ 7.

1084.  In 2022 to 2023, Providence school bus drivers were set to strike again if

260

contract negotiations fell through. However, the potential crisis was averted with the assistance of mediation through FMCS. ECF 3-32 – Taibi Dec., ¶ 8.

1085.   At the time of filing, four more school bus contracts were either open or were set to open in the immediate future, and another six are set to open next year, impacting almost 900 school bus workers in Rhode Island. ECF 3-32 – Taibi Dec., ¶ 9.

1086.   If negotiations fall through, thousands of students in over ten school districts may not have reliable transportation to school and the cost to the employers could be significant. ECF 3-32 – Taibi Dec., ¶ 9.

1087.   In addition to bus drivers, Local 251 represents 2,500 healthcare workers in Rhode Island hospitals, including at Rhode Island Hospital, the only Level 1 Trauma Center in the state. ECF 3-32 – Taibi Dec., ¶ 10.

1088.   Rhode Island Hospital is the only hospital in the state which has board-certified trauma surgeons and surgical critical care teams on staff, and which has operating rooms open and staffed around the clock, able to care for all patients (pediatric and adult) in the state with acute, complex trauma and life threatening injuries (such as gunshot victims and people seriously injured in motor vehicle accidents). ECF 3-32 – Taibi Dec., ¶ 10.

1089.   Failed contract negotiations would lead to massive disruptions in the state's fragile healthcare ecosystem, creating risk to and threatening the health and wellbeing of every person throughout the state. ECF 3-32 – Taibi Dec., ¶ 10.

1090.   In 2015, a mediator played a crucial role in assisting negotiations to avoid a strike. ECF 3-32 – Taibi Dec., ¶ 10.

1091.   Matthew Taibi, Secretary-Treasurer and Principal Officer of General Teamsters

Local 251 in East Providence, testified that if FMCS ceased to function in a meaningful way, it was his opinion that the State and municipalities in Rhode Island would suffer from prolonged labor disputes that could disrupt transportation, healthcare, and other critical services throughout the State. ECF 3-32 – Taibi Dec., ¶ 13.

1092.  Ken DeLorenzo is the Field Representative of United Nurses & Allied Professionals (UNAP) representing approximately 7,000 nurses, technologists, therapists, support staff, and other health care workers employed in Rhode Island, Vermont, and Connecticut. Over the last 11 years, he has participated in hundreds of management-labor disputes on behalf of UNAP, including negotiations involving collective bargaining agreements, grievances, strikes, lockouts, and arbitrations. ECF 44-2 - DeLorenzo Dec., ¶¶ 4-5

1093.  By statute, disputes between UNAP and employers are referred to mediation by FMCS. Mr. DeLorenzo has participated in eight disputes mediated by FMCS, and stated that to his knowledge, dozens of disputes have been referred to FMCS over the past 11 years. Many of these disputes were successfully mediated, preventing escalations that could otherwise have a devastating impact on critical healthcare services throughout Rhode Island. ECF 44-2 - DeLorenzo Dec., ¶ 6.

1094.  For example, in 2018, FMCS played a critical role in mediating contract negotiations and ending a five-day work stoppage at Rhode Island Hospital and Hasbro Children's Hospital, which cost Lifespan (now Brown University Health) millions of dollars to hire replacement staff—paying exorbitant rates for temporary workers who were largely unfamiliar with the hospital's equipment, layout, practices, and standards of care. ECF 44-2 - DeLorenzo Dec., ¶ 7.

1095.  Since January 2025, UNAP has been negotiating a new collective bargaining agreement on behalf of approximately 2,500 healthcare workers at Rhode Island Hospital, the state's only Level-One Trauma Center and the flagship hospital for Brown University Health (formerly Lifespan), the state's largest private employer. On or about March 20, 2025, the parties agreed that negotiations had stalled, and they agreed that a resolution of the disagreement would likely require a neutral mediator provided by FMCS. On or about October 24, 2024, they were assigned a mediator by FMCS. ECF 44-2 - DeLorenzo Dec., ¶¶ 8-10. A copy of the notice is available at ECF 44-2, Attachment A.

1096.  On or about March 26, [2025], the assigned mediator arrived for the first mediation session, but before they could begin, he informed the parties that he had been placed on administrative leave in accordance with the Executive Order and was no longer able to mediate UNAP's negotiations with Brown University Health. For that reason, the mediation session was cancelled. ECF 44-2 - DeLorenzo Dec., ¶ 11.

1097.  On or about March 31, 2025, UNAP's collective bargaining agreement with Brown University Health expired, and a work stoppage--with likely devastating effects on the state's healthcare system from even the temporary loss of its dedicated healthcare workers--became an ever-increasing possibility while negotiations dragged out. ECF 44-2 - DeLorenzo Dec., ¶ 12.

1098.  As of April 16, 2025, the parties were at a critical juncture in their negotiations, and UNAP may have needed to issue a strike notice. If that were the case, UNAP is legally required under the National Labor Relations Act to notify FMCS in advance so that FMCS may intervene. However, the dismantling of FMCS has created confusion over

how UNAP shall fulfill that duty and to what end. ECF 44-2 - DeLorenzo Dec., ¶ 13.

1099.   Mr. DeLorenzo testified that there is no replacement for FMCS services. UNAP and Brown University Health may be able to pay for private mediation, but only FMCS mediators have the authority to force parties to the table if a work stoppage is imminent. In his professional opinion, the loss of FMCS mediation services has dramatically increased the risk of an imminent work stoppage--with life or death consequences--at the busiest medical center in the region. ECF 44-2 - DeLorenzo Dec., ¶¶ 14-15.

1100.   FMCS also mediates disputes between the New England Health Care Employees Union, District 1199NE and employers. SEIU 1199NE represents nearly 5,000 union employees across healthcare and related service industries. SEIU 1199NE members work as nurses, CNAs, technicians, clerical employees, service and maintenance workers, and other positions in hospitals, community health centers, nursing homes, community programs for developmentally disabled individuals, and other critical social service programs across the State of Rhode Island. ECF 3-45 – Martin Dec., ¶¶ 4, 6.

1101.   Ten disputes have been referred to FMCS over the past three years. Many of those disputes were successfully mediated, preventing escalation that could have had a devastating impact on critical health and social services throughout Rhode Island. ECF 3-45 – Martin Dec., ¶ 6.

1102.   When healthcare workers are forced to strike, public disruption results. ECF 3-45 – Martin Dec., ¶ 7.

1103.   Whenever negotiations break down and a strike appears imminent, the Rhode Island Department of Health ("RIDOH") is immediately involved as the employer's facility is required to submit to RIDOH a strike preparedness plan for RIDOH

approval. RIDOH then needs to expeditiously review that plan, pulling resources away

from other key RIDOH functions, such as code enforcement at other facilities, and

frequently requiring overtime by RIDOH employees. Once the strike begins, RIDOH

has to place inspectors in the facility 24 hours per day, 7 days a week, to ensure that

vulnerable patient populations within these facilities are not endangered by disruptions

in care.  These costs are borne by the State. ECF 3-45 – Martin Dec., ¶ 7.

