**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF RHODE ISLAND, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,<br><br>  Defendants. | No. 25-cv-00128 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................................. ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

    I.    Statutory Background ..................................................................................................... 2

        A.  IMLS ....................................................................................................................... 2

        B.  MBDA ..................................................................................................................... 2

        C.  FMCS ..................................................................................................................... 3

        D.  ICH .......................................................................................................................... 3

    II.    Factual Background ....................................................................................................... 3

    III.   Procedural History ......................................................................................................... 4

LEGAL STANDARD ..................................................................................................................... 5

ARGUMENT .................................................................................................................................. 6

    I.    The Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs' Claims ............... 6

        A.  The Tucker Act Vests Exclusive Jurisdiction Over Grant Claims In The Court Of Federal Claims. .................................................................................................... 6

        B.  The Civil Service Reform Act Provides The Exclusive Channel For Any Challenge To Federal Employee Removals. ............................................................. 11

    II.    Plaintiffs Do Not Have Standing to Demand the Broad Relief They Seek. ..................... 15

    III.   Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action. ........................................................................................................ 19

    IV.   Defendants' Staffing And Funding Determinations Are Themselves Committed To Agency Discretion. ........................................................................................................... 23

    V.    Plaintiffs' Constitutional And *Ultra Vires* Claims Fail. ................................................ 27

        A.  Plaintiffs Cannot Enforce The Impoundment Control Act. ........................................ 29

        B.  The Appropriations Clause Does Not Justify A Declaration That The Executive Order Is Unlawful ................................................................................................................ 31

        C.  The Take Care Clause Claims Also Fails Because There Has Been No Such Violation. ............................................................................................................... 32

        D.  *Ultra Vires* Review Is Not Available. .................................................................... 33

    VI.   Plaintiffs Have Failed to Establish Irreparable Harm. ..................................................... 34

    VII.  The Balance Of The Equities And The Public Interest Tip In Defendants' Favor. ........... 37

CONCLUSION .............................................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982) ........................................................................................................... 17

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ........................................................................................... 12

*Am. Library Ass'n v. Sonderling,*
No. CV 25-1050 (RJL), 2025 WL 1615771 (D.D.C. June 6, 2025) ................................. 9, 11

*Appalachian Energy Grp. v. EPA,*
33 F.3d 319 (4th Cir. 1994) ............................................................................................... 21

*Baker v. Carr,*
369 U.S. 186 (1962) ..................................................................................................... 14, 32

*Bd. of Governors, FRS v. MCorp Fin., Inc.,*
502 U.S. 32 (1991) ............................................................................................................. 34

*Bennett v. Spear,*
520 U.S. 154 (1997) ........................................................................................................... 21

*Biden v. Texas,*
597 U.S. 785 (2022) ........................................................................................................... 22

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) ........................................................................................................... 30

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.,*
622 F.3d 36 (1st Cir. 2010) ........................................................................................... 34, 35

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ............................................................................................. 31

*California v. Texas,*
593 U.S. 659 (2021) ..................................................................................................... 18, 39

*Camp v. Pitts,*
411 U.S. 138 (1973) ............................................................................................................. 5

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................................. 5

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .................................................................................. 34

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ..................................................................................... 21, 32

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ...................................................................................... 22

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) .................................................................................................. 17

*Climate United Fund v. Citibank, N.A.*,
No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ................................. 8, 11

*Clinton v. Jones*,
520 U.S. 681 (1997) .................................................................................................. 33

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir.1995) ....................................................................................... 34

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ................................................................................. 19

*Comm'n v. Texas*,
605 U.S. 665 (2025) ............................................................................................. 33, 34

*Commonwealth of Massachusetts v. Mellon*,
262 U.S. 447 (1923) .................................................................................................. 17

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .................................................................................................. 18

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................. 28, 32

*Davis v. FEC*,
554 U.S. 724 (2008) .................................................................................................. 17

*Dept. of Pub. Welfare v. Departmental Grant Appeals Bd. of U.S. Dept. of Health & Human Services*,
815 F.2d 778 (1st Cir. 1987) ...................................................................................... 6

*Dep't of Ed. v. California*,
604 U.S. 650 (2025) ........................................................................................... passim

iv

*DeVillier v. Texas*,
601 U.S. 285 (2024)................................................................................................. 28

*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*,
18 F.4th 38 (1st Cir. 2021)...................................................................................... 37

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975)................................................................................................. 38

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002)................................................................................... 24

*Egbert v. Boule*,
596 U.S. 482 (2022)................................................................................................. 14

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012)............................................................................................... 12, 13

*EPA v. Brown*,
431 U.S. 99 (1977)................................................................................................... 21

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)................................................................................................. 23

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................................................... 17, 18

*Foxboro Co. v. Arabian Am. Oil. Co.*,
805 F.2d 34 (1st Cir. 1986)...................................................................................... 35

*Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)................................................................................................. 33

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980)................................................................................................. 22

*Gill* v. *Whitford*,
138 S. Ct. 1916 (2018)............................................................................................. 19

*Global Health Council v. Trump*,
2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .............................................. 28, 30, 31

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U. S. 204 (2002)................................................................................................. 9

*Griggs-Ryan v. Smith*,
904 F.2d 112 (1st Cir. 1990) ................................................................. 5

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................. 13, 14

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ................................................................. 17

*Harkrader v. Wadley*,
172 U.S. 148 (1898) ................................................................. 14

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................. 24

*In re Sawyer*,
124 U.S. 200 (1888) ................................................................. 14

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ................................................................. 22

*Lampon-Paz v. OPM*,
732 F. App'x 158 (3d Cir. 2018) ................................................................. 12

*Lincoln v. Vigil*,
508 U.S. 191 (1993) ................................................................. passim

*Littlefield v. U.S. Dep't of the Interior*,
85 F.4th 635 (1st Cir. 2023) ................................................................. 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................. 15, 32

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................. 19, 20

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ................................................................. 39

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ................................................................. 32

*Maryland v. King*,
567 U.S. 1301 (2012) ................................................................. 37

*McMahon v. New York*,
145 S. Ct. 2643 (2025) .................................................................................. 15

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ...................................................................... 26

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ................................................................... 32, 33

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ........................................................................................ 18

*Morrison v. Olson*,
487 U.S. 654 (1988) ...................................................................................... 33

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................... 15, 35

*Myers v. United States*,
272 U.S. 52 (1926) ................................................................................... 31, 37

*National Institutes of Health v. American Public Health Association*,
No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .................................... 1, 7, 8, 10

*National Treasury Employees Union v. Vought*,
2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ...................................... passim

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ...................................................................................... 31

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................................... 37

*Norton v. S. Utah Wilderness Al*l.,
542 U.S. 55 (2004) ........................................................................................ 19

*OPM v. American Fed'n of Gov't Emps.*,
145 S. Ct. 1914 (2025) .................................................................................. 18

*Printz v. United States*,
521 U.S. 898 (1997) ...................................................................................... 33

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
45 F.4th 353 (D.C. Cir. 2022) ...................................................................... 22

*Railway Clerks v. Assoc. for Benefit of Non-contract Employees*,
380 U.S. 650 (1965) ............................................................................................. 33

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................................. 18

*Rhode Island v. Mass.*,
37 U.S. 657 (1838) ............................................................................................... 38

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) .................................................................................... 34

*Sampson v. Murray*,
415 U.S. 61 (1974) .................................................................................. 14, 15, 34

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991) ............................................................................... 12

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*,
123 F.4th 1 (1st Cir. 2024) ..................................................................................... 5

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................................................. 24

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ............................................................................................... 9

*Spokeo v. Robins*,
578 U.S. 330 (2016) ............................................................................................. 18

*Town of Winthrop v. F.A.A.*,
535 F.3d 1 (1st Cir. 2008) ...................................................................................... 5

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...................................................................................... 15, 16

*Trump v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) ......................................................................................... 31

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............................................................................................. 39

*United States v. Fausto*,
484 U.S. 439 (1988) ............................................................................................. 12

*United States v. Texas*,
599 U.S. 670 (2023) ........................................................................................... 38, 39

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ................................................................................................. 18

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) .................................................................................... 35

*Veit v. Heckler*,
746 F.2d 508 (9th Cir. 1984) .................................................................................... 12

