# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in his official capacity as Acting Executive Director of the U.S. Interagency Council on Homelessness, <br><br> Defendants. | Case No. 1:25-cv-00128-JJM-AEM <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................. 2

I.  This Court Has Jurisdiction Over Plaintiffs' Claims ............................................ 2

    A.  Plaintiffs Have Demonstrated Article III Standing.................................... 2

    B.  No Statute Channels Plaintiffs' Claims to Another Forum ....................... 4

        i.  The Tucker Act Does Not Divest the Court of Jurisdiction................................................................................... 4

        ii.  The Civil Service Reform Act Does Not Bar the Court From Ordering Reinstatement of Agency Personnel..................... 7

II.  The Closure Decisions Violate the Administrative Procedure Act ....................... 9

    A.  Plaintiffs Challenge Discrete and Final Agency Action Subject to Review Under the Administrative Procedure Act .................................. 9

    B.  The Closure Decisions Are Not Committed to Agency Discretion................................................................................................ 13

III.  The Reduction EO and the Closure Decisions Violate the Constitution .............. 17

    A.  The Reduction EO and the Closure Decisions Violate the Separation of Powers ............................................................................... 19

    B.  The Reduction EO and the Closure Decisions Violate the Take Care Clause .............................................................................................. 21

    C.  Ultra Vires Review is Available .............................................................. 22

IV.  Plaintiffs Are Entitled to the Relief Prayed for in Their First Amended Complaint............................................................................................................. 23

    A.  A Permanent Injunction is Warranted...................................................... 23

        i.  Implementation of the Reduction EO and the Closure Decisions Would Inflict Irreparable Harm on Plaintiff States ............................................................................................. 23

        ii.  The Balance of Equities and the Public Interest Both Clearly Favor Plaintiff States............................................................. 28

    B.  Vacatur is Appropriate Under the APA .................................................... 29

## INTRODUCTION

In an attempt to dismantle federal agencies in defiance of Congress's directives, the President issued an Executive Order (the "*Reduction* EO") on March 14, directing the Institute of Museum and Library Services (IMLS), the Minority Business Development Agency (MBDA), the Federal Mediation and Conciliation Service (FMCS), the United States Interagency Council on Homelessness (USICH), and three other agencies not at issue here to eliminate every one of their "non-statutory components and functions[,]" and "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" Exec. Order No. 14,238, "Continuing the Reduction of the Federal Bureaucracy," § 2(a) (Mar. 14, 2025). The President also ordered the Office of Management and Budget to deny these agencies authorization to spend federal funds for any functions "inconsistent" with the order. *Id.* § 2(c). Defendants do not substantively dispute the fact that all four agencies implemented the *Reduction* EO by essentially gutting all operations, statutorily mandated or not, terminating large swaths of both discretionary and statutorily mandated grant awards to several States, and placing almost all employees on administrative leave via Reductions in Force (RIFs).

The *Reduction* EO and Closure Decisions are unlawful in multiple respects: they are unreasonable and unreasonably explained, they are contrary to law because they are inconsistent with the agencies' mandatory statutory duties and violate each agency's appropriation statutes, and they violate the Constitution's Separation of Powers and Take Care Clause. This Court should disregard Defendants' recycled threshold arguments and hold that the *Reduction* EO and Closure Decisions are arbitrary and capricious, contrary to law, and unconstitutional.

Judgment should accordingly be entered in Plaintiffs' favor and relief awarded in the requested form.

**ARGUMENT**

Plaintiffs are entitled to summary judgment because "the record 'show[s] that there is no genuine issue as to any material fact.'" *Cash v. Cycle Craft Co., Inc.*, 508 F.3d 680, 682 (1st Cir. 2007). With their Motion for Summary Judgment, Plaintiffs compiled an extensive record demonstrating that the agency actions were illegal, injurious, and contrary to the public interest. That record is largely uncontroverted: Of the 1,288 facts Plaintiffs put forward, Defendants attempt to dispute the substance of only sixteen. Pls.' Resp. to Defs.' Statement of Disputed Facts, ECF No. 93 at 3. *See* LR Cv 56(a)(3) ("[A]ny fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted unless expressly denied or otherwise controverted" by the objecting party with "evidence establishing the dispute"). Even as to facts they purport to dispute, Defendants largely fail to sufficiently identify a basis for the dispute. ECF No. 93 at 3-14. And Defendants raise no specific dispute as to the facts regarding three of the four agencies. *Id.* at 3. Defendants thus fall far short of "produc[ing] 'hard evidence of a material factual dispute' to survive a summary judgment motion." *United States v. 6 Fox St.*, 480 F.3d 38, 42 (1st Cir. 2007); *accord Gerffert Co. v. William J. Hirten Co., LLC*, 815 F. Supp. 2d 521, 537 (D.R.I. 2011).

## I. This Court Has Jurisdiction Over Plaintiffs' Claims.

### A. Plaintiffs Have Demonstrated Article III Standing.

As Plaintiffs' Motion for Summary Judgment explained (ECF No. 75 at 22), Plaintiffs have established Article III standing by marshaling an extensive factual record that identifies numerous actual and imminent injuries traceable to Defendants' actions and redressable by judicial relief. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023). In rejecting the government's arguments about Article III standing, the First Circuit found that "plaintiffs have been and will continue to be injured by the denial of funds to which they are entitled, and that, with respect to the other

challenged actions, they have been and will continue to be injured by the defendants' failure to provide services on which the plaintiffs rely." *Rhode Island v. Trump*, No. 25-1477 2025 WL 2621593, at *6 (1st Cir. Sept. 11, 2025). Indeed, the record abounds with examples of real-world harm inflicted on Plaintiffs by Defendants' implementation of the *Reduction* EO at the agencies. Among other things, the challenged actions disrupted States' library services (*see, e.g.*, Statement of Undisputed Facts (SOUF) ¶¶ 213-19, 231-33, 254-55, 302, 330-31); threatened to diminish State services to local businesses (*see, e.g.*, *id.* ¶¶ 808, 831-32, 851); "dramatically increased the risk of an imminent work stoppage" after eliminating access to federal mediation services, including in Rhode Island (*id.* ¶¶ 1099, 1123-25 (describing how departure of FMCS mediator "at a crucial moment" ultimately led to highly disruptive monthslong strike at Butler Hospital); *see also id.* ¶ 1183 (noting FMCS's importance "to vital health care services for the people of Hawaiʻi")); and hindered States' efforts at combating homelessness (*see, e.g.*, *id.* ¶¶ 1230, 1244, 1253). Defendants do not dispute those facts. *See* Defs.' Opp. to S.J. and Cross-Motion for S.J. ("Opp.") at 15-19 (Oct. 10, 2025), ECF No. 84; Defs.' Resp. to SOUF at 5 (Oct. 10, 2025), ECF No. 85.

