# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAI'I; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. 1:25-cv-128-JJM-AEM |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

| | |
|---|---|
| Federal Mediation and Conciliation Service; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget; U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in his official capacity as Acting Executive Director of the U.S. Interagency Council on Homelessness, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

This case concerns the Trump administration's efforts to dismantle federal agencies that are responsible for, among other things, funding museums and libraries, mediating labor disputes, supporting minority-owned businesses, and preventing and ending homelessness in the United States. By now, the question presented in this case is a familiar one: may the Executive Branch undertake such actions in circumvention of the will of the Legislative Branch? In recent months, this Court—along with other courts across the country—has concluded that it may not. That answer remains the same here.

Plaintiffs are twenty-one states (the "States") that challenge the legality of Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" ("*Reduction* EO"). The *Reduction* EO had the effect of dismantling the Institute of Museum and Library Services ("IMLS"), the Minority Business Development Agency

("MBDA"), the Federal Mediation and Conciliation Service ("FMCS"), and the U.S. Interagency Council on Homelessness ("USICH") by withholding already-appropriated federal funding from these agencies, terminating numerous grants and programs that these agencies administer, and placing many of the agencies' employees on administrative leave.

This Court previously issued a preliminary injunction, barring the Trump administration from implementing the *Reduction* EO. *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 56 (D.R.I. 2025). The First Circuit denied Defendants' request for a stay pending appeal of the preliminary injunction, concluding that Defendants had failed to make a strong showing that they were likely to succeed on the merits of their appeal. *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025).

Now pending before the Court is the States' and Defendants' cross-motions for summary judgment (ECF Nos. 75, 84). The States argue that the implementation of the *Reduction* EO violates the Administrative Procedure Act ("APA"), the Separation of Powers doctrine, and the Take Clare Clause of the United States Constitution. Defendants counter on both jurisdictional and merits grounds. Also before the Court are the Defendants' Motion for Partial Reconsideration of the Court's earlier order staying the *Reduction* EO as to the U.S. Interagency Council on Homelessness

("USICH") (ECF No. 86),[1] and the States' Motion to Enforce the Court's previously issued preliminary injunction (ECF No. 88).[2]

For the following reasons, the Court GRANTS the States' Motion for Summary Judgment and DENIES Defendants' Cross-Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Factual Background

The relevant agencies in this suit are IMLS, MBDA, FMCS, and USICH. "IMLS supports museums and libraries across the United States by disbursing federal funds and providing technical assistance." *Rhode Island*, 155 F.4th at 39

---

[1] Because the Court has ultimately determined that USICH's implementation of the *Reduction* EO violated both its statutory and constitutional authority, the Court DENIES Defendants' Motion for Partial Reconsideration (ECF No. 86).

[2] The States contend that Defendants violated this Court's earlier order that required MBDA to restore all the employees who were terminated as a result of the *Reduction* EO. *See* ECF No. 88 at 2-3 (citing ECF No. 60 at 3). It allegedly did so when, on October 10, 2025, the U.S. Department of Commerce sent out a Reduction-In-Force ("RIF") notice, informing twenty-four MBDA employees that their positions were being "eliminated" due to a "lack of funding" and because their functions "are not consistent with the Secretary's priorities." ECF No. 88 at 1.

In a subsequent notice, Defendants told the Court that the latest appropriations bill signed into law on November 12, 2025, nullified any RIFs that had gone into effect during the government shutdown. ECF No. 98 at 1 (citing H.R. 5371, 119th Cong. (2025)). As such, the Department of Commerce rescinded the RIFs it had issued to MBDA employees. *Id.*

The Court will remind Defendants that it is never acceptable to violate a court order, and that such violations may in some circumstances warrant further Court action. *See* 18 U.S.C. § 401. However, in light of the rescission of the RIFs, the issue presented in the States' Motion to Enforce is now moot. *See Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001) ("When a case is moot—that is, when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome—a case or controversy ceases to exist, and dismissal of the action is compulsory."). As such, the Court DENIES as moot the Motion to Enforce (ECF No. 88).

(citing 20 U.S.C. §§ 9121-9165, 9171-9176). "MBDA provides various forms of assistance to support the growth of 'minority-owned businesses' in the United States." *Id.* (citing 15 U.S.C. §§ 9511-9526). "FMCS is tasked with using conciliation and mediation to assist in the resolution of labor disputes in industries affecting commerce." *Id.* (citing 29 U.S.C. § 173(a)). USICH partners with states, local governments, and public and private nonprofit organizations to implement the federal strategic plan aimed at preventing and ending homelessness. *See* 42 U.S.C. § 11313(a). All four agencies were established by Congress and continue to receive annual congressional appropriations. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(2), (8), (12), 139 Stat. 9, 10-12 (2025).

On March 14, 2025, President Trump issued the *Reduction* EO, which directed seven federal agencies—including IMLS, MBDA, FMCS, and USICH[3]—to: (1) eliminate their "non-statutory components and functions ... to the maximum extent consistent with applicable law," and (2) "reduce the performance of their statutory function and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). The *Reduction* EO instructed the head of each of these agencies to submit "[w]ithin 7 days … a report to the Director of the Office of Management and Budget confirming full

---

[3] The other three agencies, which are not subject to this lawsuit, are the Community Development Financial Institutions Fund ("CDFI Fund"), the United States Agency for Global Media ("USAGM"), and the Woodrow Wilson International Center for Scholars ("Wilson Center"). ECF No. 75 at 4 n.1.

compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id.* § 2(b). The *Reduction* EO also outlines that, upon review of budget requests these agencies submit, the OMB Director "shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests … to the extent they are inconsistent with this order." *Id.* § 2(c).

Following issuance of the *Reduction* EO, leaders at IMLS, MBDA, FMCS, and USICH took several actions in furtherance of the EO's mandates.  First, they fired, placed on administrative leave, or reassigned all or almost all employees in the four agencies.  ECF No. 75 at 8, 12-13, 16, 19-20.  Second, they cancelled a broad array of grants to the agencies.  *Id.* at 9, 13.  Third, they cancelled several public programs and services that the agencies administered and caused the agencies to default on contracts with outside service providers.  *Id.* at 9, 12, 15, 20.  Fourth and finally, they left the agencies unable to carry out their statutorily mandated functions and unable to spend their congressionally appropriated funds.  *Id.* at 9, 13, 15, 19-20.

### B.     Procedural Background

On April 4, 2025, the States filed this action and moved for a temporary restraining order to enjoin Defendants' implementation of the *Reduction* EO as to IMLS, MBDA, and FMCS.  ECF No. 1.  The parties later stipulated that the motion be converted into a motion for a preliminary injunction, which the Court accepted.  *See* ECF No. 31; *see also* Text Order (Apr. 10, 2025) (entering the parties' stipulation).

On May 6, 2025, this Court granted the States' motion, and it issued its preliminary injunction on May 13, 2025.  ECF Nos. 57, 60; *see also Rhode Island*, 781 F. Supp. 3d at 56.  The Court held that Defendants' actions were likely arbitrary and capricious, contrary to law, and unconstitutional.  *Rhode Island*, 781 F. Supp. 3d at 47, 48-49, 52.

Defendants timely appealed the preliminary injunction order to the First Circuit and sought a stay pending appeal.  ECF No. 84 at 5.  They also sought such a stay from this Court, *see* ECF No. 63, but that motion was denied, *see* ECF No. 67; *see also Rhode Island v. Trump*, No. 25-cv-128-JJM-LDA, 2025 WL 1594366 (D.R.I. June 5, 2025).

Meanwhile, the States submitted an amended complaint in which they added USICH as a defendant and alleged harms also caused by that agency because of the *Reduction* EO's implementation.  ECF No. 68.  The States subsequently moved for summary judgment.  ECF No. 75.  Defendants cross-moved for summary judgment. ECF No. 84.