1104.   In addition to paying for an exceedingly high cost of labor to replace striking staff,

hospitals / facilities must also direct resources towards training and orienting

replacement staff to the many complex systems and policies of each facility. All non-

union staff are reassigned to additional duties above their regular job functions during

strikes, and most facilities accommodate these non-union staff who work around the

clock during strikes with "overtime" compensation or bonuses. ECF 3-45 – Martin

Dec., ¶ 8.

1105.   Jesse Martin, Executive Vice President of SEIU1199NE, RI, testified that despite

paying a very high premium for temporary labor, in his experience that the quality of

care at striking facilities suffers without the workers who are most familiar with the

unique needs of the facility and its patients. For example, every electronic medical

record system is unique to the specific build and specific use at each facility, and

medical professionals need training and time to learn new systems before they can be

proficient with them. The same is true for facility policies and procedures, many of

which exist because adherence to them is necessary in order to prevent human error

and/or to ensure optimization of patient care in a specific patient care environment. No

matter how skilled or experienced travel staff may be, there is no possible way for them

266 of 301 PageID
#: 4812

to download the institutional and facility-specific knowledge that the staff who routinely care for those patients have from their lived experience within that facility and within those patient care teams. ECF 3-45 – Martin Dec., ¶ 9.

1106.   New England Health Care Employees Union District 1199 represents over 90% of the employees at Women & Infants Hospital, including all Nurses, Technical Employees, Clerical Employees and Service and Maintenance Employees. ECF 3-45 – Martin Dec., ¶ 13.

1107.   Medical care is delivered at Women & Infants and Butler, and in other care settings represented by the Union, in a team-based model, and the medical professionals work and train together, as teams, to deliver the most effective, safest, highest quality of care possible. ECF 3-45 – Martin Dec., ¶  13.

1108.   It is well studied and evidenced that most medical errors are rooted in failures in communication among teams, and for that reason, the medical care teams at Women & Infants cross-train on teamwork and communication so that their care can be of the highest quality possible. ECF 3-45 – Martin Dec., ¶ 10.

1109.   There is simply no substitution for those care teams who are trained to communicate well together, for the benefit and safety of their patients. ECF 3-45 – Martin Dec., ¶ 10

1110.   In addition, employees who are locked out of the facility can apply to the State for unemployment benefits, further increasing the cost to the State of failed contract negotiations. ECF 3-45 – Martin Dec., ¶ 11.

1111.   As recently as December 2024, SEIU 1199NE represented workers at a negotiation with Woman & Infants Hospital of Rhode Island. ECF 3-45 – Martin Dec., ¶ 12.

1112.   Women & Infants is the major teaching affiliate of Brown university for OBGYN,

maternal-fetal-medicine, gynecology and neonatal care, and is one of the largest stand-alone obstetrical hospitals in the country, delivering approximately 8,500 infants per year with an 85-bed neonatal intensive care unit. ECF 3-45 – Martin Dec., ¶ 12.

1113.   Women & Infants cares for almost all of the state's high-risk pregnancies and is a tertiary care referral center for high-risk patients in other regions. ECF 3-45 – Martin Dec., ¶ 12.

1114.   SEIU 1199NE's negotiation with Women & Infants Hospital would have gone on strike but for mediations facilitated by FMCS. ECF 3-45 – Martin Dec., ¶ 12.

1115.   FMCS's involvement prevented a potentially devastating strike. ECF 3-45 – Martin Dec., ¶ 12.

1116.   An SEIU strike at Women & Infants would impact all the services provided by the Hospital at its main location and approximately 35 offsite clinical locations through RI and southeastern MA. ECF 3-45 – Martin Dec., ¶ 13.

1117.   New England Health Care Employees Union District 1199 represents over 90% of the employees at Women & Infants Hospital, including all Nurses, Technical Employees, Clerical Employees and Service and Maintenance Employees. ECF 3-45 – Martin Dec., ¶ 13.

1118.   To replace over 90% of the staff would cost the Hospital tens of millions of dollars in contracts for the replacement staff. ECF 3-45 – Martin Dec., ¶ 13.

1119.   Such an expenditure would create a significant fiscal crisis for the Hospital that it would have a long-standing impact on the institution and the services it provides. ECF 3-45 – Martin Dec., ¶ 13.

1120.   At the time of filing, SEIU 1199NE had open contracts with three nursing homes,

one federally qualified health clinic (FQHC), and Butler Hospital. It also had contracts with another nursing home and another qualified clinic opening during the following two months.  Those contract negotiations implicated around 2,000 healthcare workers that could go on strike if agreement was not reached through other means. ECF 3-45 – Martin Dec., ¶ 13.

1121.   The negotiations with Butler Hospital were extremely likely to lead toward a strike without the benefit of FMCS mediation. During the course of recent contract negotiations there were significant issues on the bargaining table that the parties were very far apart on, for example, wages, retirement, health care, training benefits, along with scheduling practices. These issues were the largest economic problems faced at the bargaining table and the hardest to overcome if the parties are unable to use a neutral to bridge a divide. The collective bargaining agreement at Butler expired on April 1, 2025, leaving both the employer and the union operating without labor peace. A one-week strike could cost Butler Hospital millions of dollars, and those costs would pass on to Rhode Islanders as explained above. ECF 3-45 – Martin Dec., ¶ 14.

1122.   As of April 4, 2025, Butler Hospital had 29 monitored community detox spots, 15 adolescent behavioral health beds, 81 general behavioral health beds, 20 geriatric psychology beds, and 45 intensive / violent behavioral beds filled. The hospital had approximately 2 open beds. These 161 vulnerable patients would be harmed in the event those who provide care go on strike.  Rhode Islanders would suffer from the disruption of the only in-house psychological treatment facility in Providence. ECF 3-45 – Martin Dec., ¶ 14.

1123.  Since February 2025, SEIU 1199NE had been negotiating a collective bargaining

agreement with Butler Hospital, Rhode Island's largest mental health hospital. On or around February or March 2025, the parties had been assigned an FMCS mediator from the Boston office. It is helpful to work with regional FMCS mediators from New England, as they tend to specialize in healthcare and have relevant subject matter expertise. ECF 76-7 – Martin Dec., ¶¶ 4-5.

1124.  Executive Order 14,238 was issued on March 14, 2025, and the FMCS mediator from the Boston office was placed on administrative leave. He left at a crucial moment, as the collective bargaining agreement expired on April 1, 2025. At the time, there were no federal mediators available to resolve the labor dispute. ECF 76-7 - Martin Dec., ¶ 6.

1125.  SEIU1199NE sent a strike notice at the end of April, and the Butler Hospital workers went on strike on May 15, 2025. The strike lasted three months. ECF 76-7 - Martin Dec., ¶ 7.

1126.  As a result of the preliminary injunction issued by the United States District Court for the District of Rhode Island on May 6, 2025, SEIU1199NE was able to obtain a federal mediator. At first, as FMCS was in the process of responding to the preliminary injunction order, the parties were assigned a mediator who was not from New England, lacked subject matter expertise, was only allowed to attend virtually, and was not permitted to work weekends. Not having a federal mediator available in person for the entire month of May was a huge problem. SEIU1199NE attempted to hire multiple FMCS mediators on private duty status to work in-person after the Executive Order was issued to try to resolve the dispute, but FMCS denied these requests, notwithstanding the fact that Butler hospital workers were out on strike. ECF 76-7 -

Martin Dec., ¶ 8.