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ................................................................................................. 24

*Vill. W. Associates v. Rhode Island Hous. & Mortg. Fin. Corp.*,
618 F. Supp. 2d 134 (D.R.I. 2009) ............................................................................ 6

*Walton v. House of Representatives*,
265 U.S. 487 (1924) ................................................................................................. 14

*White v. Berry*,
171 U.S. 366 (1898) ................................................................................................. 14

**Statutes**

2 U.S.C. § 681 ......................................................................................................... 30

2 U.S.C. § 683 ......................................................................................................... 29

2 U.S.C. § 687 ................................................................................................... 29, 30

5 U.S.C. § 701 ......................................................................................................... 24

5 U.S.C. § 702 ......................................................................................................... 13

5 U.S.C. § 704 ......................................................................................................... 21

5 U.S.C. § 706 ................................................................................................... 15, 18

12 U.S.C. § 5708 ..................................................................................................... 27

15 U.S.C. § 9502 ................................................................................................. 2, 25

15 U.S.C. § 9524 ....................................................................................................... 8

15 U.S.C. § 9543 ..................................................................................................... 27

15 U.S.C. § 9523 .................................................................................................... 27

15 U.S.C. § 9524 .................................................................................................... 27

20 U.S.C. § 9102 ...................................................................................................... 2

20 U.S.C. § 9105 .................................................................................................... 24

20 U.S.C. § 9108 ...................................................................................................... 8

20 U.S.C. § 9162 .................................................................................................... 26

28 U.S.C. § 1491 ............................................................................................. 6, 9, 15

29 U.S.C. § 172 ...................................................................................................... 25

42 U.S.C. § 11311 .................................................................................................... 3

42 U.S.C. § 11314 .................................................................................................. 25

Civil Service Reform Act of 1978,
Pub. L. No. 95-454, 92 Stat. 1111 (1978).............................................................. 12

Consolidated Appropriations Act, 2024,
Pub. L. No. 118–42, 138 Stat. 25 ......................................................................... 26

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119–4, 139 Stat. 9 ............................................................................. 26

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118–47, 138 Stat. 460......................................................................... 26

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 5

**Other Authorities**

Exec. Order No. 14210 ............................................................................................ 32

Exec. Order No. 14238 ..................................................................................... passim

## <u>INTRODUCTION</u>

The legal landscape affecting this case has significantly changed since this Court issued its preliminary injunction.  The day before Plaintiffs submitted their Motion for Summary Judgment, ECF No. 75 ("Plaintiffs' Motion"), the Supreme Court again stayed an order that would have vacated government grant terminations.  *See National Institutes of Health v. American Public Health Association ("NIH"),* No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025).  In so holding, the Supreme Court reiterated its prior holding in *Department of Education v. California* that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the [grants at issue] or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *Id.* (citing *Dep't of Ed. v. California*, 604 U.S. 650 (2025) (per curiam)).  And in *National Treasury Employees Union v. Vought*, the D.C. Circuit, applying Supreme Court precedent, concluded that—even as to challenges to personnel actions that occur as part of "broad disputes about agency shutdowns"—such challenges cannot be heard by a district court in light of Congressional channeling of such claims to a specialized review scheme No. 25-5091, 2025 WL 2371608, at *6 (D.C. Cir. Aug. 15, 2025).

That changed legal landscape requires a different result than the one reached by the Court in May.  As to grant terminations, the Supreme Court's reasoning in *California* and *NIH* controls because those claims are committed to the Court of Federal Claims by the Tucker Act.  As to personnel decisions, the Civil Service Reform Act requires channeling of claims related to federal employment to the administrative bodies created by that statute.  Together, these two jurisdictional bars entirely preclude Plaintiffs' case.  Although the First Circuit recently declined to stay the preliminary injunction pending appeal in this case, it critically did not reach the substance of either of the above-discussed jurisdictional bars.  *See State of Rhode Island v. Trump*, 25-1477 (1st Cir. Sept. 11, 2025).  Nor did the First Circuit consider that Plaintiffs' Administrative Procedure Act and constitutional claims fail as a matter of law.

For these reasons, and the additional reasons explained herein, this Court should deny

Plaintiffs' Motion, grant Defendants' cross-motion, and enter judgment for Defendants.

## BACKGROUND

**I.    Statutory Background**

This suit concerns four Congressionally created agencies—the Institute of Museum and Library Services ("IMLS"), the Minority Business Development Agency ("MBDA"), the Federal Mediation and Conciliation Service ("FMCS"), and the Interagency Council on Homelessness ("ICH").[1]

**A.  IMLS**

Congress established IMLS in 1996. 20 U.S.C. § 9102. IMLS is headed by a director, whose "primary responsibility" is the "development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." *Id.* § 9103(a), (c). To that end, the director is entitled to "appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute." *Id.* § 9105(a). The director is also "authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate" to carry out policy objectives and fulfill statutory responsibilities. *Id.* § 9108(c).

**B.  MBDA**

Congress statutorily authorized MBDA, which is located within the Department of Commerce, in 2021.  15 U.S.C. § 9502.  MBDA is headed by the Under Secretary of Commerce for Minority Business Development. *Id.* § 9102(b)(1).  MBDA has various ongoing initiatives.

---

[1] Plaintiffs have also sued the Office of Management and Budget ("OMB"), claiming that "OMB's oversight of the [Executive Order's implementation] precludes the possibility the agencies will make up for their dramatic cuts with increases elsewhere and makes certain that the Administration will fail to spend the full amount of funding appropriated by Congress." Am. Compl., ECF No. 68, ¶ 182.  Although the Executive Order places certain obligations upon OMB in overseeing the Order's implementation, OMB is not itself subject to the Order.  *See* Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025).

*See, e.g.*, *id*. §§ 9511–26.  For example, the MBDA Business Center Program is intended to (1) assist minority business in "accessing capital, contracts, and grants" and "creating and maintaining jobs"; (2) "provide counseling and mentoring to minority business enterprises"; and (3) "facilitate the growth of minority business enterprises by promoting trade."  *Id*. § 9522.  The Under Secretary has authority to provide grants to entities approved to participate in the Business Center Program. *Id*. § 9524.

### C.  FMCS

Congress established FMCS in 1947 "to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation."  29 U.S.C. §§ 172, 173(a).  Specifically, FMCS services are available "either upon its own motion or upon the request of one or more of the parties to the dispute, whenever in its judgment such dispute threatens to cause a substantial interruption of commerce."  *Id.* § 173(b).

### D.  ICH

Congress created ICH in 1987 "to coordinate the Federal response to homelessness and to create a national partnership at every level of government and with the private sector to reduce and end homelessness in the nation while maximizing the effectiveness of the Federal Government in contributing to the end of homelessness."  42 U.S.C. § 11311.  Designees from agencies across the government comprise ICH's Council.  *Id*. § 11312.  The Council shall *inter alia* "monitor, evaluate, and recommend improvements in programs and activities to assist homeless individuals conducted by Federal agencies, State and local governments, and private voluntary organizations."  *Id*. § 11313.  "The Council shall appoint an Executive Director" and "[w]ith the approval of the Council, the Executive Director of the Council may appoint and fix the compensation of such additional personnel as the Executive Director considers necessary to carry out the duties of the Council."  *Id*. § 11314.

## II.    Factual Background

On March 14, 2025, President Trump issued Executive Order No. 14,238, titled

"Continuing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14238, 90 FR 13043 (Mar. 14, 2025).  The Order calls for the "reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary."  *Id*. § 1.  Under the Order, IMLS, MBDA, FMCS, ICH, and three other agencies not at issue in this litigation—the United States Agency for Global Media, the Woodrow Wilson International Center for Scholars in the Smithsonian Institution, and the Community Development Financial Institutions Fund—"shall be eliminated to the maximum extent *consistent with applicable law*, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  *Id*. § 2(a) (emphasis added).  The Order also instructs the head of each agency to submit a report to OMB "confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent."  *Id*. § 2(b).