Instead, Defendants rehash arguments about standing that have been rejected by both this Court and the First Circuit. For example, the First Circuit already held that "the complaint does not allege that the plaintiffs will be injured simply by the Executive's general failure to adhere to the separation of powers in the abstract," *Rhode Island*, 2025 WL 2621593, at *6, contrary to Defendants' assertion. *See* Opp. at 17. Likewise, Defendants contend that the relief sought redresses "injuries allegedly suffered by other states and parties," *id.* at 16, even after the First Circuit upheld the finding that the preliminary injunction addresses agency actions responsible for "the loss of services of which the plaintiffs complain." *Rhode Island*, 2025 WL 2621593, at *6.

Defendants also continue to object that the States cannot seek relief as to agencies not party to this lawsuit, even though this Court previously explained that "equitable relief against non-parties is not at issue here." Mem. & Order at 12 (May 6, 2025), ECF No. 57; *see also* Pls.' Reply Br. in Supp. of P.I. at 4 (Apr. 16, 2025), ECF No. 44. In all, Defendants fail to produce any persuasive argument as to Plaintiffs' standing.

**B.    No Statute Channels Plaintiffs' Claims to Another Forum.**

**i.    The Tucker Act Does Not Divest the Court of Jurisdiction.**

For the reasons explained in Plaintiffs' Motion for Summary Judgment (at 23-24), the APA provides for judicial review in federal district court where, as here, plaintiffs seek equitable relief enjoining final agency action. *See* 5 U.S.C. § 704; *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). This Court has rejected Defendants' argument (Opp. at 6-11) that the Tucker Act, 28 U.S.C. § 1491, strips federal district courts of jurisdiction to hear Plaintiffs' claims to the extent they involve grant funding. As the Court correctly held, Plaintiffs' claims are not "founded" on "any express or implied contract" and therefore do not fall within the Tucker Act's ambit. ECF No. 57 at 14-18; *see* 28 U.S.C. § 1491(a)(1). In opposition, Defendants offer no persuasive reason to disturb that legal conclusion.

First, Defendants' grant terminations comprised only one facet of Defendants' categorical decision to incapacitate the agencies. Indeed, Defendants acknowledge that two of the four agencies named in this lawsuit, FMCS and USICH, do not administer grants at all. Opp. at 6. As to IMLS and MBDA, the harms from gutting those agencies go beyond grant terminations. At MBDA, for example, Defendants' implementation of the *Reduction* EO caused the agency's inability to perform its statutory functions, service existing MBDA centers, and issue new grant solicitations. *See, e.g.*, SOUF ¶¶ 761-63. And grantmaking aside, IMLS could no longer perform research and data collection as required by statute, depriving the States of these important

resources. *See id.* ¶¶ 72-75. Accordingly, the legal theories underpinning Plaintiffs' claims about the illegality of Defendants' actions are the same whether or not grant funding is at stake, especially because the grants were terminated wholesale to shutter the agencies in compliance with the *Reduction* EO—not because any contract-specific reasoning or language compelled the terminations.

Indeed, the Supreme Court recently confirmed that challenges to categorical agency policies belong in the district courts, not the Court of Federal Claims (CFC), even if the policies pertain to grants. In *National Institutes of Health v. American Public Health Association* ("*NIH*"), the Court denied the government's request to stay a district court judgment insofar as it vacated internal agency guidance about grant funding. 145 S. Ct. 2658 (2025). Five Justices agreed that challenges to "policies related to grants" are properly brought in federal district court under the APA. *See id.* at 2661 (Barrett, J., concurring); *see also id.* at 2663 (Roberts, C.J., concurring in part) (reasoning that the plaintiffs' challenge to grant-related policies fell "well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"); *id.* at 2671 (Jackson, J., concurring in part) (noting that five Justices agreed that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law"). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at 2661 (quoting 28 U.S.C. § 1491(a)(1)) (Barrett, J., concurring). *NIH* "left undisturbed the First Circuit's assessment that 'the district court clearly had jurisdiction to grant 'prospective relief' that [would] govern 'the rather complex ongoing relationships' between the Department and grant recipients.'" *Ass'n of Am. Universities v. Dep't of Def.*, No. CV 25-11740-BEM, 2025 WL 2899765, at *3 (D.

Mass. Oct. 10, 2025) (quoting *NIH*, 145 F.4th 39, 50 (1st Cir. 2025)) (granting plaintiffs' motion for summary judgment).[1]

Defendants' other arguments fare no better. Under the "longstanding test" for evaluating a claim's essential character under the Tucker Act, *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022), Plaintiffs' claim is not "at its essence a contract claim," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); Motion at 23-24. Though Defendants frame Plaintiffs' claims as "seek[ing] to ensure the government's continued compliance with the terms of their grant agreements" (Opp. at 10), this Court rightly found that "nowhere are the parties quibbling over whether the States subject to those grant terminations breached the terms or conditions of the underlying agreements as to transform this action into one sounding in contract," ECF No. 57 at 16. The legal rights on which Plaintiffs base their claims stem from the Constitution and statutory law—rights that "exist[ed] prior to and apart from rights created under" grant agreements or any other contract with the federal government. *Crowley*, 38 F.4th at 1107. As another district court in this Circuit recently put it, "[t]o argue that the background existence of Plaintiffs' grant agreements defines Plaintiffs' regulatory and statutory claims is to let the tail wag the dog." *Ass'n of Am. Universities*, 2025 WL 2899765, at *6.

---

[1] Defendants' discussion of *NIH* focuses primarily on Justice Gorsuch's partial concurrence, in which Justice Kavanaugh joined. *See* Opp. at 7-8. Justice Gorsuch noted that he would have stayed the district court's judgments in full because "[t]he only injury that gave respondents standing to obtain that relief was the termination of pre-existing grants," as the district court did not address "the government's alleged failure to process *new* grant applications." *NIH*, 145 S. Ct. at 2665 n.2 (Gorsuch, J., concurring in part). By contrast here, this Court recognized that Plaintiffs' injury stems in part from the agencies' inability to process new grant applications and other prospective actions. *See* ECF No. 57 at 34.

### ii.    The Civil Service Reform Act Does Not Bar the Court From Ordering Reinstatement of Agency Personnel.

Plaintiffs' Motion for Summary Judgment (at 24-25) also demonstrated that the grievance procedure for federal employees under the Civil Service Reform Act (CSRA) does not deprive this Court of jurisdiction over the States' claims challenging illegal agency action. The First Circuit rejected a "seemingly identical CSRA argument" before and saw no reason to "conclude otherwise" here. *Rhode Island*, 2025 WL 2621593, at *8 (citing *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) (declining to interpret the CSRA "to bar every challenge to an unlawful effort by the Executive to shut down a statutorily created agency by summarily firing its employees en masse . . . except for those specific challenges that the terminated employees themselves may choose to bring.")). This Court correctly applied the factors articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to hold that Plaintiffs' claims are not "the type Congress intended to be reviewed within [the CSRA's] statutory structure." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023) (quotation marks omitted). *See* ECF No. 57 18-21. As this Court explained, "[t]here is no dispute that the CSRA 'established a comprehensive system for reviewing personnel action taken against *federal employees*.'" ECF No. 57 at 18 (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988) (emphasis added)). But Plaintiffs do not ask the court to review the propriety of personnel actions. They allege that Defendants have used mass terminations as a tool to dismantle the agencies. The CSRA therefore does not channel Plaintiffs' claims to another tribunal.