On September 11, 2025, the First Circuit denied Defendants' motion for a stay pending appeal.  *Rhode Island*, 155 F.4th at 50.  The court concluded that Defendants failed to: (1) make a strong showing that they were likely to succeed on the merits of their appeal; (2) show that the States would not be likely to suffer substantial injury were the stay to be issued; or (3) show that the issuance of a stay was in the public interest.  *Id.*  Defendants' appeal of the preliminary injunction remains pending.

A few more developments have occurred since the First Circuit's ruling. First, this Court issued a text order in which it stayed the implementation of the *Reduction* EO as it pertained to USICH. *See* Text Order (Sept. 12, 2025). Second, Defendants filed a motion for partial reconsideration of the Court's issuance of the stay as to USICH. ECF No. 86. Third and finally, the States' moved to enforce the Court's preliminary injunction order, arguing that Defendants were attempting to dismantle the MBDA in direct contravention of the order. ECF No. 88 at 1.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve … in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome … under the applicable law.'" *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[ ] all reasonable inferences" in its favor. *Id.* (quoting *Harley-Davidson Credit Corp. v. Galvin*, 807 F.3d 407, 408 (1st Cir. 2015)). "Where the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn." *Vazquez-Velazquez v. P.R. Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (cleaned up).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).  In this specific context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.*  The court makes that determination by "review[ing] the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

## III.  DISCUSSION

### A.    The Court Has Jurisdiction Over the States' Claims

Defendants first challenge the Court's subject-matter jurisdiction over this case.  ECF No. 84 at 6.  They argue that the States make two types of claims that should have been bifurcated and brought before two distinct adjudicatory bodies, and not this Court.  First, Defendants assert that the Tucker Act, 28 U.S.C. § 1491(a), bars judicial review over the States' "grant termination claims" and that those claims belong in the Court of Federal Claims.[4]  *Id.* at 6.  Second, Defendants contend that this Court is precluded from reviewing the States' "employee removal claims" because the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), provides the Office of Special Counsel, the Merit Systems Protection Board

---

[4] Defendants acknowledge that this jurisdictional argument only applies to the States' claims against IMLS and MBDA because FMCS and ICH do not administer grants.  ECF No. 84 at 6 n.2.

9

("MSPB"), and the Federal Labor Relations Authority ("FLRA") with the exclusive authority to review such claims. *Id.* at 11-12. Defendants also argue that the States lack Article III standing to bring their claims. *Id.* at 15. All three arguments are addressed in turn.

### 1.    The Tucker Act

In certain circumstances, the APA waives sovereign immunity for suits against the federal government. *See* 5 U.S.C. § 702. However, this "limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money....'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quoting *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

Defendants argue that, at least with regard to IMLS and MBDA, the States are essentially bringing contract claims because they challenge those agencies' grant termination decisions. ECF No. 84 at 6-8. It is an argument that the Government has raised repeatedly in recent months in response to various challenges against executive agency actions. *See, e.g.*, *President & Fellows of Harvard Coll. v. U.S. Dep't of Health and Human Servs.*, Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, --- F. Supp. 3d ----, 2025 WL 2528380, at *11-13 (D. Mass. Sept. 3, 2025); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-279 WES, --- F. Supp. 3d ----, 2025 WL 2271867,

at *5 n.7 (D.R.I. Aug. 8, 2025) (collecting cases).  Like many of those courts before it, this Court can easily dispense with this argument.

First, the States' APA claims aside, the Tucker Act does not prohibit this Court from reviewing the States' claim that Defendants acted unconstitutionally.  *See California v. U.S. Dep't of Transp.*, No. 25-cv-208-JJM-PAS, --- F. Supp. 3d ----, 2025 WL 3072541, at *5 (D.R.I. Nov. 4, 2025) (citing *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1265 (1st Cir. 1993)). Whether Defendants violated the Separation of Powers doctrine and the Take Care Clause in their implementation of the *Reduction* EO is a classic constitutional question that district courts are tasked with analyzing and one that "the Court of Federal Claims . . . cannot fully adjudicate…." *President & Fellows of Harvard Coll.*, 2025 WL 2528380, at *14 (holding that Plaintiffs' First Amendment claim belonged in district court and not Court of Federal Claims because case involved "a bedrock constitutional principle rather than the interpretation of contract terms").

Second, to the extent that the APA is implicated, Defendants' Tucker Act argument fails because the States' challenge is not, at its essence, a contract claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) ("[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and … a district court has no power to grant injunctive relief in such a case.").  As the Supreme Court recently explained, there is a difference—for Tucker Act purposes— between challenges to the cancellation of grants and challenges to agency policies

11

undertaken in response to executive orders. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* ("*APHA*"), 606 U.S. ----, 145 S. Ct. 2658, 2660-61 (2025) (Barrett, J., concurring). Whereas the former is a type of contract claim that must be heard in the Court of Federal Claims,[5] the latter is not and is therefore properly brought before a district court under the APA.[6] *Id.* at 2661 (Barrett, J., concurring).

Important to note is that not every case with "some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 967-68. This principle was recently reaffirmed by Justice Barrett: "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded … upon' contract that only the CFC can hear." *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). So too by the First Circuit in *New York*

---

[5] Five Supreme Court justices have held that grant termination claims must be brought in the Court of Federal Claims. *See APHA*, 145 S. Ct. at 2659 (per curiam) (noting that Justices Thomas, Alito, Gorsuch, and Kavanaugh would have granted the Government's stay application in full, which included the determination that the district court lacked jurisdiction over plaintiffs' claims challenging NIH's grant terminations); *id.* at 2661 (Barrett, J., concurring) ("[T]he District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC).").

[6] Five Supreme Court justices have held that claims challenging agency policies implemented in connection with executive orders fall within the scope of the district court's jurisdiction under the APA. *See APHA*, 145 S. Ct. at 2660-61 (Barrett, J., concurring) (noting that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance" issued by NIH in response to "changed policy priorities mandated by a series of executive orders"); *id.* at 2662-63 (Roberts, C.J., concurring in part) (noting that Chief Justice Roberts and Justices Sotomayor, Kagan, and Jackson would have denied the Government's stay application in full, which included the determination that the district court had jurisdiction over plaintiffs' challenge to NIH's directives implemented because of executive orders).

*v. Kennedy*, 155 F.4th 67, 75 n.4 (1st Cir. 2025) (rejecting the Government's argument that "all grant-related suits must be heard by the Court of Federal Claims under the Tucker Act"), and by a district court within this circuit in *Association of American Universities v. Department of Defense*, No. 25-11740-BEM, --- F. Supp. 3d ----, 2025 WL 2899765, at *6 (D. Mass. Oct. 10, 2025) ("To argue that the background existence of Plaintiffs' grant agreements defines Plaintiffs' regulatory and statutory claims is to let the tail wag the dog.").