1127.   Finally, the parties were able to commence in-person mediation in June with a regional FMCS mediator from the New York / Connecticut office who specialized in health care and had relevant subject matter expertise.  The new FMCS mediator had initially been placed on administrative leave due to the Executive Order but was brought back as a result of the preliminary injunction.  The regional FMCS mediator from the New York / Connecticut office was instrumental in helping to resolve this labor dispute. ECF 76-7 - Martin Dec., ¶ 9.

1128.   The strike ended on August 18, 2025. ECF 76-7 - Martin Dec., ¶ 10.

1129.   Likewise, the American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"), a national labor organization and unincorporated membership association, specifically relies upon the Federal Mediation and Conciliation Service ("FMCS") to help facilitate the negotiation of collective bargaining and other labor-management agreements, and in the handling of grievances concerning state employees, in California, Delaware, the District of Columbia, Illinois, Maryland, Michigan, Nevada, New Mexico, New York, Rhode Island and Washington. ECF 3-39 – Thornton Dec., ¶ 8.

1130.   AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, including the District of Columbia, and Puerto Rico. ECF 3-39 – Thornton Dec., ¶ 3.

1131.   AFSCME, through its affiliates District Councils and local unions, represents public employees at the local, municipal, county and state levels of government

including thousands of state employees in state agencies and departments across the country. ECF 3-39 – Thornton Dec., ¶ 3.

1132. AFSCME assists in negotiating collective bargaining agreements and other labor-management agreements with state and other public and private sector employers with the goal of advocating for fairness in the workplace, better wages and working conditions, excellence in public services, and prosperity and opportunity for all working families. ECF 3-39 – Thornton Dec., ¶ 6.

1133. AFSCME also assists its affiliates in handling grievances and arbitrations concerning disputes with state and other employers over the terms of agreements and concerning grievances and arbitrations over the discipline of employees. ECF 3-39 – Thornton Dec., ¶ 6.

1134. There are approximately 1,900 AFSCME collective bargaining or other agreements with employers in the private sector and the public sector at all levels of government with specific provisions either allowing for or mandating the use of FMCS in labor-management relations. ECF 3-39 – Thornton Dec., ¶ 7.

1135. These agreements are in forty-two states, including the District of Columbia. ECF 3-39 – Thornton Dec., ¶ 7.

1136. AFSCME affiliates also rely upon FMCS to provide "card check" services to conduct card counts for AFSCME organized bargaining units. ECF 3-39 – Thornton Dec., ¶ 8.

1137. Many AFSCME agreements with state employees provide for the use of FMCS arbitrators or fact finders to serve as impartial decision makers and/or mediators in disputes over the meaning of terms in an agreement or in employee discipline

cases. ECF 3-39 – Thornton Dec., ¶ 9.

1138.  For example, in the state of Maryland, under the Memorandum of Understanding between AFSCME and the state, when the union and employer during negotiations cannot come to an agreement on a mandatory subject of bargaining, either party can at their own cost request a mediator from FMCS to aid in resolving the dispute.   ECF 3-39 – Thornton Dec., ¶ 10.

1139.  Additionally, per the terms of the agreement, complaints concerning alleged violations of the terms of the agreement can be heard by a fact finder provided by FMCS, with costs to be shared equally by the parties. ECF 3-39 – Thornton Dec., ¶ 10.

1140.  Similarly, in Illinois, the Illinois Public Labor Relations Act requires mediation in negotiations over collective bargaining agreements between the state and unions representing public safety employees (peace officers, firefighters, paramedics), and requires mediation before those employees could otherwise exercise their right to strike. ECF 3-39 – Thornton Dec., ¶ 11.

1141.  If either the employer or the union requests mediation services from FMCS, the other party must join in that request or otherwise bear the additional cost of mediation from another source. ECF 3-39 – Thornton Dec., ¶ 11.

1142.  The use of FMCS appointed mediators has helped to resolve disputes that otherwise may have escalated and caused both the union and the state to expend greater resources in both time and money to resolve the dispute. ECF 3-39 – Thornton Dec., ¶ 12.

1143.  Mediation frequently is less costly and takes significantly less time to resolve disputes in contrast to labor disruptions, administrative hearings, or other litigation. ECF 3-39 – Thornton Dec., ¶ 12.

1144.   In 2019, AFSCME and the state of Maryland relied upon FMCS to mediate a dispute over a new overtime policy within the state Department of Public Safety and Correctional Services. ECF 3-39 – Thornton Dec., ¶ 13.

1145.   With the involvement of the FMCS Commissioner as a mediator, what began as a contentious labor relations dispute at the states' largest correctional facility instead resulted in a mediated new policy that applied beyond the specific institution originally involved. ECF 3-39 – Thornton Dec., ¶ 13.

1146.   FMCS assistance helped to facilitate a reasonable solution to navigate the difficult issues of understaffing in correctional facilities in Maryland; an issue that without FMCS assistance would have surely resulted in costly and time-consuming litigation before the state labor relations board. ECF 3-39 – Thornton Dec., ¶ 13.

1147.   In 2023, in Salisbury, Maryland, AFSCME and other unions utilized FMCS to conduct a card count (card check) to determine which union would represent separate bargaining units of the Fire Department, Police Department, and General Government Personnel in that city. ECF 3-39 – Thornton Dec., ¶ 14.

1148.   As is often the case, use of FMCS was at considerably less cost to the unions and the employer than alternative private vendors that can cost hundreds or thousands of dollars to engage. ECF 3-39 – Thornton Dec., ¶ 14.

1149.   In 2021, AFSCME reached an agreement with Eastern Illinois University, a public state university, after over a year of bargaining. ECF 3-39 – Thornton Dec., ¶ 15.

1150.   It was not until the union and the state agreed to bring in FMCS to help mediate that an agreement could be reached. ECF 3-39 – Thornton Dec., ¶ 15.

1151.   Also in Illinois, AFSCME depends upon FMCS to mediate contract negotiations

for the approximately 38,000 AFSCME represented state employees there, to avoid labor disruption including the potential for strikes. ECF 3-39 – Thornton Dec., ¶ 16.

1152.   AFSCME also relies upon FMCS mediation services concerning its negotiation of collective bargaining agreements in the private sector and has been harmed by the sudden cessation of FMCS services. ECF 3-39 – Thornton Dec., ¶ 17.

1153.   AFSCME has negotiated several first contracts with tentative agreements on grievance and arbitration procedures specifying FMCS as the provider of arbitrators and/or mediation. ECF 3-39 – Thornton Dec., ¶ 18.

1154.   As a result of the cessation of FMCS services, all of those contracts will now have to be re-opened to renegotiate the articles referencing FMCS, thereby putting all negotiations progress at risk. ECF 3-39 – Thornton Dec., ¶ 18.

1155.   AFSCME affiliates have informed AFSCME that they have been notified that FMCS is basically being shut down. ECF 3-39 – Thornton Dec., ¶ 19.

1156.   AFSCME affiliates have told AFSCME that FMCS staff now placed on administrative leave have informed them that FMCS is "being reduced to a minimum presence", and "just like that, it's done." ECF 3-39 – Thornton Dec., ¶ 19.