## III.    Procedural History

Plaintiffs request that the Court permanently enjoin the Defendant Agencies' re-structuring efforts pursuant to Executive Order 14,238.  *See generally* Am. Compl.  The Amended Complaint asserts seven counts: (1) Count I—arbitrary and capricious and abuse of discretion under the APA regarding Defendants' reduction in force efforts, *id*. at 55–56; (2) Count II—contrary to law under the APA "by failing to expend funds appropriated by Congress, or by delaying the expenditure of such funds, in a manner not permitted by the appropriations acts or the Impoundment Control Act," *id*. at 57; (3) Count III—notice and comment violations under the APA regarding the Defendant Agencies' reduction in force efforts, *id*. at 58–59; (4) Count IV—violation of the Appropriations Clause regarding Defendants' alleged failure "to expend appropriated funds," *id*. at 59–60; (5) Count V—violation of the separation of powers doctrine regarding the Defendant Agencies' compliance with statutory minimum functions in light of reductions in force, *id*. at 60–61; (6) Count VI—violation of the Take Care Clause because "[b]y dismantling the Defendant Agencies and the programs they administer . . . the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take

4

Care Clause," *id*. at 61–62; and (7) Count VII—equitable *ultra vires* "because Defendants cannot dismantle federal agencies and terminate their programs by eliminating the staff and resources the agencies require to meet their statutory obligations, *id*. at 63.

On May 13, 2025, the Court entered a Preliminary Injunction Order, enjoining IMLS, MBDA, and FMCS from implementing the Executive Order and requiring that IMLS, MBDA, and FMCS "promptly take all necessary steps to reverse any policies, memoranda, directives, or actions issued before this Order that were designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out the directives contained in [the] Executive Order." Prel. Inj. Ord., ECF No. 60, ¶¶ 1–2; *see also* Memo. and Ord., ECF No. 57. After the Preliminary Injunction Order was issued, Plaintiffs amended their complaint to add ICH as a defendant. *See* Am. Compl. ¶ 44.

Defendants appealed the Preliminary Injunction Order on May 16, 2025, and sought a stay pending appeal. The First Circuit Court of Appeals denied the motion for a stay pending appeal on September 11, 2025, and the appeal remains pending.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of fact "does not spring into being simply because a litigant claims that one exists." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). And, in an APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 14 (1st Cir. 2008) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))). The non-moving party must provide "hard evidence" of a factual dispute; evidence that is "merely colorable, or is not significantly probative," is not sufficient to defeat a motion for summary judgment. *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 27 (1st Cir. 2024).

5

## ARGUMENT

**I.     The Court Does Not Have Subject-Matter Jurisdiction Over Plaintiffs' Claims.**

While Plaintiffs characterize their claims as challenges to what they call "Closure Decisions," those are not discrete, final agency actions. *See infra* part III.  In reality, Plaintiffs' claims are aimed either at grant delays or terminations, as to IMLS and MBDA, *see* Am. Compl. ¶¶ 88, 122, and the placement of the majority of IMLS, MBDA, FMCS, and ICH's employees on administrative leave, *id.* ¶ 3.  As the Supreme Court has re-affirmed, both categories of claims must be heard by another body.

**A.     The Tucker Act Vests Exclusive Jurisdiction Over Grant Claims In The Court Of Federal Claims.**

Plaintiffs argue that the fact that they "cite grant terminations as one component of the harm resulting from Defendants' actions does not transform this case into a contract dispute." Pls.' Mot. at 24.  But grant terminations are not merely "one component" of the claimed harms, *id.*; they are the cornerstone of Plaintiffs' claims against IMLS and MBDA.[2]  That means these claims, under the Tucker Act, belong in the Court of Federal Claims.  Plaintiffs cannot avoid the Tucker Act—and its centrality to the claims they press—through such a sleight of hand.

The Tucker Act, 28 U.S.C. § 1491(a), "provides jurisdiction *and* waiver of immunity in the Claims Court so long as the action: 1) is against the United States; 2) seeks relief over $10,000; and 3) is founded upon the Constitution, federal statute, executive regulation or governmental contract." *Vill. W. Associates v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009) (emphasis supplied).  As a result, the Court of Federal Claims "has exclusive jurisdiction over claims 'founded upon a contract.'" *Com. of Mass. by Dept. of Pub. Welfare v. Departmental Grant Appeals Bd. of U.S. Dept. of Health & Human Services*, 815 F.2d 778, 785 (1st Cir. 1987).

Recently, in *NIH*, the Supreme Court reiterated its prior holding in *California* that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the

---

[2] FMCS and ICH do not administer grants.

District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 2025 WL 2415669, at *1 (citing *California*, 604 U.S. at 968). The Court emphasized that the Government faced irreparable harm absent a stay insofar as the plaintiffs in the case did not state they would "repay grant money if the Government ultimately prevails." *Id*. Justice Barrett's concurrence provides that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)." *Id*. at *2. And Justice Gorsuch's concurrence explains why *California*, despite being a decision regarding interim relief, should still carry precedential weight with respect to its reasoning. *Id*. at *4. Justice Gorsuch notes that "even probabilistic holdings—such as *California*'s top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,' must 'inform how a [lower] court' proceeds 'in like cases.'" *Id*. (internal citations omitted). Moreover, Justice Gorsuch dispensed with the court of appeals' argument that *California* was distinguishable because the district court had only invoked the APA "to vacate the government's decision to terminate respondents' grants," stating that "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *Id*. Justice Gorsuch also disagreed with the court of appeals' assertion that the claims before it did not rely on the grant awards' terms and conditions, noting that "[i]n both cases, respondents' injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id*.

Here, Plaintiffs' claims are grounded in the alleged need for undisrupted funding pursuant to grant agreements with IMLS and MBDA. *See* Am. Compl. ¶¶ 88, 122. Plaintiffs posit that because of IMLS and MBDA's implementation of the Executive Order, the agencies will likely default on upcoming grant payments and fail to timely renew future grants to prevent lapses in funding. *See id*. The heart of this action, then, is a request to prevent the termination of those agreements or the enforcement of monetary obligations of the government pursuant to

those agreements. *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025) ("[T]he grantees seek to set aside their grant terminations, which means they seek specific performance. This is a typical contract remedy that indicates a claim is founded upon a contract for purposes of the Tucker Act." (cleaned up)); *NIH*, 2025 WL 2415669, at *4 (concurring in the Supreme Court's order to stay district court's judgments vacating grant terminations because "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants.") (Gorsuch, J., concurring); *id*. at *5 ("[P]laintiffs' claims challenging NIH grant terminations likely belong in the Court of Federal Claims, not in federal district court . . . .[t]he reason is straightforward: The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants.") (Kavanaugh, J., concurring).

That grant agreements are contracts also makes sense as a matter of first principles. Plaintiffs' grant agreements are contracts because they set out obligations that must be fulfilled in exchange for consideration from the government. Indeed, Congress has made clear that any funds disbursed to grantees like Plaintiffs are paid via grant agreements, *i.e.*, contracts, between the subject agencies and the grantees. *See* 20 U.S.C. § 9108(c) ("The Director [of the IMLS] is authorized to enter into grants, contracts, cooperative agreements, and other arrangements with Federal agencies, public and private organizations, and other entities with expertise the Director determines appropriate . . . ."); 15 U.S.C. § 9524(c)(1) ("The amount of financial assistance provided by the Under Secretary under an MBDA Business Center agreement shall be not less than $250,000 for the term of the agreement."). Plaintiffs attempt to sidestep the Tucker Act's jurisdictional mandate by depicting their claims as requests for equitable relief stemming from statutory mandates. *See* Am. Compl. ¶ 9 ("One option that our Constitution does not give the President is to shutter the agencies himself, in defiance of the administrative procedures that Congress required to be followed, the appropriations that Congress ordered to be spent, and the separation of powers that every officer of our government has sworn to uphold."). But this misstates the law: Congress did not directly appropriate funds to the states; it authorized the

Defendant agencies to issue grants. Those grants are contracts, and suits challenging their termination—and Plaintiffs' demand that the government keep paying funds out from these terminated grants—belong in the Court of Federal Claims. The government acknowledges that the subject grants are funded via appropriations, but that is true for virtually all government contracts—after all, generally federal funds cannot be paid absent appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). Nothing in the statutory framework mandates payment by methods other than grant agreements. Indeed, Plaintiffs' request to enjoin implementation of the Executive Order is premised on the notion that the Defendant agencies will be unable to distribute grant funds to Plaintiffs. *See, e.g.*, Am. Compl. ¶ 77 ("In addition to paying the salaries of critical staff members, Plaintiff States also use these [IMLS] Grants to States program funds to support a wide variety of programs . . . ."); *id.* ¶ 122 ("MBDA will not be able to timely process grants, provide technical advice, or support capital development at the MBDA Business Centers as the MBD Act requires, directly and irreparably harming Plaintiff States . . . .").