Unlike the cases on which Defendants rely, Plaintiff States do not sue on behalf of federal employees to challenge individual employment decisions. *Cf. Fausto*, 484 U.S. at 440-41 (challenging individual employee's suspension), *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6-7 (2012) (challenging individual employee terminations); *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th

762, 775-76 (D.C. Cir. 2025) (holding that CSRA precluded district court jurisdiction as to claims brought by organizations representing federal employees); *Lampon-Paz v. Off. of Pers. Mgmt.*, 732 F. App'x 158, 159 (3d Cir. 2018) (challenging disability retirement payments to individual employee); *Saul v. United States*, 928 F.2d 829, 831 (9th Cir. 1991) ("consider[ing] what remedies are available to a federal employee who has work-related differences with his supervisors"); *Veit v. Heckler*, 746 F.2d 508, 509 (9th Cir. 1984) (considering "whether a federal civil service employee may challenge certain government employment actions or practices in the federal courts"). Nor do Plaintiffs' claims implicate the nuances of "federal labor-management relations." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 753 (D.C. Cir. 2019). Defendants' reliance on *National Treasury Employees Union* is particularly misplaced because the D.C. Circuit held that the CSRA applied only as to the plaintiff organizations challenging "their members' loss of employment"—explaining that the remaining plaintiffs "d[id] not seek redress for employment-related injuries." 149 F.4th at 774-76. So too here, Plaintiffs are suing to redress their own injuries resulting from the agencies' incapacitation, which was carried out in part through mass terminations.

Defendants argue (Opp. at 13-15) that ordering employee reinstatement to remedy the government's APA violation exceeds the Court's "historical authority in equity." That is incorrect. *See Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 320-21 (1st Cir. 1989) (noting that "[r]einstatement is an equitable remedy" that is "legally available" under appropriate circumstances). Defendants cite a slew of inapt cases involving equitable relief in the context of property transfers, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999), State apportionment, *Baker v. Carr*, 369 U.S. 186, 231 (1962), the impeachment of State officers, *Walton v. House of Representatives of State of Okla.*, 265 U.S. 487, 489 (1924),

and the arrest of State officials, *In re Sawyer*, 124 U.S. 200, 212 (1888). And Defendants rely (Opp. at 15) on the stay order in *McMahon v. New York*, 145 S. Ct. 2643 (2025) (mem.), which the First Circuit observed is not a "'like' case" given the many factual differences between the agency actions involved. *Rhode Island*, 2025 WL 2621593, at *4.

Defendants also rely on *Sampson v. Murray*, in which a discharged federal employee sought to enjoin her dismissal pending an administrative appeal. 415 U.S. 61, 62-63 (1974). *Sampson* does not hold, as Defendants suggest (Opp. at 14), that reinstatement is unavailable in equity. *See Sampson*, 415 U.S. at 84. Although *Sampson* notes that courts of equity are traditionally unwilling "to enforce contracts for personal service either at the behest of the employer or of the employee," *id.* at 83, that principle has no application here. Plaintiffs do not seek to vindicate any particular employment contract or relationship, but rather to ensure that the States receive statutorily mandated funding and services that require agency employees to effectuate them.[2] The States are challenging improper agency action effectuated, in part, through mass terminations. Nothing in *Sampson*—or any other case Defendants cite—bars federal courts from remedying such unlawful actions.

## II.    The Closure Decisions Violate the Administrative Procedure Act.

### A.    Plaintiffs Challenge Discrete and Final Agency Action Subject to Review Under the Administrative Procedure Act.

The actions challenged by Plaintiffs represent discrete and final agency action subject to review under the APA, as this Court previously found. *See* ECF No. 57 at 22-26. Plaintiffs' Motion for Summary Judgment (at 25-26) described the evidence establishing that Defendants' actions (1)

---

[2] In passing, Defendants add that Plaintiffs ought to bring their APA claims under the provision "authorizing suits to 'compel agency action unlawfully withheld or unreasonably delayed.'" Opp. at 15 (quoting 5 U.S.C. § 706(1)). However, Defendants do not explain why a claim under § 706(1) would yield any different result with respect to either CSRA preclusion or the availability of reinstatement as an equitable remedy.

marked the "consummation of [Defendants'] decisionmaking process" and (2) produced "legal consequences" for the parties. *See Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Defendants therefore engaged in final reviewable agency action. And Defendants fail to raise a genuine fact issue on this score (Opp. at 19-22) because their argument relies on "conclusory allegations and unsupported speculation" without citing to any "definite, competent evidence" in the record. *Burns v. State Police Ass'n of Massachusetts*, 230 F.3d 8, 9 (1st Cir. 2000).

First, while Defendants claim that their implementation of the *Reduction* EO "marks the initiation, not the consummation, of the agency's decision-making process," Opp. at 21, they point to nothing in the record substantiating this *post hoc* characterization. Defendants adopted policies to eliminate all non-statutorily mandated functions and to reduce to the minimum all statutorily required functions, just as the *Reduction* EO directed. And they implemented those categorical policies by severely curtailing the agencies' operations, implementing mass reductions of staff, ending categories of services, and terminating grants en masse. *See, e.g.*, SOUF ¶¶ 54-83, 756-67, 961-76, 1218-1225. ECF No. 57 at 23-26. As this Court found, "there is no evidence" that these actions were in any way "'tentative or interlocutory.'" ECF No. 57 at 25 (quoting *Bennett*, 520 U.S. at 178). And Defendants cite none. Instead, Defendants cite inapt cases where the agency "ha[d] not taken any action," *Appalachian Energy Grp. v. E.P.A.*, 33 F.3d 319, 322 (4th Cir. 1994), or conceded that the regulations at issue needed "essential modifications" before going into effect, *E.P.A. v. Brown*, 431 U.S. 99, 103-04 (1977), or could not act until further action by the President, *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 112 (1948). None of those cases are comparable to what happened here. Because Defendants definitively conveyed the agencies' positions in implementing the *Reduction* EO, they forfeited "the benefit of postponed judicial

review." *Ciba-Geigy Corp. v. U.S. E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986); *see Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) ("final agency action" requires "'definitive statement [] of [the agency's] position'" (quoting *Federal Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 241 (1980)).