*New York v. Kennedy* is particularly on point here. That case concerned actions taken by the U.S. Department of Health and Human Services ("HHS") to implement an executive order by eliminating over a dozen sub-agencies and placing 10,000 full-time employees on administrative leave (i.e., reductions-in-force, or "RIFs"). *New York v. Kennedy*, 789 F. Supp. 3d 174, 189 (D.R.I. 2025). The plaintiff States sued to enjoin these HHS actions and, while they "produced evidence about the failure to process one grant to support their claims that the sub-agencies were no longer functioning," the First Circuit concluded that "the inclusion of that allegation [did] not transform their suit into a demand for money damages or an order 'to enforce a contractual obligation to pay money.'" *New York*, 155 F.4th at 75 n.4 (quoting *California*, 604 U.S. at 651) (internal citation omitted). The First Circuit also distinguished between challenges to "the cancellation of grants" and challenges "concern[ing] the dismantling of sub-agencies and a RIF at [HHS]," the latter of which the district court had jurisdiction to review. *Id.*

Here, Defendants contend that "grant terminations" are "the cornerstone of [the States'] claim" and at "[t]he heart of this action," which make it a contract claim subject to the Tucker Act. ECF No. 84 at 6, 7; *see also* ECF No. 97 at 3-5. However, simply repeating an assertion over and over does not make it true.[7] While some of the harms the States allege pertain to grant terminations, this "comprise[s] only one facet of Defendants' categorical decision to incapacitate the agencies." ECF No. 92 at 4. Just as in *New York*, the States' primary challenge is to the dismantling of IMLS, MBDA, FMCS, and USICH through policies undertaken by Defendants to eliminate their programming,[8] to eliminate their congressionally appropriated funding,[9] and to terminate a vast swath of employees through RIFs.[10] *Id.* at 13. The States argue that Defendant did this "in defiance of the administrative procedures that Congress required to be followed, the appropriations Congress ordered to be

---

[7] In fact, in an earlier filing, Defendants took the opposite stance: they contended that the States "do not challenge specific grant terminations [or] specific payments they claim to be entitled to … they challenge the entire course of conduct of three agencies moving forward." ECF No. 41 at 21.

[8] The States note that, following the implementation of the *Reduction* EO, IMLS was incapable of administering its programs, such as its Grants to States Program that distributes $180,000,000 to libraries across the United States. ECF No. 75 at 8. Similarly, MBDA could not administer its Capital Readiness Program that supports the Rhode Island Small Business HUB, the Northern Great Lakes Initiative, the Office of Business & Entrepreneurship at the University of Wisconsin System, and the Arizona Hispanic Chamber of Commerce. *Id.* at 11.

[9] The States note that, for Fiscal Year 2025, Congress appropriated $294,800,000 to IMLS. ECF No. 75 at 8. Congress also appropriated $68,250,000 to MBDA. *Id.* at 12.

[10] The States note that on March 21, 2025, Defendant Latif issued a RIF that placed all but three of MBDA's forty-nine employees on paid administrative leave. ECF No. 75 at 12. Later, even those employees that remained were reassigned to positions outside the MBDA. *Id.* Similarly, on March 31, 2025, IMLS issued a RIF that placed all seventy-seven of its employees on paid administrative leave. *Id.* at 8.

spent, and the separation of powers that constrain every officer of our government." ECF No. 75 at 4.

The "gravamen" of the States' claims "does not turn on terms of a contract between the parties; it turns largely on federal statutes and regulations put in place by Congress." *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025) (internal quotations omitted) (citing *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 464-65 (D.R.I. 2025); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293-94 (D. Mass. 2025)). This is apparent because, as in *Colorado*, "the States' claims do not arise in any contract, but the APA—particularly its provisions forbidding arbitrary and capricious action, action contrary to law … and the Constitution's … underlying separation of powers principles." *Id.* Again, the States' claims involve the process Defendants undertook in implementing the *Reduction* EO—not any specific terms and conditions in their grant agreements—and that makes them "precisely the type of claims that belong in district court." *Id.*

In short, notwithstanding certain actions relating to grants, this Court has jurisdiction to hear this case. *See APHA*, 145 S. Ct. at 2660-61; *Megapulse*, 672 F.2d at 967-68; *New York*, 155 F.4th at 75 n.4; *Ass'n of Am. Univs.*, 2025 WL 2899765, at *6; *Colorado*, 788 F. Supp. 3d at 296.

### 2.    The Civil Service Reform Act

Defendants also argue that the CSRA divests this Court of jurisdiction over the States' claims "to the extent they challenge federal personnel decisions."  ECF

15

No. 84 at 13. They claim that the CSRA channels these types of disputes to the Office of Special Counsel, the MSPB, and the FLRA. *Id.* at 12 (citing *United States v. Fausto*, 484 U.S. 439, 455 (1988); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019)). This argument too is easily discarded.

First, the First Circuit has already rejected Defendants' CSRA argument in this case. *See Rhode Island*, 155 F.4th at 47. As the court noted, it rejected a "seemingly identical CSRA argument" in *Somerville Public Schools*. *Id.* (citing *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) ("[W]e are loath at this juncture of the proceedings to attribute to Congress the intention in enacting the CSRA … to bar every challenge to an unlawful effort by the Executive to shut down a statutorily created agency by summarily firing its employees en masse … except for those specific challenges that the terminated employees themselves may choose to bring."). Even though the Government subsequently sought a stay from the Supreme Court in *Somerville Public Schools*, *see McMahon v. New York*, 606 U.S. ---, 145 S. Ct. 2643 (2025), the First Circuit observed that nothing in that case indicated that it had erred in rejecting the Government's CSRA argument. *Rhode Island*, 155 F.4th at 47 (citing *McMahon*, 145 S. Ct. at 2643).

Second, as the First Circuit observed in *New York v. Kennedy*, the Supreme Court has already likely indicated that Defendants' CSRA argument fails. 155 F.4th at 75 (citing *Trump v. Am. Fed'n of Gov't Emps.* ("*AFGE*"), 606 U.S. ----, 145 S. Ct. 2635 (2025)). *AFGE* involved a similar challenge to the mass firings of federal

employees due to an agency RIF implemented under an executive order and, even though the Government raised the same CSRA argument at issue here, the Court determined that the Government was likely to succeed in its argument that the executive order was lawful. *Id.* (citing *AFGE*, 145 S. Ct. at 2635). This merits-based ruling "indicate[d] that the Supreme Court concluded that the district court likely had jurisdiction" to review the lawfulness of such agency decisions, and that it "likely decided that the CSRA did *not* funnel the dispute at issue … to the MSPB." *Id.* (citing *AFGE*, 145 S. Ct. at 2635).

Accordingly, the CSRA does not divest this Court of its jurisdiction to review the States' claims relating in part to the mass terminations of federal employees at IMLS, MBDA, FMCS, and USICH. *See Rhode Island*, 155 F.4th at 47; *Somerville Pub. Schs.*, 139 F.4th at 71; *New York*, 155 F.4th at 75; *AFGE*, 145 S. Ct. at 2635.

### 3.    Standing

Defendants' last jurisdictional argument is that the States lack Article III standing because their injuries are not "actual or imminent" and are "too speculative," ECF No. 84 at 17 (first quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); then quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013)), and because the States' claim "involve no 'legally and judicially cognizable' harm" and are instead "generalized interest[s] … [that are] too abstract to constitute a 'case or controversy' appropriate for judicial resolution," *id.* at 18 (first quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997); then quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)).

Defendants' arguments are once again ones that have been rejected by the First Circuit in this case. *Rhode Island*, 155 F.4th at 44. Specifically, the First Circuit found that the States do in fact assert a "legally and judicially cognizable" harm rather than a "generalized interest" because they "have been and will continue to be injured by the denial of funds to which they are entitled, and … by the defendants' failure to provide services on which the plaintiffs rely." *Id.* So too did the First Circuit conclude that Defendants were unlikely to succeed in their "injury in fact" argument. *Id.* Indeed, the court left undisturbed this Court's finding that the States' injuries were sufficiently "actual or imminent" given that Defendants' actions "caused and will continue to cause the loss of services of which [the States] complain." *Id.* at 45; *see also Rhode Island*, 781 F. Supp. 3d at 38-39. The Court sees no reason to depart from these findings.