1157.   In Minnesota, AFSCME Council 65 has been in contentious negotiations for a first contract with the Cura of Monticello nursing home recently acquired by its new owner. ECF 3-39 – Thornton Dec., ¶ 20.

1158.   Negotiations have been ongoing for more than a year and have included the filing of an unfair labor practice by the union against the employer. ECF 3-39 – Thornton Dec., ¶ 20.

1159.   To help ease the tension and in hopes of securing an agreement, after four months

of negotiations, the parties invoked mediation from FMCS. ECF 3-39 – Thornton Dec.,
¶ 20.

1160.   FMCS mediation began in May of 2024 and had been ongoing since March of
2025.        ECF 3-39 – Thornton Dec., ¶ 20.

1161.   FMCS mediation had been successful and resulted in the parties reaching agrement
on virtually all disputes. ECF 3-39 – Thornton Dec., ¶ 20.

1162.   The next meeting with the FMCS mediator was scheduled for Friday, March 28,
2025. However, on March 26, 2025, as a direct result of the March 14, 2025 Executive
Order "Continuing the Reduction of the Federal Bureaucracy" the parties received an
email from the FMCS mediator abruptly canceling the mediation session. ECF 3-39 –
Thornton Dec., ¶ 20.

1163.   The cancellation email stated that it was due to "FMCS is being reduced to a
minimum presence and nearly all staff nationwide   are being placed on administrative
leave effective tomorrow." ECF 3-39 – Thornton Dec., ¶ 20.

1164.   In Illinois, at the Thrive nursing home, AFSCME Council 31 has been in
negotiations over a new contract for several months. ECF 3-39 – Thornton Dec., ¶ 21.

1165.   The negotiations have been contentious, and the parties brought in a FMCS
mediator to help avoid a potential strike. ECF 3-39 – Thornton Dec., ¶ 21.

1166.   The assigned mediator has now informed the parties that he no longer can provide
services due to his sudden layoff brought on by the Executive Orders. ECF 3-39 –
Thornton Dec., ¶ 21.

1167.   In Vermont, AFSCME Local 1674 represents employees at the Howard Center
which provides mental health and developmental disability services, some of which are

aided by state funding sources. ECF 3-39 – Thornton Dec., ¶ 22.

1168. Bargaining between the union and employer has often been contentious and difficult and the possibility of a strike or lockout is frequently present. ECF 3-39 – Thornton Dec., ¶ 22.

1169. With that in mind, the union and employer during the last round of bargaining in 2023 and 2024, agreed to bring in a FMCS mediator to all bargaining sessions and hopefully avoid labor disruptions. ECF 3-39 – Thornton Dec., ¶ 22.

1170. FMCS was instrumental in navigating the threat of impasse and brokering a final agreement, one which satisfied both the union and the employer and avoided a costly work stoppage that would have impacted the provision of vital health services to the public. ECF 3-39 – Thornton Dec., ¶ 22.

1171. The immediate effect of the March 14, 2025, Executive Order "Continuing the Reduction of the Federal Bureaucracy" has been the immediate cessation of all FMCS assistance in the mediating of labor management disputes in the public and private sector and the immediate cessation of all FMCS assistance in grievance mediation across the board. ECF 3-39 – Thornton Dec., ¶ 23.

1172. Additionally, AFSCME unions representing employees in both the private and public sectors must now find and utilize other more costly and time expansive methods to resolve disputes with employers. ECF 3-39 – Thornton Dec., ¶ 23.

1173. Additionally, labor disputes are more likely to result in work disruptions when the path to otherwise mediating the dispute has been eliminated. ECF 3-39 – Thornton Dec., ¶ 23.

1174. These injuries suffered by AFSCME, employees, and employers are ongoing or

imminent and will persist unless this Court intervenes. ECF 3-39 – Thornton Dec., ¶ 24.

1175.  Hawaiʻi Pacific Health ("HPH") is anchored by four medical centers and has seventy locations across the state of Hawaiʻi.    ECF 3-6 – Boivin Dec., ¶ 2.

1176.  FMCS has assisted HPH and two different labor unions with mediation in five contract negotiations since 2022 (two involving strikes) that culminated in four successful conclusions and one current ongoing mediation. ECF 3-6 – Boivin Dec., ¶ 6.

1177.  These matters include renegotiation of existing contracts that expire approximately every three years and concern wages, hours, and working conditions for employee bargaining unit members at certain HPH facilities. ECF 3-6 – Boivin Dec., ¶ 7.

1178.  FMCS expertise has assisted the parties in reaching agreements. ECF 3-6 – Boivin Dec., ¶ 8.

1179.  Similarly, where there was an ongoing strike and/or lockout, FMCS was able to assist the parties in ending the dispute and resolving outstanding issues. ECF 3-6 – Boivin Dec., ¶ 8.

1180.  The services provided by FMCS in these matters include the provision of a mediator/neutral for the purpose of assisting the parties in resolving disputes when the parties have not been able to do so successfully on their own. ECF 3-6 – Boivin Dec., ¶ 9.

1181.  For example, in September and October of 2024, after over a year of difficult negotiations with the nurses' union at Kapiʻolani Medical Center for Women and Children that involved two different strikes and a twenty-two day lockout, the parties

agreed to bring FMCS mediation into the talks. ECF 3-6 – Boivin Dec., ¶ 9.

1182. After five days of mediation, the parties reached a mediated agreement that brought employees back to work and concluded a very contentious and difficult collective bargaining process. ECF 3-6 – Boivin Dec., ¶ 9.

1183. If the matter had not been resolved with the assistance of FMCS, employees may have remained out of work indefinitely with prolonged discord and strain to vital health care services for the people of Hawaiʻi. ECF 3-6 – Boivin Dec., ¶ 10.

1184. FMCS services were provided at no cost to the parties. ECF 3-6 – Boivin Dec., ¶ 11.

1185. FMCS mediators have been able to organize and efficiently run a mediation process that effectively and timely focuses the parties on their interests beyond their respective positions to find a mutually acceptable resolution. ECF 3-6 – Boivin Dec., ¶ 11.

1186. Based on the importance and impact of health care services to the public, the timely resolution of these disputes is paramount in the interest of maintaining health care services to the community. ECF 3-6 – Boivin Dec., ¶ 11.

1187. FMCS has also provided training on labor conflict management to HPH on at least four occasions for different facilities/employee groups. ECF 3-6 – Boivin Dec., ¶ 12.

1188. These FMCS training programs are presented to help resolve real-world day to day challenges of labor-management relations in the administration of the contracts negotiated between the parties. ECF 3-6 – Boivin Dec., ¶ 12.

**D. United States Interagency Council on Homelessness**

1189. The United States Interagency Council on Homelessness ("USICH") is the only Federal agency focused solely on ending homelessness. ECF 76-1 – Doe Dec., ¶ 6.

1190.  Congress established USICH in 1987 to "coordinate the Federal response to homelessness and to create a national partnership at every level of government and with the private sector to reduce and end homelessness in the nation while maximizing the effectiveness of the Federal Government in contributing to the end of homelessness." ECF 76-1 – Doe Dec., ¶ 6 (quoting 42 U.S.C. § 11311).

1191.  Congress reauthorized the agency in the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009. ECF 76-1 – Doe Dec., ¶ 6 (citing Pub. L. No. 111-22, div. B, §§ 1001-1505).