Such challenges to grant terminations belong in the Court of Federal Claims. The Supreme Court in *California* considered a temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 604 U.S. at 968. The Supreme Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U. S. C. § 1491(a)(1)); *Am. Library Ass'n v. Sonderling,* No. CV 25-1050 (RJL), 2025 WL 1615771, at *9

(D.D.C. June 6, 2025) ("The core dispute between plaintiffs and defendants arose when [IMLS] terminated those contracts.  Therefore, it appears that plaintiffs' claims may indeed be contract claims under the Tucker Act." (internal citations omitted)).

And Plaintiffs' claimed harm involves the impact of grant payments or terminations— and thus complain either about the effect of grant terminations or delays in payment of funds they claim an entitlement to only through grant agreements.  *See, e.g*, Pl.'s Mot. at 43 ("Every one of the Plaintiff States receives millions of dollars in grant funding from IMLS through its Grants for States Program.  Any delay in grant payments from IMLS would cause immediate and costly disruptions to critical state library and museum services.") (citing SOMF ¶¶ 360–61, 364–66); *id.* at 46 ("much as with IMLS—any delay in the disbursement of funds from MBDA would cause States immediate harm" (citing SOMF ¶¶ 896, 826–27, 861, 862)).  The remaining alleged impact of the agencies' restructuring can be traced to contracting or other funding decisions. *See*, *e.g.*, SOMF ¶ 762 ("Doe testified that it will be particularly difficult for five employees to adequately monitor existing grants because the MBDA allowed its contract with Salesforce to expire. Salesforce is the performance-management platform that MBDA previously used to track grantee performance and monitor how grant funds were being used. Doe further testified that without this platform it will be extremely challenging for MBDA to monitor grantee performance, especially with a skeleton staff"); *see also* Pl.'s Mot. at 13 ("the MBDA allowed contracts to lapse or terminated them for convenience" (citing SOMF ¶ 765).  Because—as the Supreme Court recently emphasized—Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks jurisdiction over grant terminations.  *See NIH*, 2025 WL 2415669, at *1 (citing *California*, 604 U.S. at 968 (per curiam))

Because Plaintiffs seek to ensure the government's continued compliance with the terms of their grant agreements, their claims sound in contract.  The Amended Complaint confirms as much, repeatedly emphasizing that uninterrupted grant funding is necessary to ensure that continued viability of Plaintiffs' programs.  Plaintiffs' claims rest on the need for assurances that the government will continue to comply with existing grant agreements.  In other words,

Plaintiffs want the Government to keep paying up—and what—if anything—is a contract but a commitment to pay money in exchange for something. *See Climate United Fund*, 2025 WL 2502881, at *7 (holding the district court lacked jurisdiction over grantees' APA claims where, "[d]espite the grantees' characterizations, the remedy they seek is specific performance of their contracts, and they have identified no right to relief that is 'truly independent' of the grant agreements.").

At bottom, jurisdiction for Plaintiffs' claims related to IMLS and MBDA grant agreements lies exclusively in the Court of Federal Claims. *See Sonderling*, 2025 WL 1615771, at *7 ("The heart of these allegations is that defendants have failed to comply with Congress's statutory mandates for IMLS. However, the main mechanism through which defendants allegedly violated those mandates is by suspending and terminating grants . . . . [P]laintiffs' framing of their claims for relief under the APA and the Constitution do not necessarily take this case out of the ambit of the Tucker Act.").

## B. The Civil Service Reform Act Provides The Exclusive Channel For Any Challenge To Federal Employee Removals.

In addition to seeking specific performance on grant agreements, Plaintiffs' allegations challenge the Defendants Agencies' employment actions. *See* Am. Compl. ¶ 87 ("The severe reduction in staff at IMLS will prevent it from meeting its statutory obligations, both in library services and museum services."); *id*. ¶ 122 ("[R]emaining staff members at MBDA will not be able to timely process grants, provide technical advice, or support capital development at the MBDA Business Centers as the MBD Act requires."); *id*. ¶ 144 ("Because FMCS has dramatically reduced its personnel and has ceased all public sector services, State agencies that previously relied on FMCS must now find and utilize other more costly and time intensive methods to resolve disputes with public sector unions."); *id*. ¶ 163 ("The only two employees remaining at USICH are responsible for processing payroll, reporting expenses, and otherwise preparing USICH for imminent shutdown. They are not performing any work related to USICH's statutory mission."). And the predicate step for the Court's Preliminary Injunction Order was the

re-instatement of employees at IMLS, MBDA, and FMCS. *See* Prel. Inj. Ord. ¶ 4. However, Federal law does not permit Plaintiffs to employ an APA action in district court to challenge the removal of federal employees—much less the removal of third-party employees.

Rather, in the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress established a comprehensive framework for evaluating employment actions against federal employees and presenting an integrated scheme of both administrative and subsequent judicial review of challenged personnel practices. In so doing, Congress balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988).

Specifically, in passing the CSRA, Congress made the Office of Special Counsel, the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees, applicants, labor unions and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions, *see United States v. Fausto*, 484 U.S. 439, 455 (1988), even when those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

The Supreme Court has long recognized that Congress established the CSRA as a comprehensive scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455. Indeed, the Supreme Court has held that, even if a federal employee was raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12. The CSRA thus "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 835–42 (9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Veit v. Heckler*, 746 F.2d 508, 510–11 (9th Cir. 1984). A request for

"reinstatement [of] members already terminated and to prevent [an agency] from terminating other members in the future . . . is precisely the relief afforded through the CSRA." *Nat'l Treasury Employees Union*, 2025 WL 2371608, at *5.

The D.C. Circuit recently held that, even as to challenges to personnel actions that occur as part of "broad disputes about agency shutdowns," such challenges cannot be heard by a district court in light of Congressional channeling of such claims to a specialized review scheme. *Id.* at *6. In so holding, the D.C. Circuit explained it was relying on precedent in which "the Supreme Court held that the CSRA review scheme is exclusive even where the harmed employee contends that a governing 'federal statute is unconstitutional.'" *Id.* (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012)). Thus, although this Court previously expressed concern that the claims at issue in this litigation "fall outside the 'competence and expertise' of the administrative bodies that handle employee grievance arising under the CSRA," May 6, 2025, Mem. and Order, ECF No. 57 at 20, the Supreme Court precedent on which the D.C. Circuit relied confirms that even claims related to an alleged effort to shut down an agency must be channeled under the CSRA review scheme.

The same reasoning applies in this case. Because federal law requires channeling of all claims related to federal employment to the administrative bodies that Congress created in the CSRA, this Court lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge federal personnel decisions. Indeed, such a holding is consistent with the Supreme Court's emphasis in *California* that the APA does not allow litigants to forestall properly applicable channeling regimes that Congress established. *See California*, 604 U.S. at 968.

Relatedly, reinstatement is not an available remedy under the APA because it exceeds court's historical authority in equity. The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement was not a traditionally available remedy at equity. *See*

13

*Sampson v. Murray*, 415 U.S. 61, 83 (1974).  To the contrary, courts of equity lacked "the power . . . to restrain by injunction the removal of a [public] officer."  *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the [g]overnment."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (citation omitted)).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332.  Plaintiffs are not entitled to bring claims under the CSRA, nor did they follow CSRA-required procedures.  More broadly, no statute authorizes courts to reinstate public employees in order to improve government services to third parties.  This Court thus the power to grant the reinstatement remedy here.  And even where Congress has authorized reinstatement, the Supreme Court has recognized that a grant of preliminary-injunctive relief in government personnel cases requires an elevated showing.  *See Sampson*, 415 U.S. at 84.  The Supreme Court emphasized the historical denial of a reinstatement power to courts of equity, citing "the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs, and the traditional unwillingness of courts of equity to enforce contracts for personal service," and instructing that a plaintiff in a "Government personnel case[]" must "at the very least . . . make a showing of irreparable injury sufficient in kind and degree to override these factors cutting

14

against the general availability of preliminary injunctions." *Id.* at 83–84 (citation and internal quotation marks omitted). Even if those harms met the bare minimum required for Article III (and for the reasons already explained, they do not), they could not provide the basis for reinstatement of employees that the Executive has chosen to dismiss.