Second, "legal consequences" undoubtedly flowed from Defendants' actions. As this Court explained, Plaintiffs lost access to previously awarded funds and to services that the States relied on. ECF No. 57 at 26. *See* SOUF ¶¶ 56-59, 70-73, 757-67, 965-74, 1227. It is undisputed that the challenged actions would leave the agencies unable to expend their statutory appropriations. Defendants cite nothing in the record to dispute that the agencies took concrete actions to curtail their ability to carry out their functions on which the States rely. As the First Circuit recently observed in another agency action case, the government "does not explain" how its implementation of the Executive Order "did not have 'legal consequences,'" given the drastic changes imposed at the agencies shortly thereafter. *See New York v. Kennedy*, No. 25-1780, 2025 WL 2658233, at *5 (1st Cir. Sept. 17, 2025). These undisputed legal consequences contrast starkly with *National Treasury Employees Union*, on which Defendants primarily rely, where an alleged agency action "triggered no appreciable legal consequences" because "[i]t neither terminated any employees nor cancelled any contracts." 149 F.4th at 782. Even in that case, the court noted that "informal kinds of agency action" are reviewable under the APA "only if the agency treats the action as binding, and only if the action has appreciable legal consequences for the plaintiff." *Id.* Both conditions are met here.

Defendants nevertheless assert that the lawsuit is an impermissible "programmatic challenge." *See* Opp. at 20. But the cases Defendants cite disprove their argument. For example, unlike the plaintiff in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), Plaintiffs here

identify "a completed universe of particular [agency] orders and regulations," *id.* at 890, that violate the APA. Plaintiffs do not challenge "abstract" policy goals or strategy. *Cf. Norton v. South Utah Wilderness All.*, 542 U.S. 55, 66 (2004). Rather, Plaintiffs challenge each agency's express adoption of a policy to eliminate *all* non-statutorily mandated functions and to reduce their remaining functions to the bare minimum, in conjunction with the concrete actions that flowed from those categorical policies. *Lujan* itself makes clear that if an agency applied "some particular measure across the board," then it could "of course be challenged under the APA." 497 U.S. at 890 n.2. That is the challenge Plaintiffs bring here. ECF No. 57 at 22 (noting Defendants' "adoption of a discrete, categorical policy" that applies "across the board").

Defendants' contention (Opp. at 19-20) that Plaintiffs are challenging "general agency operations"—rather than "specific grant terminations" or "specific provision of mediation services"—disregards vast swaths of the record. Plaintiffs set forth in granular detail specific agency funds and services imperiled by Defendants' actions, and how the States rely on those funds and services. *See, e.g.*, SOUF ¶¶ 85-161, 224-35, 808, 831-832, 851, 975-1023, 1047-1188, 1230, 1244, 1253. Defendants cite no authority holding that "a collection" of such actions, Opp. at 19, becomes unreviewable in aggregate.

Indeed, courts routinely recognize final agency action in a series of "broad, categorical" agency decisions that seek to accomplish an overarching directive. *See New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025); *see also Lubow v. U.S. Dep't of State*, 783 F.3d 877, 883 (D.C. Cir. 2015) (reviewing "four final agency actions" by multiple agencies); *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387-88 (D.C. Cir. 2018) (rejecting government's argument under *Lujan* and allowing APA review of agency practice). That is because nothing in the APA "bars a plaintiff from challenging a number of discrete final agency actions all at once." *New York*, 133 F.4th at

12

68. That the final agency actions here—including grant terminations, service terminations, and RIFs—expressly cited to the *Reduction* EO underscores the conclusion that they were all carrying out a single, overarching directive. And an unlawful policy is not immunized from APA review simply because it consists of multiple unlawful parts.

### B.    The Closure Decisions Are Not Committed to Agency Discretion.

Rather than substantively disputing Plaintiffs' claims that the Closure Decisions are arbitrary and capricious and contrary to law, Defendants assert that their actions are unreviewable because they are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Opp. at 24. That is wrong. Because of the APA's overarching presumption favoring judicial review, this exception under § 701(a)(2) has been interpreted "quite narrowly." *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). Section 701(a)(2) precludes judicial review in "rare circumstances" when the relevant statute provides "no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce*, 588 U.S. at 772 (quotation marks omitted). And its application has generally been limited to "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Id.* (quotation marks omitted). Defendants bear the "burden" of "rebut[ting] the presumption that agency action is judicially reviewable," *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007), and they have failed to make that showing here.

The agencies carried out the *Reduction* EO's mandate by terminating programs, eliminating funding, and implementing large-scale RIFs of agency employees. This Court previously identified multiple statutory commands that Defendants' actions likely violated, including each agency's appropriations statutes. *See* ECF No. 57 at 31-39. As Defendants' own cases explain, "an agency is not free simply to disregard statutory responsibilities," and "Congress

may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Union of Concerned Scientists*, the First Circuit permitted APA review to determine whether an agency's changing approach to staffing its advisory committees violated federal law. 954 F.3d at 18-19. The Court explained that "[t]hese are clearly not individual hiring decisions committed to discretion, but an agency-wide policy" subject to statutory constraints. *Id.* at 18 n.5. Whatever discretion the agencies may exercise in making individual funding and staffing decisions, "an agency is not free simply to disregard statutory responsibilities." *Dep't of Commerce,* 588 U.S. at 771–72; *see Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 352 (10th Cir. 1989) ("It is beyond doubt that the district court in this instance possessed jurisdiction to determine whether [the agency] violated federal statutes in terminating [the plaintiff's] grant."); *Milk Train, Inc. v. Veneman,* 310 F.3d 747, 752 (D.C. Cir. 2002) (allowing APA review insofar as the claim implicated congressional limits on agency's ability to disburse funds).

Defendants' argument that the agencies' funding determinations are committed to agency discretion by law rests primarily on *Lincoln,* 508 U.S. 182, *see* Opp. at 23-27, but that case has no bearing here. *Lincoln* involved an effort to obtain judicial review of an agency's allocation of funds to a program from unrestricted lump-sum appropriations. *See* 508 U.S. at 186–87. "[N]o statute or regulation even mention[ed] the [p]rogram" in question, *id.* at 190; rather, the program was the administrative agency's own creation. The Court found that because the relevant statutes "d[id] not so much as mention" the defunded program, and its replacement program "clearly f[ell] within the [agency's] statutory mandate," the decision to defund it was unreviewable. *Id*. at 194. Courts have thus read *Lincoln* to preclude review only where Congress does not provide even a "statutory reference point" by which to assess the legality of an agency's action. *See Milk Train, Inc.*, 310

14

F.3d at 752; *accord Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1449–50 (10th Cir. 1994). Unlike the lump-sum funding decisions in *Lincoln*, 508 U.S. at 192, the grants at issue here are governed by statutory frameworks that provide judicially manageable standards for review. *See Dep't of Commerce*, 588 U.S. at 771–72.[3]