Defendants also assert that the States "lack standing to seek broad relief against the Defendant Agencies as to injuries allegedly suffered by other states and parties that are not plaintiffs before this Court." ECF No. 84 at 16. In other words, they claim that the States "can only assert standing, if at all, to remedy injury to themselves." *Id.* In addition, they assert that the States lack standing to seek relief as to the other three agencies identified in the *Reduction* EO but not named as defendants in this suit. *Id.*

Taking the latter argument first, there is no dispute among the parties that the States are *not* seeking relief as to the three agencies not named in this lawsuit. ECF No. 92 at 4; ECF No. 97 at 7. As mentioned earlier, the CDFI Fund, USAGM,

and the Wilson Center are not at issue here.  *See* Section I.A.  There is a dispute, however, over whether the States may seek broad relief that also happens to redress "injuries allegedly suffered by other states and parties."

Defendants cite the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), for the proposition that Article III's standing requirement prevents this Court from "grant[ing] any relief to anyone other than Plaintiffs."  ECF No. 97 at 7-8.  Put another way, Defendants argue that this Court may not, under Article III, "enter an order vacating or setting aside Executive Order 14238 in its entirety because such relief would implicate individuals and entities not party to this litigation."  *Id.* at 8.  However, Defendants are plainly wrong in asserting that *CASA* stands for this premise.

As the First Circuit has noted, the Supreme Court in *CASA* treated the question of whether an injunction is "broader than necessary to provide complete relief" as distinct from whether a plaintiff has "standing to sue."  *Rhode Island*, 155 F.4th at 45 (citing *CASA*, 606 U.S. at 838 n.2, 839, 860-61).  Furthermore, the Supreme Court expressly stated its "decision rest[ed] *solely* on the statutory authority that federal courts possess under the Judiciary Act of 1789," and that it was "express[ing] no view" on the Government's Article III argument.  *CASA*, 606 U.S. at 841 n.4 (emphasis added).  It simply cannot be that, under *CASA*, "Plaintiffs' Request … Does Not Satisfy Article III," ECF No. 97 at 7-8, when the Supreme Court "express[ed] no view" as to Article III in *CASA*.  606 U.S. at 841 n.4.

Accordingly, each of Defendants' standing arguments must fail. *See Rhode Island*, 155 F.4th at 44, 45; *CASA*, 606 U.S. at 838 n.2, 841 n.4.

**B.    Implementation of the Reduction EO Is Unlawful**

Having dispensed with Defendants' jurisdictional arguments, the Court now turns to the merits. The States argue that Defendants' implementation of the *Reduction* EO is unlawful for three reasons: (1) because it violates the APA; (2) because it violates the Separation of Powers doctrine; and (3) because it violates the Take Clare Clause of the United States Constitution. Each claim is addressed in turn.

**1.    APA Claim**

Beginning with the APA claim, the States assert that Defendants' implementation of the *Reduction* EO violates the APA because such actions are "arbitrary and capricious" and "contrary to law." ECF No. 75 at 27-38. Defendants counter by arguing that the States cannot seek judicial review under the APA because the agency actions are neither discrete nor final. ECF No. 84 at 19-22. They also contend that such actions are committed to agency discretion by law. ECF No. 23-27. The Court will address Defendants' contentions first before turning to the merits.

**a.    Discrete Agency Action**

Defendants assert that the States "are not challenging a discrete agency action, but rather a collection of grant terminations, personnel actions, and programmatic activities." ECF No. 84 at 19. They compare the States' challenge to the "programmatic challenges" rejected by the Supreme Court in *Lujan v. National*

*Wildlife Federation*, 497 U.S. 871 (1990). *Id.* It is an argument the Defendants made earlier in their opposition to the States' request for a preliminary injunction. *Rhode Island*, 781 F. Supp. 3d at 43. As this Court explained then, the Supreme Court in *Lujan* rejected plaintiffs' "programmatic challenge" that amounted to nothing more than "an attempt to seek wholesale programmatic improvements by court decree by couching the Bureau of Land Management's land withdrawal review program as an unlawful agency action." *Id.* (quoting *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004))) (cleaned up). However, the Court in *Lujan* also recognized that "[i]f there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations … it can of course be challenged under the APA…." *Id.* (quoting 497 U.S. at 890 n.2).

This Court determined that the States' claims are closer to the latter type of APA claim because they challenge Defendants' adoption of a "discrete, categorical policy" that applies the *Reduction* EO's mission "of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions" across the board, and thus are subject to APA review. *Id.* In their latest briefing, Defendants acknowledge this determination but argue that the D.C. Circuit's more recent decision in *National Treasury Employees Union* ("*NTEU*") *v. Vought* points the opposite way. ECF No. 84 at 20 (citing 149 F.4th 762, 777 (D.C. Cir. 2025)).

This position, however, ignores the fact that this Court is not bound by D.C. Circuit precedent[11]; it is instead bound by First Circuit precedent.  Indeed, in recent months, the First Circuit has rejected Defendants' exact argument not once but twice. *See New York v. Trump*, 133 F.4th at 67; *New York v. Kennedy*, 155 F.4th at 76.  As that court stated: "We cannot conclude that the government has made a strong showing of likely success on this [discrete agency action] argument … given that the plaintiffs challenge a particular directive, not a 'variety of programmatic deficiencies' or 'all aspects of' a program.'"  *New York v. Kennedy* 155 F.4th at 76 (quoting *New York v. Trump*, 133 F.4th at 67) (quoting *Lujan*, 497 U.S. at 890 n.2)).

As such, this Court's conclusion remains the same as it was before: the States' APA claim is proper under *Lujan* because it is of the type that challenges "a discrete, categorical policy" that applies the *Reduction* EO's overarching directive "across the board."  *See Rhode Island*, 781 F. Supp. 3d at 43; *New York v. Trump*, 133 F.4th at 67; *New York v. Kennedy*, 155 F.4th at 76.

### b.    Final Agency Action

Defendants also contend that there has been no "final agency action" to warrant judicial review under the APA.  ECF No. 84 at 21.  Of course, judicial review

---

[11] In any event, the majority in *National Treasury Employees Union* seemingly ignored Footnote 2 of the Supreme Court's opinion in *Lujan*, in which it made clear that plaintiffs could challenge "some specific order or regulation, applying some particular measure across the board…."  497 U.S. at 890 n.2.  The dissent did not ignore this key part of the opinion, however, and stated that "[i]t is hard to imagine an agency action that more clearly applies 'across the board' to all ensuing agency operations than an order to terminate an agency entirely."  *NTEU*, 149 F.4th at 813 (Pillard, J., dissenting) (citing *Lujan*, 497 U.S. at 890 n.2).

under the APA is available "only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704). This means that a plaintiff can only challenge an action that "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Courts are to apply the "finality" requirement in a "flexible" and "pragmatic" fashion. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016); *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-51 (1967).

This Court has determined that the requisite final agency action has occurred, making this case subject to judicial review. *Rhode Island*, 781 F. Supp. 3d at 45. Specifically, the Court found that Defendants took "agency action" where, "to comply with the *Reduction* EO," each agency "adopted a policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum." *Id.* at 44-45. The agencies "consummate[ed] [their decisionmaking process" upon adopting this policy given that no evidence suggests that the elimination of these activities and functions was "tentative or interlocutory." *Id.* at 45 (citing *Bennett*, 520 U.S. at 178). Also, "legal consequences" flowed from these decisions given that: (1) the States lost access to previously awarded funds due to grant terminations and the withholding or delay of disbursements; (2) the

23

personnel in charge of administering the agencies' programs were removed en masse; and (3) the agencies stopped providing public sector services to the States.[12]  *Id.*

Defendants do not press any new arguments to challenge final agency action other than an attempt to distinguish this case from the Supreme Court's decision in *Biden v. Texas*, 597 U.S. 785, 809 (2022).  ECF No. 84 at 22.  In that case, the Supreme Court found there to be "final agency action" where the DHS Secretary issued memoranda that "bound [agency] staff by forbidding them to continue [a DHS] program in any way from that moment on."  597 U.S. at 808-09.  Defendants assert that the conduct the States point to is "an abstract decision 'wholly apart from' any 'specific agency action, as defined in the APA.'"  ECF No. 84 at 22 (quoting *Biden*, 597 U.S. at 809).  They refer to the conduct as nothing more than "a constellation of then-ongoing actions."  ECF No. 97 at 9 (quoting *NTEU*, 149 F.4th at 784).