1192.  USICH is authorized to operate until October 1, 2028. ECF 76-1 – Doe Dec., ¶ 6 (citing 42 U.S.C. § 11319).

1193.  Congress appropriated $4.3 million to USICH for Fiscal Year 2025. ECF 76-1 – Doe Dec., ¶ 11 (citing Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, Tit. 3, 138 Stat. 388 (2024)).

1194.  In requesting funding for Fiscal Year 2025, USICH informed Congress that funding at this level is "critical to supporting USICH's mission to prevent and end homelessness in America." ECF 76-1 – Doe Dec., ¶ 11.

1195.  USICH is statutorily required to develop and annually update "a National Strategic Plan to End Homelessness." ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(1)).

1196.  USICH is statutorily required to "monitor, evaluate, and recommend improvements in programs and activities to assist homeless individuals conducted by Federal agencies, State and local governments, and private voluntary organizations." ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(4)).

1197.  USICH is statutorily required to provide "provide professional and technical assistance . . . to States, local governments, and other public and private nonprofit organizations," to enable governments and organizations to interpret federal regulations, provide assistance on federal programs, develop recommendations, and establish biennial regional workshops. ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(5)).

1198.  USICH is statutorily required to encourage "the creation of State Interagency Councils on Homelessness" and the formulation of plans to "end homelessness at State, city, and county levels." ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(6)).

1199.  USICH is statutorily required to "develop mechanisms to ensure access by persons experiencing homelessness to all Federal, State, and local programs for which the persons are eligible." ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(7)).

1200.  USICH is statutorily required to "conduct research and evaluation" related to its mission to end homelessness. ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(8))

1201.  USICH is statutorily required to "prepare and distribute to States . . . a bimonthly bulletin" that describes available Federal resource. ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(a)(11)).

1202.  USICH is statutorily required to notify the head or the inspector general of the relevant agency if USICH encounters significant problem, abuse, or deficiency in programs to assist unhoused individuals. ECF 76-1 – Doe Dec., ¶ 7 (citing 42 U.S.C. § 11313(d)).

1203.  By statute, USICH is composed of representatives of at least 20 agencies who meet

"not less often than four times each year." 42 U.S.C. § 11312(a)-(c).

1204.  USICH is statutorily required to employ an Executive Director and "not less than 5 . . . regional coordinators." 42 U.S.C. §§ 11314(a), 11313(a)(5). The Secretary of Housing and Urban Development must provide USICH with "such administrative and support services as are necessary to ensure that the Council carries out its functions . . . in an efficient and expeditious manner." 42 U.S.C. §11314(d).

1205.  In Fiscal Year 2023, Congress appropriated well over $9 billion for targeted programs to end homelessness administered by nine separate agencies, including among 19 USICH member agencies.  USICH, *Annual Report to Congress on Targeted Programs That Help People Experiencing or At Risk of Homelessness*, Table 1, https://www.usich.gov/sites/default/files/document/FY%2023%20Targeted%20Programs%20That%20Help%20People%20Experiencing%20or%20At%20Risk%20of%20Homelessness.pdf, (last visited Aug. 4, 2025); USICH, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness*, https://www.usich.gov/sites/default/files/document/All_In.pdf (last visited Aug. 20, 2025).

1206.  Until March 14, 2025, USICH was funded at 18 full-time equivalent positions, approximately 13 of which were filled. ECF 76-1 – Doe Dec., ¶ 12.

1207.  Until March 14, 2025, in furtherance of its statutory duty to encourage State Interagency Councils, USICH hosted a quarterly meeting with over 25 states and provided one-on-one support for state interagency councils on homelessness. ECF 76-1 – Doe Dec., ¶ 13.

1208.  Until March 14, 2025, USICH provided direct support to the States by executing

its 2022 Federal Strategic Plan entitled All In ("The Plan"), which set out an "all-hands-on-deck response" for Federal efforts to prevent and end homelessness. ECF 76-1 – Doe Dec., ¶ 8.  The Plan notes the current crisis in America, which was exacerbated by the COVID-19 pandemic and rising housing costs.  It sets forth a vision for "a nation in which no one experiences the tragedy and indignity of homelessness, and everyone has a safe, stable, accessible, and affordable home."  USICH, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness*, https://www.usich.gov/sites/default/files/document/All_In.pdf (last visited Aug. 12, 2025).

1209.  The Plan provided a strategic plan and implementation framework to reduce homelessness by 25% by 2025. ECF 76-1 – Doe Dec., ¶ 8.

1210.  In 2024, USICH ran the ALL INside Initiative, dedicating full-time Federal employees to facilitate access to resources for unhoused populations in seven communities across the United States. ECF 76-1 – Doe Dec., ¶ 9.

1211.  As part of the ALL INside Initiative, USICH provided guidance and peer-to-peer networks to States wishing to establish their own Interagency Councils on Homelessness. ECF 76-1 – Doe Dec., ¶ 9.

1212.  As part of the ALL INside Initiative, USICH conducted over 58 site visits to local communities to provide feedback and support. ECF 76-1 – Doe Dec., ¶ 9.

1213.  As part of the ALL INside Initiative, USICH helped the U.S. Department of Veterans' Affairs house 48,000 veterans, resulting in the lowest level of veteran homelessness since HUD began collecting data on the problem in 2009. ECF 76-1 – Doe Dec., ¶ 9.

1214.   As part of the All INside Initiative, USICH produced the first federal homelessness prevention framework, a guide intended for a wide range of partners, including local, tribal, and state governments. ECF 76-1 – Doe Dec., ¶ 9.

1215.   In its January 2025 Annual Report to the President, USICH reported that the Federal Strategic Plan had helped approximately 300,000 individuals per year find permanent housing. ECF 76-1 – Doe Dec., ¶ 10, *see also* USICH, *Annual Report to the President of the United States for FY 2024* (Jan. 2025), https://www.usich.gov/sites/default/files/document/FY%202024%20USICH%20Annual%20Report%20to%20the%20President%20FINAL.pdf (last visited Aug. 12, 2025).

1216.   In response to the *Reduction* EO, on or around March 13, 2025, USICH leadership submitted an Agency RIF and Reorganization Plan to OMB and Kenneth Jackson (Acting Executive Director of USICH) stating that a minimum of 13 USICH staff were required to fully carry out USICH's statutory duties. ECF 76-1 – Doe Dec., ¶ 14.

1217.   On or around April 8, 2025, Kenneth Jackson authorized Nate Cavanaugh, a known operative of the Department of Government Efficiency (DOGE), to carry out the duties of the Executive Director of USICH. ECF 76-1 – Doe Dec., ¶ 15.

1218.   Despite the Agency RIF and Reorganization Plan's determination that USICH required at least 13 full time employees to fulfill its statutory duties, on or around April 14, 2025, DOGE informed USICH leadership that all staff, including the statutorily required regional coordinators, were being placed on administrative leave as of the next day, April 15, 2025. In this communication, USICH staff were told that, without speaking to Kenneth Jackson or a supervisor, they could not enter USICH premises, access USICH systems, or attempt to use their position or authority within USICH in

any way. ECF 76-1 – Doe Dec., ¶ 16.