Any claim that Defendants have failed to take a discrete, mandatory agency action to which Plaintiffs believe they are legally entitled must be brought under the APA's provision authorizing suits to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. 706(1). Or, should the Defendants fail to disburse funds that Plaintiffs believe the Defendants are obligated to pay, Plaintiffs could pursue remedies in the Court of Federal Claims under the Tucker Act, 28 U.S.C. 1491. Plaintiffs may not evade the limits on such actions by seeking mass reinstatement instead. *See McMahon v. New York*, 145 S. Ct. 2643 (2025) (granting stay of an order requiring re-instatement of 1,400 federal employees while the appellate court considers the government's channeling arguments).

## II.    Plaintiffs Do Not Have Standing to Demand the Broad Relief They Seek.

Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). The Supreme Court has emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted) (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified whole"). Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). The Supreme Court highlighted that "[h]eeding these conditions is critically important" in a "sprawling suit" with multiple plaintiffs, defendants, and claims, where plaintiffs had alleged different impacts

stemming from varying conduct by different defendants. *Id.* The same requirement for careful analysis applies here.

Although the First Circuit recently noted that Defendants' actions "directly caused and will continue to cause the loss of services of which the plaintiffs complain," *State of Rhode Island v. Trump*, No. 25-1477, Slip. Op. at 19 (1st Cir. Sept. 11, 2025), Defendants maintain that the relief ordered in the preliminary injunction phase—and that which Plaintiffs now seek—sweeps far beyond any injury Plaintiffs can claim. Plaintiffs seek a complete stay of so-called "Closure Decisions" relating to four different federal agencies, and an injunction prohibiting the implementation of Executive Order 14,238 altogether; Plaintiffs are twenty-one different states, challenging the conduct of five different agencies,[3] as to an unspecified number of grant, employment, and programmatic terminations, some alleged to have occurred, and some which may—or may not—occur in the future. Plaintiffs concede that three additional agencies included in Executive Order 14,238 "are not the subject of this lawsuit," Am. Compl. at 14 n.7,[4] yet draw their request for relief so broadly that those agencies would be prohibited from implementing Executive Order 14,238. *See id*. at 64 (requesting that the Court enjoin Defendants "from implementing the Closure Decisions and the Closure Order"). Plainly, the Court lacks jurisdiction as to the agencies not party to this lawsuit because Plaintiffs do not have standing to seek relief as to those agencies and have not alleged any injury stemming from their conduct.

Plaintiffs likewise lack standing to seek broad relief against the Defendant Agencies as to injuries allegedly suffered by other states and parties that are not plaintiffs before this Court—they can only assert standing, if at all, to remedy injury to themselves. To the extent Plaintiffs seek relief to remedy others' injuries, that would be a *parens patriae* suit, but the Supreme Court

---

[3] Plaintiffs challenge IMLS, MBDA, FMCS and ICH's implementation of the Executive Order and OMB's oversight of that implementation, generally. *See* Am. Compl. ¶ 181.

[4] The Executive Order also implicates the United States Agency for Global Media, the Woodrow Wilson International Center for Scholars in the Smithsonian Institution, and the Community Development Financial Institutions Fund.

has made clear that "'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government,'" *Haaland v. Brackeen,* 599 U.S. 255, 295 (2023) (quoting *Alfred L. Snapp & Son, Inc., Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)); *see also Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485– 86 (1923) ("[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae"). Therefore, Plaintiffs do not have standing to seek injunctive relief regarding assistance that is disbursed directly or otherwise provided via direct services to entities or citizens other than the Plaintiff States in this suit. *See*, *e.g.*, Am. Compl. ¶ 87 ("IMLS will also be unable to process thousands of applications for competitive grant programs mandated by statute."); *id.* ¶ 139 (citing forty-two states' collective bargaining agreements that "call for the use of FMCS"); *id.* at 44 (citing that a private and public sector union "had multiple pending mediations in which the parties were using FMCS services").

Moreover, a "plaintiff must demonstrate standing for each" form of relief sought, *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotation omitted), including a showing of injury in fact, *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Only "actual or imminent" injuries count. *Id*. Allegations that are "too speculative" or merely assert "possible future injury" do not suffice. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (emphasis and quotation omitted). Plaintiffs do not have standing to lodge a generalized, speculative dispute over whether an agency will perform its statutory duties or will have sufficient resources to do so. Plaintiffs assert—without citation to anything at all—that "their injuries derive not from Defendants' exercise of their duties in a particular way, but from the agencies' inability to perform any functions whatsoever." Pls' Mot. at 22. Where Plaintiffs alleged that they have suffered actual loss—*i.e.*, termination of grants and programs that has already occurred—they do not claim (nor could they plausibly do so) that those terminations were the result of insufficient staffing. Indeed, Plaintiffs' own evidence shows at most that grants and programs were terminated by choice, not inability. Plaintiffs' speculation that reductions in force may lead to

delays or terminations in the future is insufficient to establish any injury in fact.  *See Alliance for Hippocratic Med.*, 602 U.S. at 383.  To be sure, the proportion of staff terminated at each agency tends to support a prediction that the agency's scale and scope, including in programs offered, will be reduced in the future.  But that is the very intent of the Executive Order.  The appropriate and lawful method to challenge an actual (not hypothetical) failure to provide a program that a plaintiff believes an agency is legally obligated to provide is through a claim under 5 U.S.C. § 706(1), if and when the program is no longer available and any injury to that plaintiff has actually occurred.  *See California v. Texas*, 593 U.S. 659, 678 (2021) (rejecting a "highly attenuated chain of possibilities"); *OPM v. American Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025) (citing *Clapper* and concluding that "allegations of the nine non-profit-organization plaintiffs" were "presently insufficient to support the organizations' standing").

And Plaintiffs' broad claims regarding the purported "dismantling" of IMLS, MBDA, FMCS, and ICH, Am. Compl. ¶ 52, involve no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution through the judicial process," *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo v. Robins*, 578 U.S. 330, 341 (2016).  This "generalized interest . . . is too abstract to constitute a 'case or controversy' appropriate for judicial resolution."  *Id.*; *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982).  Finally, because Plaintiffs assert an injury caused by an alleged blanket abdication by four agencies of their legal responsibilities, the judiciary may not redress that injury, as doing so require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

For the reasons explained further herein, Plaintiffs' claims fail in their entirety.  To the extent the Court is inclined to grant any relief, Article III—and the related requirement that the

remedy sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill* v. *Whitford*, 138 S. Ct. 1916, 1931 (2018)—necessitates that any relief be drawn narrowly to address only demonstrated injuries to Plaintiffs in this case.

## III.    Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete, Final Agency Action.

Plaintiffs' APA claims fail because they are not challenging a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities.  Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004).  Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).  "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*.

Plaintiffs improperly seek wholesale judicial review of the Defendant Agencies' implementation of the Executive Order.  *See* Pls' Mot. at 25–27.  For example, Plaintiffs characterize the Executive Order as a "Closure Order" that "this Administration has undertaken to dissolve federal agencies established by Congress."  Am. Compl. ¶ 46.  Plaintiffs claim that each Defendant Agency has "has made a final decision . . . to implement the Closure Order and to gut its operations" through various grant terminations and reductions in force.  *Id.* ¶ 56. Notably, Plaintiffs do not challenge specific grant terminations; specific payments they claim to be entitled to; or specific provision of mediation services—they challenge the entire course of conduct of four agencies moving forward.  The APA does not permit such challenges.

19

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892–93 (footnote omitted).  Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to the possibility that the agencies will fail to disburse grant funds as they become due and the prospect that they may be unable to comply with generalized purported statutory obligations given their current staffing decisions.  But these are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions.