Defendants also argue that "agency action regarding reallocation of resources and reorganization of enforcement priorities after a change in presidential administration, if reviewable at all, must be afforded highly deferential rational basis review." Opp. at 23. First, this case has nothing to do with the agencies' "reorganization of enforcement priorities;" nor is it about a mere "reallocation of resources." Instead, each agency implemented the *Reduction* EO by eliminating all of its non-statutorily mandated functions and gutting its statutory functions by terminating programs, eliminating funding, and implementing large-scale RIFs of agency employees. Furthermore, even if a Presidential transition could provide grounds for an agency's decision to reallocate resources or otherwise change priorities, an agency must still acknowledge that it is changing positions, identify the reasoned basis for the change, and grapple with the implications and reliance interests impacted by its new stance. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Rather than dictating "'to the agency the methods [and] procedures' the agency must use to complete its statutory obligations," Opp. at 23-24, "[t]he reasoned explanation requirement of

---

[3] Defendants' other cited cases are also inapt. Plaintiffs do not seek to limit the agencies' discretion in undertaking enforcement actions, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), or deciding whether to dismiss a complaint without a hearing, the "equivalent to a decision not to commence an enforcement action," *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Nor do Plaintiffs seek to impose procedural requirements in addition to those already mandated by the APA. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978).

administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public," *Dep't of Commerce*, 588 U.S. at 785. Here, as this Court previously found, "there is an absence of *any* reasonable explanation from IMLS, MBDA, and FMCS" to support the Closure Decisions. ECF 57 at 27. Nor have the Defendants provided any explanation to support USICH's Closure Decision. Furthermore, Defendants did not dispute their utter failure to consider reliance interests or any available alternatives. Pls.' Resp. to Defs.' Statement of Disputed Facts, ECF No. 93; *see* LR Cv 56(a)(3). Because Defendants have failed to meet this baseline requirement, the Closure Decisions are arbitrary and capricious.

The Closure Decisions are also contrary to law because they are inconsistent with the statutory requirements and appropriations laws that each agency is obligated to follow. *See* 5 U.S.C. § 706(2)(A) (directing courts to "set aside agency action . . . not in accordance with law"). IMLS, MBDA, FMCS, and USICH were all created by statute and vested with a lengthy list of statutory responsibilities. The same day that the President signed the *Reduction* EO, Congress passed—and the President one day later signed—a law appropriating each agency tens of millions of dollars to continue operating through the end of the Fiscal Year 2025. The Closure Decisions violate these congressional enactments in two respects: first, they prevent the agencies from carrying out many of their statutory responsibilities; and second, they render the agencies unable to spend the funds Congress appropriated. *See New York v. Kennedy*, No. 25-cv-196-MRD-PAS, 2025 WL 1803260, at *18 (D.R.I. July 1, 2025) ("The Defendants here have failed to submit any evidence that [each agency] can meet its Congressional orders without applying the federal appropriations and employing the essential staff and experts who run its programs.").

Plaintiffs set forth a multitude of facts in their SOUF demonstrating that the Closure Decisions violate these congressional enactments. *See generally* SOUF ¶¶ 60-71 (IMLS); 748, 757-59, 762-64, 770-71 (MBDA); 961, 970-77, 988-89 (FMCS); 1193-94, 1216-27 (USICH). Defendants presented no evidence to dispute the claim that IMLS, FMCS, and USICH would be unable to carry out their statutory functions or spend congressionally appropriated funds following the Closure Decisions. ECF No. 85 at 3-4. With respect to MBDA, the sole authority for their claim that the remaining staff at MBDA would be able to carry out the agency's statutory obligations and spend appropriated funds is a conclusory statement based on nothing more than an improbable inference, which alone cannot create a genuine issue of material fact. *See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (nonmovant "must point to competent evidence and specific facts to stave off summary judgment") (quotation marks omitted); *Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, 781 F.3d 510, 516 (1st Cir. 2015) ("In order to defeat a motion for summary judgment, the nonmovant may not rest upon some combination of conclusory allegations, improbable inferences, and unsupported speculation, but must instead present definite, competent evidence to rebut the motion.").

Because the Closure Decisions are inconsistent with statutory requirements and appropriations laws that each agency is obligated to follow, they are unlawful.

## III.    The *Reduction* EO and the Closure Decisions Violate the Constitution.

Defendants repeat their earlier arguments that Plaintiffs' constitutional challenges are merely repackaged statutory claims. Opp. at 27. This Court should once again reject those arguments and hold that Defendants' actions violate the separation of powers doctrine and the Take Care Clause.

Defendants contend that no constitutional cause of action is available to Plaintiffs here. Opp. at 27-29. This argument, however, misreads *Dalton v. Specter*, 511 U.S. 462 (1994), the case

on which Defendants principally rely. *Dalton* involved a challenge to the President's decision to close a Naval shipyard in Philadelphia following an "elaborate" administrative process set out by statute. *Id.* at 464. The statute "d[id] not at all limit the President's discretion in approving or disapproving" shipyard closures, *id.* at 476, enabling him to decide to do so "for a good reason, a bad reason, or no reason" at all, *id.* at 478 (Souter, J., concurring). When the President exercised that discretion to approve the Philadelphia shipyard closure, opponents sued to enjoin the decision and claimed that it did not comport with the statute. *Id.* at 466. The question presented for the Supreme Court was whether this alleged statutory violation gave rise to a constitutional claim subject to judicial review. *Id.* at 468. The Court's answer was no. *Id.* When the President exercises discretion committed to him by statute, a claim that the President exceeded his statutory authority is not necessarily reviewable as a constitutional claim. *See id.* at 472-73; *see also Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022).

*Dalton* does not foreclose Plaintiffs' constitutional claims here but instead, reaffirms a "well established" "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." 511 U.S. at 474. The conclusion that judicial review was unavailable in *Dalton* followed from the Court's interpretation of the relevant statute in that case, which, as noted, conferred on the President unbounded discretion with respect to shipyard closure recommendations. In this case, no statute entrusts the Executive with discretion to unilaterally dismantle IMLS, MBDA, FMCS, and USICH. As a result, Defendants cannot invoke *Dalton* "to bypass scores of statutory limitations on governmental authority." *Chamber of Commerce*, 74 F.3d at 1332. This Court was right to

conclude that Plaintiffs are likely to succeed on their constitutional claims, and Defendants make no effort to defend the constitutionality of their actions.

### A.    The *Reduction* EO and the Closure Decisions Violate the Separation of Powers.

"[T]he Framers crafted the federal system of Government so that the people's rights would be secured by the division of power." *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000). The Constitution vests "[a]ll legislative Powers" in Congress, which makes laws, and it vests the "executive Power" in the President, who "shall take Care that the Laws be faithfully executed." U.S. Const. art. I, § 1; *id.*, art. II, § 1, cl. 1; *id.*, art. II, § 3. This separation of powers, which is "foundational" to our system of government, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020), means that the Executive has no power to enact, amend, or repeal statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Nor does the President have—under the Constitution or otherwise—the power to disregard or act contrary to statutes, even in an emergency. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952).