Far from being "abstract," the agencies' actions could not have been clearer: in response to the *Reduction* EO, which demanded the agencies' "full compliance," the agencies terminated their grants, terminated their programming and services, and terminated their employees en masse.  In undertaking these actions, some of the agencies even cited to the *Reduction* EO.  ECF No. 75 at 9, 12.  Importantly, in *New York v. Trump*, the First Circuit held that "final agency action" existed and was

---

[12] In the Court's earlier decision, the *Bennett* prongs were only applied as to IMLS, MBDA, and FMCS; USICH was not yet party to the litigation.  However, USICH also meets the requirements of *Bennett* given that, following the implementation of the *Reduction* EO, it too terminated its employees en masse, terminated its lease for office space, and ceased performing any of its statutory functions.  *See* ECF No. 75 at 26.  No evidence suggests that any of these decisions were "tentative or interlocutory."  *Id.*

sufficiently "specific" where the Plaintiff-States in that case could point to "the Agency Defendants' actions – following the executive orders and [OMB] Directive – to implement categorical funding freezes without regard and contrary to legal authority." 133 F.4th at 68 (internal quotations omitted). And the court gave no credence to the Agency Defendants' argument that those actions were based on "individualized assessments of their statutory authorities and relevant grant terms," finding them instead to be actions that were "categorical in nature." *Id.*

As in *New York v. Trump*, Defendants' actions here are "categorical in nature," and they were specifically implemented following the issuance of the *Reduction* EO. *See* 133 F.4th at 68. There can be no doubt then, as this Court has noted, that the agency actions the States point to are sufficiently specific and sufficiently final. *See Rhode Island*, 781 F. Supp. 3d at 45.

### c.    Committed to Agency Discretion

One last challenge Defendants make is that their actions are unreviewable because they are of the sort that are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). ECF No. 84 at 23-24. To start, the APA "establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (quoting *Gardner*, 387 U.S. at 140). To honor this presumption, the Supreme Court has read this agency discretion exception "quite narrowly," finding that it only applies in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's

exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (first quoting *Gardner*, 387 U.S. at 140; then quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)).  Historically, these "rare circumstances" have been limited to only a few specific types of decisions, such as an agency's decision not to institute enforcement proceedings, *see Heckler v. Chaney*, 470 U.S. 821 (1985), and an agency's decision to terminate an employee in the interest of national security, *see Webster v. Doe*, 486 U.S. 592 (1988).  Neither of these rare circumstances are at issue here.

Defendants contend that this case fits "neatly" within those categories of administrative decisions, like *Lincoln v. Vigil*, that courts have traditionally regarded as "committed to agency discretion."  ECF No. 84 at 24 (quoting 508 U.S. 182, 191-92 (1993)).  *Lincoln* involved a decision by the Indian Health Service ("IHS") to discontinue the Indian Children's Program, which provided clinical services to children, and the Supreme Court held that such a decision was "committed to agency discretion by law."  508 U.S. at 184-85.  A closer review of *Lincoln* shows that Defendants' analogy is anything but "neat"; it is more akin to forcing a square peg into a round hole—and therefore must fail.

First, in *Lincoln*, Congress never expressly authorized the Indian Children's Program by any statute.  *Id.* at 187.  Here, by contrast, Congress specifically authorized the creation of all four agencies.  *See* Museum & Library Services Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (establishing IMLS); Minority Business Development Act of 2021, Infrastructure Investment & Jobs Act, Pub. L.

No. 117-58, 135 Stat. 429 (codified as amended at 15 U.S.C. § 9501 *et seq.*) (establishing MBDA); Taft–Hartley Act, Labor-Management Relations Act, 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); McKinney–Vento Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (codified as amended at 42 U.S.C. §§ 11301 *et seq.*) (establishing USICH).

Second, in *Lincoln*, Congress never appropriated any funds specifically for the Indian Children's Program; it instead provided IHS with a lump-sum appropriation for it to use in its discretion. *Id.* at 186-87. The Supreme Court emphasized that "where 'Congress merely appropriates lump-sum amounts *without statutorily restricting* what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions....'" *Id.* at 192 (emphasis added) (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)). Here, by contrast, Congress specifically appropriated funds for each agency, statutorily restricting what can be done with those funds. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 ("2025 Appropriations"), Pub. L. No. 119-4, § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, 138 Stat. 460, 697 (appropriating $294,800,000 for IMLS); 2025 Appropriations, Pub. L. No. 119-4, § 1101(a)(2); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. C, 138 Stat. 25, 123 (appropriating $68,250,000 for MBDA); 2025 Appropriations, Pub. L. No. 119-4, § 1101(a)(8); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, 138 Stat. 460, 697 (appropriating $53,705,000 for FMCS); 2025

Appropriations, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, 138 Stat. 25, 388 (appropriating $4,300,000 for USICH).

Third and finally, in *Lincoln*, Congress made no mention of how the Indian Children's Program was to be staffed or how operations were to be conducted. *Id.* at 186-87. Here, by contrast, Congress has provided explicit direction as to how each agency is to be staffed and operated. *See* 20 U.S.C. §§ 9102, 9108, 9121-9165, 9171-9176 (explaining how IMLS is to maintain its offices, engage in research and data collection, and support museums and libraries); 15 U.S.C. §§ 9522, 9523(a)(1)-(3), 9524(a)(1)(A), 9502(d)(2), 9502(e)(2)(A) (explaining how MBDA is to maintain its offices, engage in the facilitation of minority business enterprise growth, and staff its positions); 29 U.S.C. §§ 173(a)-(c), (d), (e) (explaining how FMCS is to assist with labor disputes, conduct grievance mediations, and encourage and support joint labor-management activities); 42 U.S.C. §§ 11312(a)-(c), 11314(a), 11313(a)(5), 11313(a)(4)-(8) (explaining how USICH is to appoint its representatives, employ an Executive Director and regional coordinators, and generally carry out its duties to prevent and eliminate homelessness).

Congress's statutory restrictions on how IMLS, MBDA, FMCS, and USICH are to be funded, operated, and staffed stand in sharp contrast to how Congress gave broad discretion to IHS over the Indian Children's Program in *Lincoln*. 508 U.S. at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."). Here, Defendants' decision to eliminate

programs, terminate grants, and implement large-scale employee RIFs undermined their ability to perform functions mandated by statute. This is clearly not an action committed to agency discretion by law, and many courts have reached the same conclusion in similar cases. *See, e.g.*, *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. MJM-25-1458, 2025 WL 1865971, at *20 (D. Md. July 7, 2025) (rejecting Defendants' argument that their decision to terminate grants, terminate statutorily mandated programs, and issue RIFs to 85% of AmeriCorp's workforce was committed to agency discretion); *Maryland v. Corp. for Nat'l & Cmty Serv.*, 785 F. Supp. 3d 68, 94-96 (D. Md. 2025) (same); *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 112-13 (D.D.C. 2025) (rejecting Defendants' argument that their decision to terminate EPA grants and programs was committed to agency discretion where Congress specifically imposed statutory obligations for such grants and programs to be carried out); *Colorado*, 788 F. Supp. 3d at 301 (holding that HHS's decision to eliminate congressionally appropriated funds based on its own assessment that they were no longer necessary "is certainly not a question about agency discretion").