1219.   Shortly after being placed on administrative leave, all but the two remaining USICH

employees were presented with a Deferred Resignation Agreement. Employees that

entered the agreement would be kept on administrative leave through September 30,

2025, and dismissed thereafter. ECF 76-1 – Doe Dec., ¶ 17.

1220.   On or around April 30, 2025, GSA terminated the lease for USICH's office space,

deeming it no longer necessary. ECF 76-1 – Doe Dec., ¶ 18.

1221.   As of July 31, 2025, all but two employees remain on administrative leave. ECF

76-1 – Doe Dec., ¶ 19.

1222.   USICH is not performing any programmatic functions as required by statute.

USICH is not organizing Council meetings; preparing a National Strategic Plan;

monitoring or evaluating Federal, State, local, or private programs and activities;

providing professional or technical assistance; encouraging the creation of State

Interagency Councils; developing mechanisms to ensure access to Federal, State, and

local programs; conducting research; preparing or distributing bimonthly bulletins or

other communications; or reporting on significant problems, abuses, or deficiencies in

agency programs meant to assist unhoused individuals. ECF 76-1 – Doe Dec., ¶ 20.

1223.   The only two employees remaining at USICH are responsible for processing

payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown.

They are not performing any work related to USICH's statutory mission. ECF 76-1 –

Doe Dec., ¶ 21.

1224.   By the end of Fiscal Year 2025, a substantial portion of the Congressionally

appropriated budget for USICH is expected to be left unspent due to the cessation of

USICH activities and programming based on the implementation of the *Reduction* EO. ECF 76-1 – Doe Dec., ¶ 21.

1225.   The last Council meeting, which took place without USICH leadership or knowledge, was on or around March 14, 2025. As of July 31, 2025, there are no USICH Council meetings scheduled and no plans to schedule any more meetings. All USICH employees that would be responsible for arranging such a meeting are on deferred resignation. ECF 76-1 – Doe Dec., ¶ 22.

1226.   Constituents, including State officers, are calling USICH for assistance and reporting a growing homelessness problem across the United States. ECF 76-1 – Doe Dec., ¶ 23.

1227.   In response, USICH personnel fielding and responding to these calls inform callers that USICH was shut down by DOGE and is no longer able to provide its statutorily mandated services. ECF 76-1 – Doe Dec., ¶ 23.

1228.   For example, one woman called seeking referrals to local resources for rent assistance and shelter assistance. However, USICH was unable to provide that information because the regional coordinators responsible for such references are no longer working. The woman hung up in tears. ECF 76-1 – Doe Dec., ¶ 24.

1229.   Because of the cuts, USICH will also be unable to build on its successes from the ALL INside Initiative. The Initiative drew on USICH expertise and resources to identify and act on unsheltered homelessness in six cities (Chicago, Dallas, Denver, Los Angeles, Phoenix, and Seattle) as well as in California. ECF 76-1 – Doe Dec., ¶ 25; *see also* USICH, *ALL INside Initiative Strategic Reflections, Progress & Opportunities* (Jan.                                                                                                      2025),

https://usich.gov/sites/default/files/document/ALL%20INside%20Report%202025%20Final_0.pdf (last visited August 4, 2025).

1230. For example, as part of the initiative, Denver, Colorado implemented an encampment resolution pilot, moving unhoused individuals into transitional housing through partnerships between the municipal public housing authority, HUD, and the VA. The cuts to USICH make it impossible for such dedicated efforts to continue. ECF 76-1 – Doe Dec., ¶ 25.

1231. USICH is also unable to continue its work facilitating inter-state support and learning initiatives. ECF 76-1 – Doe Dec., ¶ 26.

1232. For example, USICH convenes a monthly meeting series called "West Coast Cities Peer to Peer Call on Homelessness" that allows a variety of stakeholders to present and discuss their successes, failures, and lessons learned on both broad strategies and specific intervention types, which helps these West Coast cities more effectively address homelessness. ECF 76-1 – Doe Dec., ¶ 26.

1233. USICH is also unable to continue the National Youth Homelessness Partnership, which empowers young people who have experienced homelessness to engage directly with Federal partners to address root causes of youth homelessness in their communities. ECF 76-1 – Doe Dec., ¶ 27.

1234. USICH is also unable to continue its research function developing and disseminating evidence-based best practices for homelessness interventions. ECF 76-1 – Doe Dec., ¶ 28.

1235. USICH is also unable to continue its direct, community-specific expert assistance. ECF 76-1 – Doe Dec., ¶ 29.

1236.   For example, in May 2024, USICH visited Newark, New Jersey, and New York City to meet with people experiencing homelessness, their representatives in State and local government, as well as private partners, in order to coordinate access to Federal resources for innovative housing efforts. As part of the same trip, USICH participated in the first-ever statewide meeting of Continuums of Care and public housing authorities in New Jersey. ECF 76-1 – Doe Dec., ¶ 29.

1237.   Likewise in 2024, USICH visited Phoenix, Arizona, and Southern California to understand and address the root causes of homelessness. USICH designed a response for each community. USICH is no longer able to visit communities to provide the resources, expertise, and assistance that has proven so effective at combatting homelessness and supporting unhoused individuals. ECF 76-1 – Doe Dec., ¶ 29.

1238.   Likewise, the Michigan Interagency Council on Homelessness ("MICH"), housed within the Michigan State Housing Development Authority, relied on USICH for professional and technical assistance interpreting regulations, applying for grants, and coordinating with Federal programs to facilitate access to Federal resources for unhoused individuals. ECF 76-2 – Kemmis Dec., ¶¶ 3, 7-8.

1239.   MICH also relied on USICH for general consulting services to facilitate access to state resources for unhoused individuals. ECF 76-2 – Kemmis Dec., ¶¶ 7-8.

1240.   MICH also relied on USICH for the Federal Strategic Plan to Prevent and End Homelessness, which MICH references in producing its own strategic plan. ECF 76-2 – Kemmis Dec., ¶¶ 7-8.

1241.   MICH also relied on USICH for research and best practices presented through various platforms, including webinars and publications, and meetings such as the

Building Michigan Communities Conference and Annual Homeless Summit. ECF 76-2 – Kemmis Dec., ¶¶ 7-8.

1242. MICH also relied on USICH for regional and national workshops, policy sprints, and peer-to-peer calls to address both regional and systemic causes and consequences of homelessness. ECF 76-2 – Kemmis Dec., ¶¶ 7-8.

1243. During the pandemic, the number of unhoused in Michigan sharply declined when USICH helped lead multiple national strategies and aligned federal resources to move people into housing and stabilize housing. ECF 76-2 – Kemmis Dec., ¶ 10.

1244. Without USICH's direction and aid, MICH anticipates the number of unhoused individuals will continue to grow and result in disparate impact on highly vulnerable populations like youth, aging adults, and veterans. ECF 76-2 – Kemmis Dec., ¶ 10.

1245. Illinois also relied on USICH through the agency's partnership with the Illinois Interagency Task Force on Homelessness ("IITFH"). ECF 76-3 – Haley Dec., ¶ 5.

1246. IITFH was created to "facilitate and implement initiatives related to decreasing homelessness and unnecessary institutionalization in" Illinois, "improve health and human services outcomes for people who experience homelessness, and strengthen the safety nets that contribute to housing stability." ECF 76-3 – Haley Dec., ¶ 3 (citing 20 ILCS 1305/10-75(b)).