In its May 6, 2025, Memorandum and Order, ECF No. 57, this Court distinguished *Lujan*, reasoning that "the States have underscored that they are challenging the Agency Defendants' adoption of a discrete, categorical policy that applies the measure of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions across the board."  May 6, 2025, Mem. and Order, at 22 (quotation omitted).  But the D.C. Circuit's subsequent decision in *National Treasury Employees Union* demonstrates that this construction cannot salvage Plaintiffs' claims.  In that case, the D.C. Circuit explained that "plaintiffs [sought] to challenge what they describe as a single, overarching decision to shut down the CFPB."  2025 WL 2371608, at *11.  Plaintiffs in that case inferred the "putative shutdown decision" "from various discrete actions taken by agency leadership to downsize [and agency], including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters."  *Id.* at *7.  The D.C. Circuit explained that such a challenge "is not viable," *id.*, and does not constitute final agency action reviewable under the APA.

As in *National Treasury Employees Union*, Plaintiffs here "point to no regulation, order, document, email, or other statement, written or oral, purporting to shut down the [Defendant

Agencies]." *Id.* at *11.  Plaintiffs' claims do not stem from the programmatic efforts of the agency writ large, but from specific activities stemming from programmatic plans—from a grant termination (were such terminations reviewable under the APA, which they are not), or the specific cancellation of services to which the Plaintiffs allegedly had a legal entitlement.  But they do not bring those specific challenges—and, as the D.C. Circuit made clear, they cannot subsume concrete final agency action within the banner of a programmatic challenge more generally.

Moreover, the Defendant Agencies' compliance with the Executive Order generally would not itself constitute final agency action reviewable under the APA.  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).  Plaintiffs' argument that IMLS, MBDA, FMCS, and ICH's respective "Closure Decisions" are final agency actions under *Bennett*, Pls' Mot. at 25, misses the mark.

Under *Bennett*'s first prong, the agencies' implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making process.  The agencies' actions reflect decisions by agency leadership to realign their policy goals and actions consistent with the current administration's directives.  Those decisions would be "preliminary" in nature and "not directly reviewable[.]"  *See* 5 U.S.C. § 704.  "[They] may be a step, which if erroneous will mature into a prejudicial result[.]"  *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948).  But that does not make the interim implementation decisions themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id.* at 113; *see EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position").

Nor do the agencies' attempts to implement the Executive Order satisfy the second *Bennett* prong. Prong two's language requires "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). The holding in *Biden v. Texas*, 597 U.S. 785 (2022), does not save Plaintiffs' APA claims. *See* Pls' Mot. at 27. In that case, the Supreme Court concluded that memoranda terminating an immigration program constituted final agency action because they "bound [agency] staff by forbidding them to continue the program in any way from that moment on." *Id.* at 808–09. Here, however, Plaintiffs' programmatic challenge to the Defendant Agencies' decisions to review their statutory obligations and undertake restructuring consistent with the Executive Order and applicable law fails to identify any discrete and final agency of the type considered by the Court in *Biden* and reviewable under the APA. Indeed, *Biden* was careful to warn that to the extent a court was "reviewing an abstract decision apart from specific agency action"—there, a purported "Termination Decision" rather than the memoranda—that was "error." *Id.* at 809–10. Here, Plaintiffs point to a range of conduct across four different agencies that they claim somehow creates a policy or decision. But, like the unreviewable "Termination Decision" in *Biden*, the conduct Plaintiffs point to is decidedly abstract. *See Nat'l Treasury Employees*, 149 F.4th at 783 ("[T]he shutdown decision posited here, like the Termination Decision posited in *Biden v. Texas*, is an abstract decision 'wholly apart from' any 'specific agency action, as defined in the APA.'" (quoting *Biden*, 597 U.S. at 809). Simply put, Plaintiffs' sweeping claims here are not workable as APA challenges.

22

IV.    **Defendants' Staffing And Funding Determinations Are Themselves Committed To Agency Discretion.**

Plaintiffs repeatedly complain about Defendants' staffing decisions, which they say may—though they have not yet—hinder the provision of what Plaintiffs claim are the Defendants' legally mandated obligations.  But this conflates two distinct inquiries: (1) agency internal staffing determinations, on one hand, and (2) specific provision of specific services to external parties, on the other.  The former is committed to agency discretion, and Plaintiffs cannot use their fears about the latter to justify challenges to the former, particularly in the absence of concrete actions to terminate statutorily required obligations.

As a result, Plaintiffs cannot succeed on the merits of their arbitrary and capricious claim regarding staffing changes, which involve actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied sub nom. Littlefield v. Dep't of the Interior*, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").  Plaintiffs bear the burden of making such a showing.  *See generally DeVillers v. Blue Cross & Blue Shield of Rhode Island*, No. CA 13-173 ML, 2014 WL 1338420, at *4 (D.R.I. Mar. 31, 2014) (noting that the plaintiff carries the burden of showing that agency action is arbitrary and capricious).

Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the

agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524–25 (1978) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). To override these principles and enjoin agency leadership from exercising procedural control over its own staff so as to ensure that staff is carrying out statutory obligations or otherwise exercising agency leadership's policies would be an extraordinary violation of the separation of powers. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191–92 (quoting 5 U.S.C. § 701). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions. Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543. The agencies' statutes expressly grant such discretion. *See* 20

24

U.S.C. § 9105(a) ("The [IMLS] Director may . . . appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute."); 29 U.S.C. § 172(b) ("The [FMCS] Director is authorized . . . to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service . . . and may . . . appoint such conciliators and mediators as may be necessary to carry out the functions of the Service."); 15 U.S.C. § 9502(e)(1) ("In addition to the regional offices that the [MBDA] Under Secretary is required to establish under paragraph (2), the Under Secretary shall establish such other offices within the Agency as are necessary to carry out this chapter."); 42 U.S.C. § 11314(b) ("With the approval of the [ICH] Council, the Executive Director of the Council may appoint and fix the compensation of such additional personnel as the Executive Director considers necessary to carry out the duties of the Council.").

Ultimately, if Plaintiffs are dissatisfied with a specific final agency action, they may challenge that action in an appropriate venue. And they cannot preemptively challenge staffing determinations antecedent to those actions on the fear that the agency may not be able to comply with any statutory mandates. Said differently, a person may be able to challenge a final agency action that injures them; they cannot challenge the staffing determinations that decided which line employee made that determination. But it is the latter challenge Plaintiffs bring, because they cannot bring the former.

Additionally, an agency's decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln*, 508 U.S. at 185–88. The Supreme Court has explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its

statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id*. at 193 (quotation omitted). Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).

Many of the grant programs at issue here fall under that rubric. Each agency is funded at present by a lump-sum appropriation. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, div. A, tit. I, § 1102(a)(2), (8), 139 Stat. 9, 10–11; *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 697 (appropriating "[f]or expenses necessary for the Federal Mediation and Conciliation Service ('Service') to carry out the functions vested in it by the Labor-Management Relations Act, 1947[;] for expenses necessary for the Labor Management Cooperation Act of 1978; and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, $53,705,000"); *id*. (appropriating "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act, $294,800,000"); Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 123 (appropriating "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law, $68,250,000").

And the specific grant programs Plaintiffs cite vest each agency's leadership with discretion to determine the appropriate number and size of grants awarded, to the extent they obligate the agencies to make grants at all. *See e.g.*, 20 U.S.C. § 9162(b)(1) ("National leadership grants") ("The Director may carry out the activities described in subsection (a) by entering into arrangements, including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education, museums, and other entities that the Director determines appropriate."); *id*. § 9165(b) ("Laura Bush 21st Century Librarian Program") ("[T]he [IMLS] Director may enter into arrangements,

including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education (as defined in section 1001 of this title), and other entities that the Director determines appropriate"); 15 U.S.C. §§ 9523–24 (requiring the establishment of an "MBDA Business Center Program" that "offers" particular "services" "in all regions of the United States," and further requiring MBDA to provide minimum funding to any Business Center established, but declining to specify a minimum number of centers, to define "regions of the United States," or to mandate particular grant recipients); 15 U.S.C. § 9543(b)(2) (requiring MBDA to "award grants to eligible institutions," but providing no further criteria to govern the number or size of such grants); 12 U.S.C. § 5708(e)(2) (transferring funds to MBDA "so that the Agency may use such amounts in a manner the Agency determines appropriate").