Congress created IMLS, MBDA, FMCS, and USICH, assigned the agencies "a comprehensive set of statutory responsibilities," and every year appropriated funds it deemed necessary to carry out those agency functions. ECF No. 57 at 39. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202, 61 Stat. 136, 153 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. No. 104-208, § 702, 110 Stat. 3009, 3009-294 (establishing IMLS); Minority Business Development Act of 2021, Pub. L. No. 117-58, § 100003(a), 135 Stat. 429, 1448 (authorizing MBDA); Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, Pub. L. No. 111-22, § 1004, 123 Stat. 1632, 1666 (reauthorizing USICH); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1101(a)(2), (8), 139 Stat. 9, 10-11 (2025).

Defendants' attempts to dismantle IMLS, MBDA, FMCS, and USICH through executive fiat usurped Congress's powers. *See* ECF No. 57 at 39-40. "[S]ettled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). This Court previously found that, "[b]y issuing the *Reduction* EO—which effectively directs withholding the funds that Congress recently statutorily appropriated to IMLS, MBDA, and FMCS, resulting in the cessation of several of their programs, . . . the Executive is usurping Congress's: (1) power of the purse, by disregarding congressional appropriations; and (2) vested legislative authority to create and abolish federal agencies." ECF No. 57 at 40. Defendants' claim that the Appropriations Clause does not justify a declaration that the *Reduction* EO is unconstitutional (Opp. at 31-32) misconstrues Plaintiffs' separation of powers claims. *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025), is also distinguishable. Unlike that case, where the agency plans implementing the Executive Order in question were not before the court for review, *id*. at 2635, the Closure Decisions implementing the *Reduction* EO are before this Court, and it is clear they cannot and would not be carried out "consistent with the constraints of law," *id.* (Sotomayor, J., concurring); *see also* ECF No. 57 at 39-40.

Additionally, contrary to Defendants' claims (Opp. at 29-31), Plaintiffs are not somehow seeking to enforce the Impoundment Control Act by arguing that the *Reduction* EO and Closure Decisions violate the separation of powers doctrine or each agency's appropriations statute. Defendants' reliance on *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. Aug. 28, 2025), is misplaced. In that case, the plaintiffs challenged an Executive Order that essentially impounded congressionally appropriated foreign assistance funds, and their APA claims were explicitly premised on a violation of the Impoundment Control Act. *Id*. at 9-10. None of Plaintiffs' claims in

this case are premised on a violation of the Impoundment Control Act, nor are Plaintiffs challenging any impoundment of funds. As this Court explained, Defendants cannot "ignore[] the unshakeable principles that Congress makes the law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated." ECF No. 57 at 2. Our Constitution does not allow the President to shutter agencies himself, in defiance of the administrative procedures that Congress required to be followed, the appropriations Congress ordered to be spent, and the separation of powers that constrain every officer of our government.

**B.     The *Reduction* EO and the Closure Decisions Violate the Take Care Clause.**

Defendants' arguments against Plaintiffs' Take Care Clause claim are equally unpersuasive. Defendants argue that the Clause entrusts the President with "broad, discretionary authority" that is not "subject to judicial direction." Opp. at 32. But whatever the outer limits of the President's discretion to execute the laws, it does not include authority to disregard statutes that create agencies, assign them responsibilities, appropriate them funds, and—through the APA—mandate that they engage in reasoned decisionmaking. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care Clause "implies a power to forbid their execution"). "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President—and his subordinates—do not wield 'authority to set aside congressional legislation by executive order.'" *New York v. Trump*, 767 F. Supp. 3d 44, 81 (S.D.N.Y. 2025) (quoting *United Mine Workers*, 190 F.3d at 551). By dismantling the Defendant Agencies and the programs they

administer, which are creatures of Congress, the Executive has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

Defendants next assert that the Take Care Clause does not provide for review of "the actions of subordinate Executive Branch officials," but the cases they cite do not state that proposition. Opp. at 33. Indeed, *Printz v. United States*, 521 U.S. 898 (1997), suggests the opposite. *See id*. at 922 (the Constitution provides that the President "'shall take Care that the Laws be faithfully executed,' Art. II, § 3, personally *and through officers whom he appoints*" (emphasis added)); *see also In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1137-38 (S.D. Cal. 2018) ("[T]he Court disagrees with Defendants' argument that the Take Care Clause applies only to the President, and not his cabinet members.") (collecting cases).

### C.    *Ultra Vires* Review is Available

Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority. And federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc*, 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Commerce Corp*., 337 U.S. 682, 689 (1949); *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials). For the reasons previously discussed, Defendants' challenged actions are contrary to law and outside of Defendants' authority because Defendants cannot dismantle federal agencies and terminate their

programs by eliminating the staff and resources the agencies require to meet their statutory obligations.[4]

IV.    **Plaintiffs Are Entitled to the Relief Prayed for in Their First Amended Complaint.**

    A.    **A Permanent Injunction Is Warranted.**

Plaintiffs are entitled to a permanent injunction against implementation of the Closure Decisions. Courts generally issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987)). Plaintiffs have established that the *Reduction* EO and the Closure Decisions violate both the APA and the Constitution, *see supra*, this Court has already concluded that the equitable factors favor a preliminary injunction, and those same factors call for a permanent injunction as well. To the extent Defendants take issue with the scope of Plaintiffs' requested injunction, Defendants have failed to propose a feasible alternative that would afford Plaintiffs complete relief.

      i.    **Implementation of the *Reduction* EO and the Closure Decisions Would Inflict Irreparable Harm on Plaintiff States.**

---

[4] However, the Court need not reach Plaintiffs' *ultra vires* claims if it finds that Plaintiffs are entitled to summary judgment on their APA and constitutional claims.

Plaintiffs' Motion for Summary Judgment was supported by an extensive Statement of Undisputed Facts detailing Defendants' efforts to incapacitate the agencies and the consequent harms Plaintiffs experienced and would continue to experience absent injunctive relief. *See generally* SOUF. Defendants submitted no evidence to rebut Plaintiffs' showing, and Defendants have not raised a genuine issue of fact as to irreparable harm. *See* Opp. and Defs.' Decl., ECF No. 85-1.

This Court has previously correctly concluded that the States "demonstrated irreparable and continuing harm from the Defendants' de facto dismantling of IMLS, MBDA, and FMCS." ECF 57 at 41. And the Administration's dismantling of USICH, which currently has only two staff members not placed on administrative leave, continues to inflict irreparable harm on Plaintiff States. SOUF ¶¶ 1219-24. Contrary to Defendants' claim, Plaintiffs allege much more than "economic harms," Opp. at 35, citing imminent program closures, project delays, loss of research and data collection, loss of mediation services, and job losses as examples of harm from Defendants' dismantling of the four agencies.