Accordingly, the Court finds that Defendants' actions were not "committed to agency discretion by law" and are thus subject to review under the APA. *Lincoln*, 508 U.S. at 193; *see also Elev8 Baltimore*, 2025 WL 1865971, at *20; *Maryland*, 785 F. Supp. 3d at 94-96; *Climate United Fund*, 778 F. Supp. 3d at 112-13; *Colorado*, 788 F. Supp. 3d at 301.

### d.    Arbitrary and Capricious

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, [and] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Under this standard, while a reviewing court must ensure that the agency action is reasonable, it may not "substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Nevertheless, the court must still ensure that the agency has offered "a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). But "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

This Court has determined that the States were likely to succeed on the merits of their arbitrary and capricious claim. *See Rhode Island*, 781 F. Supp. 3d at 45-48. Specifically, Defendants' actions were arbitrary and capricious where: (1) Defendants

failed to offer any reasonable explanation for why the agencies were being dismantled, *see Encino Motorcars*, 579 U.S. at 221 ("[T]he agency's explanation [must be] clear enough [so] that its path may reasonably be discerned.") (internal quotations omitted); (2) Defendants failed to, in response to the *Reduction* EO's command that the agencies eliminate their "non-statutory components and functions," show that any analysis was conducted to determine which agency components and functions were statutorily required and which were not, *see State Farm*, 463 U.S. at 43 ("[T]he agency must … articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal quotations omitted); (3) Defendants couched their justifications for eliminating programs, terminating grants, and implementing large-scale employee RIFs in "mere conclusory statements," most of which merely defer to the *Reduction* EO, *see Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*.") (internal quotations and citations omitted); and (4) Defendants failed to indicate that they considered "any of the significant reliance interests of their program beneficiaries or grantees such as libraries, museums, business centers, contractors, labor unions, states, and local governments," *see Regents*, 591 U.S. at 30 ("When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.").

The Court incorporates the reasoning set forth in its earlier opinion in resolving this case.[13]  *See Rhode Island*, 781 F. Supp. 3d at 45-48.  Defendants do not contest these determinations at all in their briefing.  Their entire opposition to the States' APA claims is focused on claiming that there has been no discrete, final agency action and that their decisions are committed to agency discretion by law.  *See* ECF No. 84 at 19-27; ECF No. 97 at 8-12.  This further supports a finding in the States' favor.  *Cf. Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-1775 (BAH), 2025 WL 2374528, at *36 (D.D.C. Aug. 14, 2025) ("[D]efendants opted to make no argument or present evidence to the contrary on plaintiffs' arbitrary and capricious APA claim.  On this record, then, plaintiffs have demonstrated a likelihood

---

[13] Because its earlier analysis pertained only to IMLS, MBDA, and FMCS, the Court will say a few words about USICH.  The record demonstrates that USICH's actions were also arbitrary and capricious.  First, USICH provided no "reasoned explanation" as to why it was terminating its existing programs and operations and terminating most of its staff through a RIF.  ECF No. 75 at 27-28; *see Encino Motorcars*, 579 U.S. at 221.  Second, USICH failed to account for the reliance interests of the constituents, including State officers, it served in addressing the nation's homelessness problem.  *Id.* at 20; *see Regents*, 591 U.S. at 30.  Rather, USICH has been telling these constituents—who have been calling in for assistance— that USICH is shut down and is no longer able to serve them.  ECF No. 75 at 20.

Third, and most striking, USICH failed to follow its own regulations when it significantly reduced its workforce.  In response to the *Reduction* EO, the agency submitted an Agency RIF and Reorganization Plan in which it stated that a minimum of thirteen USICH employees were required to fully carry out its statutory duties.  *Id.* at 19.  Despite this, just a few weeks later, USICH—in response to a Department of Government Efficiency ("DOGE") directive—reduced its staff to just two employees. *Id.*  This conduct is undoubtedly arbitrary and capricious.  *See, e.g., Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A) if the agency fails to comply with its own regulations." (internal citations and quotations omitted)); *see also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 73 (1st Cir. 2007) (Boudin, C.J., concurring) (looking to agency's application of "its [own] general policy" to determine whether its decision was arbitrary and capricious).

of success on their APA claim that defendants' termination of plaintiffs' grant awards were arbitrary and capricious.") (citing *Thakur v. Trump*, 781 F. Supp. 3d 955, 983 (N.D. Cal. 2025) ("Agency Defendants do not contest that the termination letters represent the sum-total of their 'reasoned explanation.")).

Accordingly, the Court concludes that Defendants acted arbitrarily and capriciously in their implementation of the *Reduction* EO, and those actions must be set aside. *See Rhode Island*, 781 F. Supp. 3d at 45-48.

### e.    Contrary to Law

The APA instructs reviewing courts to "hold unlawful and set aside" agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Federal agencies are of course a "creature of statute," *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 177 (2022), and when charged with administering federal statutes, their "power to act is authoritatively prescribed by Congress," and they must follow "statutory mandates." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (internal quotations and citations omitted); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

Again, this Court has determined that the States are likely to succeed on the merits of their contrary to law claim. *Rhode Island*, 781 F. Supp. 3d at 48-51. Specifically, Defendants' actions were contrary to law where: (1) Defendants flouted the agencies' *mandatory* statutory duties by implementing policies in accordance with the *Reduction* EO that prevented them from carrying out those duties, *see In re Aiken Cnty.*, 725 F.3d at 259 (explaining that, "[u]nder Article II of the Constitution and

relevant Supreme Court precedents," the President and executive agencies "must follow statutory mandates" and may not "decline to follow a statutory mandate or prohibition simply because of policy objections"); and (2) Defendants violated each agency's appropriations statute by refusing to spend funds appropriated to them by Congress, *see id.* at 261 n.1 ("[T]he President does not have unilateral authority to refuse to spend [congressionally appropriated] funds."); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

The Court incorporates the reasoning set forth in its earlier opinion in resolving this case.[14]    *See Rhode Island*, 781 F. Supp. 3d at 48-51.  The Court also notes that the U.S. Government Accountability Office ("GAO") recently released a

---

[14] Again, because the earlier opinion focused only on IMLS, MBDA, and FMCS, the Court concludes here that USICH's actions were also contrary to law.  First, Congress has tasked USICH with various functions, including, but not limited to, organizing Council meetings, preparing a National Strategic Plan to End Homelessness, monitoring or evaluating federal, state, local, or private programs and activities, conducting research, and reporting on significant problems, abuses, or deficiencies in agency programs meant to assist unhouse individuals.  42 U.S.C. § 11313.  To carry out these statutory duties, Congress mandated certain staffing requirements, including that USICH employ an Executive Director, 42 U.S.C. § 11314(a), and "not less than 5 . . . regional coordinators," 42 U.S.C. § 11313(a)(5).  By reducing USICH's personnel down to two, Defendants have acted "contrary to law" because they have made it impossible for the agency to continue to perform its statutory duties.  *See Rhode Island*, 781 F. Supp. 3d at 48-51.

Second, Congress appropriated $4.3 million to USICH so that it could carry out its agency functions.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12); Consolidated Appropriations Act, 2024, Pub. L. 118-42, Div. F, 138 Stat. 25, 388.  However, by dismantling these agencies, Defendants made it so that USICH could not spend these funds in violation of the appropriations statutes.  *See Rhode Island*, 781 F. Supp. 3d at 48-51.

report in which it concluded that IMLS violated the Impoundment Control Act of 1974 ("ICA"), 2 U.S.C. § 681 *et seq. See* U.S. Gov't Accountability Off., B-337375, Institute of Museum and Library Services—Applicability of the Impoundment Control Act to Reduction of Agency Functions 1-2 (2025).[15]  According to GAO, it did so when, in response to the *Reduction* EO, IMLS unlawfully withheld funds that Congress had appropriated it.  *Id.*  While that report only pertained to IMLS, it underscores this Court's earlier conclusion that Defendants also acted unlawfully when they failed to follow the procedures set forth in the ICA for rescinding or deferring funds appropriated to each agency.  *See Rhode Island*, 781 F. Supp. 3d at 51 ("[T]he ICA sets forth clear procedures to facilitate that process under congressional oversight. But that process was not facilitated here.  Rather, IMLS, MBDA, and FMCS took actions that essentially directed the rescission of funds to fulfill the President's policy—with congressional authorization glaringly absent.").[16]  Also important to note—for the purposes of this claim—that contrary to law "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering."  *Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971)).