1247. IITFH is pursuing an ambitious goal to reach "functional zero": where homelessness is brief and non-recurring, and where Illinois has a robust capacity of homelessness prevention and response systems. ECF 76-3 – Haley Dec., ¶ 13.

1248. IITFH relies on support and expertise of the United States Interagency Council on Homelessness to fulfill its statutorily required duties, including to develop and

implement the "State Plan" aimed at addressing homelessness. ECF 76-3 – Haley Dec., ¶ 5.

1249.   On April 15, Christine Haley, Chief Homelessness Officer of the Illinois Office to Prevent & End Homelessness, learned through the National Alliance to End Homelessness that all USICH staff was placed on administrative leave, effective that day.   https://endhomelessness.org/blog/ceo-corner-week-of-april-15/.   ECF   76-3   – Haley Dec., ¶ 7.

1250.   Also on April 15, the regularly scheduled quarterly meeting with USICH and the states was cancelled by USICH. ECF 76-3 – Haley Dec., ¶ 8.

1251.   Since April 15, USICH has not convened any meetings between states. ECF 76-3 – Haley Dec., ¶ 9.

1252.   When Ms. Haley attempted to access USICH's website on August 7, 2025, the site—which was a repository for numerous guidance and policy documents—had been removed. ECF 76-3 – Haley Dec., ¶ 10.

1253.   Executive Order 14,238 and the elimination of all USICH staff has caused USICH to eliminate or substantially reduce programs on which IITFH relies and on which it expects to rely in the future, causing significant harm to IITFH. ECF 76-3 – Haley Dec., ¶ 11.

1254.   "Prior to the implementation of Executive Order 14,238, USICH provided the following programs and services:

a.   Professional and technical assistance interpreting regulations, applying for grants, and coordinating with Federal programs to facilitate access to Federal resources for unhoused individuals.

b.  Consulting with State Interagency Councils on Homelessness to facilitate access to State resources for unhoused individuals.

c.  Publishing a Federal Strategic Plan to Prevent and End Homelessness, which State councils and agencies reference in producing their own strategic plans.

d.  Conducting research and disseminating best practices through various presentations, webinars, and publications.

e.  Coordinating regional and national workshops, policy sprints, and peer-to-peer calls to address both regional and systemic causes and consequences of homelessness." ECF 76-3 – Haley Dec., ¶ 12.

1255.  IITFH has received numerous services from USICH and continuously benefitted from USICH's expertise. ECF 76-3 -Haley Dec., ¶ 13.

1256.  Interpretations of Federal eligibility requirements and guidance helped state agencies and service providers efficiently navigate the various federal agencies and programs that serve individuals experiencing homelessness, including benefits for veterans, Medicaid , child welfare programs, and student loan assistance. ECF 76-3 – Haley Dec., ¶ 13.

1257.  As one of the states that has an interagency task force, historically Illinois would participate in USICH's quarterly convening of states. Illinois would also participate in USICH's quarterly meeting specifically for Midwest states.     ECF 76-3 – Haley Dec., ¶ 13

1258.  At these meetings, Illinois benefitted from USICH's presentations from experts and federal agency leaders about national practices on ending homelessness, amplification of innovative work in particular states, and facilitation of inter-state discussions. IITFH

would rely on these meetings to improve its work by incorporating best practices, understanding how to efficiently leverage federal programs and resources, and collaborating and sharing information with other states. ECF 76-3 – Haley Dec., ¶ 13.

1259.   IITFH relied on USICH's Federal Strategic Plan to Prevent and End Homelessness in developing and implementing the Home Illinois Plan to Prevent and End Homelessness to ensure the Illinois Plan incorporates and aligns with current research and best practices. For example, IITFH drew on USICH's federal plan to, among other things, understand the drivers of homelessness in order to stem the flow of people entering homelessness. ECF 76-3 – Haley Dec., ¶ 13.

1260.   Relying on USICH's leadership and example, IITFH has crafted strategies to engage multiple stakeholder agencies, including the Illinois Department of Corrections and the Illinois Department of Veterans Affairs. For example, IITFH recently launched the Illinois Homelessness Collaborative Project, which specifically relies on USICH's federal framework. ECF 76-3 – Haley Dec., ¶ 13.

1261.   IITFH relies on concrete and actionable guidance to communities about addressing homelessness developed by USICH, including toolkits, webinars, and sample documents. After implementation of Executive Order 14,238, however, IITFH is currently using an archived version of USICH's Federal Homelessness Prevention Framework, as well as USICH's "19 Strategies for Communities to Address Encampments Humanely & Effectively," both of which used to be available on USICH's website. ECF 76-3 – Haley Dec., ¶ 13.

1262.   IITFH advanced its work through USICH platforms by, for example, giving a presentation on the initiative, Home Illinois, which has an ambitious goal to reach

"functional zero": where homelessness is brief and non-recurring, and where Illinois has a robust capacity of homelessness prevention and response systems. ECF 76-3 – Haley Dec., ¶ 13.

1263.  IITFH also has relied on USICH's expertise in certifying that communities have reached "functional zero." ECF 76-3 – Haley Dec., ¶ 13.

1264.  The elimination of the resources and services provided by USICH has already irreparably harmed IITFH's ability to serve Illinois communities. The Illinois Office to Prevent and End Homelessness and the service providers it works with now struggle to navigate the various federal systems and programs that impact Illinois' homeless population. ECF 76-3 – Haley Dec., ¶ 14.

1265.  The State will have to use resources to start at square one if it can no longer rely on the national plan to end homelessness. And without USICH acting as a facilitator, inter-state coordination has become sporadic or non-existent, losing the benefits they have gained by sharing resources and implementing best practices consistently in states across the country. ECF 76-3 – Haley Dec., ¶ 14.

1266.  Without USICH, IITFH expects that it will be less effective at supporting vulnerable individuals experiencing homelessness or at risk of homelessness, and as a result, those individuals will be less likely to access federal and state assistance and programs that are intended to support their transition into safe and stable housing. ECF 76-3 – Haley Dec., ¶ 15.

1267.  Rhode Island also relied on USICH through the agency's partnership with the Rhode Island Department of Housing ("the Department"). ECF 76-4 – Haynie Dec., ¶¶ 5-6.

1268.  In December 2024, the Department started to reconvene the Rhode Island Interagency Council on Homelessness ("RIICH") for the first time in seven years. ECF 76-4 – Haynie Dec., ¶ 6.  Rhode Island is just one of twenty-seven States and Territories relying on USICH guidance to establish and maintain Interagency Councils on Homelessness.  USICH, Creating and Sustaining State Interagency Councils on Homelessness (May 2024), https://www.usich.gov/sites/default/files/document/Creating%20and%20Sustaining%20State%20Interagency%20Councils%20on%20Homelessness.pdf (listing twenty-six other states and territories with active Interagency Councils on Homelessness).

1269.  In reconvening RIICH, the Department consulted with USICH and planned to have USICH attend the April 24, 2025, meeting of RIICH. ECF 76-4 – Haynie Dec., ¶ 6.