The Defendant Agencies have the ability to consider the optimal distribution of funding to achieve statutory goals "in what [each agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id*. at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)).

## V. Plaintiffs' Constitutional And *Ultra Vires* Claims Fail.

As a threshold matter, the constitutional and *ultra vires* claims are merely Plaintiffs' statutory and APA claims re-packaged because they argue that Defendants' actions do not comport with the applicable statutes. *See, e.g.*, Am. Compl. ¶ 226 ("Here, where Congress has created the Defendant Agencies and the programs they administer, the Executive cannot do away with the Agencies or effectively incapacitate their ability to administer appropriated grants or carry out statutorily assigned duties."); *id*. ¶ 238 ("The actions challenged herein are contrary to law and outside of Defendants' authority because Defendants cannot dismantle federal agencies and terminate their programs by eliminating the staff and resources the agencies require to meet their statutory obligations.").

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). As the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims. *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id*. at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5.

Recently, in *Global Health Council v. Trump*, the D.C. Circuit considered various APA and constitutional challenges to an executive order calling for an agency funding freeze and a reevaluation of the agency's funding programs. No. 25-5097, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 28, 2025). The grantees claimed "that the Executive [] unlawfully impounded—that is, improperly delayed or withheld—certain sums appropriated" through the implementation of an executive order—specifically, through the "suspen[sion] or terminat[ion] thousands of grant awards" and the "major [agency] restructuring and downsizing efforts." *Id*. at *2–3. In determining "whether the underlying claim [was] properly characterized as statutory or constitutional," the court applied the *Dalton* framework. *Id*. at *6. The court concluded that the grantees "may not bring a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory" and that the "the grantees may not reframe this fundamentally statutory dispute as an ultra vires claim either." *Id*. at *1. Here, too, the

28

constitutional and *ultra vires* claims amount to little more than an attempt to re-state a statutory claim in constitutional parlance, and they should therefore be rejected.

### A. Plaintiffs Cannot Enforce The Impoundment Control Act.

Plaintiffs claim that Defendants have violated the Appropriations Clause and separation of powers by failing to administer funds appropriated by Congress.  *See* Am. Compl. ¶¶ 218, 226; Pls' Mot. at 39 ("These appropriations pay for the agencies to continue operating at full capacity through the end of the fiscal year. By issuing a *Reduction* EO that slashes the agencies' staff to the bare minimum, shutters many of their programs, and directs them not to use or disburse congressionally appropriated funds, the Executive usurped Congress's authority to create and abolish federal agencies, as well as Congress's power of the purse.").  These claims can only be understood as arising under the Impoundment Control Act, which provides a framework for guiding inter-Branch engagement on certain decisions regarding the obligation of appropriated funds. The Act does not confer any judicially enforceable rights on third parties, and any attempt to enforce the Act via the garb of an amorphous constitutional claim ought be rejected.

The Impoundment Control Act directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal.  The statute specifies particular forms of legislative action that Congress may undertake to address proposed rescissions.  *See id*. § 688.  To the extent that the Impoundment Control Act contemplates litigation to enforce any obligation to spend appropriated funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch.  2 U.S.C. § 687.  And the statute imposes limitations on any such suit that reinforce Congress's desire to control any response to the Executive's actions: no such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25

calendar days of continuous session of the Congress" elapse.  *Id*.  Regardless of whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties.  And the statute certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General.  *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984).

Emphasizing the point, the Impoundment Control Act expressly provides that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment."  2 U.S.C. § 681. That provision makes clear Congress's intent that third parties cannot rely on the statute's provisions to generate a judicially enforceable right to compel spending that did not otherwise exist.  *See Glob. Health Council*, 2025 WL 2480618, at *10 ("[T]he ICA created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations . . . As in *Block*, it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation." (internal citations omitted)).

In short, permitting Plaintiffs here to challenge the Executive Branch's spending decisions through Appropriation Clause and separation of powers claims alleging, in essence, a violation of the Impoundment Control Act would "severely disrupt" the statute's "complex and delicate" enforcement scheme.  *Block*, 467 U.S. at 348.  It is thus "clear that Congress intended that" any response to the Executive's actions in this sphere should "be confined to" the Legislative Branch-directed responses undertaken "in accordance with" the statute's scheme.  *Id*.

Plaintiffs should not be able to ignore the restrictions that this statute imposes—ones negotiated by the political branches—solely by artful pleading, when they seek a broader remedy.[5]

### B. The Appropriations Clause Does Not Justify A Declaration That The Executive Order Is Unlawful.

Plaintiffs request that the Executive Order be deemed unconstitutional.  Am. Comp. at 63; *id*. ¶ 220 ("Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the Closure Order and the Closure Decisions violate the Appropriations Clause.").  Federal law expressly recognizes that the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).  "It clearly is within the President's constitutional and statutory authority to prescribe the manner in which" his subordinates conduct their business, and "this mandate of office must include the authority to prescribe reorganizations and reductions in force."  *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982).  There is thus nothing plausibly unlawful about an Executive Order directing agency heads to "eliminate[] to the maximum extent consistent with applicable law" the Agency Defendants' "non-statutory components and functions."  90 FR 13043, § 2(a).  Although an Executive Order cannot validly direct an agency to violate the law, the Executive Order does not do that.  Indeed, the Executive Order provides broad direction that agencies must follow, while also noting that it does not direct any specific actions (and again, even if the Executive Order did direct specific actions, there would be nothing wrong with that unless the specific directed actions were illegal).  *See also Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025)

---

[5] At least one portion of Plaintiffs' contrary to law APA claim (Count II) is based on ICA.  *See* Am. Compl. ¶ 204 ("Defendants have acted contrary to law by failing to expend funds appropriated by Congress, or by delaying the expenditure of such funds, in a manner not permitted by the appropriations acts or the Impoundment Control Act.").  For the reasons set forth above, Plaintiffs cannot enforce the ICA.  *See Glob. Health Council*, 2025 WL 2480618, at *10 (concluding that "grantees have no [ICA] cause of action to undergird their APA contrary-to-law claim").

(Sotomayor, J., concurring) (concurring in the stay of a preliminary injunction against the implementation of an Executive Order, reasoning that while "the President cannot restructure federal agencies in a manner inconsistent with congressional mandates . . . the relevant Executive Order directs agencies to plan reorganizations and reductions in force "consistent with applicable law"") (quoting Exec. Order No. 14210, 90 Fed. Reg. 9669 (2025)).

### C. The Take Care Clause Claims Also Fails Because There Has Been No Such Violation.

The Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.  The Supreme Court has recognized that the President's duty when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character.").

To hold otherwise would upset the separation of powers and allow judicial superintendence over executive power that the Clause commits to the President alone.  *Baker*, 369 U.S. at 217 (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.")*; Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review the President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts

32

to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials.  The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process.  *See Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is his responsibility to take care that the laws be faithfully executed."); *id*. at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring).  A subordinate Executive officer cannot violate *the President's* duty to faithfully execute the laws.  To the extent Plaintiffs seek to challenge the legality of Defendants' conduct, they cannot do so through the Take Care Clause, but must do so, if at all, through an APA or *ultra vires* claim, which in this case present separate insurmountable obstacles.  *See Nat'l Treasury Employees*, 149 F.4th at 794 ("[T]he only constitutional source of executive authority in this case is the President's obligation to take care that the statutes governing the CFPB are faithfully executed.  And as *Dalton* made clear, a claim that executive officials have not discharged such a responsibility under the Take Care Clause gives rise at most to an *ultra vires* claim." (cleaned up)).

### D.  *Ultra Vires* Review Is Not Available.

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . .  judicial-review statutes."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting than an *ultra vires* claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (quotation omitted)).  Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute.  *Id.* (emphasis in original) (quoting *Railway Clerks v. Assoc. for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)) .

Plaintiffs' claim in this case falls beyond these boundaries. Plaintiffs cite no specific prohibition in any statute that they contend was violated in this case. *See* Am. Compl. ¶¶ 235–240; *see generally* Pls' Mot. (omitting any discussion of *ultra vires* review). Because they identify no statutory prohibition that they contend was violated—and, indeed, no violation of a statutory prohibition occurred in this case—Plaintiffs' *ultra vires* claim is without merit.