Contrary to Defendants' claim otherwise (Opp. at 35-36), this case is distinguishable from *Department of Education v. California* because many state grantees do not in fact have the "financial wherewithal to keep their programs running" absent continued funding from the MBDA. 604 U.S. 650, 652 (2025).[5] For the University of Hawai'i Maui College—which receives MBDA funding to provide entrepreneurship training to students—"[a]ny pause in funding would displace the students currently in training programs" and cause three staff members to lose their jobs. SOUF ¶¶ 826-27. And if the Entrepreneurial Development and Assistance Center (EDAC) at Maryland's

---

[5] This case is further distinguishable because unlike *California*, where defendants were seeking an emergency stay based on "barebones briefing" and "no argument," *id.* at 652-53, Plaintiffs here seek a permanent injunction on the merits, supported by a substantial evidentiary record.

Morgan State University's MBDA funding had not been promptly restored, it would have had to halt essential programs such as entrepreneurship education, one-on-one business guidance, and access to resources such as the content library for continued learning. *Id*. ¶ 861. Similarly, the termination of Arizona's MBDA Business Center's grant would have forced it to close and to terminate ten employees and release twenty contractors without notice. *Id*. ¶¶ 940-46.

Any lapse in funding should MBDA not have sufficient staff to renew Plaintiffs' grants in a timely manner would also cause irreparable harm. A lapse in funding to the University of Hawaiʻi MBDA Business Center Hawaiʻi would prevent the Center from continuing to support clients' projects and force it to default on a contract with the Hawaiʻi YWCA to provide services to other small Hawaiʻi businesses. *Id*. ¶¶ 808-09. A lapse in funding to the Baltimore City Mayor's Office of Small & Minority Business & Advocacy that operates the Baltimore MBDA Advanced Manufacturing Center would cause it to cease operations. *Id*. ¶¶ 850. Plaintiffs also suffer more than economic harm from the dismantling of MBDA because in addition to grant funding, the MBDA plays a critical role in providing access to "technical assistance, procurement opportunities, and tailored training programs, all of which are vital for minority entrepreneurs to compete and thrive." *Id.* ¶ 863.

The dismantling of IMLS will similarly cause more than "economic harm" to Plaintiff States. In addition to relying on IMLS for grant funding, States also rely on IMLS for its "leadership, programs, data collection, and role as a convener of State library administration agencies." *Id*. ¶ 427. "Termination of IMLS's research function will impair the State Library of Oregon's ability to meet its mission to serve its patrons and to support local libraries in Oregon." *Id*. ¶ 231. The loss of data from IMLS's Public Library Survey "would represent the loss of decades of information that is critical for community development and planning." *Id*. And it would disrupt

New Jersey State Library's "operations related to the distribution of State aid, its ability to provide guidance to library trustees and directors related to service levels, and to plan new buildings or adapt services to community changes." *Id*. ¶ 576. "Without timely access to national surveys, guidance, and studies," the University of Hawai'i at Manoa's ability to prepare students and collaborate with community partners would also suffer. *Id*. ¶ 479.

The substantial factual record makes clear that the harms caused by the dismantling of FMCS are also far more than speculative, "economic injuries." Opp. at 36. FMCS mediators are trusted and highly skilled "neutrals" whose services are "critical for resolving labor disputes" and "promoting confidence in the decision-makers and the dispute resolution process." SOUF ¶ 987. FMCS mediators are "exceedingly competent and well-trained," and States will "not be able to replace [their] services in the near or medium term." *Id*. ¶¶ 1040, 1055. The absence of such mediators will cause the States to "suffer from prolonged labor disputes and could disrupt transportation, healthcare, and other critical services." *Id*. ¶ 1091.

Contrary to Defendants' claim, Plaintiff States have identified more than one instance where "they were actively using FMCS's services when they became unavailable." Opp. at 36. In Illinois, a school district had spent five months working with an FMCS mediator to resolve a labor-management dispute at the time the agency shut down. SOUF ¶ 1007. After FMCS's services "ceased to be available," the union issued a notice of intent to strike unless the dispute was resolved by early April. *Id*. Additionally, the Associated Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")—a private and public sector union that uses FMCS for handling grievances concerning the States' public employees—attested to having multiple pending mediations in which the parties were using FMCS services, including with a nursing home in Minnesota, *id*. ¶¶ 1157-63, and a nursing home in Illinois, *id*. ¶¶ 1164-65. After the "immediate

cessation of all FMCS assistance," AFSCME unions representing public sector employees in the States were left having to "find and utilize other more costly and time expansive method to resolve disputes." *Id.* ¶¶ 1171-72. Finally, at Butler Hospital in Rhode Island, union negotiations were "extremely likely to lead toward a strike" without FMCS mediation. *Id.* ¶ 1121. Following FMCS's Closure Decision, the federal mediator abandoned Butler Hospital and union employees at a crucial juncture in mediation and those parties then became engaged in a prolonged strike that materially impacted Rhode Island's largest mental health hospital. *Id.* ¶¶ 1123-28.

Defendants' dismantling of USICH also causes irreparable harm to Plaintiff States that is not "self-inflicted." Opp. at 37. The work USICH does to coordinate homeless assistance programs across federal agencies is invaluable to Plaintiffs. States will no longer be able to rely on USICH resources to navigate various federal systems and programs that affect the States' unhoused population, and States, like Rhode Island, will face more obstacles establishing their own Interagency Councils on Homelessness. SOUF ¶¶ 1267-68, 1270. The gutting of the agency will also deprive Plaintiffs of the research-based federal expertise Congress directed USICH to develop specifically for the benefit of State governments. *Id.* ¶ 1234-37. Plaintiffs will also lose the benefit of USICH's direct, community-specific expert assistance. *See id.* ¶¶ 1236-37, 1241, 1284. Without the benefit of USICH's resources, expertise, and assistance, Plaintiffs will be less effective at combatting homelessness, providing support to unhoused individuals, and ensuring that their residents can access federal programs instead of relying entirely on already overburdened State service providers.

Plaintiffs have established that they will suffer irreparable harm in the absence of injunctive relief.  Indeed, Defendants' recent attempt to dismantle the MBDA despite this Court's preliminary injunction reaffirms the need for permanent injunctive relief. *See* ECF 88 (Plaintiffs' Motion to

Enforce Preliminary Injunction). Defendants' conduct demonstrates that they will continue to attempt to carry out the directives and policy of the *Reduction EO* unless judicially restrained from doing so. The relief provided by the preliminary injunction should be made permanent to ensure that Defendants cannot carry out the directives and policy of the *Reduction EO* in a manner contrary to the terms of the injunction.

> ### ii.   The Balance of Equities and the Public Interest Both Clearly Favor Plaintiff States.

Defendants claim that "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Opp. at 37 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Contrary to Defendants' assertions otherwise, this quote highlights the irreparable injuries caused by the *Reduction* EO and Closure Decisions rather than by any injunction enjoining their implementation. A permanent injunction would ensure that Defendants effectuate statutes enacted by representatives of the people and properly spend funds appropriated by those representatives. It would also enjoin unlawful agency action, and "there is generally no public interest in the perpetuation of unlawful agency action." *New York v. Kennedy*, 2025 WL 2658233, at *6 (quoting *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025)).