---

[15] The report is available at: https://www.gao.gov/assets/880/878908.pdf.

[16] This conclusion also applies to USICH, considering that Defendants also failed to follow the necessary procedures for rescinding or deferring funds appropriated to that agency.  ECF No. 75 at 37-38.

The Court therefore finds that Defendants' actions in implementing the *Reduction* EO were "not in accordance with law" and must be set aside. *See Rhode Island*, 781 F. Supp. 3d at 48-51.

### 2.    Separation of Powers and Take Care Clause Claims

Under the Constitution, the President is required to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This requirement extends "across the entire Executive Branch—including 'independent' agencies." *English v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496-97 (2010)). "And because federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the authority that Congress has provided them.'" *Widakuswara v. Lake* ("*Widakuswara II*"), 779 F. Supp. 3d 10, 36 (D.D.C. 2025) (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024)).

The Court has concluded that the States were likely to succeed on their claim that Defendants' actions violated the Take Care Clause. *See Rhode Island*, 781 F. Supp. 3d at 51-52. What was particularly remarkable to the Court was that, a mere day after the *Reduction* EO's issuance, Congress passed a statute appropriating the funds necessary to carry out the functions of each agency. *Id.* at 51. Nevertheless, in the weeks that followed, Defendants proceeded to effectively shutter the very same

agencies that Congress had just funded and had charged them with administering.[17] *Id.* These actions "simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause]." *Id.* (quoting *Widakuswara II*, 779 F. Supp. 3d at 36).

The Court found that the States were also likely to succeed on their related Separation of Powers claim. *See id.* at 51-52. While there is no "separation of powers clause" in the Constitution, "that doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers and vesting the Executive power solely in the President." *Trump v. United States*, 603 U.S. 593, 637-38 (2024) (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020)). As a reminder, Article I of the Constitution grants to the Legislative Branch, the exclusive power to make law, U.S. Const. art. I, § 1, and the power of the purse, U.S. Const. art. I, § 8, cl. 1. As for the Executive, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Simply put, "the President is without authority to thwart congressional will by canceling appropriations passed by Congress" and "does not have unilateral authority to refuse to spend the funds." *City & Cnty. of San Francisco*, 897 F.3d at 1232 (citing *In re Aiken Cnty.*, 725 F.3d at 261 n.1). Nor may the President "decline to follow a statutory mandate or prohibition

---

[17] The same is true of USICH, which again was not party to this Court's original order. Congress's appropriations statute also funded USICH for another year. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a)(12).

simply because of policy objections." *Id.* These same principles apply to the President's agents. *See, e.g.*, *Colorado*, 788 F. Supp. 3d at 309.

In its earlier decision, the Court specifically found that, in implementing the *Reduction* EO, the Executive was "usurping Congress's: (1) power of the purse, by disregarding congressional appropriations; and (2) vested legislative authority to create and abolish federal agencies." *Rhode Island*, 781 F. Supp. 3d at 52 (citing *Widakuswara v. Lake* ("*Widakuswara I*"), 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025)).

Defendants now boldly claim that, in holding that they violated the Separation of Powers doctrine, this Court would itself be "upset[ing] the separation of powers." ECF No. 84 at 32. Such an argument lacks merit. The Separation of Powers is a principle that is integral to our democracy. As Justice Kennedy has observed, "liberty is threatened" when "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress." *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring). "Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints." *Id.*; *see also Mistretta v. United States*, 488 U.S. 361, 380 (1989) ("[W]ithin our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."). Federal courts "have a constitutional obligation to safeguard personal liberties and to uphold federal law." *Stone v. Powell*, 428 U.S. 465, 493 n.35 (1976). Where, as here, Defendants' actions threaten to undermine

such liberties, the Court is not "upset[ing] the separation of powers"; it is merely performing its constitutional function.

Defendants also now argue that the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994) forecloses the States' constitutional claims. ECF No. 84 at 28. *Dalton* involved the President's decision to close a naval shipyard, and a claim that the Secretary of Defense had violated a federal statute when he recommended closure of the shipyard. 511 U.S. at 464-66. The Supreme Court concluded that the President's decision to accept a flawed recommendation was "not a constitutional claim, but a statutory one" and that, because the statute "commit[ted] decisionmaking to the President, judicial review of the President's decision [was] not available." *Id.* at 476-77. However, the Court distinguished its decision in *Dalton* from its decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), where the President acted in the "*absence* of *any* statutory authority," as opposed to "a claim that the President acted in excess of such authority." *Id.* at 473 (citing *Youngstown*, 343 U.S. at 585, 587). Cases in which the President has acted in the absence of any statutory authority are of course subject to judicial review. *Id.*; *see also Youngstown*, 343 U.S. at 582.

Here, Defendants would like this Court to believe that the President and his subordinates merely acted in excess of their statutory authority, making judicial review unavailable under *Dalton*. ECF No. 84 at 28. But this is a grossly inapt comparison given that "no statute entrusts the Executive with discretion to unilaterally dismantle IMLS, MBDA, FMCS, and USICH." ECF No. 92 at 18.

Instead, this case is more akin to *Youngstown* because the President has no statutory authority to cancel appropriations passed by Congress or abolish federal agencies created by Congress. *See Rhode Island*, 781 F. Supp. 3d at 52; *see also Youngstown*, 343 U.S. at 587.

Accordingly, the Court finds that Defendants violated the Constitution's Take Care Clause and the Separation of Powers doctrine. *Id.*; *see also Clinton*, 524 U.S. at 438; *City & Cnty. of San Francisco*, 897 F.3d at 1232; *Widakuswara I*, 773 F. Supp. 3d at 57.

### C.  Vacatur and Permanent Injunction Are Merited

Now that the Court has concluded that Defendants' actions in implementing the *Reduction* EO violate the APA, the Take Care Clause, and the Separation of Powers doctrine, the remaining issue concerns the type of relief that ought to be granted in this case. The States request both vacatur of the agencies' actions and entry of a permanent injunction, barring Defendants from future implementation of the *Reduction* EO. ECF No. 75 at 41-56. Defendants oppose both forms of relief. ECF No. 84 at 34-37, 38-39.

#### 1.  Vacatur

Defendants first argue that vacatur is inappropriate here because "the APA does not permit vacatur of agency action." ECF No. 84 at 38. That is plainly incorrect.[18] The APA authorizes a court to "hold unlawful and set aside agency

---

[18] Defendants cite only to Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670 (2023), in support of its argument that "the APA does not permit vacatur of agency action." ECF No. 84 at 38 (citing *id.* at 695 (Gorsuch, J.,

action." 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately."). Indeed, Defendants' argument "does not reflect the law of this Circuit, including as recently reviewed by the Supreme Court." *Ass'n of Am. Univs.*, 2025 WL 2899765, at *27 (citing *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (recognizing the "remedy of vacatur" under Section 706 of the APA); *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance.")).