1270.  The Department expected to rely on the same professional and technical assistance, consulting, strategic planning, research/best practices, and regional/national coordination as did MICH and IITFH.

a.  Rhode Island uses and expected to use USICH's consultation and expertise as it reconvened RIICH, as established by statute, R.I. Gen. Laws § 40-17-2, to facilitate access to State resources for unhoused individuals.

b.  Rhode Island relied on USICH for publication of a Federal Strategic Plan to End Homelessness, which RIICH considers, pursuant to R.I. Gen. Laws § 40-17-3(1), in developing its strategic plan to end homelessness in Rhode Island.

c.  Rhode Island relies and expected to rely on USICH to conduct research and disseminate best practices through various presentations, webinars, and publication, which the Department references in developing its own guidance and

resources.

    d.  Rhode Island relies and expected to rely on USICH to coordinate regional and national workshops, policy springs, and peer-to-peer calls, in which the Department participated and planned to participate, to address both regional and systemic causes and consequences of homelessness. ECF 76-4 – Haynie Dec., ¶ 10.

1271.  By effectively eliminating USICH, the Trump Administration has suddenly cut off a vital source of expertise and support the Department was relying upon to fulfill its statutory obligations in leading RIICH. ECF 76-4 – Haynie Dec., ¶ 11.

1272.  Rhode Island does not have the reach or the resources to replace the research, coordination, and communication functions of USICH. ECF 76-4 – Haynie Dec., ¶ 11.

1273.  Without USICH, the Department expects that those experiencing homelessness will find it harder to access the state and federal resources they need to find safe and stable housing. ECF 76-4 – Haynie Dec., ¶ 11.

1274.  Washington State has likewise benefitted from USICH's partnership with the City of Seattle's Unified Care Team, which implements a coordinated, strategic, data-driven, and compassionate approach to connect people with opportunities to come into shelter and ensure clean and open public spaces. ECF 76-5 – Garrity Dec., ¶ 3.

1275.  Washington State, through the City of Seattle, has relied on USICH for the same professional and technical assistance, consulting, strategic planning, research/best practices, and regional/national coordination as did MICH, IITFH, and WICH. ECF 76-5 – Garrity Dec., ¶ 7-8.

1276.  Washington State, through the City of Seattle, has benefitted from USICH's efforts to research best practices and inform policy and program proposals, including sharing

current research and about policy and programmatic initiatives and connecting experts
and leaders in cities across the country to leverage learnings to inform local efforts.
ECF 76-5 – Garrity Dec., ¶ 8.

1277.  Washington State, through the City of Seattle, benefitted from the USICH All
INside initiative to address unsheltered homelessness and improve access to health and
housing services. ECF 76-5 – Garrity Dec., ¶ 8.

1278.  Washington State, through the City of Seattle, benefitted from the USICH monthly
meeting series "West Coast Cities Peer to Peer Call on Homelessness," which allowed
representatives from government, nonprofit, and political entities to share best practices
and broader strategies. ECF 76-5 – Garrity Dec., ¶ 8.

1279.  USICH's facilitation and access to information has helped the City of Seattle
streamline research into best practices, connect with policy experts, and identify gaps
and potential system solutions. ECF 76-5 – Garrity Dec., ¶ 9.

1280.  Without USICH, the Unified Care Team expects future efforts to address
homelessness and improve outcomes to be less informed and less collaborative, having
an overall negative effect on efforts to help unsheltered individuals. ECF 76-5 – Garrity
Dec., ¶¶ 9-10.

1281.  Wisconsin also relied on USICH through the agency's partnership with the
Wisconsin Interagency Council on Homelessness ("WICH"). ECF 76-6 – Basford
Dec., ¶ 6.

1282.  WICH relied on USICH for the same professional and technical assistance,
consulting, strategic planning, research/best practices, and regional/national
coordination as did MICH and IITFH. ECF 76-6 – Basford Dec., ¶ 7-8.

1283.   WICH has benefitted from USICH making research staff available to present on federal homelessness policy to the Council and at other events around Wisconsin where homelessness policy is discussed.   This includes participation from Jeff Olivet, Executive Director of USICH during the Biden Administration. ECF 76-6 – Basford Dec., ¶ 8.

1284.   WICH has also benefitted from USICH's help in implementing a strategy from the state's homelessness plan ("Welcoming Wisconsin Home"), to create a Midwest consortium of state interagency councils on homelessness by facilitating meetings with federal agency staff and counterparts from Minnesota, Illinois, and Michigan. ECF 76-6 – Basford Dec., ¶ 8.

1285.   WICH has also benefitted from federal research on homelessness topics and datasets made available by USICH and not readily available from other sources. ECF 76-6 – Basford Dec., ¶ 8.

1286.   Without USICH, WICH will lose access to a valuable conduit between Wisconsin state government and the federal government. ECF 76-6 – Basford Dec., ¶ 9.

1287.   Without USICH, WICH expects that it will be more difficult to receive information on federal funding opportunities, the state of federal housing and homelessness policy, and valuable consultation on proposed state policy. ECF 76-6 – Basford Dec., ¶ 9.

1288.   Without USICH, WICH expects that people experiencing homelessness in the State of Wisconsin will lose support for their efforts to transition from homelessness to housing through the reduction in efficacy of Wisconsin's policy and programs that work to prevent and end homelessness in Wisconsin. ECF 76-6 – Basford Dec., ¶ 10.

August 22, 2025

Respectfully submitted,

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Katherine Connolly Sadeck (RI Bar No. 8637)
Solicitor General
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
ksadeck@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu
Assistant Attorney General
Rabia Muqaddam
Special Counsel for Federal Initiatives
Sean Bunny
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov
*Attorneys for the State of New York*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

297

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

*/s/ Jay C. Russell*
Jay C. Russell
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Zelda Vassar
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
Ashley Meskill
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Holly F.B. Berlin*
HOLLY F.B. BERLIN
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

298

**AARON M. FREY**
Attorney General for
the State of Maine

/s/ *Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
Office of the Attorney
General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
Vivian.Mikhail@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: /s/ *Keith M. Jamieson*
Keith M. Jamieson
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ *Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**
Attorney General for the People of Michigan

/s/ *Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: /s/ *Jacob Harris*
Jacob Harris
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn
*Deputy Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
Attorney for Plaintiff State of New Mexico

**DAN RAYFIELD**
Attorney General for the State of Oregon

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

*/s/ Kate S. Worthington*
Kate S. Worthington, WSBA #47556
Sarah E. Smith-Levy, WSBA #55770
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
Attorneys for Plaintiff State of Washington

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

*/s/ Colin T. Roth*
COLIN T. ROTH
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
Attorney for Plaintiff State of Wisconsin

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on August 22, 2025, I provided a copy of the foregoing document to counsel of record for the Defendants via the ECF filing system:

**Abigail Stout**
DOJ-Civ
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
404-731-2159
Email: abigail.stout@usdoj.gov

**Heidy L Gonzalez**
DOJ-Civ
1100 L St., N.W.
Ste #3408
Washington, DC 20005
202-598-7409
Email: heidy.gonzalez@usdoj.gov

**Julia Heiman**
DOJ-Civ
Poc Agostinho, Jean
1100 L St., N.W.
Washington, DC 20530
202-616-8480
Email: julia.heiman@usdoj.gov

/s/ *Katherine Connolly Sadeck*
Solicitor General
Assistant Attorney General