Plaintiffs' *ultra vires* claim also fails for the independent reason that *ultra vires* review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, as discussed above, the Tucker Act and the CSRA provide a mechanism for the review of Plaintiffs' claims. And, even if the Court were to disagree and hold that Plaintiff's APA claims could proceed, this, too, would supply an adequate opportunity for the review of Plaintiffs' claims. Given these "alternative path[s] to judicial review," *Nuclear Regul. Comm'n*, 605 U.S. at 681, an *ultra vires* claim is not available.

## VI.    Plaintiffs Have Failed to Establish Irreparable Harm.

Plaintiffs have also failed to demonstrate that they will suffer irreparable harm if the Court does not enter a permanent injunction. Irreparable harm is "the essential prerequisite for equitable relief." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quotation omitted); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm.").

"The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 18 (1st Cir. 2000)). The irreparable harms pled must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting an injunction. *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir.1995) ("the issuance of a preliminary

injunction requires a showing of irreparable harm to the movant rather than to one or more third parties") (emphasis in original).

In general, economic harm does not compromise "irreparable injury" under First Circuit precedent. *See Foxboro Co. v. Arabian Am. Oil. Co.*, 805 F.2d 34, 36 (1st Cir. 1986); *see also Braintree Lab'ys, Inc.*, 622 F.3d at 41 (noting that damages, with prejudgment interest, could provide an adequate remedy at law if, after litigation on the merits, the Court were to determine that plaintiff was entitled to relief). A narrow exception exists "where the potential economic loss is so great as to threaten the existence of the movant's business." *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).

Here, none of the alleged injuries Plaintiffs plead can support the entry of the requested injunction preventing the Defendant Agencies from taking any steps to implement the Executive Order because all claimed harms are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief.

First, Plaintiffs' allegations regarding MBDA illustrate why economic harms generally are not cognizable as "irreparable harm" for purposes of equitable relief; money is generally fungible, and, unless the very existence of an enterprise is threatened, *see Vaquería Tres Monjitas, Inc.*, 587 F.3d at 485, a litigant suffering financial loss may be made whole through money damages. Plaintiffs effectively concede the point in arguing alleged irreparable harm to the University of Wisconsin Office of Business and Entrepreneurship, asserting that if it "did not receive expected disbursements as scheduled, it would not be able to pay students, independent contractors, or staff, and would need to draw funds from its own pocket to meet expenses." Pls' Mot. at 46 (quotation omitted). More broadly, Plaintiffs argue without MBDA grant payments "some recipients would not have been paid when due, and that the States and their instrumentalities would either need to forgo services to disadvantaged businesses or shell out their own money as a result." *Id*. at 47.

In *California*, the Supreme Court considering an analogous suit found it "compelling" that grantees—that had been granted a temporary restraining order enjoining the Government

35

from terminating various education-related grants—"[had] the financial wherewithal to keep their programs running." 604 U.S. at 659. Against that backdrop, the Supreme Court held it was appropriate to stay the temporary restraining order, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum.' *Id.* Just so in this case. While any grantee could have chosen to bring its own action in an appropriate forum, *i.e.*, the Court of Federal Claims, to litigate whether payment on that grant must be made, there is no authority under which another State can bootstrap onto any alleged harm an order that all future payments to it must be made by MBDA, regardless of the President's or agency's judgment, let alone to numerous other Plaintiff States. Yet that is the expansive relief that Plaintiff States demand.

Second, Plaintiffs' allegations of harm related to IMLS fare no better. As with MBDA, to the extent Plaintiffs identify any IMLS grant terminations, the States in such situations could have brought individual actions in the appropriate forum to address their concrete interests. The expansive reach of the relief that the twenty-one Plaintiff states seek instead—rather than targeting relief to any concrete injuries identified in Plaintiffs' Motion—underscores the overbreadth of the requested injunction.

Third, Plaintiffs' allegations regarding FMCS likewise depend on economic injuries, which are not cognizable, and altogether speculative. Although Plaintiffs note that forty-two states have collective bargaining agreements that expressly call for the use of FMCS, they identify only one matter as to which they were actively using FMCS's services when they became unavailable. Pls' Mot. at 49. As to other cases, Plaintiffs note the parties had "hoped" to obtain FMCS's mediation services. *Id.* Given these limited allegations, there is no basis to credit the speculation that the states will see a "huge influx of contract disputes" in the absence of FMCS's services. *Id*. at 50.

Fourth, Plaintiffs' allegations regarding ICH do not support injunctive relief. Plaintiffs claim that if ICH ceases administration of its programs to end homelessness, then the individuals who receive homelessness assistance will be harmed. *Id*. at 52. In turn, Plaintiffs claim that they

36

would "bear the full burden of helping unhoused individuals access Federal resources and programs designed to help them." *Id*. Plaintiffs also claim that they will lose ICH's technical experience and assistance. *Id*. at 55. Any harm to third parties benefitting from ICH assistance is not a basis for establishing irreparable harm to Plaintiffs. And any potential, self-inflicted economic harms stemming from Plaintiffs' decision to render services the federal government has terminated do not satisfy the narrow exception made for circumstances in which economic harm is deemed irreparable.

Accordingly, Plaintiffs have failed to establish irreparable harm that could support the entry of any injunction.

## VII.    The Balance Of The Equities And The Public Interest Tip In Defendants' Favor.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See  Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the injunction that Plaintiffs seeks would disrupt the agencies' efforts to comply with the Executive Order, and act as responsible stewards of public funds. Such an order here would effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted); *see also See Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. *See California*, 604 U.S. at 969 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants).

37

## VIII.   Vacatur is Not Appropriate Under the APA.

Plaintiffs' request—that the Court "vacate the Closure Decisions, and permanently enjoin [D]efendants from implementing the *Reduction* EO and the Closure Decisions," Pls' Mot. at 57—constitutes an over-broad equitable remedy that exceeds any harm to the Plaintiffs States. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff.  If the court's remedial order affects nonparties, it does so only incidentally."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.").  "This tracks the founding-era understanding that courts 'render a judgment or decree upon the right of the litigant[s].'" *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring) (quoting *Rhode Island v. Mass.*, 37 U.S. 657 (1838)).  This notion "ensures that federal courts respect the limits of their Article III authority to decide cases and controversies and avoid trenching on the power of the elected branches to shape legal rights and duties more broadly." *Id.* at 693–94.

As an initial matter, the APA does not permit vacatur of agency action, much less of an executive order.  *See Texas*, 599 U.S at 695 (Gorsuch, J., concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise).").  The history and structure of the APA do not support that the "set aside" language in Section 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case. *Id.* ("Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them.").  At the time of the APA's adoption, "conventional wisdom regarded agency rules as 'quasi-legislative' in nature." *Id.* at 696.  Indeed, federal courts have "never enjoyed the power to 'vacate' legislation," but instead possessed "'little more than the negative power to disregard an unconstitutional enactment.'" *Id.* (citation omitted).  Interpreting the APA to allow quasi-legislative rules to be vacated (rather than disregarded) would thus be inconsistent with the

history of the APA.

Even if Section 706 could be read to authorize vacatur of agency action, "a district court should think twice—and perhaps twice again—before granting such sweeping relief." *Id.* at 702 (citations and internal quotation marks omitted). As the Supreme Court recently explained in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit. The Court has long recognized that "equitable relief must be limited to the inadequacy that produced [the] injury in fact" and "[a]ny remedy a judge authorizes must not be more burdensome [to the defendant] than necessary to redress the complaining parties." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) (cleaned up). To grant universal relief under the auspices of vacatur "strains our separation of powers. It exaggerates the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Id.* at 703. Accordingly, any equitable remedy applied in the nature of vacatur should apply only to the named parties. *See California v. Texas*, 141 S.Ct. 2104, 2115 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations and internal quotation marks omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (citations omitted).

## CONCLUSION

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter summary judgment in Defendants' favor.

Dated: October 10, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

39

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/ *Heidy L. Gonzalez*
JULIA A. HEIMAN (D.C. Bar No. 986228)
HEIDY L. GONZALEZ (FL Bar No. 1025003)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Telephone: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*