While Defendants claim that they are harmed by having to pay out money in the form of grants, Opp. at 37, they can make "no showing that dispersing congressionally appropriated funds for statutorily mandated purposes would cause irreparable harm in this case." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 137 F.4th 932, 942 (9th Cir. 2025). Withholding funding, resources, technical support, and services harms Plaintiff States and their residents directly, whereas injunctive relief maintains the status quo. The balance of equities clearly tips in Plaintiffs' favor. The States rely on IMLS, MBDA, FMCS, and USICH to support

their public libraries and museums, assist state entities in extending contracting opportunities to disadvantaged individuals, prevent and resolve public-sector labor disputes involving State entities, and address the complex challenges of homelessness. Protecting access to these resources is squarely aligned with the public interest. As this Court previously found, the balance of equities and public interest "weigh strongly in favor of equitable relief." ECF No. 57 at 46.

### B.    Vacatur is Appropriate Under the APA

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action. *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring); *see also New York v. Kennedy*, 2025 WL 2658233, at *1; *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately."); *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 141 F.4th 153, 182 (D.C. Cir. 2025) ("With respect to remedy, the ordinary response to a violation is to vacate the unlawful agency action."). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post,* 603 U.S. at 830 (Kavanaugh, J., concurring). The vacated "agency action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (statement of Kavanaugh, J.) (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1013 (2018)). This means that the parts of the agency action held unlawful are vacated as a whole—"not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also Corner Post*, 603 U.S. at 830-31

(Kavanaugh, J., concurring) (collecting cases where the Supreme Court affirmed decisions that "vacated the challenged agency rules rather than merely providing injunctive relief . . . [for] the specific plaintiffs").

Defendants rely entirely on Justice Gorsuch's non-precedential concurrence in *United States v. Texas*, 599 U.S. 670 (2023), to support their proposition that "the APA does not permit vacatur of agency action," Opp. at 38. However, Defendants significantly overstate Justice Gorsuch's position. While his concurrence engages in an academic discussion regarding whether the APA empowers courts to vacate agency action, Justice Gorsuch expressly declined to reach the proper application and scope of vacatur. *Texas*, 599 U.S. at 701-02 (Gorsuch, J., concurring in the judgment) ("I do not pretend that the matter is open and shut. Thoughtful arguments and scholarship exist on both sides of the debate. Nor do I mean to equate vacatur of agency action with universal injunctions. Despite some similarities, courts can at least arguably trace their authority to order vacatur to language in a statute and practice in some lower courts.").

In *Trump v. CASA, Inc.*, the Supreme Court expressly did not address the APA's command to "set aside" unlawful agency action. 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). Justice Kavanaugh reaffirmed in his concurrence that even though the use of "universal preliminary injunctions" may be restricted, "in cases under the Administrative Procedure Act, plaintiffs may [still] ask a court to preliminarily 'set aside' a new agency rule." *Id*. at 868-69 (emphasis omitted) (quoting 5 U.S.C. § 706(2)). When deciding a summary judgment motion requesting vacatur under the APA, a District of Rhode Island judge recently held that "vacatur under the APA remains, for now, a valid remedy." *Illinois v. FEMA*, No.

25-206 WES, 2025 WL 2716277, at *15 (D.R.I. Sept. 24, 2025). The traditional APA remedy of vacatur is appropriate here.

Defendants next attempt to characterize vacatur as an equitable remedy akin to a universal injunction that should "apply only to the named parties." Opp. at 39. However, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon*, 878 F.2d at 495 n.21. There is no logical or feasible way to vacate the Closure Decisions with respect to Plaintiff States only, which is presumably why Defendants make this amorphous request without even attempting to articulate what it would mean in practice or how the court could fashion such a vacatur order. Because the Closure Decisions implementing the *Reduction* EO are arbitrary and capricious and contrary to law, that agency action should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in Plaintiff States' favor, vacate the Closure Decisions, and permanently enjoin Defendants from implementing the *Reduction* EO and the Closure Decisions.

Date: October 24, 2025

Respectfully submitted,

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

*/s/ Natalya A. Buckler*
Kathryn M. Sabatini (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
Katherine Connolly Sadeck (RI Bar No. 8637)
Solicitor General
Assistant Attorney General
Natalya A. Buckler (RI Bar No. 8415)
Assistant Attorney General
Paul Meosky (RI Bar No. 10742)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
ksabatini@riag.ri.gov
ksadeck@riag.ri.gov
nbuckler@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Abigail Katowitz-Liu*
Abigail Katowitz-Liu
Assistant Attorney General
Rabia Muqaddam
Special Counsel for Federal Initiatives
Sean Bunny
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(212) 416-8922
Abigail.katowitz-liu@ag.ny.gov
Rabia.muqaddam@ag.ny.gov
Sean.bunny@ag.ny.gov
*Attorneys for the State of New York*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Syreeta A. Tyrell*
Syreeta A. Tyrell
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF
CALIFORNIA

*/s/ Jay C. Russell*
Jay C. Russell
Deputy Attorney General
Thomas S. Patterson
Senior Assistant Attorney General
Zelda Vassar
Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3617
Jay.Russell@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000new
David.Moskowitz@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Ashley Meskill*
Ashley Meskill
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5270
Ashley.Meskill@ct.gov

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Holly F.B. Berlin*
HOLLY F.B. BERLIN
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000
holly.berlin@ilag.gov
Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for
the State of Maine

/s/ *Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney
General
Office of the Attorney
General
6 State House Station
Augusta, ME  04333-
0006
Tel.:  207-626-8800
Fax:  207-287-3145
Vivian.Mikhail@maine.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ *Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
*Attorney for the State of Massachusetts*

**DANA NESSEL**
Attorney General for the People of Michigan

/s/ *Neil Giovanatti*
Neil Giovanatti
BreAnna Listermann
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ListermannB@michigan.gov

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Jacob Harris*
Jacob Harris
Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1156
Jacob.Harris@ag.state.mn.us

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.go

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Joshua Bohn*
Joshua Bohn
  *Deputy Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
Attorney for Plaintiff State of New Mexico

**DAN RAYFIELD**
Attorney General for the State of Oregon

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

**NICHOLAS W. BROWN**
Attorney General for the State of
Washington

*/s/ Kate S. Worthington*
Kate S. Worthington, WSBA #47556
Sarah E. Smith-Levy, WSBA #55770
Assistant Attorneys General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
Attorneys for Plaintiff State of Washington

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

*/s/ Colin T. Roth*
COLIN T. ROTH
Assistant Attorney General
WI State Bar #1103985
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
Attorney for Plaintiff State of Wisconsin

## CERTIFICATE OF SERVICE

I certify that on October 24, 2025, I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/Paul Meosky_____*