Next, Defendants rely on the Supreme Court's decision in *CASA* in an attempt to equate vacatur of agency actions with universal injunctions, the latter of which the Court recently concluded were unlikely to be authorized by the Judiciary Act of 1789. ECF No. 84 at 39 (citing *CASA*, 606 U.S. at 831). But this reliance is misguided given that the Court explicitly stated in *CASA*: "Nothing we say today resolves the distinct

---

concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise).")). Defendants' claim is misleading, however, given that Justice Gorsuch himself purported only to "rais[e] questions" about the APA and concedes that the Supreme Court has yet to "address" those questions. *Id.* at 701-02 (Gorsuch, J. concurring).

question whether the Administrative Procedure Act authorizes federal courts to vacate agency action."  606 U.S. at 847 n.10.[19]

Finally, Defendants argue that "any equitable remedy applied in the nature of vacatur should apply only to the named parties."  ECF No. 84 at 39.  This argument, however, fundamentally misunderstands vacatur as a remedy.  "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court."  *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring).  "This vacation applies to the unlawful action itself, rather than merely to its application to the individual challengers."  *California*, 2025 WL 3072541, at *11 (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).  To use Chief Justice Roberts' words, providing party-specific relief under the APA would be "fairly radical and inconsistent with" the longstanding practices of federal courts.  *Ass'n of Am. Univs.*, 2025 WL

---

[19] Defendants again attempt to rely on Justice Gorsuch's concurrence in *United States v. Texas* in support of their position.  ECF No. 84 at 39 (citing *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring)).  The Court, again, points Defendants to Justice Gorsuch's own words: "Nor do I mean to equate vacatur of agency action with universal injunctions.  Despite some similarities, courts can at least arguably trace their authority to order vacatur to language in a statute and practice in some lower courts."  *Texas*, 599 U.S. at 701-02 (Gorsuch, J., concurring).

2899765, at *29 (quoting Transcript of Oral Argument at 35, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.)).

Accordingly, the Court agrees with the States. Because Defendants' actions were "arbitrary and capricious" and "contrary to law," the Court concludes that the proper remedy is to vacate those actions in their entirety.

### 2.    Permanent Injunction

The States also request that the Court enter a permanent injunction. ECF No. 75 at 42. The Supreme Court has recently cautioned federal courts to ensure that "injunctions are [no] broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. This Court bears that consideration in mind as it evaluates the States' request.

A district court will grant a permanent injunction if the plaintiff can show: (1) "actual success on the merits of its claims"; (2) that they "would be irreparably injured in the absence of injunctive relief"; (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction"; and (4) that "the public interest would not be adversely affected by an injunction."[20] *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025)

---

[20] The test for a permanent injunction and a preliminary injunction is essentially the same, "except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.'" *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990) (quoting *K-Mart Corp.*, 875 F.2d at 914-15). That the success-on-the-merits factor is the only difference means that, as with preliminary injunctions, the third and fourth injunction factors for a permanent injunction "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

(quoting *United States v. Mass. Water Res. Auth.*, 256 F.3d, 51 n.15 (1st Cir. 2001)). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

The Court determines that the States are entitled to further injunctive relief. First, the States have demonstrated actual success on the merits of their claims: Defendants' implementation of the *Reduction* EO violated the APA, the Take Care Clause, and the Separation of Powers doctrine. Second, as this Court concluded in its earlier decision, the States have demonstrated that they will be irreparably injured if Defendants are allowed to dismantle the at-issue federal agencies. [21] *See Rhode Island*, 781 F. Supp. 3d at 52-54. Defendants nevertheless contend that "all [the States'] claimed harms are economic, speculative, or affect third parties rather than the Plaintiffs seeking relief," and therefore do not satisfy the irreparable-injury requirement. ECF No. 84 at 35.

The Court finds Defendants' argument unavailing, as the record paints a markedly different picture. For instance, consider the public libraries in New Mexico,

---

[21] The States would also suffer irreparable harm if USICH were to be dismantled by the implementation of the *Reduction* EO. The States receive critical resources from USICH to help their unhoused constituents. ECF No. 75 at 51-55. These resources include but are not limited to: guidance to the States as they work to establish their respective Interagency Councils on Homelessness, inter-state connections that USICH facilitates to allow various stakeholders to share strategies for preventing and ending homelessness, research and recommendations provided by USICH experts to State and local entities to address homelessness in their communities, and direct support to unhoused individuals so that they may access federal programs available to them. *Id.*; ECF No. 92 at 27.

New Jersey, Maine, and Oregon that would have to close branches, implement hiring freezes, and/or cease providing services that aim to foster literacy and support learning among its patrons were IMLS to be dismantled. ECF No. 75 at 43-46; ECF No. 92 at 25-26. Or consider the State universities in Hawaiʻi, Maryland, and Arizona that would be forced to eliminate their student programming, default on their contracts, and/or terminate their employees absent continued funding from MBDA.[22] ECF No. 92 at 24-25. Next, consider the State entities in Rhode Island, Illinois, and Minnesota that face the very real prospect of work stoppage and negotiation impasses should their labor disputes go unresolved without the critical support of FMCS mediators. ECF No. 92 at 26-27. And finally, consider the loss that Michigan, New York, and Wisconsin would suffer without the research-based and community-specific expert assistance that each State's agencies have continuously relied on in their efforts to support unhoused individuals. ECF No. 75 at 53-55. All this to say: the

---

[22] To the extent that Defendants argue that this specific harm is economic and thus not irreparable, the Court notes that "some economic losses can be deemed irreparable." *Rhode Island*, 155 F.4th at 49 (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)). Indeed, the First Circuit has "recognized that harms to plaintiffs resulting from withheld grant funding – including 'the obligation of new debt; the inability to pay existing debt; impediments to planning, hiring, and operations; and disruptions to research projects by state universities' – may be 'irreparabl[e].'" *Id.* (quoting *New York*, 133 F.4th at 73).

    In addition, to the extent that Defendants rely on *Department of Education v. California* in support of their argument, it bears noting that the Supreme Court found irreparable harm unlikely where the plaintiffs had "represented … that they ha[d] the financial wherewithal to keep their programs running" even without federal funding. 604 U.S. at 652 (2025). Here, by contrast, several States assert that they do *not* have the "financial wherewithal to keep their programs running" absent continued funding from MBDA. ECF No. 92 at 24 (quoting *id.* at 652).

injuries alleged are to the States themselves and are far more than merely economic or speculative.

The final two factors concern the balance of the equities and the public interest. Defendants make the same arguments as before, asserting that an injunction would "effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities," and that they would be harmed were the Court to order the disbursement of funds that "may not be retrievable afterwards."   ECF No. 84 at 37; *see also Rhode Island*, 781. F. Supp. 3d at 54-55 (same).  To be sure, as the First Circuit and the Supreme Court have observed, there may be some harm to Defendants were they erroneously required to pay funds that could not later be recouped. *See Somerville Pub. Schs.*, 139 F.4th at 75; *California*, 604 U.S. at 651-52.

However, the Court is required to "balance the competing claims of injury and … consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Given the "plethora of injuries" that would arise if the Court did not grant injunctive relief, the balance of equities favors the States.   *Rhode Island*, 781. F. Supp. 3d at 54. Additionally, as this Court has determined, Defendants acted without constitutional or statutory authority in their implementation of the *Reduction* EO, and "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs.*, 139 F.4th at 76 (quoting *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  There is, however, a

46

"substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (*Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, the issuance of preliminary relief merely "orders compliance with governing statutes and the Constitution." *Widakuswara II*, 779 F. Supp. 3d at 39. The public-interest factor therefore also weighs in the States' favor.

Accordingly, the Court finds that a permanent injunction is warranted. Defendants are hereby permanently enjoined from taking any future actions to implement, give effect to, comply with, or carry out the directives contained in the *Reduction* EO with respect to IMLS, MBDA, FMCS, and USICH.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the States' Motion for Summary Judgment (ECF No. 75) and DENIES Defendants' Cross-Motion for Summary Judgment (ECF No. 84).

IT IS SO ORDERED.

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

November 21, 2025